**2024-1557**

# United States Court of Appeals for the Federal Circuit

BRUCE FLEMING,

*Petitioner,*

— v. —

DEPARTMENT OF THE NAVY,

*Respondent.*

*On Appeal from the Merit Systems Protection
Board in Case No. PH-0752-18-0457-I-1*

## BRIEF FOR PETITIONER

JASON EHRENBERG
EHRENBERG LEGAL
  & HIGHER ED SOLUTIONS PLLC
5335 Wisconsin Avenue NW,
  Suite 440
Washington, DC 20015
(202) 617-2590
jason@ehrenberglegal.com

*Counsel for Petitioner*

JUNE 10, 2024



# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2024-1557

**Short Case Caption** Flemming v. Navy

**Filing Party/Entity** Appellant Bruce Fleming

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 03/23/2024

Signature: //s// Jason H. Ehrenberg

Name: Jason H. Ehrenberg

**FORM 9. Certificate of Interest**

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Bruce Fleming | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable            ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐    Yes (file separate notice; see below)    ☑    No    ☐    N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable            ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# Table of Contents

**Page**

Table of Authorities ............................................................................. ii

Statement of Related Cases ...................................................................1

Jurisdictional Statement ........................................................................1

Statement of the Issues ..........................................................................1

Statement of the Case and Facts ...........................................................2

Summary of Argument ........................................................................10

Standard of Review ..............................................................................12

Argument ..............................................................................................13

I.     The AJ did not err by considering performance and context as
       factors in determining misconduct .......................................14

II.    The Board Did Not Afford Appropriate Deference to the AJ's
       Credibility Determinations as to MD and RJ .......................17

       A.    The AJ Correctly Concluded that MD  and RJ were not
             Credible ........................................................................17

       B.    The Board Failed to Afford Significant Deference to
             the AJ's Credibility Determinations ............................20

III.   There was Insufficient Evidence to Support the Agency's
       Removal Action ......................................................................24

       a.    Specification 1 ..............................................................25

       b.    Specification 2 ..............................................................26

       c.    Specification 3 ..............................................................29

       d.    Specification 4 ..............................................................31

       e.    Specification 5 ..............................................................33

       f.    Specification 6 ..............................................................35

       g.    Specification 7 ..............................................................36

IV.    The Board's *Douglas* and Bias Analyses Were Erroneous ...............37

Conclusion and Relief Sought ..............................................................41

# Table of Authorities

**Page(s)**

**Cases:**

*Anderson v. Dep't of Justice,*
  62 M.S.P.R. 611 (June 1, 1994)...........................................................................20

*Bolton v. Merit Sys. Prot. Bd.,*
  154 F.3d 1313 (Fed. Cir. 1998) ........................................................................13

*Boo v. Dep't of Homeland Security,*
  2014 M.S.P.B. 86 (Dec 3, 2014)........................................................................38

*Booker v. Department of Veterans Affairs,*
  110 M.S.P.R. 72 (2008) .............................................................................. 24, 33

*Briggs v. Merit Sys. Prot. Bd.,*
  331 F.3d 1307 (Fed. Cir. 2003) ........................................................................12

*Douglas v. Veterans Administration,*
  5 M.S.P.R. 280 (1981) ......................................................................... 2, 37, 38

*Haebe v. Department of Justice,*
  288 F.3d 1288 (Fed. Cir. 2002) ........................................................................20

*Hawes v. Office of Personnel Management,*
  2015 M.S.P.R. 29 (April 2, 2015)......................................................................20

*Hillen v. Department of the Army,*
  35 M.S.P.R. 453 (1987) .............................................................................. 21, 22

*Jackson v. Veterans Administration,*
  768 F.2d 1325 (Fed. Cir. 1985) ................................................................... 20-21

*King v. Nazelrod,*
  43 F.3d 663 (Fed. Cir. 1994) ...........................................................................24

*Rodriguez v. Dep't of Homeland Security,*
  2008 M.S.P.R. 25 (January 31, 2008)................................................................20

*Weaver v. Department of the Navy,*
  2 M.S.P.R. 129 (1980),
  *review denied,* 669 F.2d 613 (9th Cir. 1982)......................................................20

**Statutes & Other Authorities:**

5 U.S.C. § 7703(a)(1) ............................................................................1

5 U.S.C. § 7703(b)(1)(A) ....................................................................1, 8

5 U.S.C. § 7703(c) ...............................................................................12

5 U.S.C. §§ 7511-7514 ...........................................................................1

5 C.F.R. § 752 ........................................................................................1

5 C.F.R. § 1201.3(a)(1) ...........................................................................1

5 C.F.R. § 1201.115 ........................................................................ 12, 13

"Loyal Opposition Isn't Disloyal" (September 2001) *Proceedings – U.S.
Naval Institute*, https://www.usni.org/
search?search_api_fulltext=fleming&sort_by=search_api_relevance&sort
_order=ASC&f%5B0%5D=usni_author%3ABruce%20Fleming (last
accessed 6/8/2024) .................................................................................4

"Nobody Asked Me, But The Academy Can Do Better" (February 2005)
*Proceedings – U.S. Naval Institute*, https://www.usni.org/
search?search_api_fulltext=fleming&sort_by=search_api_relevance&sort
_order=ASC&f%5B0%5D=usni_author%3ABruce%20Fleming (last
accessed 6/8/2024) .................................................................................4

2009 CNN News Report,
https://www.youtube.com/watch?v=eQ2PvSamP0s ...............................4

Appellant article, 2011, https://thefederalist.com/2017/10/16/not-just-west-
point-u-s-military-academies-become-disneyland-politicians/ ...............5

William Reukauf statement, OSC press release,
https://www.cbsnews.com/baltimore/news/naval-academy-settles-with-
critical-professor/ ..................................................................................5

Appellant article in the *Federalist*, October 2017,
https://thefederalist.com/2017/10/16/not-just-west-point-u-s-military-
academies-become-disneyland-politicians/ ........................................ 5-6

https://www.routledge.com/Masculinity-from-the-Inside-Gender-Theorys-
Missing-Piece/Fleming/p/book/9781032191478 ...................................9

https://www.nytimes.com/2019/12/06/us/politics/trump-transgender-
rights.html ..............................................................................................9

https://www.washingtonpost.com/world/national-security/trump-
announces-that-he-will-ban-transgender-people-from-serving-in-the-
military/2017/07/26/6415371e-723a-11e7-803f-
a6c989606ac7_story.html ........................................................................9

*U.S. News* Best Colleges is National Liberal Arts Colleges,
2024 edition, https://www.usnews.com/best-colleges/united-states-
naval-academy-2101 .................................................................................2

https://www.aaup.org/about-aaup ...........................................................7

## Statement of Related Cases

There is no other appeal in or from the same proceedings in the originating tribunal that was previously before this or any appellate court. Counsel is unaware of any case pending in this or any other tribunal that will directly affect or be directly affected by this Court's decision in the pending case.

## Jurisdictional Statement

The Board had jurisdiction over Appellant's appeal of the Agency's decision to remove Appellant from his federal employment under 5 U.S.C. §§ 7511-7514; 5 C.F.R. Part 752; 5 C.F.R. § 1201.3(a)(1). This Court has jurisdiction over Appellant's petition for review of the Board's Final Order overturning the Administrative Judge's ("Administrative Judge" or "AJ") decision in Appellant's favor under 5 U.S.C. § 7703(a)(1). This petition for review is timely pursuant to 5 U.S.C. § 7703(b)(1)(A), as it was filed and received by this Court on March 8, 2024, within 60 days of the Board's January 26, 2024 Final Order. This petition for review is from a final order or judgment that disposed of all parties' claims.

## Statement of the Issues

Whether MSPB's decision was arbitrary and capricious, an abuse of discretion or otherwise not in accordance with law because:

(1) the Board's decision did not afford sufficient deference and did not provide sufficiently sound reasons for its rejection of the Administrative Judge's demeanor-based credibility determinations;

(2) the Board's decision finding conduct unbecoming a federal employee is not supported by substantial evidence;

(3) the Board did not adequately consider the *Douglas* factors and the bias of the deciding Agency official when assessing whether the penalty of removal was reasonable.

### Statement of the Case and Facts

Appellant worked as a professor of English at the United States Naval Academy (the "Academy" or "Agency") for approximately thirty-one years, from August 1987 until August 2018, when the Agency unceremoniously terminated his employment. [*See* Appx25.] The Appellant was a rather unique professor at the Academy.[1]  He was irreverent, theatrical, fashion-conscious, outspoken in his criticism of the Academy (both in the classroom and his writings), and liberally sprinkled his classes with profanity and discussions of sexually related topics (from

---

[1] United States Naval Academy is a public collegiate institution that was founded in 1845. It has a total undergraduate enrollment of 4,450 (fall 2022), its setting is city, and the campus size is 338 acres. It utilizes a semester-based academic calendar. The Academy's ranking in the 2024 edition of *U.S. News* Best Colleges is National Liberal Arts Colleges, #3. [*See* https://www.usnews.com/best-colleges/united-states-naval-academy-2101 (last accessed 6/8/24).

condom use to transgender issues). [*See* Appx31.] The Appellant was also a "work-out fiend," and in good enough shape to regularly exercise with the well-conditioned midshipmen at the gyms and swimming pools on campus (where typical attire is swim trunks and other workout gear). [*Id.*]

The overwhelming majority of Appellant's students enjoyed the Appellant and his unique teaching style. Indeed, photographs were frequently taken in class, and they reflect a "loose" atmosphere – with the appellant dressed in costume (pirate), students trying on the appellant's designer sport coat or cowboy hat (with arms around each other's shoulders), carrying classmates around, and flexing their biceps en masse. [See Appx32; Appx716-717; Appx720-724; Appx751-758; Appx760-765.] Indeed, one of the Agency's witnesses at hearing, Professor Keith Lindler (a faculty member in the Mechanical Engineering Department), stated the Appellant was a great classroom teacher. The deciding Agency Official, Dean Andrew Phillips conceded that Appellant could be a remarkably effective teacher, and Professor Anne Marie Drew (a 30+ year faculty member at the Academy who has served on various academic committees at the Academy) testified that she had reviewed over a thousand of Appellant's student evaluations during her time at the Academy and that over ninety percent (90%) were positive – an unheard-of success rate. [*See* App31].

Although Appellant was a valued member of the Academy's faculty and widely recognized as a committed teacher, the Academy's leadership started to target Appellant for harassment approximately halfway into his tenure, in retaliation for his publication of articles that questioned the costs and benefits of some of the Academy's policies and practices. *See, e.g.*, "Loyal Opposition Isn't Disloyal" (September 2001) and "Nobody Asked Me, But The Academy Can Do Better" (February 2005) published in *Proceedings – U.S. Naval Institute*. [these articles may be accessed at the following Internet address - https://www.usni.org/search?search_api_fulltext=fleming&sort_by=search_api_rel evance&sort _order=ASC&f%5B0%5D=usni_author%3ABruce%20Fleming (last accessed 6/8/2024)].

In approximately 2008, Appellant published an article in the periodical *Proceedings - U.S. Naval Institute* that was critical of the Academy's admission standards. The Superintendent of the Academy at the time, Superintendent Rempt, stated in a two-page letter response to the magazine that "he would have expected better judgment" from Appellant and that for a faculty member to publish an article critical of Naval Academy admissions practices was "not professional." Although Superintendent Rempt publicly stated that he wanted to terminate Appellant at that time, no action was taken. [*See* 2009 CNN News Report https://www.youtube.com/watch?v=eQ2PvSamP0s (last accessed on 6/8/24).]

In 2011, Appellant published an article critical of certain Academy policies in another national periodical. *See* https://thefederalist.com/2017/10/16/not-just-west-point-u-s-military-academies-become-disneyland-politicians/ (last accessed 6/8/2024). The Agency did act at this time and retaliated against Appellant by denying him a merit pay increase (a prohibited personnel practice). This action was taken by Dean Andrew Phillips – **the same deciding official who ultimately terminated Appellant's employment in this matter**. Appellant filed a complaint with the Office of Special Counsel ("OSC"). OSC investigated Appellant's complaint and found evidence indicating that the Academy illegally denied Appellant a merit pay increase because of his public disclosures. OSC also determined that the Agency had provided Appellant with a written warning stating that he would be subject to disciplinary action were he to make further "inappropriate" public disclosures. OSC's Associate Special Counsel at the time, William Reukauf stated in an OSC press release (announcing the settlement of Appellant's OSC complaint) that "no federal employee should fear that he will be penalized on the job for expressing an opinion on controversial matters of public concern." [*See* https://www.cbsnews.com/baltimore/news/naval-academy-settles-with-critical-professor/ (last accessed on 6/8/24).]

In October 2017, Appellant published an article in the *Federalist* that discussed the role and relevance of the modern service academies (including the

Academy).   [*See*   https://thefederalist.com/2017/10/16/not-just-west-point-u-s-military-academies-become-disneyland-politicians/ (last accessed 6/8/2024).] The Superintendent of the Academy and the Agency's deciding official, Dean Andrew Phillips were aware of, and repeatedly emailed about Appellant's article. [*See* Appx777-804.]

On January 19, 2018, one midshipman ("MD") in one of Appellant's freshman (or "plebe") English classes filed a complaint against Appellant, followed later by four shorter complaints from other midshipmen made after prompting from MD. [*See* Appx25-26] The Academy retaliated against Appellant for his previous public disclosures and writings on the Academy immediately thereafter  by: (1) pulling Appellant from the classroom and suspending him; (2) ordering Appellant not to communicate with any midshipmen, and (3) commencing an investigation into Appellant. [*See* Appx25-26.] The Academy pulled Appellant from the classroom even though no immediate harm to the faculty members or others (i.e., students) was threatened by the Appellant's continued presence in the classroom. [*See* Appx734-35.] This was in violation of relevant policies of the American Association of University Professors ("AAUP") – which the Academy has adopted and purports to follow – and of the Academy's own policies and procedures. [*See* Appx734-35;

Appx768-770; Appx72-75.][2] Significantly, the Agency affirms in its Faculty Handbook and relevant policies that it subscribes to the American Association of University Professors 1940 Principles on Academic Freedom with 1970 Interpretive Comments. [Appx848].

The Agency terminated Appellant based on one charge of "Conduct Unbecoming a Federal Employee." This charge had seven specifications included as a narrative of the alleged misconduct:

> (1) referring to students as "right-wing extremists," and or words to that effect, (2) classroom comments/discussion regarding anal sex, oral sex, and transgender surgery, (3) emailing partially clothed pictures of yourself to students after having been counseled that doing so was inappropriate and your agreement not to do so in the future, (4) touching students without their approval, (5) referring to your own sexual experiences, (6) repeatedly mispronouncing an Asian-American student's name despite being corrected several times by the student, and (7) making demeaning sexually-related comments about a young woman attending a dance with your son and similar offensive comments

---

[2] The AAUP is a nonprofit membership association of faculty and other academic professionals. Headquartered in Washington, DC, The AAUP has members and chapters based at colleges and universities across the country. Since its founding in 1915, the AAUP has helped to shape American higher education by developing the standards and procedures that maintain quality in education and academic freedom in this country's colleges and universities. The AAUP defines fundamental professional values and standards for higher education, advance the rights of academics, particularly as those rights pertain to academic freedom and shared governance, and promote the interests of higher education teaching and research. [*See* https://www.aaup.org/about-aaup (last accessed 6/8/24).]

about the young woman's mother.

