2024-1557

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

BRUCE FLEMING,
Petitioner,

v.

DEPARTMENT OF THE NAVY,
Respondent.

Petition For Review Of The Merit Systems Protection Board
In Case No. PH-0752-18-0457-I-1

## BRIEF FOR RESPONDENT

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

ELIZABETH M. HOSFORD
Assistant Director

LIRIDONA SINANI
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 353-2188

August 21, 2024          Attorneys for Respondent

# **TABLE OF CONTENTS**

**Page:**

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF RELATED CASES ............................................................v

INTRODUCTION .........................................................................................1

STATEMENT OF THE ISSUES...................................................................3

STATEMENT OF THE CASE SETTING FORTH RELEVANT FACTS.............4

I.  Nature Of The Case ..............................................................................4

II.  Statement Of Facts And Course Of Proceedings Below ....................4

    A.  Background On The Naval Academy, Its Mission, And Its
Expectations From Its Faculty And Midshipmen ...............4

    B.  In Early 2018, Five Midshipmen Submit Written Complaints
Concerning Dr. Fleming's Conduct, The Navy Convenes A Fact-
Finding Inquiry, And The Navy Ultimately Removes Dr. Fleming
From Federal Service ...........................................................7

    C.  Dr. Fleming Appeals The Removal Decision To The MSPB............14

SUMMARY OF THE ARGUMENT .............................................................26

ARGUMENT ................................................................................................27

I.  Standard Of Review..............................................................................27

II.  Substantial Evidence Supports The Board's Decision That Dr. Fleming
Engaged In Conduct Unbecoming A Federal Employee .....................27

    A.  The Proper Context Within Which To Evaluate Dr. Fleming's
Conduct Is The Naval Academy, Not His English Department
Classroom ............................................................................29

    B.  Specification (1): Email Indisputably Proved That Dr. Fleming
Called Students "Right-Wing Extremists" And Agency Witnesses
Testified That Dr. Fleming Committed Misconduct By Failing To
Treat These Students With Dignity And Respect .................32

    C.  Specification (2): It Was Undisputed That, During Class, Dr.
Fleming Made Comments Regarding Oral Sex, Anal Sex, And
Transgender Surgery, Which Were Unrelated To The Course
Material.................................................................................35

    D.  Specification (3): Emails And Other Documentary Evidence
Undisputably Proved That Dr. Fleming Emailed Partially Clothed
Photos Of Himself To Students After Having Been Counseled That
Doing So Was Inappropriate And Agreeing Not To Do So Again.....39

    E.  Specification (4): It Was Undisputed That Dr. Fleming Sat Next
To A Student In Class And Rubbed The Students Back, Without
Consent, For Approximately 15 Seconds.............................42

i

F.    Specification (5): It Was Undisputed That Dr. Fleming Referred To His Own Sexual Experiences In Class, And These Comments Were Unrelated To Class Material.......................................43

G.    Specification (6): Midshipman RJ's Testimony, Which The Board Properly Credited, And Documentary Evidence Proved That Dr. Fleming Repeatedly Mispronounced An Asian-American Student's Name Despite Being Corrected Several Times By The Student ........45

H.    Specification (7): It Was Undisputed That Dr. Fleming Made Demeaning, Sexually Related Comments About An Adolescent Girl Attending A Dance With His Son And Similar Offensive Comments About The Girl's Mother—Conduct That Common Sense Dictates Is Improper.................................................50

I.    Even If The Court Finds That Substantial Evidence Does Not Support All Specifications, The Court Should Nevertheless Hold That The Agency Proved Its Charge ................................51

III.   The Administrative Judge's Credibility Determination Regarding MD Is Irrelevant........................................................................52

IV.   The Penalty Of Removal Was Reasonable....................................55

CONCLUSION ........................................................................57

# TABLE OF AUTHORITIES

**Cases:**                                                              **Page(s):**

*Arije v. Pointcross Life Scis.*,
  No. CV JKB-18-3119, 2019 WL 652426 (D. Md. Feb. 15, 2019) ....................46
*Boyer v. Dep't of the Navy*,
  56 F.3d 84 (Fed. Cir. 1995) ...................................................................38
*Brenner v. Dep't of Veterans Affairs*,
  990 F.3d 1313 (Fed. Cir. 2021) ............................................................55
*Brown v. Dep't of the Navy*,
  229 F.3d 1356 (Fed. Cir. 2000) ..................................................... 28, 29
*Brown v. Dep't of Transp.*, F.A.A.,
  735 F.2d 543 (Fed. Cir. 1984) ..............................................................38
*Buchanan v. Alexander*,
  919 F.3d 847 (5th Cir. 2019) ................................................................31
*Burroughs v. Dep't of Army*,
  918 F.2d 170 (Fed. Cir. 1990) ..................................................... 28, 51
*Douglas v. Dep't of Veterans Admin.*,
  5 M.S.P.R. 280 (1981) ................................................................. 12, 16
Edler v. Dep't of Veterans Affs.,
  No. 2021-1694, 2022 WL 298651 (Fed. Cir. Feb. 1, 2022) ................................47
*Feld v. Dep't of Veterans,*
  *Affs.*, 484 F. App'x 519 (Fed. Cir. 2012) ...................................... 34, 35
*Goldstein v. Dep't of the Treasury*,
  62 M.S.P.R. 622 (1994) .........................................................................38
*Guise v. Dep't of Just.*,
  330 F.3d 1376 (Fed. Cir. 2003) ...........................................................51
*Haebe v. Department of Justice*,
  288 F.3d 1288 (Fed. Cir. 2002) ..................................................... 47, 48
*Hamilton v. Dep't of Veterans Affairs*,
  115 M.S.P.R. 673 (2011) .......................................................................40
*Hillen v. Dep't of Army*,
  35 M.S.P.R. 453 (1987) .........................................................................54
*In re Glover*,
  1 M.S.P.R. 660 (1980) ...........................................................................46
*Lachance v. Merit Sys. Prot. Bd.*,
  147 F.3d 1367 (Fed. Cir. 1998) ............................................. 28, 47, 51

*Long v. Soc. Sec. Admin.*,
    635 F.3d 526 (Fed. Cir. 2011) .......................................................... 27, 28, 47, 50
*Malloy v. United States Postal Service*,
    578 F.3d 1351 (Fed. Cir. 2009) ...................................................................55
*Martin v. Dep't of Homeland Sec.*,
    855 F. App'x 691 (Fed. Cir. 2021) ............................................................ 29, 30
*Mings v. Dep't of Justice*,
    813 F.2d 384 (Fed. Cir. 1984) ....................................................................55
*Raco v. Soc. Sec. Admin.*,
    117 M.S.P.R. 1 (2011) ...............................................................................28
*Robacker v. Dep't of Agric.*,
    385 F. App'x 990 (Fed. Cir. 2010) ..............................................................38
*Sistek v. Dep't of Veterans,*
    *Affs.*, 955 F.3d 948 (Fed. Cir. 2020) ..........................................................27
*Social Sec. Admin. v. Brennan*,
    19 M.S.P.R. 335 (1984) ............................................................ 40, 41, 44, 45
*Spurlock v. Dep't of Just.*,
    894 F.2d 1328 (Fed. Cir. 1990) ..................................................................49
*Webster v. Dep't of Army*,
    911 F.2d 679 (Fed. Cir. 1990) ....................................................................56

Statutes

5 U.S.C. § 7703(c) .............................................................................................27

Rules

Fed. R. App. P. 32(a)(5) .....................................................................................59
Fed. R. App. P. 32(a)(6) .....................................................................................59
Fed. R. Evid. 610 ...............................................................................................55

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, respondent's counsel states that she is unaware of any other appeal in or from this action that previously was before this Court or any other appellate court under the same or similar title.  Respondent's counsel also states that she is unaware of any case pending in this or any other court that may directly affect or be directly affected by this Court's decision in this appeal.

2024-1557

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

BRUCE FLEMING,
Petitioner,

v.

DEPARTMENT OF THE NAVY,
Respondent.

Petition For Review Of The Merit Systems Protection Board
In Case No. PH-0752-18-0457-I-1

INTRODUCTION

At the time of his removal, Dr. Bruce Fleming was a tenured professor of

English at the United States Naval Academy (Naval Academy).  The Department

of the Navy (agency) removed him from that position, effective August 17, 2018,

based on a charge of Conduct Unbecoming a Federal Employee, with seven

specifications.  The specifications supporting the charge were that Dr. Fleming: (1)

referred to students as "right-wing extremists"; (2) made comments about and

discussed anal sex, oral sex, and transgender surgery; (3) emailed partially clothed

photos of himself to students after having been counseled that such conduct was

inappropriate and agreeing to refrain from doing so; (4) touched students without

their approval; (5) referred to his own sexual experiences; (6) repeatedly

mispronounced an Asian-American student's name despite being corrected several times by the student; and (7) made demeaning, sexually related comments about a young girl attending a school dance with his son and the girl's mother because of how they were dressed.

Dr. Fleming appealed his removal to the Merit System Protection Board (MSPB or board). He asserted affirmative defenses of whistleblower retaliation, violation of First Amendment rights, and harmful procedural error by the agency. On July 24, 2019, an administrative judge issued an initial decision sustaining noneof the specifications and reversing the removal on that basis, and concluding that Dr. Fleming failed to prove his affirmative defenses. The agency petitioned for review. On January 26, 2024, the board issued a final decision (1) granting the agency's petition for review, (2) sustaining all seven specifications, (3) concluding that the agency established a nexus by preponderant evidence, (4) determining that the penalty of removal was within the tolerable limits of reasonableness, (5) affirming the administrative judge's rejection of Dr. Fleming'saffirmative defenses, and (6) sustaining Dr. Fleming's removal. Dr. Fleming now seeks review of the final decision.

## STATEMENT OF THE ISSUES[1]

1.     Whether substantial evidence supports the board's concluding that the Department of the Navy proved its charge of Conduct Unbecoming a Federal Employee against Dr. Fleming;

2.     Whether the board provided sound reasons for overturning the administrative judge's credibility determination—which the board found to be implicitly based on demeanor—regarding Richard Jin, the agency's main witness for one specification;

3.     Whether the board owed any deference to the administrative judge's findings regarding Midshipman Matthew DeSantis's credibility when there were no factual disputes on the record regarding any material issue about which Mr. DeSantis testified to warrant a credibility assessment;

4.     Whether the agency's selection of the penalty of removal constitutes an abuse of discretion.

---

[1]   Pursuant to Federal Circuit Rule 28(b), we have included a statement of the issues, the case and facts, and the standard of review because we are not satisfied with Dr. Fleming's presentations of these aspects of the case.  In the "Statement of the Case and Facts" section of his brief, Dr. Fleming makes several unsubstantiated claims that the agency has retaliated against him because of his writings about the Naval Academy.  *See* Corrected Br. For Pet'r (Pet. Br.) at 4-6, ECF No. 12. Neither the administrative judge nor the board found any evidence of retaliation, Appx16 n.12, and Dr. Fleming does not challenge that finding.  Thus, the Court should disregard Dr. Fleming's statement of "facts."