[*See* Appx27].

Appellant challenged the decision removing him, and the AJ held a hearing in which he heard from nine witnesses. [*See* Appx28.] After the hearing, the AJ issued his decision reversing the Agency's action of removal. In short, the AJ found that the Agency had not met its burden to prove that Professor Fleming perpetrated conduct unbecoming a federal employee and, specifically, found that **the Agency failed to establish all seven specifications**. [*See generally* Appx25-Appx43.] As to the specifications, generally speaking, the Agency failed to show that the alleged actions constituted misconduct, **especially in context of the situations in which they occurred**. [*See id.*]

The Agency petitioned for review of the Administrative Judge's initial decision to the Merit Systems Protection Board. The Board granted the Agency's petition for review and reversed the Administrative judge's initial order in its entirety. [*See* Appx1-Appx24.] As noted below, the Board's decision is erroneous and an abuse of discretion for several reasons. The Board essentially found that Appellant had acted **"unprofessionally"** in the classroom during the fall 2017 semester. The Board erroneously found, among other things, that Appellant's discussion of transgender issues in the classroom was unprofessional and *bordered on sexual harassment*, even though Appellant has extensively researched and

published on the issues of trans-gender issues, sexual ethics and gender studies from the perspective of a straight male. [*See* Appx726-Appx732 (article discussing the vocabulary of transgender theory); *see also* https://www.routledge.com/Masculinity-from-the-Inside-Gender-Theorys-Missing-Piece/Fleming/p/book/9781032191478 (last checked 6/8/2024).] Moreover, the discussion of transgender issues was very germane to and appropriate for classroom discussion, as evidenced by the fact the issues were being widely discussed in the media, the military, and the Academy, as a result of President Trump's recent changes to the military's treatment of such issues. [*See* https://www.nytimes.com/2019/12/06/us/politics/trump-transgender-rights.html (last accessed on 6/8/2024) and https://www.washingtonpost.com/world/national-security/trump-announces-that-he-will-ban-transgender-people-from-serving-in-the-military/2017/07/26/6415371e-723a-11e7-803f-a6c989606ac7_story.html (last accessed on 6/8/2024)].

In any event, as noted above, the Appellant's classroom performance and writings clearly have created long-standing tension with the Academy's more traditional hierarchy. [*See* Appendix31.] In addition, this case suggests a potential tension between the concepts of tenure and academic freedom – concepts the Academy states it respects – with the basic process of disciplining a federal employee under Title V and the relevant regulations. [*Id*.] The Appellant is both a

professor at an institution of higher learning and a civilian federal employee at the Academy. [*See* Appendix810-812.] Thus, he is entitled to academic freedom, including a fair amount of leeway with regard to his teaching pedagogy. The Board ignored the fact that Appellant was a college professor entitled to the protections of academic freedom and tenure.

## Summary of Argument

The Board committed an abuse of discretion in overturning the AJ's decision because the AJ neither erred in his decision to reverse the Agency's removal of Appellant nor in finding insufficient evidence to sustain each of the seven specifications of the charge of conduct unbecoming a federal employee. The AJ found that the Agency ultimately failed to carry its burden of proof regarding the charge for a host of reasons. [*See* Appx32.]

The Board flatly rejected the Administrative Judge's finding that the Agency's primary witness had **severe credibility issues**. [*See id.* (emphasis added).] The Board ignored the Administrative Judge's finding that the witnesses' testimony was "greatly exaggerated" – **to the point of being hard to credit**. [*See id.*] According to the AJ, this witnesses' "limited" credibility was "critical" because, as the Agency's Deciding Official conceded, in the absence of the primary witnesses' complaint (and it being believed), "we would not be here." [*See* Appx32-33.]

In addition, the Board disregarded the Administrative Judge finding that the purported "victims" of the Appellant's actions, the students in Appellant's freshman English classes, did not generally take offense or have any actual issue with the Appellant. [*Id.*] Moreover, much of the charged conduct, as noted by the investigating panel, did not appear to be actual misconduct in the context of free-wheeling classroom discussions. [*Id.*] Further, the AJ noted that the panel members taught in subject areas where class discussions were unlikely to include profanity or sexual discussions –mechanical engineering and chemistry. [*Id.*]. **Yet, they readily recognized that profanity and the discussion of sexual topics could be completely appropriate in the appellant's class.** Moreover, the one English professor who testified at hearing noted that profanity and sexual discussions were not uncommon when discussing literature in a collegiate classroom (which frequently contains these matters). [*Id.*] The Administrative Judge also found that a lack of notice was also a significant issue regarding certain specifications, as the Appellant had taught in his same distinctive manner for decades. [*Id.*] The Board abused its discretion in not considering this context.

Essentially, the Board disagreed with **every** factual finding and conclusion the AJ reached on the basis that the AJ erred by considering the context in which the alleged conduct arose, a college classroom. However, for the Board to overturn the Administrative Judge's decision, the Board was required to prove not only that the

conduct occurred, but also that the conduct was itself misconduct. And. whether the alleged conduct constituted misconduct necessarily depends on the context of the relevant situations, and thus the AJ did not err in not sustaining the charge or any of the specifications. Moreover, the AJ is entitled to deference by the Board for his factual findings, which include findings of whether the alleged conduct was inappropriate in context of the situation. See 5 C.F.R. § 1201.115.

In sum, the Agency failed to overcome its burden of proving the charge of conduct unbecoming a federal employee because even where the actions were proven by a preponderance of the evidence, the Administrative Judge correctly determined that the conduct did not constitute misconduct in the context of a collegiate classroom. The Board, therefore, should have affirmed the AJ's decision reversing the Agency action to terminate and remove Appellant from the federal service as a college professor.

## Standard of Review

This Court's scope of review for Board decisions is limited by statute. This Court should affirm the Board's decision unless it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c); *Briggs v. Merit Sys. Prot. Bd.*, 331 F.3d 1307, 1311 (Fed. Cir. 2003). Factual findings underlying the Board's

jurisdictional determination are reviewed for substantial evidence. *See Bolton v. Merit Sys. Prot. Bd.*, 154 F.3d 1313, 1316 (Fed. Cir. 1998).

## Argument

The Board's decision must be overturned because the AJ neither erred in his decision to reverse the Agency's removal of Appellant nor in finding insufficient evidence to sustain each of the seven specifications of the charge of conduct unbecoming a federal employee. Essentially, the Board overturned the AJ's decision on the basis that the AJ erred by considering the context of Appellant's alleged actions as part of its analysis as whether they constituted misconduct. However, even the Agency recognized that to have the AJ uphold the removal action, the Agency was required to prove not only that the conduct occurred, but also that the conduct was itself misconduct. Whether the alleged conduct constituted misconduct necessarily depends on the context of the relevant situations, and thus the AJ did not err in not sustaining the charge or any of the specifications.

Moreover, the Board finds fault with the AJ's rulings, but the AJ is entitled to deference by the Board for his factual findings, which include findings of whether the alleged conduct was inappropriate in context of the situation. *See* 5 C.F.R. § 1201.115.

In sum, the Agency failed to overcome its burden of proving the charge

of conduct unbecoming a federal employee because even where the actions were proven by a preponderance of the evidence, the AJ correctly determined that the conduct did not constitute misconduct. The Board must, therefore, have affirmed the AJ's decision reversing the Agency's decision to terminate Appellant's employment and end his academic and teaching career.

## I.    The AJ did not err by considering performance and context as factors in determining misconduct.

The AJ's consideration of Appellant's positive performance reviews was not in error because such reviews provide context to how Appellant's demeanor overwhelmingly contributes positively to his classroom and the midshipmen. The AJ appropriately considered how evidence, such as overwhelmingly positive performance evaluations by students, contributes to an understanding of the overall circumstances necessary to determine whether Appellant's conduct at issue was, in fact, misconduct or unprofessional.

A review of the AJ's opinion reveals not that the AJ considered positive performance as a factor in determining misconduct, but, rather, appropriately acknowledged that the positive reviews provided evidence that Appellant's overall demeanor and irreverent style had, over almost thirty years, generally contributed positively to his students.

For instance, the AJ noted that Appellant taught his college students in an "irreverent, theatrical . . . [and] outspoken" nature, and taught with a "loose

14

atmosphere." [*See* Appx31.] The AJ went on to note that the positive reviews contributed to evidence that "the overwhelming majority of his students enjoyed the appellant and his teaching style." [*Id.*]

At issue ultimately was the conduct subject to the complaint of one main midshipman, MD, thus evidence that the overwhelming majority of students felt the opposite reaction to MD shows that the problem more likely stemmed from MD's subjective discomfort and not objectively inappropriate behavior. Thus, in determining the context of Appellant's actions and style, it was relevant to consider positive reviews. In this light, the AJ properly considered Appellant's overwhelmingly positive reviews and that the vast majority of students appreciated Professor Fleming's style. [*See e.g.,* Appx949 (most students enjoyed Professor Fleming's energetic teaching style); Appx963-Appx964 (most students enjoyed Professor Fleming's 'life lessons'), Appx1099 (Ninety percent of Professor Fleming's students enjoyed his class and teaching style. Students "say this class is interesting. He cares about us. He makes us think.") The Board clearly did not give any consideration to Appellant's stellar performance.

The AJ, however, properly noted these overwhelmingly positive evaluations as part of his evaluation of whether the conduct alleged by the Agency was in fact *misconduct*. Many of the actions the Agency argues were

unprofessional were topics discussed in Appellant's English classes, which was not considered by the decision-makers, none of whom would generally discuss similar topics in classes that they might teach, thus not necessarily understanding the context of Appellant's English classroom. [*See e.g.* Appx905 (Captain Chadwick admits that he never observed how Appellant's teaching style fit into the context of his class), Appx942 (Linder teaches in Mechanical Engineering, for which classroom discussion are in a different context than in an English classroom), Appx956 (no committee members observed Appellant in his classroom context), Appx1040 (Dean Phillips teaches cyber operations, in which discussions would be much different than the context of an English classroom).

Moreover, the AJ noted that Appellant positively interacted with his students (dressed in costume, students trying on Appellant's designer sport coat or cowboy hat, and flexing their biceps in masse). [*See* Appx31.] Thus, examining how students generally perceive that style, through the positive performance reviews, is relevant to whether Appellant's teaching style was unprofessional or otherwise misconduct. Again, the Board clearly did not give any consideration to this issue or analysis.

In this way, considering the overwhelmingly positive reviews that Appellant received was not an analysis of Professor Fleming's performance,

but rather, was the AJ appropriately putting the relevant acts in question into context. The fact that most of Professor Fleming's students found his teaching style effective and entertaining cuts against the Agency's arguments that he committed misconduct. Rather it supports the AJ's view that the discomfort of one or a few students does not establish that Professor Fleming committed misconduct in the classroom.

## II.    The Board Did Not Afford Appropriate Deference to the AJ's Credibility Determinations as to MD and RJ

### A. The AJ Correctly Concluded that MD  and RJ were not Credible

The number and substance of the complaints against Professor Fleming provide relevant context to the issue of whether Appellant's actions were misconduct, and the AJ did not err in noting the number of complaints as a factor in evaluating that context.

The Administrative Judge noted that while the overwhelming majority of students approved of Appellant's classroom demeanor, "an unheard-of success rate," a "small group of students – one in particular – disapproved of the appellant's classroom performance." [*See* Appx31.] **The AJ furthermore noted his finding that "it also appears that the Agency's primary witness, MD, asked/cajoled/encouraged the other complaining midshipmen to file complaints**. As previously noted, their complaints were short (often less than a page) and some included the disclaimer that they were not personally

offended by the appellant's actions." [*See* Appx34-35].

A few examples of MD's questionable assertions are instructive.  In his statement and testimony, MD stated a "plethora" of people were "suffering" or "crying," but on cross he conceded that it was really only one person. MD also conceded at hearing that his reference to repeated "attacks" by the Appellant all referred to one email (discussed below).  Further, MD stated that the "obscene, X-rated, and sexually explicit" comments were the Appellant's discussions of such things as condom use, transgender surgery, and his expressed opinion that sexual matters should be discussed openly. [*See* Appx33.]

Indeed, MD stated that he "agonized" over whether the photo constituted sexual assault or sexual harassment. According to the AJ, "[t[he former is nonsense while the latter is merely a long stretch."  The AJ noted that taking photos was common in the Appellant's class, and the record included photos of the entire class (including MD) flexing their biceps – "flex" being a writing concept the Appellant encouraged. [*See* Appx33-Appx34]  In this context, the Administrative Judge found MD's purported reaction appeared feigned.

At bottom, MD having the Appellant as his instructor in his first semester of college was something of the perfect storm.  An eighteen-year-old from a conservative, religious family, who had only attended religious schools and only experienced academic success versus the profane, irreverent, brutally critical (read

18

admitted very tough grader) and highly theatrical Appellant had conflict written all over it. MD testified, *with some indignation*, that the Appellant gave him his first "C" of his academic life, and he had noted in his statement that grading was where the Appellant "asserted dominance" over plebes. [*See* Appx34.] That high grades might not come as easily in college as they did in high school, particularly in a hyper-competitive collegiate environment like the Academy, did not seem to occur to him. MD was on notice that Appellant's class was "intense" and difficult – Appellant's course syllabus clearly noted that the course was "intense" and that Appellant's approach to grading was "hard-line." [*See* Appx741-Appx749.]  MD also conceded that a low grade could impact upon his future posting. In sum, MD gave the impression his complaint was motivated more by animus for his grade than any sort of genuine concern about the Appellant's teaching style.

The Board also improperly set aside the AJ's credibility determination with regard to RJ. The AJ found that RJ's testimony, while generally consistent with his complaint, was not consistent with his statements in the panel's questionnaire. [*See* Appx38.] Indeed, his comments to the questionnaire suggest that he was not positive the mispronunciations were deliberate and did not mention the (fairly significant) "fuck off" comment he raised for the first time before the panel.  [See Appx38.] Moreover, the lack of corroboration from the rest of the class is particularly telling given the panel used a fairly specific question – essentially does the Appellant ever

mispronounce names, particularly Asian names?   If the incidents had occurred as charged, one would think that question would jog the students' memories. [*See* Appx38.] Thus, the AJ determined that RJ was not a credible witness and rejected the specification.

## B. The Board Failed to Afford Significant Deference to the AJ's Credibility Determinations

The Agency bore the burden at the MSPB level of showing that the AJ somehow erred in his credibility analysis. *See Hawes v. Office of Personnel Management*, 2015 M.S.P.R. 29 (April 2, 2015), citing *Haebe v. Department of Justice*, 288 F.3d 1288, 1302 (Fed. Cir. 2002). Where the Agency fails to meet that burden, or where the objecting party (here the Agency) is merely disagreeing with the credibility determinations, no full review of the record is warranted by the Board. *Anderson v. Dep't of Justice*, 62 M.S.P.R. 611 (June 1, 1994), citing *Weaver v. Department of* the *Navy,* 2 M.S.P.R. 129, 133-34 (1980), *review denied,* 669 F.2d 613 (9th Cir. 1982) (per curium); *see also Rodriguez v. Dep't of Homeland Security*, 2008 M.S.P.R. 25 (January 31, 2008) (finding no error in the AJ's decision that a witness lacked credibility where the witness evidenced potential bias against the agency for removing him in the past, as such, the objecting party was expressing mere disagreement with the finding and no further review was warranted). The Agency clearly failed to meet its burden here and the Board therefore erred in even addressing the credibility issue. *See Jackson v. Veterans Administration*, 768 F.2d

1325, 1331 (Fed. Cir. 1985) (special deference must be given to the administrative judge's findings regarding credibility where those findings are based on the demeanor of witnesses).