## STATEMENT OF THE CASE SETTING FORTH RELEVANT FACTS

I.     Nature Of The Case

Dr. Fleming seeks review of a final decision of the MSPB, issued on January

26, 2024, sustaining his removal from Federal service based on a charge of

Conduct Unbecoming a Federal Employee.  Appx0001-0024.[2]

II.     Statement Of Facts And Course Of Proceedings Below

At the time of his removal, Dr. Fleming was a tenured professor of English

at the at the U.S. Naval Academy in Annapolis, Maryland.  Appx2.

A.     Background On The Naval Academy, Its Mission, And Its
Expectations From Its Faculty And Midshipmen

The Naval Academy is a Department of the Navy institution of higher

learning.  Appx814.  It is unlike a civilian university in that all of the students are

midshipmen on active duty in the Navy and are destined to serve the United States

as active duty Navy or Marine Corps officers.  Appx1041, Appx1055 (Phillips

Test.).[3]  The Naval Academy's mission is "to develop midshipmen morally,

mentally and physically" and "imbue them with the highest ideals of duty, honor,

---

[2] "Appx__" refers to pages in the joint appendix to be filed in this case.

[3] Andrew Phillips was the Academic Dean and Provost and the deciding official for Dr. Fleming's removal.  Appx1039 (Phillips Test.); Appx205.  The Academic Dean and Provost is responsible for all matters concerning faculty at the Naval Academy.  Appx846.

and loyalty," in order to graduate leaders who are dedicated to a career of naval

service and have the potential "to assume the highest positions of citizenship,

command[,] and government."  Appx883 (Chadwick test.);[4] Appx916 (Lindler

Test.).[5]  In support of that mission, all faculty—whether civilian or military— are

expected to serve as role models for the midshipmen under their tutelage.[6]

Appx916-917 (Lindler Test.); Appx1049-1050, Appx1055, Appx1083 (Phillips

Test.); Appx1104 (Drew Test.); *see also* Appx846.  Such modeling includes

exemplifying the "fundamental principle[] in the military profession," which is to

treat everyone with dignity and respect.  Appx883-884, Appx912-913 (Chadwick

Test.); Appx916-917 (Lindler Test.); Appx1048-1049 (Phillips Test.).  As the

Academic Dean and Provost testified during the MSPB hearing, it is "crucial that .

. . midshipmen[] learn what dignity and respect looks like[] because [the Navy is]

going to expect them to treat their subordinates, the citizens of this country, [and]

---

[4] Captain Robert Chadwick was the Commandant of Midshipmen at the Naval Academy during the relevant time period.  Appx882 (Chadwick Test.).  The Naval Academy Commandant is similar to the Dean of Students at a civilian university, and is responsible for the day-to-day conduct, military training and professional development of approximately 4,300 midshipmen.  *Id.*, Appx887-888.

[5] Professor Lindler served as chair of the investigation panel in this case. Appx919-921, Appx936 (Lindler Test.).

[6] A little over 50 percent of the faculty at the Naval Academy are civilian and the remaining are military, either Navy or Marine Corps officers.  Appx1042 (Phillips Test.).

the citizens of other countries[] with dignity and respect at all times." Appx1048 (Phillips Test.).

Naval Academy instructions provide that Naval Academy civilian faculty are "[h]ired not simply as classroom instructors, but to support the Naval Academy's comprehensive mission to develop officers for the Navy and Marine Corps[.]" Appx848. Instructors have the right to academic freedom within the classroom; however, such freedom is not "a license to say or do anything without restriction." Appx520-521. Academic freedom includes the use of pedagogical techniques that allow for spirited exchanges of beliefs and ideas; adoption of an unusual, different, or unpopular stance to provoke discussion; or encouragement of students to analyze their own views or to assess the basis of their values. *Id.* Academic freedom is not a license to engage in "behavior that is unprofessional and/or pedagogically inappropriate"; instructors are "obliged to maintain a professional atmosphere" and are "expected to treat their students with dignity and respect." *Id.*

Midshipmen are between the ages of 18 to 24 years old. Appx1048 (Phillips Test.). Midshipmen receive extensive training in the "Honor Concept," which is to not lie, cheat, or steal. Appx886 (Chadwick Test.); Appx967-968 (DeSantis Test.); Appx1027 (Jin Test.). Violators of the Honor Concept risk separation from the

Naval Academy and forfeiture of opportunities to serve in the Navy or Marine

Corps.  Appx886-887 (Chadwick Test.).

B.    In Early 2018, Five Midshipmen Submit Written Complaints
      Concerning Dr. Fleming's Conduct, The Navy Convenes A Fact-
      Finding Inquiry, And The Navy Ultimately Removes Dr. Fleming
      From Federal Service

In the Fall semester of the 2017-2018 academic year, Dr. Fleming taught

two plebe (freshman) classes titled Rhetoric & Introduction to Literature, HE 111.

Appx2.  In January 2018, five midshipmen from those classes filed written

complaints with the Vice Academic Dean regarding Dr. Fleming's conduct.

Appx295-313.

The first complainant, Matthew DeSantis (MD), alleged, among other

things, that Dr. Fleming levied personal attacks on midshipmen, calling them

"midsheeple," to indicate that midshipmen lacked the ability to think for

themselves, and "goldfish," to indicate that the midshipmen lacked the ability to

remember anything for longer than 10 seconds.[7]  Appx295.  MD also alleged that

Dr. Fleming spent about half of the class on what he referred to as "life advice."

Appx298.  During one of those classes, Dr. Fleming discussed the implications of

the dress length of a young girl, approximately 13 years old, that accompanied his

---

[7]  When referring to individual midshipmen, the administrative judge and the
board used initials rather than full or last names.  Thus, for ease of reference, we
also use initials.

son to a school dance.  Appx298.  Dr. Fleming showed the class photographs of the young girl, zoomed in on the girl's legs and pelvic region, and called the girl a "slut" who was "looking for something more," to indicate that the girl had sexual intentions with his son.  Appx298.  He made similar comments about the young girl's mother's dress choice.  *Id.*

MD alleged that Dr. Fleming also spent class time on "vivid sexual discussions."  Appx305.  Among many, MD described one instance in which, "[t]o teach a grammatical lesson," Dr. Fleming picked apart the term "sucking dick . . . to clarify what is considered an act [versus] action.  He then led the discussion to the act of fellatio and how sperm enters another person's mouth and the sexually transmitted diseases that can occur as a result."  Appx305.  MD alleged that, during frequent discussions on anal sex, Dr. Fleming, "[i]n graphic detail, [] told our section about the act of anal penetration."  Appx305.  MD described other instances in which Dr. Fleming discussed vaginoplasty, breast augmentation, and, in "extreme detail," transgender surgery, none of which were relevant to the class topics.  Appx300.  MD also alleged that Dr. Fleming discussed the "erotic details of his multiple affairs with women."  Appx300.

MD further alleged that Dr. Fleming touched some midshipmen in the classroom, including "massag[ing]" them.  Appx298, Appx305.  As for Dr. Fleming's conduct directed at MD personally, MD alleged that Dr. Fleming

referred to MD and another midshipman as "Right Wing Extremists" in an email
sent to the two midshipmen regarding papers submitted in response to a writing
assignment. Appx296-297. MD also alleged that, on November 7, 2017, Dr.
Fleming sent MD an unsolicited, semi-nude photo of himself in response to MD's
inquiry about the Naval Academy's registration process. Appx301. Dr. Fleming's
response left MD "extremely disturbed." Appx301. MD expressed in his
allegation that he did "not feel comfortable being alone with [Dr. Fleming] in his
office," explaining "[o]ne time, while getting [extra instruction] on a paper,
Professor Fleming got so close to me that I found myself searching the room to
find an object to fight back and strike him if he attempted to sexually assault
me[.]" Appx303. Overall, MD alleged, Dr. Fleming's conduct "caused
tremendous pain" to MD and his classmates. Appx308.

The other complainants echoed these allegations and added others.
Midshipman Ethan Wheeler (EW) and Midshipman Gray Creed (GC) echoed
allegations of innumerable sexual references in class, with midshipman GC
explaining that the "[s]ex change and homecoming date discussions seemed
inappropriate and uncomfortable for most of the class." Appx309-311. EW
alleged that Dr. Fleming referred to him as a "right-wing extremist," referred to
midshipmen generally as "midsheeple" and "goldfish," and that Dr. Fleming
"routinely la[id] hands on students." Appx309. Midshipman Juliet Yu (JY)

alleged that Dr. Fleming massaged students in class, sent a shirtless photo of himself to one of the midshipmen, and spent most of the class discussions on his clothes and his views on sex and various stereotypes, including race and gender. Appx312. Midshipman Richard Jin (RJ) alleged that Dr. Fleming repeatedly called RJ by a different last name, especially when angry, even though RJ's last name was written on his uniform, reports, and assignments. Appx313. The last names used were Asian and similar in pronunciation to Jin, such as Kim, Lin, and Sim. *Id.* RJ alleged that he corrected Dr. Fleming on many occasions, but Dr. Fleming "always brushed it off," and one time even told RJ to "f*** off." *Id.*

In response to the allegations, and pursuant to published guidelines, the Vice Academic Dean directed the Director of the Division of Humanities and Social Sciences to supervise a fact-finding inquiry. Appx294; *see* Appx523-527. The Division Director assembled a three-member faculty investigatory panel. Appx919-920. After framing the issues and creating a set of interview questions, the panel interviewed each midshipman from Dr. Fleming's Fall 2017 classes and two midshipmen from his Spring 2018 class that were invited based on an email containing a photo that they had received from Dr. Fleming. Appx278. The panel notated the responses from each midshipman interviewed. Appx278; *see* Appx375-412, Appx414-453.