More significantly, the AJ's credibility determinations were entitled to significant deference, and the Board also erred by rejecting them without sufficient explanation. The Board has held that a credibility determination made after an in-person hearing is at least implicitly based on witness demeanor. [*See* Appx13.] Such demeanor-based credibility determinations are entitled to deference and may only be overturned when the Board has "sufficiently sound" reasons for doing so. [*See* Appx13-14.] Here, the Board failed to articulate sufficiently sound reasons for its conclusion that the AJ's credibility determinations were erroneous.

The Board also erred in not properly applying the *Hillen* factors and erred in overturning the AJ's finding that MD, the main complaining midshipman, lacked credibility. [*See* Appx32-35.] To resolve credibility issues, an administrative judge must identify the factual questions in dispute, summarize the evidence on each disputed question, state which version he believes, and explain in detail why he found

the chosen version more credible. *Hillen v. Department of the Army,* 35 M.S.P.R. 453, 458 (1987).[3]

The first step for the AJ in the *Hillen* analysis was to determine factual questions in dispute – the key factual question in dispute was whether Appellant's conduct, as set out in the relevant specifications, was inappropriate, not merely whether specific actions occurred. Thus, while MD testified that the actions described in the specifications occurred, his testimony with regard to misconduct was in dispute and not fully corroborated. As such, a *Hillen* analysis was proper.

The AJ's determination that MD lacked credibility is supported by several factors relevant to the *Hillen* analysis. The AJ found that MD lacked credibility due to his "testimony, like his written complaint, [being] greatly exaggerated." [*See* Appx32; *see also* Appx987-988 (MD admitting that he does not actually know if there is support for his allegation that Professor Fleming 'attacked' other students).] MD also evidenced bias because Appelant was seemingly the

_____

[3] Numerous factors must be considered in making and explaining a credibility determination. These include: (1) The witness's opportunity and capacity to observe the event or act in question; (2) the witness's character; (3) any prior inconsistent statement by the witness; (4) a witness's bias, or lack of bias; (5) the contradiction of the witness's version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness's version of events; and (7) the witness's demeanor. [*Hillen*, 35 M.S.P.R. at 458.]

first professor to give MD a 'C' grade. [*See* Appx973 ("And I definitely did not deserve the grade I got on that assignment"). The AJ also noted several other factors negatively affecting MD's credibility, such as exaggerating the number of 'suffering students' and 'agonizing' over whether a photo he received from Professor Fleming constituted 'sexual assault or sexual harassment,' which the AJ having viewed the photo noted was "nonsense" and "a long stretch." [*See* Appx34.]

As to sending photos of himself, other than MD, no one who received the photos appeared particularly offended by them.  Indeed, the comparative bodybuilder photos (the young Appellant in posing trunks and the current appellant posing shirtless) had been prompted by a student's question as to how the Appellant physically compared to himself twenty-years ago.  [See AF, Tab 29 at 76-78.]   Notably, the student who received the photo, while providing it to the panel as requested, was not a complaining witness. As to MD, he admitted to sending a photo of a man jogging in a speedo to the Appellant. [*See* Appx37; Appx718.] MD attempted to back-pedal by saying the Appellant asked for a copy, but, even if true, the Appellant would not have known to ask if MD had not mentioned that he had taken such a photo. [*See* Appx37.] Thus, MD's purported "offense" at a shirtless photo is hard to believe.

### III.    There was Insufficient Evidence to Support the Agency's Removal Action

To satisfy its burden the Agency needed to prove not only that Appellant committed the acts specified in his charge of conduct unbecoming, but also that the acts themselves were improper, unsuitable, or otherwise detracted from his character or reputation. And where, as here, the Agency chooses to use a label for conduct, that label must be proven. This Court has held that an agency must prove every element of a charge, including intent if that is an element. [*See, e.g.*, *King v. Nazelrod*, 43 F.3d 663, 666-67 (Fed. Cir. 1994).]  And, proving elements can become particularly complex if the agency uses a label that has a specific meaning in a statute of is defined in more than one place. Take, for example, the label of "sexual harassment." Such harassment can be defined by Agency policy, as well as by statute and either or both of those definitions may vary from what a person drafting or reading the charges may think of as "sexual harassment." This can result in a situation where an agency that uses the term "sexual harassment" in a charge may be required to prove that the conduct meets a formal definition, regarding of whether that was the drafting official's intent. [*See Booker v. Department of Veterans Affairs*, 110 M.S.P.R. 72, ¶ 5 (2008)].

Yet despite acknowledging that the Agency must show that the acts, as labeled, were in fact misconduct, the Board instead attempted to isolate each

act in a vacuum and attack the AJ's decision for considering context.

Because context is necessary, the AJ did not err in his analysis. Moreover, the Board's attempts to strip away the context around Appellant's conduct makes plain its inability to prove that the conduct was inappropriate, unsuitable, or otherwise misconduct warranting disciplinary action.

    a.  <u>Specification 1</u>

The Agency failed to meet its burden of showing that Appellant's alleged conduct, using the term "right-wing extremists" in an email to students regarding their writing assignments, was inappropriate or otherwise misconduct. At issue for this Specification is an email sent by Appellant to MD and one other student. S*ee* AF, Tab 8 at 135. The email began with the phrase 'right-wing extremists,' but the message of the overall email is clear that Appellant, a college professor, was attempting to instruct the students on better ways to support written arguments and had made the reference about right-wing extremists' as a tongue-in-cheek statement because the students were taking stereotypically conservative opinions on tax reform. [*See* Appx973 (MD acknowledges that the email was sent as part of Appellant's critique of MD and the other student's writing assignment).]

The AJ, thus, rightly viewed the reference to 'right-wing extremists' in its context, noting that Appellant would say the same thing to a liberal position.

[*See* Appx35.] "[T]he obvious thesis of the email was that the students had erred in failing to justify their positions." [*Id.*] Even MD acknowledged that Appellant had sent the email as part of his effort to instruct MD that he needed to provide more defense of his written position, as a way to improve his writing. [*See* Appx973.] Thus, when viewed in context of the situation, the Agency was unable to show that the mere use of the phrase was misconduct.

The AJ appropriately viewed the full context of the expression and its relation to the students' work assignment. The AJ importantly notes his factual conclusion that the term was "tongue in cheek" "to the real message – provide supporting arguments for your positions – which is a completely appropriate criticism for a student paper." [*See* Appx35]. In light of the full message, rather than noting only the term "right-wing extremists" in a vacuum, the AJ found no inappropriate behavior, whether political discrimination or otherwise. The Board's contrary decision was not supported by substantial evidence and therefore was erroneous.

    b.  <u>Specification 2</u>

The Agency failed to meet its burden of showing that discussion of anal sex, oral sex, and transgender surgery in Appellant's English class was misconduct, and the AJ did not err by considering the relevant context of such discussions. Thus, the Board's argument that the AJ erred by reviewing

whether the discussions were relevant to class topics, whether any policy prohibited discussion of those topics, and lack of notice is erroneous because those considerations were appropriately part of the AJ's consideration of the context of the discussions at issue.

While Professor Fleming does not dispute that such topics of conversation occurred in his classroom, the Agency failed to account for the fact that such topics have possible relevance and propriety in the scope of an English classroom. The AJ noted that Dean Phillips, the ultimate decision maker, "did not take into account that assigned readings involved sexual topics that warranted class discussions." [*See* Appx36.] "Phillips was also unaware that the appellant wrote on transgender issues and one of the assigned readings involved transgender issues." [*Id*,] "Thus, the deciding official did not consider the fundamental issue of whether the academic context warranted the discussion of sexual topics." [*Id*.] In fact, as noted above, many of the decision makers came from different academic backgrounds where such topics would be much less germane, or they failed to consider that such topics might be germane and appropriate in an English classroom.

Contrary to the AJ, the Board did not appropriately analyze the issue by considering whether or how the discussions of anal sex, oral sex, or transgender surgery related to the topics within Professor Fleming's English class. Rather,

as is clear from the AJ's opinion, the AJ appropriately considered the nature of Appellant's instruction to consider the context of such conversations, and he rightly considered whether the Agency considered that context in its dismissal decision. Without evaluating that context, the Board was unable to establish that discussions of anal sex, oral sex, or transgender surgery in an English class are *per se* misconduct, and the AJ correctly found that, in fact, such topics can be germane to English class discussions.

Second, the AJ's consideration of the lack of any policy prohibiting such discussion and the lack of notice that such discussions were misconduct is relevant to the analysis of whether such discussions are misconduct. The AJ notes that "there does not appear to be any rule or policy discussing sexual topics," and that "appellant does not appear to have received any notice . . . that discussions of sexual topics in a ***college*** classroom were forbidden or greatly restricted." [*See* Appx36 (emphasis in original).] The AJ's emphasis on the word 'college' speaks to his use of the lack of policy or notice and shows that the lack of such policies or notice are relevant to whether Appellant's conduct, in context of his classroom, was misconduct. The lack of any policy prohibiting such discussions is relevant to the context of the Agency's charge that Appellant, by bringing up issues of anal sex, oral sex, and transgender surgery, committed misconduct.

c. Specification 3

The Agency failed to meet its burden to show that specific photographs were misconduct, and the AJ appropriately considered the context in which the photographs were sent to find that Appellant had not committed misconduct.

With regard to these photographs, the photograph received by MD was a picture of the top half of Appellant, without his shirt on, in a bicep flexing pose, referencing his 'flex' writing concept. The second set of photographs at issue were comparative bodybuilding photographs showing Professor Fleming's physique at the time compared with his younger self. [*See* Appx37.] Notably, this comparative set of photographs was sent in response to a student's interest in how Professor Fleming's physique compared to his younger self. [*Id.*]

The AJ properly found that the Agency failed to establish that the mere sending of these photographs was misconduct. One set of photographs related directly to class concepts, and evidence was presented that a photograph that reinforced classroom concepts may not be improper. The other set of photographs, the comparative bodybuilding photos, were sent after request by a student. Moreover, there is evidence that these photos were not sexual or otherwise improper on their face.

Appellant's good physique, moreover, has a different context at a collegiate institution like the Naval Academy. As Professor Drew testified,

students respect when a professor is physically fit, as physical fitness has a large place in the curriculum for the students, as military officers and trainees. [*See* Appx1099 (noting that students respect Appellant in part because he is in such good physical shape).] Moreover, it is not uncommon for midshipmen to see or be in close proximity to academic faculty during physical exercise and dressed in such a manner. [*See* Appx1102-1103.] The mere sending of these photographs is therefore not misconduct in the context of the Naval Academy.

The AJ's reference to the fact that the recipient of one of the pictures was not offended is also not error because relevant evidence of the context of the pictures cuts against the Board's position that the mere sending of the pictures was misconduct. Moreover, the response of the recipient strengthens the notion that sending the pictures was not inappropriate. While not sufficient on its own to prove that the pictures were not misconduct, the student's reaction does support a finding that they were not inappropriate and add further to the context of the situation.

Finally, the AJ also did not err based on the fact that Appellant had been informally counseled about sending inappropriate pictures in the past. Notably, that counseling did not establish what pictures were inappropriate and what pictures were appropriate. Thus, there were still some pictures, including those relevant to class topics, that Appellant may have reasonably believed were

appropriate. Absent a proof otherwise, the Agency fails to show that sharing the specific photographs at issue constituted misconduct.

    d. <u>Specification 4</u>

The AJ did not err in his consideration of whether Appellant's actions with regard to physical contact with students was misconduct, and his consideration of the lack of a clear policy and the subjective feeling of the student receiving the contact was relevant to the assessment of whether such touching was factually inappropriate. By considering the lack of a clear policy rule and the recipient's reactions, the AJ properly determined that Professor Fleming did not commit misconduct.

First, the AJ's consideration of the fact that there was no relevant policy against touching was not improper, and the Board misconstrues the AJ's use of this fact. In essence, the Board appears to argue that the AJ erred by using the lack of a policy to mean that a professor could never be found to have committed misconduct by touching a student unless such touching entered into the bounds of sexual harassment – this is not the case, as illustrated by the AJ's opinion. Rather the AJ notes that because there is a lack of a relevant policy, one must use common sense to determine if the conduct at issue crossed from a permissible touching to an impermissible touching.

Specifically, the AJ notes "there is no policy against touching . . . so there

is an element of line drawing based upon common sense." [*See* Appx37]. The AJ then notes the different standards for inappropriate touching expressed by the various witnesses. [*Id.*] These differing opinions and inability to provide a bright-line rule evidenced the need for the AJ to consider the conduct at issue in a case-by-case manner, where relevant context must be assessed.

Thus, because the Board could not establish a clear standard for determining whether touching crossed the line into impermissible action, it failed to meet its burden of showing that Appellant's contact with students was misconduct.

Second, the AJ did not err by considering the subjective reaction of the recipient of the physical contact because such evidence that the student did not feel offended or uncomfortable lends credence to the AJ's finding that Appellant's contact did not cross the boundary of impermissible physical contact. Simply put, because it is undisputed that some level of physical contact can be appropriate, the Agency must have shown that Appellant committed physical contact that crossed the bounds into impermissible contact, and the reaction of the recipient of that contact is relevant to that consideration.

In essence, the Board treated Specification 4 as a charge of sexual harassment. And, as noted, such behavior can be defined by Agency policy, as well as by statute and either or both of those definitions may vary from what a

person drafting or reading the charges may think of as "sexual harassment." This can result in a situation where an agency that uses the term "sexual harassment" in a charge may be required to prove that the conduct meets a formal definition, regarding of whether that was the drafting official's intent. [*See Booker v. Department of Veterans Affairs*, 110 M.S.P.R. 72, ¶ 5 (2008)]. Such was the case here, where the Board clearly attempted to portray Appellant's patting a student on the back as a sexual predatory or harassing act. The AJ correctly rejected this specification and the Board abused its discretion where there was not substantial evidence to reverse that decision.

e.  <u>Specification 5</u>

The Board also acted arbitrarily and capriciously by finding that the AJ erred by noting the lack of a policy against or notice of problems with Appellant's discussion of sexual topics.

As the AJ noted, the Agency's position (and now the Board's position) is essentially that discussion of personal sexual experiences can cross the line into misconduct. Thus, the lack of a policy and notice is relevant to whether this specific conduct crossed the line because there is no bright line rule. The AJ was, therefore, was within his discretion to determine whether Appellant's comments were misconduct as a matter of fact, and his reference to the lack of a policy and notice supported, rather than justified on its own, his finding. [*See*

Appx37.]

Without any specific policy or notice, the Agency and the Board bore the burden of showing that Appellant's comments were, in fact, misconduct. The AJ was well within his authority to find that the Agency failed to meet that burden. The Board abused its discretion in finding to the contrary, in the absence of substantial evidence.