The panel invited Dr. Fleming to address the panel, but he declined to do so. Appx278. He did reply by email with his response to each of the student complaints. Appx494-500. While the formal panel inquiry was underway, Dr. Fleming sent an unsolicited group email to all Naval Academy faculty concerning the allegations and generally complaining about the unfairness of the process. Appx501-505. In the text of the email, Dr. Fleming identified another Asian midshipman and former student who had filed a complaint against Dr. Fleming in 2016, and disclosed sensitive personal information about this student's grades and Scholastic Aptitude Test scores. Appx505; Appx1052 (Phillips Test.). This disclosure of private student information led to a reprimand. Appx274-275; *see also* Appx926-930 (Lindler Test.); Appx1051-1052 (Phillips Test.).

Upon completion of the inquiry, the investigatory panel issued a report finding that a number of matters described in the complaints had occurred and qualified as unprofessional behavior. *See* Appx277-293. Through his counsel, Dr. Fleming submitted comments on the panel's report before it was forwarded to the Division Director for action. Appx120. Subsequently, the Division Director received and considered the record, including comments submitted by Dr. Fleming's counsel, and proposed Dr. Fleming's removal on a charge of Conduct Unbecoming A Federal Employee with seven specifications. Appx120-125. The specifications set forth that Dr. Fleming: (1) referred to students as "right-wing

11

extremists" or words to that effect; (2) made comments about and discussed anal sex, oral sex, and transgender surgery; (3) emailed partially clothed photos of himself to students after having been counseled that such conduct was inappropriate and agreeing to refrain from doing so in the future; (4) touched students without their approval; (5) referred to his own sexual experiences; (6) repeatedly mispronounced an Asian-American student's name despite being corrected several times by the student; and (7) made demeaning, sexually related comments about a young woman attending a dance with his son and similar offensive comments about the young woman's mother.  Appx120.

Through his counsel, Dr. Fleming provided a response to the proposed removal.  *See* Appx127, Appx213.  Subsequently, Dean Phillips assembled and independently reviewed all the material, including the panel report, its enclosures, the proposed removal, and the responses that Dr. Fleming and his counsel provided.  *See* Appx126-131, Appx1077.  Following review of the record and application of the factors set forth in *Douglas v. Dep't of Veterans Admin.*, 5 M.S.P.R. 280, 305-06 (1981), Dean Phillips issued a decision sustaining all seven specifications and removing Dr. Fleming from his position and Federal Service. Appx126-131.

When determining the appropriate penalty, Dean Phillips concluded that there were six aggravating factors that warranted removal.  First, Dr. Fleming's

misconduct in the classroom and in emails to his students occurred on multiple

occasions and was serious, intentional, unprofessional, and especially egregious

given Dr. Fleming's position as a senior member of the faculty.  Appx127.

Second, Dr. Fleming's conduct fell well short of the expected behavior of someone

in his position, who plays a vital role in the education and professional

development of future Navy and Marine Corps leaders and is expected to be a role

model to midshipmen in that developmental process, especially given the

asymmetric relationship that faculty members have with their students.  Appx128.

Third, Dr. Fleming had a past disciplinary record dating from 2013, including,

among other incidents, discipline for sharing inappropriate photographs of himself

with students.  Appx128.  Fourth, Dr. Fleming was on clear notice that the

transmission of partially clothed photographs of himself to students is outside the

accepted standards of professional conduct for a faculty member because he had

received formal counseling and was directed to refrain from such conduct in 2015.

Appx129; *see also* Appx529-530 (2015 formal counseling letter and certificate of

completion of anti-harassment training received as a result).  Fifth, there was a lack

of confidence that Dr. Fleming would perform at a satisfactory level in the future

because he repeatedly rejected any responsibility for his actions and contended that

he is entitled to continue the behavior at issue— including the touching of

midshipmen in class without their consent and emailing partially-clothed

13

photographs of himself—even after past formal counseling to refrain from such conduct.  Appx129.  And sixth, there was no evidence that rehabilitation or a lesser sanction would be effective.  Appx130.

Dr. Fleming's removal became effective August 17, 2018.

C.     Dr. Fleming Appeals The Removal Decision To The MSPB

Dr. Fleming filed an appeal at the MSPB contesting the merits of his removal and raising affirmative defenses of whistleblower retaliation, violation of First Amendment rights, and harmful procedural error.  Appx3.

Following discovery, including Dr. Fleming's deposition, the administrative judge held a hearing during which eight agency witnesses, including five midshipmen, two of whom had filed complaints, testified.[8]  Appx602, Appx877. Those agency witnesses were: Captain Chadwick, Professor Lindler, complainant MD, complainant RJ, midshipman Andrew Buckley (AB), midshipman Justine Ransdell (JR), midshipman Brandon Gore (BG), and Dean Phillips.  Dr. Fleming, who did not testify, called Anne Drew, a friend and colleague at the English Department, as a witness.  Appx880, Appx914, Appx966, Appx1026, Appx1412, Appx1422, Appx1426, Appx1430, Appx1477.

---

[8] The administrative judge erroneously stated that all five midshipmen that testified were ones who filed complaints. *See* Appx28.

Captain Chadwick testified concerning the Naval Academy's mission and
Honor Concept, the expectation that all faculty exemplify dignity and respect, and
his opinion that Dr. Fleming's conduct was inappropriate.  Appx883-891,
Appx894-895, Appx908-913 (Chadwick Test.).

Professor Lindler, who acted as chair of the investigatory panel, also
testified concerning the Naval Academy's mission and the expectation that all
faculty exemplify dignity and respect.  Appx916 (Lindler Test.).  He further
testified concerning the investigatory process and the panel's results.  *See
generally* Appx919-964.  Professor Lindler, who had almost 40 years of service at
the Naval Academy, testified that, although Dr. Fleming was a good teacher, his
behavior in the classroom and in emails to students in the Fall of 2017 was
unprofessional, and Dr. Fleming did not belong in the classroom.  Appx936,
Appx964-965.

Regarding the panel's results, Professor Lindler testified that Dr. Fleming
denied referring to students as "right wing extremists," but the complaining
midshipmen provided the email, which corroborated their claim.  Appx928-929
(Lindler Test.); *see also* Appx680 (email).  Further, Professor Lindler testified that
the panel found that Dr. Fleming described transgender surgery in "minute detail"
in class, the students found the discussion uncomfortable, and the discussion "ha[d]
nothing to do with the class material at hand."  Appx951-952. He also testified that

Dr. Fleming denied sending midshipmen shirtless photos of himself after he was counseled in 2015 not to do so, but emails provided by midshipmen proved otherwise. Appx929-930. The photo attachments in the emails included one of Dr. Fleming wearing only a speedo, one of Dr. Fleming's shirtless torso and him flexing, and one of Dr. Fleming's partial bare torso, shoulder, and flexed bicep. Appx930 (Lindler Test.); *see also* Appx689-695 (photos). Concerning his touching of students, Dr. Fleming denied ever touching any student's neck, back, or shoulders. Appx932; *see also* Appx286. He also denied ever hugging a plebe (freshman) and, as for others, he claimed he can read body language and can tell when a midshipman wanted a hug, so he hugs them when it is consensual. Appx932. The panel, however, found otherwise. *Id.* First, the panel found that on approximately two occasions, Dr. Fleming had sat next to AB in class and rubbed AB's back for a period of up to 15 seconds. Appx932-933; *see also* Appx518 (AB's recounting of events). Second, "[n]umerous plebes said that [Dr. Fleming] would hug them." Appx933.

As to whether Dr. Fleming repeatedly mispronounced RJ's last name despite being corrected several times, and told RJ to "fuck off" during one of those times, Professor Lindler testified that although RJ's classmates did not recall this

16

happening, the panel found RJ to be credible regarding this claim.[9]  Appx934.  He explained that RJ "seemed very truthful about it, and very somewhat upset he was being singled out that way."  Appx934.  And Dr. Fleming did not admit or deny that he said "fuck off" to RJ, but instead claimed "I never said fuck you."  Appx934.  Professor Lindler further testified that Dr. Fleming admitted displaying photos of his son's date in class and making derogatory remarks about the young girl, her clothing, and her mother.  Appx933; *see also* Appx499 (Dr. Fleming's admission).

Complainant MD testified regarding his allegations.  *Compare* Appx968-998 *with* Appx295-308.  MD testified that Dr. Fleming caused "mental anguish . . . to so many people," Appx980, and MD decided to file a complaint after he had a conversation with an upper-level midshipman who was crying, depressed, and stated that he wanted to leave the Naval Academy because of "how professor Fleming ha[d] talked to him."  Appx968.  This midshipman dropped out of the Naval Academy shortly thereafter.  Appx969.

MD testified that Dr. Fleming emailed MD and EW and referred to both as "right-wing extremists" in response to papers they had submitted pursuant to an assignment to write about how the student would change the world.  Appx972.

---

[9]  The panel report reflects that two students recalled that Dr. Fleming mispronounced a student's name, which was Wesley, as "Weswee."  Appx288, Appx476, Appx482.

17

MD had written about tax reform. Appx973. He also testified that Dr. Fleming described in detail how transgender surgery works, including "[h]ow a male appendage is cut off, and how . . .[the] shape of a female vagina" is created. Appx977. This discussion had no connection to the topic of the day, nor was the topic on the syllabus. Appx977. MD further testified that other class discussions on sexual topics were unrelated to the course material. Appx992. Further, "Dr. Fleming did utilize a lot of physical touch in the classroom environment[.]" Appx980. MD testified that Dr. Fleming spent approximately 20 minutes showing the class a photograph of his son's date to the school dance, zooming in on the girl's legs to point to her dress length, and suggesting that the young girl wanted something sexual with his son. Appx974, Appx1013-1014. Dr. Fleming also talked about the girl's mother's dress length and suggested she was "looking for more." Appx974-975. MD testified that this incident left him feeling "very angry and upset" because MD has a sister approximately the same age that was starting to attend school dances and Dr. Fleming's comments made MD think "the adults and dads were thinking that about my sister." Appx975.

MD further testified that, in response to a request for information regarding the Naval Academy's registration process, Dr. Fleming emailed him "an unsolicited semi-nude picture" of "his torso, nipple and [flexed] arm." Appx978, Appx994. After receiving the photo, MD called his parents. Appx975. His mom

reacted with "tears" and confusion as to "how a professor at the Naval Academy is doing this," and MD and his father was equally confused about Dr. Fleming's intent. Appx975-976. Given such confusion (including whether Dr. Fleming was attracted to him), MD considered approaching the Sexual Assault Prevention and Response (SAPR) office because:

> It didn't feel right the professor was sending me that type of picture. . . . It's one thing to have a picture of an arm, for like a course discussion, but it's a different thing to send an actual picture of yourself, to someone over email. Especially, I didn't want that on my email because [the Academy's cybersecurity department checks emails,] and "I didn't want that – them to see, after going through my emails, that I have a picture of my professor shirtless on there, without at least letting someone know.