The lack of a specific policy and lack of notice to Appellant that he had committed any misconduct is relevant to the consideration of whether his actions crossed the line into misconduct because the Agency must show that he did commit misconduct. Such a policy or notice could have provided a rubric for adjudicating whether Professor Fleming's actions were over the line of misconduct. However, the Agency and Board only put forth that the statements, absent any other consideration of relevant circumstances, were *per se* misconduct. Given the AJ's appropriate consideration of the context of the academic environment of an English classroom, the Board erred in in finding that the Agency met its burden of showing that the sexual comments were misconduct.

### f. Specification 6

As noted above, the AJ did not err in finding RJ's testimony lacked credibility or that the Agency failed to meet its burden due to a lack of

34

corroborative evidence. First, the AJ did not err in finding that RJ lacked credibility. The AJ correctly noted, as part of his credibility analysis, that "RJ's testimony. . . is not consistent with his statements in the panel's questionnaire." Initial Decision at 15 (citing AF, Tab 8 at 59-60). "Indeed, his comments to the questionnaire suggest that he was not positive the mispronunciations were deliberate and did not mention the (fairly significant) 'fuck off' comment [in the questionnaire]." Initial Decision at 15 (citing AF, Tab 8 at 59-60).

Additionally, the Board's position with regard to the mispronunciations is in error. In effect, the Board appears to be asserting that Appellant should be reprimanded, and dismissed from duty, for mispronouncing a student's name, even if Appellant did not intentionally do so. That the mispronunciation alone would justify a finding that Appellant committed misconduct strains credulity. Rather, the AJ appropriately assessed whether the Agency presented sufficient evidence to find that Appellant deliberately mispronounced the student's name. As such, RJ's credibility on the issue was significant, and the fact that RJ was unsure of whether it was deliberate and the lack of mentioning the "fuck off" comment prior to his interview, shows significant inconsistency that calls RJ's credibility into question.

Second, the AJ did not err in finding for Appellant on the basis that RJ's testimony lacked corroboration. Importantly, not only did the AJ find that RJ's

testimony lacked corroboration, but the Agency Panel that investigated the allegation also determined that RJ's allegations lacked corroboration, and thus the panel found for Appellant on this issue as well. "Moreover, the lack of corroboration from the rest of the class is particularly telling given the panel used a fairly specific question – essentially does the appellant ever mispronounce names, particularly Asian names?" [Appx39.] "If the incidents had occurred as charged, one would think that the question would jog the students' memories." [*See id*; *see also* Appx964 ("We asked each and every student in his class about the incident, and to be honest with you, none of them recalled it.").] As such, there was sufficient evidence for the AJ to discredit RJ's testimony and not sustain Specification 6. Correspondingly, there was not substantial evidence to support the Board's sustaining of this allegation.

g.   Specification 7

The AJ did not err in finding that Appellant's comments did not amount to misconduct, and the reference to the lack of any policy, as with several of the other specifications, is relevant to the consideration of whether such comments crossed the boundary into impermissible conduct. Most notably, the AJ considered whether the comments at issue constituted misconduct with review of the relevant context: "I am hard pressed to find misconduct here, *in context*." [*See* Appx39.]

Out the outset, the Board disregards that the AJ appropriately considered the statements "in context." In this way, the lack of a relevant policy leaves the Agency and the Board without a firm rubric to show that Appellant's conduct was, in fact, misconduct. Thus, the AJ's notation about the lack of a relevant policy was not in error. Furthermore, the Agency carried the burden of showing that Appellant's comments about his own family, of which there is no dispute that comments about one's own family can be made without being misconduct, were in fact misconduct.

In conclusion, the Agency is unable to show that the AJ erred, and therefore, the Board should uphold the AJ's decision reversing the removal. There was not substantial evidence in the record to support the Board's decision.

## IV.    The Board's *Douglas* and Bias Analyses Were Erroneous

The Board did not adequately consider the *Douglas* factors and the bias of the deciding Agency official when assessing whether the penalty of removal was reasonable. Even if the Board found some errors in the AJ's initial decision, it should nevertheless have upheld the Administrative Judge's the reversal of the dismissal.

The Board will review an agency-imposed penalty only to determine if the agency considered all the relevant factors and exercised management discretion within tolerable limits of reasonableness. *Douglas v. Veterans Administration*, 5

M.S.P.R. 280, 305-06 (1981). In making this determination, the Board must give due weight to the agency's primary discretion in maintaining employee discipline and efficiency, recognizing that the Board's function is not to displace management's responsibility, but to ensure that managerial judgment has been properly exercised. *Id.* at 306.

If the Board overturns some of the specifications, it must consider whether the sustained elements merit the imposed penalty. *See Boo v. Dep't of Homeland Security*, 2014 M.S.P.B. 86 at ¶ 17 (Dec 3, 2014). "The Board may mitigate the penalty imposed by the agency to the maximum penalty that is reasonable in light of the sustained charges as long as the agency has not indicated in either its final decision or in proceedings before the Board that it desires that a lesser penalty be imposed for fewer charges. *Id.* If the deciding official did not express whether he would have imposed a lesser penalty if not for all of the specifications, the Board must apply the *Douglas* factors to determine the maximum reasonable penalty for the sustained charge of misconduct. *Id.* The application of the *Douglas* factors to Appellant shows that even if some of the specifications are sustained, dismissal is too punitive a measure. For instance, many of the specifications, even if proven, lack any showing of intentional misconduct.

While not generally discussed in the AJ or Board decisions, it is important to note the evidence of serious bias that the Agency holds against Appellant. At the hearing, testimony was presented showing that, at the time the Agency was contemplating Appellant's removal, relevant Agency decision makers were aware of Appellant's public statements about the Naval Academy, many of which were not flattering. [*See* Appx895.] Specifically, Dean Phillips, the ultimate decision maker, showed bias against Professor Fleming. Dean Phillips admits to knowledge about Professor Fleming's public statements about his opinion of the state of the Naval Academy. [*See* Appx1054 ("The articles are sort of repetition of his usual mantra, that the Naval Academy is a failed institution that should be closed.").] In fact, Dean Phillips had previously denied Professor Fleming a merit pay increase but was overturned when an Office of Special Counsel investigation determined that the decision violated Appellant's rights. [Appx1057.] Thus, there was sufficient evidence that the decision to dismiss Appellant was seriously biased. The Board should have considered this fact.

The Agency's lack of relevant policies or sufficient notice to Appellant are mitigating circumstances relevant to the imposition of the penalty. The reaction of the Appellant's students is relevant to the maximum level of discipline, and it is undisputed that other than MD and RJ (relating to the mispronunciation of

his name only), the complaining students generally did not take offense, feel uncomfortable, or otherwise have problems with Appellant's conduct.

It is also noteworthy that the only significant complaint against Appellant was that of MD, along with the evidence that but for MD's "cajoling" and encouragement, the other complaints would not have been filed against Appellant; thus, Appellant's general demeanor has done little to trigger any student complaints over his many years of employment, and even in the scope of the complaining class, relatively few students seemed to have any concerns.

It was also important for the Board to give weight to Professor Fleming's significant positive contributions to the Agency over the course of his more than thirty years of service at the Naval Academy. As even the Agency recognizes, Appellant's successful teaching performance is relevant and should have been considered when determining what discipline, if any, was warranted. At the hearing, the uncontroverted testimony showed that Appellant received overwhelmingly positive reviews for his teaching and instruction. Moreover, the rate of positive student reviews were far above average. [*See* Appx1099 (noting Professor Fleming's student evaluations are "extraordinary" in terms of the rate of positive reviews).] Students also overwhelmingly appreciated Appellant's 'life lessons,' (discussions held in class that may have not directly related to course materials).

Thus, regardless of whether the AJ committed any error, there exists insufficient evidence to support the Board's finding that the Agency's dismissal of Appellant from the Naval Academy and from his federal service was proper under the requisite *Douglas* analysis.

## Conclusion and Relief Sought

For the foregoing reasons, Appellant respectfully requests that this Court overturn the Board's decision removing Appellant from his federal employment and reinstate the Administrative Judge's decision in Appellant's favor.

Dated: June 10, 2024        *//s// Jason H. Ehrenberg*
                            Ehrenberg Legal & Higher Ed Solutions
                            5335 Wisconsin Ave, N.W., Suite 440
                            Washington, D.C. 20015
                            T: (202) 617-2590
                            E: jason@ehrenberglegal.com

                            *Attorneys for Appellant*

# Addendum

## Addendum Table of Contents

| TAB No. | Dated | Description | Appx. No. |
|---------|-------|-------------|-----------|
|         |       |             |           |
| PFR 17  | 1/26/2024 | MSPB - Final Order | Appx1 |
| IA 33   | 7/24/2019 | Initial Decision | Appx25 |

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**

BRUCE FLEMING,
               Appellant,

      v.

DEPARTMENT OF THE NAVY,
            Agency.

DOCKET NUMBER
PH-0752-18-0457-I-1

DATE:  January 26, 2024

## THIS FINAL ORDER IS NONPRECEDENTIAL[1]

Jason H. Ehrenberg, Esquire, Washington, D.C., for the appellant.

Alison Gray, Esquire, Washington, D.C., for the agency.

Terrence P. Cook, Esquire, Annapolis, Maryland, for the agency.

### BEFORE

Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member

### FINAL ORDER

The agency has filed a petition for review of the initial decision, which reversed the appellant's removal.  The appellant has filed a motion to dismiss the agency's petition for failure to provide interim relief.  For the reasons discussed below, we DENY the appellant's motion to dismiss, GRANT the agency's

---

[1]  A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law.  Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions.  In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law.  *See* 5 C.F.R. § 1201.117(c).

2

petition for review, and REVERSE the initial decision.  The agency's action is
SUSTAINED.

## BACKGROUND

The appellant is a tenured Professor of English at the U.S. Naval Academy
in Annapolis, Maryland.  At issue are certain aspects of the appellant's conduct in
teaching first-year Rhetoric & Introduction to Literature, HE 111, during the fall
semester of the 2017/2018 academic year.   In January 2018, five different
students filed complaints with the Vice Academic Dean alleging that the appellant
had made various offensive comments, discussed inappropriate matters during
class, and engaged in other unprofessional conduct.  Initial Appeal File (IAF),
Tab 7 at 115-34.  The Vice Academic Dean directed the Director of the Division
of Humanities and Social Sciences to supervise a fact-finding inquiry.  *Id.* at 114.

The Division Director assembled a panel of three senior faculty members,
who interviewed the students from the appellant's fall classes, as well as two
other students whose names had come up regarding one matter.  *Id.* at 135-89;
IAF, Tab 8 at 4-119.  The appellant was invited to address the panel, but he
declined to do so.  IAF, Tab 8 at 120-21; IAF, Tab 28 at 91.  He did reply by
email, IAF, Tab 8 at 123, and he also sent an email message to the entire faculty
in which he generally complained about the unfairness of the process, *id.* at 130.
Thereafter, the panel issued a report finding that a number of the matters as
described in the complaints had occurred and qualified as unprofessional
behavior.  IAF, Tab 7 at 97-113.

On June 26, 2018, the Division Director proposed the appellant's removal
on a charge of Conduct Unbecoming a Federal Employee with seven
specifications.  The agency alleged that the appellant:  (1) referred to students as
"right-wing extremists"; (2) made comments about and discussed anal sex, oral
sex, and transgender surgery; (3) emailed partially clothed photos of himself to
students after having been counseled that doing so was inappropriate and agreeing

to refrain from doing so; (4) touched students without their approval; (5) referred to his own sexual experiences; (6) repeatedly mispronounced an Asian-American student's name despite being corrected several times; and (7) made demeaning, sexually related comments about a child and her mother because of how they were dressed.[2]  *Id.* at 79.  After the appellant responded,  the Academic Dean and Provost issued a decision sustaining all seven specifications and removing the appellant effective August 17, 2018.  *Id.* at 18-21, 33.

The appellant filed a Board appeal contesting the merits of the removal and raising several affirmative defenses, including retaliation for whistleblowing, violation of his First Amendment rights, and harmful procedural error.  IAF, Tabs 1, 30.  After a hearing, the administrative judge issued an initial decision not sustaining any of the seven specifications and reversing the removal on that basis.  IAF, Tab 33, Initial Decision (ID).  The administrative judge considered the appellant's affirmative defenses but found that he failed to prove them.  ID at 16-17.  He ordered the agency to provide interim relief if either party filed a petition for review.  ID at 19.

The agency has filed a petition for review, Petition for Review (PFR) File, Tab 7; the appellant has filed a response, PFR File, Tab 13; and the agency has filed a reply, PFR File, Tab 16.  The appellant has also moved to dismiss the agency's petition for failure to comply with the interim relief order, PFR File, Tab 11, and the agency has responded in opposition to that motion, PFR File, Tab 12.

## ANALYSIS

The agency is in compliance with the administrative judge's interim relief order.

If the appellant is the prevailing party in the initial decision and the administrative judge orders interim relief, a petition for review filed by the

---

[2] In proposing the appellant's removal, the agency considered that he had previously been issued a Letter of Reprimand for disclosing a student's personally identifiable information.  IAF, Tab 7 at 81.  The Reprimand was issued on May 11, 2018.  *Id.* at 94.

4

agency must be accompanied by a certification that the agency has complied with the interim relief order, either by providing the interim relief ordered, or by making a determination that returning the appellant to the place of employment would cause undue disruption to the work environment. *Ayers v. Department of the Army*, 123 M.S.P.R. 11, ¶ 6 (2015); 5 C.F.R. § 1201.116(a); *see* 5 U.S.C. § 7701(b)(2)(A)(ii). If an agency makes a determination that an employee will pose an undue disruption, it must nonetheless return the employee to a pay status pending the outcome of its petition for review, and provide "pay, compensation, and all other benefits as terms and conditions of employment" pending the outcome of the petition for review. 5 U.S.C. § 7701(b)(2)(B). The Board's review of interim relief is limited to determining whether the agency actually made an undue disruption determination and whether the employee has received appropriate pay and benefits. The Board does not have the authority to review the merits of an undue disruption determination. *King v. Jerome*, 42 F.3d 1371, 1375-76 (Fed Cir 1994).

In this case, the agency's petition for review was accompanied by a certification that it has complied with the administrative judge's interim relief order by reinstating the appellant to his position, effective the date of the initial decision, and a Standard Form 50 (SF-50), Notification of Personnel Action, reflecting the interim appointment. PFR File, Tab 7 at 61, 63. The certification states, however, that the appellant has not been returned to the classroom. *Id.* at 61. In support of the certification, the agency has submitted a declaration by the Academic Dean and Provost, stating that based on the seriousness of the charged misconduct, he determined that the appellant's presence in the classroom and his engaging with midshipmen in any advisory role would be an undue disruption to the workplace. *Id.* at 65. He emphasized that his determination was guided by the Naval Academy's responsibility to provide a positive and supportive classroom and advisory environment which respects the dignity of the individual, promotes the education and professional development of future Navy

and Marine Corps leaders, and ensures the wellbeing of the midshipmen.  *Id.* at 66.  The agency has also submitted a copy of the Academic Dean and Provost's August 7, 2019 letter to the appellant explaining that, for the reasons set forth above, in lieu of teaching and advising midshipmen, his assignments during the pendency of the petition will include scholarly research and writing and service to the school.  *Id.* at 67.