Appx997-998.

Complainant RJ likewise testified regarding his written allegations. *Compare* Appx1027-1029 *with* Appx313-314. He testified that midshipmen's names are stitched on their uniforms, and instructors generally refer to midshipmen by their last names. Appx1028. Although Dr. Fleming generally referred to RJ by his last name, RJ testified, "on occasional cases, there were different pronunciations of my name. . . . [Those pronunciations] were close to what my last name sounds like," and were "[o]ther variations of Asian names, such as Kim, Jong or Lim, of the sorts." Appx1028. RJ further testified that he tried to correct Dr. Fleming "at least three or four times," but Dr. Fleming "just kind of walked

away.  However, there was one incidence where he told me to 'fuck off.'"

Appx1028.  Other than Dr. Fleming, no other instructor at the Naval Academy had

trouble pronouncing RJ's name: Jin.  Appx1027-1028.  RJ described the personal

impact of Dr. Fleming's conduct as follows:

> So as a child of two immigrant parents, who came to the
> United States with  literally nothing, and created a living
> for my family and my brother, our last name in -- at least
> in an Asian-American household is very important to us.
> The last name holds significant honor, background and
> essentially our culture, as a family.  So my last name
> means very much to me.  My last name Jin, in Chinese, is
> translated to gold, which is something that I've always
> shown pride in.  And to have my last name be
> mispronounciated (sic) on purpose, was basically a slap
> in  the face.

Appx1029.

Midshipmen AB, JR, and BG—all of whom were enrolled in Dr. Fleming's

Fall 2017 classes, testified regarding various specifications.  AB testified that twice

during class, Dr. Fleming rubbed AB's back without consent.  Appx1022.  He

described these occurrences as follows:

> So I would sit next to him in a circle-type, so everyone
> could look at each other, and have a conversation.  And
> he would pick the spot next to me.  And he just -- would
> just reach over, and touch my back and like . . .  rub it . . .
> [for] 15 seconds. . . . I was uncomfortable.

Appx1022-1023.   AB testified that he expressed his discomfort about these back rubs to his classmates.[10]  Appx1023.  JR testified that Dr. Fleming's behavior of showing the photographs of his son and the son's date and the professor's comments regarding the date and her mother were inappropriate and made female students in the class uncomfortable.[11]  Appx1033.  She reasoned, "for any class at the Academy, . . . talking about someone in that manner, especially to students, especially when the girl was underage, just seemed inappropriate."  Appx1033-1034.  Regarding class discussions deemed as "life lessons," BG testified that most of them were irrelevant to the course material, and although "some of the advice was maybe constructive, . . . oral sex, anal sex, things like that, were definitely not something that I would have used, to become a naval officer.  Not very constructive for me."  Appx1037.  He testified that, although he did not "feel too uncomfortable" about Dr. Fleming's comments, he "kn[ew] that other people in the class definitely did.  And you could kind of feel it in the room too."  Appx1038.

The agency's final witness, Dean Phillips, testified that he only became involved in Dr. Fleming's removal process when he received the proposed

---

[10]  The panel first learned about AB's experiences from one of AB's classmates, who told the panel that Dr. Fleming would sometimes sit next to AB during class discussions and rub AB's back.  Appx518.

[11]  JR recalled that Dr. Fleming calling the girl's dress and the mother's dress either "shitty" or "slutty."  Appx1033.

removal.  Appx1044.  Like Commandant Chadwick and Professor Lindler, Dean

Phillips testified that faculty are expected to be role models in demonstrating

dignity and respect, explaining "dignity and respect is a thread, that runs through

everything we do."  Appx1047-1049.   Dean Phillips also testified that an analysis

of the *Douglas* factors guided his decision to terminate Dr. Fleming.  Appx1046,

Appx1077.

When addressing conduct that he determined to be "especially troubling,"

Dean Phillips explained:

> This case hinges on really three significant factors in my
> mind. One, the inappropriate emails with the photographs.
> A repeated behavior. The unwanted, inappropriate
> touching of midshipmen.  And then the outright rejection,
> that there was anything wrong with that.  The refusal to
> admit any responsibility for doing so, and the claim that
> Dr. Fleming is in the right, in having done it, and would
> do it again.  That -- and respectful approach to educating
> midshipmen. Those are sorts of things that the Naval
> Academy cannot condone.

Appx1049-1050; *see also* Appx1051, Appx1055-1056 (testifying similarly).

Dean Phillips testified he lost confidence that Dr. Fleming would be

respectful toward the midshipmen and perform satisfactorily.  Appx1050-1053.

Dr. Fleming showed no potential for rehabilitation due to his refusal to

acknowledge any wrongdoing, insistence that he would continue the same

behavior, and prior disciplinary record.   Appx1053-1054, Appx1069-1071.  Dr.

Fleming's prior disciplinary record included formal counseling by the Department

Chair as a result of a complaint by an Asian student concerning disrespectful treatment by Dr. Fleming; a subsequent Letter of Reprimand for releasing that same student's personal identifiable information to the entire faculty; a Letter of Reprimand for retaliating against two female midshipmen who had filed complaints against Dr. Fleming; and the formal counseling for sending inappropriate photographs of himself to students.  Appx1052-1053, Appx1069-1072, Appx1074; *see also* Appx529-530 (2015 letter of counseling); Appx274-275 (2018 letter of reprimand).

Dean Phillips testified that he considered Dr. Fleming's teacher evaluations, which were mixed because there were "students who th[ought] very, very highly of him" and there were "[s]tudents who th[ought]very, very poorly of him[.]" Appx1472.  Nevertheless, he explained, no percentage of positive evaluations would negate Dr. Fleming's behavior in the classroom because he could be an effective English teacher, yet violate the principles of the Naval Academy. Appx1083-1084.  "Teaching effectiveness is really quite different[] than inappropriate behavior in this case."  Appx1083.

Dr. Fleming's sole witness, Professor Drew, testified that she did not think that Dr. Fleming should have been removed and that she had never heard of the *Douglas* factors.  Appx1100.   She testified that she has been teaching for 30 years,

and the newer classes are "more sensitive" and "more willing to say, if something makes them feel uncomfortable." Appx1119.

On July 24, 2019, Administrative Judge Mark Syska issued a decision declining to sustain any of the agency's specifications and reversing its removal decision. Appx25-39. Before addressing the seven specifications, the administrative judge conducted a preliminary "Analysis and Fact-Finding," which portrayed Dr. Fleming in a positive light, questioned the credibility and motives of MD, and expressed concern that a "small group of students" could adversely impact Dr. Fleming. Appx31-35. In this analysis, the administrative judge found that MD had "[s]evere credibility issues" because his testimony was "greatly exaggerated" and his religious and ideological background suggested that MD had a motive to exaggerate his claims. Appx32-34. Turning to the specifications, the administrative judge refused to sustain them based on findings that "the purported 'victims' of the appellant's actions did not generally take offense," "much of the charged conduct. . . did not appear to be actual misconduct in the context of free-wheeling classroom discussions," and lack of notice that the charged conduct was unprofessional "was also a significant issue[.]" Appx32. Having not sustained any of the specifications, the administrative judge did not conduct any analysis regarding nexus and the reasonableness of the penalty. *See* Appx25-41. The administrative judge addressed and rejected Dr. Fleming's affirmative defenses of

whistleblower retaliation, violation of First Amendment rights, and harmful procedural error.  Appx39-41.

The agency filed a petition for review with the full board.  Appx1, Appx1199.  The agency argued that the administrative judge erred as a matter of law and fact in failing to sustain the seven underlying specifications in support of the charge.  *See* Appx1200.  It further argued that the board should find nexus and uphold the penalty of removal on the record evidence.  Appx1201.  Dr. Fleming filed a motion to dismiss the agency's petition for failure to provide interim relief. Appx1.  Otherwise, Dr. Fleming did not file a cross-petition.

The board denied Dr. Fleming's motion to dismiss and granted the agency's petition for review.  Appx1-2.  The board sustained the Conduct Unbecoming charge and each of the underlying specifications.  Appx6-16.  The board next determined that the agency established a nexus between Dr. Fleming's misconduct and the efficiency of the service.  Appx16.  With respect to the penalty, the board determined that the agency established that removal was a reasonable penalty for the sustained misconduct.  Appx17-18.  As for Dr. Fleming's affirmative defenses, the board stated that Dr. Fleming did not file a petition for review challenging the administrative judge's findings concerning those defenses; "[t]herefore, and because, based on our review, we determine the findings to be well supported, we will not disturb them."  Appx16 n.12 (citing 5 C.F.R. § 1201.115).

This appeal followed.

## SUMMARY OF THE ARGUMENT

Substantial evidence supports the board's conclusion that the agency proved the seven specifications underlying the charge of Conduct Unbecoming a Federal Employee. Dr. Fleming largely does not dispute that he engaged in the charged conduct. Instead, Dr. Fleming—a 64-year old man with approximately 31 years of teaching experience at the Naval Academy at the time of his removal—contends that his behavior in the classroom and in emails with his students does not constitute misconduct because it occurred in the setting of a collegiate classroom and that he did not know that the challenged conduct would be considered unprofessional because the Navy failed to notify him as such. The record and law belie his contentions.

Dr. Fleming errs in focusing on his English Department classroom because the proper setting in which to evaluate his conduct is the Naval Academy, whose mission is to develop midshipmen morally, mentally and physically and imbue them with the highest ideals of duty, honor and loyalty. By engaging in the largely undisputed conduct, Dr. Fleming failed in his duty to serve as a role model and trusted advisor. Whether viewed independently or collectively, Dr. Fleming's conduct contravenes and undermines the Naval Academy's mission. Although Dr. Fleming enjoyed academic freedom, that freedom was not a license to fail to treat

his students with dignity and respect.  In determining that the agency proved its

charge, the board properly accounted for the credibility determinations that the

administrative judge made.

The record likewise belies Dr. Fleming's challenges to the agency's choice

of penalty.  Thus, the Court should leave the agency's choice of penalty

undisturbed.

## ARGUMENT

### I.   Standard Of Review

The scope of judicial review of MSPB decisions by this Court is narrowly

defined and limited by statute.  The board's decision must be affirmed unless it is

found to be: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law; (2) obtained without procedures required by law, rule, or

regulation having been followed; or (3) unsupported by substantial evidence."