In his motion to dismiss, the appellant argues that the agency has failed to provide the necessary interim relief because, by not allowing him to teach, it has denied him the possibility of receiving student and peer evaluations, which are a significant component of yearly considerations in the merit pay increases that are a condition of his employment.  PFR File, Tab 11.  The appellant likens merit pay increases to overtime which is required as part of interim relief when the employee proves that he is entitled to it as a condition of employment.  *Id.* at 7.

In its response to the appellant's motion, the agency argues that the three performance elements for Academy faculty that form the basis for merit increases are teaching, scholarship, and service, and that, when a faculty member does not perform tasks in one of the elements during the rating period, the member is still eligible for a merit increase based on the element(s) in which he or she has performed tasks.[3]  PFR File, Tab 12 at 6-7.  Thus, the agency argues that, when the appellant is eligible for a merit increase, it will be based on his performance in the elements of scholarship and performance.  *Id.* at 7.  In support of its position, the agency has submitted a declaration under penalty of perjury by the Vice Academic Dean, who oversees the Academy's performance plan program.  *Id.* at 16.  The agency also disputes the appellant's argument that merit increases should be considered like overtime.  *Id.* at 11-12.

We find that the agency has met its initial burden of demonstrating that it is in compliance with the administrative judge's interim relief order.  Specifically,

---

[3] As an example, the agency references a professor who, because of absence due to maternity leave, is not in the classroom for a portion of time during the rating period and is therefore not rated on the teaching element.  PFR File, Tab 12 at 7, 19.

the agency has: (1) certified its compliance; (2) submitted an SF-50 showing that the appellant has been given an interim appointment to his Professor position at his previous adjusted basic pay, effective the date of the initial decision; (3) made a determination that returning him to the classroom would pose an undue disruption; and (4) so advised the appellant.

Therefore, the only remaining issue is whether the appellant has been denied pay, compensation, or other benefits as terms and conditions of employment, during the pendency of the petition for review. 5 U.S.C. § 7701(b)(2)(B). We find that he has not. The evidence submitted by the agency shows that merit increases for faculty are not automatic, PFR File, Tab 12 at 18, 21, and not a condition of employment.[4] In any event, the agency has shown that the appellant's absence from the classroom will not automatically preclude him from receiving merit increases during subsequent academic years because his eligibility will be based on performance in the remaining two elements. *Id.* at 19.

For these reasons, the appellant's motion to dismiss is denied.

Conduct Unbecoming.

The administrative judge correctly found that a charge of conduct unbecoming has no specific elements and that, in analyzing such a charge, the Board considers whether the conduct was improper, unsuitable, or detracting from one's character or reputation. ID at 5; *see Social Security Administration v. Long*, 113 M.S.P.R. 190, ¶ 42 (2010), *aff'd*, 635 F.3d 526 (Fed. Cir. 2011). The agency must prove its charge by preponderant evidence, which is the degree of relevant evidence that a reasonable person, considering the record as a whole,

---

[4] The appellant's likening of his situation to overtime is not persuasive. Generally, overtime pay is compensation that is not required to be paid under an interim relief order. *McLaughlin v. U.S. Postal Service*, 55 M.S.P.R. 192, 200 (1992), The only exception is in those instances in which an employee proves that he is entitled to overtime as a term or condition of employment by virtue of law, rule, regulation, collective bargaining agreement, or binding agency policy. *Id.* The appellant has made no such showing regarding merit increases.

would accept as sufficient to find that a contested fact is more likely to be true than untrue.  5 C.F.R. §§ 1201.4(q), 1201.56(b)(1)(ii).

Specification (1) is sustained.

In this specification, the agency alleged that the appellant referred to two students as "right-wing extremists" or words to that effect.  IAF, Tab 7 at 79.  In an email dated September 26, 2017, he referred to the two as "my right-wing extremists," and then critiqued what he perceived as their unsupported positions on issues about which they had written (anti-gun control and anti-taxes) in connection with an assignment.  IAF, Tab 8 at 135.  In his initial decision, the administrative judge noted that, in the email, the appellant stated that he would have sent the same email to "left-wing extremists," and that "this is not a left-right thing.  It's a justify that thing."[5]  ID at 11; IAF, Tab 8 at 135.  Finding that the email was not "politically discriminatory," the appellant's real message to the students was that they must provide supporting arguments for positions they take, and that is a completely appropriate criticism for a student paper, the administrative judge concluded that the specification does not describe misconduct.  ID at 11-12.

On review, the agency argues that the email was unprofessional because it detracted from the appellant's role as a supervisor, and that, in sending the email, he abdicated his responsibility to be a role model for the students and to show them dignity and respect.  PFR File, Tab 7 at 20-21.  The agency asserts that it charged the appellant with conduct unbecoming, not political discrimination.  *Id.* at 19-20.

That the appellant sent this email is not in dispute.  What is in dispute is whether the email constitutes actionable misconduct.  We find that it does, particularly in the setting of the U.S. Naval Academy.  The mission of the Academy is to develop midshipmen morally, mentally, and physically, and it is

---

[5] The investigatory panel did not find any negative outcomes for any students based on their political beliefs.  IAF, Tab 7 at 99.

expected of all members, military or civilian, that they be examples of the principles the Academy is trying to teach—honor, courage, and commitment. Hearing Transcript (HT) at 11 (testimony of the Commandant of Midshipmen). Midshipmen are supposed to be taught, by word and example, that treating others with dignity and respect is a core tenet of the military professional. HT at 9-10 (testimony of the Commandant of Midshipmen). Therefore, certain types of conversations, which between peers might be considered "joking around," are not acceptable in the very different context of a senior-subordinate relationship. HT at 37-39 (testimony of the Commandant of Midshipmen). The testimony of the Commandant of Midshipmen was echoed by other witnesses, who likewise emphasized the values of dignity and respect, the role of a service academy to instill these values into future officers, and the responsibility of the faculty to exemplify them. HT at 41-42, 45-46, 68, 70 (testimony of a Professor of Mechanical Engineering), 166-67, 174-75 (testimony of the Academic Dean and Provost), 301 (testimony of a Professor of English). Naval Academy instructors have the right to academic freedom within the classroom, but there is a difference between proper pedagogical activities and behavior that is unprofessional or pedagogically inappropriate, and instructors are expected to treat their students with dignity and respect. IAF, Tab 8 at 149-50, Academic Dean and Provost Instruction 1531.63C (Apr. 1, 2016).

We agree with the witnesses who testified that, by labeling two of his students "right-wing extremists," the appellant failed in his duty to treat them with dignity and respect. HT at 16 (testimony of the Commandant of Midshipmen), 308 (testimony of a Professor of English). This specification is sustained. *See Dolezal v. Department of the Army*, 58 M.S.P.R. 64, 66-67 (1993) (upholding a conduct unbecoming charge based on disparaging and demeaning comments the appellant made in an email about a subordinate).

Specifications (2) and (5) are sustained.[6]

In specification (2), the agency charged that, during class, the appellant made comments regarding oral sex, anal sex, and transgender surgery, and in specification (5), that he made comments referring to his own sexual experiences. IAF, Tab 7 at 79. The appellant did not deny discussing these matters in class, but he disagreed that the discussions were inappropriate. *Id.* at 125, 133.

The administrative judge agreed with the appellant. He found that the deciding official failed to consider whether the academic context warranted the discussion of sexual topics, particularly in light of the appellant's academic writing on transgender issues. He further found that there did not appear to be a rule or policy against discussing such topics or the appellant's own sexual experiences, and that the appellant was not on notice that such discussions were forbidden or greatly restricted. Therefore, the administrative judge found that the allegations in specifications (2) and (5) did not constitute actionable misconduct, and for that reason, he did not sustain them. ID at 12-13.

On review, the agency argues that conduct unbecoming does not necessarily require violation of a specific rule, and that there is sufficient evidence to show that many of the appellant's remarks were off-topic or otherwise inappropriate. PFR File, Tab 7 at 22, 26-27, 42-44. We agree. There are certain academic contexts in which discussion and even explicit discussion of sexual material may be proper. However, the unrebutted hearing testimony shows that the appellant frequently perseverated on these topics even when they were completely unrelated to the course material.[7] HT at 103 (testimony of Midshipman M.D.), 162-63 (testimony of Midshipman B.G.). This testimony is consistent with the content of the students' written complaints and the greater

---

[6] We agree with the administrative judge that it is best to address these two specifications together. ID at 12-13.

[7] Regarding specification (5) in particular, it is difficult to imagine a situation in which it would be appropriate for a professor to share with the class details of his own personal sexual experiences.

part of student responses to the panel inquiry. IAF, Tab 7 at 117-21, 125-27, 129, 131-33, Tab 8 at 4-119.[8] Nor does the appellant suggest that his discussion of these matters was confined to situations in which they may have been implicated by course materials. IAF, Tab 8 at 125-26; IAF, Tab 7 at 33-34. Furthermore, even to the extent that these discussions may have been related to the course material, and allowing that it is normal for college classroom discussions to stray from the material sometimes, we still find that the nature and extent of the appellant's remarks went beyond what was appropriate.[9]

Specification (3) is sustained.

In specification (3), the agency charged that the appellant emailed partially clothed pictures of himself[10] to students, after having been counseled that doing so was inappropriate and agreeing to not do so in the future. IAF, Tab 7 at 79. This conduct was mentioned in two of the student complaints, *id.* at 121, 132, as well as in a number of interview responses, *e.g.*, IAF, Tab 8 at 61, 66, 88, 98, 104, 114, 116. In his email to the panel, the appellant denied this specification, admitting that he had only sent such a photo to a student 2 years ago, not during the timeframe at issue, and he defended that earlier action as not inappropriate, suggesting that it related to course material. *Id.* at 125-26.

In addressing this specification, the administrative judge found that there was no dispute that the appellant was counseled for sending partially clothed photos of himself to students in 2015, IAF, Tab 8 at 158-59, and that he again

---

[8] Some of the interviewees reported that the appellant discussed condom use, transgender surgery, and sexuality, yet also reported that there was no "sexually suggestive language" used.

[9] Even if we did not sustain specification 2, we find that the charge would still be sustained based upon the remaining specifications. *Burroughs v. Department of the Army*, 918 F.2d 170, 172 (Fed. Cir. 1990) (proof of one or more specifications is enough to sustain charge); *Avant v. Department of the Air Force*, 71 M.S.P.R. 192, 198 (1996) (explaining that if a single charge has multiple specifications, an agency need only prove one specification to sustain the charge).

[10] Most of the photos were of the appellant shirtless and flexing. IAF, Tab 8 at 136, 142-45.

engaged in that behavior in 2017, *id.* at 136, Tab 29 at 77-78.   ID at 13.
Nonetheless, the administrative judge found that, other than one midshipman,
M.D., no one who received the photos appeared particularly offended by them,
and that Midshipman M.D.'s claim that he was offended at receiving the photo
was "hard to believe."  ID at 13-14.   Concluding that there was no misconduct,
the administrative judge did not sustain this specification.  ID at 14.  The agency
contests this analysis on review.  PFR File, Tab 7 at 32.

We find that, regardless of whether the appellant believed that sending
midshipmen shirtless photos of himself was appropriate, and regardless of
whether any recipients of those photos were actually offended, his actions still
amounted to conduct unbecoming.  The record shows that, in the fall of 2015, the
agency gave the appellant a written and verbal counseling about this very same
behavior, notified him that it was inappropriate, required him to retake an
anti-harassment training course, and warned him against engaging in such
behavior in the future.  IAF, Tab 8 at 159.  The appellant acknowledged, at that
time, that sending such photos of himself to students could result in allegations of
impropriety, and he agreed to refrain from doing so in the future.  *Id.*  Yet 2 years
later, the appellant disregarded the agency's warning and resumed emailing
midshipmen shirtless pictures of himself.   IAF, Tab 7 at 121, 132, Tab 8
at 142-45; HT at 55-56.(testimony of Professor K.L.), (testimony of Midshipman
M.D.).  That the appellant claims a pedagogical purpose for this is immaterial; he
acted contrary to his supervisors' clearly stated expectations, and on that basis, he
committed conduct unbecoming.

Specification (4) is sustained.

In specification (4), the agency alleged that the appellant touched students
without their approval.  IAF, Tab 7 at 79.  The appellant touching students on
their shoulders, head, and neck in an unwanted, unnecessary, and unprofessional
manner was mentioned in several complaints, *id.* at 118, 129, 132, as well as in a
number of student interviews conducted by the panel, *e.g.*, IAF, Tab 8 at 5, 13,

21, 41, 58, 66, 78. In his email to the panel, the appellant did not deny the touching, but stated that, because he "can read body language," any such touching was always welcome. *Id.* at 128.

The administrative judge found that the appellant did touch students, but there was no policy against it and no students were offended. The administrative judge therefore found that there was no misconduct, and he did not sustain this specification. ID at 14.

On petition for review, the agency disputes the administrative judge's analysis and argues that it presented sufficient evidence for the Board to sustain this specification. PFR, Tab 7 at 38, 41. We agree. The record shows that the appellant, on one or two occasions, sat next to a student in class and rubbed his back for approximately 15 seconds. HT at 148-49 (testimony of Midshipman A.B.). The appellant does not deny this behavior, IAF, Tab 7 at 106-07, and we find that it was inappropriate on its face. Furthermore, the student at issue testified, unsurprisingly, that the appellant's actions made him feel uncomfortable.[11] HT at 148-49 (testimony of Midshipman A.B.). We agree with the agency that this constituted conduct unbecoming.

Specification (6) is sustained.

In specification (6), the agency alleged that the appellant repeatedly mispronounced an Asian-American student's name despite being corrected several times. IAF, Tab 7 at 79. The student in question, Midshipman R.J., raised this matter in his complaint, stating that, "especially when angry," the appellant would call him different last names "which were common Asian last names," and that, when corrected, he "always brushed it off, . . . one time even telling [the student] to 'f*** off.'" *Id.* at 133. The student's testimony was consistent with his complaint. HT at 154 (testimony of Midshipman R.J.). Midshipman R.J. also testified that he believed that the appellant intentionally

---

[11] Although the student's feelings about the appellant's behavior are not dispositive, they lend further support to our finding that it was inappropriate.

called him the wrong name because he repeatedly mispronounced his name despite several corrections, and that he viewed the mispronunciations as a "slap in the face" given his status as a child of immigrant parents who came to the United States with "literally nothing," and given that a family name holds significant honor in his culture. HT at 155-56 (testimony of Midshipman R.J.). During the investigation, a number of other students remarked upon the appellant's mispronouncing of names, specifically Asian names. *See, e.g.*, IAF, Tab 8 at 13, 46, 58, 62, 68, 70, 85. In his deposition, the appellant stated three times that he did not "recollect" mispronouncing the student's name, although he then denied that it happened after being specifically asked whether he denied mispronouncing the name. IAF, Tab 28 at 78-79. In his written reply to the panel, he acknowledged that, while he tries to get names right, he "can't always." He denied making a "f*** you" comment, IAF, Tab 8 at 129, although that was not specifically what Midshipman R.J. had claimed.