5 U.S.C. § 7703(c)); *Long v. Soc. Sec. Admin.*, 635 F.3d 526, 530 (Fed. Cir. 2011).

The burden of establishing reversible error in the MSPB's decision rests with the

petitioner.  *Sistek v. Dep't of Veterans Affs.*, 955 F.3d 948, 953 (Fed. Cir. 2020).

### II.  Substantial Evidence Supports The Board's Decision That Dr. Fleming Engaged In Conduct Unbecoming A Federal Employee

To prove a charge of Conduct Unbecoming, an agency must demonstrate

that the employee engaged in the underlying conduct described in the charge and

that such conduct was improper, unsuitable, or detracted from his or her character

27

or reputation. *See Long*, 635 F.3d at 533; *Raco v. Soc. Sec. Admin.*, 117 M.S.P.R. 1, 4 (2011). In determining the context in which to evaluate whether misconduct occurred, the Court considers whether the conduct was contrary to the mission of the employing agency. *See Brown v. Dep't of the Navy*, 229 F.3d 1356, 1362–63 (Fed. Cir. 2000). When the agency establishes more than one specification to support a charge, "proof of one or more, but not all, of the supporting specifications is sufficient to sustain the charge." *Burroughs v. Dep't of Army*, 918 F.2d 170, 172 (Fed. Cir. 1990); *Lachance v. Merit Sys. Prot. Bd.*, 147 F.3d 1367, 1371 (Fed. Cir. 1998).

As we explain below, the proper context within which to evaluate Dr. Fleming's conduct is the Naval Academy, not simply the confines of his English classroom. On review, the board was "free to re-weigh the evidence and substitute its judgment for that of [the] administrative judge[]." *Long*, 635 F.3d at 530. Where the board overturned the administrative judge's credibility determination (with regard to RJ, concerning specification 6), it provided "sound reasons, based on the record, for its contrary evaluation" of the evidence." *Id.* (quotation omitted). Substantial evidence, which was largely undisputed, supports the board's holding that the agency proved the seven underlying specifications supporting the Conduct Unbecoming charge. Even if the Court were to hold that substantial

evidence did not support all of the specifications, which it should not, the Court

should nevertheless sustain the charge.

> A.     The Proper Context Within Which To Evaluate Dr. Fleming's
>         Conduct Is The Naval Academy, Not His English Department
>         Classroom

Throughout his briefing, Dr. Fleming incorrectly asserts that his conduct,

even if proven, was not actual misconduct in the context of a collegiate classroom.

*See* Pet. Br. at 11-12, 16, 27-28, 34.

As this Court has previously determined, "[c]onduct that might be

overlooked in some settings can be the cause for removal in other settings in which

the conduct is perceived as more clearly inappropriate or contrary to the mission of

the employing agency."  *Brown*, 229 F.3d at 1362–63; *see also Martin v. Dep't of*

*Homeland Sec.*, 855 F. App'x 691, 694 (Fed. Cir. 2021) ("To prove Charge 1

(conduct unbecoming a law enforcement officer), it sufficed for the Agency to

prove the alleged misconduct, as long as the proof of the specification, given in

narrative form, shows that the conduct adversely affects efficiency of the

service.").  In *Brown*, the Court found the military setting—the Marine Corps—as

determinative of whether the conduct was inappropriate, reasoning:

> [The appellant's] job responsibilities were to serve the
> Marine community, and his effectiveness depended at
> least to some extent on his compliance with certain basic
> standards of conduct shared by that community. . . .
> Because his job was to serve the Marine community, it is
> not a sufficient answer for him simply to say that he was

> a civilian employee and therefore the standards of
> conduct of the Marine community had no applicability to
> him.

*Id.*  The same reasoning governs here.

As the board correctly concluded, the proper context in which to evaluate Dr. Fleming's conduct is the Naval Academy— a Federal workplace and the agency's only undergraduate educational institution—whose mission is to develop midshipmen morally, mentally and physically, and imbue them with the highest ideals of duty, honor and loyalty.  Appx7-8.  In support of its mission to graduate leaders dedicated to a career of naval service and with the potential to assume the highest positions of command, citizenship, and government, all faculty members are expected to serve as role models.  *Id.*  Such modeling includes the dignified and respectful treatment of everyone.  *Id.*

Dr. Fleming errs in narrowing the context to his English Department classroom and contending that, because students have responded positively to his "overall demeanor" and "theatrical," and "outspoken" teaching style, the board should hold him to a more relaxed standard in judging what constitutes misconduct.  *See* Pet. Br. at 14-16.  Student receptivity to an unorthodox teaching style, however, is not determinative of misconduct.  Although students might enjoy trying on his expensive jackets, or be amused that he wears costumes, acceptance of such classroom antics does not mean the challenged conduct is acceptable.

Such conduct (*e.g.*, nonconsensual touching, emailing semi-nude self-photos, discussing his sexual affairs, demeaning a teenager and her mother, repeatedly mis-pronouncing an Asian-American student's name, and labeling students based on work product) cannot be excused as an extension of Dr. Fleming's "teaching style." *Cf. Buchanan v. Alexander*, 919 F.3d 847, 853 (5th Cir. 2019) (even "[u]nder the First Amendment, students, teachers, and professors are not permitted to say anything and everything simply because the words are uttered in the classroom context.").

Here, the board found that the agency proved a nexus between the Dr. Fleming's conduct and the efficiency of the service. Appx16. Dr. Fleming does not dispute this claim, thus conceding that his conduct adversely effected efficiency of the service. Furthermore, as we discuss in more detail in the following sections, the record disproves Dr. Fleming's unsubstantiated claim that the challenged conduct was pedagogically appropriate for his English classroom. Pet. Br. at 27-28; *see, e.g.,* Appx977, Appx992 (MD Test.: class discussions on transgender surgery and sexual topics were unrelated to the course material); Appx1037 (BG Test.: most "life lessons" were irrelevant to course material and not constructive); Appx310 (EW: "[M]uch of class was not dedicated to class at all but rather heavily opinionated segments . . . which often had nothing even remotely related to the class material."). Although Naval Academy professors enjoy

31

academic freedom, the agency's policy is clear that such freedom is not a license to engage in "behavior that is unprofessional and/or pedagogically inappropriate." Appx520-521.

B.     Specification (1): Email Indisputably Proved That Dr. Fleming Called Students "Right-Wing Extremists" And Agency Witnesses Testified That Dr. Fleming Committed Misconduct By Failing To Treat These Students With Dignity And Respect

As the board correctly found, it was undisputed that, on September 26, 2017, Dr. Fleming sent an email to two midshipmen referring to them as "right-wing extremists" and then critiqued what he perceived as their unsupported positions on issues about which they had written (anti-gun control and anti-taxes) in response to an assignment. Appx7. The record includes a copy of this email, which stated in part:

> You two are my right-wing extremists who sit next to each others [sic], so I'll write to both. I'd have the same email to left-wing extremists only there aren't many at USNA! Now gentlemen. I know you've both grown up listening to Dad spout unopposed at dinner, but this is the big time. One of you hates taxes, the other hates gun regulation. Both are standard right-wing positions, so fine. But to make a paper for Bill, you have to be aware of objections. . . . Need to get shit in gear here. Sigh. You're both acting like midsheeple: huge flex and no justify. Sigh. Won't work for Bill. Welcome to reality. You're not home w Dad any more in your bubble. Believe me, I'd say the same to Bernie, so this is not a left-right thing. It's a justify that thing.

Appx680.

Further, the agency proved that Dr. Fleming's actions constituted Conduct Unbecoming a Federal Employee. Documentary evidence and testimony of three agency witnesses demonstrated that Naval Academy Instructors are obliged to maintain a professional classroom atmosphere and are expected to treat their students with dignity and respect. Appx520-521; Appx883-884, Appx912-913 (Chadwick Test.); Appx916-917 (Lindler Test.); Appx1048-1049 (Phillips Test.). As the Commandant testified, based on his prior 29+ years of active duty and three tours of command in the Navy: (1) any kind of labeling by a senior to a subordinate, including calling someone a "right-wing extremist" is counter to "the expectation, of treating subordinates with dignity and respect;" (2) such labeling has no place in the military and "there would be action taken, as a result;" and (3) while faculty should hold students "to a high standard," "dignity and respect has to rule the day." Appx889-890 (Chadwick Test.).

The Naval Academy expected Dr. Fleming to serve as a role model for his students in professionalism, dignity and respect. By engaging in the charged misconduct, Dr. Fleming failed to set a proper example. As the Commandant explained, in response to the AJ's question as to why "future warriors necessarily have to be protected, from snarky or insulting remarks in the classroom:"

> A: Well, I think it goes to again, the expectation of a
> military professional. . . [F]or the midshipmen, who we
> are developing . . . [i]t's important that they understand

> that you can be a demanding leader, but underpinning it
> all has to be dignity and respect.
> Q: (Judge Syska): So essentially you wouldn't want an
> officer ridiculing their underlings unnecessarily?
> A: Absolutely not.

Appx912-913.

Dr. Fleming, who elected not to testify, offered no counter-evidence.  Indeed, Professor Drew, his sole witness, supported the agency's position by conceding that she is unaware of any other faculty member that have labeled their students as "right-wing extremists," and agrees that labeling midshipmen based on their writing is not appropriate.  Appx1111; *see also* Appx929 (Lindler: No awareness of another faculty member labeling a midshipman in that manner).

Before this court, Dr. Fleming argues that, in context, labeling two midshipmen "right-wing extremists" was an appropriate response to their writings that adopted "stereotypically conservative opinions" because the real message to the midshipmen was that they must provide supporting arguments for their positions.  Pet. Br. at 25.  Like the board, the Court should reject this claim.  *See* Appx6-7.  As the board explained, in the particular setting of the Naval Academy, "certain types of conversations, which between peers might be considered "joking around," are not acceptable in the very different context of a senior-subordinate relationship."  Appx8 (citing Appx911-912); *see also Feld v. Dep't of Veterans Affs.*, 484 F. App'x 519, 522 (Fed. Cir. 2012) (sustaining a charge of Conduct

Unbecoming for comments made that were deemed unprofessional even though

the appellant claimed to have made them in jest).  Dr. Fleming, a professor of

English, could have used more appropriate language to express his criticism in a

respectful, professional way.

> C.     Specification (2): It Was Undisputed That, During Class, Dr. Fleming
>         Made Comments Regarding Oral Sex, Anal Sex, And Transgender
>         Surgery, Which Were Unrelated To The Course Material

As the board correctly found, the record indisputably showed that Dr.