In finding this specification not sustained, the administrative judge questioned Midshipman R.J.'s credibility because, when he was interviewed by the panel, he stated that he was unsure whether the mispronunciation was "done on purpose," and because, while he stated that the appellant used profanity in the classroom, and that two or three times it was directed at him personally, he did not mention the "f*** off" comment. IAF, Tab 8 at 60; ID at 15. The administrative judge also found a lack of corroboration of this specification by the rest of the class. ID at 15.

On review, the agency argues that the administrative judge's credibility determination was not demeanor-based, and that it therefore should not be afforded deference. PFR File, Tab 7 at 47. However, the Board has held that a credibility determination made after an in-person hearing is at least implicitly based on witness demeanor. *Aldridge v. Department of Agriculture*, 111 M.S.P.R. 670, ¶ 11 (2009). Such demeanor-based credibility determinations are entitled to deference and may only be overturned when the Board has "sufficiently sound"

reasons for doing so. *Haebe v. Department of Justice*, 288 F.3d 1288, 1301 (Fed. Cir. 2002). There are sufficiently sound reasons in this case for us to find Midshipman R.J. a credible witness notwithstanding the administrative judge's finding to the contrary. Midshipman R.J.'s testimony was consistent with his complaint and supported by other students' accounts as to the appellant's mispronouncing of students' names. Although Midshipman R.J. informed the panel that it was "[h]ard to tell if it was done on purpose," he nevertheless "felt it was directed intentionall[y]" at him. IAF, Tab 8 at 60. As stated above, the appellant elected not to testify at the hearing. *See Scott v. Department of Justice*, 69 M.S.P.R. 211, 229 (1995) (noting that, in weighing the evidence, that the appellant did not explain why he did not testify under oath or provide a sworn statement), *aff'd*, 99 F.3d 1160 (Fed. Cir. 1996). That the appellant did not recall mispronouncing Midshipman R.J.'s name is not the same as denying that it occurred. *Hillen v. Department of the Army*, 50 M.S.P.R. 293, 302 (1991). His denial, in turn, occurred only after he had stated three times that he did not "recollect" doing so, and only after he was specifically asked whether he denied it. *See Spurlock v. Department of Justice*, 894 F.2d 1328, 1330 (Fed. Cir. 1990) (holding that self-contradiction and imprecision detract from the weight to be accorded the evidence upon which an administrative board bases its decision). For these reasons, we find that Midshipman R.J.'s account is credible and that the appellant engaged in conduct unbecoming as specified.

<u>Specification (7) is sustained.</u>

In this specification, the agency alleged that the appellant made demeaning sexually related comments about an adolescent girl attending a dance with his son and similar offensive comments about the girl's mother. IAF, Tab 7 at 79. Midshipman M.D. reported that the appellant said that the appellant called the girl a "slut" who was "looking for something more," and said that her short dress suggested her sexual intentions. IAF, Tab 7 at 118. According to Midshipman M.D., the appellant then showed the class a photo of the girl with his son, again

focusing on the shortness of her dress, and also made fun of her mother's physical features, skirt length, clothing choices, and parental decision-making. *Id.* at 119. Midshipman M.D.'s hearing testimony was in accord, HT at 100-01 (testimony of Midshipman M.D.), as was the testimony of another student, HT at 158-59 (testimony of Midshipman J.R.). Two of the other students who filed complaints also mentioned this incident, IAF, Tab 7 at 129, 131, as did a number of the students who were interviewed by the panel. *See, e.g.*, IAF, Tab 8 at 7, 11, 13, 15, 17, 21, 25, 27, 29, 31, 33, 37, 41, 82. The appellant admitted to these actions in his email to the panel. *Id.* at 128.

Regarding this specification, the administrative judge found that there was no prohibition against discussing either one's family or sexual topics, and that because there was no misconduct, the specification was not sustained. ID at 15. We disagree with the administrative judge's reasoning.

There is no dispute that the appellant made the comments in question. IAF, Tab 7 at 107-08; ID at 15. An agency is not required to describe in detail all potentially prohibited employee conduct and the resulting discipline. Rather, an agency may reasonably require its employees to exercise good judgment, notwithstanding a lack of literal guidance from an agency rule, regulation, or other statement of policy. *Byers v. Department of Veterans Affairs*, 89 M.S.P.R. 655, ¶ 24 (2001). Here, given the Academy's commitment to the principles of dignity and respect, the appellant should have known that his actions would be considered inappropriate and could constitute actionable misconduct. In particular, the appellant should have known that making demeaning sexual comments about an adolescent would constitute conduct unbecoming a Federal employee. This specification is sustained.

<u>The agency's charge is sustained.</u>

Because we have found all of the specifications sustained, the charge of Conduct Unbecoming is sustained.[12]    *See Johnson v. Small Business Administration*, 97 M.S.P.R. 571, ¶¶ 24-25 (2004).

<u>The agency has established a nexus between the sustained misconduct and the efficiency of the service.</u>

In addition to the requirement that an agency must prove the charge it has brought against the appellant, it must also prove that there is a nexus, i.e., a clear and direct relationship between the articulated grounds for the adverse action and either the appellant's ability to accomplish his duties satisfactorily or some other legitimate government interest.    *Canada v. Department of Homeland Security*, 113 M.S.P.R. 509, ¶ 10 (2010).  Here, the charge bears on the Academy's mission of preparing midshipmen morally, mentally, and physically to fulfill their leadership role in the Navy and Marine Corps, and of the importance of training midshipmen to treat others with dignity and respect and to build trust between these future leaders and their subordinates, who will be asked to follow their commands.    HT at 9-10 (testimony of Commandant).    Every member of the Academy, including civilian faculty like the appellant, is expected to act in a manner that reflects the core values and principles being taught.    HT at 11 (testimony of the Commandant).    We therefore find that the agency has established a nexus between the sustained misconduct and the efficiency of the service.    *See Canada*, 113 M.S.P.R. 509, ¶ 11 (finding nexus, based on conduct adversely affecting the agency's mission, when the appellants, who were first-line

---

[12] As noted, the administrative judge found that the appellant did not establish his claims that, in taking this action, the agency retaliated against him for engaging in whistleblowing, violated his First Amendment rights, and committed harmful procedural error.  ID at 16-18.  The appellant has not filed a petition for review challenging the administrative judge's findings not sustaining any of these affirmative defenses.  Therefore, and because, based on our review, we determine the findings to be well supported, we will not disturb them.  *See* 5 C.F.R. § 1201.115 (providing that the Board normally will consider only issues raised in a timely filed petition or cross petition for review).

supervisors, oversaw a young and impressionable workforce of junior employees who looked to the appellants for guidance and direction).

<u>The agency has shown that removal is a reasonable penalty for the sustained misconduct.</u>

When, as here, all of an agency's charges are sustained, the Board will review the agency-imposed penalty only to determine if the agency considered all the relevant factors and exercised management discretion within the tolerable limits of reasonableness. In making this determination, the Board must give due weight to the agency's primary discretion in maintaining employee discipline and efficiency, recognizing that the Board's function is not to displace management's responsibility, but to ensure that management's judgment has been properly exercised. *Powell v. U.S. Postal Service*, 122 M.S.P.R. 60, ¶ 12 (2014).

Here, in arriving at his decision to affirm the appellant's removal, the deciding official considered the factors set forth by the Board in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 305-06 (1981), as appropriate in making a penalty determination. IAF, Tab 7 at 21-24. In so doing, he concurred in the analysis of the *Douglas* factors made by the proposing official. *Id.* at 79-83. The most important of these factors is the nature and seriousness of the offense. *Boo v. Department of Homeland Security*, 122 M.S.P.R 100, ¶ 18 (2014). Regarding this factor, the deciding official found that the appellant's misconduct was intentional and repeated, and that it occurred both in the classroom and in emails to students. IAF, Tab 7 at 21. In considering the appellant's job level and type of employment, the deciding official found that, as a senior faculty member and instructor of future Navy and Marine Corps leaders, the appellant's conduct fell short of the requirement that he establish and maintain a classroom environment that respects the dignity of the individual and develops an appreciation for an appropriate superior-subordinate relationship. *Id.* at 22. The deciding official also considered that, since 2013, the appellant was formally counseled twice and received a letter of reprimand regarding his

unprofessional behavior. *Id.* The deciding official noted that the appellant had been formally counseled against sending partially clothed photos of himself to students, yet repeated this conduct. *Id.* at 23. Based on the appellant's insistence that his actions were proper and that he is entitled to continue such behavior, the deciding official indicated that, in his view, the appellant lacks rehabilitative potential, stating that he lacks confidence that the appellant will perform at a satisfactory level in the future and change his behavior. *Id.* at 23-24. The deciding official also stated that removal is within the range of remedies in the agency's table of penalties for a similar offense of inappropriate conduct. *Id.* at 24. The deciding official considered mitigating factors, including the appellant's lengthy service as a faculty member, his satisfactory official performance ratings, and his receipt of performance awards in the 1990s. *Id.* at 22. Despite these factors, the administrative judge concluded that removal was the appropriate penalty. *Id.* at 20. Apart from a pro forma statement in his initial appeal form, IAF, Tab 1 at 6, the appellant has not contested the agency's penalty determination.

Based on our review, we find that the deciding official carefully considered the appropriate *Douglas* factors, and we agree that removal is within the parameters of reasonableness for the sustained charge. We therefore defer to the agency's penalty determination.

## NOTICE OF APPEAL RIGHTS[13]

You may obtain review of this final decision. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most

---

[13] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions. As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general**. As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date of issuance of this decision. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at

http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

(2) **Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after you receive</u> this decision. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** <u>after your representative</u> receives this decision. If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of <u>your discrimination claims only, excluding all other issues</u>. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** <u>after you receive</u> this decision. 5 U.S.C. § 7702(b)(1). If you have a representative in this case,

and your representative receives this decision before you do, then you must file with the EEOC no later than **30 calendar days** <u>after your representative receives</u> this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3)** <u>**Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**</u>.  This option applies to you <u>only</u> if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D).  If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[14]  The court of appeals must <u>receive</u> your petition for

---

[14]  The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017.  The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction.  The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195,

22

review within **60 days** of the <u>date of issuance</u> of this decision.   5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

---

132 Stat. 1510.

23

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

FOR THE BOARD:

*Jennifer Everling*

_____

Jennifer Everling
Acting Clerk of the Board

Washington, D.C.

CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

<u>Appellant</u>

U.S. Mail                  Bruce Fleming
                           739 Governor Bridge Rd
                           Davidsonville, Maryland 21035

<u>Appellant Representative</u>

Electronic Service         Jason Ehrenberg
                           Served on email address registered with MSPB

<u>Agency Representative</u>

Electronic Service         Terrence Cook
                           Served on email address registered with MSPB

<u>Agency Representative</u>

Electronic Service         Alison Gray
                           Served on email address registered with MSPB

---

01/26/2024                              *Dinh Chung*
(Date)                                  Dinh Chung
                                        Case Management Specialist

Appx24

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**NORTHEASTERN REGIONAL OFFICE**

| | |
|---|---|
| BRUCE FLEMING,<br>          Appellant, | DOCKET NUMBER<br>PH-0752-18-0457-I-1 |
| v. | |
| DEPARTMENT OF THE NAVY,<br>          Agency. | DATE: July 24, 2019 |

Jason H. Ehrenberg, Esquire, Washington, D.C., D.C., for the appellant.

Terrence P. Cook, Esquire, Annapolis, Maryland, for the agency.

**BEFORE**
Mark Syska
Administrative Judge

**INITIAL DECISION**

The appellant filed this appeal to challenge his removal.  *See* Appeal File (AF), Tab 1.  The Board has jurisdiction under 5 U.S.C. §§ 7511-7514; 5 C.F.R. Part 752; 5 C.F.R. § 1201.3(a)(1).  For the reasons that that follow, the agency's removal decision is REVERSED.

**Background**

The appellant has served as a Professor at the United States Naval Academy at Annapolis, Maryland (academy or agency) for approximately thirty-one years.  The appellant served in the English Department, and the case pertains to his conduct in a plebe (freshman) class of HE 111: Rhetoric & Introduction to Literature during the 2017/2018 academic year.  On January 19, 2018, a midshipman (MD) filed a lengthy complaint about the appellant regarding the Fall

2017 section of HE 111. *Id*. at 115-128. This complaint was ultimately accompanied by more limited complaints from four other midshipmen. *Id*. at 129-133. As a consequence, a faculty panel was assembled to investigate the complaints, and the appellant was taken out of the classroom during the investigation.

The panel investigated a variety of purported misbehavior: (1) Discriminating against students on political grounds, in particular referring to two students as "right-wing extremists;" (2) using demeaning language to refer to students, specifically "goldfish" and "midsheeple;" (3) allowing students to tell jokes of a sexual nature in class; (4) regularly discussing sexual matters unrelated or only tangentially related to readings in class, including transgender reassignment surgery and anal sex; (5) emailing partially-clothed photos of himself to his students; (6) touching students on the neck, shoulders, and back in class without their consent; (7) displaying photos of his son's date and making derogatory remarks about her and her mother in class; (8) purposely mispronouncing an Asian student's last name multiple times and telling him to "fuck off" when he repeatedly corrected you; (9) making it known that you have previously litigated complaints against you by Navy administrators and any future complaint is likely to fail because you have tenure; (10) additional finding one - using profanity in classroom discussions and email to students; (11) additional finding two − spending a significant amount of class time on "off topic" discussions; and (12) additional finding number three − making inappropriate and/or unprofessional remarks in class. *Id*. at 97-113. The appellant was twice invited to address the panel, and he declined by email twice: (1) His first email led to a reprimand because it mentioned private student information; and (2) the second email provided his colorful response to the charged conduct. *See* AF, Tab 8 at 123-134.

On May 18, 2018, the panel issued its report, which began with effusive praise for the appellant – that the students in his upper level class (HE 302) for

the academic year had a universally positive opinion of him, enjoyed his teaching, and deemed him an excellent or good teacher. *See* AF, Tab 7 at 97. The report also notes that the students in the plebe class (HE 111) largely echoed these sentiments, but for seven students that rated him a poor instructor. *Id*. The panel then went into the various complaints. Ultimately, the panel concluded that complaints 1, 3, 8, 9, additional finding one, and additional finding two could not be confirmed, or, if confirmed, were <u>not</u> misconduct. *Id*. at 113. The panel also concluded that complaints 2, 5, 6, 7, and additional finding three did occur and did qualify as unprofessional behavior. *Id*. As to complaint four, the panel concluded that discussions of sex that were germane to the reading assignments were appropriate, but the appellant's discussion of his personal experiences had no place in the classroom. *Id*.

On June 26, 2018, the academy proposed the appellant's removal. *See* AF, Tab 7 at 79-84. The proposed removal was based on one charge of "Conduct Unbecoming a Federal Employee," which had one specification:

> During the fall semester of Academic Year 2017-2018, you engaged in unprofessional conduct in the classroom and outside the classroom. Your conduct included, but is not limited to: (1) referring to students as "right-wing extremists," and/or words to that effect; (2) classroom comments/discussion regarding anal sex, oral sex, and transgender surgery; (3) emailing partially clothed pictures of yourself to students after having been counseled that doing so was inappropriate and your agreement not to do so in the future; (4) touching students without their approval; (5) referring to your own sexual experiences; (6) repeatedly mispronouncing an Asian-American student's name despite being corrected several times by the student; and (7) making demeaning sexually-related comments about a young woman attending a dance with your son and similar offensive comments about the young woman's mother.