Fleming discussed oral sex, anal sex, and transgender surgery in class.  Appx9.

Indeed, Dr. Fleming did not deny discussing those matters in class.  *Id.*  Further,

the board correctly found that the nature and extent of Dr. Fleming's remarks on

those topics "went beyond what was appropriate," constituting Conduct

Unbecoming a Federal Employee.  Appx10.

By engaging in the charged misconduct, Dr. Fleming failed to set a proper

example.  *See* Appx916 (Lindler Test: "[W]e're taught to be good role models for

the midshipmen, to set a good example, so that they will be good officers.").  As

Midshipman BG testified, based on his midshipman training, he would not elect to

discuss such topics with subordinate Sailors or Marines because such discussions

could result in disciplinary action against an officer.  Appx1037.  Additionally, he

was aware that the discussions "definitely" made some people in the class

"uncomfortable." "[Y]ou could kind of feel it in the room too."  Appx1038; *see*

*also* Appx300 (MD Compl.: The graphic nature of the transgender discussion was "disturbing" to class members.); Appx309-310 (EW: Such discussions were "generally odd for a classroom. Continual sexual references . . . did not seem proper for a classroom setting."); Appx311 (CC Compl.: Certain discussions, like the sex-change operations "were uncomfortable" for him; he viewed the sex-change and homecoming date conversations (see Specification 7) as "inappropriate" for the classroom and "uncomfortable for most of the class."); Appx891 (Chadwick Test: "I can certainly speak to my expectation, of what's appropriate in the classroom," and the specified misconduct "was not appropriate.").

As he did before the board, Dr. Fleming disagrees that the discussions were inappropriate in the context of his English classroom because "such topics have possible relevance and propriety in the scope of an English classroom." Pet. Br. at 27. As the board correctly found, however, "the unrebutted testimony" showed that Dr. Fleming "frequently perseverated on these topics even when they were completely unrelated to the course material." Appx9 (citing Appx977 (MD Test.), Appx1036-1037 (BG Test.)). This testimony was consistent with the content of the midshipmen's complaints and the greater part of the midshipmen's responses to the panel inquiry. Appx10 (citing Appx297-301, Appx305-307, Appx309, Appx311-313, Appx375-490). Dr. Fleming, who elected not to testify, offered no counter-

36

evidence. Given the record evidence, Dr. Fleming's assertions that Dean Phillips "did not take into account that assigned readings involved sexual topics that warranted class discussions" is plainly erroneous.[12] Pet. Br. at 27 (quoting Appx36). To repeat, there is no testimony (or other evidence) to support that the oral and anal sex, and transgender surgery discussions at issue related to any actual assignments.

In any event, specification 2 does not require that the discussions and comments regarding anal sex, oral sex, and transgender surgery be off-topic. *See*

---

[12] Dr. Fleming quotes the administrative judge here, who relied entirely on statements by opposing counsel, which do not constitute evidence, to reach this conclusion. Appx36; *see* Appx1067-1068. The exchange, during cross examination, upon which the administrative judge relied, was as follows:

> Q: Are you aware that Professor Fleming has written on issues, such as the use of sexuality and language? The connection or the vocabulary affiliated with issues?
> A: I wasn't aware of that.
> Q: Okay. So you obviously did not take into account, the nature of the work that he does, or the nature of the readings that he assigns, in terms of the appropriateness or inappropriateness of some of the discussion.
> A: Did I take that into account in this decision?
> Q: No. I'm saying am I correct that you did not take that into account, because you –
> A: I wasn't aware of it.

Appx1067-1068. There is no evidentiary foundation to support the truth of opposing counsel's questions. Nor do those statements establish that Dr. Fleming's comments on oral and anal sex and transgender surgery discussions were related to any assigned readings.

Appx20.  As written, the specification covers both off-topic and on-topic

discussions.  For example, it covers the multiple instances where the testimony

reflects that Dr. Fleming's discussions of anal and oral sex, and the minutiae of

transgender surgery were, in fact, "off topic," (i.e., Sex Ed. versus English) and

instances in which Dr. Fleming's behavior is technically "on topic" but still

unprofessional (i.e. describing the act of fellatio using a vulgar term to teach a

grammatical lesson).

Dr. Fleming next suggests that the agency failed to prove this specification

because there was no rule or policy placing him on notice that discussing sexual

topics in class was forbidden or restricted.  Pet. Br. at 28.  This is factually

inaccurate because the agency had a policy notifying Dr. Fleming that academic

freedom is not "a license to say or do anything without restriction."  Appx520-521.

In any event, an agency is not required to have a specific policy in place that

proscribes all conduct deemed inappropriate.  *See Brown v. Dep't of Transp.*,

F.A.A., 735 F.2d 543, 548 (Fed. Cir. 1984); *Goldstein v. Dep't of the Treasury*, 62

M.S.P.R. 622, 627 (1994)*, vacated and remanded on other grounds*, 62 F.3d 1430

(Fed. Cir. 1995) (Table); *Robacker v. Dep't of Agric.*, 385 F. App'x 990, 992 (Fed.

Cir. 2010).  Rather, an agency can rely on the fact that a supervisor's "common

sense should have forewarned him" that the conduct at issue was improper and

could result in discipline.  *Brown*, 735 F.2d at 548; *Boyer v. Dep't of the Navy*, 56

F.3d 84, 1995 WL 319531, at *2 (Fed. Cir. 1995).  Dr. Fleming conceded as much

during his deposition.  *See* Appx613.

> D.   Specification (3): Emails And Other Documentary Evidence
> Undisputably Proved That Dr. Fleming Emailed Partially Clothed
> Photos Of Himself To Students After Having Been Counseled That
> Doing So Was Inappropriate And Agreeing Not To Do So Again

The board correctly determined that documentary evidence in the record

indisputably showed that, in the Fall of 2015, the agency provided Dr. Fleming

written and verbal counseling that sending partially clothed photographs of himself

to students was inappropriate and unprofessional.   Appx11, Appx529-530.

Indeed, at the same time, the agency required Dr. Fleming to retake an anti-

harassment course and warned him against engaging such behavior in the future,

and Dr. Fleming agreed to not repeat such conduct.   Appx11, Appx530-531.

Despite such agreement to refrain from emailing partially nude photos of

himself to students, Dr. Fleming did just that in 2017.  *See, e.g.*, Appx507,

Appx513-14, Appx516, Appx689-695.  Nine midshipmen indicated that Dr.

Fleming had emailed them shirtless photos of himself flexing; Dr. Fleming sent

upper-class midshipman Lunsford Schock (LS), "three partially-clothed photos of

himself," including "one of him in a Speedo bathing suit, in response to a question

on how he compared himself physically today to 20 years ago;" and another

midshipman provided the panel with a "sample of emails from Dr. Fleming's

[upper level] HE 302 class, which included a shirtless photo of Dr. Fleming."
Appx283, Appx286.

The board correctly determined that Dr. Fleming's actions constituted
misconduct regardless of whether Dr. Fleming believed that his conduct was
appropriate or whether any recipient of the photos was actually offended.
Appx11, Appx286; *see, e.g., Hamilton v. Dep't of Veterans Affairs*, 115 M.S.P.R.
673, 683 (2011) (finding appellant's contention that "statements by certain
supervisors that they were not greatly offended by a particular statement"
insufficient to overcome "agency's judgment concerning seriousness of the
misconduct and the appropriateness of the agency-imposed penalty").  As the
board correctly reasoned, Dr. Fleming acknowledged in 2015 that sending partially
clothed photographs of himself to students could result in allegations of
impropriety, and he agreed to refrain from doing so in the future.  Appx11,
Appx530.  Yet he repeated that same behavior in 2017 despite his supervisors'
clearly stated expectations.  *Id.*; *see, e.g., Social Sec. Admin. v. Brennan*, 19
M.S.P.R. 335, 340 (1984) ("Where a management need exists to impose
reasonable requirements . . . [an employee] would not be justified in refusing to
comply with such instructions.").

Dr. Fleming contends that, when viewed in "context," his behavior was
appropriate.  Pet. Br. at 29-30.  Specifically, emailing semi-nude self-photos to

students was proper because: (1) he has a "good physique," which is admired within the "context" of the Naval Academy, where physical fitness is important; (2) it is common for students and faculty to exercise in shared gym spaces; (3) the comparative set of self-photos (including the one in a Speedo) were sent in response to one midshipman's interest in how Dr. Fleming's "physique compared to his younger self;" (4) the midshipman who received the Speedo photo was not offended; and (5) prior counseling did not establish what photos were inappropriate. *Id.*

The fallacy of the first assertion is the Court would have to accept the untenable, unsound, and subjective standard that sending semi-nude self-photos to students is unprofessional only if the faculty member is not physically fit. The second assertion is irrelevant because one-on-one, personal, intrusive emails to students, in which unsolicited semi-nude self-photos are attached, is different in nature from observing faculty in a public gym environment. Third, there is no evidence that the midshipman that asked for a comparison specifically requested any photos. Fourth, as set forth above, offense is not required to demonstrate the inappropriateness of the challenged conduct. Dr. Fleming's fifth argument is disingenuous given that deposition evidence demonstrated the same Speedo photo was at issue in the case that resulted in his removal and prior counseling. *See* Appx642-643.

E.    Specification (4): It Was Undisputed That Dr. Fleming Sat Next To A Student In Class And Rubbed The Students Back, Without Consent, For Approximately 15 Seconds

As the board correctly found, the record indisputably reflected that, on approximately wo occasions, Dr. Fleming sat next to AB in class and rubbed his back without consent for approximately 15 seconds.  Appx12; Appx1022-1023 (AB's testimony); Appx932-933 (Lindler Test.).  AB found the touching "strange" and was bothered enough that he told his classmates that it made him "uncomfortable."  Appx1023 (AB Test.), Appx286.  Moreover, that Dr. Fleming touched students on their shoulders, head, and neck in an unwanted, unnecessary, and unprofessional manner was mentioned in several student complaints and student interviews.  Appx11 (citing Appx298, Appx309, Appx312, Appx376, Appx384, Appx392, Appx412, Appx429, Appx437, Appx449).