*See* AF, Tab 7 at 79.[1] The appellant's counsel provided a lengthy response to the proposal. *Id*. at 33-78. Ultimately, the deciding official ordered the appellant removed, effective August 17, 2018. *Id*. at 18, 20-25.

---

[1] The agency's decision to include specifications 1, 2, and 6 appear at odds with the panel's conclusions.

This appeal followed.    I held the appellant's requested hearing, and nine witnesses (of the thirteen that had been approved) testified: (1) Captain Robert Chadwick, Commandant of Midshipmen; (2) Professor Keith Lindler, chair of the investigation panel; (3) Midshipman MD, primary complaining witness; (4) Midshipman AB, secondary complaining witness; (5) Midshipman RJ, secondary complaining witness; (6) Midshipman JR, secondary complaining witness; (7) Midshipman BG, secondary complaining witness; (8) Mr. Andrew Phillips, Academic Dean & Provost, deciding official; and (9) Professor Anne Marie Drew, English Professor.    *See* AF, Tab 32 (Hearing CD).    After Prof. Drew (the appellant's first witness) testified, the appellant (surprisingly) elected not to testify, nor call any further witnesses, and the hearing immediately proceeded to closing arguments.    *Id*.

**Legal Standards**

Adverse Action

The Board may uphold an agency decision to take adverse action against an employee only if the charge is supported by preponderant evidence.    5 U.S.C. § 7701(c)(1)(B);  5 C.F.R.  § 1201.56(a)(1)(ii).    Preponderant evidence is the degree of relevant evidence a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue.  5 C.F.R. § 1201.56(c)(2).    In addition to proving the charge, the agency also has the burden of establishing that its action promotes the efficiency of the service (the nexus requirement), meaning the removal action relates to either the appellant's ability to accomplish his duties or some other legitimate government interest.    5 U.S.C. § 7513.    Finally, the agency must show that its penalty selection was not so excessive as to be an abuse of discretion, and not otherwise arbitrary or unreasonable.    *Douglas v. Veterans Administration,* 5 M.S.P.R. 280, 296-306 (1981).

5

Conduct Unbecoming

In analyzing a charge of "conduct unbecoming," the Board relies upon the term's ordinary meaning, holding that unbecoming conduct is: "unattractive; unsuitable …, detracting from one's … character, or reputation; [or] creating an unfavorable impression." *Miles v. Department of the Army,* 55 M.S.P.R. 633, 637-38 (1992) (intentionally killing deer with government vehicle was conduct unbecoming). A charge of "conduct unbecoming" has no specific elements of proof; it is established by proving that appellant committed the acts alleged in support of the broad label. *Canada v. Department of Homeland Security,* 113 M.S.P.R. 509, ¶ 9 (2010) (consuming alcohol in government vehicle was conduct unbecoming). In this way, an agency may describe actions that constitute misbehavior in narrative form and have its discipline sustained if the efficiency of the service suffers because of the misconduct. *Id.* However, a general charge must be described in sufficient detail to allow an appellant to make an informed reply. *See Cross v. Department of the Army,* 89 M.S.P.R. 62, 68 (2001) (changing subordinate's appraisal without notice to employee was conduct unbecoming). *Cf. Colbert v. U.S. Postal Service,* 93 M.S.P.R. 467, 471 (2002) (narrative charge acceptable so long as it describes misbehavior) (manipulation of timecards was "unacceptable conduct").

Whistleblower Affirmative Defense

The WPA prohibits an agency from taking a personnel action against an employee for disclosing information that the employee reasonably believes evidences a violation of law, rule, or regulation; gross mismanagement; a gross waste of funds; an abuse of authority; or a substantial and specific danger to public health or safety. *See Chambers v. Department of the Interior*, 602 F.3d 1370, 1375-76 (Fed. Cir. 2010) (citing 5 U.S.C. § 2302(b)(8)); *Mudd v. Department of Veterans Affairs*, 120 M.S.P.R. 365, ¶ 5 (2013); *see also Linder v. Department of Justice*, 122 M.S.P.R. 14, ¶ 11 (2014) (the employee need not "label" the disclosure correctly). The disclosure must be specific and detailed,

not just vague allegations of wrongdoing.  *See Scoggins v. Department of the Army*, 123 M.S.P.R. 592, ¶ 6 (2016).    At a hearing, the appellant must prove his affirmative defense by preponderant evidence.    *See Scoggins*, 123 M.S.P.R. 532, ¶ 5.    If the appellant proves that he made a disclosure and the disclosure was a contributing factor in an adverse personnel action, the burden shifts to the agency to prove by clear and convincing evidence that it would have taken the same action in the absence of the disclosure.  *See Whitmore v. Department of Labor*, 680 F.3d 1353, 1364 (Fed. Cir. 2012).

Other Protected Activity Affirmative Defense

To establish a case of retaliation for engaging in a protected activity, the appellant must show that a prohibited consideration was a factor in the contested personnel action.  *See Savage v. Department of Army*, 122 M.S.P.R. 612, ¶ 41 (2015).  But the Board will only reverse the action if the appellant can show this retaliation was a "but for" cause of the action.  *Id.*, ¶ 48.    Thus, if the appellant shows the prohibited consideration was a factor in an agency decision, the agency can avoid corrective action by showing that it would have taken the same action in the absence of the discriminatory or retaliatory motive.  *Id.*, ¶ 51.

Harmful Error Affirmative Defense

To prove the affirmative defense of harmful error, the appellant must show that the agency violated its own procedures, and that this error was harmful (would change the result).

As to the witnesses, I had the opportunity to observe each witness, and I carefully considered his/her demeanor.  *See Hamilton v. Department of Veterans Affairs*, 115 M.S.P.R. 673, ¶ 18 (2011).[2]

---

[2] To resolve any credibility issues, I utilized a *Hillen* analysis.  An administrative judge must identify the factual questions in dispute, summarize the evidence on each disputed question, state which version he believes, and explain in detail why he found the chosen version more credible, considering such factors as: (1) The witness's opportunity and capacity to observe the event or act in question; (2) the witness's character; (3) any prior inconsistent statement by the witness; (4) a witness's bias, or lack of bias; (5) the contradiction of the witness's version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness's version of events;

**Analysis & Fact-findings**

The appellant appears to be a rather unique professor at the academy. He is irreverent, theatrical, fashion-conscious, outspoken in his criticism of the academy (both in the classroom and his writings), and liberally sprinkles his classes with profanity and discussions of sexually-related topics (from condom use to transgender surgery). The appellant is also a "work-out fiend," and in good enough shape to regularly exercise with the well-conditioned midshipmen at the gyms and swimming pools on campus (where typical attire is swim trunks and other workout gear). Moreover, the overwhelming majority of his students enjoyed the appellant and his teaching style. Indeed, photographs were frequently taken in class, and they reflect a "loose" atmosphere – with the appellant dressed in costume (pirate), students trying on the appellant's designer sport coat or cowboy hat (with arms around each other's shoulders), carrying classmates around, and flexing their biceps en masse. *See, e.g.*, AF, Tab 29 at 20, 21, 24, 26-28, 55-60, 62, 65-69. Indeed, Lindler stated the appellant was a great classroom teacher, Phillips conceded that he could be a very effective teacher, and Drew testified that she had reviewed over a thousand of his student evaluations (over her 30 years) and over 90% were positive – an unheard of success rate. Hearing CD.

But a small group of students – one in particular – disapproved of the appellant's classroom performance. Further, the appellant's classroom behavior and writings appear to have created long-standing tension with the academy's more traditional hierarchy. In addition, this case suggests a potential tension between the concepts of tenure and academic freedom – concepts the academy states it respects – with the basic process of disciplining a federal employee under Title V and the relevant regulations. The appellant is both a professor at an institution of higher learning and a federal employee at the academy.

---

and (7) the witness's demeanor. *Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987).

8

<u>The Charge</u>

The agency ultimately fails to carry its burden of proof regarding the charge for a host of reasons.  At the outset, their primary witness had severe credibility issues.  In addition, the purported "victims" of the appellant's actions did not generally take offense or have any actual issue with the appellant.  Moreover, much of the charged conduct, as noted by the investigating panel, did not appear to be actual misconduct in the context of free-wheeling classroom discussions.  Further, I note that the panel members taught in subject areas where class discussions were unlikely to include profanity or sexual discussions – mechanical engineering and chemistry.  Hearing CD.  Yet, they readily recognized that profanity and the discussion of sexual topics could be completely appropriate in the appellant's class.  Moreover, the one English professor who testified noted that profanity and sexual discussions were not uncommon when discussing literature (which frequently contains these matters).[3]  *Id.*(Drew).  A lack of notice was also a significant issue regarding certain specifications, as the appellant had taught in his same distinctive manner for decades.

<u>General Credibility</u>

Only the primary complaining midshipman testified for any length of time; the secondary complaining midshipman generally testified for bare minutes.  As to the latter, I note their testimony was roughly consistent with their prior statements (with one notable exception).  Hearing CD.  More specifics will be noted below.

As to the former, I must conclude that MD's testimony, like his written complaint, is greatly exaggerated -- to the point of being hard to credit on certain points.  Hearing CD; *see also* AF, Tab 7 at 115-128.  MD also appeared to have a motive to exaggerate his claims about the appellant.  Further, MD's limited

---

[3] Drew emphasized this point by noting some of the English professors are Marines. Hearing CD.

credibility is critical because, as the deciding official conceded, in the absence of MD's complaint (and it being believed), "we would not be here." Hearing CD.

A few examples of MD's questionable assertions are instructive. In his statement and testimony, MD stated a "plethora" of people were "suffering" or "crying," but on cross he conceded that it was really only one person. Hearing CD.[4] He also conceded his reference to repeated "attacks" by the appellant all referred to one email (discussed below). *Id*. Further, he stated that the "obscene, X-rated, and sexually explicit" comments were the appellant's discussions of such things as condom use, transgender surgery, and his expressed opinion that sexual matters should be discussed openly. *Id*.

Significantly, on cross, MD also recounted that during a private help session in the appellant's office, he began to believe that he would be sexually assaulted and looked about for a weapon to potentially fight the appellant off. Hearing CD; *see also* AF, Tab 7 at 123. Notably, nothing occurred beyond discussing the appellant's written work, and the appellant did not report his perceived "imminent attack" to anyone (although he would later complain about far smaller matters). *Id*. Further, the appellant's direct testimony about this session only included a reference to the appellant looking up MD's SAT scores and opining "that explains a lot." Hearing CD. Moreover, MD completely undermines his "attack claim " with an email from late in the semester in which MD states that he tried to get into the appellant's class for the following semester, thanked the appellant for everything, and said he would stay in touch with the appellant.[5] *See* AF, Tab 29 at 18.

MD's reaction to the appellant's photo – a shirtless half torso with the focus on a flexed bicep -- is similarly difficult to credit. *See* AF, Tab 8 at 136.

---

[4] He also conceded that many students like the appellant - the "Fleming Faithful." Hearing CD.

[5] MD suggested in his testimony that he was merely trying to curry favor and save his grade with this email. Hearing CD. Admitting to making misstatements to curry favor – serve one's personal interests – does nothing for one's credibility.

Indeed, MD stated that he "agonized" over whether the photo constituted "sexual assault or sexual harassment. " *See* AF, Tab 7 at 121; Hearing CD. The former is nonsense while the latter is merely a long stretch. I note that taking photos was common in the appellant's class, and the record included photos of the entire class (including MD) flexing their biceps – flex being a writing concept the appellant encouraged. Hearing CD; *see also* AF, Tab 29 at 27-28, 66, 69. In this context, MD's purported reaction appears feigned.

At bottom, MD having the appellant as his instructor in his first semester of college was something of the perfect storm. An eighteen year-old from a conservative, religious family, who had only attended religious schools and only experienced academic success versus the profane, irreverent, brutally critical (read admitted very tough grader[6]) and highly theatrical appellant had conflict written all over it. MD testified, with some indignation, that the appellant gave him his first "C" of his academic life, and he had noted in his statement that grading was where the appellant "asserted dominance" over plebes. Hearing CD. That high grades might not come as easily in college as they did in high school, particularly in a hyper-competitive environment like the academy, did not seem to occur to him. MD also conceded that a low grade could impact upon his future posting. *Id*. In sum, MD gave the impression his complaint was motivated more by animus for his grade than any sort of genuine concern about the appellant's teaching style.

Thus, MD's statements, when not corroborated, were of limited value. Further, as noted by Lindler, it also appears that MD asked/cajoled/encouraged the other complaining midshipman to file complaints. Hearing CD. As previously noted, their complaints were short (often less than a page) and some included the disclaimer that they were not personally offended by the appellant's actions. *See* AF, Tab 7 at 129-134. These witnesses generally reiterated the fact

---

[6] *See* AF, Tab 29 at 45-53.

they were not personally offended by the appellant's conduct in their testimony. Hearing CD (AB, JR, BG).

  a. Specification One – "right-wing extremists"

This specification is based upon an email that the appellant sent to two midshipmen (including MD) on September 26, 2017, *see* AF, Tab 8 at 135, that the panel addressed and found did not constitute "political discrimination" or other inappropriate conduct, *see* AF, Tab 7 at 98-99.   The email quite simply cannot be read as politically discriminatory.   While the email begins with the phrase "right-wing extremists,"[7] the appellant goes to great pains to state he would make the same comments to "left-wing extremists" and would say the same thing to "Bernie" [Sanders].  *See* AF, Tab 8 at 135.  Further, the obvious thesis of the email was that the students had erred in failing to justify their positions – by providing authority for assertions and addressing obvious counter-arguments.  *Id.* Indeed, the appellant had summed up the failing as follows---"Tell Bill why" and "it's not a left-wing thing. It's a justify that thing." *Id.*   The reference to politics was incidental[8] (and tongue in cheek) to the real message – provide supporting arguments for your positions – which is a completely appropriate criticism for a student paper.   Specification one is simply does not describe misconduct.

  Specification one is NOT SUSTAINED.

  b. Specification Two - comments regarding oral/anal sex and transgender
     surgery & specification five - referring to his own sexual experiences
     (panel complaint #4)

---

[7] The midshipmen were taking stereotypical "right-wing" positions - anti-tax and anti-gun control.

[8] Even if it was not, my conclusion would not change.   Drew testified, without contradiction, that professors often gave tongue-in-cheek nicknames to various groups of students (*e.g.*, "the theater geeks").  Hearing CD.  Moreover, MD's claimed "political discrimination" had no further manifestations – he testified the appellant commented on his other papers, but he "could not remember" the comments (or whether he disagreed with them).  *Id.*

The panel summarized the evidence on this issue, and concluded that discussions of the topic were appropriate as it related to assigned reading, but not appropriate to the extent the appellant referred to his personal experiences.  *See* AF, Tab 7 at 101-103.  In his email response, the appellant conceded the conduct and provided his justifications for it.  *Id*. at 102-103.