Further, the board correctly agreed with the agency that the charged conduct constituted Conduct Unbecoming a Federal Employee.  Appx12; *see, e.g.*, Appx885-886 (Chadwick Test.: "[U]nwanted touching, unwelcome touching is certainly not permitted.").  All faculty, including Dr. Fleming, knew or should have known, as the investigatory panel found, that nonconsensual touching of students is "not in accordance with standard accepted practices for USNA faculty members." Appx287.  In contrast to normal "congratulatory gestures" such as a handshake or tap on the shoulder, which are appropriate, any kind of prolonged touching (more

42

than four or five seconds) is likely to be improper since prolonged touching from a superior to a subordinate could cause "awkwardness," "discomfort," and confusion as to "what their expectations are.").  Appx906 (Chadwick Test.)

Dr. Fleming asserts his conduct is excused because: (1) the agency could not establish a "bright-line" rule due to differing opinions as to what constitutes impermissible touching; and (2) the student touched "did not feel offended or uncomfortable."  Pet. Br. at 31-32.  As established, above, however, Dr. Fleming knew or should have known that that nonconsensual touching of students is not an accepted practice for Naval Academy faculty members.  Appx287.  Indeed, in his deposition, Dr. Fleming conceded knowledge of the clear distinction between wanted or unwanted touching and believes the determining factor is whether the student makes the "first move."  *See* Appx662 (Fleming: "So unwanted means they don't make the first move").  Here, AB did not make the first move, and the psychological discomfort he described unquestionably supports the finding that the touch was unwanted.

F.    Specification (5): It Was Undisputed That Dr. Fleming Referred To His Own Sexual Experiences In Class, And These Comments Were Unrelated To Class Material

The board correctly found that Dr. Fleming referred to his own sexual experience in the classroom and that such behavior was improper or unsuitable.  Appx10.  In his January 2018 complaint, written within weeks of the end of the

Fall 2017 semester, MD described the following classroom conduct by Dr.

Fleming: "Professor Fleming also went into the erotic details of his multiple affairs

with women and described his perspective to the section. . . . [A classmate also

recounted that in another class] Professor Fleming went into his personal sexual

fantasies without the class's approval or initiation." Appx305, Appx307. This was

consistent with MD's interview with the investigatory panel, to whom he related

that "Dr. Fleming discussed erotic fantasies and his past affairs." Appx281. The

Panel also noted the following evidence regarding Specification 5: (1) "According

to Midn Augie, . . . Dr. Fleming referred to computers owned by midshipmen as

'porn machines.' She also indicated that Dr. Fleming would talk about gay

pornography and affairs that he had;" and (2) "Midn. Roach . . . indicated that Dr.

Fleming . . . bragged about having an affair." *Id.* Dr. Fleming did not dispute such

evidence. Appx10. The Panel concluded that, "discussion of Dr. Fleming's

personal sexual experiences has no place in the classroom." Appx283.

Further, for the same reasons set forth with respect to specification 2 (i.e.,

classroom comments and discussions concerning anal and oral sex and transgender

surgery), the agency demonstrated that the conduct was unprofessional, improper

or unsuitable. Indeed, as the board properly observed, "it is difficult to imagine a

situation in which it would be appropriate for a professor to share with the class

details of his own personal experiences." Appx9 n.7.

Dr. Fleming repeats the erroneous argument asserted regarding specification
2—that absence of a specific policy or notice impacts whether conduct is
inappropriate.  Pet. Br. at 33-34.  Dr. Fleming also errs in relying on the context of
"an academic environment of an English classroom" to excuse his behavior (e.g.,
"the erotic details of his multiple affairs") without identifying any supporting
evidence, including relevance to course materials, or other valid rationale for such
unprofessionalism.

> G.  Specification (6): Midshipman RJ's Testimony, Which The Board
>     Properly Credited, And Documentary Evidence Proved That Dr.
>     Fleming Repeatedly Mispronounced An Asian-American Student's
>     Name Despite Being Corrected Several Times By The Student

The board correctly found that Dr. Fleming engaged in the charged
misconduct: "repeatedly mispronouncing an Asian-American student's name
despite being corrected several times by the student."  Appx13-14.  In the Naval
Academy, each midshipman uniform has the name of the student on it, which helps
in identifying students.  Appx663-665.  According to RJ, Dr. Fleming generally
referred to him by his three-letter last name (Jin); however, there were times when
he would address RJ with "other variations of Asian names, such as Kim, Jong or
Lim."  Appx1028.  On at least three or four occasions when this occurred, RJ
attempted to correct Dr. Fleming; in response, Dr. Fleming would just walk away,
although on one occasion, he told RJ to "fuck off."  *Id.*  RJ also testified that this
experience was unique to his interactions with Dr. Fleming; there were no other

Naval Academy instructors that had trouble pronouncing his name.  Appx1028-1029.  As the board properly observed, "a number of other students remarked upon the Dr. Fleming's mispronouncing of names, especially Asian names."  Appx13 (citing Appx384, Appx417, Appx429, Appx433, Appx439, Appx441, Appx456).

Further, the board correctly found that the charged misconduct constituted Conduct Unbecoming a Federal Employee.  As Dr. Fleming conceded in his deposition, in the context of a Naval Academy classroom, individuals address each other in ways that recognize mutual respect, *see* Appx665-666, and attempting to correctly pronounce an individual's name is a sign of respect, Appx667-668.  The conduct at issue, which RJ described as like a "slap in the face," is directly counter to the dignity and respect that all faculty are expected to role-model for their students.  *See, e.g.*, Appx916 (Lindler's testimony that faculty serve as role models).  The board also has recognized the actionable nature of this type of conduct.  S*ee, e.g., Arije v. Pointcross Life Scis.*, No. CV JKB-18-3119, 2019 WL 652426, at *6 (D. Md. Feb. 15, 2019) (repeated mispronunciations of an employee's name, after being corrected, could suggest a knowing attempt to insult or demean.); *In re Glover*, 1 M.S.P.R. 660, 663 (1980) ("[P]roper performance of government business requires that employees treat each other with a minimum degree of courtesy in their daily contacts;" rude, inconsiderate behavior is properly subject to discipline).

Dr. Fleming erroneously contends that: (1) to find misconduct, intent is required; and (2) the board owed deference to the administrative judge's assessment that RJ was not credible due to: (a) inconsistent statements, and (b) lack of corroboration. Pet. Br. at 34-36. Neither the charge nor the specifications, however, required proof of intent. *See Lachance*, 147 F.3d at 1372-1374; *Edler v. Dep't of Veterans Affs.*, No. 2021-1694, 2022 WL 298651, at *6 (Fed. Cir. Feb. 1, 2022) (agency was not required to prove intent when "[n]either the charge label— Conduct Unbecoming of a Federal Employee—nor the specification's narrative description" required proof of intent). As set forth above, in the Naval Academy context, where faculty members are required to model dignity and respect, repeated mispronunciation of a student's name, despite being corrected by the student, is disrespectful and has a negative impact (i.e., demeaning and diminishing the student and his/her place in the classroom) regardless of intent. Regarding RJ's credibility, the board provided sound reasons for overturning the administrative judge's credibility determination. *See Long*, 635 F.3d at 530 (demeanor-based credibility determinations may be overturned when the board provides "sound reasons, based on the record" for doing so); *Haebe v. Department of Justice*, 288 F.3d 1288, 1301 (Fed. Cir. 2002) (same).

As the board noted, the administrative judge questioned RJ's credibility because, "when he was interviewed by the panel, he stated that he was unsure

whether the mispronunciation was 'done on purpose.'" Appx13 (citing Appx38, Appx431). The board, citing to the record, explained that although RJ informed the panel that it was "[h]ard to tell if it was done on purpose," he nevertheless "felt it was directed intentionall[y]" at him; thus, there was no actual inconsistency. Appx14 (citing Appx431).

The administrative judge also questioned AJ's credibility because, when he was interviewed by the panel, "while he stated that the appellant used profanity in the classroom, and that two or three times it was directed at him personally, he did not mention the "f\*\*\* off" comment."[13] Appx13 (citing Appx431). The AJ focused on the lack of reference to the "fuck off" statement in questionnaire notations by the panel to discredit RJ, yet failed to address Dr. Fleming's lack of forthrightness on this specification. *See id.* But the board did. As the board observed, Dr. Fleming did not deny saying "fuck off," asserting instead, "I never say 'fuck you,'" Appx288, Appx934, which is disingenuous wordplay. Appx13, Appx934. During his deposition, Dr. Fleming twice attested that he had no recollection of mispronouncing RJ's last name, and then responded as follows:

> Q: So if you say it didn't happen and Midshipman Jin
> says it did he'd be lying; is that correct?
> A: I'm not going to answer that. You've asked me did I
> recollect doing it and I said I do not, do not recollect, and
> I'm not that kind of person.

---

[13] Note that whether Dr. Fleming made the "f\*\*\* off" is not part of the specification.

> Q: You deny it happened?
> A: Of course I deny it happened.

Appx13, Appx668-669. Dr. Fleming's deposition testimony reflects a microcosm of inconsistent statements, by transitioning from a repeated "no recollection" as to events to an overt denial in the space of less than a minute. Appx668-669. The board properly considered that this self-contradiction and imprecision detracted from the weight to be accorded the evidence upon which the administrative judge based his decision. *See Spurlock v. Dep't of Just.*, 894 F.2d 1328, 1330 (Fed. Cir. 1990).

The administrative judge's final rationale for questioning RJ's credibility was that the rest of the class did not corroborate his claims. Appx13. However, as the board explained, citing to the record, a number of other students' accounts concerning Dr. Fleming's mispronunciation of names—in particular, Asian names, were consistent with RJ's claims. Appx13-14 (citing Appx384, Appx417, Appx429, Appx433, Appx439, Appx441, Appx456).

In summary, the board referenced specific portions of the record establishing that the administrative judge's findings regarding discrepancies in, and lack of corroboration with, RJ's testimony were factually inaccurate. Additionally, the board, unlike the administrative judge, engaged in a fulsome analysis of the record to assess Dr. Fleming's and RJ's consistency with other evidence when reaching its credibility determination. And finally, the board articulated that Fleming's own

49

lack of forthrightness and contradictions detracted from the weight of his version

of events.  Thus, the board provided "sound reasons, based on the record, for its

contrary conclusions."  *Long*, 635 F.3d at 532.

H.    Specification (7): It Was Undisputed That Dr. Fleming Made
      Demeaning, Sexually Related Comments About An Adolescent Girl
      Attending A Dance With His Son And Similar Offensive Comments
      About The Girl's Mother—Conduct That Common Sense Dictates Is
      Improper

The board correctly found that that the record indisputably shows Dr.