Specification two charged discussions of various sexual topics generally, contrary to the panel's conclusion that such topics were appropriate if applicable to the reading assignments.  More significantly, Phillips did not take into account that the assigned readings involved sexual topics that warranted class discussions.  Hearing CD.   Phillips was also unaware that the appellant wrote on transgender issues and one of the assigned readings involved transgender issues.  *Id*.  Thus, the deciding official did not consider the fundamental issue of whether the academic context warranted the discussion of sexual topics.   Moreover, there does not appear to be a rule or policy against discussing sexual topics in an academy classroom.  *Id*.   In addition, the appellant does not appear to have received any notice – prior counseling or letter of reprimand – that discussions of sexual topics in a *college* classroom were forbidden or greatly restricted.   On this record, it's difficult to see any misconduct.

As to specification 5, the panel did conclude that the appellant's references to his own experiences were inappropriate.   However, as before, the appellant does not appear to have received any notice about this "forbidden" topic, nor does there appear to be an express prohibition of this topic.[9]  Hearing CD.

Specifications two & five are NOT SUSTAINED.

c.  Specification three – emailing partially clothed photos to students after being counseled and agreeing not to do so (panel complaint #5).

The panel concluded that these incidents had occurred, and that the appellant's focus on his prior counseling was disingenuous.  *See* AF, Tab 7 at

---

[9] The academy's position, which is somewhat murky, appears to be that discussions of personal experiences can quickly cross the line into sexual harassment.   In essence, the appellant's conduct <u>could</u> become misconduct.

103-106.   There is no real dispute that the appellant was previously counseled for sending partially clothed photos of himself to students in 2015, *see* AF, Tab 8 at 158-159, and that he engaged in the behavior again in 2017, *see* AF, Tab 8 at 136; Tab 29 at 77-78.   But again is this actual misconduct, as opposed to being, as Drew put it, a dumb decision?   Hearing CD.

As to sending photos of himself, other than MD, no one who received the photos appeared particularly offended by them.   Indeed, the comparative bodybuilder photos (the young appellant in posing trunks and the current appellant posing shirtless) had been prompted by a student's question as to how the appellant physically compared to himself twenty-years ago.   *See* AF, Tab 29 at 77-78.   Notably, the student who received the photo, while providing it to the panel as requested, was not a complaining witness.   As to MD, he admitted to sending a photo of a man jogging in a speedo to the appellant.   Hearing CD; *see also* AF, Tab 29 at 22.   MD attempted to back-pedal by saying the appellant asked for a copy, but, even if true, the appellant would not have known to ask if MD had not mentioned that he had taken such a photo.   *Id*.   Thus, MD's purported "offense" at a shirtless photo is hard to believe.   On this record, I again cannot find misconduct.

Specification three is NOT SUSTAINED.

d. Specification 4 – touching students without their approval (panel complaint #6).

The panel concluded that this specification was fully supported by the evidence, and the appellant conceded hugging and other touching.   *See* AF, Tab 7 at 106-107.   The panel also found the appellant's assertion that he did not touch plebes was inconsistent with the evidence.   *Id*.   I must agree, as midshipman AB testified to the appellant rubbing his back for about fifteen seconds on two occasions (when he was a plebe).   Hearing CD.

However, there is no policy against touching – beyond that it be consented to and not constitute sexual harassment or other misconduct – so there is an

14

element of line drawing based upon common sense. Hearing CD. Indeed, Chadwick took the view that only hand-shakes or a pat on the back were appropriate, while Drew viewed hugs appropriate because the students get to know them (but one must be sensitive to circumstances). *Id*. Chadwick also tried to draw a temporal line – any contact over 4-5 seconds was "prolonged" and likely to be improper. *Id*.

Here, the appellant admitted to hugs in his email response, but Drew admitted the same (and stated other professors do too) and was not cautioned or disciplined for it. The only other contact presented was AB getting his back rubbed. *Id*. But AB emphasized that he was not offended, enjoyed the appellant's class, and had no problem with the appellant personally. *Id*. Again, in these circumstances, I am hard pressed to find misconduct.

Specification four is NOT SUSTAINED.

e. Specification six – repeatedly mispronouncing an Asian student's name (panel complaint #8).

The panel considered midshipman RJ's statements and the appellant's denial. *See* AF, Tab 7 at 108. The panel found RJ credible, but nonetheless found in favor of the appellant on this point for lack of corroboration. *Id*.

I part company with the panel on the credibility question. RJ's testimony, while consistent with his complaint, *see* AF, Tab 7 at 133-134, is not consistent with his statements in the panel's questionnaire, *see* AF, Tab 8 at 59-60. Indeed, his comments to the questionnaire suggest that he was not positive the mispronunciations were deliberate and did not mention the (fairly significant) "fuck off" comment. *Id*. Moreover, the lack of corroboration from the rest of the class is particularly telling given the panel used a fairly specific question – essentially does the appellant ever mispronounce names, particularly Asian names? *See* AF, Tab 8 at 133-173. If the incidents had occurred as charged, one would think that question would jog the students' memories.

Specification six is NOT SUSTAINED.

    f. Specification seven – making demeaning remarks about his son's date and her mother (panel complaint #7).

The panel noted that the appellant conceded that he in fact engaged in this behavior. *See* AF, Tab 7 at 107-108. The panel concluded that the appellant was free to discuss his family and opine on dress length, but it was inappropriate to discuss the girl or her mother's sexual intentions.[10] *Id*. at 108. Before me, both MD and JR testified about the incident. Hearing CD.

As before, I am hard pressed to find misconduct here, in context. There appears to be no prohibition on discussing one's family, and, as noted above, there does not appear to be a prohibition about discussing sexual topics.

Specification 7 is NOT SUSTAINED.

Accordingly, because none of the specifications were sustained, the Charge is NOT SUSTAINED. In addition, nexus is ultimately irrelevant in light of the agency's failure to prove the charge.

<u>Affirmative Defenses</u>

The appellant's affirmative defenses were compromised by his failure to testify and to call his remaining witnesses.[11] Notably, other than a few minor op-ed pieces, there is no evidence beyond the titles (in hyperlinks) of/or general references to the appellant's purportedly most significant writing(s). *See* AF, Tab 29 at 4-8, 30-36, 103-106. On this record, there is no basis for finding that any of these writings constituted or contained disclosures under 5 U.S.C. § 2302(b)(8). Indeed, the basic subject matter of the more significant articles – whether the service academies still serve a purpose/should be kept open -- suggest that they were opinion or "think" pieces. This would suggest they did not amount to (or contain) protected disclosures. *See LaChance v. White*, 174 F.3d 1378, 1381

---

[10] Although one wonders what else criticizing the inappropriately short length of a woman's skirt could imply.

[11] Indeed, even the closing argument focused primarily on the weaknesses of the agency's evidence and the unreasonableness of the penalty. Hearing CD.

(Fed. Cir. 1999) (the WPA is not a weapon in arguments over policy); *Salerno v. Department of the Interior*, 123 M.S.P.R. 230, ¶ 7 (2016) (general philosophical or policy disagreements do not constitute protected disclosures). In any event, the burden is on the appellant to present evidence establishing his disclosures by a preponderance of the evidence, and he has not done so.

As to whether the agency retaliated against the appellant for exercising his First Amendment rights, the appellant has again failed to carry his burden of proof. On this record, one simply cannot conclude that the appellant's speech was a "but for cause" of this action. While, the agency officials were aware of his various articles, and had exchanged emails about them, nothing in the emails constitutes a "smoking gun." *See generally* AF, Tab 29. Notably, the email correspondence between the various management officials regarding the appellant's various articles do not reflect much beyond a mixture of curiosity and vague annoyance. Phillips also testified that he had long before stopped reading the appellant's articles, as he found them repetitive. Hearing CD. I do note that the agency officials – Chadwick and Phillips -- were quite hostile about the appellant in their testimony. *Id*. But this seemed to be based upon his classroom behavior, that both believed showed that he was not modeling appropriate academy behavior of "dignity and respect" and failing as a role-model. *Id*. Further, the appellant's own witness also largely undermines his claim. Notably, she testified that the last four superintendents did not like the appellant's personal behavior or writings. *Id*. Yet, he has served the academy for over thirty years, which suggests not liking the appellant's writings and retaliating against him for those writings remained two very different things.

The harmful error claim is also unpersuasive. Indeed, none of the American Association of University Professors (AAUP) filings suggest that a tenured professor cannot be removed for serious misconduct or incompetence (the grist of Chapter 75 and Chapter 43). *See* AF, Tab 7 at 39, 75; Tab 29 at 37, 72. Thus, the standards for removing a tenured professor and a federal employee are

not per se incompatible. More significantly, there is no evidence that the academy was obligated to follow the AAUP standard. While the academy does state that it adopts the AAUP guidelines for academic freedom and, to some extent, tenure (but noting the academy's unique circumstances), there is no real dispute that the academy had its own process (adopted in 2016), which ultimately ends in a proceeding before the Board for the disciplined professor. *See* AF, Tab 8 at 149-155; Tab 29-114-121. Indeed, the issue appeared to be a question of confusion rather than one of academy authority – that the agency should not state on the hiring end that it generally follows AAUP standards while conducting disciplinary actions through a different process. Hearing CD (Drew). Thus, on the current record, there appears to be no harmful error.

Lastly, Phillips' testimony also undermines the appellant's affirmative defenses. Notably, he opined that in the absence of the MD complaint (and the complaint being believed), the disciplinary action would not have taken place. Hearing CD.

## DECISION

The agency's action is REVERSED.

## ORDER

I **ORDER** the agency to cancel the removal and to retroactively restore appellant effective **August 17, 2018**. This action must be accomplished no later than 20 calendar days after the date this initial decision becomes final.

I **ORDER** the agency to pay appellant by check or through electronic funds transfer for the appropriate amount of back pay, with interest and to adjust benefits with appropriate credits and deductions in accordance with the Office of Personnel Management's regulations no later than 60 calendar days after the date this initial decision becomes final. I **ORDER** the appellant to cooperate in good faith with the agency's efforts to compute the amount of back pay and benefits

18

due and to provide all necessary information requested by the agency to help it comply.

If there is a dispute about the amount of back pay due, I **ORDER** the agency to pay appellant by check or through electronic funds transfer for the undisputed amount no later than 60 calendar days after the date this initial decision becomes final.  Appellant may then file a petition for enforcement with this office to resolve the disputed amount.

I **ORDER** the agency to inform appellant in writing of all actions taken to comply with the Board's Order and the date on which it believes it has fully complied.  If not notified, appellant must ask the agency about its efforts to comply before filing a petition for enforcement with this office.

For agencies whose payroll is administered by either the National Finance Center of the Department of Agriculture (NFC) or the Defense Finance and Accounting Service (DFAS), two lists of the information and documentation necessary to process payments and adjustments resulting from a Board decision are attached.  I **ORDER** the agency to timely provide DFAS or NFC with all documentation necessary to process payments and adjustments resulting from the Board's decision in accordance with the attached lists so that payment can be made within the 60-day period set forth above.

## INTERIM RELIEF

If a petition for review is filed by either party, I **ORDER** the agency to provide interim relief to the appellant in accordance with 5 U.S.C. § 7701(b)(2) (A).  The relief shall be effective as of the date of this decision and will remain in effect until the decision of the Board becomes final.

Any petition for review or cross petition for review filed by the agency must be accompanied by a certification that the agency has complied with the interim relief order, either by providing the required interim relief or by satisfying the requirements of 5 U.S.C. § 7701(b)(2)(A)(ii) and (B).  If the

appellant challenges this certification, the Board will issue an order affording the agency the opportunity to submit evidence of its compliance. If an agency petition or cross petition for review does not include this certification, or if the agency does not provide evidence of compliance in response to the Board's order, the Board may dismiss the agency's petition or cross petition for review on that basis.


FOR THE BOARD: _____

Mark Syska
Administrative Judge

## ENFORCEMENT

If, after the agency has informed you that it has fully complied with this decision, you believe that there has not been full compliance, you may ask the Board to enforce its decision by filing a petition for enforcement with this office, describing specifically the reasons why you believe there is noncompliance. Your petition must include the date and results of any communications regarding compliance, and a statement showing that a copy of the petition was either mailed or hand-delivered to the agency.

Any petition for enforcement must be filed no more than 30 days after the date of service of the agency's notice that it has complied with the decision. If you believe that your petition is filed late, you should include a statement and evidence showing good cause for the delay and a request for an extension of time for filing.

## NOTICE TO PARTIES CONCERNING SETTLEMENT

The date that this initial decision becomes final, which is set forth below, is the last day that the parties may file a settlement agreement, but the administrative judge may vacate the initial decision in order to accept such an agreement into the record after that date. *See* 5 C.F.R. § 1201.112(a)(4).

## NOTICE TO APPELLANT

This initial decision will become final on **August 28, 2019**, unless a petition for review is filed by that date. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first. You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review. Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record. You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and

may only be accomplished at the Board's e-Appeal website ([https://e-appeal.mspb.gov](https://e-appeal.mspb.gov)).

### NOTICE OF LACK OF QUORUM

The Merit Systems Protection Board ordinarily is composed of three members, 5 U.S.C. § 1201, but currently there are no members in place. Because a majority vote of the Board is required to decide a case, *see* 5 C.F.R. § 1200.3(a), (e), the Board is unable to issue decisions on petitions for review filed with it at this time. *See* 5 U.S.C. § 1203. Thus, while parties may continue to file petitions for review during this period, no decisions will be issued until at least two members are appointed by the President and confirmed by the Senate. The lack of a quorum does not serve to extend the time limit for filing a petition or cross petition. Any party who files such a petition must comply with the time limits specified herein.

For alternative review options, please consult the section below titled "Notice of Appeal Rights," which sets forth other review options.

### Criteria for Granting a Petition or Cross Petition for Review

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative

judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first. If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt. You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j). If the petition is filed electronically, the online process itself will serve the petition on other e-filers. *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

**ATTORNEY FEES**

If no petition for review is filed, you may ask for the payment of attorney fees (plus costs, expert witness fees, and litigation expenses, where applicable) by filing a motion with this office as soon as possible, but no later than 60 calendar days after the date this initial decision becomes final. Any such motion must be

prepared in accordance with the provisions of 5 C.F.R. Part 1201, Subpart H, and applicable case law.

### NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

### NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above.  5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file.  5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.  Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general**.  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court

within **60 calendar days** of <u>the date this decision becomes final</u>.  5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2)** <u>**Judicial or EEOC review of cases involving a claim of discrimination**</u>.  This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.  If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after this decision becomes final</u> under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. _____ , 137 S. Ct. 1975 (2017). If the action involves a claim of

discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after this decision becomes final as explained above. 5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C. 20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**. This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and you wish to challenge the Board's rulings on your whistleblower claims only, excluding all other issues, then you may file a petition for judicial review

with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.  The court of appeals must <u>receive</u> your petition for review within **60 days** of <u>the date this decision becomes final</u> under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

<u>http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx</u>

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 24-1557

**Short Case Caption:** BRUCE FLEMING v. DEPARTMENT OF THE NAVY

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

[✔] the filing has been prepared using a proportionally-spaced typeface and includes 8838 words.

[ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

[ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 06/10/2024        Signature: /s/ Jason H. Ehrenberg

                        Name: Jason H. Ehrenberg