Fleming made demeaning, sexually related comments about an adolescent girl

attending a dance with his son and similar offensive comments about the girl's

mother.  Appx15 (citing, *e.g.*, Appx499 (Dr. Fleming's admission)).  The board also

correctly found that such comments constitute Conduct Unbecoming a Federal

Employee.  Appx15.  Such conduct is contrary to the Naval Academy's mission

and Dr. Fleming's responsibility to model dignity and respect.  Appx900.

Dr. Fleming repeats the same erroneous argument regarding specifications 2

and 5 (i.e., absence of a specific policy/notice impacts whether conduct is

inappropriate).  Pet. Br. at 37-38.  Equally unpersuasive is Dr. Fleming's

generalized assertion that the "context" of the comments prevents a finding of

misconduct (i.e., English professors are held to a different standard than

Mechanical Engineering professors).  *Id.* at 16, 36-37.  Although Dr. Fleming fails

to identify the "context," the record shows the conduct occurred during plebe

classes and had no course material relevance. Appx15. Dr. Fleming also

erroneously characterizes the challenged conduct as a discussion of "one's own

family." *Id.* at 37. This is irrelevant since that is not the charged conduct.

I.     Even If The Court Finds That Substantial Evidence Does Not Support
All Specifications, The Court Should Nevertheless Hold That The
Agency Proved Its Charge

The foregoing discussion demonstrates that substantial evidence supports all

of the specifications underlying the charge. But if the Court disagrees—which it

should not—then, the Court should nevertheless sustain the charge because "proof

of one or more, but not all, of the supporting specifications is sufficient[.]"

*Burroughs*, 918 F.2d at 172; *Lachance*, 147 F.3d at 1371; *see Guise v. Dep't of*

*Just.*, 330 F.3d 1376, 1380 (Fed. Cir. 2003) (sustaining a charge when only one of

two specifications were proven). Whether viewed independently or collectively,

Dr. Fleming's conduct contravenes and undermines the Naval Academy's mission.

Thus, sustaining even a single specification nevertheless warrants removal. By

engaging in the above, largely undisputed, conduct, Dr. Fleming failed in his duty

to serve as a role model and trusted advisor. Such conduct was especially

egregious in that it predominantly occurred during most students' first Academy

semester, when the asymmetrical relationship between an authority figure, such as

a faculty member, and the student is at its highest and the ability of a young student

to process and challenge such behavior is at its lowest.

51

III.    The Administrative Judge's Credibility Determination Regarding MD Is
        Irrelevant

Dr. Fleming incorrectly asserts that the board failed to afford proper

deference to the administrative judge's credibility determination concerning MD.

Pet. Br. at 20-23.  The administrative judge specifically stated that his credibility

determination concerned "MD's statements, when not corroborated."[14]  Appx34.

The board relied on no such statements.  When the board relied on any statements

by MD, those statements were fully corroborated by documentary evidence and/or

other witnesses.  Each and every specification was based on corroborating

evidence; therefore, the administrative judge's credibility determination regarding

MD is irrelevant.  Indeed, the record contains, and the board cited, substantial

evidence concerning each specification without regard to MD's statements.

Regarding Specification 1, that Dr. Fleming sent the email referring to

students as "right-wing extremists" was not in dispute.  Whether the email

constitutes actionable conduct was proven not by MD's testimony, but

Commandant Chadwick, Professor Lindler, and Dean Phillips.  Appx7-8.

Regarding Specifications 2 and 5, that Dr. Fleming discussed anal and oral sex,

transgender surgery, and his sexual experiences in class, were also not in dispute.

Appx9 ("Appellant did not deny discussing these matters in class").  That these

---

[14]  And even then, the administrative judge did not find that MD's statements
were entirely incredible, only that they "were of limited value."  Appx34.

discussions were "completely unrelated to course material" was also "unrebutted." Appx9. The unrebutted testimony included not only MD's, but also BG's, and both students' testimony was "consistent with the content of the students' written complaints and the greater part of student responses to the panel inquiry." Appx10 (citations omitted). Further, Commandant Chadwick unequivocally testified, "I can certainly speak to my expectation, of what's expected in the classroom," and Dr. Fleming's conduct "was not appropriate." Appx891. Regarding specification 3, that Dr. Fleming sent the partially nude photographs of himself to students after being counseled not to do so and agreeing to not repeat his conduct, was not in dispute. Appx37, Apx10. That this conduct was actionable misconduct was proven not by MD, but by the undisputed fact that Dr. Fleming, at the time of his counseling in 2015 "acknowledged . . . that sending photos of himself to students could result in allegations of impropriety, and he agreed to refrain from doing so in the future"; yet he repeated his behavior "contrary to his supervisors' clearly stated expectations." Appx11.3

Similarly, regarding Specification 4, that Dr. Fleming touched AB for approximately 15 seconds without consent, was not in dispute. Appx12. That the behavior constituted actionable conduct was proven not by MD, but the board's finding that the conduct was "inappropriate on its face" and AB's unrebutted testimony that the unwanted touching made him feel uncomfortable. And

regarding specification 7, that Dr. Fleming made demeaning sexually related comments about a young girl and similar offensive comments about the young girl's mother, was also not in dispute. Appx15. That the comments constituted actionable conduct was proven not by MD, but by Commandant Chadwick, Professor Lindler, and Dean Phillips, who testified regarding the Naval Academy's principles of dignity and respect.

Dr. Fleming contends that the administrative judge correctly considered MD's credibility regarding whether the charged "conduct was inappropriate[.]" Pet. Br. at 22. As we just explained, however, MD's testimony was not determinative on this issue. Thus, Dr. Fleming's claim that MD's "testimony with regard to misconduct was in dispute and not fully corroborated," Pet. Br. at 22, is demonstrably incorrect.

In any event, with credibility determinations, demeanor-based or otherwise, the first step is identification of factual questions in dispute. *See Hillen v. Dep't of Army*, 35 M.S.P.R. 453, 458 (1987) (providing factors to guide the board's resolution of credibility determinations when there are "factual questions in dispute."). Here, there were no such disputes as there was corroborating evidence for each specification.

Further, the administrative judge suggested that MD's reactions to Dr. Fleming are less worthy of credence because he was "an eighteen year-old from a

conservative, religious family, who had only attended religious schools and only experienced academic success."[15]  Appx34.  Such characterization is inappropriate in light of Federal Rules of Evidence, Rule 610, which states that, "Evidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility," and suggests a bias by the administrative judge.  *See* Fed. R. Evid. 610.

IV.   The Penalty Of Removal Was Reasonable

Although the board determines the reasonableness of a penalty by considering the relevant *Douglas* factors, *Malloy v. United States Postal Service*, 578 F.3d 1351, 1356 (Fed. Cir. 2009), this Court's scope of review is much more restricted.  Because penalty determinations are within the discretion of the agency, this Court reviews penalty decisions to determine if the penalty is "totally unwarranted" in light of the relevant factors.  *Brenner v. Dep't of Veterans Affairs*, 990 F.3d 1313, 1317-18 (Fed. Cir. 2021) (quoting *Mings v. Dep't of Justice*, 813 F.2d 384, 390 (Fed. Cir. 1984)).  Where, as here, all charges are sustained by the board, this Court defers to the agency's choice of penalty unless the penalty is so

---

[15] MD, in fact, testified, on cross, that he was "somewhat religious," Appx982, and, in response to the AJ's questioning, that he had attended a religious high school and had received an A in AP English, Appx1017, but never testified that his pre-high school education was religious-based, or that he had only had academic success.

harsh and grossly disproportionate to the offense to constitute an abuse of discretion. *Webster v. Dep't of Army*, 911 F.2d 679, 685 (Fed. Cir. 1990).

Here, the board correctly determined that the agency's removal was within the bounds of reasonableness for the sustained charge. Appx18. Like the board, the Court should defer to the agency's penalty determination and determine that the penalty of removal is not so harsh and grossly disproportionate to the offense proven.

Here, as detailed in his Decision, Dean Phillips fully considered all relevant *Douglas* factors. Appx200-205. Dean Phillips also attested that, in addition to the negative impact on the dignity and respect at the "heart of developing leaders," three significant factors stood out: (1) "repeated behavior" in emailing semi-nude photographs; (2) nonconsensual touching; and (3) Dr. Fleming's "outright rejection" of any wrongdoing and clear intent not to change. Appx1049. These findings squarely refute Dr. Fleming's claims now that his conduct was not intentional and that he lacked notice that his actions were improper or unsuitable. *See* Pet. Br. at 38, 39. Dr. Fleming's behavior is "the sort of things that would get officers relieved of command, were they to repeat that in the fleet." Appx1049-1051. No percentage of positive evaluations would negate Dr. Fleming's behavior in the classroom because he could be an effective English teacher, yet violate the principles of the Naval Academy. Appx1083-1084. Dean Phillips also attested

that, in light of such intent, he has "lost confidence" that Dr. Fleming: (1) will be a good role model, and it is not possible to impose full-time monitoring, in the classroom, his office, and in his use of emails, to ensure that he functions as the mission requires, Appx1050-1051, Appx1052; and (2) can be rehabilitated, based on prior counseling, and, more significantly, his failure to take responsibility and refusal to acknowledge the inappropriateness of his behavior as evidenced in his written response to the panel. Appx1053-1054. Were he to return Dr. Fleming to the classroom, he would be sending a message to midshipmen and faculty that the misconduct at issue is condoned, which is "[n]ot a message I can send." Appx1056. Thus, the Court should hold that removal was not an abuse of discretion.

Dr. Fleming incorrectly contends that the record demonstrates agency bias due to his negative public statements about the Naval Academy. Pet. Br. at 39. The board, however, agreed with the administrative judge's decision to reject Dr. Fleming's affirmative defense of agency bias. Appx16 n.12. Dr. Fleming has not challenged that decision. In sum, the deciding official relied on substantial evidence from multiple sources, not bias, in reaching his removal decision.

## CONCLUSION

For these reasons, we respectfully request that the Court affirm the decision of the Merit Systems Protection Board.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Elizabeth M. Hosford
ELIZABETH M. HOSFORD
Assistant Director

/s/ Liridona Sinani
LIRIDONA SINANI
Trial Attorney
Commercial Litigation Branch
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 353-2188
Email: Liridona.Sinani@usdoj.gov

August 21, 2024          Attorneys for Respondent

CERTIFICATE OF COMPLIANCE

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because the filing has been prepared using a proportionally-spaced typeface and includes 13,591 words.  Further, this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in a proportionally spaced typeface, Times New Roman, 14 point, using Microsoft Word.