**2024-1557**

# United States Court of Appeals for the Federal Circuit

BRUCE FLEMING,

*Petitioner,*

— v. —

DEPARTMENT OF THE NAVY,

*Respondent.*

*On Appeal from the Merit Systems Protection Board in Case No. PH-0752-18-0457-I-1*

## JOINT APPENDIX

LIRIDONA SINANI
UNITED STATES DEPARTMENT OF JUSTICE
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 353-2188
liridona.sinani@usdoj.gov

*Counsel for Respondent*

JASON EHRENBERG
EHRENBERG LEGAL
  & HIGHER ED SOLUTIONS PLLC
5335 Wisconsin Avenue NW,
  Suite 440
Washington, DC 20015
(202) 617-2590
jason@ehrenberglegal.com

*Counsel for Petitioner*

September 19, 2024

CP COUNSEL PRESS    (800) 4-APPEAL • (329997)

# TABLE OF CONTENTS

| TAB No. | Dated | Description | Appx. No. |
|---|---|---|---|
| PFR 17 | 1/26/2024 | MSPB - Final Order | Appx1 |
| IA 33 | 7/24/2019 | Initial Decision | Appx25 |
| | | Certified List | Appx54 |
| IA 1 | 8/28/2018 | Appellant - Initial Appeal | Appx120-131 |
| IA 7 | 9/20/2018 | Agency - Agency File Submission Part 1 | Appx200-205<br>Appx213-218<br>Appx274-275<br>Appx277-314 |
| IA 8 | 9/20/2018 | Agency - Agency File Submission Part 2 | Appx375-490<br>Appx494-505<br>Appx507<br>Appx513-518<br>Appx520-531 |
| IA 28 | 5/15/2019 | Agency - Agency PreHearing Submission | Appx601-604<br>Appx613<br>Appx642-643<br>Appx662-669<br>Appx680<br>Appx689-695 |
| IA 29 | 5/15/2019 | Appellant - Appellant's Prehearing Submissions | Appx714<br>Appx716-718<br>Appx720-724<br>Appx726-732<br>Appx734-735<br>Appx741-749<br>Appx751-765<br>Appx768-804<br>Appx808<br>Appx810-812<br>Appx814-815<br>Appx845-850 |
| IA 36 | 8/5/2019 | Other - Hearing Transcript - May 22 2019 | Appx875-891<br>Appx894-895<br>Appx900<br>Appx905-998<br>Appx1013-1014<br>Appx1017<br>Appx1022-1023 |

i

# TABLE OF CONTENTS

| TAB No. | Dated | Description | Appx. No. |
|---------|-------|-------------|-----------|
| | | | Appx1026-1029 |
| | | | Appx1032-1034 |
| | | | Appx1036-1057 |
| | | | Appx1067-1074 |
| | | | Appx1077 |
| | | | Appx1083-1084 |
| | | | Appx1099-1100 |
| | | | Appx1102-1104 |
| | | | Appx1111 |
| | | | Appx1119 |
| | | | Appx1199-1201 |
| | | | Appx1266-1268 |
| | | | Appx1306-1307 |
| | | | Appx1412 |
| | | | Appx1422 |
| | | | Appx1426 |
| | | | Appx1430 |
| | | | Appx1472 |
| PFR 7 | 9/27/2019 | Agency - Petition for Review | Appx1477-1495 |

**UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD**

BRUCE FLEMING,
                Appellant,

      v.

DEPARTMENT OF THE NAVY,
           Agency.

DOCKET NUMBER
PH-0752-18-0457-I-1

DATE:  January 26, 2024

## THIS FINAL ORDER IS NONPRECEDENTIAL[1]

<u>Jason H. Ehrenberg</u>, Esquire, Washington, D.C., for the appellant.

<u>Alison Gray</u>, Esquire, Washington, D.C., for the agency.

<u>Terrence P. Cook</u>, Esquire, Annapolis, Maryland, for the agency.

**BEFORE**

Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member

**FINAL ORDER**

The agency has filed a petition for review of the initial decision, which reversed the appellant's removal.  The appellant has filed a motion to dismiss the agency's petition for failure to provide interim relief.  For the reasons discussed below, we DENY the appellant's motion to dismiss, GRANT the agency's

---

[1]  A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law.  Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions.  In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law.  *See* 5 C.F.R. § 1201.117(c).

petition for review, and REVERSE the initial decision. The agency's action is SUSTAINED.

### BACKGROUND

The appellant is a tenured Professor of English at the U.S. Naval Academy in Annapolis, Maryland. At issue are certain aspects of the appellant's conduct in teaching first-year Rhetoric & Introduction to Literature, HE 111, during the fall semester of the 2017/2018 academic year. In January 2018, five different students filed complaints with the Vice Academic Dean alleging that the appellant had made various offensive comments, discussed inappropriate matters during class, and engaged in other unprofessional conduct. Initial Appeal File (IAF), Tab 7 at 115-34. The Vice Academic Dean directed the Director of the Division of Humanities and Social Sciences to supervise a fact-finding inquiry. *Id.* at 114.

The Division Director assembled a panel of three senior faculty members, who interviewed the students from the appellant's fall classes, as well as two other students whose names had come up regarding one matter. *Id.* at 135-89; IAF, Tab 8 at 4-119. The appellant was invited to address the panel, but he declined to do so. IAF, Tab 8 at 120-21; IAF, Tab 28 at 91. He did reply by email, IAF, Tab 8 at 123, and he also sent an email message to the entire faculty in which he generally complained about the unfairness of the process, *id.* at 130. Thereafter, the panel issued a report finding that a number of the matters as described in the complaints had occurred and qualified as unprofessional behavior. IAF, Tab 7 at 97-113.

On June 26, 2018, the Division Director proposed the appellant's removal on a charge of Conduct Unbecoming a Federal Employee with seven specifications. The agency alleged that the appellant: (1) referred to students as "right-wing extremists"; (2) made comments about and discussed anal sex, oral sex, and transgender surgery; (3) emailed partially clothed photos of himself to students after having been counseled that doing so was inappropriate and agreeing

to refrain from doing so; (4) touched students without their approval; (5) referred to his own sexual experiences; (6) repeatedly mispronounced an Asian-American student's name despite being corrected several times; and (7) made demeaning, sexually related comments about a child and her mother because of how they were dressed.[2]  *Id.* at 79.  After the appellant responded,  the Academic Dean and Provost issued a decision sustaining all seven specifications and removing the appellant effective August 17, 2018.  *Id.* at 18-21, 33.

The appellant filed a Board appeal contesting the merits of the removal and raising several affirmative defenses, including retaliation for whistleblowing, violation of his First Amendment rights, and harmful procedural error.  IAF, Tabs 1, 30.  After a hearing, the administrative judge issued an initial decision not sustaining any of the seven specifications and reversing the removal on that basis.  IAF, Tab 33, Initial Decision (ID).  The administrative judge considered the appellant's affirmative defenses but found that he failed to prove them.  ID at 16-17.  He ordered the agency to provide interim relief if either party filed a petition for review.  ID at 19.

The agency has filed a petition for review, Petition for Review (PFR) File, Tab 7; the appellant has filed a response, PFR File, Tab 13; and the agency has filed a reply, PFR File, Tab 16.  The appellant has also moved to dismiss the agency's petition for failure to comply with the interim relief order, PFR File, Tab 11, and the agency has responded in opposition to that motion, PFR File, Tab 12.

### ANALYSIS

<u>The agency is in compliance with the administrative judge's interim relief order.</u>

If the appellant is the prevailing party in the initial decision and the administrative judge orders interim relief, a petition for review filed by the

---

[2] In proposing the appellant's removal, the agency considered that he had previously been issued a Letter of Reprimand for disclosing a student's personally identifiable information.  IAF, Tab 7 at 81.  The Reprimand was issued on May 11, 2018.  *Id.* at 94.

agency must be accompanied by a certification that the agency has complied with the interim relief order, either by providing the interim relief ordered, or by making a determination that returning the appellant to the place of employment would cause undue disruption to the work environment.  *Ayers v. Department of the Army*, 123 M.S.P.R. 11, ¶ 6 (2015); 5 C.F.R. § 1201.116(a); *see* 5 U.S.C. § 7701(b)(2)(A)(ii).  If an agency makes a determination that an employee will pose an undue disruption, it must nonetheless return the employee to a pay status pending the outcome of its petition for review, and provide "pay, compensation, and all other benefits as terms and conditions of employment" pending the outcome of the petition for review.  5 U.S.C. § 7701(b)(2)(B).  The Board's review of interim relief is limited to determining whether the agency actually made an undue disruption determination and whether the employee has received appropriate pay and benefits.  The Board does not have the authority to review the merits of an undue disruption determination.  *King v. Jerome*, 42 F.3d 1371, 1375-76 (Fed Cir 1994).

   In this case, the agency's petition for review was accompanied by a certification that it has complied with the administrative judge's interim relief order by reinstating the appellant to his position, effective the date of the initial decision, and a Standard Form 50 (SF-50), Notification of Personnel Action, reflecting the interim appointment.  PFR File, Tab 7 at 61, 63.  The certification states, however, that the appellant has not been returned to the classroom.  *Id*. at 61.  In support of the certification, the agency has submitted a declaration by the Academic Dean and Provost, stating that based on the seriousness of the charged misconduct, he determined that the appellant's presence in the classroom and his engaging with midshipmen in any advisory role would be an undue disruption to the workplace.  *Id.* at 65.  He emphasized that his determination was guided by the Naval Academy's responsibility to provide a positive and supportive classroom and advisory environment which respects the dignity of the individual, promotes the education and professional development of future Navy

and Marine Corps leaders, and ensures the wellbeing of the midshipmen. *Id.*
at 66. The agency has also submitted a copy of the Academic Dean and Provost's
August 7, 2019 letter to the appellant explaining that, for the reasons set forth
above, in lieu of teaching and advising midshipmen, his assignments during the
pendency of the petition will include scholarly research and writing and service to
the school. *Id.* at 67.

In his motion to dismiss, the appellant argues that the agency has failed to
provide the necessary interim relief because, by not allowing him to teach, it has
denied him the possibility of receiving student and peer evaluations, which are a
significant component of yearly considerations in the merit pay increases that are
a condition of his employment. PFR File, Tab 11. The appellant likens merit pay
increases to overtime which is required as part of interim relief when the
employee proves that he is entitled to it as a condition of employment. *Id.* at 7.

In its response to the appellant's motion, the agency argues that the three
performance elements for Academy faculty that form the basis for merit increases
are teaching, scholarship, and service, and that, when a faculty member does not
perform tasks in one of the elements during the rating period, the member is still
eligible for a merit increase based on the element(s) in which he or she has
performed tasks.[3] PFR File, Tab 12 at 6-7. Thus, the agency argues that, when
the appellant is eligible for a merit increase, it will be based on his performance
in the elements of scholarship and performance. *Id.* at 7. In support of its
position, the agency has submitted a declaration under penalty of perjury by the
Vice Academic Dean, who oversees the Academy's performance plan program.
*Id.* at 16. The agency also disputes the appellant's argument that merit increases
should be considered like overtime. *Id.* at 11-12.

We find that the agency has met its initial burden of demonstrating that it is
in compliance with the administrative judge's interim relief order. Specifically,

---

[3] As an example, the agency references a professor who, because of absence due to
maternity leave, is not in the classroom for a portion of time during the rating period
and is therefore not rated on the teaching element. PFR File, Tab 12 at 7, 19.

the agency has:  (1) certified its compliance; (2) submitted an SF-50 showing that the appellant has been given an interim appointment to his Professor position at his previous adjusted basic pay, effective the date of the initial decision; (3) made a determination that returning him to the classroom would pose an undue disruption; and (4) so advised the appellant.

Therefore, the only remaining issue is whether the appellant has been denied pay, compensation, or other benefits as terms and conditions of employment, during the pendency of the petition for review.   5 U.S.C. § 7701(b)(2)(B).  We find that he has not.  The evidence submitted by the agency shows that merit increases for faculty are not automatic, PFR File, Tab 12 at 18, 21, and not a condition of employment.[4]  In any event, the agency has shown that the appellant's absence from the classroom will not automatically preclude him from receiving merit increases during subsequent academic years because his eligibility will be based on performance in the remaining two elements.  *Id.* at 19.

For these reasons, the appellant's motion to dismiss is denied.

Conduct Unbecoming.

The administrative judge correctly found that a charge of conduct unbecoming has no specific elements and that, in analyzing such a charge, the Board considers whether the conduct was improper, unsuitable, or detracting from one's character or reputation.  ID at 5; *see Social Security Administration v. Long*, 113 M.S.P.R. 190, ¶ 42 (2010), *aff'd*, 635 F.3d 526 (Fed. Cir. 2011).  The agency must prove its charge by preponderant evidence, which is the degree of relevant evidence that a reasonable person, considering the record as a whole,

---

[4] The appellant's likening of his situation to overtime is not persuasive.  Generally, overtime pay is compensation that is not required to be paid under an interim relief order.  *McLaughlin v. U.S. Postal Service*, 55 M.S.P.R. 192, 200 (1992),  The only exception is in those instances in which an employee proves that he is entitled to overtime as a term or condition of employment by virtue of law, rule, regulation, collective bargaining agreement, or binding agency policy.  *Id.*  The appellant has made no such showing regarding merit increases.

would accept as sufficient to find that a contested fact is more likely to be true than untrue.  5 C.F.R. §§ 1201.4(q), 1201.56(b)(1)(ii).

Specification (1) is sustained.

In this specification, the agency alleged that the appellant referred to two students as "right-wing extremists" or words to that effect.  IAF, Tab 7 at 79.  In an email dated September 26, 2017, he referred to the two as "my right-wing extremists," and then critiqued what he perceived as their unsupported positions on issues about which they had written (anti-gun control and anti-taxes) in connection with an assignment.  IAF, Tab 8 at 135.  In his initial decision, the administrative judge noted that, in the email, the appellant stated that he would have sent the same email to "left-wing extremists," and that "this is not a left-right thing.  It's a justify that thing."[5]  ID at 11; IAF, Tab 8 at 135.  Finding that the email was not "politically discriminatory," the appellant's real message to the students was that they must provide supporting arguments for positions they take, and that is a completely appropriate criticism for a student paper, the administrative judge concluded that the specification does not describe misconduct.  ID at 11-12.

On review, the agency argues that the email was unprofessional because it detracted from the appellant's role as a supervisor, and that, in sending the email, he abdicated his responsibility to be a role model for the students and to show them dignity and respect.  PFR File, Tab 7 at 20-21.  The agency asserts that it charged the appellant with conduct unbecoming, not political discrimination.  *Id.* at 19-20.

That the appellant sent this email is not in dispute.  What is in dispute is whether the email constitutes actionable misconduct.  We find that it does, particularly in the setting of the U.S. Naval Academy.  The mission of the Academy is to develop midshipmen morally, mentally, and physically, and it is

---

[5] The investigatory panel did not find any negative outcomes for any students based on their political beliefs.  IAF, Tab 7 at 99.

expected of all members, military or civilian, that they be examples of the principles the Academy is trying to teach—honor, courage, and commitment. Hearing Transcript (HT) at 11 (testimony of the Commandant of Midshipmen). Midshipmen are supposed to be taught, by word and example, that treating others with dignity and respect is a core tenet of the military professional. HT at 9-10 (testimony of the Commandant of Midshipmen). Therefore, certain types of conversations, which between peers might be considered "joking around," are not acceptable in the very different context of a senior-subordinate relationship. HT at 37-39 (testimony of the Commandant of Midshipmen). The testimony of the Commandant of Midshipmen was echoed by other witnesses, who likewise emphasized the values of dignity and respect, the role of a service academy to instill these values into future officers, and the responsibility of the faculty to exemplify them. HT at 41-42, 45-46, 68, 70 (testimony of a Professor of Mechanical Engineering), 166-67, 174-75 (testimony of the Academic Dean and Provost), 301 (testimony of a Professor of English). Naval Academy instructors have the right to academic freedom within the classroom, but there is a difference between proper pedagogical activities and behavior that is unprofessional or pedagogically inappropriate, and instructors are expected to treat their students with dignity and respect. IAF, Tab 8 at 149-50, Academic Dean and Provost Instruction 1531.63C (Apr. 1, 2016).

We agree with the witnesses who testified that, by labeling two of his students "right-wing extremists," the appellant failed in his duty to treat them with dignity and respect. HT at 16 (testimony of the Commandant of Midshipmen), 308 (testimony of a Professor of English). This specification is sustained. *See Dolezal v. Department of the Army*, 58 M.S.P.R. 64, 66-67 (1993) (upholding a conduct unbecoming charge based on disparaging and demeaning comments the appellant made in an email about a subordinate).

Specifications (2) and (5) are sustained.[6]

In specification (2), the agency charged that, during class, the appellant made comments regarding oral sex, anal sex, and transgender surgery, and in specification (5), that he made comments referring to his own sexual experiences. IAF, Tab 7 at 79.  The appellant did not deny discussing these matters in class, but he disagreed that the discussions were inappropriate.  *Id.* at 125, 133.

The administrative judge agreed with the appellant.  He found that the deciding official failed to consider whether the academic context warranted the discussion of sexual topics, particularly in light of the appellant's academic writing on transgender issues.  He further found that there did not appear to be a rule or policy against discussing such topics or the appellant's own sexual experiences, and that the appellant was not on notice that such discussions were forbidden or greatly restricted.  Therefore, the administrative judge found that the allegations in specifications (2) and (5) did not constitute actionable misconduct, and for that reason, he did not sustain them.  ID at 12-13.

On review, the agency argues that conduct unbecoming does not necessarily require violation of a specific rule, and that there is sufficient evidence to show that many of the appellant's remarks were off-topic or otherwise inappropriate.  PFR File, Tab 7 at 22, 26-27, 42-44.  We agree.  There are certain academic contexts in which discussion and even explicit discussion of sexual material may be proper.  However, the unrebutted hearing testimony shows that the appellant frequently perseverated on these topics even when they were completely unrelated to the course material.[7]  HT at 103 (testimony of Midshipman M.D.), 162-63 (testimony of Midshipman B.G.).  This testimony is consistent with the content of the students' written complaints and the greater

---

[6] We agree with the administrative judge that it is best to address these two specifications together.  ID at 12-13.

[7] Regarding specification (5) in particular, it is difficult to imagine a situation in which it would be appropriate for a professor to share with the class details of his own personal sexual experiences.

part of student responses to the panel inquiry.  IAF, Tab 7 at 117-21, 125-27, 129, 131-33, Tab 8 at 4-119.[8]  Nor does the appellant suggest that his discussion of these matters was confined to situations in which they may have been implicated by course materials.  IAF, Tab 8 at 125-26; IAF, Tab 7 at 33-34.  Furthermore, even to the extent that these discussions may have been related to the course material, and allowing that it is normal for college classroom discussions to stray from the material sometimes, we still find that the nature and extent of the appellant's remarks went beyond what was appropriate.[9]

Specification (3) is sustained.

In specification (3), the agency charged that the appellant emailed partially clothed pictures of himself[10] to students, after having been counseled that doing so was inappropriate and agreeing to not do so in the future.  IAF, Tab 7 at 79.  This conduct was mentioned in two of the student complaints, *id.* at 121, 132, as well as in a number of interview responses, *e.g.*, IAF, Tab 8 at 61, 66, 88, 98, 104, 114, 116.  In his email to the panel, the appellant denied this specification, admitting that he had only sent such a photo to a student 2 years ago, not during the timeframe at issue, and he defended that earlier action as not inappropriate, suggesting that it related to course material.  *Id.* at 125-26.

In addressing this specification, the administrative judge found that there was no dispute that the appellant was counseled for sending partially clothed photos of himself to students in 2015, IAF, Tab 8 at 158-59, and that he again

---

[8]  Some of the interviewees reported that the appellant discussed condom use, transgender surgery, and sexuality, yet also reported that there was no "sexually suggestive language" used.

[9]  Even if we did not sustain specification 2, we find that the charge would still be sustained based upon the remaining specifications.  *Burroughs v. Department of the Army*, 918 F.2d 170, 172 (Fed. Cir. 1990) (proof of one or more specifications is enough to sustain charge); *Avant v. Department of the Air Force*, 71 M.S.P.R. 192, 198 (1996) (explaining that if a single charge has multiple specifications, an agency need only prove one specification to sustain the charge).

[10]  Most of the photos were of the appellant shirtless and flexing.  IAF, Tab 8 at 136, 142-45.

engaged in that behavior in 2017, *id.* at 136, Tab 29 at 77-78. ID at 13. Nonetheless, the administrative judge found that, other than one midshipman, M.D., no one who received the photos appeared particularly offended by them, and that Midshipman M.D.'s claim that he was offended at receiving the photo was "hard to believe." ID at 13-14. Concluding that there was no misconduct, the administrative judge did not sustain this specification. ID at 14. The agency contests this analysis on review. PFR File, Tab 7 at 32.

We find that, regardless of whether the appellant believed that sending midshipmen shirtless photos of himself was appropriate, and regardless of whether any recipients of those photos were actually offended, his actions still amounted to conduct unbecoming. The record shows that, in the fall of 2015, the agency gave the appellant a written and verbal counseling about this very same behavior, notified him that it was inappropriate, required him to retake an anti-harassment training course, and warned him against engaging in such behavior in the future. IAF, Tab 8 at 159. The appellant acknowledged, at that time, that sending such photos of himself to students could result in allegations of impropriety, and he agreed to refrain from doing so in the future. *Id*. Yet 2 years later, the appellant disregarded the agency's warning and resumed emailing midshipmen shirtless pictures of himself. IAF, Tab 7 at 121, 132, Tab 8 at 142-45; HT at 55-56.(testimony of Professor K.L.), (testimony of Midshipman M.D.). That the appellant claims a pedagogical purpose for this is immaterial; he acted contrary to his supervisors' clearly stated expectations, and on that basis, he committed conduct unbecoming.

Specification (4) is sustained.

In specification (4), the agency alleged that the appellant touched students without their approval. IAF, Tab 7 at 79. The appellant touching students on their shoulders, head, and neck in an unwanted, unnecessary, and unprofessional manner was mentioned in several complaints, *id.* at 118, 129, 132, as well as in a number of student interviews conducted by the panel, *e.g.*, IAF, Tab 8 at 5, 13,

21, 41, 58, 66, 78. In his email to the panel, the appellant did not deny the touching, but stated that, because he "can read body language," any such touching was always welcome. *Id.* at 128.

The administrative judge found that the appellant did touch students, but there was no policy against it and no students were offended. The administrative judge therefore found that there was no misconduct, and he did not sustain this specification. ID at 14.

On petition for review, the agency disputes the administrative judge's analysis and argues that it presented sufficient evidence for the Board to sustain this specification. PFR, Tab 7 at 38, 41. We agree. The record shows that the appellant, on one or two occasions, sat next to a student in class and rubbed his back for approximately 15 seconds. HT at 148-49 (testimony of Midshipman A.B.). The appellant does not deny this behavior, IAF, Tab 7 at 106-07, and we find that it was inappropriate on its face. Furthermore, the student at issue testified, unsurprisingly, that the appellant's actions made him feel uncomfortable.[11] HT at 148-49 (testimony of Midshipman A.B.). We agree with the agency that this constituted conduct unbecoming.

Specification (6) is sustained.

In specification (6), the agency alleged that the appellant repeatedly mispronounced an Asian-American student's name despite being corrected several times. IAF, Tab 7 at 79. The student in question, Midshipman R.J., raised this matter in his complaint, stating that, "especially when angry," the appellant would call him different last names "which were common Asian last names," and that, when corrected, he "always brushed it off, . . . one time even telling [the student] to 'f*** off.'" *Id.* at 133. The student's testimony was consistent with his complaint. HT at 154 (testimony of Midshipman R.J.). Midshipman R.J. also testified that he believed that the appellant intentionally

---

[11] Although the student's feelings about the appellant's behavior are not dispositive, they lend further support to our finding that it was inappropriate.

called him the wrong name because he repeatedly mispronounced his name despite several corrections, and that he viewed the mispronunciations as a "slap in the face" given his status as a child of immigrant parents who came to the United States with "literally nothing," and given that a family name holds significant honor in his culture.  HT at 155-56 (testimony of Midshipman R.J.).  During the investigation, a number of other students remarked upon the appellant's mispronouncing of names, specifically Asian names.  *See, e.g.*, IAF, Tab 8 at 13, 46, 58, 62, 68, 70, 85.  In his deposition, the appellant stated three times that he did not "recollect" mispronouncing the student's name, although he then denied that it happened after being specifically asked whether he denied mispronouncing the name.  IAF, Tab 28 at 78-79.  In his written reply to the panel, he acknowledged that, while he tries to get names right, he "can't always."  He denied making a "f*** you" comment, IAF, Tab 8 at 129, although that was not specifically what Midshipman R.J. had claimed.

In finding this specification not sustained, the administrative judge questioned Midshipman R.J.'s credibility because, when he was interviewed by the panel, he stated that he was unsure whether the mispronunciation was "done on purpose," and because, while he stated that the appellant used profanity in the classroom, and that two or three times it was directed at him personally, he did not mention the "f*** off" comment.  IAF, Tab 8 at 60; ID at 15.  The administrative judge also found a lack of corroboration of this specification by the rest of the class.  ID at 15.

On review, the agency argues that the administrative judge's credibility determination was not demeanor-based, and that it therefore should not be afforded deference.  PFR File, Tab 7 at 47.  However, the Board has held that a credibility determination made after an in-person hearing is at least implicitly based on witness demeanor.  *Aldridge v. Department of Agriculture*, 111 M.S.P.R. 670, ¶ 11 (2009).  Such demeanor-based credibility determinations are entitled to deference and may only be overturned when the Board has "sufficiently sound"

reasons for doing so. *Haebe v. Department of Justice*, 288 F.3d 1288, 1301 (Fed. Cir. 2002). There are sufficiently sound reasons in this case for us to find Midshipman R.J. a credible witness notwithstanding the administrative judge's finding to the contrary. Midshipman R.J.'s testimony was consistent with his complaint and supported by other students' accounts as to the appellant's mispronouncing of students' names. Although Midshipman R.J. informed the panel that it was "[h]ard to tell if it was done on purpose," he nevertheless "felt it was directed intentionall[y]" at him. IAF, Tab 8 at 60. As stated above, the appellant elected not to testify at the hearing. *See Scott v. Department of Justice*, 69 M.S.P.R. 211, 229 (1995) (noting that, in weighing the evidence, that the appellant did not explain why he did not testify under oath or provide a sworn statement), *aff'd*, 99 F.3d 1160 (Fed. Cir. 1996). That the appellant did not recall mispronouncing Midshipman R.J.'s name is not the same as denying that it occurred. *Hillen v. Department of the Army*, 50 M.S.P.R. 293, 302 (1991). His denial, in turn, occurred only after he had stated three times that he did not "recollect" doing so, and only after he was specifically asked whether he denied it. *See Spurlock v. Department of Justice*, 894 F.2d 1328, 1330 (Fed. Cir. 1990) (holding that self-contradiction and imprecision detract from the weight to be accorded the evidence upon which an administrative board bases its decision). For these reasons, we find that Midshipman R.J.'s account is credible and that the appellant engaged in conduct unbecoming as specified.

Specification (7) is sustained.

In this specification, the agency alleged that the appellant made demeaning sexually related comments about an adolescent girl attending a dance with his son and similar offensive comments about the girl's mother. IAF, Tab 7 at 79. Midshipman M.D. reported that the appellant said that the appellant called the girl a "slut" who was "looking for something more," and said that her short dress suggested her sexual intentions. IAF, Tab 7 at 118. According to Midshipman M.D., the appellant then showed the class a photo of the girl with his son, again

focusing on the shortness of her dress, and also made fun of her mother's physical features, skirt length, clothing choices, and parental decision-making.  *Id.* at 119.  Midshipman M.D.'s hearing testimony was in accord, HT at 100-01 (testimony of Midshipman M.D.), as was the testimony of another student, HT at 158-59 (testimony of Midshipman J.R.).  Two of the other students who filed complaints also mentioned this incident, IAF, Tab 7 at 129, 131, as did a number of the students who were interviewed by the panel.  *See, e.g.,* IAF, Tab 8 at 7, 11, 13, 15, 17, 21, 25, 27, 29, 31, 33, 37, 41, 82.  The appellant admitted to these actions in his email to the panel.  *Id.* at 128.

Regarding this specification, the administrative judge found that there was no prohibition against discussing either one's family or sexual topics, and that because there was no misconduct, the specification was not sustained.  ID at 15.  We disagree with the administrative judge's reasoning.

There is no dispute that the appellant made the comments in question.  IAF, Tab 7 at 107-08; ID at 15.  An agency is not required to describe in detail all potentially prohibited employee conduct and the resulting discipline.  Rather, an agency may reasonably require its employees to exercise good judgment, notwithstanding a lack of literal guidance from an agency rule, regulation, or other statement of policy.  *Byers v. Department of Veterans Affairs*, 89 M.S.P.R. 655, ¶ 24 (2001).  Here, given the Academy's commitment to the principles of dignity and respect, the appellant should have known that his actions would be considered inappropriate and could constitute actionable misconduct.  In particular, the appellant should have known that making demeaning sexual comments about an adolescent would constitute conduct unbecoming a Federal employee.  This specification is sustained.

<u>The agency's charge is sustained.</u>

Because we have found all of the specifications sustained, the charge of Conduct Unbecoming is sustained.[12]    *See Johnson v. Small Business Administration*, 97 M.S.P.R. 571, ¶¶ 24-25 (2004).

<u>The agency has established a nexus between the sustained misconduct and the efficiency of the service.</u>

In addition to the requirement that an agency must prove the charge it has brought against the appellant, it must also prove that there is a nexus, i.e., a clear and direct relationship between the articulated grounds for the adverse action and either the appellant's ability to accomplish his duties satisfactorily or some other legitimate government interest. *Canada v. Department of Homeland Security*, 113 M.S.P.R. 509, ¶ 10 (2010). Here, the charge bears on the Academy's mission of preparing midshipmen morally, mentally, and physically to fulfill their leadership role in the Navy and Marine Corps, and of the importance of training midshipmen to treat others with dignity and respect and to build trust between these future leaders and their subordinates, who will be asked to follow their commands. HT at 9-10 (testimony of Commandant). Every member of the Academy, including civilian faculty like the appellant, is expected to act in a manner that reflects the core values and principles being taught. HT at 11 (testimony of the Commandant). We therefore find that the agency has established a nexus between the sustained misconduct and the efficiency of the service. *See Canada*, 113 M.S.P.R. 509, ¶ 11 (finding nexus, based on conduct adversely affecting the agency's mission, when the appellants, who were first-line

---

[12] As noted, the administrative judge found that the appellant did not establish his claims that, in taking this action, the agency retaliated against him for engaging in whistleblowing, violated his First Amendment rights, and committed harmful procedural error. ID at 16-18. The appellant has not filed a petition for review challenging the administrative judge's findings not sustaining any of these affirmative defenses. Therefore, and because, based on our review, we determine the findings to be well supported, we will not disturb them. *See* 5 C.F.R. § 1201.115 (providing that the Board normally will consider only issues raised in a timely filed petition or cross petition for review).

supervisors, oversaw a young and impressionable workforce of junior employees who looked to the appellants for guidance and direction).

<u>The agency has shown that removal is a reasonable penalty for the sustained misconduct.</u>

When, as here, all of an agency's charges are sustained, the Board will review the agency-imposed penalty only to determine if the agency considered all the relevant factors and exercised management discretion within the tolerable limits of reasonableness. In making this determination, the Board must give due weight to the agency's primary discretion in maintaining employee discipline and efficiency, recognizing that the Board's function is not to displace management's responsibility, but to ensure that management's judgment has been properly exercised. *Powell v. U.S. Postal Service*, 122 M.S.P.R. 60, ¶ 12 (2014).

Here, in arriving at his decision to affirm the appellant's removal, the deciding official considered the factors set forth by the Board in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280, 305-06 (1981), as appropriate in making a penalty determination. IAF, Tab 7 at 21-24. In so doing, he concurred in the analysis of the *Douglas* factors made by the proposing official. *Id.* at 79-83. The most important of these factors is the nature and seriousness of the offense. *Boo v. Department of Homeland Security*, 122 M.S.P.R 100, ¶ 18 (2014). Regarding this factor, the deciding official found that the appellant's misconduct was intentional and repeated, and that it occurred both in the classroom and in emails to students. IAF, Tab 7 at 21. In considering the appellant's job level and type of employment, the deciding official found that, as a senior faculty member and instructor of future Navy and Marine Corps leaders, the appellant's conduct fell short of the requirement that he establish and maintain a classroom environment that respects the dignity of the individual and develops an appreciation for an appropriate superior-subordinate relationship. *Id.* at 22. The deciding official also considered that, since 2013, the appellant was formally counseled twice and received a letter of reprimand regarding his

unprofessional behavior. *Id.* The deciding official noted that the appellant had been formally counseled against sending partially clothed photos of himself to students, yet repeated this conduct. *Id.* at 23. Based on the appellant's insistence that his actions were proper and that he is entitled to continue such behavior, the deciding official indicated that, in his view, the appellant lacks rehabilitative potential, stating that he lacks confidence that the appellant will perform at a satisfactory level in the future and change his behavior. *Id.* at 23-24. The deciding official also stated that removal is within the range of remedies in the agency's table of penalties for a similar offense of inappropriate conduct. *Id.* at 24. The deciding official considered mitigating factors, including the appellant's lengthy service as a faculty member, his satisfactory official performance ratings, and his receipt of performance awards in the 1990s. *Id.* at 22. Despite these factors, the administrative judge concluded that removal was the appropriate penalty. *Id.* at 20. Apart from a pro forma statement in his initial appeal form, IAF, Tab 1 at 6, the appellant has not contested the agency's penalty determination.

Based on our review, we find that the deciding official carefully considered the appropriate *Douglas* factors, and we agree that removal is within the parameters of reasonableness for the sustained charge. We therefore defer to the agency's penalty determination.

<div align="center">

**NOTICE OF APPEAL RIGHTS**[13]

</div>

You may obtain review of this final decision. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most

---

[13] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions. As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) <u>Judicial review in general</u>**. As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of <u>the date of issuance</u> of this decision. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at

http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

(2) **Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after you receive</u> this decision. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** <u>after your representative receives this decision</u>. If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of <u>your discrimination claims only, excluding all other issues</u>. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** <u>after you receive</u> this decision. 5 U.S.C. § 7702(b)(1). If you have a representative in this case,

and your representative receives this decision before you do, then you must file with the EEOC no later than **30 calendar days** <u>after your representative receives</u> this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

<div align="center">

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

</div>

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

<div align="center">

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

</div>

**(3)** <u>**Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**</u>.  This option applies to you <u>only</u> if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[14]   The court of appeals must <u>receive</u> your petition for

_____

[14] The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017.  The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction. The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195,

review within **60 days** of the <u>date of issuance</u> of this decision.    5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

---

132 Stat. 1510.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

FOR THE BOARD:

*Jennifer Everling*

_____
Jennifer Everling
Acting Clerk of the Board

Washington, D.C.

CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

<u>Appellant</u>

U.S. Mail                    Bruce Fleming
                             739 Governor Bridge Rd
                             Davidsonville, Maryland 21035

<u>Appellant Representative</u>

Electronic Service           Jason Ehrenberg
                             Served on email address registered with MSPB

<u>Agency Representative</u>

Electronic Service           Terrence Cook
                             Served on email address registered with MSPB

<u>Agency Representative</u>

Electronic Service           Alison Gray
                             Served on email address registered with MSPB

| | |
|---|---|
| 01/26/2024 | *Dinh Chung* |
| (Date) | Dinh Chung |
| | Case Management Specialist |

Appx24

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**NORTHEASTERN REGIONAL OFFICE**

| | |
|---|---|
| BRUCE FLEMING,<br>          Appellant, | DOCKET NUMBER<br>PH-0752-18-0457-I-1 |
|     v. | |
| DEPARTMENT OF THE NAVY,<br>          Agency. | DATE: July 24, 2019 |

<u>Jason H. Ehrenberg</u>, Esquire, Washington, D.C., D.C., for the appellant.

<u>Terrence P. Cook</u>, Esquire, Annapolis, Maryland, for the agency.

**BEFORE**
Mark Syska
Administrative Judge

**INITIAL DECISION**

The appellant filed this appeal to challenge his removal. *See* Appeal File (AF), Tab 1. The Board has jurisdiction under 5 U.S.C. §§ 7511-7514; 5 C.F.R. Part 752; 5 C.F.R. § 1201.3(a)(1). For the reasons that that follow, the agency's removal decision is REVERSED.

<u>Background</u>

The appellant has served as a Professor at the United States Naval Academy at Annapolis, Maryland (academy or agency) for approximately thirty-one years. The appellant served in the English Department, and the case pertains to his conduct in a plebe (freshman) class of HE 111: Rhetoric & Introduction to Literature during the 2017/2018 academic year. On January 19, 2018, a midshipman (MD) filed a lengthy complaint about the appellant regarding the Fall

2017 section of HE 111. *Id*. at 115-128.    This complaint was ultimately accompanied by more limited complaints from four other midshipmen. *Id*. at 129-133.   As a consequence, a faculty panel was assembled to investigate the complaints, and the appellant was taken out of the classroom during the investigation.

The panel investigated a variety of purported misbehavior: (1) Discriminating against students on political grounds, in particular referring to two students as "right-wing extremists;" (2) using demeaning language to refer to students, specifically "goldfish" and "midsheeple;" (3) allowing students to tell jokes of a sexual nature in class; (4) regularly discussing sexual matters unrelated or only tangentially related to readings in class, including transgender reassignment surgery and anal sex; (5) emailing partially-clothed photos of himself to his students; (6) touching students on the neck, shoulders, and back in class without their consent; (7) displaying photos of his son's date and making derogatory remarks about her and her mother in class; (8) purposely mispronouncing an Asian student's last name multiple times and telling him to "fuck off" when he repeatedly corrected you; (9) making it known that you have previously litigated complaints against you by Navy administrators and any future complaint is likely to fail because you have tenure; (10) additional finding one - using profanity in classroom discussions and email to students; (11) additional finding two – spending a significant amount of class time on "off topic" discussions; and (12) additional finding number three – making inappropriate and/or unprofessional remarks in class. *Id*. at 97-113.  The appellant was twice invited to address the panel, and he declined by email twice: (1) His first email led to a reprimand because it mentioned private student information; and (2) the second email provided his colorful response to the charged conduct. *See* AF, Tab 8 at 123-134.

On May 18, 2018, the panel issued its report, which began with effusive praise for the appellant – that the students in his upper level class (HE 302) for

the academic year had a universally positive opinion of him, enjoyed his teaching, and deemed him an excellent or good teacher.  *See* AF, Tab 7 at 97.  The report also notes that the students in the plebe class (HE 111) largely echoed these sentiments, but for seven students that rated him a poor instructor.  *Id*.  The panel then went into the various complaints.  Ultimately, the panel concluded that complaints 1, 3, 8, 9, additional finding one, and additional finding two could not be confirmed, or, if confirmed, were <u>not</u> misconduct.  *Id*. at 113.  The panel also concluded that complaints 2, 5, 6, 7, and additional finding three did occur and did qualify as unprofessional behavior.  *Id*.  As to complaint four, the panel concluded that discussions of sex that were germane to the reading assignments were appropriate, but the appellant's discussion of his personal experiences had no place in the classroom.  *Id*.

On June 26, 2018, the academy proposed the appellant's removal.  *See* AF, Tab 7 at 79-84.  The proposed removal was based on one charge of "Conduct Unbecoming a Federal Employee," which had one specification:

> During the fall semester of Academic Year 2017-2018, you engaged in unprofessional conduct in the classroom and outside the classroom.  Your conduct included, but is not limited to: (1) referring to students as "right-wing extremists," and/or words to that effect; (2) classroom comments/discussion regarding anal sex, oral sex, and transgender surgery; (3) emailing partially clothed pictures of yourself to students after having been counseled that doing so was inappropriate and your agreement not to do so in the future; (4) touching students without their approval; (5) referring to your own sexual experiences; (6) repeatedly mispronouncing an Asian-American student's name despite being corrected several times by the student; and (7) making demeaning sexually-related comments about a young woman attending a dance with your son and similar offensive comments about the young woman's mother.

*See* AF, Tab 7 at 79.[1]  The appellant's counsel provided a lengthy response to the proposal.  *Id*. at 33-78.  Ultimately, the deciding official ordered the appellant removed, effective August 17, 2018.  *Id*. at 18, 20-25.

---

[1] The agency's decision to include specifications 1, 2, and 6 appear at odds with the panel's conclusions.

4

This appeal followed. I held the appellant's requested hearing, and nine witnesses (of the thirteen that had been approved) testified: (1) Captain Robert Chadwick, Commandant of Midshipmen; (2) Professor Keith Lindler, chair of the investigation panel; (3) Midshipman MD, primary complaining witness; (4) Midshipman AB, secondary complaining witness; (5) Midshipman RJ, secondary complaining witness; (6) Midshipman JR, secondary complaining witness; (7) Midshipman BG, secondary complaining witness; (8) Mr. Andrew Phillips, Academic Dean & Provost, deciding official; and (9) Professor Anne Marie Drew, English Professor. *See* AF, Tab 32 (Hearing CD). After Prof. Drew (the appellant's first witness) testified, the appellant (surprisingly) elected not to testify, nor call any further witnesses, and the hearing immediately proceeded to closing arguments. *Id*.

**Legal Standards**

Adverse Action

The Board may uphold an agency decision to take adverse action against an employee only if the charge is supported by preponderant evidence. 5 U.S.C. § 7701(c)(1)(B); 5 C.F.R. § 1201.56(a)(1)(ii). Preponderant evidence is the degree of relevant evidence a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. 5 C.F.R. § 1201.56(c)(2). In addition to proving the charge, the agency also has the burden of establishing that its action promotes the efficiency of the service (the nexus requirement), meaning the removal action relates to either the appellant's ability to accomplish his duties or some other legitimate government interest. 5 U.S.C. § 7513. Finally, the agency must show that its penalty selection was not so excessive as to be an abuse of discretion, and not otherwise arbitrary or unreasonable. *Douglas v. Veterans Administration,* 5 M.S.P.R. 280, 296-306 (1981).

Conduct Unbecoming

In analyzing a charge of "conduct unbecoming," the Board relies upon the term's ordinary meaning, holding that unbecoming conduct is: "unattractive; unsuitable …, detracting from one's … character, or reputation; [or] creating an unfavorable impression." *Miles v. Department of the Army,* 55 M.S.P.R. 633, 637-38 (1992) (intentionally killing deer with government vehicle was conduct unbecoming). A charge of "conduct unbecoming" has no specific elements of proof; it is established by proving that appellant committed the acts alleged in support of the broad label. *Canada v. Department of Homeland Security,* 113 M.S.P.R. 509, ¶ 9 (2010) (consuming alcohol in government vehicle was conduct unbecoming). In this way, an agency may describe actions that constitute misbehavior in narrative form and have its discipline sustained if the efficiency of the service suffers because of the misconduct. *Id.* However, a general charge must be described in sufficient detail to allow an appellant to make an informed reply. *See Cross v. Department of the Army,* 89 M.S.P.R. 62, 68 (2001) (changing subordinate's appraisal without notice to employee was conduct unbecoming). *Cf. Colbert v. U.S. Postal Service,* 93 M.S.P.R. 467, 471 (2002) (narrative charge acceptable so long as it describes misbehavior) (manipulation of timecards was "unacceptable conduct").

Whistleblower Affirmative Defense

The WPA prohibits an agency from taking a personnel action against an employee for disclosing information that the employee reasonably believes evidences a violation of law, rule, or regulation; gross mismanagement; a gross waste of funds; an abuse of authority; or a substantial and specific danger to public health or safety. *See Chambers v. Department of the Interior*, 602 F.3d 1370, 1375-76 (Fed. Cir. 2010) (citing 5 U.S.C. § 2302(b)(8)); *Mudd v. Department of Veterans Affairs*, 120 M.S.P.R. 365, ¶ 5 (2013); *see also Linder v. Department of Justice*, 122 M.S.P.R. 14, ¶ 11 (2014) (the employee need not "label" the disclosure correctly). The disclosure must be specific and detailed,

not just vague allegations of wrongdoing.  *See Scoggins v. Department of the Army*, 123 M.S.P.R. 592, ¶ 6 (2016).   At a hearing, the appellant must prove his affirmative defense by preponderant evidence.   *See Scoggins*, 123 M.S.P.R. 532, ¶ 5.   If the appellant proves that he made a disclosure and the disclosure was a contributing factor in an adverse personnel action, the burden shifts to the agency to prove by clear and convincing evidence that it would have taken the same action in the absence of the disclosure.  *See Whitmore v. Department of Labor*, 680 F.3d 1353, 1364 (Fed. Cir. 2012).

Other Protected Activity Affirmative Defense

To establish a case of retaliation for engaging in a protected activity, the appellant must show that a prohibited consideration was a factor in the contested personnel action.  *See Savage v. Department of Army*, 122 M.S.P.R. 612, ¶ 41 (2015).  But the Board will only reverse the action if the appellant can show this retaliation was a "but for" cause of the action. *Id*., ¶ 48.   Thus, if the appellant shows the prohibited consideration was a factor in an agency decision, the agency can avoid corrective action by showing that it would have taken the same action in the absence of the discriminatory or retaliatory motive.  *Id*., ¶ 51.

Harmful Error Affirmative Defense

To prove the affirmative defense of harmful error, the appellant must show that the agency violated its own procedures, and that this error was harmful (would change the result).

As to the witnesses, I had the opportunity to observe each witness, and I carefully considered his/her demeanor.  *See Hamilton v. Department of Veterans Affairs*, 115 M.S.P.R. 673, ¶ 18 (2011).[2]

[2] To resolve any credibility issues, I utilized a *Hillen* analysis.  An administrative judge must identify the factual questions in dispute, summarize the evidence on each disputed question, state which version he believes, and explain in detail why he found the chosen version more credible, considering such factors as: (1) The witness's opportunity and capacity to observe the event or act in question; (2) the witness's character; (3) any prior inconsistent statement by the witness; (4) a witness's bias, or lack of bias; (5) the contradiction of the witness's version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness's version of events;

**Analysis & Fact-findings**

The appellant appears to be a rather unique professor at the academy. He is irreverent, theatrical, fashion-conscious, outspoken in his criticism of the academy (both in the classroom and his writings), and liberally sprinkles his classes with profanity and discussions of sexually-related topics (from condom use to transgender surgery). The appellant is also a "work-out fiend," and in good enough shape to regularly exercise with the well-conditioned midshipmen at the gyms and swimming pools on campus (where typical attire is swim trunks and other workout gear). Moreover, the overwhelming majority of his students enjoyed the appellant and his teaching style. Indeed, photographs were frequently taken in class, and they reflect a "loose" atmosphere – with the appellant dressed in costume (pirate), students trying on the appellant's designer sport coat or cowboy hat (with arms around each other's shoulders), carrying classmates around, and flexing their biceps en masse. *See, e.g.*, AF, Tab 29 at 20, 21, 24, 26-28, 55-60, 62, 65-69. Indeed, Lindler stated the appellant was a great classroom teacher, Phillips conceded that he could be a very effective teacher, and Drew testified that she had reviewed over a thousand of his student evaluations (over her 30 years) and over 90% were positive – an unheard of success rate. Hearing CD.

But a small group of students – one in particular – disapproved of the appellant's classroom performance. Further, the appellant's classroom behavior and writings appear to have created long-standing tension with the academy's more traditional hierarchy. In addition, this case suggests a potential tension between the concepts of tenure and academic freedom – concepts the academy states it respects – with the basic process of disciplining a federal employee under Title V and the relevant regulations. The appellant is both a professor at an institution of higher learning and a federal employee at the academy.

---

and (7) the witness's demeanor. *Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987).

The Charge

The agency ultimately fails to carry its burden of proof regarding the charge for a host of reasons.  At the outset, their primary witness had severe credibility issues.  In addition, the purported "victims" of the appellant's actions did not generally take offense or have any actual issue with the appellant. Moreover, much of the charged conduct, as noted by the investigating panel, did not appear to be actual misconduct in the context of free-wheeling classroom discussions.  Further, I note that the panel members taught in subject areas where class discussions were unlikely to include profanity or sexual discussions – mechanical engineering and chemistry.  Hearing CD.  Yet, they readily recognized that profanity and the discussion of sexual topics could be completely appropriate in the appellant's class.  Moreover, the one English professor who testified noted that profanity and sexual discussions were not uncommon when discussing literature (which frequently contains these matters).[3]  *Id*.(Drew).  A lack of notice was also a significant issue regarding certain specifications, as the appellant had taught in his same distinctive manner for decades.

General Credibility

Only the primary complaining midshipman testified for any length of time; the secondary complaining midshipman generally testified for bare minutes.  As to the latter, I note their testimony was roughly consistent with their prior statements (with one notable exception).  Hearing CD.  More specifics will be noted below.

As to the former, I must conclude that MD's testimony, like his written complaint, is greatly exaggerated -- to the point of being hard to credit on certain points.  Hearing CD; *see also* AF, Tab 7 at 115-128.  MD also appeared to have a motive to exaggerate his claims about the appellant.  Further, MD's limited

---

[3] Drew emphasized this point by noting some of the English professors are Marines. Hearing CD.

credibility is critical because, as the deciding official conceded, in the absence of MD's complaint (and it being believed), "we would not be here." Hearing CD.

A few examples of MD's questionable assertions are instructive. In his statement and testimony, MD stated a "plethora" of people were "suffering" or "crying," but on cross he conceded that it was really only one person. Hearing CD.[4] He also conceded his reference to repeated "attacks" by the appellant all referred to one email (discussed below). *Id*. Further, he stated that the "obscene, X-rated, and sexually explicit" comments were the appellant's discussions of such things as condom use, transgender surgery, and his expressed opinion that sexual matters should be discussed openly. *Id*.

Significantly, on cross, MD also recounted that during a private help session in the appellant's office, he began to believe that he would be sexually assaulted and looked about for a weapon to potentially fight the appellant off. Hearing CD; *see also* AF, Tab 7 at 123. Notably, nothing occurred beyond discussing the appellant's written work, and the appellant did not report his perceived "imminent attack" to anyone (although he would later complain about far smaller matters). *Id*. Further, the appellant's direct testimony about this session only included a reference to the appellant looking up MD's SAT scores and opining "that explains a lot." Hearing CD. Moreover, MD completely undermines his "attack claim " with an email from late in the semester in which MD states that he tried to get into the appellant's class for the following semester, thanked the appellant for everything, and said he would stay in touch with the appellant.[5] *See* AF, Tab 29 at 18.

MD's reaction to the appellant's photo – a shirtless half torso with the focus on a flexed bicep -- is similarly difficult to credit. *See* AF, Tab 8 at 136.

---

[4] He also conceded that many students like the appellant - the "Fleming Faithful." Hearing CD.

[5] MD suggested in his testimony that he was merely trying to curry favor and save his grade with this email. Hearing CD. Admitting to making misstatements to curry favor – serve one's personal interests – does nothing for one's credibility.

Indeed, MD stated that he "agonized" over whether the photo constituted "sexual assault or sexual harassment. "  *See* AF, Tab 7 at 121; Hearing CD.   The former is nonsense while the latter is merely a long stretch.  I note that taking photos was common in the appellant's class, and the record included photos of the entire class (including MD) flexing their biceps – flex being a writing concept the appellant encouraged.  Hearing CD; *see also* AF, Tab 29 at 27-28, 66, 69.  In this context, MD's purported reaction appears feigned.

At bottom, MD having the appellant as his instructor in his first semester of college was something of the perfect storm.   An eighteen year-old from a conservative, religious family, who had only attended religious schools and only experienced academic success versus the profane, irreverent, brutally critical (read admitted very tough grader[6]) and highly theatrical appellant had conflict written all over it.    MD testified, with some indignation, that the appellant gave him his first "C" of his academic life, and he had noted in his statement that grading was where the appellant "asserted dominance" over plebes.   Hearing CD. That high grades might not come as easily in college as they did in high school, particularly in a hyper-competitive environment like the academy, did not seem to occur to him.   MD also conceded that a low grade could impact upon his future posting.  *Id*.  In sum, MD gave the impression his complaint was motivated more by animus for his grade than any sort of genuine concern about the appellant's teaching style.

Thus, MD's statements, when not corroborated, were of limited value. Further, as noted by Lindler, it also appears that MD asked/cajoled/encouraged the other complaining midshipman to file complaints.   Hearing CD.   As previously noted, their complaints were short (often less than a page) and some included the disclaimer that they were not personally offended by the appellant's actions.  *See* AF, Tab 7 at 129-134.  These witnesses generally reiterated the fact

---

[6] *See* AF, Tab 29 at 45-53.

they were not personally offended by the appellant's conduct in their testimony. Hearing CD (AB, JR, BG).

   a.  Specification One – "right-wing extremists"

   This specification is based upon an email that the appellant sent to two midshipmen (including MD) on September 26, 2017, *see* AF, Tab 8 at 135, that the panel addressed and found did not constitute "political discrimination" or other inappropriate conduct, *see* AF, Tab 7 at 98-99.    The email quite simply cannot be read as politically discriminatory.    While the email begins with the phrase "right-wing extremists,"[7] the appellant goes to great pains to state he would make the same comments to "left-wing extremists" and would say the same thing to "Bernie" [Sanders].  *See* AF, Tab 8 at 135.  Further, the obvious thesis of the email was that the students had erred in failing to justify their positions – by providing authority for assertions and addressing obvious counter-arguments.  *Id*. Indeed, the appellant had summed up the failing as follows---"Tell Bill why" and "it's not a left-wing thing. It's a justify that thing." *Id*.   The reference to politics was incidental[8] (and tongue in cheek) to the real message – provide supporting arguments for your positions – which is a completely appropriate criticism for a student paper.   Specification one is simply does not describe misconduct.

   Specification one is NOT SUSTAINED.

   b.  Specification Two - comments regarding oral/anal sex and transgender
       surgery & specification five - referring to his own sexual experiences
       (panel complaint #4)

_____

[7] The midshipmen were taking stereotypical "right-wing" positions - anti-tax and anti-gun control.

[8] Even if it was not, my conclusion would not change.   Drew testified, without contradiction, that professors often gave tongue-in-cheek nicknames to various groups of students (*e.g.*, "the theater geeks").  Hearing CD.  Moreover, MD's claimed "political discrimination" had no further manifestations – he testified the appellant commented on his other papers, but he "could not remember" the comments (or whether he disagreed with them).  *Id*.

The panel summarized the evidence on this issue, and concluded that discussions of the topic were appropriate as it related to assigned reading, but not appropriate to the extent the appellant referred to his personal experiences. *See* AF, Tab 7 at 101-103. In his email response, the appellant conceded the conduct and provided his justifications for it. *Id*. at 102-103.

Specification two charged discussions of various sexual topics generally, contrary to the panel's conclusion that such topics were appropriate if applicable to the reading assignments. More significantly, Phillips did not take into account that the assigned readings involved sexual topics that warranted class discussions. Hearing CD. Phillips was also unaware that the appellant wrote on transgender issues and one of the assigned readings involved transgender issues. *Id*. Thus, the deciding official did not consider the fundamental issue of whether the academic context warranted the discussion of sexual topics. Moreover, there does not appear to be a rule or policy against discussing sexual topics in an academy classroom. *Id*. In addition, the appellant does not appear to have received any notice – prior counseling or letter of reprimand – that discussions of sexual topics in a *college* classroom were forbidden or greatly restricted. On this record, it's difficult to see any misconduct.

As to specification 5, the panel did conclude that the appellant's references to his own experiences were inappropriate. However, as before, the appellant does not appear to have received any notice about this "forbidden" topic, nor does there appear to be an express prohibition of this topic.[9] Hearing CD.

Specifications two & five are NOT SUSTAINED.

c. Specification three – emailing partially clothed photos to students after being counseled and agreeing not to do so (panel complaint #5).

The panel concluded that these incidents had occurred, and that the appellant's focus on his prior counseling was disingenuous. *See* AF, Tab 7 at

---

[9] The academy's position, which is somewhat murky, appears to be that discussions of personal experiences can quickly cross the line into sexual harassment. In essence, the appellant's conduct <u>could</u> become misconduct.

103-106.   There is no real dispute that the appellant was previously counseled for sending partially clothed photos of himself to students in 2015, *see* AF, Tab 8 at 158-159, and that he engaged in the behavior again in 2017, *see* AF, Tab 8 at 136; Tab 29 at 77-78.   But again is this actual misconduct, as opposed to being, as Drew put it, a dumb decision?   Hearing CD.

As to sending photos of himself, other than MD, no one who received the photos appeared particularly offended by them.   Indeed, the comparative bodybuilder photos (the young appellant in posing trunks and the current appellant posing shirtless) had been prompted by a student's question as to how the appellant physically compared to himself twenty-years ago.   *See* AF, Tab 29 at 77-78.   Notably, the student who received the photo, while providing it to the panel as requested, was not a complaining witness.   As to MD, he admitted to sending a photo of a man jogging in a speedo to the appellant.   Hearing CD; *see also* AF, Tab 29 at 22.   MD attempted to back-pedal by saying the appellant asked for a copy, but, even if true, the appellant would not have known to ask if MD had not mentioned that he had taken such a photo.   *Id*.   Thus, MD's purported "offense" at a shirtless photo is hard to believe.   On this record, I again cannot find misconduct.

Specification three is NOT SUSTAINED.

d. Specification 4 – touching students without their approval (panel complaint #6).

The panel concluded that this specification was fully supported by the evidence, and the appellant conceded hugging and other touching.   *See* AF, Tab 7 at 106-107.   The panel also found the appellant's assertion that he did not touch plebes was inconsistent with the evidence.    *Id*.   I must agree, as midshipman AB testified to the appellant rubbing his back for about fifteen seconds on two occasions (when he was a plebe).   Hearing CD.

However, there is no policy against touching – beyond that it be consented to and not constitute sexual harassment or other misconduct – so there is an

14

element of line drawing based upon common sense. Hearing CD. Indeed, Chadwick took the view that only hand-shakes or a pat on the back were appropriate, while Drew viewed hugs appropriate because the students get to know them (but one must be sensitive to circumstances). *Id*. Chadwick also tried to draw a temporal line – any contact over 4-5 seconds was "prolonged" and likely to be improper. *Id*.

Here, the appellant admitted to hugs in his email response, but Drew admitted the same (and stated other professors do too) and was not cautioned or disciplined for it. The only other contact presented was AB getting his back rubbed. *Id*. But AB emphasized that he was not offended, enjoyed the appellant's class, and had no problem with the appellant personally. *Id*. Again, in these circumstances, I am hard pressed to find misconduct.

Specification four is NOT SUSTAINED.

e. Specification six – repeatedly mispronouncing an Asian student's name (panel complaint #8).

The panel considered midshipman RJ's statements and the appellant's denial. *See* AF, Tab 7 at 108. The panel found RJ credible, but nonetheless found in favor of the appellant on this point for lack of corroboration. *Id*.

I part company with the panel on the credibility question. RJ's testimony, while consistent with his complaint, *see* AF, Tab 7 at 133-134, is not consistent with his statements in the panel's questionnaire, *see* AF, Tab 8 at 59-60. Indeed, his comments to the questionnaire suggest that he was not positive the mispronunciations were deliberate and did not mention the (fairly significant) "fuck off" comment. *Id*. Moreover, the lack of corroboration from the rest of the class is particularly telling given the panel used a fairly specific question – essentially does the appellant ever mispronounce names, particularly Asian names? *See* AF, Tab 8 at 133-173. If the incidents had occurred as charged, one would think that question would jog the students' memories.

 Specification six is NOT SUSTAINED.

     f. Specification seven – making demeaning remarks about his son's date and her mother (panel complaint #7).

The panel noted that the appellant conceded that he in fact engaged in this behavior. *See* AF, Tab 7 at 107-108.   The panel concluded that the appellant was free to discuss his family and opine on dress length, but it was inappropriate to discuss the girl or her mother's sexual intentions.[10]   *Id*. at 108.   Before me, both MD and JR testified about the incident.   Hearing CD.

As before, I am hard pressed to find misconduct here, in context.   There appears to be no prohibition on discussing one's family, and, as noted above, there does not appear to be a prohibition about discussing sexual topics.

Specification 7 is NOT SUSTAINED.

Accordingly, because none of the specifications were sustained, the Charge is NOT SUSTAINED.   In addition, nexus is ultimately irrelevant in light of the agency's failure to prove the charge.

<u>Affirmative Defenses</u>

The appellant's affirmative defenses were compromised by his failure to testify and to call his remaining witnesses.[11]   Notably, other than a few minor op-ed pieces, there is no evidence beyond the titles (in hyperlinks) of/or general references to the appellant's purportedly most significant writing(s).   *See* AF, Tab 29 at 4-8, 30-36, 103-106.   On this record, there is no basis for finding that any of these writings constituted or contained disclosures under 5 U.S.C. § 2302(b)(8). Indeed, the basic subject matter of the more significant articles – whether the service academies still serve a purpose/should be kept open -- suggest that they were opinion or "think" pieces.   This would suggest they did not amount to (or contain) protected disclosures.   *See LaChance v. White*, 174 F.3d 1378, 1381

---

[10] Although one wonders what else criticizing the inappropriately short length of a woman's skirt could imply.

[11] Indeed, even the closing argument focused primarily on the weaknesses of the agency's evidence and the unreasonableness of the penalty.   Hearing CD.

(Fed. Cir. 1999) (the WPA is not a weapon in arguments over policy); *Salerno v. Department of the Interior*, 123 M.S.P.R. 230, ¶ 7 (2016) (general philosophical or policy disagreements do not constitute protected disclosures).   In any event, the burden is on the appellant to present evidence establishing his disclosures by a preponderance of the evidence, and he has not done so.

As to whether the agency retaliated against the appellant for exercising his First Amendment rights, the appellant has again failed to carry his burden of proof.   On this record, one simply cannot conclude that the appellant's speech was a "but for cause" of this action.   While, the agency officials were aware of his various articles, and had exchanged emails about them, nothing in the emails constitutes a "smoking gun."   *See generally* AF, Tab 29.   Notably, the email correspondence between the various management officials regarding the appellant's various articles do not reflect much beyond a mixture of curiosity and vague annoyance.   Phillips also testified that he had long before stopped reading the appellant's articles, as he found them repetitive.  Hearing CD.   I do note that the agency officials – Chadwick and Phillips -- were quite hostile about the appellant in their testimony.   *Id*.  But this seemed to be based upon his classroom behavior, that both believed showed that he was not modeling appropriate academy behavior of "dignity and respect" and failing as a role-model.   *Id*. Further, the appellant's own witness also largely undermines his claim.   Notably, she testified that the last four superintendents did not like the appellant's personal behavior or writings.   *Id*.   Yet, he has served the academy for over thirty years, which suggests not liking the appellant's writings and retaliating against him for those writings remained two very different things.

The harmful error claim is also unpersuasive.   Indeed, none of the American Association of University Professors (AAUP) filings suggest that a tenured professor cannot be removed for serious misconduct or incompetence (the grist of Chapter 75 and Chapter 43).   *See* AF, Tab 7 at 39, 75; Tab 29 at 37, 72. Thus, the standards for removing a tenured professor and a federal employee are

not per se incompatible. More significantly, there is no evidence that the academy was obligated to follow the AAUP standard. While the academy does state that it adopts the AAUP guidelines for academic freedom and, to some extent, tenure (but noting the academy's unique circumstances), there is no real dispute that the academy had its own process (adopted in 2016), which ultimately ends in a proceeding before the Board for the disciplined professor. *See* AF, Tab 8 at 149-155; Tab 29-114-121. Indeed, the issue appeared to be a question of confusion rather than one of academy authority – that the agency should not state on the hiring end that it generally follows AAUP standards while conducting disciplinary actions through a different process. Hearing CD (Drew). Thus, on the current record, there appears to be no harmful error.

Lastly, Phillips' testimony also undermines the appellant's affirmative defenses. Notably, he opined that in the absence of the MD complaint (and the complaint being believed), the disciplinary action would not have taken place. Hearing CD.

## DECISION

The agency's action is REVERSED.

## ORDER

I **ORDER** the agency to cancel the removal and to retroactively restore appellant effective **August 17, 2018**. This action must be accomplished no later than 20 calendar days after the date this initial decision becomes final.

I **ORDER** the agency to pay appellant by check or through electronic funds transfer for the appropriate amount of back pay, with interest and to adjust benefits with appropriate credits and deductions in accordance with the Office of Personnel Management's regulations no later than 60 calendar days after the date this initial decision becomes final. I **ORDER** the appellant to cooperate in good faith with the agency's efforts to compute the amount of back pay and benefits

due and to provide all necessary information requested by the agency to help it comply.

If there is a dispute about the amount of back pay due, I **ORDER** the agency to pay appellant by check or through electronic funds transfer for the undisputed amount no later than 60 calendar days after the date this initial decision becomes final.  Appellant may then file a petition for enforcement with this office to resolve the disputed amount.

I **ORDER** the agency to inform appellant in writing of all actions taken to comply with the Board's Order and the date on which it believes it has fully complied.  If not notified, appellant must ask the agency about its efforts to comply before filing a petition for enforcement with this office.

For agencies whose payroll is administered by either the National Finance Center of the Department of Agriculture (NFC) or the Defense Finance and Accounting Service (DFAS), two lists of the information and documentation necessary to process payments and adjustments resulting from a Board decision are attached.  I **ORDER** the agency to timely provide DFAS or NFC with all documentation necessary to process payments and adjustments resulting from the Board's decision in accordance with the attached lists so that payment can be made within the 60-day period set forth above.

### INTERIM RELIEF

If a petition for review is filed by either party, I **ORDER** the agency to provide interim relief to the appellant in accordance with 5 U.S.C. § 7701(b)(2) (A).  The relief shall be effective as of the date of this decision and will remain in effect until the decision of the Board becomes final.

Any petition for review or cross petition for review filed by the agency must be accompanied by a certification that the agency has complied with the interim relief order, either by providing the required interim relief or by satisfying the requirements of 5 U.S.C. § 7701(b)(2)(A)(ii) and (B).   If the

appellant challenges this certification, the Board will issue an order affording the agency the opportunity to submit evidence of its compliance. If an agency petition or cross petition for review does not include this certification, or if the agency does not provide evidence of compliance in response to the Board's order, the Board may dismiss the agency's petition or cross petition for review on that basis.


FOR THE BOARD:                    _____

                                  Mark Syska
                                  Administrative Judge

## ENFORCEMENT

If, after the agency has informed you that it has fully complied with this decision, you believe that there has not been full compliance, you may ask the Board to enforce its decision by filing a petition for enforcement with this office, describing specifically the reasons why you believe there is noncompliance. Your petition must include the date and results of any communications regarding compliance, and a statement showing that a copy of the petition was either mailed or hand-delivered to the agency.

Any petition for enforcement must be filed no more than 30 days after the date of service of the agency's notice that it has complied with the decision. If you believe that your petition is filed late, you should include a statement and evidence showing good cause for the delay and a request for an extension of time for filing.

## NOTICE TO PARTIES CONCERNING SETTLEMENT

The date that this initial decision becomes final, which is set forth below, is the last day that the parties may file a settlement agreement, but the administrative judge may vacate the initial decision in order to accept such an agreement into the record after that date. *See* 5 C.F.R. § 1201.112(a)(4).

## NOTICE TO APPELLANT

This initial decision will become final on **August 28, 2019**, unless a petition for review is filed by that date.  This is an important date because it is usually the last day on which you can file a petition for review with the Board.  However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision.  If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first.  You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review.  Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record.  You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing.  A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and

may only be accomplished at the Board's e-Appeal website ([https://e-appeal.mspb.gov](https://e-appeal.mspb.gov)).

### NOTICE OF LACK OF QUORUM

The Merit Systems Protection Board ordinarily is composed of three members, 5 U.S.C. § 1201, but currently there are no members in place. Because a majority vote of the Board is required to decide a case, *see* 5 C.F.R. § 1200.3(a), (e), the Board is unable to issue decisions on petitions for review filed with it at this time. *See* 5 U.S.C. § 1203. Thus, while parties may continue to file petitions for review during this period, no decisions will be issued until at least two members are appointed by the President and confirmed by the Senate. The lack of a quorum does not serve to extend the time limit for filing a petition or cross petition. Any party who files such a petition must comply with the time limits specified herein.

For alternative review options, please consult the section below titled "Notice of Appeal Rights," which sets forth other review options.

### <u>Criteria for Granting a Petition or Cross Petition for Review</u>

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative

judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first. If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the <u>earlier</u> date of receipt. You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j). If the petition is filed electronically, the online process itself will serve the petition on other e-filers. *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

## ATTORNEY FEES

If no petition for review is filed, you may ask for the payment of attorney fees (plus costs, expert witness fees, and litigation expenses, where applicable) by filing a motion with this office as soon as possible, but no later than 60 calendar days after the date this initial decision becomes final. Any such motion must be

prepared in accordance with the provisions of 5 C.F.R. Part 1201, Subpart H, and applicable case law.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general**. As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court

within **60 calendar days** of the date this decision becomes final. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after this decision becomes final under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. ____ , 137 S. Ct. 1975 (2017). If the action involves a claim of

discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security.  *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues.  5 U.S.C. § 7702(b)(1).  You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after this decision becomes final as explained above.  5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D).  If so, and you wish to challenge the Board's rulings on your whistleblower claims only, excluding all other issues, then you may file a petition for judicial review

with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction. The court of appeals must <u>receive</u> your petition for review within **60 days** of <u>the date this decision becomes final</u> under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

> <u>http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx</u>



| | |
|---|---|
| | **DFAS CHECKLIST** |
| | **INFORMATION REQUIRED BY DFAS IN ORDER TO PROCESS PAYMENTS AGREED UPON IN SETTLEMENT CASES OR AS ORDERED BY THE MERIT SYSTEMS PROTECTION BOARD** |

AS CHECKLIST: INFORMATION REQUIRED BY IN ORDER TO PROCESS PAYMENTS AGREED UPON IN SETTLEMENT CASES

## CIVILIAN PERSONNEL OFFICE MUST NOTIFY CIVILIAN PAYROLL OFFICE VIA COMMAND LETTER WITH THE FOLLOWING:

1. Statement if Unemployment Benefits are to be deducted, with dollar amount, address and POC to send.

2. Statement that employee was counseled concerning Health Benefits and TSP and the election forms if necessary.

3. Statement concerning entitlement to overtime, night differential, shift premium, Sunday Premium, etc, with number of hours and dates for each entitlement.

4. If Back Pay Settlement was prior to conversion to DCPS (Defense Civilian Pay System), a statement certifying any lump sum payment with number of hours and amount paid and/or any severance pay that was paid with dollar amount.

5. Statement if interest is payable with beginning date of accrual.

6. Corrected Time and Attendance if applicable.

## ATTACHMENTS TO THE LETTER SHOULD BE AS FOLLOWS:

1. Copy of Settlement Agreement and/or the MSPB Order.

2. Corrected or cancelled SF 50's.

3. Election forms for Health Benefits and/or TSP if applicable.

4. Statement certified to be accurate by the employee which includes:

    a. Outside earnings with copies of W2's or statement from employer.
    b. Statement that employee was ready, willing and able to work during the period.
    c. Statement of erroneous payments employee received such as; lump sum leave, severance pay, VERA/VSIP, retirement annuity payments (if applicable) and if employee withdrew Retirement Funds.

5. If employee was unable to work during any or part of the period involved, certification of the type of leave to be charged and number of hours.



**NATIONAL FINANCE CENTER CHECKLIST FOR BACK PAY CASES**

Below is the information/documentation required by National Finance Center to process payments/adjustments agreed on in Back Pay Cases (settlements, restorations) or as ordered by the Merit Systems Protection Board, EEOC, and courts.

1. Initiate and submit AD-343 (Payroll/Action Request) with clear and concise information describing what to do in accordance with decision.

2. The following information must be included on AD-343 for Restoration:

    a. Employee name and social security number.
    b. Detailed explanation of request.
    c. Valid agency accounting.
    d. Authorized signature (Table 63)
    e. If interest is to be included.
    f. Check mailing address.
    g. Indicate if case is prior to conversion.  Computations must be attached.
    h. Indicate the amount of Severance and Lump Sum Annual Leave Payment to be collected. (if applicable)

Attachments to AD-343

1. Provide pay entitlement to include Overtime, Night Differential, Shift Premium, Sunday Premium, etc. with number of hours and dates for each entitlement. (if applicable)

2. Copies of SF-50's (Personnel Actions) or list of salary adjustments/changes and amounts.

3. Outside earnings documentation statement from agency.

4. If employee received retirement annuity or unemployment, provide amount and address to return monies.

5. Provide forms for FEGLI, FEHBA, or TSP deductions. (if applicable)

6. If employee was unable to work during any or part of the period involved, certification of the type of leave to be charged and number of hours.

7. If employee retires at end of Restoration Period, provide hours of Lump Sum Annual Leave to be paid.

NOTE:  If prior to conversion, agency must attach Computation Worksheet by Pay Period and required data in 1-7 above.

The following information must be included on AD-343 for Settlement Cases: (Lump Sum Payment, Correction to Promotion, Wage Grade Increase, FLSA, etc.)

    a. Must provide same data as in 2, a-g above.
    b. Prior to conversion computation must be provided.
    c. Lump Sum amount of Settlement, and if taxable or non-taxable.

If you have any questions or require clarification on the above, please contact NFC's Payroll/Personnel Operations at 504-255-4630.



# U.S. MERIT SYSTEMS PROTECTION BOARD

### Office of the Clerk of the Board
**1615 M Street, N.W.**
**Washington, D.C. 20419-0002**

Phone: 202-653-7200; Fax: 202-653-7130; E-Mail: mspb@mspb.gov

2024-1557

## ATTESTATION

I HEREBY ATTEST that the attached index represents a list of the documents comprising the administrative record of the Merit Systems Protection Board in the appeal of Bruce Flemming *v.* Department of the Navy, MSPB Docket No. PH-0752-18-0457-I-1, and that the administrative record is under my official custody and control on this date

on file in this Board

| April 8, 2024 | /s/ for |
|---|---|
| Date | Gina K. Grippando |
| | Clerk of the Board |

Appx54

CERTIFICATE OF SERVICE

I hereby certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

<u>Petitioner</u>

Electronic Mail       Jason H. Ehrenbert
(via <u>mspb@mspb.gov</u>)   <u>jason@ehrenberglegal.com</u>

<u>Respondent</u>

Electronic Mail       Martin F. Hockey, Jr., Acting Director
(via <u>mspb@mspb.gov</u>)   Commercial Litigation Branch
                   Civil Division Classification Unit
                   U.S. Department of Justice
                   c/o Thee Matthews
                   <u>thee.matthews@usdoj.gov</u>

| April 8, 2024 | | /s/ |
| :---: | | :---: |
| (Date) | | Dinh Chung |
| | | Case Management Specialist |

INDEX

Bruce Fleming

V.

Department of the Navy

MSPB Docket No. PH-0752-18-0457-I-1

I - Initial Appeal

| TAB | RECORD TYPE | DESCRIPTION OF DOCUMENT | DATE OF RECEIPT OR ISSUANCE |
|---|---|---|---|
| 1 | IA | Appellant - Initial Appeal | 08/28/2018 |
| 2 | IA | MSPB - Acknowledgment Order | 08/28/2018 |
| 3 | IA | Appellant - Designation of Representative | 08/30/2018 |
| 4 | IA | Agency - Motion for Extension of Time | 09/11/2018 |
| 5 | IA | MSPB - General Order | 09/13/2018 |
| 6 | IA | Agency - Agency Representative Addition | 09/15/2018 |
| 7 | IA | Agency - Agency File Submission Part 1 | 09/20/2018 |
| 8 | IA | Agency - Agency File Submission Part 2 | 09/20/2018 |
| 9 | IA | MSPB - Preliminary Status Order | 09/24/2018 |
| 10 | IA | MSPB - Order Suspending Case Processing | 10/09/2018 |
| 11 | IA | MSPB - Preliminary Status Order | 11/15/2018 |
| 12 | IA | MSPB - Order Suspending Case Processing | 11/26/2018 |
| 13 | IA | MSPB - Preliminary Status Order | 01/28/2019 |
| 14 | IA | MSPB - Order and Summary of Telephonic | 02/04/2019 |
| 15 | IA | Agency - Motion to Preserve Deposition | 02/05/2019 |
| 16 | IA | Agency - Motion to Preserve Dipostion | 02/05/2019 |
| 17 | IA | MSPB - General Order | 02/05/2019 |
| 18 | IA | Appellant - Agreement to Mediate | 02/07/2019 |
| 19 | IA | MSPB - notice of appointment as mediator | 02/19/2019 |
| 20 | IA | MSPB - notice of scheduled mediation | 02/27/2019 |
| 21 | IA | MSPB - Preliminary Status Order | 03/25/2019 |
| 22 | IA | MSPB - notice of termination of mediation | 04/04/2019 |
| 23 | IA | MSPB - Preliminary Status Order | 04/18/2019 |
| 24 | IA | MSPB - Hearing Order | 05/06/2019 |
| 25 | IA | MSPB - Hearing Order | 05/07/2019 |
| 26 | IA | Appellant - Consent Request for Extension of | 05/14/2019 |
| 27 | IA | MSPB - General Order | 05/14/2019 |

Appx56

| TAB | RECORD TYPE | DESCRIPTION OF DOCUMENT | DATE OF RECEIPT OR ISSUANCE |
|---|---|---|---|
| 28 | IA | Agency - Agency PreHearing Submission | 05/15/2019 |
| 29 | IA | Appellant - Appellant's Prehearing Submissions | 05/15/2019 |
| 30 | IA | MSPB - Order and Summary of Telephonic | 05/16/2019 |
| 31 | IA | Appellant - Appellant's Objection to Order and | 05/20/2019 |
| 32 | IA | MSPB - Hearing Paperwork | 05/23/2019 |
| 32-1 | IA | MSPB - PH180457I1_2019-05- | 05/22/2019 |
| 33 | IA | MSPB - Initial Decision | 07/24/2019 |
| 34 | IA | MSPB - Certificate of Service | 07/24/2019 |
| 35 | IA | Agency - Agency Representative Addition | 07/31/2019 |
| 36 | IA | Other - Hearing Transcript - May 22 2019 | 08/05/2019 |

INDEX

Bruce Fleming

V.

Department of the Navy

MSPB Docket No. PH-0752-18-0457-I-1

I - Initial Appeal

| TAB | RECORD TYPE | DESCRIPTION OF DOCUMENT | DATE OF RECEIPT OR ISSUANCE |
|-----|-------------|------------------------|----------------------------|
| 1 | PFR | Agency - Request for Extension of Time to File | 07/31/2019 |
| 2 | PFR | MSPB - Extension of Time Order | 07/31/2019 |
| 3 | PFR | Agency - Request to Exceed Length Limitation | 09/10/2019 |
| 4 | PFR | MSPB - Order Granting Extension of the PFR | 09/11/2019 |
| 5 | PFR | Appellant - Request for Extension of Time to File | 09/19/2019 |
| 6 | PFR | MSPB - Denial of Extension of Time Order | 09/19/2019 |
| 7 | PFR | Agency - Petition for Review | 09/27/2019 |
| 8 | PFR | MSPB - Petition For Review Acknowledgment | 09/30/2019 |
| 9 | PFR | Appellant - Request for Extension of Time | 10/01/2019 |
| 10 | PFR | MSPB - Extension of Time Order | 10/01/2019 |
| 11 | PFR | Appellant - Motion to Dismiss Agency's Petition | 10/22/2019 |
| 12 | PFR | Agency - Opposition to Appellant's Motion to | 11/05/2019 |
| 13 | PFR | Appellant - Opposition to Agency's Petition for | 11/21/2019 |
| 14 | PFR | Agency - Request for Extension of Time | 11/21/2019 |
| 15 | PFR | MSPB - Extension of Time Order | 11/21/2019 |
| 16 | PFR | Agency - Reply to Appellant's Opposition to | 01/08/2020 |
| 17 | PFR | MSPB - Final Order | 01/26/2024 |

Appx58

# UNITED STATES OF AMERICA
# MERIT SYSTEMS PROTECTION BOARD
# NORTHEASTERN REGIONAL OFFICE

| | |
|---|---|
| BRUCE FLEMING, | DOCKET NUMBER |
| Appellant, | PH-0752-18-0457-I-1 |
| v. | |
| DEPARTMENT OF THE NAVY, | DATE: July 24, 2019 |
| Agency. | |

Jason H. Ehrenberg, Esquire, Washington, D.C., D.C., for the appellant.

Terrence P. Cook, Esquire, Annapolis, Maryland, for the agency.

## BEFORE
Mark Syska
Administrative Judge

## INITIAL DECISION

The appellant filed this appeal to challenge his removal.  *See* Appeal File (AF), Tab 1.   The Board has jurisdiction under 5 U.S.C. §§ 7511-7514; 5 C.F.R. Part 752; 5 C.F.R. § 1201.3(a)(1).   For the reasons that that follow, the agency's removal decision is REVERSED.

**Background**

The appellant has served as a Professor at the United States Naval Academy at Annapolis, Maryland (academy or agency) for approximately thirty-one years.  The appellant served in the English Department, and the case pertains to his conduct in a plebe (freshman) class of HE 111: Rhetoric & Introduction to Literature during the 2017/2018 academic year.   On January 19, 2018, a midshipman (MD) filed a lengthy complaint about the appellant regarding the Fall

2017 section of HE 111. *Id*. at 115-128. This complaint was ultimately accompanied by more limited complaints from four other midshipmen. *Id*. at 129-133. As a consequence, a faculty panel was assembled to investigate the complaints, and the appellant was taken out of the classroom during the investigation.

The panel investigated a variety of purported misbehavior: (1) Discriminating against students on political grounds, in particular referring to two students as "right-wing extremists;" (2) using demeaning language to refer to students, specifically "goldfish" and "midsheeple;" (3) allowing students to tell jokes of a sexual nature in class; (4) regularly discussing sexual matters unrelated or only tangentially related to readings in class, including transgender reassignment surgery and anal sex; (5) emailing partially-clothed photos of himself to his students; (6) touching students on the neck, shoulders, and back in class without their consent; (7) displaying photos of his son's date and making derogatory remarks about her and her mother in class; (8) purposely mispronouncing an Asian student's last name multiple times and telling him to "fuck off" when he repeatedly corrected you; (9) making it known that you have previously litigated complaints against you by Navy administrators and any future complaint is likely to fail because you have tenure; (10) additional finding one - using profanity in classroom discussions and email to students; (11) additional finding two – spending a significant amount of class time on "off topic" discussions; and (12) additional finding number three – making inappropriate and/or unprofessional remarks in class. *Id*. at 97-113. The appellant was twice invited to address the panel, and he declined by email twice: (1) His first email led to a reprimand because it mentioned private student information; and (2) the second email provided his colorful response to the charged conduct. *See* AF, Tab 8 at 123-134.

On May 18, 2018, the panel issued its report, which began with effusive praise for the appellant – that the students in his upper level class (HE 302) for

the academic year had a universally positive opinion of him, enjoyed his teaching, and deemed him an excellent or good teacher.  *See* AF, Tab 7 at 97.  The report also notes that the students in the plebe class (HE 111) largely echoed these sentiments, but for seven students that rated him a poor instructor.  *Id.*  The panel then went into the various complaints.  Ultimately, the panel concluded that complaints 1, 3, 8, 9, additional finding one, and additional finding two could not be confirmed, or, if confirmed, were <u>not</u> misconduct.  *Id.* at 113.  The panel also concluded that complaints 2, 5, 6, 7, and additional finding three did occur and did qualify as unprofessional behavior.  *Id.*  As to complaint four, the panel concluded that discussions of sex that were germane to the reading assignments were appropriate, but the appellant's discussion of his personal experiences had no place in the classroom.  *Id.*

On June 26, 2018, the academy proposed the appellant's removal.  *See* AF, Tab 7 at 79-84.  The proposed removal was based on one charge of "Conduct Unbecoming a Federal Employee," which had one specification:

> During the fall semester of Academic Year 2017-2018, you engaged in unprofessional conduct in the classroom and outside the classroom.  Your conduct included, but is not limited to: (1) referring to students as "right-wing extremists," and/or words to that effect; (2) classroom comments/discussion regarding anal sex, oral sex, and transgender surgery; (3) emailing partially clothed pictures of yourself to students after having been counseled that doing so was inappropriate and your agreement not to do so in the future; (4) touching students without their approval; (5) referring to your own sexual experiences; (6) repeatedly mispronouncing an Asian-American student's name despite being corrected several times by the student; and (7) making demeaning sexually-related comments about a young woman attending a dance with your son and similar offensive comments about the young woman's mother.

*See* AF, Tab 7 at 79.[1]  The appellant's counsel provided a lengthy response to the proposal.  *Id.* at 33-78.  Ultimately, the deciding official ordered the appellant removed, effective August 17, 2018.  *Id.* at 18, 20-25.

---

[1] The agency's decision to include specifications 1, 2, and 6 appear at odds with the panel's conclusions.

This appeal followed.   I held the appellant's requested hearing, and nine witnesses (of the thirteen that had been approved) testified: (1) Captain Robert Chadwick, Commandant of Midshipmen; (2) Professor Keith Lindler, chair of the investigation panel; (3) Midshipman MD, primary complaining witness; (4) Midshipman AB, secondary complaining witness; (5) Midshipman RJ, secondary complaining witness; (6) Midshipman JR, secondary complaining witness; (7) Midshipman BG, secondary complaining witness; (8) Mr. Andrew Phillips, Academic Dean & Provost, deciding official; and (9) Professor Anne Marie Drew, English Professor.   *See* AF, Tab 32 (Hearing CD).   After Prof. Drew (the appellant's first witness) testified, the appellant (surprisingly) elected not to testify, nor call any further witnesses, and the hearing immediately proceeded to closing arguments.   *Id*.

**Legal Standards**

Adverse Action

The Board may uphold an agency decision to take adverse action against an employee only if the charge is supported by preponderant evidence.   5 U.S.C. § 7701(c)(1)(B);  5 C.F.R.  §  1201.56(a)(1)(ii).    Preponderant evidence is the degree of relevant evidence a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue.  5 C.F.R. § 1201.56(c)(2).   In addition to proving the charge, the agency also has the burden of establishing that its action promotes the efficiency of the service (the nexus requirement), meaning the removal action relates to either the appellant's ability to accomplish his duties or some other legitimate government interest.  5 U.S.C. § 7513.   Finally, the agency must show that its penalty selection was not so excessive as to be an abuse of discretion, and not otherwise arbitrary or unreasonable.  *Douglas v. Veterans Administration,* 5 M.S.P.R. 280, 296-306 (1981).

Conduct Unbecoming

In analyzing a charge of "conduct unbecoming," the Board relies upon the term's ordinary meaning, holding that unbecoming conduct is: "unattractive; unsuitable …, detracting from one's … character, or reputation; [or] creating an unfavorable impression." *Miles v. Department of the Army,* 55 M.S.P.R. 633, 637-38 (1992) (intentionally killing deer with government vehicle was conduct unbecoming). A charge of "conduct unbecoming" has no specific elements of proof; it is established by proving that appellant committed the acts alleged in support of the broad label. *Canada v. Department of Homeland Security,* 113 M.S.P.R. 509, ¶ 9 (2010) (consuming alcohol in government vehicle was conduct unbecoming). In this way, an agency may describe actions that constitute misbehavior in narrative form and have its discipline sustained if the efficiency of the service suffers because of the misconduct. *Id.* However, a general charge must be described in sufficient detail to allow an appellant to make an informed reply. *See Cross v. Department of the Army,* 89 M.S.P.R. 62, 68 (2001) (changing subordinate's appraisal without notice to employee was conduct unbecoming). *Cf. Colbert v. U.S. Postal Service,* 93 M.S.P.R. 467, 471 (2002) (narrative charge acceptable so long as it describes misbehavior) (manipulation of timecards was "unacceptable conduct").

Whistleblower Affirmative Defense

The WPA prohibits an agency from taking a personnel action against an employee for disclosing information that the employee reasonably believes evidences a violation of law, rule, or regulation; gross mismanagement; a gross waste of funds; an abuse of authority; or a substantial and specific danger to public health or safety. *See Chambers v. Department of the Interior*, 602 F.3d 1370, 1375-76 (Fed. Cir. 2010) (citing 5 U.S.C. § 2302(b)(8)); *Mudd v. Department of Veterans Affairs*, 120 M.S.P.R. 365, ¶ 5 (2013); *see also Linder v. Department of Justice*, 122 M.S.P.R. 14, ¶ 11 (2014) (the employee need not "label" the disclosure correctly). The disclosure must be specific and detailed,

not just vague allegations of wrongdoing. *See Scoggins v. Department of the Army*, 123 M.S.P.R. 592, ¶ 6 (2016). At a hearing, the appellant must prove his affirmative defense by preponderant evidence. *See Scoggins*, 123 M.S.P.R. 532, ¶ 5. If the appellant proves that he made a disclosure and the disclosure was a contributing factor in an adverse personnel action, the burden shifts to the agency to prove by clear and convincing evidence that it would have taken the same action in the absence of the disclosure. *See Whitmore v. Department of Labor*, 680 F.3d 1353, 1364 (Fed. Cir. 2012).

<u>Other Protected Activity Affirmative Defense</u>

To establish a case of retaliation for engaging in a protected activity, the appellant must show that a prohibited consideration was a factor in the contested personnel action. *See Savage v. Department of Army*, 122 M.S.P.R. 612, ¶ 41 (2015). But the Board will only reverse the action if the appellant can show this retaliation was a "but for" cause of the action. *Id*., ¶ 48. Thus, if the appellant shows the prohibited consideration was a factor in an agency decision, the agency can avoid corrective action by showing that it would have taken the same action in the absence of the discriminatory or retaliatory motive. *Id*., ¶ 51.

<u>Harmful Error Affirmative Defense</u>

To prove the affirmative defense of harmful error, the appellant must show that the agency violated its own procedures, and that this error was harmful (would change the result).

As to the witnesses, I had the opportunity to observe each witness, and I carefully considered his/her demeanor. *See Hamilton v. Department of Veterans Affairs*, 115 M.S.P.R. 673, ¶ 18 (2011).[2]

---

[2] To resolve any credibility issues, I utilized a *Hillen* analysis. An administrative judge must identify the factual questions in dispute, summarize the evidence on each disputed question, state which version he believes, and explain in detail why he found the chosen version more credible, considering such factors as: (1) The witness's opportunity and capacity to observe the event or act in question; (2) the witness's character; (3) any prior inconsistent statement by the witness; (4) a witness's bias, or lack of bias; (5) the contradiction of the witness's version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness's version of events;

**Analysis & Fact-findings**

The appellant appears to be a rather unique professor at the academy. He is irreverent, theatrical, fashion-conscious, outspoken in his criticism of the academy (both in the classroom and his writings), and liberally sprinkles his classes with profanity and discussions of sexually-related topics (from condom use to transgender surgery). The appellant is also a "work-out fiend," and in good enough shape to regularly exercise with the well-conditioned midshipmen at the gyms and swimming pools on campus (where typical attire is swim trunks and other workout gear). Moreover, the overwhelming majority of his students enjoyed the appellant and his teaching style. Indeed, photographs were frequently taken in class, and they reflect a "loose" atmosphere – with the appellant dressed in costume (pirate), students trying on the appellant's designer sport coat or cowboy hat (with arms around each other's shoulders), carrying classmates around, and flexing their biceps en masse. *See, e.g.*, AF, Tab 29 at 20, 21, 24, 26-28, 55-60, 62, 65-69. Indeed, Lindler stated the appellant was a great classroom teacher, Phillips conceded that he could be a very effective teacher, and Drew testified that she had reviewed over a thousand of his student evaluations (over her 30 years) and over 90% were positive – an unheard of success rate. Hearing CD.

But a small group of students – one in particular – disapproved of the appellant's classroom performance. Further, the appellant's classroom behavior and writings appear to have created long-standing tension with the academy's more traditional hierarchy. In addition, this case suggests a potential tension between the concepts of tenure and academic freedom – concepts the academy states it respects – with the basic process of disciplining a federal employee under Title V and the relevant regulations. The appellant is both a professor at an institution of higher learning and a federal employee at the academy.

---

and (7) the witness's demeanor. *Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987).

The Charge

The agency ultimately fails to carry its burden of proof regarding the charge for a host of reasons. At the outset, their primary witness had severe credibility issues. In addition, the purported "victims" of the appellant's actions did not generally take offense or have any actual issue with the appellant. Moreover, much of the charged conduct, as noted by the investigating panel, did not appear to be actual misconduct in the context of free-wheeling classroom discussions. Further, I note that the panel members taught in subject areas where class discussions were unlikely to include profanity or sexual discussions – mechanical engineering and chemistry. Hearing CD. Yet, they readily recognized that profanity and the discussion of sexual topics could be completely appropriate in the appellant's class. Moreover, the one English professor who testified noted that profanity and sexual discussions were not uncommon when discussing literature (which frequently contains these matters).[3] *Id*.(Drew). A lack of notice was also a significant issue regarding certain specifications, as the appellant had taught in his same distinctive manner for decades.

General Credibility

Only the primary complaining midshipman testified for any length of time; the secondary complaining midshipman generally testified for bare minutes. As to the latter, I note their testimony was roughly consistent with their prior statements (with one notable exception). Hearing CD. More specifics will be noted below.

As to the former, I must conclude that MD's testimony, like his written complaint, is greatly exaggerated -- to the point of being hard to credit on certain points. Hearing CD; *see also* AF, Tab 7 at 115-128. MD also appeared to have a motive to exaggerate his claims about the appellant. Further, MD's limited

_____

[3] Drew emphasized this point by noting some of the English professors are Marines. Hearing CD.

9

credibility is critical because, as the deciding official conceded, in the absence of MD's complaint (and it being believed), "we would not be here." Hearing CD.

A few examples of MD's questionable assertions are instructive. In his statement and testimony, MD stated a "plethora" of people were "suffering" or "crying," but on cross he conceded that it was really only one person. Hearing CD.[4] He also conceded his reference to repeated "attacks" by the appellant all referred to one email (discussed below). *Id*. Further, he stated that the "obscene, X-rated, and sexually explicit" comments were the appellant's discussions of such things as condom use, transgender surgery, and his expressed opinion that sexual matters should be discussed openly. *Id*.

Significantly, on cross, MD also recounted that during a private help session in the appellant's office, he began to believe that he would be sexually assaulted and looked about for a weapon to potentially fight the appellant off. Hearing CD; *see also* AF, Tab 7 at 123. Notably, nothing occurred beyond discussing the appellant's written work, and the appellant did not report his perceived "imminent attack" to anyone (although he would later complain about far smaller matters). *Id*. Further, the appellant's direct testimony about this session only included a reference to the appellant looking up MD's SAT scores and opining "that explains a lot." Hearing CD. Moreover, MD completely undermines his "attack claim " with an email from late in the semester in which MD states that he tried to get into the appellant's class for the following semester, thanked the appellant for everything, and said he would stay in touch with the appellant.[5] *See* AF, Tab 29 at 18.

MD's reaction to the appellant's photo – a shirtless half torso with the focus on a flexed bicep -- is similarly difficult to credit. *See* AF, Tab 8 at 136.

---

[4] He also conceded that many students like the appellant - the "Fleming Faithful." Hearing CD.

[5] MD suggested in his testimony that he was merely trying to curry favor and save his grade with this email. Hearing CD. Admitting to making misstatements to curry favor – serve one's personal interests – does nothing for one's credibility.

Indeed, MD stated that he "agonized" over whether the photo constituted "sexual assault or sexual harassment. " *See* AF, Tab 7 at 121; Hearing CD. The former is nonsense while the latter is merely a long stretch. I note that taking photos was common in the appellant's class, and the record included photos of the entire class (including MD) flexing their biceps – flex being a writing concept the appellant encouraged. Hearing CD; *see also* AF, Tab 29 at 27-28, 66, 69. In this context, MD's purported reaction appears feigned.

At bottom, MD having the appellant as his instructor in his first semester of college was something of the perfect storm. An eighteen year-old from a conservative, religious family, who had only attended religious schools and only experienced academic success versus the profane, irreverent, brutally critical (read admitted very tough grader[6]) and highly theatrical appellant had conflict written all over it. MD testified, with some indignation, that the appellant gave him his first "C" of his academic life, and he had noted in his statement that grading was where the appellant "asserted dominance" over plebes. Hearing CD. That high grades might not come as easily in college as they did in high school, particularly in a hyper-competitive environment like the academy, did not seem to occur to him. MD also conceded that a low grade could impact upon his future posting. *Id*. In sum, MD gave the impression his complaint was motivated more by animus for his grade than any sort of genuine concern about the appellant's teaching style.

Thus, MD's statements, when not corroborated, were of limited value. Further, as noted by Lindler, it also appears that MD asked/cajoled/encouraged the other complaining midshipman to file complaints. Hearing CD. As previously noted, their complaints were short (often less than a page) and some included the disclaimer that they were not personally offended by the appellant's actions. *See* AF, Tab 7 at 129-134. These witnesses generally reiterated the fact

---

[6] *See* AF, Tab 29 at 45-53.

they were not personally offended by the appellant's conduct in their testimony. Hearing CD (AB, JR, BG).

a. Specification One – "right-wing extremists"

This specification is based upon an email that the appellant sent to two midshipmen (including MD) on September 26, 2017, *see* AF, Tab 8 at 135, that the panel addressed and found did not constitute "political discrimination" or other inappropriate conduct, *see* AF, Tab 7 at 98-99.    The email quite simply cannot be read as politically discriminatory.    While the email begins with the phrase "right-wing extremists,"[7] the appellant goes to great pains to state he would make the same comments to "left-wing extremists" and would say the same thing to "Bernie" [Sanders].   *See* AF, Tab 8 at 135.   Further, the obvious thesis of the email was that the students had erred in failing to justify their positions – by providing authority for assertions and addressing obvious counter-arguments.   *Id*. Indeed, the appellant had summed up the failing as follows---"Tell Bill why" and "it's not a left-wing thing. It's a justify that thing." *Id*.   The reference to politics was incidental[8] (and tongue in cheek) to the real message – provide supporting arguments for your positions – which is a completely appropriate criticism for a student paper.   Specification one is simply does not describe misconduct.

Specification one is NOT SUSTAINED.

b. Specification Two - comments regarding oral/anal sex and transgender surgery & specification five - referring to his own sexual experiences (panel complaint #4)

---

[7] The midshipmen were taking stereotypical "right-wing" positions - anti-tax and anti-gun control.

[8] Even if it was not, my conclusion would not change.    Drew testified, without contradiction, that professors often gave tongue-in-cheek nicknames to various groups of students (*e.g.*, "the theater geeks").   Hearing CD.   Moreover, MD's claimed "political discrimination" had no further manifestations – he testified the appellant commented on his other papers, but he "could not remember" the comments (or whether he disagreed with them).   *Id*.

The panel summarized the evidence on this issue, and concluded that discussions of the topic were appropriate as it related to assigned reading, but not appropriate to the extent the appellant referred to his personal experiences. *See* AF, Tab 7 at 101-103. In his email response, the appellant conceded the conduct and provided his justifications for it. *Id*. at 102-103.

Specification two charged discussions of various sexual topics generally, contrary to the panel's conclusion that such topics were appropriate if applicable to the reading assignments. More significantly, Phillips did not take into account that the assigned readings involved sexual topics that warranted class discussions. Hearing CD. Phillips was also unaware that the appellant wrote on transgender issues and one of the assigned readings involved transgender issues. *Id*. Thus, the deciding official did not consider the fundamental issue of whether the academic context warranted the discussion of sexual topics. Moreover, there does not appear to be a rule or policy against discussing sexual topics in an academy classroom. *Id*. In addition, the appellant does not appear to have received any notice – prior counseling or letter of reprimand – that discussions of sexual topics in a *college* classroom were forbidden or greatly restricted. On this record, it's difficult to see any misconduct.

As to specification 5, the panel did conclude that the appellant's references to his own experiences were inappropriate. However, as before, the appellant does not appear to have received any notice about this "forbidden" topic, nor does there appear to be an express prohibition of this topic.[9] Hearing CD.

Specifications two & five are NOT SUSTAINED.

c. Specification three – emailing partially clothed photos to students after being counseled and agreeing not to do so (panel complaint #5).

The panel concluded that these incidents had occurred, and that the appellant's focus on his prior counseling was disingenuous. *See* AF, Tab 7 at

---

[9] The academy's position, which is somewhat murky, appears to be that discussions of personal experiences can quickly cross the line into sexual harassment. In essence, the appellant's conduct <u>could</u> become misconduct.

103-106. There is no real dispute that the appellant was previously counseled for sending partially clothed photos of himself to students in 2015, *see* AF, Tab 8 at 158-159, and that he engaged in the behavior again in 2017, *see* AF, Tab 8 at 136; Tab 29 at 77-78. But again is this actual misconduct, as opposed to being, as Drew put it, a dumb decision? Hearing CD.

As to sending photos of himself, other than MD, no one who received the photos appeared particularly offended by them. Indeed, the comparative bodybuilder photos (the young appellant in posing trunks and the current appellant posing shirtless) had been prompted by a student's question as to how the appellant physically compared to himself twenty-years ago. *See* AF, Tab 29 at 77-78. Notably, the student who received the photo, while providing it to the panel as requested, was not a complaining witness. As to MD, he admitted to sending a photo of a man jogging in a speedo to the appellant. Hearing CD; *see also* AF, Tab 29 at 22. MD attempted to back-pedal by saying the appellant asked for a copy, but, even if true, the appellant would not have known to ask if MD had not mentioned that he had taken such a photo. *Id*. Thus, MD's purported "offense" at a shirtless photo is hard to believe. On this record, I again cannot find misconduct.

Specification three is NOT SUSTAINED.

d. Specification 4 – touching students without their approval (panel complaint #6).

The panel concluded that this specification was fully supported by the evidence, and the appellant conceded hugging and other touching. *See* AF, Tab 7 at 106-107. The panel also found the appellant's assertion that he did not touch plebes was inconsistent with the evidence. *Id*. I must agree, as midshipman AB testified to the appellant rubbing his back for about fifteen seconds on two occasions (when he was a plebe). Hearing CD.

However, there is no policy against touching – beyond that it be consented to and not constitute sexual harassment or other misconduct – so there is an

element of line drawing based upon common sense. Hearing CD. Indeed, Chadwick took the view that only hand-shakes or a pat on the back were appropriate, while Drew viewed hugs appropriate because the students get to know them (but one must be sensitive to circumstances). *Id*. Chadwick also tried to draw a temporal line – any contact over 4-5 seconds was "prolonged" and likely to be improper. *Id*.

Here, the appellant admitted to hugs in his email response, but Drew admitted the same (and stated other professors do too) and was not cautioned or disciplined for it. The only other contact presented was AB getting his back rubbed. *Id*. But AB emphasized that he was not offended, enjoyed the appellant's class, and had no problem with the appellant personally. *Id*. Again, in these circumstances, I am hard pressed to find misconduct.

Specification four is NOT SUSTAINED.

e. Specification six – repeatedly mispronouncing an Asian student's name (panel complaint #8).

The panel considered midshipman RJ's statements and the appellant's denial. *See* AF, Tab 7 at 108. The panel found RJ credible, but nonetheless found in favor of the appellant on this point for lack of corroboration. *Id*.

I part company with the panel on the credibility question. RJ's testimony, while consistent with his complaint, *see* AF, Tab 7 at 133-134, is not consistent with his statements in the panel's questionnaire, *see* AF, Tab 8 at 59-60. Indeed, his comments to the questionnaire suggest that he was not positive the mispronunciations were deliberate and did not mention the (fairly significant) "fuck off" comment. *Id*. Moreover, the lack of corroboration from the rest of the class is particularly telling given the panel used a fairly specific question – essentially does the appellant ever mispronounce names, particularly Asian names? *See* AF, Tab 8 at 133-173. If the incidents had occurred as charged, one would think that question would jog the students' memories.

Specification six is NOT SUSTAINED.

f. Specification seven – making demeaning remarks about his son's date and her mother (panel complaint #7).

The panel noted that the appellant conceded that he in fact engaged in this behavior. *See* AF, Tab 7 at 107-108.   The panel concluded that the appellant was free to discuss his family and opine on dress length, but it was inappropriate to discuss the girl or her mother's sexual intentions.[10]   *Id*. at 108.   Before me, both MD and JR testified about the incident.   Hearing CD.

As before, I am hard pressed to find misconduct here, in context.   There appears to be no prohibition on discussing one's family, and, as noted above, there does not appear to be a prohibition about discussing sexual topics.

Specification 7 is NOT SUSTAINED.

Accordingly, because none of the specifications were sustained, the Charge is NOT SUSTAINED.   In addition, nexus is ultimately irrelevant in light of the agency's failure to prove the charge.

Affirmative Defenses

The appellant's affirmative defenses were compromised by his failure to testify and to call his remaining witnesses.[11]   Notably, other than a few minor op-ed pieces, there is no evidence beyond the titles (in hyperlinks) of/or general references to the appellant's purportedly most significant writing(s).   *See* AF, Tab 29 at 4-8, 30-36, 103-106.   On this record, there is no basis for finding that any of these writings constituted or contained disclosures under 5 U.S.C. § 2302(b)(8).   Indeed, the basic subject matter of the more significant articles – whether the service academies still serve a purpose/should be kept open -- suggest that they were opinion or "think" pieces.   This would suggest they did not amount to (or contain) protected disclosures.   *See LaChance v. White*, 174 F.3d 1378, 1381

---

[10] Although one wonders what else criticizing the inappropriately short length of a woman's skirt could imply.

[11] Indeed, even the closing argument focused primarily on the weaknesses of the agency's evidence and the unreasonableness of the penalty.   Hearing CD.

(Fed. Cir. 1999) (the WPA is not a weapon in arguments over policy); *Salerno v. Department of the Interior*, 123 M.S.P.R. 230, ¶ 7 (2016) (general philosophical or policy disagreements do not constitute protected disclosures).  In any event, the burden is on the appellant to present evidence establishing his disclosures by a preponderance of the evidence, and he has not done so.

As to whether the agency retaliated against the appellant for exercising his First Amendment rights, the appellant has again failed to carry his burden of proof.  On this record, one simply cannot conclude that the appellant's speech was a "but for cause" of this action.   While, the agency officials were aware of his various articles, and had exchanged emails about them, nothing in the emails constitutes a "smoking gun."   *See generally* AF, Tab 29.  Notably, the email correspondence between the various management officials regarding the appellant's various articles do not reflect much beyond a mixture of curiosity and vague annoyance.   Phillips also testified that he had long before stopped reading the appellant's articles, as he found them repetitive.  Hearing CD.  I do note that the agency officials – Chadwick and Phillips -- were quite hostile about the appellant in their testimony.  *Id*.  But this seemed to be based upon his classroom behavior, that both believed showed that he was not modeling appropriate academy behavior of "dignity and respect" and failing as a role-model.  *Id*. Further, the appellant's own witness also largely undermines his claim.  Notably, she testified that the last four superintendents did not like the appellant's personal behavior or writings.  *Id*.  Yet, he has served the academy for over thirty years, which suggests not liking the appellant's writings and retaliating against him for those writings remained two very different things.

The harmful error claim is also unpersuasive.   Indeed, none of the American Association of University Professors (AAUP) filings suggest that a tenured professor cannot be removed for serious misconduct or incompetence (the grist of Chapter 75 and Chapter 43).   *See* AF, Tab 7 at 39, 75; Tab 29 at 37, 72. Thus, the standards for removing a tenured professor and a federal employee are

not per se incompatible.    More significantly, there is no evidence that the academy was obligated to follow the AAUP standard.    While the academy does state that it adopts the AAUP guidelines for academic freedom and, to some extent, tenure (but noting the academy's unique circumstances), there is no real dispute that the academy had its own process (adopted in 2016), which ultimately ends in a proceeding before the Board for the disciplined professor.    *See* AF, Tab 8 at 149-155; Tab 29-114-121.    Indeed, the issue appeared to be a question of confusion rather than one of academy authority – that the agency should not state on the hiring end that it generally follows AAUP standards while conducting disciplinary actions through a different process.    Hearing CD (Drew).    Thus, on the current record, there appears to be no harmful error.

Lastly, Phillips' testimony also undermines the appellant's affirmative defenses.    Notably, he opined that in the absence of the MD complaint (and the complaint being believed), the disciplinary action would not have taken place. Hearing CD.

## DECISION

The agency's action is REVERSED.

## ORDER

I **ORDER** the agency to cancel the removal and to retroactively restore appellant effective **August 17, 2018**.    This action must be accomplished no later than 20 calendar days after the date this initial decision becomes final.

I **ORDER** the agency to pay appellant by check or through electronic funds transfer for the appropriate amount of back pay, with interest and to adjust benefits with appropriate credits and deductions in accordance with the Office of Personnel Management's regulations no later than 60 calendar days after the date this initial decision becomes final.  I **ORDER** the appellant to cooperate in good faith with the agency's efforts to compute the amount of back pay and benefits

due and to provide all necessary information requested by the agency to help it comply.

If there is a dispute about the amount of back pay due, I **ORDER** the agency to pay appellant by check or through electronic funds transfer for the undisputed amount no later than 60 calendar days after the date this initial decision becomes final. Appellant may then file a petition for enforcement with this office to resolve the disputed amount.

I **ORDER** the agency to inform appellant in writing of all actions taken to comply with the Board's Order and the date on which it believes it has fully complied. If not notified, appellant must ask the agency about its efforts to comply before filing a petition for enforcement with this office.

For agencies whose payroll is administered by either the National Finance Center of the Department of Agriculture (NFC) or the Defense Finance and Accounting Service (DFAS), two lists of the information and documentation necessary to process payments and adjustments resulting from a Board decision are attached. I **ORDER** the agency to timely provide DFAS or NFC with all documentation necessary to process payments and adjustments resulting from the Board's decision in accordance with the attached lists so that payment can be made within the 60-day period set forth above.

## INTERIM RELIEF

If a petition for review is filed by either party, I **ORDER** the agency to provide interim relief to the appellant in accordance with 5 U.S.C. § 7701(b)(2) (A). The relief shall be effective as of the date of this decision and will remain in effect until the decision of the Board becomes final.

Any petition for review or cross petition for review filed by the agency must be accompanied by a certification that the agency has complied with the interim relief order, either by providing the required interim relief or by satisfying the requirements of 5 U.S.C. § 7701(b)(2)(A)(ii) and (B). If the

appellant challenges this certification, the Board will issue an order affording the agency the opportunity to submit evidence of its compliance. If an agency petition or cross petition for review does not include this certification, or if the agency does not provide evidence of compliance in response to the Board's order, the Board may dismiss the agency's petition or cross petition for review on that basis.


FOR THE BOARD:    _____

                             Mark Syska
                             Administrative Judge

## ENFORCEMENT

If, after the agency has informed you that it has fully complied with this decision, you believe that there has not been full compliance, you may ask the Board to enforce its decision by filing a petition for enforcement with this office, describing specifically the reasons why you believe there is noncompliance. Your petition must include the date and results of any communications regarding compliance, and a statement showing that a copy of the petition was either mailed or hand-delivered to the agency.

Any petition for enforcement must be filed no more than 30 days after the date of service of the agency's notice that it has complied with the decision. If you believe that your petition is filed late, you should include a statement and evidence showing good cause for the delay and a request for an extension of time for filing.

## NOTICE TO PARTIES CONCERNING SETTLEMENT

The date that this initial decision becomes final, which is set forth below, is the last day that the parties may file a settlement agreement, but the administrative judge may vacate the initial decision in order to accept such an agreement into the record after that date. *See* 5 C.F.R. § 1201.112(a)(4).

**NOTICE TO APPELLANT**

This initial decision will become final on **August 28, 2019**, unless a petition for review is filed by that date. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first. You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

**BOARD REVIEW**

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review. Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record. You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and

may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

## NOTICE OF LACK OF QUORUM

The Merit Systems Protection Board ordinarily is composed of three members, 5 U.S.C. § 1201, but currently there are no members in place. Because a majority vote of the Board is required to decide a case, *see* 5 C.F.R. § 1200.3(a), (e), the Board is unable to issue decisions on petitions for review filed with it at this time. *See* 5 U.S.C. § 1203. Thus, while parties may continue to file petitions for review during this period, no decisions will be issued until at least two members are appointed by the President and confirmed by the Senate. The lack of a quorum does not serve to extend the time limit for filing a petition or cross petition. Any party who files such a petition must comply with the time limits specified herein.

For alternative review options, please consult the section below titled "Notice of Appeal Rights," which sets forth other review options.

### Criteria for Granting a Petition or Cross Petition for Review

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative

judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record.  A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first.  If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt.  You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim.  The date of filing by mail is determined by the postmark date.  The date of filing by fax or by electronic filing is the date of submission.  The date of filing by personal delivery is the date on which the Board receives the document.  The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service.  Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party.  *See* 5 C.F.R. § 1201.4(j).  If the petition is filed electronically, the online process itself will serve the petition on other e-filers.  *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

## ATTORNEY FEES

If no petition for review is filed, you may ask for the payment of attorney fees (plus costs, expert witness fees, and litigation expenses, where applicable) by filing a motion with this office as soon as possible, but no later than 60 calendar days after the date this initial decision becomes final.  Any such motion must be

prepared in accordance with the provisions of 5 C.F.R. Part 1201, Subpart H, and applicable case law.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above.  5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file.  5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.  Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general**.  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court

within **60 calendar days** of the date this decision becomes final. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after this decision becomes final under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. ____ , 137 S. Ct. 1975 (2017). If the action involves a claim of

discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after this decision becomes final as explained above. 5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C. 20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**. This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and you wish to challenge the Board's rulings on your whistleblower claims only, excluding all other issues, then you may file a petition for judicial review

with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.  The court of appeals must <u>receive</u> your petition for review within **60 days** of <u>the date this decision becomes final</u> under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

<div align="center">

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

</div>

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

<u>http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx</u>



| | DFAS CHECKLIST |
|---|---|
| | **INFORMATION REQUIRED BY DFAS IN ORDER TO PROCESS PAYMENTS AGREED UPON IN SETTLEMENT CASES OR AS ORDERED BY THE MERIT SYSTEMS PROTECTION BOARD** |

AS CHECKLIST: INFORMATION REQUIRED BY IN ORDER TO PROCESS PAYMENTS AGREED UPON IN SETTLEMENT CASES

## CIVILIAN PERSONNEL OFFICE MUST NOTIFY CIVILIAN PAYROLL OFFICE VIA COMMAND LETTER WITH THE FOLLOWING:

1. Statement if Unemployment Benefits are to be deducted, with dollar amount, address and POC to send.

2. Statement that employee was counseled concerning Health Benefits and TSP and the election forms if necessary.

3. Statement concerning entitlement to overtime, night differential, shift premium, Sunday Premium, etc, with number of hours and dates for each entitlement.

4. If Back Pay Settlement was prior to conversion to DCPS (Defense Civilian Pay System), a statement certifying any lump sum payment with number of hours and amount paid and/or any severance pay that was paid with dollar amount.

5. Statement if interest is payable with beginning date of accrual.

6. Corrected Time and Attendance if applicable.

## ATTACHMENTS TO THE LETTER SHOULD BE AS FOLLOWS:

1. Copy of Settlement Agreement and/or the MSPB Order.

2. Corrected or cancelled SF 50's.

3. Election forms for Health Benefits and/or TSP if applicable.

4. Statement certified to be accurate by the employee which includes:

    a. Outside earnings with copies of W2's or statement from employer.
    b. Statement that employee was ready, willing and able to work during the period.
    c. Statement of erroneous payments employee received such as; lump sum leave, severance pay, VERA/VSIP, retirement annuity payments (if applicable) and if employee withdrew Retirement Funds.

5. If employee was unable to work during any or part of the period involved, certification of the type of leave to be charged and number of hours.



**NATIONAL FINANCE CENTER CHECKLIST FOR BACK PAY CASES**

Below is the information/documentation required by National Finance Center to process payments/adjustments agreed on in Back Pay Cases (settlements, restorations) or as ordered by the Merit Systems Protection Board, EEOC, and courts.

1. Initiate and submit AD-343 (Payroll/Action Request) with clear and concise information describing what to do in accordance with decision.

2. The following information must be included on AD-343 for Restoration:

    a. Employee name and social security number.
    b. Detailed explanation of request.
    c. Valid agency accounting.
    d. Authorized signature (Table 63)
    e. If interest is to be included.
    f. Check mailing address.
    g. Indicate if case is prior to conversion.  Computations must be attached.
    h. Indicate the amount of Severance and Lump Sum Annual Leave Payment to be collected. (if applicable)

Attachments to AD-343

1. Provide pay entitlement to include Overtime, Night Differential, Shift Premium, Sunday Premium, etc. with number of hours and dates for each entitlement. (if applicable)

2. Copies of SF-50's (Personnel Actions) or list of salary adjustments/changes and amounts.

3. Outside earnings documentation statement from agency.

4. If employee received retirement annuity or unemployment, provide amount and address to return monies.

5. Provide forms for FEGLI, FEHBA, or TSP deductions. (if applicable)

6. If employee was unable to work during any or part of the period involved, certification of the type of leave to be charged and number of hours.

7. If employee retires at end of Restoration Period, provide hours of Lump Sum Annual Leave to be paid.

NOTE:  If prior to conversion, agency must attach Computation Worksheet by Pay Period and required data in 1-7 above.

The following information must be included on AD-343 for Settlement Cases: (Lump Sum Payment, Correction to Promotion, Wage Grade Increase, FLSA, etc.)

    a. Must provide same data as in 2, a-g above.
    b. Prior to conversion computation must be provided.
    c. Lump Sum amount of Settlement, and if taxable or non-taxable.

If you have any questions or require clarification on the above, please contact NFC's Payroll/Personnel Operations at 504-255-4630.

CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

<u>Appellant</u>

Electronic Mail          Bruce Fleming
                         739 Governor Bridge Rd
                         Davidsonville, MD 21035


<u>Appellant Representative</u>

Electronic Mail          Jason H. Ehrenberg, Esq.
                         Bailey & Ehrenberg Pllc
                         1015 18th Street, N.W.
                         Suite 204
                         Washington, D.C., DC 20036

<u>Agency Representative</u>

Electronic Mail          Terrence P. Cook, Esq.
                         Department of the Navy
                         U.S. Naval Academy - Superintendent's Office
                         121 Blake Road
                         Annapolis, MD 21402


| July 24, 2019 | | |
|---|---|---|
| (Date) | | Roy D. Mazique |
| | | Paralegal Specialist |

## UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD

BRUCE FLEMING,
               Appellant,

     v.

DEPARTMENT OF THE NAVY,
               Agency.

DOCKET NUMBER
PH-0752-18-0457-I-1

DATE:  January 26, 2024

## THIS FINAL ORDER IS NONPRECEDENTIAL[1]

<u>Jason H. Ehrenberg</u>, Esquire, Washington, D.C., for the appellant.

<u>Alison Gray</u>, Esquire, Washington, D.C., for the agency.

<u>Terrence P. Cook</u>, Esquire, Annapolis, Maryland, for the agency.

### BEFORE

Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member

### FINAL ORDER

The agency has filed a petition for review of the initial decision, which reversed the appellant's removal.  The appellant has filed a motion to dismiss the agency's petition for failure to provide interim relief.  For the reasons discussed below, we DENY the appellant's motion to dismiss, GRANT the agency's

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law.  Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions.  In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law.  *See* 5 C.F.R. § 1201.117(c).

petition for review, and REVERSE the initial decision.  The agency's action is SUSTAINED.

## BACKGROUND

The appellant is a tenured Professor of English at the U.S. Naval Academy in Annapolis, Maryland.  At issue are certain aspects of the appellant's conduct in teaching first-year Rhetoric & Introduction to Literature, HE 111, during the fall semester of the 2017/2018 academic year.   In January 2018, five different students filed complaints with the Vice Academic Dean alleging that the appellant had made various offensive comments, discussed inappropriate matters during class, and engaged in other unprofessional conduct.  Initial Appeal File (IAF), Tab 7 at 115-34.  The Vice Academic Dean directed the Director of the Division of Humanities and Social Sciences to supervise a fact-finding inquiry.  *Id.* at 114.

The Division Director assembled a panel of three senior faculty members, who interviewed the students from the appellant's fall classes, as well as two other students whose names had come up regarding one matter.  *Id.* at 135-89; IAF, Tab 8 at 4-119.   The appellant was invited to address the panel, but he declined to do so.  IAF, Tab 8 at 120-21; IAF, Tab 28 at 91.  He did reply by email, IAF, Tab 8 at 123, and he also sent an email message to the entire faculty in which he generally complained about the unfairness of the process, *id.* at 130.  Thereafter, the panel issued a report finding that a number of the matters as described in the complaints had occurred and qualified as unprofessional behavior.  IAF, Tab 7 at 97-113.

On June 26, 2018, the Division Director proposed the appellant's removal on a charge of Conduct Unbecoming a Federal Employee with seven specifications.  The agency alleged that the appellant:  (1) referred to students as "right-wing extremists"; (2) made comments about and discussed anal sex, oral sex, and transgender surgery; (3) emailed partially clothed photos of himself to students after having been counseled that doing so was inappropriate and agreeing

to refrain from doing so; (4) touched students without their approval; (5) referred to his own sexual experiences; (6) repeatedly mispronounced an Asian-American student's name despite being corrected several times; and (7) made demeaning, sexually related comments about a child and her mother because of how they were dressed.[2]  *Id.* at 79.  After the appellant responded,  the Academic Dean and Provost issued a decision sustaining all seven specifications and removing the appellant effective August 17, 2018.  *Id.* at 18-21, 33.

The appellant filed a Board appeal contesting the merits of the removal and raising several affirmative defenses, including retaliation for whistleblowing, violation of his First Amendment rights, and harmful procedural error.  IAF, Tabs 1, 30.  After a hearing, the administrative judge issued an initial decision not sustaining any of the seven specifications and reversing the removal on that basis.  IAF, Tab 33, Initial Decision (ID).  The administrative judge considered the appellant's affirmative defenses but found that he failed to prove them.  ID at 16-17.  He ordered the agency to provide interim relief if either party filed a petition for review.  ID at 19.

The agency has filed a petition for review, Petition for Review (PFR) File, Tab 7; the appellant has filed a response, PFR File, Tab 13; and the agency has filed a reply, PFR File, Tab 16.  The appellant has also moved to dismiss the agency's petition for failure to comply with the interim relief order, PFR File, Tab 11, and the agency has responded in opposition to that motion, PFR File, Tab 12.

## ANALYSIS

### The agency is in compliance with the administrative judge's interim relief order.

If the appellant is the prevailing party in the initial decision and the administrative judge orders interim relief, a petition for review filed by the

---

[2] In proposing the appellant's removal, the agency considered that he had previously been issued a Letter of Reprimand for disclosing a student's personally identifiable information.  IAF, Tab 7 at 81.  The Reprimand was issued on May 11, 2018.  *Id.* at 94.



**DEPARTMENT OF THE NAVY**
OFFICE OF THE ACADEMIC DEAN AND PROVOST
UNITED STATES NAVAL ACADEMY
589 MCNAIR ROAD
ANNAPOLIS MARYLAND 21402-1323

HRD-18-DL-12
26 JUN 2018

From:  Director, Division of Humanities and Social Sciences
To:    Dr. Bruce Fleming, Professor AD-1710-07

Subj:  NOTICE OF PROPOSED REMOVAL

Ref:   (a) Faculty Misconduct Inquiry dated 18 MAY 18
       (b) Letter from Jason H. Ehrenberg dated 6 JUN 18
       (c) 5 C.F.R. 752
       (d) SECNAVINST 12752.1A 3 MAY 16

1. This is a notice of proposed removal.  As you are aware, an inquiry has been conducted based on allegations of faculty misconduct, reference (a).  Through your attorney, you have submitted a formal response, reference (b).  Under the authority in references (c) and (d), and to promote the efficiency of service, I am proposing that you be removed from your position of Professor, AD-1710-07 and the Federal Service, for the following charge:

**Charge**: Conduct Unbecoming a Federal Employee

**Specification**.
*During the fall semester of the Academic Year 2017-2018, you engaged in unprofessional conduct in the classroom and outside the classroom.  Your conduct included, but is not limited to: (1) referring to students as "right-wing extremists," and/or words to that effect; (2) classroom comments/discussion regarding anal sex, oral sex, and transgender surgery; (3) emailing partially clothed pictures of yourself to students after having been counseled that doing so was inappropriate and your agreement not to do so in the future; (4) touching students without their approval; (5) referring to your own sexual experiences; (6) repeatedly mispronouncing an Asian-American student's name despite being corrected several times by the student; and (7) making demeaning sexually related comments about a young woman attending a dance with your son and similar offensive comments about the young woman's mother.*  See reference (a)

Your response to the alleged misconduct came in two parts.  The first was in reply to the request to be interviewed by the Inquiry Panel.  You refused the opportunity to rebut the allegations in person and instead, sent an unsolicited email detailing your position and disdain for the Naval Academy.  Your email was included in reference (a).  The second and more formal response was provided by your counsel in reference (b).  I have carefully considered your personal email and the comments provided by your counsel.  I have also weighed the behavior documented in the Inquiry and your 30 plus year record as a Federal employee.  Using the Douglas Factors as a framework to apply all these elements, I have come to one conclusion.  Your length of government service, while noteworthy, does not outweigh the cumulative effect of your

FOR OFFICIAL USE ONLY- PRIVACY SENSITIVE
ANY MISUSE OR UNAUTHORIZED  DISCLOSURE CAN RESULT IN BOTH CIVIL AND CRIMINAL PENALTIES

Subj:   NOTICE OF PROPOSED REMOVAL

unacceptable comments and conduct directed at young midshipmen - students entrusted to your care.   I am convinced that the only appropriate remedy for this behavior is your removal from the Federal service.

2. In reaching my decision I have considered the following Douglas Factors:

a. The nature and seriousness of the offense, and its relation to the employee's duties, position and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated.

The Inquiry revealed serious misconduct both in the classroom setting, and in emails to your students. Your behavior crossed a line and I no longer have trust or confidence that you can appropriately interact with students and cannot in good faith permit you to continue teaching.  In your response to the Inquiry you appear to acknowledge much of the behavior but do not recognize the inappropriate nature of your comments or actions.  Instead, you argue that your role as a faculty member includes exposing your students to the lessons of life, as you see it. As a long-term member of the faculty, you are familiar with the position of power and authority you have over midshipmen – their grades and achieving their goal of graduating.  You abused this authority on multiple occasions through comments and actions outlined in the specification and addressed more fully in the Inquiry.  Your conduct was inappropriate and unprofessional in the federal workplace, and made especially egregious given your position as a senior member of the Academy faculty.  I propose that the Deciding Official find this to be an aggravating factor in the determination of the appropriate penalty.

b. The employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position.

In your position, you are entrusted on a daily basis during the school-year with the education and professional development of our Nation's future Navy and Marine Corps leaders.  In this role, it is critical that you establish and maintain a classroom environment that respects the dignity of the individual and develops an understanding and appreciation for an appropriate superior-subordinate relationship.  Your conduct during the fall of 2017 fell well short of this mark.  As a tenured professor you are also expected to be a role model for both the students and other younger members of the faculty.   In my opinion, your personal commentary on sex, transgender surgery, and sharing partially clothed pictures of yourself to young students, failed to exhibit the type of professional behavior of someone filling your position and prominent role at the Naval Academy.  I propose that the Deciding Official find this to be an aggravating factor in the determination of the appropriate penalty.

c. The employee's past disciplinary record.

When reference (a) was initiated, you had no formal disciplinary record in your official personnel file.  On April 20, 2018, however, that changed.  On that day you sent a group email to

FOR OFFICIAL USE ONLY- PRIVACY SENSITIVE
ANY MISUSE OR UNAUTHORIZED DISCLOSURE CAN RESULT IN BOTH CIVIL AND CRIMINAL PENALTIES

Subj:   NOTICE OF PROPOSED REMOVAL

the faculty in which you disclosed controlled unclassified information, specifically personally identifiable information (PII) consisting of an individual's name, SAT Scores, race, and grade information. The individual was a former student that had filed a complaint against you in 2016 that also alleged inappropriate comments and behavior both in the classroom and in private extra-instruction sessions. The result was a meeting with your Department Chair to discuss how such comments about race and SAT scores can be misunderstood. The unsolicited group email was sent in an attempt to defend the alleged behavior that was in part, the subject of the then ongoing Inquiry that resulted in reference (a). You disclosed PII despite having completed training on the Privacy Act and the importance of safeguarding the personal privacy of others. Your actions resulted in the issuance of a Letter of Reprimand. I propose that the Deciding Official find this to be an aggravating factor in the determination of the appropriate penalty.

   d. The employee's past work record, length of service, performance on the job, and ability to get along with others and dependability.

Your performance record during your federal career of over 30 years has been acceptable, and I recognize that many of your students have given positive evaluations of your courses. Records reflect your most recent academic related award to be 1994. I propose that the Deciding Official find this to be a mitigating factor in the determination of the appropriate penalty.

   e. The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question.

In a prior counseling session in 2015, you were instructed by your Department Chair to refrain from sending partially-clothed photos of yourself to students. Despite this counselling and your apparent agreement to not repeat the behavior, you again sent partially-clothed pictures of yourself to midshipmen. In addition, the Academic Dean and Provost has promulgated faculty conduct guidelines – that classroom behavior and demeanor be professional and not engage in disrespectful or unnecessary negative interactions with students. I propose that the Deciding Official find this to be an aggravating factor in the determination of the appropriate penalty.

   f. The notoriety of the offense or its impact upon the reputation of the Agency.

Your conduct has not yet had an impact on the reputation of the United States Naval Academy. I propose that the Deciding Official find this to be a neutral factor in the determination of the appropriate penalty.

   g. The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's work ability to perform assigned duties.

Your misconduct occurred over a significant period of time and for the most part, in the work space – the classroom - and was directed at those under your charge, the midshipmen. The

3

FOR OFFICIAL USE ONLY- PRIVACY SENSITIVE
ANY MISUSE OR UNAUTHORIZED DISCLOSURE CAN RESULT IN BOTH CIVIL AND CRIMINAL PENALTIES

Subj:   NOTICE OF PROPOSED REMOVAL

absence of any understanding on your part that the behavior was not appropriate is especially troubling and causes me to be greatly concerned that it will not stop if you are returned to the classroom.  Your role is to educate midshipmen.  Your faculty position does not include the unlimited authority to comment/discuss oral/anal sex, offer your personal sexual experiences to the class, or make sexually offensive statements about others.  No where do you have the unfettered discretion to touch these young men and women in the classroom without their approval.   Your misconduct has eroded my trust in your ability to appropriately interact with midshipmen.  I cannot in good faith put you back into a teaching role, which is the essential duty of your position.  I do not see how you can effectively perform those duties in the future and uphold the mission of the Academy.  I propose that the Deciding Official find this to be an aggravating factor in the determination of the appropriate penalty.

h. Consistency of the penalty with those imposed upon other employees for the same or similar offenses.

I am aware of no other instances where a civilian faculty employee has engaged in similar misconduct.  I propose that the Deciding Official find this to be a neutral factor in the determination of the appropriate penalty.

i. Consistency with table of penalties from SECNAVINST 12752.1A.

The recommended range of remedies for similar offenses is Reprimand to Removal.  I propose that the Deciding Official find this to be a neutral factor in the determination of the appropriate penalty.

j. The potential for the employee's rehabilitation and the adequacy and effectiveness of alternative sanctions to deter such conduct by you or other employees in the future.

Despite a prior warning to refrain from sending partially clothed pictures of yourself to students, you repeated this misconduct.  You deny this accusation and yet, those pictures and the email sending them to students are included in reference (a).  Furthermore, although you apparently acknowledge that many of the classroom events occurred, you never recognize that your conduct was, or even may have been, inappropriate.  You express no regrets for your behavior, because you do not think any of it was inappropriate.  I disagree.   Your statements are indicative of an inability or unwillingness to appreciate the significance of your inappropriate conduct and to correct your behavior.   You fail to ever admit that your teaching methodology is sometimes inappropriate, disrespectful, and damaging to students.  I am also aware of your classroom behavior in 2013 that was directed at two female midshipmen students and representatives of the Academy's Sexual Assault Prevention and Response Program.  Your disagreement with the Program went beyond the classroom wherein you engaged in email correspondence with the two young women and other midshipmen.  A subsequent inquiry brought the matter to closure.  Regrettably, you continued the dispute by falsely accusing the two young women of filing a

4

FOR OFFICIAL USE ONLY- PRIVACY SENSITIVE
ANY MISUSE OR UNAUTHORIZED  DISCLOSURE CAN RESULT IN BOTH CIVIL AND CRIMINAL PENALTIES

Subj:   NOTICE OF PROPOSED REMOVAL

sexual assault charge against you.  Your vindictive action and abuse of your faculty position and influence to harm the reputation and future careers of the midshipman prompted a stern rebuke in a Letter of Reprimand.  It is your classroom conduct that we are again now addressing, some five-years later.   I have carefully considered proposing a lesser form of disciplinary action to include a long-term suspension.  However, given the serious nature and multiple instances of inappropriate classroom conduct, the complete disregard for the Department Chair's counselling, and refusal to even acknowledge any responsibility, I have no reason to believe that any penalty, short of removal from the Federal service, will change your behavior.  I propose that the Deciding Official find that rehabilitation is unlikely.  I also request that the Deciding Official consider that the adequacy and effectiveness of alternative sanctions appears not to be present to deter similar conduct in the future given (1) the close proximity between the September 2015 counseling regarding the sharing of pictures and its reoccurrence in September 2017 and (2) the unauthorized disclosure of the personal information of a former student in April 2018 in an effort to defend your current misconduct.

3. You are entitled to be represented by a representative of your choice who is willing to present your reply.  You or your representative, if you elect to be represented, has the right to request and review copies of the materials relied on to support this proposal. You have the right to respond to this notice, orally and/or in writing, and to furnish affidavits as well as other documentary evidence in support of your response(s).  Your reply must be submitted to the Deciding Official, Academic Dean & Provost, Andrew Phillips, no later than seven (7) calendar days after receipt of this notice.  To reply in person, you may contact Dean Phillips' Executive Assistant, CAPT Pospisil, at 410-293-1587 to schedule a meeting.  If necessary, you may request additional time to prepare your reply.  Any reply will be given full consideration.

4. As soon as possible after receipt of your reply, or after seven (7) calendar days have passed if you do not reply, Dean Phillips will notify you in writing of the final decision on the proposed action.  If you need time to prepare your reply, you may request up to seven (7) business days of regularly paid time. If you wish to request such time, please do so in writing addressed to Dean Phillips within the seven (7) calendar day window.  The proposed action, if found warranted, will not be effected earlier than thirty (30) calendar days after your receipt of this notice.

5. In the event you are experiencing a medical or personal problem that is having an impact on your behavior, I urge you to seek counseling which is available to you through the Civilian Employee Assistance Program (CEAP).  This is a free and confidential service.  You may schedule a confidential appointment by calling 1-844-366-2327.

FOR OFFICIAL USE ONLY- PRIVACY SENSITIVE
ANY MISUSE OR UNAUTHORIZED DISCLOSURE CAN RESULT IN BOTH CIVIL AND CRIMINAL PENALTIES

Appx124

Subj:   NOTICE OF PROPOSED REMOVAL

6. Copies of applicable regulations, as well as the official case file, are available to you and/or
your representative through the Human Resources Office.  If you have any questions concerning
the information provided in this letter, you may contact Ms. Alaina Kistler at 410-293-2514.

COL J. AYTES

_____        _____
Acknowledgment of Receipt                    Date

Copy to:
Command Counsel
Dir, HR

6

FOR OFFICIAL USE ONLY- PRIVACY SENSITIVE
ANY MISUSE OR UNAUTHORIZED  DISCLOSURE CAN RESULT IN BOTH CIVIL AND CRIMINAL PENALTIES

Appx125



**DEPARTMENT OF THE NAVY**
OFFICE OF THE ACADEMIC DEAN AND PROVOST
UNITED STATES NAVAL ACADEMY
589 MCNAIR ROAD
ANNAPOLIS MARYLAND 21402-1323

HRO-18-DL-15
15 AUG 2018

From: Academic Dean and Provost
To:   Dr. Bruce Fleming, Professor AD-1710-07

Subj: NOTICE OF DECISION ON PROPOSED REMOVAL

Ref:  (a) 5 CFR 752
      (b) SECNAVINST 12752.1A dated 3 MAY 16
      (c) Faculty Misconduct Inquiry dated 18 MAY 18
      (d) Notice of Proposed Removal dated 26 JUN 2018
      (e) ACDEANINST1531.63C dated 1 APR 16

Encl: (1) Merit Systems Protection Board Appeals Form

1. Pursuant to reference (a) and (b), this is a notice that I have decided to remove you from your position and federal service effective 17 August 2018. This decision is made to promote the efficiency of the service and is based on the following Reasons and Specifications as stated in the Notice of Proposed Removal (reference d):

2. **Charge:** Conduct Unbecoming a Federal Employee

**Specifications.**
*During the fall semester of the Academic Year 2017-2018, you engaged in unprofessional conduct in the classroom and outside the classroom. Your conduct included, but is not limited to: (1) referring to students as "right-wing extremists," and/or words to that effect; (2) classroom comments/discussion regarding anal sex, oral sex, and transgender surgery; (3) emailing partially clothed pictures of yourself to students after having been counseled that doing so was inappropriate and your agreement not to do so in the future; (4) touching students without their approval; (5) referring to your own sexual experiences; (6) repeatedly mispronouncing an Asian-American student's name despite being corrected several times by the student; and (7) making demeaning sexually related comments about a young woman attending a dance with your son and similar offensive comments about the young woman's mother.* See reference (d).

The investigating panel's final report (reference c) supported the charges and specific misconduct cited in the specifications above. In your response to the panel's report, you made it clear that you do not accept responsibility for these actions. You either dispute that they occurred, or you argue that you are within your rights to engage in these activities. In his Notice of Proposed Removal (reference d), the Proposing Official (COL Aytes) writes:

FOR OFFICIAL USE ONLY PRIVACY SENSITIVE
Any misuse or unauthorized disclosure can result in both civil and criminal penalties

Appx126

"I have carefully considered proposing a lesser form of disciplinary action to include a long-term suspension. However, given the serious nature and multiple instances of inappropriate classroom conduct, the complete disregard for the Department Chair's counseling [sic], and refusal to even acknowledge any responsibility, I have no reason to believe that any penalty, short of removal from the Federal service, will change your behavior. I propose that the Deciding Official find that rehabilitation is unlikely."

In the written reply to the Notice of Proposed Removal, you claim that you are being unjustifiably punished for articles you have published, and that you are being denied your academic freedom to use "theatrical and provocative" teaching methods. I do not agree; I find nothing in the record that supports your claim. It is apparent that you do not find any aspect of your behavior to be inappropriate for a federal employee, and you offer no intention to alter any aspect of your behavior. Pertinent to this point, the Proposing Official also writes in his Notice of Proposed Removal:

"I also request that the Deciding Official consider that the adequacy and effectiveness of alternative sanctions appears not to be present to deter similar conduct in the future given (1) the close proximity between the September 2015 counseling regarding the sharing of pictures and its reoccurrence in September 2017 and (2) the unauthorized disclosure of personal information of a former student in April 2018 in an effort to defend your current misconduct."

3. I have carefully considered all of the information contained in the Notice of Proposed Removal along with its supporting documentation, and the supplemental information you provided in your 3 July 2018 written reply. Based on my review, I find that the reasons and specifications contained in the Notice of Proposed Removal are supported by the record. To reach my final decision, I have considered the following factors:

a. <u>The nature and seriousness of the offense, and its relation to employee's duties, position, and responsibility, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated.</u>

The Proposing Official determined in his Notice of Proposed Removal that the "inquiry revealed serious intentional misconduct both in the classroom setting, and in emails to your students." In your written response to the investigating panel, you made it clear that your conduct was intentional, and you do not see any fault in your behavior. The investigating panel confirmed your unprofessional behavior with respect to all of the complaints listed in the specification above, and they further determined that such behavior was repeated on multiple occasions. As a result, the Proposing Official determined that "your conduct was inappropriate and unprofessional in the federal workplace, and especially egregious given your position as a senior member of the faculty." I concur with the Proposing Official, and find this to be an aggravating factor in my determination of the appropriate penalty.

2

FOR OFFICIAL USE ONLY PRIVACY SENSITIVE
Any misuse or unauthorized disclosure can result in both civil and criminal penalties

b. The employee's job level and type of employment, including supervisory or fiduciary role contacts with public, and prominence of the position.

Your position requires you to play a vital role in the education and professional development of future Navy and Marine Corps leaders. In this role, it is crucial that you provide a positive and supportive classroom environment in which midshipmen may focus on their education. You are in a senior level faculty position and are expected to be a role-model to midshipmen in that developmental process. As the Proposing Official writes in his Notice of Proposed Removal, "it is critical that you establish and maintain a classroom environment that respects the dignity of the individual and develops an understanding and appreciation for an appropriate superior-subordinate relationship. Your conduct during the fall of 2017 fell well short of this mark." The investigating panel report similarly states that "Instructors have an asymmetric relationship with their students. Simply saying 'no' or 'please stop' or 'you're making me uncomfortable' is not often a realistic option for students. The best practice is to refrain from touching students altogether beyond a handshake in keeping with a professional atmosphere and relationship." In fact, several of the student complaints against you specifically highlight the inappropriate nature of this unwanted touching. Due to the job level and the nature of your offenses, I concur with the Proposing Official, and find this to be an aggravating factor in making my determination of the appropriate penalty.

c. The employee's past disciplinary record, past work record, length of service, performance on the job, and ability to get along with others and dependability.

You have been a faculty member for over 30 years, your official performance has been rated as satisfactory, and you received performance awards in the 1990's. I concur with the Proposing Official, and consider this to be a potentially mitigating factor. However, since 2013 you have engaged in behaviors that are unacceptable.

Specifically, since 2013 there have been two instances of formal counseling (one involving inappropriate photos of yourself, and one resulting from the formal complaint filed by a midshipman) conducted at the Department level as well as two formal letters of reprimand (one in 2014 and one in 2018) issued from the HUM/SS Division regarding your inappropriate professional behavior during that period. As the Proposing Official cites in the Notice of Proposed Removal, in your official personnel file now is a letter of reprimand regarding an intentional PII violation by you, a disclosure made by you by email to all faculty at USNA and that was specifically targeted at a midshipman, the same midshipman who had previously filed a formal complaint against you. That student complaint was investigated and resulted in formal counseling of you at the Department level, and yet you continue to reject any responsibility for your actions in that case, and chose to share his federally protected information with all faculty as a means to defend yourself during this investigation. In summary, the extent of your *disciplinary* record compiled since 2013 is unacceptable, and outweighs your satisfactory official performance record. I concur with the Proposing Official, and find this to be an aggravating factor in making my determination of the appropriate penalty.

3

FOR OFFICIAL USE ONLY PRIVACY SENSITIVE
Any misuse or unauthorized disclosure can result in both civil and criminal penalties

d. The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question.

> As the Proposing Official cites in his Notice of Proposed Removal, in a 2015 formal counseling by your Department Chair, you were directed to refrain from sending partially-clothed photos of yourself to students. As confirmed by the investigating panel's report and in spite of your claims to the contrary, you repeated this behavior in the fall of 2017. As noted in the investigating report, "Dr. Fleming states that this behavior occurred only a single time two years ago, yet the interview statements and email documentation clearly contradict this assertion." That report further states that "the panel finds sending shirtless photographs to be outside the accepted standards of professional conduct for a faculty member." This is precisely what you were counseled and directed in 2015 not to do. I concur with the Proposing Official, and find this to be an aggravating factor in making my determination of the appropriate penalty.

e. The notoriety of the offense or its impact upon the reputation of the Agency.

> To date, your actions are not widely known outside of the Naval Academy, and have not had an impact on the reputation of the Naval Academy. However, you have used Naval Academy email distribution lists several times to make your actions and rebuttals known broadly within the Naval Academy. I concur with the Proposing Official, and find this to be a neutral factor in making my determination of the appropriate penalty.

f. The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's work ability to perform assigned duties.

> In his Notice of Proposed Removal, the Proposing Official enumerated a subset of the original complaints made against you by students in your fall 2017 classes. While each of the complaints he listed was confirmed by the investigating panel, the most serious are touching midshipmen in class without their consent, and emailing several partially clothed photos of yourself to your class after having been formally counseled and directed not to do so. To be clear, the midshipmen who formally complained found this behavior to be inappropriate and unwanted, and the investigating panel and the Proposing Official agree. And yet, you reject the assertion that your touching of midshipmen is inappropriate, and you deny that you emailed any photos of yourself, in spite of clear evidence that you did so. In addition, you identified a current midshipman and former student of yours by name when you provided federally protected information about him in an email to all faculty at USNA. That midshipman is the same student who had previously filed a formal complaint against you in 2016. In each of these instances, you have rejected any responsibility for your actions, and you have made clear in your written responses to the investigating panel, to its final report, and to the Notice of Proposed Removal that you are entitled to continue this behavior. Given this set of facts, I do not have confidence that you will perform at a satisfactory level in the future. I concur with the Proposing Official, and find this to be an aggravating factor in making my determination that removal is the appropriate penalty.

g. Consistency of the penalty with those imposed upon other employees for the same or similar offenses.

FOR OFFICIAL USE ONLY PRIVACY SENSITIVE
Any misuse or unauthorized disclosure can result in both civil and criminal penalties

Appx129

I am unaware of any similar misconduct by a faculty employee. I concur with the Proposing Official, and find this to be a neutral factor in making my determination of the appropriate penalty.

h. Consistency with table of penalties from SECNAVINST 12752.1A and the Department of the Navy Civilian Human Resource Manual (CHRM) Subchapter 752 Disciplinary Actions

The recommended range of remedies for a similar offense of inappropriate conduct of a federal employee ranges from Reprimand to Removal. I concur with the Proposing Official, and find this to be a neutral factor in making my determination of the appropriate penalty.

i. The potential for the employee's rehabilitation and the adequacy and effectiveness of alternative sanctions.

Since 2013 you have been formally counseled twice at the Department level, and have received two letters of reprimand at the Division level. Your written responses to the investigating panel and to the Notice of Proposed Removal clearly indicate that you do not see anything inappropriate in your conduct, and you reject responsibility for anything that could be considered inappropriate. In some instances, you assert that the events did not even occur, and yet the evidence is clear (e.g. the inappropriate photos you sent, and your inappropriate touching of students) that they did. You have shown no evidence that rehabilitation or a lesser sanction would be effective; indeed, such sanctions have not been effective to date. In his Notice of Proposed Removal, the Proposing Official writes that "given the serious nature and multiple instances of inappropriate classroom conduct, the complete disregard for the Department Chair's counselling [sic], and refusal to even acknowledge any responsibility, I have no reason to believe that any penalty, short of removal from the Federal service, will change your behavior." I concur with the Proposing Official, and find this to be an aggravating factor in making my determination of the appropriate penalty.

4. In accordance with reference (e), you may appeal this decision to the Superintendent or his designee within 10 working days of receiving this notice.

5. You have the right to appeal this decision to the Merit Systems Protection Board (MSPB). If you choose to appeal this removal decision to the MSPB, you may file your appeal any time after the effective date of the action, but not later than thirty (30) calendar days after the effective date. If you choose to file an appeal, it may be done on-line at: https://e-appeal.mspb.gov/Default.aspx, by personal delivery during normal business hours to the MSPB, by facsimile, or by mail addressed as follows:

Regional Director
Merit Systems Protection Board (MSPB)
Northeast Regional Office
1601 Market Street, Suite 1700
Philadelphia, PA 19103

5

FOR OFFICIAL USE ONLY PRIVACY SENSITIVE
Any misuse or unauthorized disclosure can result in both civil and criminal penalties

Phone: (215) 597-9960
Fax: (215) 597-3456

6. If you believe that this adverse action discriminates against you on the basis of your race, color, religion, sex, national origin, age, or disability you may contact the EEO Office at 410-293-3558 to file a complaint. If you choose to file an EEO complaint, you will have no other means of appeal. To summarize, you may appeal this decision to the MSPB in accordance with enclosure 1, or you may file a discrimination complaint, but can only select one (1) of the above options with no other redress. Whichever appeal is filed first will be considered an election to proceed in that forum.

7. If you need further information regarding your rights in this matter, you may contact Ms. Alaina Kistler of the Human Resources Office, telephone (410) 293-2514.

_____        8/15/18
Andrew T. Phillips                       Date
Academic Dean & Provost


Receipt Acknowledged:


_____        _____
Signature                                Date


6

FOR OFFICIAL USE ONLY PRIVACY SENSITIVE
Any misuse or unauthorized disclosure can result in both civil and criminal penalties

Appx131



**DEPARTMENT OF THE NAVY**
OFFICE OF THE ACADEMIC DEAN AND PROVOST
UNITED STATES NAVAL ACADEMY
589 MCNAIR ROAD
ANNAPOLIS MARYLAND 21402-1323

HRO-18-DL-15
15 AUG 2018

From: Academic Dean and Provost
To:   Dr. Bruce Fleming, Professor AD-1710-07

Subj: NOTICE OF DECISION ON PROPOSED REMOVAL

Ref:  (a) 5 CFR 752
      (b) SECNAVINST 12752.1A dated 3 MAY 16
      (c) Faculty Misconduct Inquiry dated 18 MAY 18
      (d) Notice of Proposed Removal dated 26 JUN 2018
      (e) ACDEANINST1531.63C dated 1 APR 16

Encl: (1) Merit Systems Protection Board Appeals Form

1. Pursuant to reference (a) and (b), this is a notice that I have decided to remove you from your position and federal service effective 17 August 2018. This decision is made to promote the efficiency of the service and is based on the following Reasons and Specifications as stated in the Notice of Proposed Removal (reference d):

2. **Charge:** Conduct Unbecoming a Federal Employee

**Specifications.**
*During the fall semester of the Academic Year 2017-2018, you engaged in unprofessional conduct in the classroom and outside the classroom. Your conduct included, but is not limited to: (1) referring to students as "right-wing extremists," and/or words to that effect; (2) classroom comments/discussion regarding anal sex, oral sex, and transgender surgery; (3) emailing partially clothed pictures of yourself to students after having been counseled that doing so was inappropriate and your agreement not to do so in the future; (4) touching students without their approval; (5) referring to your own sexual experiences; (6) repeatedly mispronouncing an Asian-American student's name despite being corrected several times by the student; and (7) making demeaning sexually related comments about a young woman attending a dance with your son and similar offensive comments about the young woman's mother.* See reference (d).

The investigating panel's final report (reference c) supported the charges and specific misconduct cited in the specifications above. In your response to the panel's report, you made it clear that you do not accept responsibility for these actions. You either dispute that they occurred, or you argue that you are within your rights to engage in these activities. In his Notice of Proposed Removal (reference d), the Proposing Official (COL Aytes) writes:

FOR OFFICIAL USE ONLY PRIVACY SENSITIVE
Any misuse or unauthorized disclosure can result in both civil and criminal penalties

Appx200

"I have carefully considered proposing a lesser form of disciplinary action to include a long-term suspension. However, given the serious nature and multiple instances of inappropriate classroom conduct, the complete disregard for the Department Chair's counseling [sic], and refusal to even acknowledge any responsibility, I have no reason to believe that any penalty, short of removal from the Federal service, will change your behavior. I propose that the Deciding Official find that rehabilitation is unlikely."

In the written reply to the Notice of Proposed Removal, you claim that you are being unjustifiably punished for articles you have published, and that you are being denied your academic freedom to use "theatrical and provocative" teaching methods. I do not agree; I find nothing in the record that supports your claim. It is apparent that you do not find any aspect of your behavior to be inappropriate for a federal employee, and you offer no intention to alter any aspect of your behavior. Pertinent to this point, the Proposing Official also writes in his Notice of Proposed Removal:

"I also request that the Deciding Official consider that the adequacy and effectiveness of alternative sanctions appears not to be present to deter similar conduct in the future given (1) the close proximity between the September 2015 counseling regarding the sharing of pictures and its reoccurrence in September 2017 and (2) the unauthorized disclosure of personal information of a former student in April 2018 in an effort to defend your current misconduct."

3. I have carefully considered all of the information contained in the Notice of Proposed Removal along with its supporting documentation, and the supplemental information you provided in your 3 July 2018 written reply. Based on my review, I find that the reasons and specifications contained in the Notice of Proposed Removal are supported by the record. To reach my final decision, I have considered the following factors:

a. The nature and seriousness of the offense, and its relation to employee's duties, position, and responsibility, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated.

The Proposing Official determined in his Notice of Proposed Removal that the "inquiry revealed serious intentional misconduct both in the classroom setting, and in emails to your students." In your written response to the investigating panel, you made it clear that your conduct was intentional, and you do not see any fault in your behavior. The investigating panel confirmed your unprofessional behavior with respect to all of the complaints listed in the specification above, and they further determined that such behavior was repeated on multiple occasions. As a result, the Proposing Official determined that "your conduct was inappropriate and unprofessional in the federal workplace, and especially egregious given your position as a senior member of the faculty." I concur with the Proposing Official, and find this to be an aggravating factor in my determination of the appropriate penalty.

2

FOR OFFICIAL USE ONLY PRIVACY SENSITIVE
Any misuse or unauthorized disclosure can result in both civil and criminal penalties
Pleading Number : 2018040168    Submission date : 2018-09-20 13:15:14    Confirmation Number: 904097807    page 21 of 191

2

Appx201

**b. The employee's job level and type of employment, including supervisory or fiduciary role contacts with public, and prominence of the position.**

Your position requires you to play a vital role in the education and professional development of future Navy and Marine Corps leaders. In this role, it is crucial that you provide a positive and supportive classroom environment in which midshipmen may focus on their education. You are in a senior level faculty position and are expected to be a role-model to midshipmen in that developmental process. As the Proposing Official writes in his Notice of Proposed Removal, "it is critical that you establish and maintain a classroom environment that respects the dignity of the individual and develops an understanding and appreciation for an appropriate superior-subordinate relationship. Your conduct during the fall of 2017 fell well short of this mark." The investigating panel report similarly states that "Instructors have an asymmetric relationship with their students. Simply saying 'no' or 'please stop' or 'you're making me uncomfortable' is not often a realistic option for students. The best practice is to refrain from touching students altogether beyond a handshake in keeping with a professional atmosphere and relationship." In fact, several of the student complaints against you specifically highlight the inappropriate nature of this unwanted touching. Due to the job level and the nature of your offenses, I concur with the Proposing Official, and find this to be an aggravating factor in making my determination of the appropriate penalty.

**c. The employee's past disciplinary record, past work record, length of service, performance on the job, and ability to get along with others and dependability.**

You have been a faculty member for over 30 years, your official performance has been rated as satisfactory, and you received performance awards in the 1990's. I concur with the Proposing Official, and consider this to be a potentially mitigating factor. However, since 2013 you have engaged in behaviors that are unacceptable.

Specifically, since 2013 there have been two instances of formal counseling (one involving inappropriate photos of yourself, and one resulting from the formal complaint filed by a midshipman) conducted at the Department level as well as two formal letters of reprimand (one in 2014 and one in 2018) issued from the HUM/SS Division regarding your inappropriate professional behavior during that period. As the Proposing Official cites in the Notice of Proposed Removal, in your official personnel file now is a letter of reprimand regarding an intentional PII violation by you, a disclosure made by you by email to all faculty at USNA and that was specifically targeted at a midshipman, the same midshipman who had previously filed a formal complaint against you. That student complaint was investigated and resulted in formal counseling of you at the Department level, and yet you continue to reject any responsibility for your actions in that case, and chose to share his federally protected information with all faculty as a means to defend yourself during this investigation. In summary, the extent of your *disciplinary* record compiled since 2013 is unacceptable, and outweighs your satisfactory official performance record. I concur with the Proposing Official, and find this to be an aggravating factor in making my determination of the appropriate penalty.

3

FOR OFFICIAL USE ONLY PRIVACY SENSITIVE
Any misuse or unauthorized disclosure can result in both civil and criminal penalties

Pleading Number : 2018040168        Submission date : 2018-09-20 13:15:14        Confirmation Number: 904097807

Appx202

d. The clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question.

As the Proposing Official cites in his Notice of Proposed Removal, in a 2015 formal counseling by your Department Chair, you were directed to refrain from sending partially-clothed photos of yourself to students. As confirmed by the investigating panel's report and in spite of your claims to the contrary, you repeated this behavior in the fall of 2017. As noted in the investigating report, "Dr. Fleming states that this behavior occurred only a single time two years ago, yet the interview statements and email documentation clearly contradict this assertion." That report further states that "the panel finds sending shirtless photographs to be outside the accepted standards of professional conduct for a faculty member." This is precisely what you were counseled and directed in 2015 not to do. I concur with the Proposing Official, and find this to be an aggravating factor in making my determination of the appropriate penalty.

e. The notoriety of the offense or its impact upon the reputation of the Agency.

To date, your actions are not widely known outside of the Naval Academy, and have not had an impact on the reputation of the Naval Academy. However, you have used Naval Academy email distribution lists several times to make your actions and rebuttals known broadly within the Naval Academy. I concur with the Proposing Official, and find this to be a neutral factor in making my determination of the appropriate penalty.

f. The effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's work ability to perform assigned duties.

In his Notice of Proposed Removal, the Proposing Official enumerated a subset of the original complaints made against you by students in your fall 2017 classes. While each of the complaints he listed was confirmed by the investigating panel, the most serious are touching midshipmen in class without their consent, and emailing several partially clothed photos of yourself to your class after having been formally counseled and directed not to do so. To be clear, the midshipmen who formally complained found this behavior to be inappropriate and unwanted, and the investigating panel and the Proposing Official agree. And yet, you reject the assertion that your touching of midshipmen is inappropriate, and you deny that you emailed any photos of yourself, in spite of clear evidence that you did so. In addition, you identified a current midshipman and former student of yours by name when you provided federally protected information about him in an email to all faculty at USNA. That midshipman is the same student who had previously filed a formal complaint against you in 2016. In each of these instances, you have rejected any responsibility for your actions, and you have made clear in your written responses to the investigating panel, to its final report, and to the Notice of Proposed Removal that you are entitled to continue this behavior. Given this set of facts, I do not have confidence that you will perform at a satisfactory level in the future. I concur with the Proposing Official, and find this to be an aggravating factor in making my determination that removal is the appropriate penalty.

g. Consistency of the penalty with those imposed upon other employees for the same or similar offenses.

<div align="center">4</div>

FOR OFFICIAL USE ONLY PRIVACY SENSITIVE
Any misuse or unauthorized disclosure can result in both civil and criminal penalties

Appx203

I am unaware of any similar misconduct by a faculty employee. I concur with the Proposing Official, and find this to be a neutral factor in making my determination of the appropriate penalty.

### h. Consistency with table of penalties from SECNAVINST 12752.1A and the Department of the Navy Civilian Human Resource Manual (CHRM) Subchapter 752 Disciplinary Actions

The recommended range of remedies for a similar offense of inappropriate conduct of a federal employee ranges from Reprimand to Removal. I concur with the Proposing Official, and find this to be a neutral factor in making my determination of the appropriate penalty.

### i. The potential for the employee's rehabilitation and the adequacy and effectiveness of alternative sanctions.

Since 2013 you have been formally counseled twice at the Department level, and have received two letters of reprimand at the Division level. Your written responses to the investigating panel and to the Notice of Proposed Removal clearly indicate that you do not see anything inappropriate in your conduct, and you reject responsibility for anything that could be considered inappropriate. In some instances, you assert that the events did not even occur, and yet the evidence is clear (e.g. the inappropriate photos you sent, and your inappropriate touching of students) that they did. You have shown no evidence that rehabilitation or a lesser sanction would be effective; indeed, such sanctions have not been effective to date. In his Notice of Proposed Removal, the Proposing Official writes that "given the serious nature and multiple instances of inappropriate classroom conduct, the complete disregard for the Department Chair's counselling [sic], and refusal to even acknowledge any responsibility, I have no reason to believe that any penalty, short of removal from the Federal service, will change your behavior." I concur with the Proposing Official, and find this to be an aggravating factor in making my determination of the appropriate penalty.

4. In accordance with reference (e), you may appeal this decision to the Superintendent or his designee within 10 working days of receiving this notice.

5. You have the right to appeal this decision to the Merit Systems Protection Board (MSPB). If you choose to appeal this removal decision to the MSPB, you may file your appeal any time after the effective date of the action, but not later than thirty (30) calendar days after the effective date. If you choose to file an appeal, it may be done on-line at: https://e-appeal.mspb.gov/Default.aspx, by personal delivery during normal business hours to the MSPB, by facsimile, or by mail addressed as follows:

Regional Director
Merit Systems Protection Board (MSPB)
Northeast Regional Office
1601 Market Street, Suite 1700
Philadelphia, PA 19103

5

FOR OFFICIAL USE ONLY PRIVACY SENSITIVE
Any misuse or unauthorized disclosure can result in both civil and criminal penalties

Appx204

Phone: (215) 597-9960
Fax: (215) 597-3456

6. If you believe that this adverse action discriminates against you on the basis of your race, color, religion, sex, national origin, age, or disability you may contact the EEO Office at 410-293-3558 to file a complaint. If you choose to file an EEO complaint, you will have no other means of appeal. To summarize, you may appeal this decision to the MSPB in accordance with enclosure 1, or you may file a discrimination complaint, but can only select one (1) of the above options with no other redress. Whichever appeal is filed first will be considered an election to proceed in that forum.

7. If you need further information regarding your rights in this matter, you may contact Ms. Alaina Kistler of the Human Resources Office, telephone (410) 293-2615.

8/5/18
Andrew T. Phillips                                    Date
Academic Dean & Provost

Receipt Acknowledged:

_____        _____
Signature                                      Date

6

FOR OFFICIAL USE ONLY PRIVACY SENSITIVE
Any misuse or unauthorized disclosure can result in both civil and criminal penalties

Appx205



**Bailey &
Ehrenberg**

Jason H. Ehrenberg
jhe@becounsel.com

July 3, 2018

<u>VIA EMAIL (aphillips@usna.edu)</u>

Dr. Andrew T. Phillips
Academic Dean and Provost
U.S. Naval Academy
121 Blake Road
Annapolis, MD 21402

**Re: Professor Bruce Fleming – Notice of Proposed Removal**

Dear Dr. Phillips:

This law firm represents United States Naval Academy (the "Academy") Professor Bruce Fleming with regard to the referenced matter. Please accept this letter as Professor Fleming's response to the Notice of Proposed Removal (the "Notice") that the Academy's Director, Division of Humanities and Social Sciences provided to him on 26 June 2018. Please note that this response is being provided to you within seven (7) calendar days of Professor Fleming's receipt of the Notice and that Professor Fleming reserves the right to supplement this response whether directly or through this law office.

At the outset, the Academy's administration appears to have decided that an investigation into alleged student complaints against Professor Fleming was necessary only weeks after Professor Fleming published an article in *The Federalist* that was critical of the United States service academies (including the Academy). It is also clear from the Academy's actions vis-à-vis our client that the administration is attempting to create a system that allows it to revoke the tenure of professors it no longer desires to employ. These facts cannot be ignored when considering the appropriateness of the proposed punishment in this matter and we are confident that a reviewing body would view the Academy's conduct with disfavor (and reverse any decision to remove our client from his federal employment).

**Bailey & Ehrenberg PLLC**

1015 18ᵀᴴ Street N.W., Suite 204     Tel (202) 331-1331
Washington, DC 20036                    Fax (202) 318-7071
becounsel.com



Appx213

Bailey &
Ehrenberg

It is also clear that a reviewing body would find that the Academy's recent actions in relation to Professor Fleming are part of an ongoing pattern of targeted harassment against our client. This was made abundantly clear in the Notice where the Division Director made repeated reference to, and clearly took issue with, Professor Fleming's discussion of sexual and transgender issues in the classroom. It is evident from the Notice, and the Academy's past treatment of our client, that the Academy's administration as a whole takes issue with Professor Fleming's occasional discussion of sex and sexuality in the classroom. As noted in our prior correspondence, however, discussion of such issues in Professor Fleming's classroom is entirely appropriate, even if it can be considered controversial, for at least two reasons. First, these are issues upon which Professor Fleming regularly writes. See, for example:

1. https://www.theatlantic.com/sexes/archive/2013/01/how-to-stop-sexual-assault-at-military-service-academies-first-legalize-sex/267208/

2. https://www.huffingtonpost.com/bruce-fleming/military-service-academies-sex_b_2724757.html

Second, and more significantly, these issues are appropriate for occasional classroom discussion in any classroom at the Academy, as these are issues that the Academy, the military and our Commander in Chief openly (i.e., publically) raised during the Fall 2017 semester (and in the somewhat recent past). Indeed, these issues regularly appeared in the news in the fall 2017 semester and, therefore, merited at least some classroom discussion at the Academy during the fall 2017 semester. See, for example:

1. https://www.armytimes.com/news/2017/11/14/report-pentagon-to-pay-for-soldiers-gender-transition-surgery/

2. https://www.nytimes.com/2017/11/14/us/politics/pentagon-transgender-surgery.html

3. https://www.stripes.com/news/us/pentagon-transgender-soldier-receives-sex-change-operation-1.497887

4. https://www.washingtonpost.com/local/public-safety/a-second-judge-blocks-trump-administrations-proposed-transgender-military-ban/2017/11/21/d91f65e4-cee1-11e7-81bc-c55a220c8cbe_story.html?noredirect=on&utm_term=.f68135b312c1

Appx214

5.  https://www.washingtonpost.com/local/a-sex-misconduct-case-exposes-
    flaws-in-how-the-naval-academy-scrutinizes-
    instructors/2016/06/25/e70a1d22-3241-11e6-8ff7-
    7b6c1998b7a0_story.html?utm_term=.e9fcba36672b
6.  https://www.military.com/daily-news/2017/04/11/marine-officer-pleads-
    guilty-lying-sex-midshipmen.html
7.  https://www.military.com/daily-news/2017/05/03/midshipmen-and-
    cadets-testify-congress-sexual-assault.html

We also believe that a reviewing body would agree that the Academy's relevant policies (including, but not limited to, SECNAV INSTRUCTON 12752.1A) are unconstitutional as applied to Professor Fleming in violation of his First Amendment rights to Free Speech and Academic Freedom. The Academy's suspension of Professor Fleming from the classroom and its proposed removal of Professor Fleming from his employment were/are based on his constitutionally protected speech that is/was part of his academic freedom to choose his teaching methods. We previously outlined this issue in our 6 June 2018 correspondence to the Division Director. We have attached that correspondence as Exhibit 1 hereto. We have also attached, as Exhibit 2, a recent *amicus* brief filed by the AAUP on behalf of Professor Teresa Buchanan, a tenured professor at Louisiana State University ("LSU") in the appeal of the dismissal of her free speech and due process lawsuit against LSU. The AAUP emphasized in that brief the importance of faculty being able to use controversial language and ideas to challenge students in the classroom, and argued that Professor Buchanan's academic freedom was violated when LSU dismissed her for making statements in the classroom that the university (improperly) characterized as sexual harassment. As you will see – should you review the AAUP's submission – the pertinent facts in Professor Fleming's matter here are eerily similar to the pertinent facts in Professor Buchanan's matter and the Academy's actions here infringe upon Professor Fleming's free speech, due process and first amendment rights.

The Division Director stated in the Notice that he considered the *Douglas* factors in reaching his conclusion to propose Professor Fleming's termination. This is clearly not

Appx215

Bailey &
Ehrenberg

the case. As we noted in our prior correspondence to the Division Director, the factors that the Division Director should have *meaningfully* considered were:

- the nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

- the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

- the employee's past disciplinary record;

- the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

- the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's work ability to perform assigned duties;

- consistency of the penalty with those imposed upon other employees for the same or similar offenses;

- consistency of the penalty with any applicable agency table of penalties;

- the notoriety of the offense or its impact upon the reputation of the agency;

- the clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question;

- the potential for the employee's rehabilitation;

- mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and

- the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

We are confident that a reviewing body will conclude that – assuming the Academy's charges against Professor Fleming are sustainable (they are not) – the punishment of removal is not reasonable under the circumstances. Rather, we believe that the reviewing

Appx216

Butler &
Eisenberg

body would find that the punishment is grossly disproportionate to the alleged offense. This is especially so where, as here, the Academy already punished Professor Fleming for the same alleged wrongdoing/offense by removing him from the classroom for an entire semester (prior to even investigating the allegations levied against him). The suspension was more than an adequate punishment for the alleged wrongdoing. Indeed, many would argue that the suspension without prior investigation by a faculty panel was itself draconian and contrary to due process and free speech principles. The AAUP has recently cautioned colleges and universities from taking such actions under similar circumstances. See, for example, Exhibit 3 (AAUP Trinity Williams letter).

The grossly disproportionate nature of the penalty to the crime is not the only *Douglas* factor that weighs against removal. There are several other reasons why removal is an unfitting punishment. First, the "offense" was not made with malicious intent or for personal gain. Next, Professor Fleming has no (and should not have any) prior disciplinary record. The Division Director made repeated reference to (and mischaracterized) some statements and actions taken by Professor Fleming five or six years ago that formed the basis of the issuance of a prior Letter of Reprimand. The Division Director also made reference to a Letter of Reprimand recently issued to Professor Fleming. Those statements and actions should not have been part of the Division Director's consideration, as the Academy removed the prior Letter of Reprimand from Professor Fleming's file after two years and Professor Fleming has grieved/appealed the recent Letter of Reprimand (and that grievance/appeal is still pending).

There are other *Douglas* factors favoring a punishment other than removal, including but not limited to the following:

- Professor Fleming has a stellar work record, including a length of service of over thirty (30) years with no past disciplinary record;
- Professor Fleming's classroom conduct was not unauthorized or otherwise prohibited by any Academic legitimate policy; and
- the alleged offense was not notable and will not have any impact upon the reputation of the Academy.

Appx217

Bailey &
Ehrenberg

The Notice also makes evident that the Division Director ignored the bulk of findings in the investigative report upon which he was to base his removal decision. The investigative report lauded Professor Fleming's teaching effectiveness. The report found that "most students" enjoyed Professor Fleming's "energetic teaching style" and rated his overall effectiveness as excellent or good. The investigative report also noted that the vast majority of comments from Professor Fleming's students were "universally positive" and many students commented on his "positive attitude" and "meaningful discussions", as well as his focus on improving student writing. The report also found that, while a small subset of students disapproved of Professor Fleming's teaching techniques, Professor Fleming is an "effective" English teacher and the *Academy should defer to his professional judgment on how best to spend his time in class and how best to teach his students*. The investigative report also noted that all Academy faculty enjoy the right to academic freedom in the classroom. The Division Director made only fleeting reference to these findings and statements in the Notice, and he clearly gave them no weight in reaching his decision to recommend removal.

Finally, it is also clear that the Division Director failed to conduct any meaningful analysis of the application of SECNAV INSTRUCTON 12752.1A, and that (as previously noted) the instruction is unconstitutional as applied to Professor Fleming in this matter. The instruction directs that discipline under these circumstances should not be punitive and that disciplinary actions may only be taken for such cause as will promote the efficiency of the service. The removal of Professor Fleming from his employment at the Academy has absolutely no connection to efficacy of the service. Rather, it is a purely punitive measure taken by the Academy in an effort (1) to silence and punish Professor Fleming in retaliation for his prior exercise of his Free Speech rights, (2) to subvert his rights and set him up for termination *in circumvention of his tenure rights*.

Thank you in advance for your consideration of these matters.

Sincerely,

*//s// Jason H. Ehrenberg*

Jason H. Ehrenberg

Appx218



**DEPARTMENT OF THE NAVY**
**UNITED STATES NAVAL ACADEMY**
**121 BLAKE ROAD**
**ANNAPOLIS MARYLAND 21402-1300**

11 May 2018
HRO-18-DL-10

From:  Dr. Jason Shaffer, Department Chair
To:    Dr. Bruce Fleming, Professor

Subj:  LETTER OF REPRIMAND

Ref:   (a)  5 C.F.R. Part 752
       (b)  5 U.S. Code 552a the Privacy Act of 1974
       (c)  USNAINST 5211.3C (2015)
       (d)  SECNAVINST 5211.5E (2005)
       (e)  SECNAV INSTRUCTION 12752.1A, Disciplinary Actions, dtd 3 May 16
       (f)  SECNAV INSTRUCTION 12771.2, Department of Navy Administrative Grievance
            Procedure, dtd 30 JUL 10

1.  Per references (a)-(f), I am issuing you this Letter of Reprimand for unauthorized disclosure
or use of information or other protected materials.

2. The relevant facts are as follows:

On Friday, April 20, 2018 you sent a group email to the Faculty (listserv) in which you identify a
midshipman by name, and cite that individual's SAT scores and grades. The email was not
encrypted or marked to make it apparent that personally identifiable information (PII) was
included. In accordance to reference (b) the Privacy Act protects individuals from the
unauthorized disclosure of PII. PII refers to any information about an individual, including but
not limited to, education, financial transactions, medical history, criminal or employment history,
and information that can be used to distinguish or trace an individual's identity. In addition and
in accordance with references (c) and (d) it is USNA employees' responsibility to safeguard the
rights of others by adhering to the standards set forth in the Privacy Act of 1974. Per references
(c) and (d), this includes not disclosing any information contained in a system of record by any
means of communication to any person or agency, except as authorized and when protected
information is shared properly marking all documents containing data (e.g., letters, emails,
message traffic, etc.) as "FOR OFFICIAL USE ONLY – PRIVACY SENSITIVE – Any misuse
or unauthorized disclosure can result in both civil and criminal penalties."

3. In accordance with reference (e), the penalties for a first offense of unauthorized disclosure or
use of information or other protected material range from a reprimand to removal. In determining
the penalty to propose, I have considered the severity of the personally identifiable information

1

Appx274

Subj:   LETTER OF REPRIMAND

shared, any previous counseling on prior PII breaches, and your completion of relevant PII training on 22 September 2017. You started working for the Naval Academy in August 1987 and you have no prior instances of improperly disclosing PII materials on your official record. Therefore, I have determined that a Letter of Reprimand is an appropriate step in an attempt to immediately correct your behavior and promotes the efficiency of the Federal Service. In addition, you are required to take the Privacy and Personally Identifiable Information (PII) Awareness Training (DOD-PII-2.0) through NTMPS/Navy e-Learning (NeL) within 30 days of the issuing of this letter. Once you have completed the course, please provide me via email a copy of the completion certificate issued at the end of the course.

4. This Letter of Reprimand constitutes formal disciplinary action, and will be placed in your Official Personnel File (OPF) for a period of two (2) years from the date of receipt. Please be aware that continued misconduct on your part may result in a more severe penalty up to and including removal from the Federal Service, and that this letter may be used as a basis to support more severe disciplinary action.

5. In the event you are experiencing a medical or personal problem that is having an impact on your behavior, I urge you to seek counseling which is available to you through the Employee Assistance Program (EAP). This is a free and confidential service. You may schedule a confidential appointment by calling 1-844-366-2327.

6. In accordance with reference (f), you have the right to grieve this action. Your grievance must be submitted in writing within 15 calendar days from the date you receive this letter.

7. If you have any questions concerning the information provided in this letter, you may contact Alaina Kistler, Human Resources Specialist, at 410-293-2514.

Jason Shaffer
Department Chair, English

Please sign the receipt of acknowledgement below as evidence that you have received this letter. Your signature does not mean that you agree with the contents of the letter, nor by signing, are you forfeiting any of your rights cited above.

---

Acknowledgment of Receipt                                    Date

Delivered 5/22, signature refused.
2

Appx275

Inquiry panel members present:

- ☒ Keith Lindler
- ☒ Jeffrey Fitzgerald
- ☐ Richard McGrath
- ☒ Paige Ormiston (legal advisor)

Date: _4/9_
Time: _1315_
Location: _Mi-380_
Name: _Ballen_
Course: _SC111 Fall 2017_
Section: _2002_

Describe the general atmosphere in Dr. Fleming's class.

_different, loose/unstructured, open to discussion._

Have you sought EI from him, and if yes, what were the sessions like?

_once, short and brief, not substantive help - led (5 min) to believe on right track_

Did you have any other interactions with Dr. Fleming outside the classroom? _but got a D._
_no_

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how? _yes_

_openly talked about opposition to Academy._

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions? _yes_   _yes_

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions? _40-50%_  _sunscreen, condoms, son's girlfriend's prom date - dress to short_

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)? _obsessed w/ one student, "beautiful" "pretty boy" (at least once a week)._

Did you receive any emails from Dr. Fleming? Did the content include pictures? _to entire class w/ kids at pumpkin festival_

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why? _yes to both_
_forgetful_   _"people" - gender neutral_

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students? _no_

_Enclosure 62_

Appx375

Was profanity used in classroom or EI?  If yes, what?

~ *some*    ~ *hell, ass (don't remember.*
*additional)*

Was sexually suggestive language used?  If yes, what?

~ ~~not~~ *can't recall*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when
students corrected him when he got their names wrong? *never observed.*

Did Dr. Fleming touch students in class?  If yes, how?  *— sat next  to a student*
*and rub back  or pat back  (once/week)*
*— lasted 2-3 seconds*

Did you receive emails from Dr. Fleming with inappropriate language or images?

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make
disparaging remarks about the women and girls in those photos?  ~ *yes*

*— mother of girlfriend*
*flirting with him.*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*no*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If
yes, who and when?    ~ *not formally*
~ *mentioned in passing to*
*parents*

Is there anything else you would like to add?        *adjectives*
~~debt~~ *learned to write*        *self made*
*to his style but*        *hyper critical of*
*not in own voice*        *Academy was*
*(style + content)*        *discouraging*

These notes are an accurate recording of my statements.
~ *how to change the world*
*— criticized for being too*
*light*

*AB*
Initials

Appx376

Inquiry panel members present:

- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☐ Paige Ormiston (legal advisor)

Date: _19 MAR 2018_
Time: _1500_
Location: _MI-380_
Name: _MIDN 4/c BAYLESS_
Course: _HE 111_
Section: _2002_

Describe the general atmosphere in Dr. Fleming's class.

*Mainly him talking. Would encourage exercising*

Have you sought EI from him, and if yes, what were the sessions like?

*Yes, received constructive criticism*

Did you have any other interactions with Dr. Fleming outside the classroom?

*No*

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

*Yes, exercising and "off topic" discussions*

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

*Yes. ~15-30 minutes per week on USNA and other "Life EI"*

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

*Talked about family, sunscreen, who should be at USNA and what is wrong with USNA*

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

*Would single out for positive things (build, intelligence, etc.)*

Did you receive any emails from Dr. Fleming? Did the content include pictures?

*Yes, classwide emails*

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

*Yes, used mid sheeple to be gender neutral?*

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

*No*

*Enclosure 63*

97

Appx377

Was profanity used in classroom or EI?  If yes, what?

Yes, colorful language but not personally directed

Was sexually suggestive language used?  If yes, what?

Talked about trans gender and sex changes

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

Don't remember

Did Dr. Fleming touch students in class?  If yes, how?

No, other than swapping jackets (during class)

Did you receive emails from Dr. Fleming with inappropriate language or images?

No

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

Yes, showed son's homecoming date and said dress was too short.

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

No

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

No

Is there anything else you would like to add?

Narcissistic, Loud, opinionated, critically constructive, wierd.

These notes are an accurate recording of my statements.

Initials

Appx378

Inquiry panel members present:

- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☐ Paige Ormiston (legal advisor)

Date: _19 MAR 2018_
Time: _1450_
Location: _MI-380_
Name: _MIDN 4/C Buckley_
Course: _HE111_
Section: _2002_

**Describe the general atmosphere in Dr. Fleming's class.**

A little unorthodox. Good English class. Learned a lot.

**Have you sought EI from him, and if yes, what were the sessions like?**

Yes, pretty normal

**Did you have any other interactions with Dr. Fleming outside the classroom?**

No

**Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?**

Yes, it was different. More engaged, more personable. No bad intentions.

**Did Dr. Fleming cover the assigned material?  Did he cover other topics? Did he spend significant class time on "off topic" discussions?**

Related topics back to USNA. Made clear his opinions.

**If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?**

~20-25% "off topic"

For example, midshipmen relationships

**Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?**

Had favorites, but not based on specific things

**Did you receive any emails from Dr. Fleming?  Did the content include pictures?**

Yes, to entire class. Not inappropriate

**Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?**

Yes

**Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?**

Not to my recollection

Enclosure 64

Appx379

Was profanity used in classroom or EI?  If yes, what?

*Yes, common profanity words. Not directed at individuals*

Was sexually suggestive language used?  If yes, what?

*Yes, but did not bother me*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*No*

Did Dr. Fleming touch students in class?  If yes, how?

*Yes, pat on the back or casual hug (mostly with males)*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*Yes, a picture of son and prom date. Not a big deal.*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*No*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*No.*

Is there anything else you would like to add?

*Loud, opinionated, funny    Good guy, good teacher,*

*A little unorthodox.    a little outside the box*

These notes are an accurate recording of my statements.

Initials

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☑ Paige Ormiston (legal advisor)

Time: _At_ _1325_
Location: _MI-380_
Name: _MIDN 4/c CREED_
Course: _HE 111_
Section: _2001_

Describe the general atmosphere in Dr. Fleming's class.

*A lot of "Life Lessions." Can be negative towards USNA.*
*Not a lot of preparation required for class.*

Have you sought EI from him, and if yes, what were the sessions like?

*No*

Did you have any other interactions with Dr. Fleming outside the classroom?

*No*

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

Did Dr. Fleming cover the assigned material?  Did he cover other topics? Did he spend significant class time on "off topic" discussions?

*"Condom" and "sunscreen" talk*          *Some times cynical, but seems to have*
*"brushing and flossing" lesson*          *concern for Midshipmen*

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

*30-40% "off topic"*

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

*No*

Did you receive any emails from Dr. Fleming?  Did the content include pictures?

*Yes. Pictures of himself (fully clothed)*

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

*Yes. Short attention spans*

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?

*Talked about USNA was trying to get rid of him, but flaunted it.*
*Some times*
*No direct threats*

*Enclosure (05*

Appx381

Was profanity used in classroom or EI? If yes, what?

Yes. "F word" in general context, but not at an individual

Was sexually suggestive language used? If yes, what?

Yes. Innuendo about that "sucks"

Did Dr. Fleming mispronounce student names? Specifically asian names? How did he react when students corrected him when he got their names wrong?

Don't recall

Did Dr. Fleming touch students in class? If yes, how?

Hand on shoulders while taking pictures

Did you receive emails from Dr. Fleming with inappropriate language or images?

No

Did Dr. Fleming display pictures of his children and their dates in your class? If yes, did he make disparaging remarks about the women and girls in those photos?

Yes. Shown on phone of son's date. Talked about skimpy dress and girl's mom (talking about underage girl in inappropriate way)

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone? If yes, who and when?

No

Is there anything else you would like to add?

These notes are an accurate recording of my statements.



CGC

Initials

inquiry panel members present:

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☑ Paige Ormiston (legal advisor)

Time: 1345
Location: M1-380
Name: MIDN 4/c DE SANTIS
Course: HE 111
Section: 2001

Describe the general atmosphere in Dr. Fleming's class.

Pretty negative. Not conducive to developing future offices and leaders.

Have you sought EI from him, and if yes, what were the sessions like?    2 sessions

Yes. "Academic" chair and "Life" chair

Did you have any other interactions with Dr. Fleming outside the classroom?

Emails that were received

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

Academics was not a focus of the class.

Did Dr. Fleming cover the assigned material?  Did he cover other topics? Did he spend significant class time on "off topic" discussions?

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?    25% English. 75% other topics

75% came from the 25%

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?   Treated males and females differently. Made people uncomfortable. Did not spur productive discussion. Referred to transgender people as "crazy."

Did you receive any emails from Dr. Fleming?  Did the content include pictures?

Yes

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

Yes

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?

Spent a class period on legal battle with USNA. Would be negative consequences for students. Would put name out in media.

Enclosure 66

Appx383

Was profanity used in classroom or EI?  If yes, what?

Yes. Trying to be cool and intimidating. General usage, but not at individuals.

Was sexually suggestive language used?  If yes, what?

Yes. Discussed erotic fantasies and past affairs. Bragging behavior.

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

Yes. Done once or twice. Could be honest mistake.

Did Dr. Fleming touch students in class?  If yes, how?

Yes. Every other class. Personally touched about five times. Touches students during leader talks.

Did you receive emails from Dr. Fleming with inappropriate language or images?

Yes.

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

Talked about a 13 year old girl wanting to be "fucked" Yes. Showed on iphone.

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

Yes. Invasion of personal space.

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

Talked to Dad and friend. (Held off reporting due to possible academic reprisal).

Is there anything else you would like to add?

These notes are an accurate recording of my statements.

_initials_

Appx384

Inquiry panel members present:
- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☑ Paige Ormiston (legal advisor)

Date: 11 APRIL 2018
Time: 1300
Location: MI 380
Name: MIDN 4/c FREEH
Course: HE 111
Section: 2002

Describe the general atmosphere in Dr. Fleming's class.

Very tense. Students minded what they said. Not a lot of participation. A lot of criticism, even for correct answers

Have you sought EI from him, and if yes, what were the sessions like?

Once. For help with a paper. Felt like being judged because of NAPS background.

Did you have any other interactions with Dr. Fleming outside the classroom?

No

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

Absolutely. Would allow open questions on any subject if not a lot of students were prepared for class. Dr Fleming's views on the Naval Academy were often discussed.

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions? Yes, covered the material, but also often off-topic.

Did most of the talking early in the class period on subject material, then moved off.

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

~ 40 % of time off-topic

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

Treated all the same

Did you receive any emails from Dr. Fleming? Did the content include pictures?

No

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

Yes          ← Mids tend to go with the flow and follow

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

Talked about his issues with USNA in the past.

Enclosure 67

Was profanity used in classroom or EI?  If yes, what?

No

Was sexually suggestive language used?  If yes, what?

No

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

No

Did Dr. Fleming touch students in class?  If yes, how?

Would sometimes try on jackets with students

Did you receive emails from Dr. Fleming with inappropriate language or images?

No

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

Yes. Son and his prom date. Talked about girl's dress length (ask students' opinion of skirt length)

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

Yes, when Mids profile was up during EI

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

Is there anything else you would like to add?

Brunt, Narcissist, Charismatic

Worked for grade that he earned (C at 6 d 12 wks, B final grade)
Enjoyed the class.
Interesting look at USNA
Became a better writer

These notes are an accurate recording of my statements.

CMF
Initials

Inquiry panel members present:

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☐ Richard McGrath
☑ Paige Ormiston (legal advisor)

Date: _30 Mar_
Time: _1325_
Location: _MI 380_
Name: _Gore_
Course: _HE111_
Section: _2002_

Describe the general atmosphere in Dr. Fleming's class.

Overall positive, but talked about a lot of uncomfortable topics not on syllabus.
Some days only covered course material

Have you sought EI from him, and if yes, what were the sessions like?

Yes, went for paper help 3-4 times for re-writes, just went over papers, helpful

Did you have any other interactions with Dr. Fleming outside the classroom?

No.

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

Wanted to connect with us in our lives, but d

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

One play had sexual themes, but "life lessons" on topic went way past it. Felt uncomfortable
15-20%.  Covered all class material

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

Discussed oral + anal sex trying to give life lessons, but inappropriate to subject matter
⟶ if curious just do it not in response to question
No one questioned it. For Thanksgiving

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

Seemed fair

Did you receive any emails from Dr. Fleming? Did the content include pictures?

Group emails, nothing inappropriate

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

goldfish - bad short term memory > trying to joke, but it got old
midsteeple - gender neutral

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

Talked about case w/ other female mids
Academy trying to get him out

_Enclosure 68_

Appx387

Was profanity used in classroom or EI?  If yes, what?

*Don't think so, but hard to remember last semester*

Was sexually suggestive language used?  If yes, what?

*Yes, during sex discussions, more than once for oral/anal sex discussion (came up more than once)*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*Don't think so.*

Did Dr. Fleming touch students in class?  If yes, how?

*Don't think so, no.*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No.*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*Someone asked to see son's pic, pulled up photo, talked about how revealing the dress for the dance was very short.*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*No.*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*Discussed him being different w/ his company-mates, they said he's a good prof.*

Is there anything else you would like to add?

*Interesting guy, good at teaching English, very open.*

*Another classmate asked after holiday break if he could add a statement to a complaint.*

These notes are an accurate recording of my statements.

*BG*
Initials

Appx388

Inquiry panel members present:

- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☐ Paige Ormiston (legal advisor)

Date: _23 MAR 2018_
Time: _1570_
Location: _MI-380_
Name: _MIDN 4/c Khodr_
Course: _HE 111_
Section: _2002_

Describe the general atmosphere in Dr. Fleming's class.

_Narcissistic, Cared about Midn development, but also about own agenda_

Have you sought EI from him, and if yes, what were the sessions like?

_Yes. one session for about 5 minutes_

Did you have any other interactions with Dr. Fleming outside the classroom?

_No_

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

_A lot more vulgarity_
_Talked a lot of "life EI"_

Did Dr. Fleming cover the assigned material?  Did he cover other topics? Did he spend significant class time on "off topic" discussions?  _Covered syllabus     Nothing off topic beyond 5-10 minutes_

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?  _Would call some folks "huge" or "studs" when doing well_

Did you receive any emails from Dr. Fleming?  Did the content include pictures?

_No_

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

_Yes                          Not a big fan_

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?

_Mentioned prior SAPR case_

_Enclosure 69_

Appx389

Was profanity used in classroom or EI?  If yes, what?

*Yes, often, did not serve a purpose but was not particularly offensive*

Was sexually suggestive language used?  If yes, what?

*Yes, on a couple of occasions.  Called son's date's mother a MILF*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*No*

Did Dr. Fleming touch students in class?  If yes, how?

*Not if they didn't want to be.  Consentual hugs on occasion and handshakes*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*No*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*No*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

Is there anything else you would like to add?

*Narcissist*

*Wrote to instructor's standards to ~~see~~ do well*

*Chose to have Dr. Fleming in second semester*

These notes are an accurate recording of my statements.

_Initials

Inquiry panel members present:

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☐ Paige Ormiston (legal advisor)

Date: _23 MAR 2018_
Time: _1310_
Location: _MI-380_
Name: _MIDN 4/c KLUGER_
Course: _HE 111_
Section: _2002_

Describe the general atmosphere in Dr. Fleming's class.

_Open-ended, random, sporadic conversations_

Have you sought EI from him, and if yes, what were the sessions like?

_Yes. Twice. Discussed paper for ~10 min, then talked in general_

Did you have any other interactions with Dr. Fleming outside the classroom?

_No_

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

_Yes. Kept entertained          Grades harder than others._

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

_Spent more time on "off topic" discussions_

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

_~1/3 on readings, ~2/3 off topic_

_"Condom, sunblock, dental floss" talk (twice)  "Life EI"  Though academy has fallen off the tracks_

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

_Yes          No_

_Put on jacket and took pictures of Dr. Fleming_

Did you receive any emails from Dr. Fleming? Did the content include pictures?

_Yes. Random pictures sent to entire class_

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

_Yes      an attraction for people lookin in_

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

_Yes     Talked about two previous students that filed a complaint._

_No intimidation_

_Enclosure 70_

Appx391

Was profanity used in classroom or EI?  If yes, what?

Yes. Was vulgar at times. Speaking blunt, not sugar coated. Not directed at individuals. Not much of a filter.

Was sexually suggestive language used?  If yes, what?

No

Very egotistical, narcissistic. Brought up more than once

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

No

Did Dr. Fleming touch students in class?  If yes, how?

Yes. Would rub people's heads and put arms around people for pictures

Did you receive emails from Dr. Fleming with inappropriate language or images?

No. Sent some flexing emails to class

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

Yes. Son and dale at a dance. Talked about girl being cute and mom being "hot" and wanted him

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

No. Taken back by comments but not uncomfortable

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

No

Is there anything else you would like to add?

Wants people to know truth about USNA and wants MIDN to critically question things

Egotistical, prideful, direct, blunt

Did enjoy the class because it was not the "norm". Came up with some valid points about USNA and the Hall.

These notes are an accurate recording of my statements.

_____
Initials

MIK

Inquiry panel members present:
- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☐ Paige Ormiston (legal advisor)

Date: _23 MAR 2018_
Time: _1330_
Location: _MI-380_
Name: _MIDN 4/C MANOCK_
Course: _HE 111_
Section: _2002_

Describe the general atmosphere in Dr. Fleming's class.

Energetic ; look forward to going to class ; unorthodox

Have you sought EI from him, and if yes, what were the sessions like?

No

Did you have any other interactions with Dr. Fleming outside the classroom?

No

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

Yes. Doing exercises / push-ups to stay awake
Adapted class away from syllabus if students were not prepared

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

Wasn't aware of syllabus. Would have "Life EI" Very much a realist

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

~15 min per class off-topic

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

Yes. Asked about regular background info at beginning of semester

Did you receive any emails from Dr. Fleming? Did the content include pictures?

Yes. Random pictures (would look and move on)

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

Yes

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

He and USNA had prior friction. Students would ask.
Would assign his articles for reading

Enclosure 71

Appx393

Was profanity used in classroom or EI?  If yes, what?

*No*

Was sexually suggestive language used?  If yes, what?

*No, unless having a "Life EI" session*

Did Dr. Fleming mispronounce student names?  Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*No*

Did Dr. Fleming touch students in class?  If yes, how?

*Would choose a student to model jacket or other clothing*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*Does not recall pictures*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*No*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*No*

Is there anything else you would like to add?

*Unorthodox, progressive, a realist, out there*

*A lot of class is up to interpretation.  A good teacher, fun to learn from*

These notes are an accurate recording of my statements.

initials

Appx394

Inquiry panel members present:

☑ Keith Lindler
☐ Jeffrey Fitzgerald
☐ Richard McGrath
☑ Paige Ormiston (legal advisor)

Date: _30 Mar_
Time: _1410_
Location: _M1 380_
Name: _Morgan_
Course: _HE 111_
Section: _2002_

Describe the general atmosphere in Dr. Fleming's class.

_Open, able to be themselves, energetic + encouraged participation_

Have you sought EI from him, and if yes, what were the sessions like?

_No._

Did you have any other interactions with Dr. Fleming outside the classroom?

_No._

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

_Far more energetic, sought deeper meaning for why we do things_
_F. Had his own way of doing things, freely shared his own perspectives_

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions? _Covered material well + efficiently_
_Did cover life EI, how to be better people._

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions? _Doesn't remember specific life EI_
_40% off topic, often tied back in to class math_

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)? _Motivational — no single out_

Did you receive any emails from Dr. Fleming? Did the content include pictures?
_Yes - pics of him in blue rims, motivational pics + articles_

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?
_goldfish - joke, short attention span_
_midsheeple - gender neutral_

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students? _It came up, can't remember how._

_Enclosure 72_

Appx395

Was profanity used in classroom or EI?  If yes, what?

*Not that he recalled*

Was sexually suggestive language used?  If yes, what?

*Not recalled*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*Doesn't recall that happening*

Did Dr. Fleming touch students in class?  If yes, how?

*Corrections in how to tie a bow tie lesson*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No.*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*Brought up pic on cellphone, said girls dress was too short. He said he thought it was too short. Doesn't remember how it came up.*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*No.*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*Not entirely professional, pushups example to keep relaxed atmosphere, not as professional as other profs. Some elements Talked to his friends about odd goings on in class of coaching brought in too.*

Is there anything else you would like to add?

*excited, opinionated, open in sharing his opinions not quite as open to others' opinions, but didn't disparage them*

*F did a good job, first time student enjoyed English*

*Wasn't offended by F's critical opinions about USNA, good to hear other perspectives*

These notes are an accurate recording of my statements.  *→ would respond to student disagreement but didn't get personal, talked issues*

*Asked for, but didn't get Dr. F for second semester*

*No request from class to switch, last mi in other class*

⤻ Initials

Appx396

Inquiry panel members present:
- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☐ Richard McGrath
- ☑ Paige Ormiston (legal advisor)

Date: _30 Mar 18_
Time: _1310_
Location: _MI 380_
Name: _O'Neal_
Course: _HE III_
Section: _2002_

Describe the general atmosphere in Dr. Fleming's class.

*Relaxed, anecdotal stories*

Have you sought EI from him, and if yes, what were the sessions like?

*No EI*

Did you have any other interactions with Dr. Fleming outside the classroom?

*Just turning in late papers*

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

*More relaxed, exciting when people did pushups if sleepy*

Did Dr. Fleming cover the assigned material?  Did he cover other topics? Did he spend significant class time on "off topic" discussions?

*Always covered assigned materials, lots*
*- Use sunscreen + floss    - discussed problems w/ Academy training*

If yes, what did those off topic discussions cover?  What percentage of class time do you estimate he spent on those "off topic" discussions?

*30 -40% off topic*

Did he treat all students the same?  Was anyone singled out?  On what basis (race, gender, national origin, etc.)?

*Didn't treat any differently, called on people who didn't talk much.*

Did you receive any emails from Dr. Fleming?  Did the content include pictures?

*Yes, group emails to whole class*

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

*goldfish - short attention span*
*midsheeple - blind follow, think more*

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?

*Student asked about 2 girls complaint*

*Enclosure 73*

Appx397

Was profanity used in classroom or EI?  If yes, what?

*No, discourage*

Was sexually suggestive language used?  If yes, what?

*Some book stories had it, nothing personal during leave → see condoms*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*No*

Did Dr. Fleming touch students in class?  If yes, how?

*touch by shoulder to move them*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No.*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*Comment that his son's date and her mom wore skirts for prom that were shorter than would have been OK when F. was in high school. He wasn't offended*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*No*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*No.*

Is there anything else you would like to add?

*Intelligent, pompous, opinionated, focused, tall*

*Best English teacher he's had, never slept. But full of himself.*

These notes are an accurate recording of my statements.

Initials

Inquiry panel members present:

- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☑ Paige Ormiston (legal advisor)

Date: _20 APRIL 2018_
Time: _1336_
Location: _MI 380_
Name: _MIDN 4/c Paramore_
Course: _HE 111_
Section: _2002_

Describe the general atmosphere in Dr. Fleming's class.

_Very interesting and entertaining (The opposite of boring)_

Have you sought EI from him, and if yes, what were the sessions like?

_No_

Did you have any other interactions with Dr. Fleming outside the classroom?

_No_

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

_Always a discussion. Never boring. The whole class would interact. Always involved. No one was sleeping._

Did Dr. Fleming cover the assigned material?  Did he cover other topics? Did he spend significant class time on "off topic" discussions?  _Moved off-topic once class material was done. Wasn't unproductive_

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?  _Sometimes had political discussions. Students were willing to challenge instructor._

_~ 1/3 of time off-topic_

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

_Yes._

Did you receive any emails from Dr. Fleming?  Did the content include pictures?

_Yes, to entire section_

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

_Yes     short attention span →    ← USNA acts to put down Plebes_

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?

_Not students, but talked about how USNA made complaints against him for his articles. (Discussion was initiated by the students)_

Appx399

Was profanity used in classroom or EI? If yes, what?

Yes, like "Goddamn it, you didn't read..." — Used to get attention; not out of anger; nor directed at anyone personally

Was sexually suggestive language used? If yes, what?

Yes. During "Life Lessons with Fleming" about safe sex. Talked about condom use and Plan B

Did Dr. Fleming mispronounce student names? Specifically asian names? How did he react when students corrected him when he got their names wrong?

Don't recall

Did Dr. Fleming touch students in class? If yes, how?

Yes. Would allow students to wear his jacket. Would sometimes hug students after class or pat on shoulder. Kluger and Buckley would often try on jacket (like a game for students to wake up for class.)

Did you receive emails from Dr. Fleming with inappropriate language or images?

No

Did Dr. Fleming display pictures of his children and their dates in your class? If yes, did he make disparaging remarks about the women and girls in those photos?

Yes. Showed picture of son & prom date and commented on girl's dress. Got the impression that he considered the girl "slutty."

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

No — DeSantis wanted to try on jacket.

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone? If yes, who and when?

Condom talk was not appropriate for an English class but did not seem like a major issue

Is there anything else you would like to add?

Interesting, entertaining, cared about student learning. Hard-headed, strong-willed (can't change his beliefs) Hated (by some Mids).

Liked him more after reading articles. Warned students against becoming cynical.

He would challenge Mids if they thought they were better than other Commissioning Sources.

These notes are an accurate recording of my statements.

M.P.
Initials

Appx400

Inquiry panel members present:
- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☑ Paige Ormiston (legal advisor)

Date: 11 April 2018
Time: 1320
Location: MI- 380
Name: MIDN 4/C PEREZ
Course: HE 111
Section: 2002

Describe the general atmosphere in Dr. Fleming's class.

Very open. No limits on what was talked about. Receptive to student comments.

Have you sought EI from him, and if yes, what were the sessions like?

No

Did you have any other interactions with Dr. Fleming outside the classroom?

No

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

Yes. Very open discussions. Jokester Fridays (could sometimes get inappropriate) And sex came up in a joke & Dr Fleming said if you're going to joke about it you might as well do it.

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

~ 10 minutes each period off topic

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

All treated the same

Did you receive any emails from Dr. Fleming? Did the content include pictures?

Yes, pictures to whole class, sometimes of him flexing

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

Yes    due to short attention span

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

Yes, talked about a previous student complaint. In answer to a student question

Appx401

Was profanity used in classroom or EI?  If yes, what?

*Yes, a lot. F-words used by Dr. Fleming to emphasize a point. Not directed at anyone*

Was sexually suggestive language used?  If yes, what?

*Yes, talked about anal sex and blow jobs*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*No*

Did Dr. Fleming touch students in class?  If yes, how?

*No*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*Yes. Son and his date. Talked about date's dress length. Topic came up unsolicited.*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*Yes, sexual related jokes made uncomfortable*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*No. Talked about it with fellow students.*

Is there anything else you would like to add?

*Very smart, too open, no filter*

*Don't take class if easily offended.*

These notes are an accurate recording of my statements.

*Upp*
Initials

☒ Keith Lindler
☒ Jeffrey Fitzgerald
☐ Richard McGrath
☐ Paige Ormiston (legal advisor)

Time: _____
Location: _____ MI-380
Name: _MIDN 4/c RANSDELL_
Course: _HE 111_
Section: _____ 2002

Describe the general atmosphere in Dr. Fleming's class.

laid back. more life lessons, less English

Have you sought EI from him, and if yes, what were the sessions like?

Did you have any other interactions with Dr. Fleming outside the classroom?

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

yes, eclectic, teacher tried to engage student make different

Did Dr. Fleming cover the assigned material?  Did he cover other topics? Did he spend significant class time on "off topic" discussions?

yes, sunscreen, exercise, brush and floss, use condoms
70% off topic

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

"life lessons"

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

no

Did you receive any emails from Dr. Fleming?  Did the content include pictures?

yes, vacations with family, Lederhosen

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

both - his role to make mids think

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?

Academy not liked him, had a good lawyer

Enclosure 76

123

Appx403

Was profanity used in classroom or EI? If yes, what? *yes, hell, shit, bitch never at a person*

Was sexually suggestive language used? If yes, what?
*joke Friday - sadist and messochist*

Did Dr. Fleming mispronounce student names? Specifically asian names? How did he react when students corrected him when he got their names wrong?
*never observed*

Did Dr. Fleming touch students in class? If yes, how?
*none*

Did you receive emails from Dr. Fleming with inappropriate language or images?
*never*

Did Dr. Fleming display pictures of his children and their dates in your class? If yes, did he make disparaging remarks about the women and girls in those photos? *yes*
*yes, appalled by outfits, high heels, "slutty" mother like daughter*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?
*never*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone? If yes, who and when?        *never*
*unorthodox        more frequent occasionally "practicalities of sex"*

Is there anything else you would like to add?
*adjectives: opinionated, smart, arrogant cares about students/mids — somewhat improved writing*

These notes are an accurate recording of my statements.

*JAC*
·itials

Inquiry panel members present:

- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☐ Paige Ormiston (legal advisor)

Date: _19 MAR 2018_
Time: _MF 1340_
Location: _MI-380_
Name: _MIDN 4/C RAYBOURN_
Course: _HE111_
Section: _2007_

**Describe the general atmosphere in Dr. Fleming's class.**

A good class overall. Focus could be more on topic. Taught life lessons as well as English.

**Have you sought EI from him, and if yes, what were the sessions like?**

Yes. "Writing chair" and "Life chair" choice. Was a straight-shooter

**Did you have any other interactions with Dr. Fleming outside the classroom?**

Email

**Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?**

A fun class. Some wasting time.

**Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?**

Covered material, yes. ~15 min per class off topic, but would often segway to class topics

**If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?**

**Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?**

Treated all equally

**Did you receive any emails from Dr. Fleming? Did the content include pictures?**

Yes. Quirky but fun pictures

**Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?**

Yes

**Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?**

No

Enclosure 77

125

Appx405

Was profanity used in classroom or EI? If yes, what?

*Occasionally used to make a larger point*

Was sexually suggestive language used? If yes, what?

*Yes, but often related to class material*

Did Dr. Fleming mispronounce student names? Specifically asian names? How did he react when students corrected him when he got their names wrong?

*No*

Did Dr. Fleming touch students in class? If yes, how?

*Yes, in a ~~firstly~~ friendly way*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class? If yes, did he make disparaging remarks about the women and girls in those photos?

*Don't recall photos, but did tell story of son's date*
*may have been an iPhone*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*Brought up gender identity to prompt discussion*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone? If yes, who and when?

*No*

Is there anything else you would like to add?

*— Might look strange, but opened class for discussion*

*— Very bright smart and arrogant*

*— Wanted to get back into section this semester*

These notes are an accurate recording of my statements.

*ZMK*

.nitials

Inquiry panel members present:

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☑ Paige Ormiston (legal advisor)

Date: _26 MAR 2018_
Time: _1430_
Location: _MI-380_
Name: _MIDN 4/c Richardson_
Course: _HE111_
Section: _2002_

Describe the general atmosphere in Dr. Fleming's class.

Different than most other classes.
Casual. Open for discussion. Not a lot of formalities. Relaxed

Have you sought EI from him, and if yes, what were the sessions like?

Yes, for about 3 papers. Can improve grade on a paper with EI. Offered "Life EI" advice too. Found it helpful.

Did you have any other interactions with Dr. Fleming outside the classroom?

No

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

Yes. A lot more relaxed. Less of a division between professor and students.
Some students were reluctant to express conflicting views.
Had a conflicting discussion on transgender issues.

Did Dr. Fleming cover the assigned material?  Did he cover other topics? Did he spend significant class time on "off topic" discussions?

Mostly focused on readings. Did open topics for last 10-15 min of class
Mostly on topic

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

Enjoyed the different perspective on USNA. Helped to think critically.

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

Had some favorites. Would call the boys "studs".
Did not single out based on race, national origin

Did you receive any emails from Dr. Fleming?  Did the content include pictures?

Yes. Sent pictures of outfits, random emojis (to entire class)

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

Yes

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?

Made reference but did not go into depth. People make complaints about him based on assumptions.

Appx407

Was profanity used in classroom or EI?  If yes, what?

Did not notice

Was sexually suggestive language used?  If yes, what?

Some students told inappropriate jokes on "Joke Friday"

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

Don't recall

Did Dr. Fleming touch students in class?  If yes, how?

Shook hands.  Gave a friend a hug (indicated it was a little uncomfortable)

Did you receive emails from Dr. Fleming with inappropriate language or images?

No

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

No pictures, but told story of son's date's short dress. Felt a little sexist.

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

Once as it related to gender discussion

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

No. Discussed with Mom. Didn't think Dr. Fleming went over a line.

Is there anything else you would like to add?

Crazy, confident, strong in beliefs, closed-minded

Pretty good teacher. Feel I became a better writer.

These notes are an accurate recording of my statements.

AHR
_____
Initials

Inquiry panel members present:
- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☑ Paige Ormiston (legal advisor)

Date: _06 APRIL 2018_
Time: _~~M 380~~ 1415_
Location: _M380_
Name: _MIDN 4/c SWIFT_
Course: _HE 111_
Section: _2002_

**Describe the general atmosphere in Dr. Fleming's class.**

_A little more relaxed_

**Have you sought EI from him, and if yes, what were the sessions like?**

_Yes. Difficult grader but gave sound advice. Had 5 or 6 sessions._

**Did you have any other interactions with Dr. Fleming outside the classroom?**

_No_

**Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?**

_Yes. Teaching style and presentation is different. A little politically incorrect, but that was good to promote discussion._

**Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?**

_Yes, covered the material. Would stray from material when not enough students did the reading. Had "life EI" about USNA, which sometimes turned into a rant_

**If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?**

_~20% off-topic_

**Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?**

_Didn't single out, but had some favorites_

_About five students participated in class regularly, others were more reserved_

**Did you receive any emails from Dr. Fleming? Did the content include pictures?**

**Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?**

_Yes_     _Did not take offense_

**Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?**

_No_

_Enclosure 79_

Appx409

Was profanity used in classroom or EI?  If yes, what?

*Yes. Used a lot of different swear words frequently. Colorful; but not in anger*

Was sexually suggestive language used?  If yes, what?

*Yes. General advice about condom use, for example*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*Don't recall*

Did Dr. Fleming touch students in class?  If yes, how?

*No, beyond tying some bow ties*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*Don't recall*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*A little. Some material was bizarre for an English class.*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*Did not find inappropriate or unprofessional*

Is there anything else you would like to add?

*Dissenting, Alpha male (needs to dominate)*

*Felt compelled to write content that he would agree with.*

*Difficult but good teacher. Well prepared for HE 112*

These notes are an accurate recording of my statements.

Initials

Many panel members present:

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☑ Paige Ormiston (legal advisor)

Time: 1245
Location: MI-380
Name: MIDN 4/C Ethan Wheeler
Course: HE 111
Section: 2002

Describe the general atmosphere in Dr. Fleming's class.

Fairly light-hearted. Active, to keep energy in room.

Have you sought EI from him, and if yes, what were the sessions like?

No

Did you have any other interactions with Dr. Fleming outside the classroom?

No

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

Different interactions
Different content (topics & opinion brought in)

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

"Life EI" every couple of days. Did hit everything in syllabus, but approx 50% in out-of-class topics

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

~ 50%

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

Called "right-wing extremist"

Did you receive any emails from Dr. Fleming? Did the content include pictures?

Yes.

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

Yes. Brief attention span and blind following tendencies

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

Mentioned complaints made against him. Did not feel intimidated.

Enclosure 80

Appx411

Wheeler

Was profanity used in classroom or EI?  If yes, what?

Yes. Used many profanity words. (at least once per class period)

Was sexually suggestive language used?  If yes, what?

Yes. Talked about transgender issues and other sexual topics.

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

Don't know

Did Dr. Fleming touch students in class?  If yes, how?

Yes. Would rub heads and backs (mostly with males, trying to be friendly?, about once per class)

Did you receive emails from Dr. Fleming with inappropriate language or images?

Yes.

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

Yes. Picture of son at dance with date (short skirt). Talked about girl's mother, implying promiscuity based on manner of dress. "Slut" (maybe)

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

Personally, no (but thought actions were odd)

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

No. Showed email to company-mates.

Is there anything else you would like to add?

These notes are an accurate recording of my statements.

EbW

nitials

Appx412

2/14/2018                                          Midshipmen - Query Photos :

**Ac Yr Ending: 2018 Semester: FALL Block Number: 1**
**Course: HE111 Section: 3001**



Records 1 to 20 of 20

ReQuery

| Help | Return | MIDS Home | Academic Center | Academic Dean |
| Commandant's Staff | Department Chair | Faculty | General Academics | Logistics |
| Mid Personnel Office | Midshipmen | Physical Education | ProDev | Registrar |
| LOG OFF |

Appx413

Inquiry panel members present:
- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☐ Paige Ormiston (legal advisor)

Date: _23 MAR 2018_
Time: _1340_
Location: _MI-380_
Name: _MIDN 4/C AUGE_
Course: _HE 111_
Section: _3001_

Describe the general atmosphere in Dr. Fleming's class.

*Pretty lively ; Some material was inappropriate and made students uncomfortable*

Have you sought EI from him, and if yes, what were the sessions like?

*No*

Did you have any other interactions with Dr. Fleming outside the classroom?

*No*

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

*Odd in some ways. Did pushups in middle of floor.*

Did Dr. Fleming cover the assigned material?  Did he cover other topics?  Did he spend significant class time on "off topic" discussions?

*A lot of normal course work but also a lot of off topic material.*

*Would talk about sex and condoms. Would talk about affairs that he had.*

If yes, what did those off topic discussions cover?  What percentage of class time do you estimate he spent on those "off topic" discussions?

*~15% off-topic*

*Topics were not related to reading*

Did he treat all students the same?  Was anyone singled out?  On what basis (race, gender, national origin, etc.)?

*No one singled out (unless asleep)*

Did you receive any emails from Dr. Fleming?  Did the content include pictures?

*Yes (to whole class). Family pictures*

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

*Yes        Short attention span*

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?

*No*

*Enclosure 81*

Appx414

Was profanity used in classroom or EI?  If yes, what?

*Can't recall*

Was sexually suggestive language used?  If yes, what?

*Yes. Called computers porn machines. Talked about gay porn*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*No*

Did Dr. Fleming touch students in class?  If yes, how?

*Don't Know*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*No (have heard about this) though*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*Made comment about shooting self in head shortly after MIDN Jiminez' suicide Was called out by a student.*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*No. But talked to upperclassmen and family members*

Is there anything else you would like to add?

*Intelligent, Knows a lot*

*Arrogant, self-absorbed, inappropriate*

*Learned about organizing*

*Was confusing when teaching: used "flex" "Bill the Goat" when talking about writing standards*

These notes are an accurate recording of my statements.

*Initials*

Inquiry panel members present:

- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☑ Paige Ormiston (legal advisor)

Date: 06 APRIL 2018
Time: 1300
Location: MI-380
Name: MIDN 4/c BROPHY
Course: HE III
Section: 3001

Describe the general atmosphere in Dr. Fleming's class.

*Laid back, no attention on deck*

Have you sought EI from him, and if yes, what were the sessions like?

*Asked for help on a paper but never went to an EI session*

Did you have any other interactions with Dr. Fleming outside the classroom?

*No*

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

*Yes. Only teacher who would speak out about what he didn't like about USNA. Was very open on many topics – including sexuality and his personal relationships. Distaste for varsity athletes.*

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

*A lot of time off topic, but felt I learned a lot and became a better writer.*

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

*~35-40% off topic*

*Talked about some personal affairs*

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

*~~Yes~~*

Did you receive any emails from Dr. Fleming? Did the content include pictures?

*Yes*

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

*Yes    Can't remember things )    ← follow the system*

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

*No*

*Enclosure 82*

Appx416

Was profanity used in classroom or EI?  If yes, what?

*Yes. An array of curse words*

Was sexually suggestive language used?  If yes, what?

*Not that I can remember*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*In a joking manner sometimes, but not maliciously*

Did Dr. Fleming touch students in class?  If yes, how?

*Would swap suit jacket and sometimes help tie bow ties*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*No*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*Felt put down as a Midshipman*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*No. Talked to parents*
*Solicited by classmate to join a complaint, but chose not to*

Is there anything else you would like to add?

*Exhuberant, Different*

These notes are an accurate recording of my statements.

*RTB*

nitials

Appx417

Inquiry panel members present:

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☑ Paige Ormiston (legal advisor)

Date: 6 APRIL 2018
Time: 1320
Location: MI 380
Name: MIDN 4/c BURNETT
Course: HE111
Section: 3001

Describe the general atmosphere in Dr. Fleming's class.

Very laid back, looked forward to going to class at beginning of year
Questioned some statements that were made in class

Have you sought EI from him, and if yes, what were the sessions like?

No

Did you have any other interactions with Dr. Fleming outside the classroom?

Just in passing on the yard

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

Yes. Could ask any questions about "life" in the last
5-10 minutes of class

Did Dr. Fleming cover the assigned material?  Did he cover other topics? Did he spend significant class time on "off topic" discussions?

Yes, covered material but was often off-topic:
How much money he and his wife makes, safe sex, his son doing drugs

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

~35% off-topic

Students were not comfortable cutting off some discussion topics

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

Yes

Did you receive any emails from Dr. Fleming?  Did the content include pictures?

Yes to entire class

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

Yes                    (not offended)

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?

Mentioned some of his articles that people didn't like

Enclosure 83

Was profanity used in classroom or EI?  If yes, what?

*Yes, but not often.  Colorful but not in anger*

Was sexually suggestive language used?  If yes, what?

*Yes, talked about blow jobs    Rarely tied to readings*

Did Dr. Fleming mispronounce student names?  Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*No*

Did Dr. Fleming touch students in class?  If yes, how?

*No, maybe a touch on shoulder or hug, but not inappropriate*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*No*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*Sometimes during sexual discussions*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*No. Did not find actions inappropriate*
*Trying to give students best advice*

Is there anything else you would like to add?

*Funny, character, positive, happy*
*loved coming to class*
*Tough grading helped to improve writing through comments on papers*

These notes are an accurate recording of my statements.

*ITB*
initials

Appx419

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☐ Paige Ormiston (legal advisor)

Time: 1250
Location: MI-380
Name: MIDN 4/c COFER
Course: HE III
Section: 3001
(Section Leader)

escribe the general atmosphere in Dr. Fleming's class.

High energy. Loud and outgoing.

Have you sought EI from him, and if yes, what were the sessions like?

No. Sometimes would stay after class in groups

Did you have any other interactions with Dr. Fleming outside the classroom?

Email. Personal in context of section leader duties.

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

Yes. Wore different attire which got class engaged.
Wore a dress, Bermuda shorts, did bow tie EI

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

Some times would cover syllabus. Would do a "personal day" if not enough students did the reading. Gave "Fleming Life Lessons." Pushed students in their writing

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

~50% of time "off topic"

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

Would make comments about athletes being at USNA

Did you receive any emails from Dr. Fleming? Did the content include pictures?

Yes

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

Yes          gender neutral joke

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

Yes, people have been trying to get him fired for a long time.

No challenge or intimidation about reporting

Exhibit 64

Appx420

Was profanity used in classroom or EI?  If yes, what?

*Yes. Cussed a lot to keep students engaged and be relatable*

Was sexually suggestive language used?  If yes, what?

*Used on "Joke Friday"    Gave a condom story*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*No*

Did Dr. Fleming touch students in class?  If yes, how?

*No*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*No*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*No*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*No*

Is there anything else you would like to add?

*A lot, over the top*

*Very good at teaching, but very opinionated.*
*Truthful*

These notes are an accurate recording of my statements.

Initials

Appx421

Inquiry panel members present:
- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☐ Paige Ormiston (legal advisor)

Date: _16 May 2018_
Time: _1045_
Location: _MI-380_
Name: _Cowling_
Course: _HE 111_
Section: _3001_

Describe the general atmosphere in Dr. Fleming's class.

_Pretty relaxed. Joked around a lot. Talked about English for last 10-15 minutes._

Have you sought EI from him, and if yes, what were the sessions like?

_One time. Talked about a paper. Had a good conversation._

Did you have any other interactions with Dr. Fleming outside the classroom?

_Shook hands at a football game_

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

_Dr Fleming Said what he wanted. Not "politically correct"_

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

_Did cover the material. Talked about Fleming's clothes at beginning of periods. Had a lesson on bow-ties. Made an inappropriate comment shortly after a Midis suicide (went too far)_

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

_~ 60% off topic_

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

_Yes, but had some favorite students, perhaps based on writing ability_

Did you receive any emails from Dr. Fleming? Did the content include pictures?

_Yes. Family pictures_

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

_Yes_

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

_Did mention complaints. Did not mention consequences._

_Enclosure 85_

Appx422

Was profanity used in classroom or EI? If yes, what?

*Yes. F-word. Not directed toward individuals. Used for emphasis, not anger*

Was sexually suggestive language used? If yes, what?

*Yes. Used penis and dick.*

Did Dr. Fleming mispronounce student names? Specifically asian names? How did he react when students corrected him when he got their names wrong?

*Don't recall*

Did Dr. Fleming touch students in class? If yes, how?

*Put arm around students during pictures.*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class? If yes, did he make disparaging remarks about the women and girls in those photos?

*Don't recall*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone? If yes, who and when?

*Discussed suicide comment with a friend.*

Is there anything else you would like to add?

*Fleming had good intentions with his life lessons.*

*Good intentions but goes about it the wrong way.*

*Had some good points about USNA. Hard grader, but became a better writer*

These notes are an accurate recording of my statements.

*WEZ*
Initials

Appx423

Inquiry panel members present:

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☐ Paige Ormiston (legal advisor)

Date: _26 MAR 2018_
Time: _1305_
Location: _MI-380_
Name: _MION 4/c Donaldson_
Course: _HE III_
Section: _3001_

Describe the general atmosphere in Dr. Fleming's class.

_Made it known that he was boss (not necessarily a bad thing)_

Have you sought EI from him, and if yes, what were the sessions like?

_Once, at beginning of year. Was passimate about English, but also agressive._

Did you have any other interactions with Dr. Fleming outside the classroom?   _Did not go back._

_No_

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

_Same: was always willing to help and do EI_
_Had "Love/Hate" relationship with Mids and USNA_

Did Dr. Fleming cover the assigned material?  Did he cover other topics? Did he spend significant class time on "off topic" discussions?     _~5-15 minutes on out fit_

_Did cover material_
_Would correct students in harsh & negative ways._

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?   _Talked a lot about problems with USNA_

_~30% of time off-topic_

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?   _Singled people out, but not on race, gender, etc._

Did you receive any emails from Dr. Fleming?  Did the content include pictures?

_Yes. Approx. twice per week to whole class (family and work out pictures)_

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

_Yes, almost every day_           _Laughed at it, but could see some_

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?    _relevance_

_Yes, talked about one prior case_

_Enclosure 86_

Appx424

Was profanity used in classroom or EI?  If yes, what?

*Did not like or use profanity*

Was sexually suggestive language used?  If yes, what?

*Talked a lot about gender and sex in general (made students uncomfortable)*

Did Dr. Fleming mispronounce student names?  Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*No*

Did Dr. Fleming touch students in class?  If yes, how?

*Was very interactive.  Had a student walk on back.  Tried on jackets with students.*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*Sent some shirtless email, but did not find particularly inappropriate*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*Talked a lot about son's "drama". Showed photos of date, but was not disparaging.*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*Yes*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*No. Discussed with family and friends.*

Is there anything else you would like to add?

*Dominant, out going, wordy*

*Classes were often fun and interesting. Uncomfortable and unprofessional a minority of the time.*

*Has grown as a writer, but was a wierd process*

These notes are an accurate recording of my statements.

Initials

Appx425

Inquiry panel members present:
- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☐ Paige Ormiston (legal advisor)

Date: _23 MAR 2018_
Time: _1355_
Location: _MI-380_
Name: _MIDN 4/c GREER_
Course: _HE 111_
Section: _3001_

Describe the general atmosphere in Dr. Fleming's class.

_Different than typical English class_

Have you sought EI from him, and if yes, what were the sessions like?

_Once. Wasn't very helpful_

Did you have any other interactions with Dr. Fleming outside the classroom?

_No_

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

_Did not look forward to class. A lot of distractions. Felt nervous to talk in class. Wasn't learning a lot_

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions? _Yes, covered all material and assignments_

_Gave a lot of "life lessons." Talked about condoms and wardrobe_

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions? _~ 1/2 time off-topic_

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

_Singled out one Midshipman_

Did you receive any emails from Dr. Fleming? Did the content include pictures?

_Yes (to whole section)_

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

_Yes_

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

_Don't remember_

_Enclosure (87)_

Appx426

Was profanity used in classroom or EI?  If yes, what?

Don't remember

Was sexually suggestive language used?  If yes, what?

Talked about condoms and oral sex in regard to "that sucks"

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

Don't remember

Did Dr. Fleming touch students in class?  If yes, how?

Occasional pat on back or hand on shoulder

Did you receive emails from Dr. Fleming with inappropriate language or images?

No

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

Don't remember

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

EI was uncomfortable   (told was "dumb")   Helped with grammatical errors

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

No

Is there anything else you would like to add?

Talkative, intelligent, abrasive

These notes are an accurate recording of my statements.

JBG

Initials

Inquiry panel members present:

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☐ Paige Ormiston (legal advisor)

Date: _23 MAR 2018_
Time: _1430_
Location: _MI-380_
Name: _MIDN 4/c HoBBS_
Course: _HEIII_
Section: _3001_

Describe the general atmosphere in Dr. Fleming's class.

Unique, open to allowing discussion
Nice environment.    Requested Dr. Fleming again.

Have you sought EI from him, and if yes, what were the sessions like?

Yes, two sessions.  Very helpful.  Got a lot of helpful advice.

Did you have any other interactions with Dr. Fleming outside the classroom?

No

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

Yes   Current English class is much more "led" than "guided"

Did Dr. Fleming cover the assigned material?  Did he cover other topics?  Did he spend significant class time on "off topic" discussions?    Yes           Yes           Yes

Conversation was beneficial, whether on-topic or off-topic
" Condom, sunscreen, dental floss " lesson.  Saw his role as more than just a teacher,

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?    less than 1/3     but also
a mentor

Did he treat all students the same?  Was anyone singled out?  On what basis (race, gender, national origin, etc.)?

Did you receive any emails from Dr. Fleming?  Did the content include pictures?

Yes, frequently.  Has several pictures with Dr. Fleming

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

Yes                          Was not malicious

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?

No

Enclosure 88

Appx428

Was profanity used in classroom or EI? If yes, what?

*Yes, a lot of profanity by instructor and students*

Was sexually suggestive language used? If yes, what?

*Used mostly in context of course material*

Did Dr. Fleming mispronounce student names? Specifically asian names? How did he react when students corrected him when he got their names wrong?

*Not on purpose*

Did Dr. Fleming touch students in class? If yes, how?

*Yes, when taking pictures. Sometimes rubbed shoulders*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No. Bicep picture was wierd but not inappropriate*

Did Dr. Fleming display pictures of his children and their dates in your class? If yes, did he make disparaging remarks about the women and girls in those photos?

*Yes showed pictures. No disparaging remarks*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*No*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone? If yes, who and when?

Is there anything else you would like to add?

*Caring, quirky, unique, provocative, Challenging*

*Good mentor          Very genuine   Would give it straight*

These notes are an accurate recording of my statements.

nitials

inquiry panel members present.
☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☑ Paige Ormiston (legal advisor)

Time: _1430_
Location: _MI-380_
Name: _MIDN 4/c RICHARD JIN_
Course: _HE111_
Section: _3001_

Describe the general atmosphere in Dr. Fleming's class.

Tried to get students engaged. Responded to certain students positively and others negatively.

Have you sought EI from him, and if yes, what were the sessions like?

Asked twice for EI, but could not schedule it and stopped asking.

Did you have any other interactions with Dr. Fleming outside the classroom?

No

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

Most classes have a very professional atmosphere, but much less so with Dr Fleming.

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

He did cover material, but talked about a lot of other things not directly related to English. Gave a lot of "Life EI"

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?    25-30% "off topic"

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?    ~~Yes~~   Seemed to have students he liked and did not like.
No.    Told off in front of rest of class.

Did you receive any emails from Dr. Fleming? Did the content include pictures?

No (beyond class emails)

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

Yes "midsheeple" and "goldfish" due to short memories and herd mentality

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

No threats about retribution.

Enclosure 89

Appx430

Jin

Was profanity used in classroom or EI?  If yes, what?

*Used multiple times in classroom. Two or three times directed personally.*

Was sexually suggestive language used?  If yes, what?

*Yes. Used sexual innuendo often.*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*Yes. Hard to tell if it was done on purpose, but felt it was directed intentionally at MION Jin*

Did Dr. Fleming touch students in class?  If yes, how?

*No*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*No*

'as Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*Yes, mainly with last name incident.*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*No. Talked to roommates and company mates. Advice was to grind through and deal with it.*

Is there anything else you would like to add?

These notes are an accurate recording of my statements.

RJ

.itials

Appx431

Inquiry panel members present:

- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☐ Paige Ormiston (legal advisor)

Date: _19 MAR 2018_
Time: _1440_
Location: _MI· 380_
Name: _4/c Kilic_
Course: _HE III_
Section: _3001_

**Describe the general atmosphere in Dr. Fleming's class.**

Energetic and engaging

**Have you sought EI from him, and if yes, what were the sessions like?**

Yes, 1 session in "writing chair"; very professional

**Did you have any other interactions with Dr. Fleming outside the classroom?**

Got a flexing email. Very awkward.

**Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?**

Yes, because of subject material.

**Did Dr. Fleming cover the assigned material?  Did he cover other topics? Did he spend significant class time on "off topic" discussions?**

Yes, in addition to "life lesson EI"

**If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?**

~20 min in one class per week

**Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?**

No

**Did you receive any emails from Dr. Fleming?  Did the content include pictures?**

Yes (see above)

**Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?**

Yes, did explain (found humerus)

**Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to hose students?**

No, but heard rumors

Enclosure 90

Appx432

Was profanity used in classroom or EI?  If yes, what?

Was sexually suggestive language used?  If yes, what?

*Would make sexist comments about men and women*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*Correct him a few times ( was not intentional )*

Did Dr. Fleming touch students in class?  If yes, how?

*No*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*Yes ( one flexing image )*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*No.*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*Yes*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*Discussed with peers.*

Is there anything else you would like to add?

*Creepy, Stylish, really awkward*

These notes are an accurate recording of my statements.

*ARK*

Initials

Appx433

Inquiry panel members present:

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☑ Paige Ormiston (legal advisor)

Date: _26 MAR 2018_
Time: _1450_
Location: _MI-380_
Name: _MIDN 4/c Kustra_
Course: _HE 111_
Section: _3001_

Describe the general atmosphere in Dr. Fleming's class.

_Very lively, made strange comments every now and then_

Have you sought EI from him, and if yes, what were the sessions like?

_Only once. Went to talk about an essay grade_

Did you have any other interactions with Dr. Fleming outside the classroom?

_No_

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

_Very energetic. Off-topic quite often_

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

_Yes, covered class material, but also off topic._
_Talked about time on Admissions Board. Talked about "Life stories"_

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

_Talked about old girlfriends_    _~20 min out of 50  off-topic_
_and disciplining children_

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

_Not on these bases, but chose_
_Students he seemed not to like_
_Felt it was unfair to the ones_
_being singled out_

Did you receive any emails from Dr. Fleming? Did the content include pictures?

_Yes (to entire section)_

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

_Yes_

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

_Heard about prior investigation_

_Enclosure 91_

Appx434

Was profanity used in classroom or EI?  If yes, what?

Yes, F-word, S-word  by both instructor and students

Was sexually suggestive language used?  If yes, what?

No

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

Don't recall

Did Dr. Fleming touch students in class?  If yes, how?

Would have some students try on suits and take pictures

Did you receive emails from Dr. Fleming with inappropriate language or images?

No

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

Don't remember

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

No

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

Sometimes up unprofessional, Did not report. Discussed with friends.

Did not like varsity athletes.

Is there anything else you would like to add?

Energetic, Loud, argumentative

Signed up to have Dr Fleming for HE112. Ended up doing well in HE111 and became a better writer because of Dr. Fleming. Also knew he would stay awake due to energy in class.

These notes are an accurate recording of my statements.

L. K.

.nitials

Appx435

Inquiry panel members present:
- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☑ Paige Ormiston (legal advisor)

Date: 6 APRIL 2018
Time: 1330
Location: MI 380
Name: MIDN 4/C LECHER
Course: HE 111
Section: 3001

Describe the general atmosphere in Dr. Fleming's class.

Odd start to class : push-ups & attire
Never went into class expecting to learn anything

Have you sought EI from him, and if yes, what were the sessions like?

Sometimes in classroom, right after class. Would get up and leave if didn't
like questions from studen.
(happened 2 out of 3 EI sessions)

Did you have any other interactions with Dr. Fleming outside the classroom?

Just in passing

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

Only class where I would expect not to learn anything
Wanted to get an A or B in the course and move on

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

Did talk about class material on occasion, but a lot of life lessons.
Talked about personal affairs and "condom, sunscreen, floss" talk

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

Nothing super inappropriate,     ~ 70-75%
but odd for a college class     off-topic
No reason grade-wise to do the reading.

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

Stated he was not trying to single any one out
Seemed to have favorites (students that agreed with him - liberal or cynical )

Did you receive any emails from Dr. Fleming? Did the content include pictures?

Yes. To entire class. Heard from other students that he was a terrible professor

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

Yes           a little bit degrading        Got flaming pictur

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

Don't recall. Stated Student Opinion Forms don't mean anything.
USNA can't get rid of Dr. Fleming because he's tenured.

Enclosure 92

Appx436

Was profanity used in classroom or EI? If yes, what?

Yes, cussed during life lessons ; not out of anger

Was sexually suggestive language used? If yes, what?

Yes. Talked about sm's 14 year old girlfriend. Talked about sexiness of females at USNA

Did Dr. Fleming mispronounce student names? Specifically asian names? How did he react when students corrected him when he got their names wrong?

No

Did Dr. Fleming touch students in class? If yes, how?

Yes. Would hug students. Got close to students during bow tie EI. Had a student walk on his back.

Did you receive emails from Dr. Fleming with inappropriate language or images?

Don't recall language. Some flexing images

Did Dr. Fleming display pictures of his children and their dates in your class? If yes, did he make disparaging remarks about the women and girls in those photos?

Yes of sm & girlfriend

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

Made fun of him in class when falling asleep, but not personally uncomfortable

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone? If yes, who and when?

Did not report. It's just how Dr. Fleming is.
Talked among other students

Is there anything else you would like to add?

Sexual, Egotistical


Thesis of paper is the "flex"


These notes are an accurate recording of my statements.

JSL

nitials

Inquiry panel members present:

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☐ Paige Ormiston (legal advisor)

Date: _23 MAR 2018_
Time: _1410_
Location: _MI-380_
Name: _MIDN 4/c LORENZ_
Course: _HE111_
Section: _3601_

Describe the general atmosphere in Dr. Fleming's class.

_Coarse, Anti-USNA, very negative & pessimistic toward USNA Animated, a lot of dialogue_

Have you sought EI from him, and if yes, what were the sessions like?

_No_

Did you have any other interactions with Dr. Fleming outside the classroom?

_Email only_

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

_Wanted everyone to feel comfortable to speak More dialogue than other classes, but sometimes over the line_

Did Dr. Fleming cover the assigned material?  Did he cover other topics? Did he spend significant class time on "off topic" discussions?  _Got back well to assigned topic. Talked about "Life EI" and about his own family_

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

_~10 minutes ±5 per class off topic_

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?  _Singled out some students, but not based on anything_

Did you receive any emails from Dr. Fleming?  Did the content include pictures?

_Yes. Family pictures_

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

_Yes_

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?

_Talked about a female midshipman making a complaint about him._

Appx438

Was profanity used in classroom or EI?  If yes, what?

Yes, used by both instructor and students

Was sexually suggestive language used?  If yes, what?

Talked about "rape culture"

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

Did mispronounce names, perhaps intentionally but also accidentally

Did Dr. Fleming touch students in class?  If yes, how?

No.  Would let people wear his coats

Did you receive emails from Dr. Fleming with inappropriate language or images?

No.  Goofy but not inappropriate

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

No

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

Yes, early "in your face", but got used to it

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

No.  Mentioned to parents

Is there anything else you would like to add?

Loud, colorful, vulgar, abrasive, passionate, creative (good writer)

Would get angry 1-3 times per class, but also compassionate

about writing and English and enlisted Marines / Sailors (how they're good people)

These notes are an accurate recording of my statements.

.nitials

Started negative, but good for me in the end

Inquiry panel members present:

☒ Keith Lindler
☒ Jeffrey Fitzgerald
☐ Richard McGrath
☐ Paige Ormiston (legal advisor)

Date: 9 April
Time: 1380
Location: Mi-380
Name: MacGuire
Course: SC 111 F 2017
Section: 3001

Describe the general atmosphere in Dr. Fleming's class.

relaxed but professional. learning focus

Have you sought EI from him, and if yes, what were the sessions like?

yes, 1 or 2 x, helpful but caught a bit off guard by asking why I deserve

Did you have any other interactions with Dr. Fleming outside the classroom? to be here

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

yes, criticizes Academy

Did Dr. Fleming cover the assigned material?  Did he cover other topics? Did he spend significant class time on "off topic" discussions?

yes, at start of class

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

>50%

natural lighting, sunscreen/condom use, life EI

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

yes           no

Did you receive any emails from Dr. Fleming?  Did the content include pictures?  yes, yes,

funny (dressed as plebe/pirate)
family on vacation

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

forget EI          yes to both
people (gender neutral)

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?

no

Enclosure 94

Appx440

Was profanity used in classroom or EI? If yes, what?

*yes, all (shit, ass, fuck...) colorful language but not directed at anya*

Was sexually suggestive language used? If yes, what?

*none other than condom*

Did Dr. Fleming mispronounce student names? Specifically asian names? How did he react when students corrected him when he got their names wrong?

*only accidentaly at start of semester*

Did Dr. Fleming touch students in class? If yes, how?

*arm around student in blazer in photo*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*no*

Did Dr. Fleming display pictures of his children and their dates in your class? If yes, did he make disparaging remarks about the women and girls in those photos?

*no*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*no*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone? If yes, who and when?

*different, maybe a little unprofessional but never enough to report formally*

Is there anything else you would like to add?

*- don't like critical articles but some truth to them*

*- thinks he knows all about midshipmen / Academy*

*adjectives inciting antagonistic*

These notes are an accurate recording of my statements.

*EM*          *better writer having been in class*

Initials

Appx441

Inquiry panel members present:

- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☑ Paige Ormiston (legal advisor)

Date: 6 APRIL 2018
Time: 1400
Location: MI380
Name: MIDN 4/C MONICA
Course: HE III
Section: 3001

Describe the general atmosphere in Dr. Fleming's class.

Derogatory & very judgmental.

Have you sought EI from him, and if yes, what were the sessions like?

No

Did you have any other interactions with Dr. Fleming outside the classroom?

No

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

Very, very different. Very unstructured, did not follow syllabus at all. Did not understand grading policy. Did not provide explanation when questioned.

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

10-15 minutes on class material, then went into "life lessons" Talked about USNA and his opinions, not related to reading. Random life lessons about bow ties as well as condoms, sunscreen, dental floss

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

> 60% off topic

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

Wouldn't single people out directly. Made general comments on athletes and women in the military. Students would not challenge statements so the class could just move on

Did you receive any emails from Dr. Fleming? Did the content include pictures?

Yes. Random pictures sent to the whole class.

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

Yes   would not remember things   ℃ like to stay in packs and not think on own

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

No

Enclosure 95

162

Appx442

Was profanity used in classroom or EI?  If yes, what?

*Yes. Used all words, from nicest to f-bomb*

Was sexually suggestive language used?  If yes, what?

*Yes in sunblock, dental floss, condom lecture. Also when talking about transgenders*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*Don't recall*

Did Dr. Fleming touch students in class?  If yes, how?

*Yes. Some students would try to get on his good side (perhaps to get a better grade)*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*No. Showed a picture of son but not his dates.*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*Yes. Was speaking about personal family issues. Uncomfortable when his son came to class*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*No. Talked to an upperclassman.*

*Made a comment about killing one's self right after a suicide in the Brigade*

Is there anything else you would like to add?

*Unprofessional*

These notes are an accurate recording of my statements.

Initials

Appx443

Inquiry panel members present:
- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☐ Paige Ormiston (legal advisor)

Date: _20 MAR 2018_
Time: _____
Location: _MI-380_
Name: _MIDN 4/c PETRARD_
Course: _HE 111_
Section: _3001_

**Describe the general atmosphere in Dr. Fleming's class.**

For the most part, positive. Tried to be entertaining. Atmosphere ebbed and flowed

**Have you sought EI from him, and if yes, what were the sessions like?**

No

**Did you have any other interactions with Dr. Fleming outside the classroom?**

No

**Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?**

Took a lot of time talking about general topics

**Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?**

~ 2/3 off topic

Class material was brief and to the point

**If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?**

Would sometimes cross the line on topics, like female uniforms

**Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?**

Singled-out older (prior enlisted) students.
Found sexual meaning in every thing

**Did you receive any emails from Dr. Fleming? Did the content include pictures?**

Yes, in class emails (family pictures)

**Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?**

Yes          ↳ herd mentality

**Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?**

No. Did mention USNA had issues with his articles.

Enclosure 96

Appx444

Was profanity used in classroom or EI?  If yes, what?

*Cursed more than any other teachers*

Was sexually suggestive language used?  If yes, what?

*Called laptops "porn machines" (trying to be funny?)*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*No*

Did Dr. Fleming touch students in class?  If yes, how?

*Once student walked on his back.  Would help students tie bow ties*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*No*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*"Condom, sunblock, dental floss" lecture  (wierd in English class)*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*No*

Is there anything else you would like to add?

*Entertaining, but inappropriate (talked about porn alot)*

*Good English teacher, requested to have again*

These notes are an accurate recording of my statements.

*CR*
Initials

Appx445

Case: 24-1557     Document: 18     Page: 213     Filed: 09/19/2024

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☐ Paige Ormiston (legal advisor)

Time: ___1240___
Location: __MI-380__
Name: _MIDN 4/c ROACH_
Course: __HE 111__
Section: __3001__

escribe the general atmosphere in Dr. Fleming's class.

His way has to be right. Talks a lot. Did not like the class.

Have you sought EI from him, and if yes, what were the sessions like?

Yes, once.

Did you have any other interactions with Dr. Fleming outside the classroom?

No

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

Yes, very different. Got off topic.  Seemed sexist and discriminatory.
Did not like NAPS ters
Doesn't think sports belong at USNA

Did Dr. Fleming cover the assigned material?  Did he cover other topics? Did he spend significant class time on "off topic" discussions?

Yes, significant time was off topic

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

Prof. Fleming talked about 80% of the time.  Some days were completely off topic.

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?  Had some favorites
Said women should wear heels, skirts and blouses. Vice working blues

Did you receive any emails from Dr. Fleming?  Did the content include pictures?

Class emails with family pictures

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

Yes

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?

Might have mentioned once

Enclosure 97

Appx446

*H/c Kohen*

Was profanity used in classroom or EI?  If yes, what?

Yes

Was sexually suggestive language used?  If yes, what?

Talked about how "this sucks" refers to a blow job. Gave safe sex talks

Did Dr. Fleming mispronounce student names?  Specifically asian names?  How did he react when students corrected him when he got their names wrong?

No

Did Dr. Fleming touch students in class?  If yes, how?

Would take pictures with arm around students

Did you receive emails from Dr. Fleming with inappropriate language or images?

No, other than swear words

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

No

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

Wasn't singled out

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

No. No point because he's tenured

Is there anything else you would like to add?

- Made comments about "Shooting myself in head" shortly after MIDN Jiminez' suicide
- Bragged about affair —                    inappropriate, arrogant, narcissistic

These notes are an accurate recording of my statements.

UWR
‾initials

Appx447

Inquiry panel members present:
- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☑ Paige Ormiston (legal advisor)

Date: _06 April 2018_
Time: _1430_
Location: _Mi 380_
Name: _MIDN 4/c SELF_
Course: _HE 111_
Section: _3001_

**Describe the general atmosphere in Dr. Fleming's class.**

One of my most fun classes. Would discuss attire

**Have you sought EI from him, and if yes, what were the sessions like?**

Once or twice. Straight forward session then talked about life

**Did you have any other interactions with Dr. Fleming outside the classroom?**

No

**Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?**

Yes. Some of the class was sexualized. Gave a sex talk prior to Thanksgiving break (found unnecessary). Was awkward for class.

**Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?**

20-25 minutes on class material then 10-15 minutes off topic

**If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?**

~35% off-topic

**Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?**

Did not single anyone out. Was not treated differently as an athlete.

**Did you receive any emails from Dr. Fleming? Did the content include pictures?**

Yes, to the class (family pictures)

**Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?**

Yes

**Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?**

Don't recall

Enclosure 98

Appx448

Was profanity used in classroom or EI?  If yes, what?

Yes, a lot of profanity by both students and instructor.

Was sexually suggestive language used?  If yes, what?

Yes. During a sex talk

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

No

Did Dr. Fleming touch students in class?  If yes, how?

Touched me on cheek (a little tap on face). Called student "sweet boy"

Did you receive emails from Dr. Fleming with inappropriate language or images?

No

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

No

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

No

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

No. Unprofessional but did not bother me.
Discussed with company mates

Is there anything else you would like to add?

Goody - goody two shoes type person; your opinion doesn't matter, mine does

Writing improved in class

These notes are an accurate recording of my statements.

JS

Initials

Appx449

Inquiry panel members present:

- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☐ Paige Ormiston (legal advisor)

Date: _19 MAR 2018_
Time: _1300_
Location: _M1- 380_
Name: _MIDN 4/c SNAUKo_
Course: _HE 111_
Section: _3001_

**Describe the general atmosphere in Dr. Fleming's class.**

Unprofessionalism. Not much planning.

**Have you sought EI from him, and if yes, what were the sessions like?**

Yes. 2 sessions. Degrading - questioned if he should be here

**Did you have any other interactions with Dr. Fleming outside the classroom?**

No

**Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?**

Less professionalism than other classes

**Did Dr. Fleming cover the assigned material?  Did he cover other topics? Did he spend significant class time on "off topic" discussions?**

Often "off topic"

**If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?**

One class on bow tie EI (how to tie a bow tie)        ~15% off topic

**Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?**

No

**Did you receive any emails from Dr. Fleming?  Did the content include pictures?**

Yes, about EI. Only pictures that were sent to entire section

**Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?**

Yes

**Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?**

No

Enclosure 99

Appx450

Was profanity used in classroom or EI?  If yes, what?

Yes. Swore quite frequently in class and at EI (said my writing "fucking sucks")

Was sexually suggestive language used?  If yes, what?

No

Did Dr. Fleming mispronounce student names?  Specifically asian names?  How did he react when students corrected him when he got their names wrong?

No

Did Dr. Fleming touch students in class?  If yes, how?

Yes, but not without consent

Did you receive emails from Dr. Fleming with inappropriate language or images?

No

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

No

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

When using profanity / degrading terms during EI

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

Talked to upperclassmen.

Is there anything else you would like to add?

Went to other classmates & Writing Center to improve writing before going to instructor

These notes are an accurate recording of my statements.

JcS

Initials

Appx451

inquiry panel members present...

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☑ Paige Ormiston (legal advisor)

Time: _1300_
Location: _MI-380_
Name: _MIDN 4/c Juliet Yu_
Course: _HE 111 FIT (AY 2018)_
Section: _3001_

Describe the general atmosphere in Dr. Fleming's class.

Unnerving feeling. Knew Dr. Fleming by reputation. Didn't feel comfortable with sexual and body discussions.

Have you sought EI from him, and if yes, what were the sessions like?

No

Did you have any other interactions with Dr. Fleming outside the classroom?

No

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

Didn't gain much from class discussion. A lot of "Like EI" ~40 minutes per class

Did Dr. Fleming cover the assigned material?  Did he cover other topics? Did he spend significant class time on "off topic" discussions?

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

Had sexual discussions and a lot of "body" discussions
Took pictures with students (mostly males)

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

Did you receive any emails from Dr. Fleming?  Did the content include pictures?

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

Yes. Due to short attention span.

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?

Yes. Couldn't be touched.

Enclosure 100

Appx452

Was profanity used in classroom or EI? If yes, what?

*Yes, but not directed specifically at individuals*

Was sexually suggestive language used? If yes, what?

*Yes, but tied to topic material*

Did Dr. Fleming mispronounce student names? Specifically asian names? How did he react when students corrected him when he got their names wrong?

*Do not remember*

Did Dr. Fleming touch students in class? If yes, how?

*Stepping on backs. Two male students, at the beginning of class.* *One Students also walked on his back.*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class? If yes, did he make disparaging remarks about the women and girls in those photos?

*Don't remember specific pictures, but remembers comments about a 13-year old girl and how she looks*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*Yes*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone? If yes, who and when?

*No, but discussed with family.*

Is there anything else you would like to add?

These notes are an accurate recording of my statements.

nitials

Appx453

**Ac Yr Ending: 2018 Semester: FALL Block Number: 1**
**Course: HE302 Section: 5001**



Mary Legare Augenstein/180186/12    101

Hiram Carter/180882/13    102

Charles Andrew Eshenour/181770/23    103

ESOLDI, TAYLOR B #8
Taylor Bryan Esoldi/181776/08    104

Augusta Leo Garies/182070/05    105

Jones, David C #9
David Coles Jones/183000/09    106

Knode, Justin E. II
Justin Edward Knode/183306/22    107

MAJKIC, Andrey #7
Andrey Majkic/183822/09    108

Stephen Craig Miller Jr./184326/04    109

Lunsford Daniel Schock/185790/25    110

Ruth Virginia Snipes Soward/186084/18    112

Wesley Michael Stewart/186222/13    113

Nicole Marie Thatcher/186426/03    114

David Shepherd Warren/186852/28    116

Eleonore Elisabeth Porter/195202/29    110

Breanna Nicole Thomas/196360/09    115

Bower 117
Saumell 118

Records 1 to 16 of 16

ReQuery

Help    Return    MIDS Home    Academic Center    Academic Dean

https://mids.usna.edu/ITSD/mids/drww000$mids.actionquery?p_ub_secof_id=115768&p_ub_sect=5001&p_ub_course=HE302&p_ub_seblda_ac_yr=    1/2

174

Appx454

Inquiry panel members present:
- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☑ Paige Ormiston (legal advisor)

Date: _23 April 2018_
Time: _1300_
Location: _MI 380_
Name: _MIDN 1/c Augenstein_
Course: _HE302_
Section: _5001_

Describe the general atmosphere in Dr. Fleming's class.

_Generally positive. 50/50 on class material and life lessons/experiences_

Have you sought EI from him, and if yes, what were the sessions like?

_No_

Did you have any other interactions with Dr. Fleming outside the classroom?

_No_

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

_Yes. Offered a lot more of his personal opinions than other teachers._

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

_Yes, covered assigned material.    Other: talked about President, current events, his family_

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

_·10-15% off topic_

_Class not used efficiently as it could be._

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

_He liked the male athletes in the class_

Did you receive any emails from Dr. Fleming? Did the content include pictures?

_No, only class wide emails_

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

_Yes    satirical in reference to gender neutrality_

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

_No_

_Enclosure 101_

Was profanity used in classroom or EI?  If yes, what?

*Occasionally used for emphasis ; not directed at anyone*

Was sexually suggestive language used?  If yes, what?

*Yes in the context of course material*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*Not intentionally*

Did Dr. Fleming touch students in class?  If yes, how?

*Would give handshakes or hugs sometimes at the end of class*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*No*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*No*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*Sometimes with the life EI lessons & how he favored male athletes*

*"floss, sunscreen, condom" lessons*

Is there anything else you would like to add?

*Very expressive, cares a lot about how he dresses,*

*Opinionated, well-read, intelligent professor, at times immature*

These notes are an accurate recording of my statements.

*MIA*
Initials

Appx456

Inquiry panel members present:

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☑ Paige Ormiston (legal advisor)

Date: 26 MAR 2018
Time: 1325
Location: MI-380
Name: MION IIc Carter
Course: HE 302
Section: 5001

Describe the general atmosphere in Dr. Fleming's class.

Fun, light-hearted, emphasized individual work and growth
Positive, enjoyable, open environment

Have you sought EI from him, and if yes, what were the sessions like?

Yes, twice ~1 hour each. 45 min on writing, 15 min life lessons     Switched seats

Did you have any other interactions with Dr. Fleming outside the classroom?

No

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

Yes. Was an English class with a lot of discussion
A lot more discussion and personal opinions

Did Dr. Fleming cover the assigned material?  Did he cover other topics? Did he spend significant class time on "off topic" discussions?

Yes, covered material        ~10-20 minutes off-topic

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

10-15 min per class

Good in that he gave "non-military" perspective

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?     Yes      No one was singled out

Did you receive any emails from Dr. Fleming?  Did the content include pictures?

Yes. Pictures of suits and clothes  (sent to entire class)

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

Yes        used jokingly, not degrading

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?

Yes, mentioned an investigation several years ago. Thinks it was brought up by a student.

Enclosure (3)        107

Appx457

Was profanity used in classroom or EI?  If yes, what?

*Yes, used some foul words, but within reasonable bounds*

Was sexually suggestive language used?  If yes, what?

*Talked about men's & women's hygene (was professional, but not directly related to cause)*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*Don't recall*

Did Dr. Fleming touch students in class?  If yes, how?

*Touch on the shoulder or hand shake*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*No*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*No*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*No*

Is there anything else you would like to add?

*Fun, informative, friendly, out going*

*Relaxed (at times), Serious (at times), Personable, Genuine, Strong personality*

*Liberal          Got a lot out of the class. Very engaged.*

These notes are an accurate recording of my statements.

*HVC*
Initials

Appx458

Inquiry panel members present:
- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☑ Paige Ormiston (legal advisor)

Date: 18 April 2018
Time: 1300
Location: MI 380
Name: MIDN 1/c Eshenour
Course: HE 302
Section: 5001

Describe the general atmosphere in Dr. Fleming's class.

Very active, awake, push-ups in classroom

Have you sought EI from him, and if yes, what were the sessions like?

No

Did you have any other interactions with Dr. Fleming outside the classroom?

E-mails to entire class

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

Yes. Didn't strictly follow syllabus. Covered life topics

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

Yes, covered material    Off-topic on his own writings and some
student initiated material

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

~30% off time off topic

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

All treated the same

Did you receive any emails from Dr. Fleming? Did the content include pictures?

Class emails. Some pictures of him flexing

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

Yes

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

Yes, talked about a complaint about a poem which led to a
Washington Post article by him. Thought the institution might be out to

Appx459

Was profanity used in classroom or EI?  If yes, what?

*Yes in the classroom. Used mainly by instructor and sometimes by students. Talked about "responsible" use of profanity. Not used in anger or directed at anyone*

Was sexually suggestive language used?  If yes, what?

*Yes, but mainly as related to poetry. Had me safe sex discussions*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*No*

Did Dr. Fleming touch students in class?  If yes, how?

*Would give hugs after class. Never seemed forced.*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*Children, but not with dates*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*No*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*No. Mentioned to friends/family. "Odd" & unprofessional but not reportable*

Is there anything else you would like to add?

*Energetic, dissenting, "black sheep"*

*Genuinely cares for midshipmen & poetry/art*

These notes are an accurate recording of my statements.

Initials

Appx460

Inquiry panel members present:

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☐ Paige Ormiston (legal advisor)

Date: 19 MARCH 2018
Time: 1520
Location: MI-380
Name: MIDN _llc_ ESOLDI
Course: HE 302
Section: 5001

Describe the general atmosphere in Dr. Fleming's class.

Great atmosphere, open environment to speak mind, learned a lot about life and poetry

Have you sought EI from him, and if yes, what were the sessions like?

Yes, sessions were helpful (1 session)

Did you have any other interactions with Dr. Fleming outside the classroom?

No

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

Yes, less structured. Would move off topic and come back to course material

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

~ 10% off topic

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

No. Everyone treated the same

Did you receive any emails from Dr. Fleming? Did the content include pictures?

Yes, some vacation pictures (not individually)

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

Yes, used midsheeple tongue-in-cheek

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

No

Enclosure (04

Appx461

Was profanity used in classroom or EI? If yes, what?

 *Yes, if found in poem*

Was sexually suggestive language used? If yes, what?

*Yes, but only if found in poems*

Did Dr. Fleming mispronounce student names? Specifically asian names? How did he react when students corrected him when he got their names wrong?

*No*

Did Dr. Fleming touch students in class? If yes, how?

*No*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class? If yes, did he make disparaging remarks about the women and girls in those photos?

*No*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*No*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone? If yes, who and when?

*No*

Is there anything else you would like to add?

*Funny, energetic, intelligent*

These notes are an accurate recording of my statements.

 *TBE*

.nitials

Appx462

Inquiry panel members present:
- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☑ Paige Ormiston (legal advisor)

Date: _20 April 2018_
Time: _1580_
Location: _MI380_
Name: _MIDN 1/c Gaines_
Course: _HE 302_
Section: _5001_

Describe the general atmosphere in Dr. Fleming's class.

*Different than other classes*
*Fun, very open ended*

Have you sought EI from him, and if yes, what were the sessions like?

*No*

Did you have any other interactions with Dr. Fleming outside the classroom?

*No*

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

*Yes, more of a discussion than a lecture*

Did Dr. Fleming cover the assigned material?  Did he cover other topics?  Did he spend significant class time on "off topic" discussions?

*Yes, got through syllabus but also talked about life outside USNA*
*Some student initiated topics*

If yes, what did those off topic discussions cover?  What percentage of class time do you estimate he spent on those "off topic" discussions?

*~ 10 min per class.*

Did he treat all students the same?  Was anyone singled out?  On what basis (race, gender, national origin, etc.)?

*Seemed to be pro-athlete*

Did you receive any emails from Dr. Fleming?  Did the content include pictures?

*Yes, to whole class with family pictures*

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

*Yes*     *don't know why, but didn't mind*

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?

*No*

*Enclosure 105*

Appx463

Was profanity used in classroom or EI?  If yes, what?

*Yes, but casually thrown in    Was taken maturely by class*

Was sexually suggestive language used?  If yes, what?

*Yes, as related to class materials*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*No*

Did Dr. Fleming touch students in class?  If yes, how?

*Yes, handshakes and pats on back*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*No, just family pictures*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*No*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*Unprofessional in a quirky, wild-card way*

Is there anything else you would like to add?

*Took the class to see what Dr Fleming was all about*

*Wild, unexpected, intelligent*

*good teacher, enjoyed the class*

These notes are an accurate recording of my statements.

Initials

Appx464

Inquiry panel members present:

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☑ Paige Ormiston (legal advisor)

Date: _18 April 2018_
Time: _1430_
Location: _MI 280_
Name: _Minnie Jones_
Course: _HE 302_
Section: _5001_

Describe the general atmosphere in Dr. Fleming's class.

Open environment
Instructor was animated and straight forward. Related poetry to Life.

Have you sought EI from him, and if yes, what were the sessions like?

No

Did you have any other interactions with Dr. Fleming outside the classroom?

No

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

Yes, a lot more fun and energetic

Did Dr. Fleming cover the assigned material?· Did he cover other topics? Did he spend significant class time on "off topic" discussions?

Yes, covered course material. Would go on tangents but relate back to course material

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

Made comments about USNA and discussed his articles
~25 % off - topic

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?  No unfair singling out of students

Did you receive any emails from Dr. Fleming?  Did the content include pictures?

Yes, family pictures

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

Yes
← Mids would "stay in lane"

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?

Yes, mentioned students trying to take action against him previously.

Appx465

Was profanity used in classroom or EI?  If yes, what?

Yes, but never directed at any individual

Was sexually suggestive language used?  If yes, what?

Yes, but in context of reading

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

No

Did Dr. Fleming touch students in class?  If yes, how?

Handshake or hug leaving classroom

Did you receive emails from Dr. Fleming with inappropriate language or images?

Emails to whole class with flexing pictures.

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

No

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

With pictures and sexual topics

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

Unprofessional, but did not report it.

Is there anything else you would like to add?

Animated, Narcissistic, Energetic, Blunt, straight-forward, real, unprofessional at times

Good professor, learned a lot, does add value

These notes are an accurate recording of my statements.

DCJ
Initials

Appx466

Inquiry panel members present:

- ☑ Keith Lindler
- ☐ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☑ Paige Ormiston (legal advisor)

Date: 23rd APRIL 2018
Time: 1430
Location: MI 380
Name: MIDN 1/c Knode
Course: HE 362
Section: 5001

Describe the general atmosphere in Dr. Fleming's class.

Inspirational, positive, mentoring, life advice

Have you sought EI from him, and if yes, what were the sessions like?

Yes. EI for papers and "Life EI" for confidence and relationships. About once per week.

Did you have any other interactions with Dr. Fleming outside the classroom?

No

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

More focused on student progress.

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

Would cover material, but also would be off-topic.

Learned something everyday in this course

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

~15-20% off-topic

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

Everyone treated equally. He was readily available for students that needed help.

Did you receive any emails from Dr. Fleming? Did the content include pictures?

Yes

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

Yes

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

Yes, talked about a previous case where two female mids made a complaint

Appx467

Was profanity used in classroom or EI?  If yes, what?

*No*

Was sexually suggestive language used?  If yes, what?

*Yes, in the context of course material*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*No*

Did Dr. Fleming touch students in class?  If yes, how?

*Would put arm around shoulder when trying on jacket*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*Yes, pictures of children*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*No*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*No*

Is there anything else you would like to add?

*Inspirational, Progressive, Intelligent*

These notes are an accurate recording of my statements.

Initials

Appx468

Inquiry panel members present:

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☑ Paige Ormiston (legal advisor)

Date: 20 APRIL 2018
Time: 1445
Location: MI 380
Name: MIDN 1/c Majkic
Course: HE 302
Section: 5001

Describe the general atmosphere in Dr. Fleming's class.

*Good*

Have you sought EI from him, and if yes, what were the sessions like?

*Yes, twice.   Very helpful for a paper.*

Did you have any other interactions with Dr. Fleming outside the classroom?

*No*

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

*More opening WRT life discussions and controversial issues.*

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

*Yes, covered material well.   Off-topic discussions would be brought back to course material*

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

*0*

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

*Gave some preference to males (favoritism perhaps), but overall very fair. Perspective more male oriented, but always included females in class discussions.*

Did you receive any emails from Dr. Fleming? Did the content include pictures?

*Yes, emails to whole class.   Texting pictures*

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

*Yes*

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

*Mentioned previous SAPR case. Came up in context of a poem about sexual harassment*

189

Appx469

Was profanity used in classroom or EI?  If yes, what?

*Yes, F-word, S-word, basic cuss words. Flowed with class.*

Was sexually suggestive language used?  If yes, what?

*Can't recall*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*No*

Did Dr. Fleming touch students in class?  If yes, how?

*Yes. A pat on the back to mostly males going out the door on occasion*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*Children / Family yes. Dates, No*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*No*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*No*

Is there anything else you would like to add?

*Funny, narcissistic, intelligent, arrogant*

*refreshing class, enjoyed the class*

*Knew when to listen and when to "Shut off" discussion.*

These notes are an accurate recording of my statements.

Initials

Appx470

Inquiry panel members present:

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☐ Paige Ormiston (legal advisor)

Date: 23 MAR 2018
Time: 1450
Location: MI-380
Name: MIDN 1/C MILLER
Course: HE 302
Section: 3 5001

Describe the general atmosphere in Dr. Fleming's class.

Relaxed, open conversation, focused when discussing poetry

Have you sought EI from him, and if yes, what were the sessions like?

Yes. one session. Very helpful EI  "Paper" chair and "Life" chair

Did you have any other interactions with Dr. Fleming outside the classroom?

Saw at pool occasionally

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

First very open discussion class

Did Dr. Fleming cover the assigned material?  Did he cover other topics? Did he spend significant class time on "off topic" discussions?

Sometimes talked about outfits, never at a loss for words

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

~15 to 30% off topic

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

No

Did you receive any emails from Dr. Fleming?  Did the content include pictures?

Yes

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

Yes

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?

Yes. Talked in general about prior complaints. No intimidation

Appx471

Was profanity used in classroom or EI?  If yes, what?

Was sexually suggestive language used?  If yes, what?

Yes, to describe poems

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

Don't recall

Did Dr. Fleming touch students in class?  If yes, how?

Yes, in a friendly manner on shoulder.  Consentual hugs on occasion

Did you receive emails from Dr. Fleming with inappropriate language or images?

No

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

No

las Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

No

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

Is there anything else you would like to add?

Super nice, abrasive, good intentions

These notes are an accurate recording of my statements.


..iitials

Appx472

Inquiry panel members present:

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☐ Paige Ormiston (legal advisor)

Date: 19 MAR 2018
Time: 1310
Location: MI- 380
Name: MIDN 2/C PORTER
Course: HE 362
Section: 5001

Describe the general atmosphere in Dr. Fleming's class.

Very different. Energetic & Passionate.

Have you sought EI from him, and if yes, what were the sessions like?

Yes, on multiple occasions. Preferential to males over females in words and actions

Did you have any other interactions with Dr. Fleming outside the classroom?

No

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

A lot of off topic. Current events and politics.

Did Dr. Fleming cover the assigned material?  Did he cover other topics? Did he spend significant class time on "off topic" discussions?

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

~ 70 % off topic

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

Tended to ignore female students. Talked about race preferences in admissions.

Did you receive any emails from Dr. Fleming?  Did the content include pictures?

Yes

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

Yes

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?

Yes. He liked Midshipmen which is why he stays at the Naval Academy

Tried to intimidate speak on not complain

Appx473

Was profanity used in classroom or EI?  If yes, what?

Yes.

Was sexually suggestive language used?  If yes, what?

Yes, some related to reading to but most were not

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

No

Did Dr. Fleming touch students in class?  If yes, how?

A lot of hugging. Like to take pictures (during classtime) with males.

Did you receive emails from Dr. Fleming with inappropriate language or images?

Yes

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

No

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

Yes, through sexual discussions

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

No. Talked to a friend who is a victim's advocate

Is there anything else you would like to add?

These notes are an accurate recording of my statements.

initials

Inquiry panel members present:

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☐ Richard McGrath
☑ Paige Ormiston (legal advisor)

Date: _30 Mar_
Time: _1340_
Location: _MI 380_
Name: _Schock_
Course: _HE 302_
Section: _5011_

Describe the general atmosphere in Dr. Fleming's class.

_Relaxed, all comfortable saying what they wanted_

Have you sought EI from him, and if yes, what were the sessions like?

_No paper review, has stopped in to chat, discussed Tennyson poems_

Did you have any other interactions with Dr. Fleming outside the classroom?

_No._

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

_No one else did one armed pushups at beginning, very lively class_

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

_Covered all topics, discussed current events at beginning of class_

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

_Talked occasional politics, esp. at election anniversary_
_10% of class time_

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

_No one seemed singled out, just to read, not based on listed factors_
_Make quiet students speak up + read_

Did you receive any emails from Dr. Fleming? Did the content include pictures?

_Yes, including photographs → who would win, F of now or F of 30 years ago, F always been_
_a little out there, wasn't offended by photos of Greek god statues + pics of F's silhouettes, that F. sent in_

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why? _response_

_Sometimes, Mids are quick to drink the Coolaide, calling out Mids for not asking questions_
_about what doing. No fish comments_

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

_Not that he recalls_

_Enclosure (1)_

Appx475

Was profanity used in classroom or EI?  If yes, what?

*Class yes, trying to connect*

Was sexually suggestive language used?  If yes, what?

*Only in reference to text readings*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*No - never heard him do it.  Only w/ Wesley/Wesirey which student seemed OK with.*

Did Dr. Fleming touch students in class?  If yes, how?

*Hugs on way out, keep it it.*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*Whole class - articles he's working on only, single email discussed above.*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*No,*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*No.*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*He wasn't bothered, enjoyed going to class, positive impact*

Is there anything else you would like to add?

*eccentric, egotistical, enthusiastic about us and his work enjoyed class, would recommend to friends.*

These notes are an accurate recording of my statements.

Initials

Inquiry panel members present:

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☑ Paige Ormiston (legal advisor)

Date: 18 April 2018
Time: 1320
Location: MI 380
Name: MIDN 1/c Snipes-Seward
Course: HE 362
Section: 5001

Describe the general atmosphere in Dr. Fleming's class.

Energetic

Students would sometimes drive class off topic

Have you sought EI from him, and if yes, what were the sessions like?

No

Did you have any other interactions with Dr. Fleming outside the classroom?

No

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

Standard type English class

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

Yes, covered the material. Students brought up off-topic subjects often to discuss.

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

~ 40-50% off-topic

events at USNA, Dr Fleming's articles

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

Everyone treated the same

Liked talking to lacrosse players (but didn't show favoritism)

Did you receive any emails from Dr. Fleming? Did the content include pictures?

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

Yes    short attention span

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

Remember faintly a complaint about the poem.

Enclosure 112

197

Appx477

Was profanity used in classroom or EI?  If yes, what?

Some profanity by students.  A couple times by instructor.

Was sexually suggestive language used?  If yes, what?

Not outside of the class material.

Did Dr. Fleming mispronounce student names?  Specifically asian names?  How did he react when students corrected him when he got their names wrong?

No, not on purpose

Did Dr. Fleming touch students in class?  If yes, how?

Pats on shoulders.  Would sometimes try on suit jackets.  Hugs leaving classroom. or after last class

Did you receive emails from Dr. Fleming with inappropriate language or images?

Nothing inappropriate

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

Family photos, but not pictures with dates.

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

No

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

No.  Considered him flamboyant.

Is there anything else you would like to add?

"Flamboyant"

Accepts all viewpoints

relates poetry to real life

Teaching: unconventional, but challenges you with different opinions

These notes are an accurate recording of my statements.

"outside the bubble" is the world outside USNA

Initials

Appx478

Inquiry panel members present:

- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☐ Paige Ormiston (legal advisor)

Date: _19 MAR 2018_
Time: _1430_
Location: _MI- 380_
Name: _MIDN 1/c STEWART_
Course: _HE 302_
Section: _5801_

Describe the general atmosphere in Dr. Fleming's class.

_Pretty relaxed. Good teacher. Open to discussion. Interactive class._

Have you sought EI from him, and if yes, what were the sessions like?

_No_

Did you have any other interactions with Dr. Fleming outside the classroom?

_Brief discussions_

Was Dr. Fleming's class different from other classes you've taken at USNA?  If yes, how?

_Yes. More relaxed (even for English department standards)._
_Took two classes by choice.  No "off the table" topics._

Did Dr. Fleming cover the assigned material?  Did he cover other topics? Did he spend significant class time on "off topic" discussions?

_Yes, covered the course material.  Talked about social issues, among others_

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

_~15 to 20 %_

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

_No_

Did you receive any emails from Dr. Fleming?  Did the content include pictures?

_Yes. Family vacation pictures to class._

Did he have nicknames for Midshipmen, like goldfish or midsheeple?  Did he explain why?

_Yes. Sometimes midsheeple_

Did he ever talk about students filing complaints against him?  If yes, did he mention what happened to those students?

_Yes, but did not know reason. Did not feel intimidated._

Pleading Number : 2018040191       Submission date : 2018-09-20 13:29:40       Confirmation Number: 9379... 

199

Appx479

Was profanity used in classroom or EI? If yes, what?

*Yes, used by students and Professor on occasion*

Was sexually suggestive language used? If yes, what?

*No*

Did Dr. Fleming mispronounce student names? Specifically asian names? How did he react when students corrected him when he got their names wrong?

*No*

Did Dr. Fleming touch students in class? If yes, how?

*Some times a hug*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No*

Did Dr. Fleming display pictures of his children and their dates in your class? If yes, did he make disparaging remarks about the women and girls in those photos?

*No*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*No*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone? If yes, who and when?

*No*

Is there anything else you would like to add?

*Good teacher, cares about students*

*Narcissistic          "needs to understand boundaries"*

These notes are an accurate recording of my statements.

*WMS*
Initials

Inquiry panel members present:

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☑ Paige Ormiston (legal advisor)

Date: 23 April 2018
Time: 1325
Location: MI 380
Name: MION 1/c Thatcher
Course: HE302
Section: 5001

Describe the general atmosphere in Dr. Fleming's class.

Open discussion. Usually positive.

Have you sought EI from him, and if yes, what were the sessions like?

Yes, at least once. Gave some good advice.

Did you have any other interactions with Dr. Fleming outside the classroom?

No

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

Each English class is unique.

Got significantly off topic sometimes

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

Yes, covered material. A lot of good discussions on poetry as well as off topic subjects.

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

~10% of time off topic

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

Did you receive any emails from Dr. Fleming? Did the content include pictures?

Yes, ones sent to entire class

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

Yes          ↑ jokingly. Seems to care about Mids.

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

Yes, talked about a prior investigation.

Enclosure 114

Appx481

Was profanity used in classroom or EI?  If yes, what?

*Yes, by both instructors and students. Talked about not using profanity if it was a slur towards people.*

Was sexually suggestive language used?  If yes, what?

*Yes, some related to class material and some not. Did not feel uncomfortable.*

Did Dr. Fleming mispronounce student names?  Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*Don't recall Mispronounced one student as "Weswee"*

Did Dr. Fleming touch students in class?  If yes, how?

*Would sometimes let students try on jacket. Would hug students but only consentually*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*Sent a shirtless photo*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*Children yes, but not dates*

Has Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*Not in EI. Uncomfortable in class perhaps*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*Not reportable, perhaps discussed with family or friends*

Is there anything else you would like to add?

*Fond of himself, Knowledgeable*

*Genuinely cares about Mids despite what he says about USNA*

*Very strict / meticulous on Plebes (based on experience in Writing center)*

These notes are an accurate recording of my statements.

_____
Initials

Appx482

Inquiry panel members present:
- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☐ Richard McGrath
- ☑ Paige Ormiston (legal advisor)

Date: _30 Mar_
Time: _1350_
Location: _MI 380_
Name: _Thomas_
Course: _HE 302_
Section: _5001_

**Describe the general atmosphere in Dr. Fleming's class.**

_Open, pretty professional, helpful, insightful, comfortable_

**Have you sought EI from him, and if yes, what were the sessions like?**

_After first paper, before second paper. Explained needed improvement in paper._

**Did you have any other interactions with Dr. Fleming outside the classroom?**

_No._

**Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?**

_Aero major, more interesting than her major class_
_More open, very interesting_
_Didn't feel behind or struggling despite STEM major_

**Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?** _Covered all syllabus material_
_Good at relating outside info to the poetry_

**If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?** _End of semester, more discussion of Dr. F's articles_
_and current events. 5-10% off topic, most by students_

**Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?** _Praise writing, asked students to read work_

**Did you receive any emails from Dr. Fleming? Did the content include pictures?**
_Asked for intro pics from summer training, he provided pic of himself, class did reply all_
_w/ their summer training pics._
**Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?**
_Midsheeple - gender neutral_
_No goldfish -_
**Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?** _Mentioned past complaints, said previous complaints were dropped_
_and he didn't know how they got started. In response to_
_student question_

_Enclosure 115_

Appx483

Was profanity used in classroom or EI?  If yes, what?

*Doesn't remember excessive amts, would have corrected himself*

Was sexually suggestive language used?  If yes, what?

*Only in regard to poems*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*Didn't mispronounce names*

Did Dr. Fleming touch students in class?  If yes, how?

*No.*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*No.*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*No. Brought son to class once due to son's after school appt.*

las Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*No.*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

*No.*

Is there anything else you would like to add?

*Opinionated, different, eccentric*

*Enjoyed the class, learned to appreciate better writing; made her realize she's not worst writer. He gave her confidence in her skills.*

*He's open to ideas.*

These notes are an accurate recording of my statements.

*BAT*

.nitials

Appx484

Inquiry panel members present:
- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☐ Paige Ormiston (legal advisor)

Date: 23 MAR 2018
Time: 1530
Location: MI-380
Name: MIDN IIC ~~Emerson~~ Warren
Course: HE 302
Section: 5001

Describe the general atmosphere in Dr. Fleming's class.

Really enjoyed the class. Open and relaxed. Free discussion. Focus was on English. Made class enjoyable

Have you sought EI from him, and if yes, what were the sessions like?

No

Did you have any other interactions with Dr. Fleming outside the classroom?

No, beyond saying Hi

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

Similar to other English classes.

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

Brush and floss lesson and some other "life lessons"

Yes, covered the material. Need to know a lot about life to write and understand English. Covered a lot of material

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

~5% unrelated
~15-20% related

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

No

Did you receive any emails from Dr. Fleming? Did the content include pictures?

Yes. Photos of vacations. Sent a shirtless picture (to whole class)

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

Yes      ↳ follow like sheep

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

Yes, mentioned two complaints by female Mids. No intimidation.

Appx485

Was profanity used in classroom or EI?  If yes, what?

*Yes by students on occasion ?*

Was sexually suggestive language used?  If yes, what?

*Yes, in context of poems and with a clear connection*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

*No*

Did Dr. Fleming touch students in class?  If yes, how?

*Could try on jacket and take pictures with arms around them*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*One shirtless picture*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

*No*

!as Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*No*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

Is there anything else you would like to add?

*Funny, one of my favorite teachers     open discussions*

*Friendly, helpful     really cared about MIDS*

These notes are an accurate recording of my statements.

*[initials]*
.nitials

Appx486

inquiry panel members present.

- ☑ Keith Lindler
- ☑ Jeffrey Fitzgerald
- ☑ Richard McGrath
- ☑ Paige Ormiston (legal advisor)

Date: 06 MAR 2018
Time: 1310
Location: MI- 380
Name: MIDN 4/c Bower
Course: HE112
Section: _____

Describe the general atmosphere in Dr. Fleming's class.

*Upbeat. Lively.*

Have you sought EI from him, and if yes, what were the sessions like?

*No*

Did you have any other interactions with Dr. Fleming outside the classroom?

*Asked to read over first paper (via e-mail)*

Was Dr. Fleming's class different from other classes you've taken at USNA? If yes, how?

*A little more eccentric. Expressed opinions freely.*

Did Dr. Fleming cover the assigned material? Did he cover other topics? Did he spend significant class time on "off topic" discussions?

*Did covered class topics, but also several other subjects*

If yes, what did those off topic discussions cover? What percentage of class time do you estimate he spent on those "off topic" discussions?

*50%*      *Began with class topics, then veered off.*

Did he treat all students the same? Was anyone singled out? On what basis (race, gender, national origin, etc.)?

*"Oldster," who was prior enlisted ; singled-out due to age*

Did you receive any emails from Dr. Fleming? Did the content include pictures?

*Yes. Picture of bicep*

Did he have nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

*Yes. Disagreed, but was open to hearing different opinion.* *Positive attitude toward people in class. Trying to build up.*

Did he ever talk about students filing complaints against him? If yes, did he mention what happened to those students?

*Talked about tenure. No intimidation about making complaint.*

*Enclosure 117*

Appx487

Was profanity used in classroom or EI?  If yes, what?

Yes. Used all the words. More than once per day. Not directed at individuals.

Was sexually suggestive language used?  If yes, what?

Yes. About "this sucks," Poem with sexual topic was discussed.
↳ didn't use it, negative/ revote to say

Did Dr. Fleming mispronounce student names?  Specifically asian names?  How did he react when students corrected him when he got their names wrong?

No.

Did Dr. Fleming touch students in class?  If yes, how?

Would take pictures with sport coat on Mids and arm around. A lot of talk on wardrobe.

Did you receive emails from Dr. Fleming with inappropriate language or images?

Yes. Bicep picture was "odd."

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

No

s Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

No

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

No. Talked to father about English teacher being a little different.

Is there anything else you would like to add?

These notes are an accurate recording of my statements.

TJB
.tials

Appx488

y panel members present.

☑ Keith Lindler
☑ Jeffrey Fitzgerald
☑ Richard McGrath
☑ Paige Ormiston (legal advisor)

Date: 05 MAR 2018
Time: 1500
Location: MI-380
Name: MIDN 4/c SAMMELL
Course: HE 112
Section: 2001

be the general atmosphere in Dr. Fleming's class.

ou sought EI from him, and if yes, what were the sessions like?

e, but was not able to schedule before suspension

have any other interactions with Dr. Fleming outside the classroom?

No

Fleming's class different from other classes you've taken at USNA? If yes, how?

ived to grabbed student's attention. Talked "to" students, not "at" students

Fleming cover the assigned material? Did he cover other topics? Did he spend significant class "off topic" discussions?

rough the material, but some days went off on tangents

hat did those off topic discussions cover? What percentage of class time do you estimate he those "off topic" discussions?

about 20-25% off topic

eat all students the same? Was anyone singled out? On what basis (race, gender, national c.)?

Called on prior-semester students to participate

eceive any emails from Dr. Fleming? Did the content include pictures?

es

ve nicknames for Midshipmen, like goldfish or midsheeple? Did he explain why?

s. Due to herd mentality and short memory/attention span

er talk about students filing complaints against him? If yes, did he mention what happened to lents?

not recall.

Enclosure 118

Appx489

*Saunell*

Was profanity used in classroom or EI?  If yes, what?

*Yes. But in general, not at people individually*

Was sexually suggestive language used?  If yes, what?

*Do not recall*

Did Dr. Fleming mispronounce student names? Specifically asian names?  How did he react when students corrected him when he got their names wrong?

Did Dr. Fleming touch students in class?  If yes, how?

*Swapped jacket with a student*

Did you receive emails from Dr. Fleming with inappropriate language or images?

*Yes*

Did Dr. Fleming display pictures of his children and their dates in your class?  If yes, did he make disparaging remarks about the women and girls in those photos?

Is Dr. Fleming made you uncomfortable in class or EI (personally, not academically uncomfortable)?

*No*

If you found Dr. Fleming's behavior to be inappropriate or unprofessional, did you report it to anyone?  If yes, who and when?

Is there anything else you would like to add?

These notes are an accurate recording of my statements.

*UZS*

Initials

Appx490



Keith Lindler <lindler@usna.edu>

## Re: Meeting with Inquiry Panel - 2nd Invitation

1 message

**Bruce Fleming** <fleming@usna.edu>                                    Mon, Apr 30, 2018 at 1:37 PM
To: Keith Lindler <lindler@usna.edu>, Jason Ehrenberg <jhe@becounsel.com>

Dr. Lindler:

I am writing to you directly rather than asking my lawyer Jason Ehrenberg to handle it because the version of the request that reached you (not through the email you refer to BTW) was clearly misunderstood. Thus I am responding to prevent further misunderstanding.

The request was not for the third-hand hall gossip you have collected from your mandatory interviews with my students framed by telling them that I had been accused of bad things and where the questioning was controlled only by you and your colleagues, which is what I assume the strange ragtag list of complaints, none of which can be used to punish me, is. My lawyer was referring to the official complaint by a student or students that made its way from what appears to have been a verbal grievance session possibly with coaches (at least to judge from the remarks of the Vice Academic Dean at the Faculty Senate) to that Vice Academic Dean, an official government document that will be part of the final packet with which we will go to court or the MSPB. In other words, the formal memo-style complaint (here a technical term not to be confused with verbal moaning and groaning) that the administration is using as "justification" for your activities.

Clearly this is not going to be forthcoming at this point, so I will once again decline your invitation, for this reason and also because I will not appearing voluntarily before a committee (you call it an "inquiry panel") where whatever I say can be used against me (see the transcript of the last time I did this) but that is presented as being merely neutral, a gathering of "facts," and where whatever I say is merely an afterthought presented as raw data to the administration to do with as it chooses. It goes without saying that this whole process is a parody of due process, one that the administration, partly through you, controls completely. To be clear: you have made it clear that my participation is voluntary. I therefore decline.

However I have responded to the complaints below in written form so you can include them with the packet you will be sending forward. If you choose not to include these written responses, this email will show that I attempted to have them be part of the record.

Sincerely,
Bruce Fleming, PhD

On Monday, 12 February 2018, the Division Director of Humanities and Social Sciences directed this panel to conduct a fact-finding inquiry to determine the facts and circumstances surrounding the following allegations:

 You discriminate against students on political grounds.  Specifically, you referred to multiple students as right wing extremists.

FOR DISCRIMINATION TO OCCUR THE PERSON ALLEGING IT HAS TO HAVE SUFFERED HARM AS A RESULT OF HIS/HER VIEWS (HERE). THIS IS NOT ALLEGED, SO THIS IS A NON-STARTER. FURTHERMORE, I CATEGORICALLY DENY EVER CALLING ANY STUDENT A "RIGHT-WING EXTREMIST," THOUGH IT IS WITHIN MY RIGHTS TO DO SO, ESPECIALLY AS A JOKE—SOMETHING THIRD-HAND ANECDOTES MONTHS AFTER THE FACT CANNOT ESTABLISH. IN ANY CASE, THE FACT THAT YOU ARE PRESENTING THIS IN AN OFFICIAL CAPACITY AS A COMPLAINT THAT I MUST ANSWER IS AN ATTACK ON MY CONSTITUTIONAL FIRST AMENDMENT RIGHTS AS A FEDERAL EMPLOYEE AND THE TERMS OF MY AAUP-DEFINED TENURE.

IT'S ALSO FUNNY BECAUSE IN MOST CIRCLES I AM CONSIDERED QUITE RIGHT-WING. AT LEAST BY THE STANDARDS OF CONTEMPORARY ACADEMIA,3 STARTING WITH THE FACT THAT I HAVE

*Enclosure /21*

TAUGHT FOR 31 YEARS IN A MILITARY INSTITUTION. IT ALSO FAILS TO USE THE ASSUMPTION OF GOOD FAITH FOR TENURED 31-YEAR PROFESSORS THAT IS APPROPRIATE HERE.

You use demeaning language to refer to your students.  Specifically, yrred to them as goldfish and midsheeple.

THIS IS QUITE TRUE, AND BOTH ARE JOKES IN ORDER TO MAKE A PEDAGOGICAL POINT, WHICH YOU CANNOT ATTACK BECAUSE THE NATURE OF MY JOB IS TO MAKE CLASSROOM DECISIONS. IT'S ALSO EFFECTIVE, BECAUSE THE OVERWHELMING MAJORITY OF THE STUDENTS UNDERSTAND ITS PURPOSE AND ITS JUSTIFICATION. MANY PLAY ALONG AND SAY 'BAAAA' OR MAKE GOLDFISH GLUBBING NOISES. THE UNDENIABLE FACT IS THAT MIDSHIPMEN, OUT OF FEAR OF REPRISALS FROM THE ADMINISTRATION, ACT LIKE SHEEP AND DO WHAT THEY ARE TOLD WITHOUT CONSIDERING THE CONSEQUENCES OF THEIR INACTION. FURTHER, THEY ARE UNBELIEVABLY FORGETFUL—REPEATEDLY NOT BRINGING THEIR GRAMMAR BOOKS ON FRIDAY WHEN WE ALWAYS GO OVER IT, FOR EXAMPLE, AND FORGETTING DUE DATES OF PAPERS DESPITE THE FACT THAT THEY ARE ON THE SYLLABUS. CALLING THEM SHEEP AND GOLDFISH IS A WAY TO GET THEM TO TAKE RESPONSIBILITY WITHOUT FALLING INTO THE NAVAL ACADEMY TRAP OF MERELY GETTING STERN AND PUNISHING THEM. IT'S PURPOSE IS TO MAKE THEM TO FEEL ASHAMED AND DO BETTER. THE ADMINISTRATION MAY BELIEVE THEY ARE AMERICA'S BEST AND BRIGHTEST, AS IT TELLS THEM REGULARLY, BUT I SEE KIDS DEADENED BY MEANINGLESS RULES SELECTIVELY APPLIED TO THE POINT WHERE THEY DON'T EVEN ACT LIKE HALFWAY FUNCTIONAL HUMAN BEINGS.

TO BE CLEAR, USNA BELIEVES AND CLAIMS IT INCULCATES A SENSE OF PRO-ACTIVE RESPONSIBILITY IN STUDENTS, BUT IN FACT THEY ARE THE MOST PASSIVE AND LETHARGIC GROUP OF PEOPLE I HAVE EVER SEEN. I SPEND MUCH OF THE OPENING OF EACH CLASS PERIOD TRYING TO GET SOME ENERGY GOING. I'M SURE THERE ARE A FEW STUDENTS WHO DON'T LIKE HEARING ANYTHING BUT THE BS THE ADMIN DISHES OUT THAT THEY ARE THE 'BEST AND THE BRIGHTEST.' BUT THEY NEED TO HEAR THEY HAVE BEEN DEADENED BY USNA AND CAN DO SOMETHING TO COMBAT THIS. OR I CAN GIVE UP ON EXPECTING THEM TO ACT LIKE ADULTS, WHICH I REFUSE TO DO.

TO BE CLEAR TOO I HAVE SAID ALL THESE THINGS IN PRINT SO TRYING TO PUNISH ME FOR EXPRESSING THEM IN CLASS IS A VIOLATION OF MY PROFESSIONAL DUTY AS WELL AS MY FIRST AMENDMENT RIGHTS, WHICH I AS A FEDERAL EMPLOYEE ENJOY IN THE CLASSROOM.

You allow your students to tell jokes of a sexual nature in class.

I'D LIKE TO SEE SOME NUMBERS ON THIS, AND THE JUDGES WILL ASK FOR NUMBERS TOO. HOW MANY? HOW OFTEN? HOW SEXUAL? ARE ANY JOKES OF OTHER SORTS TOLD? DO OTHER OFFICERS AND PROFESSORS EVER ALLOW WHAT YOU CALL JOKES OF A SEXUAL NATURE? BESIDES, WHO SAYS THIS IS A PROHIBITED PRACTICE? THERE IS NO BAN ON ANY REFERENCE TO HUMAN REPRODUCTION AT USNA.

IT IS QUITE TRUE THAT FRIDAY, BECAUSE THEY ASK FOR IT, IS JOKE DAY IN MY CLASSROOM AS IT IS IN KING HALL. BECAUSE I AM A CIVILIZED HUMAN BEING, I TELL THEM THEY CANNOT TELL DEAD BABY JOKES (I HAVE THREE CHILDREN), HELEN KELLER JOKES (I HAVE A DISABLED DAUGHTER), ANTI-GAY JOKES (I HAD A GAY BROTHER WHO DIED OF AIDS), AND ANYTHING TOO RAUNCHY. THEY THEREFORE USUALLY TELL COMPLETELY INNOCENT, DUMB JOKES. HOWEVER WHEN THEY ARE FULL OF BEANS SOME OF THEM WILL SOMETIMES ASK IF THEY CAN GET A LITTLE DARING. THAT IS A TRAP, BECAUSE IF I SAY NOTHING SEXUAL ALLOWED THAT IS UNREALISTIC FOR YOUNG ADULTS CAUGHT IN A "COLLEGE" THAT FORBIDS SEXUAL EXPRESSION. (I HAVE WRITTEN ABOUT THIS FOR THE ATLANTIC MONTHLY.)  SO USUALLY I SAY OK, USE YOUR JUDGMENT, A LITTLE DARING BUT NOT RAUNCHY. I HAVE NO RECOLLECTION OF

THAT LINE EVER HAVING BEEN CROSSED, AND IN ANY CASE IT IS A GOOD PROFESSIONAL DECISION TO LET THEM DECIDE IF A JOKE IS SOCIALLY OK OR NOT—IT IS PART OF THEIR EDUCATION. SEVERAL TIMES I HAVE HAD TO SAY, THAT ONE'S OVER THE LINE. THEY LEARN.

THIS IS THE PROBLEM WITH USNA, AS I HAVE WRITTEN ON MULTIPLE OCCASIONS: IT THINKS IT HAS SOLVED THE PROBLEM BY FORBIDDING AND PUNISHING RATHER THAN DISCUSSING AND GETTING THEM TO THINK FOR THEMSELVES. AFTER 31 YEARS I HAVE A GOOD SENSE OF WHAT MIDSHIPMEN KNOW AND WHAT THEY NEED, AND SPEND CLASSROOM TIME ADDRESSING THOSE ISSUES. I WOULD EXPECT THANKS RATHER THAN CENSURE FOR TRYING TO MAKE THEM BETTER OFFICERS—BUT OF COURSE THIS 'INVESTIGATON,' LIKE THE LAST SEVERAL ONES, ARE ABOUT USNA ADMINISTRATION TRYING TO FIGURE OUT A WAY TO SILENCE ME.

You regularly discuss sexual matters unrelated or only tangentially related to the readings in class. Specifically, you discussed transgender sex reassignment surgery and anal sex in minute anatomical detail in class.

TRY SAYING "REGULARLY" IN COURT, WHERE THIS IS ALL HEADED, AND SEE WHAT YOU GET. ALSO PLEASE DEFINE 'UNRELATED' OR 'TANGENTIALLY RELATED.' ARE YOU INSIDE MY HEAD? WHAT WAS THE CONTEXT? YOU DON'T KNOW.AND YOU'RE HEARING IT MONTHS LATER FROM STUDENTS YOU HAVE ENCOURAGED TO COMPLAIN TO YOU, WHOM YOU OUTRANK, WITHOUT MY LAWYER HAVING A CHANCE (UNTIL IT COMES TO COURT) TO CROSS-EXAMINE THEM.

LET ME START WITH THE EASY ONE: I HAVE NO IDEA WHAT "MINUTE ANATOMICAL DETAIL' OF ANAL SEX CONSTITUTES, AND HAVE NO RECOLLECTION OF EVER HAVING MENTIONED IT. OR— WAIT!-- WAS IT WHEN I WAS TELLING THEM TO USE THE CONDOMS GIVEN OUT BY BMU BECAUSE THEY PREVENT STDS AND PREGNANCY, AND THAT THE RISKS ARE GREATER IN THE CASE OF ANAL SEX BECAUSE OF RETINAL TEARS? KEEP IN MIND THAT STRAIGHT ANAL SEX IS PART OF THE REPERTOIRE OF THIS GENERATION, AND THAT POST-DADT, GAYS ARE ALLOWED IN THE MILITARY.

THAT, I ALMOST CERTAINLY DID SAY. THE 'USE A CONDOM' LECTURE IS ONE OF MY PUBLIC SERVICE LECTURES (OTHERS ARE ABOUT HOW TO PICK AND CHOOSE THE FOOD IN KING HALL SO AS NOT TO DIE FROM ALL THE FRIED FAT, AND THAT THEY SHOULD NEVER USE STEROIDS), AS ONE SECTION OF A FIVE-MINUTE SPIEL ALSO TELLING THEM TO USE DENTAL FLOSS AND SUNBLOCK, THAT I TYPICALLY GIVE FALL SEMESTER BEFORE THANKSGIVING AND SPRING SEMESTER BEFORE SPRING BREAK. BMU GIVES OUT CONDOMS BUT NOBODY TO MY KNOWLEDGE TELLS THEM WHY OR EVEN HOW TO USE THEM. I'VE LEARNED SOME THINK YOU PUT THEM ON ONLY WHEN YOU'RE CLOSE TO ORGASM. I AM TRYING TO KEEP THEM ALIVE AND HEALTHY TO A RIPE OLD AGE. THIS INSTITUTION DOES VERY LITTLE TO HELP THEM MAKE GOOD CHOICES BECAUSE IT NEVER EXPLAINS THE WHY. IT JUST FORBIDS AND PUNISHES. THAT IS WHY I HAVE SAID IN WRITTEN FORM THAT THE NAVAL ACADEMY SHOULD BE FUNDAMENTALLY REVAMPED OR CLOSED. AND THAT OF COURSE IS THE REAL REASON THERE IS AN INVESTIGATION GOING ON NOW.

TO PUT THINGS IN CONTEXT: I AM NOT FORBIDDEN FROM MENTIONING S-E-X IN AN ENGLISH CLASS FOR FUTURE OFFICERS. MANY STORIES AND NOVELS REVOLVE AROUND SEX,SEXAUALITY IS PART OF HUMAN EXPERIENCE, AND USNA IS PERVERTING YOUNG PEOPLE BY MAKING IT SEEM COMPLETELY NEGATIVE AND AGGRESSIVE, AS THE SAPR/SAVI BRIEFS DO, OR FORBIDDEN (STUDENTS PUNISHED FOR SITTING ON EACH OTHERS' LAPS). THESE ARE YOUNG ADULTS, MANY OF THEM IN THEIR EARLY OR MID-20S, A GOOD NUMBER PRIOR-ENLISTED. I ASSURE YOU THAT VERY FEW ARE VIRGINS, AND THEY ARE GETTING NO REPEAT NO ADULT GUIDANCE AT USNA ON HOW TO MAKE GOOD SEXUAL CHOICES. MY BROTHER DIED OF AIDS—I DON'T WANT THEM TO. THEY GO TO AN INSTITUTION THAT POLICES THEIR SEXUAL LIVES, AND IT DRIVES THEM CRAZY. IT'S ALSO NOT GOOD EDUCATION POLICY FOR ME TO

Appx496

PRETEND THAT I NEITHER KNOW ABOUT NOR AM INTERESTED IN S-E-X. ALL OF US ARE INTERESTED, AT LEAST NORMAL PEOPLE, AND IN AN INSTUTION THAT PREPARES STUDENTS TO LEAD SEXUALLY ACTIVE ADULTS AND BE SO THEMSELVES THAT FORBIDS ANY NON-PUNITIVE DISCUSSION NEITHER THE TAXPAYERS NOR THE STUDENTS ARE BEING WELL SERVED BY PRETENDING IT DOESN'T EXIST. IF WE DON'T TALK TO THEM ABOUT IT, THEY CAN'T MAKE GOOD CHOICES. AND YES, THAT IS PART OF WHAT IT MEANS TO BE AN ENGLISH PROFESSOR AT USNA. MORALLY, MENTALLY AND PHYSICALLY, REMEMBER? THIS IS HOLISTIC EDUCATION, AT LEAST IN MY PROFESSIONAL VIEW—A VIEW I HAVE EXPRESSED IN PRINT, SO CARRYING IT OUT IN THE CLASSROOM IS PROTECTED BY MY FIRST AMENDMENT RIGHTS AND AAUP-DEFINED TENURE. THAT'S WHY I HAVE STUDENTS, MALE AND FEMALE, STILL IN CONTACT WITH ME AFTER DECADES, AND WHY I GET STUDENTS TELLING ME I'M THE BEST PROFESSOR THEY EVER HAD AT USNA, OR A NEEDED BREATH OF FRESH AIR.

LET ME BE CLEAR TOO THAT WITH DEGREES IN COMPARATIVE LITERATURE, SEXUALITY IS PART OF MY PROFESSIONAL SCOPE, AND HENCE WHAT I AM ENCOURAGED TO SHARE WITH STUDENTS. I AM THE AUTHOR OF A BOOK CALLED "SEXUAL ETHICS" AND ARTICLES ON "THE VOCABULARY OF TRANSGENDER THEORY" AND "NO-FLY ZONES; A NEW THEORY OF MALE SEXUALITY.' SO PLEASE DON'T TRY AND TELL ME I AM 'JUST AN ENGLISH PROFESSOR AND I SHOULD STICK TO THE TEXTS.' MY RESEARCH FEEDS INTO THE CLASSROOM AND IF YOU WANT TO GO AFTER ME FOR THE NATURE OF MY RESEARCH, GOOD LUCK. THIS IS A NAVY THAT NOW ALLOWS TRANSGENDER STUDENTS AND SERVICE MEMBERS—SO OF COURSE I WILL EXPLAIN WHAT THAT MEANS!

You email partially clothed photos of yourself to your students.

THIS ONE IS FALSE, AS WELL AS BEING OFF LIMITS TO YOU, AS IT IS BASED ON A SINGLE INCIDENT OF TWO YEARS AGO ABOUT WHICH MY CHAIR SPOKE TO ME AND WHICH HAS NOT BEEN REPEATED, WHICH THEREFORE CANNOT BE PART OF THIS INVESTIGATION (EXCEPT INSOFAR AS THIS INVESTIGATION IS BEING USED AS AN EXCUSE TO HOOVER UP ANY DAMAGING ALLEGATION IT CAN), AND WHICH IN ANY CASE WAS INNOCENT.

 BUT OF COURSE I AM HAPPY TO EXPLAIN THE CIRCUMSTANCES. FIRST, THIS WAS A RARE ALL-MALE PLEBE CLASS: THERE ARE THINGS I CAN SAY TO A GROUP OF MEN I CANNOT SAY IN MIXED COMPANY, EVEN IN A CLASSROOM. THE TEXT WAS JOHN KEATS'S 'ODE ON A GRECIAN URN,' WHICH MAKES THE POINT THAT PERFECTION IS IDEAL FOR HUMANS, ACHIEVABLE AS A PERMANENT STATE ONLY AT THE COST OF DEATH BECAUSE HUMANS ARE CAUGHT IN TIME. I REGULARLY TEACH THIS POEM, AND IF THEY WERE LEFT TO THEIR OWN DEVICES THEY WOULD SHUT THE BOOK AS FEW OF THEM HAVE ANY IDEA WHAT IT MEANS OR HOW IT COULD RELATE TO THEM.

INCIDENTALLY LET ME INTERJECT THAT I HAVE WRITTEN IN PROFESSIONAL MAGAZINES ABOUT MY THEORY OF PEDAGOGY WHICH ACKNOWLEDGES THE PHYSICAL FACT OF THE CLASSROOM AND THE THEATRICAL ASPECT OF TEACHING—AND WRITTEN A WHOLE BOOK ABOUT THE NECESSITY TO RELATE LITERATURE TO THE LIVES OF MUCH YOUNGER PEOPLE THAN I AM —"WHAT LITERARY STUDIES COULD BE, AND WHAT IT IS," AND A SEMINAL ARTICLE FOR THE CHRONICLE OF HIGHER EDUCATION CALLED "LEAVING LITERATURE BEHIND"—WHICH IS WHAT MOST CLASSROOMS DO THESE DAYS. THE WAY TO INTEREST STUDENTS IN LITERATURE IS TO RELATE IT TO THEIR LIVES. A SIZEABLE PERCENTAGE OF THE LIVES OF YOUNG ADULTS IS DEVOTED TO THINKING ABOUT AND ENGAGING IN SEX. WE CAN HELP THEM MAKE GOOD CHOICES THROUGH CONSIDERING LITERATURE. SEX IN USNA SAPR/SAVI BRIEFS IS ALWAYS NEGATIVE. THAT IS UNHEALTHY AND DANGEROUS IN FUTURE OFFICERS.

BECAUSE I KNOW HOW FOREIGN A POEM IN IAMBIC PENTAMETER FROM TWO CENTURIES AGO (MANY OF WHOSE WORDS THEY DON'T UNDERSTAND AND DESPITE MY TELLING THEM TO LOOK

UP, HAVE FAILED TO GRASP), I REGULARLY TRY TO COME UP WITH PARALLELS AND EXAMPLES OF THINGS THEY ARE FAMILIAR WITH TO MAKE KEATS'S POINT THAT 'HEARD MELODIES ARE SWEET; THOSE UNHEARD ARE SWEETER'—I.E THAT FANTASY ISN'T REALITY. SOME OF THE EXAMPLES I USE ARE THEIR VIEWS OF USNA BACK HOME WAITING TO COME, WHICH ARE INVARIABLY SWEETER THAN THE REALITY, ACTION MOVIES WHERE THE HERO NEVER DIES, AND WORKOUT MAGAZINES WITH IMPOSSIBLY BUFF 'PERFECT' COVER BOYS. IN ONE CLASS TWO YEARS AGO, THOUGH I TEACH THIS POEM EVERY FALL SEMESTER AND IN POETRY CLASS FOR UPPER CLASS—REPEAT, ONE CLASS,THE ALL-MALE ONE—I DECIDED IT WAS APPROPRIATE TO SEND AN EMAIL AS A PS TO DISCUSSION, AS I FREQUENTLY DO—CHECK OUT THE NUMBER OF NEWSPAPER ARTICLES I SEND TO CLASSES, I.E THIS WAS ONE OF DOZENS THAT SEMESTER— WITH THE FAMOUS PICTURE OF MARKY MARK IN CALVIN KLINE UNDERWEAR FROM TIMES SQUARE THAT STARTED THE TREND OF USING BUFF GUYS I ADVERTISING, A FULL-PAGE SHOT OF SHIRTLESS RAPHAEL NADAL FROM THE NEW YORK TIMES FROM THAT VERY WEEK (THAT'S UNDOUBTEDLY WHAT GAVE ME THE IDEA)—AND YES, A 20-YEAR-OLD MODEL SHOT IN A SPEEDO OF BRUCE FLEMING. WHY? BECAUSE I WAS THE GUY IN THE PICTURE AND SO COULD EXPLAIN TO THEM KEATS'S POINT—THAT YES IT'S PERFECT BUT IT'S ALSO FAKE. IT WAS ONE OF 100 TAKEN THAT PHOTO SHOOT, AND IT WAS THE ONE CHOSEN AS THE LIGHT WAS PERFECT, I WAS GREASED UP, AND SO ON. I COULD TELL THEM ABOUT THE 99 PICTURES TAKEN SECONDS APART THAT WERE NOT PERFECT, AND SO MAKE KEATS'S POINT—THE MEN ON THE URN ARE DESCRIBED AS SO BUFF THEY COULD BE GODS. BUT FOR THAT REASON THEY DO NOT REPRESENT REALITY, AND NEITHER DOES A PERFECT COVER BOY. BUT THEY LOVE LOOKING AT HIM ALL THE SAME. WHY? THAT'S THE SUBJECT OF THE POEM—BECAUSE WE LIKE TO SEE PERFECTION EVEN IF WE NEVER ACHIEVE IT. I ALSO ENCOURAGE THEM TO LOOK AT BEFORE AND AFTER PICTURES OF GERARD BUTLER IN THE MOVIE 300.

LET ME SAY THAT LIKE MOST MALE MIDSHIPMEN I AM A WORKOUT FIEND AND HAVE BEEN USING THE SAME WEIGHT ROOMS, LOCKER ROOMS, AND POOLS AS THEY FOR 31 YEARS. SOMETIMES THEY ASK TO WORK OUT WITH ME, WHICH I AM HAPPY TO DO. I START EVERY SEMESTER WITH ONE-ARMED PUSHUPS.

ONE PICTURE, NOT PICTURES, WITH TWO OTHERS OF FAMOUS ADVERTISEMENTS OF TWO OTHER MEN. AND NOT PARTIALLY CLOTHED, COMPLETELY CLOTHED IN A BATHING SUIT WITH GOGGLES, AS I AM REGULARLY EVERY WEEK IN LEJEUNE POOL SURROUNDED BY MIDSHIPMEN SIMILARLY CLOTHED. A BATHING SUIT IS OFFICIAL NAVY GEAR AND THAT IS WHAT I AM WEARING IN THE PICTURE.

HOWEVER I WILL ADD THAT UNLIKE MANY OLDER PEOPLE, I AM UNAPOLOGETIC ABOUT MY PHYSICALITY, PARTLY BECAUSE IT'S INTRINSICALLY GOOD, PARTLY BECAUSE IT'S A WAY FOR A MAN IN HIS 60S TO BOND WITH REALLY YOUNG ADULTS, ESPECIALLY AT AN INSTITUTION WHERE PHYSICALITY IS PART OF THE STATED MISSION. I ITRY TO HIT ALL THREE PARTS OF THE MISSION.

TO BE CLEAR, THE PICTURE IN QUESTION WAS ONE LIKE THOSE ON A DOZEN WORKOUT MAGAZINES IN THE SUPERMARKET. PHYSICALITY IS NOT SEXUALITY. IF THERE WAS A GAY MALE MIDSHIPMAN WHO WAS TURNED ON, THAT WAS NOT MY INTENT AND I CANNOT CONTROL THAT. IN ANY CASE ON THE ADVICE OF THE CHAIR I HAVE NOT DONE IT AGAIN.

FINALLY THE MIDSHIPMAN WHO WAS TALKING ABOUT THIS INCIDENT BACK THEN SAID REPEATEDLY HE WAS NOT LODGING A COMPLAINT, JUST COMMENTING.IT WAS ADDRESSED, AND HERE IT IS AGAIN.

You touch your students on the neck, shoulders, and back in class without their consent.

Appx498

THIS IS TOTAL BULLSHIT. I AM AN ATHLETE WHO RESPONDS TO ATHLETES. AND I AM NOT REQUIRED TO HEAR FROM A FELLOW 200 LB MAN OPENING HIS ARMS TO GIVE ME A HUG AT THE END OF CLASS 'YOU HAVE PERMISSION TO GIVE ME A HUG.' I AM A FUNCTIONAL ADULT WHO CAN READ BODY LANGUAGE AND I HAVE NEVER EVER FORCED PHYSICALITY ON A STUDENT OR ANYBODY ELSE. IF S/HE STEPS ASIDE OR DROPS HIS/HER GAZE OR SEEMS WITHHOLDING, I DO NOT EXPRESS PHYSICAL AFFECTION. AND I DO NOT HUG EVERYBODY, AND CERTAINLY NOT EVERY PERIOD, AND NOT AT ALL WITH PLEBES, WHOM I CALL MR AND MISS. I AM PARTICULARLY WARY OF FEMALES, WAITING FOR THEM TO SAY 'PERMISSION TO HUG' OR 'DON'T I GET A HUG TOO?'

I'D ALSO LIKE TO ASK YOU TO GOOGLE 'TRUMP HUGS' TO GET  NUMEROUS EXAMPLES OF THE COMMANDER-IN-CHIEF TOUCHING PEOPLE IN THESE PLACES WITHOUT HEARING CONSENT, MOST RECENTLY PERHAPS THE PRESIDENT OF FRANCE.

BUT IT'S QUITE TRUE THAT I DO FEEL AFFECTION FOR THESE YOUNG PEOPLE SO FULL OF DREAMS THAT ARE SO BRUTALLY DASHED BY MUCH OF WHAT USNA DOES. BY THE SAME TOKEN, I BELIEVE MANY OF THEM SEE ME AS A VIABLE ROLE MODEL BECAUSE I'M ALMOST 64, IN GREAT SHAPE WITH PUSHUPS TO PROVE IT (WHICH I DO WITH THEM WHEN WE DO PUSHUPS AS A CLASS TO WAKE UP—THINK OF HOW DEMEANING IT IS TO A PROFESSOR TO HAVE TO WAKE THE CLASS UP TO GET THEM TO PAY ATTENTION!) AND UNFRAID TO TALK ABOUT THINGS THAT THEY CAN RELATE TO.

BTW LET ME SAY THAT BONDING WITH THEM IS A LARGE PART OF THE BATTLE TO GET THEM TO RELATE TO ENGLISH—IT'S A RARE PLEBE WHO WANTS TO COME TO ENGLISH CLASS, SO I HAVE TO BREAK THROUGH THE RESISTANCE. MOST TELL ME IT'S THE ONE CLASS—THE ONE CLASS— THEY LOOK FORWARD TO, AND THAT THEY SLEEP THROUGH OTHERS. NOBODY SLEEPS THROUGH MY CLASSES.

BUT OF COURSE YOU HAVE NO RECORD OF THE STUDENTS WHO LOVE ME BECAUSE YOU HARVESTED TARGETED COMPLAINTS AND THAT'S WHAT YOU ASKED THE STUDENTS WHO HAD TO COME TO AN INTERROGATION BY THEIR MILITARY SUPERIORS. ANYWAY WHO DEFINES HOW MANY DISSATISFIED EXCEPTIONS OUTWEIGH THE DELIGHTED ONES? THAT'S NOT THE WAY PROFESSORS' CONTRACTS ARE WRITTEN. AND I'D LIKE TO HEAR STUDENT COMPLAINTS ABOUT OTHER PROFESSORS. HOW MANY WOULD SURVIVE A SINGLE COMPLAINER BEING USED AS THE FILTER TO VACUUM UP OTHERS ALONG THE SAME LINE? I HAVE HEARD SO MANY COMPLAINTS FROM MIDS ABOUT BORING OR CRITICAL PROFESSORS I COULD VOMIT. AND STUDENTS HAVE EXPRESSED SO MANY COMPLAINTS ABOUT AGGRESSIVE OR INEFFECTIVE OFFICERS, INCLUDING COMMANDANTS AND SUPERINTENDENTS, I WISH I HAD A DOLLAR FOR EACH TIME.

You displayed photos of your son's date to a dance in class and made derogatory remarks about her, her clothing, and her mother to your students.

QUITE TRUE. USUALLY WITH THE UPPERCLASS IN THE SMALL SEMINAR ROOM WE SPEND FIVE MINUTES RE-BONDING BEFORE TURNING TO THE WORK. THEY ASKED WHAT WAS NEW. I TOLD THEM. THE SON'S DATE WAS TOO SCANTILY DRESSED FOR A 15 YEAR OLD, AND THE MOTHER WASN'T ANY BETTER. THERE IS NO BAN ON ME TELLING STORIES ABOUT MY LIFE—THIS ONE WAS ABOUT THE OVER-SEXED NATURE OF ADOLESCENTS (FUNNY IN THE CONTEXT OF THIS NARRATIVE YOU ARE TRYING TO CONCOCT THAT I AM A SEX FIEND IN CLASS). MANY PROFESSORS TALK ABOUT THEIR KIDS. SERIOUSLY?

You purposely mispronounced an Asian student's last name multiple times, and told him to "fuck off" when he repeatedly corrected you.

THIS ONE WILL MAKE A GREAT SCENE AT THE MSPB. I AM A NICE PERSON WHO TRIES TO
GET NAMES RIGHT, BUT CAN'T ALWAYS. I NEVER SAY 'FUCK YOU' TO STUDENTS, AND
YOUR USE OF 'PURPOSELY' IS CONJECTURE. AND FOR SOME REASON YOU SEEM TO THINK
THE ASIAN NAME IS RELEVANT—ARE YOU TRYING TO LOOP IN THE LAST UNSUCCESSFUL
INVESTIGATION WHERE AN UNDER-PERFORMING ASIAN SOCCER PLAYER TRIED TO
ALLEGE THAT I WAS PREJUDICED AGAINST ASIANS DESPITE THE NUMEROUS EI SESSIONS I
GAVE HIM AND THE FACT THAT HE DID OK IN MY CLASS? IT CERTAINLY SEEMS SO.

You make known to your students that you have previously litigated complaints against you by USNA
administrators and that any future complaints are likely to be unsuccessful because you have tenure.

IT IS NOT TRUE THAT I SAID I HAVE LITIGATED, WHICH INVOLVES A CIVILIAN COURT, SO YOU'RE
WRONG THERE. IT IS QUITE TRUE THAT THE OSC HAS INTERVENED ON MY BEHALF, AND THAT
THERE IS ANOTHER CURRENT OSC COMPLAINT, AND THAT MY LAWYER IS RE-FILING A CIVILIAN
LAWSUIT AGAINST THE NAVAL ACADEMY'S VIOLATION OF MY FIRST AMENDMENT RIGHTS. AND
I'M SURE I DID MENTION IT IN SOME CLASSES AS PROOF OF THE NAVAL ACADEMY'S TARGETED
HARASSAMENT AS A RESULT OF WHAT I WRITE IN PUBLIC FORUMS—ALL OF WHICH ARE
PROTECTED. BUT I'VE GOT YOU ON THIS ONE, AS YOUR PUTTING THIS FORWARD UNDER
ADVERSARIAL CIRCUMSTANCES WHEN I CAN BE PUNISHED IS CLEARLY AN ATTEMPT TO
RETALIATE AGAINST ME FOR LODGING A PROTEST WITH OSC OR STANDING UP FOR MY FIRST
AMENDMENT RIGHTS. AND THAT ITSELF IS YET ANOTHER PROHIBITED PERSONNEL PRACTICE
ON THE PART OF USNA

JUST FOR THE RECORD, HOWEVER, BECAUSE I AM ALWAYS READY TO EXPLAIN MY VIEWS
WHEN NOT BEING THREATENED: IT IS NOT TRUE THAT I SAID THAT TENURE PROTECTED ME AT
USNA. THOUGH I HAVE TENURE AND USNA REPEATEDLY REFERENCES AAUP GUIDELINES, IT
HAS BEEN CLEAR TO ME FOR SOME TIME THAT USNA PISSES ON AAUP GUIDELINES, AS IT HAS
DONE THIS TIME—THEIR ATTORNEY SENT A LETTER TO THE ADMINISTRATION SAYING THAT THE
ONLY REASON TO FORBID ME CONTACT WITH STUDENTS AND BAR ME FROM THE CLASSROOM
WAS THE THREAT OF PHYSICAL HARM. GOOD LUCK ARGUING THAT IN COURT IN THIS CASE.
WHAT PROTECTS ME IS THE OFFICE OF SPECIAL COUNSEL AND THE MERIT SYSTEMS
PROTECTION BOARD.


On Fri, Apr 27, 2018 at 2:18 PM, Keith Lindler <lindler@usna.edu> wrote:
Dr. Fleming,

In your recent email to the faculty, you expressed concern that you do not know the nature of the complaints your
students made against you.  Attached please find a summary of the specific allegations of unprofessional conduct
contained in those complaints.

You are again invited to meet with the panel, accompanied by counsel if you desire your lawyer to be present. I have
reserved space to meet on 4 May at 1300.  Please let me know if you plan to avail yourself of the opportunity to be
heard on this matter.

Dr Keith W. Lindler

--
Keith W. Lindler, Ph.D.
Professor
Mechanical Engineering Dept
U. S Naval Academy
Annapolis, MD 21402

410-293-6510

Appx500



Keith Lindler <lindler@usna.edu>

## Fwd: Meeting with Inquiry Panel
1 message

**Bruce Fleming** <fleming@usna.edu>                              Fri, Apr 20, 2018 at 6:26 PM
Reply-To: Bruce Fleming <fleming@usna.edu>
To: FACULTY@lists.usna.edu

For those of you interested in/following the implementation of ACDEANINST 1531.53C:

(Please note that though many emails of not-general interest are sent to "nonmids" I am sending this only to those who could conceivably have an interest in it, namely faculty)

Please note that even at this late date the faculty member accused of the infraction of "unprofessional behavior", nowhere defined in any official regulations, is not being told what s/he is accused of. Relevant here is a transcript I made, James Comey-style, of the last time I made the mistake of going to such an "inquiry." Note the pretense that this is merely a "fact-finding investigation" but note the JAG (absent this time?) telling me that unlike all other "witnesses," anything I say can be used against me. To be clear: my attorney has not been allowed to question the student(s) making a complaint, and I have not been told what the accusation is. The students were interviewed on a mandatory basis by their military superiors, and were presumably told only that I had been accused of "unprofessional" actions.

It is thereby clear that the views of the professor him/herself are an afterthought that can be regarded or disregarded as the Vice Dean and his associates choose.

Today this is me; tomorrow this could be any of you. NB by going for the nuclear option that excludes the accused professor and makes everything written (I mean the substitution of INST C for INST B), the USNA administration has created official government documents that can be called upon in any subsequent OSC or MSPB hearing, which will involve my lawyer cross-examining the complaining students, the students called before the "inquiry," the members of the "inquiry," and the four individuals who decided to remove me from the classroom.

Note too the earlier emails from this committee broadcasting to hundreds of students that I was accused of "unprofessional" behavior despite the pretense of ACDEANINST to confidentiality; this process of interviewing six classes of students is nowhere justified in the INST nor is the practice of suspension from the classroom.

R
Prof Bruce Fleming
PS Like James Comey's transcripts, this was created within hours of exiting the "inquiry" room after the last go-round of this activity in 2016, that the administration ultimately abandoned after a letter from my lawyer. I can re-send this as an email to show the date stamp.

31 May 2016 History conference room Sampson Hall USNA
Panel/committee:
Prof De Credico
Prof Lin
Prof Ives
Their JAG attorney LT Griffis
The subject (?):
Prof Fleming

The three people named first above were variously characterized as a committee (by DeC) and as a panel (by G)
The event was characterized as an interview
The presence of F was "requested"
The character of the meeting was asserted by G to be "administrative" in nature and both emails and his personal response to F's question, was F afforded the same assurance of no reprisals as a result of meeting

*Enclosure 122*

Appx501

with the committee that were contained in DeC's emails to students?, was that this was an "administrative" "fact-finding" procedure that nonetheless could result in disciplinary action if it was found that F had engaged in "unprofessional behavior." There was no response to F's previously emailed assertion to G that apparently anything he said could be used against him, which seemed to be assent. G did not oppose F's characterization of the process being set up by Dean Phillips (Mr Cook confirms that the Dean's "cost center" is the "source" of the Inst being referred to) and that punishment rests solely with Dean Phillips, whatever F says or does in response to the inquiry or even what the Division Director recommends.

NB: G had denied the request of F that a witness be present and confirmed so late for F's attorney that attorney had made other plans. When the absence of Fs attorney was noted by F at the "interview" itself, G asserted that nothing in the Instruction said that an attorney was allowed. This is the instruction initially dated 3 May that was not promulgated until that date and then reissued with a back-date of 1 April ending in C that replaces the Inst from 2005 on the same subject ending in B, Grievances Against Faculty Members. (It is also unclear whether this means merely civilian faculty members; the Faculty Senate does not represent military officers who can be court-martialed, as civilians cannot.) The President of the Faculty Senate confirmed that on 1 May it was not in effect, and the changes the Faculty Senate had requested that were designed to protect faculty members were not included.

General facts about what transpired: at no point was F given a copy of or allowed to see the memo by MIDN Kwon (K) to Dean Boyd Waite (W) that was being used as the impetus for all subsequent events, nor were the charges specified, nor was it clear whether the charges being investigated were those of K or W or whether there were any actual charges at all—i.e. whether the "allegations of unprofessional conduct" that emails to students by DeC (see below) referred to were allegations by K or by W. Nor was a definition ever offered of the "offense" of "unprofessional conduct." F's email to G asking to be show the instruction that defined this was ignored and never addressed. Instead the questions were general about what F does or did, says or said, no dates specified, no complainant specified. L corroborated, when F questioned why she was asking a question about a statement made to the committee/panel by a student other than K during their questioning of whole classes of F's students, that their questions were "general." This meant that in the view of the committee, unspecified specific complaints (even if these were not complaints in the legal sense but rather merely things K did not like about F or things he may have misinterpreted) justified blanket interrogation of three entire classes of students where anything they said that the committee could subsequently frame as negative could be used against F. This was therefore an investigation into 29 years of F, not limited to specific alleged allegations of punishable behavior that had been determined to constitute a complaint of an  offense in the legal sense rather than mere unhappiness with a professor. Many of the questions could not have been derived from K's complaint because they asked about issues with students that do not pertain to him. (e.g. "Have you ever told a student he had a lisp?")
The questions all pertained to actions that were clearly seen as negative by the committee or by students: do you (F) X or Y? Have you ever used the phrase X or Y?  At no point was X or Y anything usually thought positive. E.g. do you praise your students? Do you correct papers (unlike virtually all other professors) from one class period to the next? Do you encourage them to come to you for EI so you can explain one-on-one what their problems are? Do you encourage them to re-write for a higher grade?

It was fairly clear what the scenario was the committee was trying to construct: in brief, that F had purposely sealed off K during EI sessions (the first question, from DeC, was: "Do you give EI with the door closed?"—answer, when there is too much noise in the hall or when the student asks for privacy, sure; and why are you asking me this anyway? Officers and most professors meet with closed doors one on one with students. [Stand by for this to appear in the committee's report as "F does not deny shutting the door during EI sessions" and for Dean Phillips to offer this as "unprofessional behavior."] Also that F gave K a low grade and/or made derogatory comments to him about his ethnicity and/or his status as a recruited athlete (as for the grade, K got a ▮ in the class, where he got a ▮ in Chemistry both semesters and ▮▮▮▮▮ PE) because of F's prejudice against a) athletes and possibly b) Asians. All allegations insofar as F could see their

misty outline referred to voluntary private sessions where K is making allegations that cannot be corroborated and which emails from K to F contradict—as well as the fact that his complaint comes 6 months after alleged events.

Emails show that K wrote before the class began to say (three times in a brief email) how "excited" he was to be in F's class, and telling F that K was a soccer player who would be missing class.  He requested and received EI on numerous occasions for papers he wanted to improve, which F always gave, and K thanked him for in written form.

The "interview":
F started with a clarification and two questions. The clarification was to let the record show that though F's presence was "voluntary" this should not be taken as implying F's acceptance of the validity of this meeting or the "investigation." This according to F was illegitimate on many grounds but most egregiously a) that the Inst being used was not in effect until 3 May and in any case was being used retroactively to alleged events in 2015, and b) because the committee in front of which F was appearing had violated its mandate, outlined in both the instruction actually in place until 3 May and the new replacement one, for "confidentiality". F noted that DeC's emails were sent out to about 60 of his former and current students announcing that there were "allegations of unprofessional behavior against Professor Bruce Fleming." F also noted that the pretense of the committee to being nothing but a neutral fact-finding committee were patently false because DeCs emails "applauded" those students coming forward for their "courage" and promised them freedom from reprisals—neither of which makes sense for positive feedback from students rather than the attacks on F her language seems to encourage. Too, the meetings with students were in the framework of superiors giving specific questions for subordinates to answer. Thus both the content and the form of the questions were in total control of the committee—itself chosen by Dean Phillips or Dean Waite, who hold absolute authority to decide how to punish F.

F then asked two questions: was F, given that F's appearance before the committee. like his students', was "voluntary," like them also protected against reprisals? Second question: Did the fact that the legal counsel of the committee was a JAG mean this was an exercise defined by the UCMJ? Neither question was answered by DeC or the committee, and answered only by G when F was on his way out the door. The first was the insistence that this hearing was "administrative" only but that yes, it could result in punishment (by Dean Phillips). The second was no. No explanation for why the legal counsel was military was offered.

DeC's personal animosity toward F was shown in her body language, her contorted face, the way she asked questions, and the abrupt angry way she concluded the interview after half an hour saying that there was no point in continuing further (as F had been uncooperative?).

DeC was the self-announced chair of the committee. Her first question was about whether or not F kept the door open during EI. Her next question was "Do you look up SAT scores?" Answer: they're on the Ac Info page for students that is accessible through the Faculty portal on the MIDS system, along with info like hometown and whether or not they went to NAPS, as well as courses taken and grades. F noted that SAT scores, freely accessible to all faculty members, give useful information in diagnosing the problems of an F paper, which is almost always the reason the student has come voluntarily for EI, because high SAT scores (SAT scores are required for USNA admission and are summarized in press packets for each class) and low performance leads to one sort of diagnosis, low scores and basic problems another. [Stand by for the committee to report that "Professor Fleming freely admitted looking up SAT scores."]

The questions then shifted largely to L, who had a pleasant tone and non-confrontational body language. The third member of the committee, I, sat silent and impassive and asked only one or two questions, one of which was "Do you treat all-male classes [K was in an all-male class] differently than other classes?" Answer: F retrofits some of the material, for example an essay in the text about black female vs. white

female body images was supplemented to make a discussion about male body images for the all-male class. I seemed uninterested in this answer.

L's questions drew largely if not exclusively on other material than can possibly have been in Ks complaint. They seemed to be aimed at characterizing F as a vulgar misogynist. These questions included:

"Do you use the word 'stud'?" Answer: yes, and so does Kwon, and F read from Kwon's paper using it sent to F on email. F then explained, citing his earlier consideration of this term in his book "Annapolis Autumn," that it has nothing to do with animal insemination, its technical meaning, but that USNA it refers to high performers. F also noted that girls, sometimes called "studettes" and sometimes "studs," can be referred to in this way too.

"Do you or have you ever used the phrase 'sucks big donkey dicks'?" Answer: F couldn't say whether he'd ever used this precise phrase, but shared that he does discuss in class the students' propensity to use the vulgar term "sucks" in the negative sense, as in "this sucks", by getting them to see that it is a homophobic slur on the passive partner in male-male oral sex and hence should not be used unless the user was aiming to be vulgar. Thus they should only say X "sucks" if they are aware they are saying X sucks dick (the donkey is optional). F noted that he has no objection to students saying "fuck" or "shit" but they should understand the nature of transgressive language, which he summarized for the committee the way he discusses it with classes. There are three basic forms: blasphemous "God damn", sexual "fuck", and excretory "shit." All show consciousness on the part of the swearer that s/he is going where s/he should not and hence are reserved for moments of great excitement, frustration, or pain, to identify them as extreme.

"Have you ever told a student he had a lisp?" Answer: F could not recall K having a lisp but yes, this is totally within the realm of the many ways F tries to improve their command presence in the privacy of a voluntary EI session, as a lisp is correctable if addressed and has a negative effect on their command presence. F also noted that the students present material standing in front of the class and the class discusses how their presence and presentation could be improved: better eye-contact, standing still, not picking at face, and not saying "like" every second word. F noted that the mission of USNA is to "develop midshipmen mentally, morally and physically." F noted that common humanity would make it impossible for a professor to point out a correctable speech impediment in class in front of others. He also noted that USNA intervenes many ways to correct characteristics of midshipmen considered private at other institutions: appearance, hair length, weight, tones of voice.

"Have you ever asked a student if he has been diagnosed with autism?" Answer: F has no recollection of ever thinking K was autistic, and so did not ask him. However this too according to F is in the realm of addressable reasons why writing could be so sub-par, and F offered that his own daughter is autistic and so he knows how autism spectrum disorders can affect writing. F also noted that USNA does have autistic students, and that in suggesting this, which he did remember having said to several students over 29 years, he was not making a diagnosis, only suggesting that they might think of being tested to get access to coping techniques from psychologists. This question as well as the one about the lisp can only have come from the anonymous testimony of the students encouraged to come forward by the committee as neither can have been in K's complaint, about which at any rate F could only speculate.

The final question was from I: "have you ever had a recruited athlete with low scores who nonetheless performed well?" Response: of course.

This question was consistent with the damaging and negative narrative the committee was apparently crafting, namely that F had decided beforehand that K was a bad writer not on the basis of the failing paper(s)—F offered to read them and comment to the committee, but L refused—but because of a pre-formed dislike/prejudice against Asians (or all minorities?) and athletes, which F openly expressed to K.

Appx504

F noted that he was exasperated because a) the complaint was clearly crafted with the help of the administration b) it was six months after alleged events c) all emails asking for and thanking F for repeated EI sessions were positive and respectful during the events now offered as evidence of culpability and that d) this was evidence of extraordinary ingratitude on the part of K, whom F had given countless hours to help when F could have pleaded no time and sent K to the writing center. F also noted that this whole exercise was clearly a further attempt of Dean Phillips to provide "justification" for punishing him for what he writes about USNA and its administration.

F also summarized sarcastically for the committee the tack they were apparently taking, saying that apparently the committee was trying to establish that F said to a student for the first time in 29 years that he was a "dirty Asian" and a "stupid athlete" and that F was going to make sure he flunked. This after getting him alone behind a closed door (NB: in an EI session the student had asked for and continued to ask for and for which he thanked F). F asked sarcastically: "Why would I say this after 29 years?"

F noted as well that his published views on the way tax dollars are spent at USNA to field Div I teams through athletic recruiting are well known, as well as his opposition to racist USNA admissions policies that admits on the basis of race, and  that drops the level of academic requirements for non-white students. F cited his time on the admissions board, where the minimum SAT score for white non-recruits was 600 (K's verbal SAT is ▮▮▮, and his math also ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮), and added that since his time on the Board, the category of "Asian," whose % are publically disclosed every year on the fact sheet about the incoming class, has been added as a "diversity" category. F noted that disapproval of USNA policy (on the grounds that it is unconstitutional and a perversion of the mission of USNA, as well as waste, fraud, and abuse of a government program) is quite different and distinct from criticizing an individual for his race, which F denied ever having done. F noted that all this was supposed to have taken place in voluntary private EI sessions asked for by the student to get the tutoring of a professor to help bring up failing grades, which K ultimately did and cannot possibly be proven. So why were we here?

At this DeC angrily brought the meeting to a close; F left the room with no thanks for the committee for having appeared voluntarily before them. When F's hand was on the door, G addressed F's two questions in the manner noted above.

As a general observation: USNA administration is clearly trying to craft an instrument that can place civilian federal employees in the position of midshipmen or junior officers, who are susceptible to blanket investigations of all actions or utterances over an unlimited period of time. In the military, subordinates can be braced up for questioning and cannot question the process itself; the superior can ask any question in any way s/he chooses. The pretense was that these fellow full professors were merely there for a collegial "voluntary" chat but in fact acted as judges chosen by the administration, , controlling the questions, withholding any knowledge by F of charges (the name of MIDN Kwon was only provided to F after the investigation had been going for weeks when the English Dept Chair wrote a memo saying that he was told it would be provided at the beginning), asking general questions about any subject they chose, interpreting the answers as they chose—this on a charge that seems the attempt to invent a civilian equivalent of the UCMJ's "conduct becoming" where the military hierarchy can punish a subordinate for any behavior that in its judgment the fact is undesirable. The military presence in this investigation in the form of the JAG and the fact that the committee submits its report to a USMC Colonel who may well be unaware that there is no such thing for civilians as the offense of "unprofessional conduct" suggest that Dean Phillips is trying to craft a system whereby he holds the same power over tenured full professors and federal employees as a military commander over his/her subordinates.



Matt Desantis <m211440@usna.edu>

## For next semester
messages

Bruce Fleming <fleming@usna.edu>                                    Tue, Nov 7, 2017 at 1:25 PM
to: he111.3001.fall@usna.edu, he111.2002.fall@usna.edu

If you want more punishment
Select sections 2001
3001
For he112

Yuttt

Sent from my iPhone

Matt Desantis <m211440@usna.edu>                                   Tue, Nov 7, 2017 at 1:30 PM
To: Bruce Fleming <fleming@usna.edu>

Sir,

Is that only open when we officially register?

Very respectfully,
M.R. DeSantis
MIDN    USN
[Quoted text hidden]

Very respectfully,

M.R. DeSantis
MIDN    USN

Bruce Fleming <fleming@usna.edu>                                   Tue, Nov 7, 2017 at 2:11 PM
To: Matt Desantis <m211440@usna.edu>

Si
R
[Quoted text hidden]

Bruce Fleming <fleming@usna.edu>                                   Tue, Nov 7, 2017 at 6:49 PM
To: Matt Desantis <m211440@usna.edu>



Sent from my iPhone
[Quoted text hidden]

Matthew Desantis <m211440@usna.edu>                          Thu, Jan 11, 2018 at 9:06 AM
To: pitterso@usna.edu

Thank you,

Matthew DeSantis

Begin forwarded message:

From: Bruce Fleming <fleming@usna.edu>
Date: November 7, 2017 at 18:49:06 EST

Pleading Number : 2018040191        Submission date : 2018-09-20 13:29:40        Confirmation Number: 937989880        page 136 of 162

227

Appx507



Keith Lindler <lindler@usna.edu>

## Fwd: You asked about me now vs 20 years ago
1 message

**Lunsford Schock** <m185790@usna.edu>    Mon, Apr 23, 2018 at 6:48 PM
To: Keith Lindler <lindler@usna.edu>

---------- Forwarded message ----------
From: **Bruce Fleming** <fleming@usna.edu>
Date: Mon, Sep 25, 2017 at 8:28 PM
Subject: You asked about me now vs 20 years ago
To: m185790@usna.edu

Here is both twenty years ago w a comparable Greek statue and now with
its comparable plus two days ago. I'm thicker for sure but not as
lean.

--
Very Respectfully,
L. D. Schock
MIDN USN

**9 attachments**



image9.jpeg
237K



image1.jpeg
100K

image2.jpeg
64K

*Enclosure 124*

233

Appx513

5/3/2018





**image10.jpeg**
62K



**image11.jpeg**
107K

📄 **noname.txt**
1K

📄 **noname.txt**
1K

📄 **noname.txt**
1K

📄 **noname.txt**
1K

Appx514



Keith Lindler <lindler@usna.edu>

**Prof Fleming emails**
message

Eleonore Porter <m195202@usna.edu>                                        Tue, Mar 20, 2018 at 1
To: Keith Lindler <lindler@usna.edu>

Good morning Professor,

I have attached various emails from Professor Fleming to my HE302 class last semester. These are just a few of the many he sent on a daily basis. If you would like more, I can certainly send them. Thank you for taking the time to hear my opinion on the environment of this course. Have a wonderful day.

Moto photo          Inbox   x

    Bruce Fleming <fleming@usna.edu>                                        10/12/17
    to he302.5001.fall

    Sent from my iPhone



Do those absent Monday          Inbox   x

    Bruce Fleming <fleming@usna.edu>                                        11/7/17
    to he302.5001.fall

    Know that paper or poem are due tomorrow?
    Yuuuut

    👍 👍 👍 👍

*Enclosure 125*

235

5/3/2018                                          USNA Mail - Prof Fleming emails



NYTimes: My Vagina Is Terrific. Your Opinion About It Is Not.    Inbox   x

Bruce Fleming <fleming@usna.edu>                                                    11/16/17
to he302.5001.fall

What would walt
say?https://www.nytimes.com/2017/11/16/style/my-vagina-is-terrific-your-opinion-about-it-is-not.html?smprod=nytcore-iphone&smid=nytcore-iphone-share

I dared to discuss my anatomy. Men couldn't handle it.

Sent from my iPhone

---

The Vagina Monologues - I WAS THERE IN THE ROOM    Inbox   x

Bruce Fleming <fleming@usna.edu>                                                    10/4/17
to he302.5001.fall

https://youtu.be/hwIMtpGcI30

Sent from my iPhone

Preview YouTube video The Vag



---

Vagina Monologues 2014    Inbox   x

Bruce Fleming <fleming@usna.edu>                                                    10/4/17
to he302.5001.fall

https://youtu.be/S7FkKX8kJaI

Sent from my iPhone

5/3/2018

Preview YouTube video Vagina



--
Very Respectfully,

Eleonore E Porter
MIDN USN

237

Appx517



Keith Lindler <lindler@usna.edu>

## Re: Prof Fleming's class
1 message

**Andrew Buckley Buckley** <m210756@usna.edu>                    Wed, Apr 11, 2018 at 7:31 PM
To: Keith Lindler <lindler@usna.edu>

Sir,

Yes its true. Sometimes he would sit next to me and rub my back. I found it a little uncomfortable. Although, I am a pretty easy going person so I never felt threatened or anything like that. it was approx. 15 sec and I believe it happened no more then twice. I never thought it was malicious. However, I did express some discomfort to my classmates and found it somewhat strange.

Very Respectfully,

MIDN 4/C Buckley,
USN

On Wed, Apr 11, 2018 at 2:00 PM, Keith Lindler <lindler@usna.edu> wrote:
> Midn Buckley,
>
> One of your classmates from your HE111 class mentioned that Dr Fleming would sometimes sit next to you during class discussions and rub your back. Could you shed some light on this? Is it true? About how many times did it happen? What was the approximate duration each time? What were your feelings about the situation?
>
> Dr Lindler
>
> -
> Keith W. Lindler, Ph.D.
> Professor
> Mechanical Engineering Dept
> U. S Naval Academy
> Annapolis, MD 21402
>
> 410-293-6510

--
Very Respectfully,

MIDN 4/C Buckley,
USN

*Enclosure  126*



**DEPARTMENT OF THE NAVY**
OFFICE OF THE ACADEMIC DEAN AND PROVOST
UNITED STATES NAVAL ACADEMY
589 MCNAIR ROAD
ANNAPOLIS MARYLAND 21402-1323

ACDEANINST 1531.63C
2/ADAA
1 April 2016

<u>ACADEMIC DEAN AND PROVOST INSTRUCTION 1531.63C</u>

From:  Academic Dean and Provost

Subj:  COMPLAINTS AGAINST FACULTY MEMBERS

Ref:   (a) USNA Faculty Handbook
       (b) AAUP Statement on Professional Ethics
       (c) AAUP Statement on Academic Freedom
       (d) Department of Defense Directive 1350.2
       (e) OPNAV Instruction 5354.1E
       (f) USNAINST 12750.4

Encl:  (1) Procedures for Handling Midshipman Complaints Against
           Faculty Members

1.  <u>Purpose</u>.  To publish instructions regarding the disposition of
grievances against alleged misconduct of faculty members in their
professional dealings with midshipmen, excluding accusations of sexual
harassment or assault, use of inappropriate teaching materials,
grading grievances, or issues of integrity in research and scholarly
activity.  These topics are covered in appropriate other Naval Academy
instructions.

2.  <u>Cancellation</u>.  ACDEANINST 1531.63B.  This instruction is a
complete revision.  Since changes are extensive, no special markings
appear in the margins.  Therefore, it should be read in its entirety.

3.  <u>Background</u>.  As provided in reference (a), U.S. Naval Academy
(USNA) instructors have the right to academic freedom within the
classroom.  At the same time, there must be a distinction drawn
between proper pedagogical activities that challenge students'
beliefs, assumptions, and perceptions in order to facilitate their
mental development, and behavior that is unprofessional and/or
pedagogically inappropriate.

   <u>Pedagogical Techniques</u>.  Pedagogical techniques must make room for
spirited exchanges over beliefs and ideas, but instructors are
obliged to maintain a professional atmosphere that respects the
students' dignity.  The USNA subscribes to the American Association
of University Professors' Statement on Professional Ethics
(reference (b)):  "As teachers, professors encourage the free
pursuit of learning in their students.  They hold before them the
best scholarly standards of their disciplines.  They demonstrate

Appx520

ACDEANINST 1531.63C
1 April 2016

respect for the student as an individual, and adhere to their proper role as intellectual guides and counselors." Respect for the midshipman as a student requires that faculty avoid discrimination on political grounds, or for reasons of race, religion, sex, ethnic origin, national origin, or ancestry. Professional ethics requires faculty members to conduct instruction in a professional and appropriate manner. Types of unacceptable behavior include: use of gratuitously abusive and/or demeaning language; failure to meet class; failure to prepare for class; evaluation of student work by criteria irrelevant to class performance; arbitrary denial of access to instruction.

b. Academic Freedom. Academic freedom is a hallmark of an academic institution that values excellence in scholarship, free inquiry, and open discourse. Reference (c) provides a definition of academic freedom and a discussion of responsibilities attendant upon its exercise. The United States Naval Academy subscribes to the American Association of University Professors' statement on academic freedom, issued in 1940 with interpretations of 1970.

(1) A broad and well-rounded educational program such as the one that the Naval Academy seeks to provide its midshipmen will expose students, at times, to controversial ideas, challenge strongly held beliefs or value systems, or touch on sensitive areas. Indeed, it is not an uncommon pedagogical practice for an instructor to adopt an unusual, different, or unpopular stance to provoke discussion or to encourage students to analyze their own views or to assess the basis of their values.

(2) The Naval Academy has never imposed any test of propriety, ideology, or religion on its faculty or the academic program it offers. To do so would deny its faculty and its students the academic freedom to explore, to teach, and to learn. Instead, the Naval Academy has relied upon the good judgment and awareness of its faculty to be reasonable and to appreciate and respect the sensibilities of its midshipmen.

(3) Academic freedom is not a faculty member's license to say or do anything without restriction. Faculty members may be provocative. They are entitled to express their opinions and offer their scholarly views on the subject matter they teach, but they are also expected to treat their students with dignity and respect. With but rare exceptions, this has been the norm at the Naval Academy.

c. Individual Rights. The rights of individuals who work for the Department of Defense and the Department of the Navy are safeguarded by regulations such as are found in references (d) and (e).

Pleading Number : 2018040191      Submission date : 2018-09-20 13:29:40      Confirmation Number: 937989880

Appx521

(1) In particular, reference (e), which derives from reference (d), proscribes hostile work environments, defining the term as follows:

"An environment which prevents members from functioning to their full capacity, free of unlawful discrimination and SH [Sexual Harassment]. A hostile work environment unreasonably interferes with an individual's work performance. It need not result in concrete psychological harm to the victim but need only be perceived by a reasonable person, and is perceived by the victim, as hostile or offensive."

This definition involves the perception of the individual as well as another party, the reasonable person. The reasonable person standard is defined in the same reference:

An objective test used to determine if behavior meets the legal test for unlawful discrimination and SH. The test requires a hypothetical exposure of a reasonable person (third party) to the same set of facts and circumstances; if the behavior is offensive, then the test is met. The reasonable person standard considers the complainant's perspective and does not rely upon stereotyped notions of acceptable behavior within that particular work environment.

(2) Reference (d) was created with an awareness of the needs of an academic institution to preserve the principles of academic freedom. In establishing the Defense Equal Opportunity Management Institute (DEOMI) whose purpose is to promote improved human relations throughout the Department of Defense, reference (d) requires that policies and procedures at DEOMI shall be consistent with the principles of responsible academic freedom at the National Defense University (NDU). NDU expects "all members of the University community to understand the importance of and to practice responsible academic freedom." In addition, NDU goes on to state that "The National Defense University has continually subscribed and subscribes now to the American Association of University Professors' statement on academic freedom, issued in 1940 with interpretations of 1970." The fact that the Department of Defense grants academic freedom to the DEOMI, the school that teaches those who will handle matters of sexual harassment and of hostile work environments is evidence that the Department of Defense is aware of the importance of the principle of academic freedom and that this is not inconsistent with the human relations objectives of the Department. The Naval Academy also subscribes to the "1940 Statement of Principles on Academic Freedom and Tenure with 1970 Interpretive Comments."

4. <u>Resolution</u>. Settling the grievance at the lowest possible level is the preferred process to resolve the issue. This process may include a direct discussion between the midshipman and faculty member or a meeting between the two, facilitated by other USNA faculty or staff. If this process is not desired by the midshipman or after

Pleading Number : 2018040191      Submission date : 2018-09-20 13:29:40      Confirmation Number: 937989880

ACDEANINST 1531.63C
1 April 2016

having met with the faculty member deemed to be unsuccessful, a third
option is available, an official inquiry into the alleged professional
misconduct.

a. At all levels of the academic chain of command, the handling of
the complaint should include the following:

(1) Strict confidentiality;

(2) Early notice to the faculty member involved;

(3) Timely action;

(4) Timely response to the complainant.

b. Enclosure (1) details procedures for handling complaints of
alleged faculty misconduct.

A. T. PHILLIPS

Distribution:
Non Mids (electronically)

Appx523

ACDEANINST 1531.63C
1 April 2016

PROCEDURES FOR HANDLING MIDSHIPMEN COMPLAINTS
AGAINST FACULTY MEMBERS

1.  Midshipman Responsibility.  Midshipmen have the right to report apparent occurrences of faculty misconduct toward students.  If desired, the midshipman alleging the misconduct (hereinafter referred to as the complainant) may bring the concern directly to the faculty member whose conduct is questioned (hereinafter referred to as the respondent).  The complainant is encouraged to enter into this discussion with an open mind.  The complainant may not have interpreted the situation accurately and may thus be incorrect in believing that misconduct has occurred.  The respondent may have inadvertently spoken or acted in a manner that gave rise to the appearance of misconduct, although no offense against the dignity of the student was intended.  Direct discussion provides the opportunity to clarify any such misunderstandings.  At times challenges to beliefs, assumptions, and perceptions in order to facilitate students' mental development may be mistaken for, or be perceived as, deliberate attempts to demean a student.  Due to the asymmetrical relationship between faculty members and midshipmen, the settling of grievances against faculty members stemming from alleged professional misconduct by expecting the grievant midshipman to directly approach the faculty member may not be possible or desired, and certainly cannot be a requirement.  While settling grievances at the lowest possible level is a desirable and common sense principle, there must be a system put in place which will provide access to midshipmen for counsel/guidance to help determine the best way forward.  If direct approach to the faculty member is not desired, midshipmen are encouraged to speak with other trusted mentors about their concerns.  These mentors could include other USNA faculty members, department chairs, division leaders, deans, company officers, other brigade officers or enlisted leaders, coaches, ECA advisors, or others.

2.  Faculty Responsibility.  A faculty member should always be aware of how his or her conduct may be perceived and should take corrective measures when alerted to the appearance of inappropriate behavior. Faculty members are expected to always behave in accordance with the highest standards of the professional ethics of the professoriate.

3.  Protection of Respondent and Complainant.  The Naval Academy will, to the greatest extent possible, protect the confidentiality of the respondent and the complainant, ensure the integrity of the inquiry process, and limit the dissemination of information regarding the complaint to only those with a need to know.  The civilian respondent retains all his or her civil service protections.

4.  Inquiry Process.  The complainant has the option of reporting the alleged misconduct to the Vice Academic Dean (VAD) at any time or attempting to resolve the matter by directly engaging the respondent.

Appx524

ACDEANINST 1531.63C
1 April 2016

The complainant may also seek the assistance of an intermediary (i.e. mentor, coach, faculty/staff member etc.) to discuss resolution options, including their assistance in facilitating a meeting with the respondent or the VAD. If the complainant does engage the respondent but after doing so remains dissatisfied with the result, a report of alleged misconduct may be filed with the VAD. Allegations of misconduct submitted to the VAD must be in writing and signed by the complainant.

A. Initial Meeting with VAD. The VAD will hold a confidential meeting with the complainant and others as appropriate. This meeting will include a discussion of the alleged misconduct detailed in the written statement provided by the midshipman and the possibility of meeting with the respondent, perhaps mediated by a third party (e.g., department chair, mentor coach, etc.). If the Division Director and/or the Department Chair are not yet aware of the complaint, the VAD will if appropriate, alert them immediately after the initial meeting. In addition, if the midshipman's chain of command is not yet aware of the issue, the VAD will notify the Deputy Commandant.

B. Assessment Meeting. If resolution through a direct meeting between the complainant and respondent is not desired, deemed inappropriate, or if the alleged misconduct warrants further attention even if there can be a resolution through direct discussion between the complainant and respondent, the VAD will convene an assessment meeting as soon as possible. Participants at the meeting will include the appropriate Division Director or Senior Professor. Additional participants may be designated by the VAD (i.e. command counsel, staff judge advocate, Human Resources Office representative). In this meeting, held outside the presence of the complainant, the VAD presents information contained in the written complaint and any attempts made to resolve the issue. Those in the meeting would then discuss the complaint and the inquiry process: (1) preliminary inquiry (military respondent) or (2) a fact-finding inquiry and report (civilian respondent).

C. Preliminary Inquiry/Fact-Finding Inquiry and Report. A preliminary inquiry/fact-finding inquiry is conducted pursuant to correspondence signed by the VAD to the Division Director of the respondent. For a military respondent, the Division Director will initiate a preliminary inquiry with the assistance of the staff judge advocate. For civilian faculty, the inquiry will be conducted by a panel of three senior faculty members, selected by the Division Director in consultation with the Faculty Senate President. A non-voting legal advisor will also be named to the panel by the Division Director. This panel collects relevant documents and conducts interviews with appropriate parties, including the complainant and the respondent. The panel will provide a written report detailing the facts and circumstances surrounding the alleged misconduct and the panel's opinions. The report will not include recommendations.
    (1) The report or the results of the preliminary inquiry are submitted to the Division Director.

2                                    Enclosure (1)

Pleading Number : 2018040191        Submission date : 2018-09-20 13:29:40        Confirmation Number: 937989880

Appx525

ACDEANINST 1531.63C
1 April 2016

(2) <u>Military Faculty</u>. The Division Director will then determine what if any further action is necessary to address the findings of the preliminary inquiry pursuant to Department of the Navy guidelines and notify the VAD of the decision.

(3) <u>Civilian Faculty</u>. The Division Director will forward a copy of the Fact-finding Inquiry and Report to the respondent for review and comment. Any comments submitted by the respondent must be in writing and submitted within 10 working days of receipt. Those comments, if any, will be considered and included with the final report. The Division Director then informs the VAD that the fact-gathering panel has completed their work and that a meeting with the command counsel, a Human Resources Office representative, and others as deemed appropriate will be scheduled to discuss the report and if necessary, options available to address misconduct.

(a) After carefully considering the entire report, including respondent's comments, the Division Director determines what if any action should be taken. The Division Director will notify the Human Resources Department representative of the decision and request preparation of the necessary implementing documentation for signature and delivery to the respondent.

(b) Any civilian personnel disciplinary action that exceeds the authority of the Division Director must be referred to the Academic Dean and Provost for decision. In such a case, the Division Director will be the Proposing Official. The respondent will have an opportunity to review and comment on the disciplinary action proposed by the Division Director before it is forwarded to the Academic Dean and Provost as the Deciding Official. The Academic Dean and Provost will review the report and any comments submitted by the respondent in rendering a decision. The Human Resources Office will be requested to draft the correspondence implementing that decision for signature and delivery to the respondent.

D. <u>Appeal Process for Civilian Faculty</u>:

(1) The respondent may appeal action taken by the Division Director to the Academic Dean and Provost. Any appeal must be made in writing and submitted to the Academic Dean and Provost within 10 working days of receiving the Division Director's decision. The Dean will forward the appeal and accompanying documentation to the Faculty Senate President for review and comment. The Academic Dean and Provost considers the entire report along with any comments provided by the Faculty Senate President and issue a decision. This decision is final and not subject to further appeal.

(2) In those cases where the Academic Dean and Provost is the Deciding Official, the appeal, if any, must be submitted in writing to the Superintendent or designee within 10 working days of receiving the decision. The Superintendent or designee will forward the report and appeal to the Faculty Senate President for review and comment. The Superintendent or designee considers the entire report, appeal, and comments from the Faculty Senate President in rendering a written decision. That decision is final and may not be further appealed.

Appx526

ACDEANINST 1531.63C
1 April 2016

E.  <u>Timeliness</u>.  The notional time between the initial meeting with
the <u>VAD</u> and the submission of the preliminary inquiry/Fact-finding
Inquiry and Report to the Division Director is 60 days.  Requests for
additional time may be submitted to the Division Director for
approval.

4                                      Enclosure (1)

Appx527

# TAB 4i

Appx528

13 October 2015

MEMORANDUM

From: Chair, English Department
To:     Director, Division of Humanities and Social Sciences

Encl:   (1) Counseling and Required Training Memo 8 October 2015

Subj:   COUNSELING AND TRAINING LETTER

1. On 13 October 2015, CDR Debbie Fermo and I met with Professor Fleming to deliver a letter acknowledging counseling and required training.

2. Professor Fleming accepted but would not sign the letter; a copy is attached (Encl. (1)).


MARK MCWILLIAMS

Appx529

8 October 2015

From: Chair and Associate Chair. English Department
To:   Professor Bruce Fleming

Subj: COUNSELING AND REQUIRED TRAINING

Ref:  (a) SECNAVINST 5300.26D
      (b) ACDEANINST 1531.63B


1. On 25 September 2015, the English Department Chair was notified of potentially inappropriate behavior by you in a series of emails to your students in HE111 section 2011. After reviewing seven of these emails forwarded to the Chair by one of you students, we consulted with several former English Department Chairs. Some of the material in these emails, particularly several photographs of yourself and your comments on those photographs, seemed clearly inappropriate.

2. On 28 September 2015, we met with you to discuss these emails. You explained that they were part of a much larger discussion that grew out of a short story concerned with the dangers body image stereotypes pose, particularly to young people. This discussion definitely falls within the range of acceptable academic behavior, as did your use of print advertisements as evidence for the students to consider. Indeed discussion of such issues seems necessary with some literary texts.

3. However, your use of photographs of yourself, even those taken as a professional model, was inappropriate and unprofessional, as were your comments on those images. Such behavior risks creating a hostile work environment as described in reference (a) (enclosure 1: Definitions 3.c.).

4. The student has not made, nor to our knowledge does he wish to make, a complaint about your behavior. As a result, neither reference (a) nor (b) clearly applies in this case. We are, however, trying to follow the spirit of these instructions in addressing this issue at the lowest level possible. Should a student complain, however, the letter of both these instructions might apply and demand further formal investigation.

5. To pursue that resolution, we counseled you about this behavior on 28 September. You recognized that your behavior could be seen as inappropriate and agreed to avoid such potential impropriety in the future. In addition to this counseling, we are requiring you to retake DON EEO/DIVERSITY/ANTI-HARRASSMENT TRAINING in TWMS no later than 20 October 2015.


MARK MCWILLIAMS
CHAIR, ENGLISH DEPARTMENT

DEBORAH FERMO
CDR, USN
ASSOCIATE CHAIR, ENGLISH DEPARTMENT


_____        _____
Acknowledgement of Receipt      Date

2

Appx530



Mark McWilliams <mcwillia@usna.edu>

## (no subject)
1 message

**Bruce Fleming** <fleming@usna.edu>                                         Wed, Oct 21, 2015 at 12:01 PM
To: Mark McWilliams <mcwillia@usna.edu>

---

### CERTIFICATE OF TRAINING

This is to certify that I have completed training for DON SEXUAL ASSAULT
PREVENTION AND RESPONSE

| **BRUCE FLEMING** | **10/21/2015** | **00161/CEB** |
|---|---|---|
| Name: | Date: | Component/Office: |

Continuing Education Units: 0

By digitally signing and submitting your proof of training certificate, you certify that
you have reviewed and understand the information in this training course.

**BRUCE FLEMING**

Signature (Digitally Signed)

---

[ Re-enter Fields ]   [ Print Certificate ]

**Enter the following information as it will appear on your certificate:**

| | |
|---|---|
| Name: | BRUCE FLEMING |
| Date: | 10/21/2015 |
| Component/Office: | 00161/CEB |
| Signature: | ☐ Check this box to digitally sign your certificate |

[ Create & View Certificate ]

Appx531

**Fleming v. DON**

**Docket Number:  PH-0752-18-0457-I-1**

**AGENCY EXHIBIT 1:  Appellant Deposition of May 3, 2019**

Appx601

1

1          UNITED STATES NAVAL ACADEMY

2

3   BRUCE E. FLEMING,          *

4          Complainant,    *

5                       *

6      vs.          *   PH-0752-18-0457

7                       *

8   DEPARTMENT OF THE NAVY,   *

9          Respondent.    *

10  * * * * * * * * * * * * * * * * * * * * * * * *

11          The deposition of BRUCE EDWARD FLEMING

12  took place on Friday, May 3, 2019, commencing at

13  10:00 a.m. at Halligan Hall HR Training Room,

14  Second Floor, Annapolis, Maryland 21402, before

15  Alfred A. Betz, Court Reporter and Notary Public.

16  * * * * * * * * * * * * * * * * * * * * * * * *

17

18

19

20  Reported by:

Appx602

21      Alfred A. Betz, Court Reporter


2


1  APPEARANCES:

2

3    On behalf of the Complainant:

4    JASON EHRENBERG, ESQUIRE

5    Bailey & Ehrenberg, PLLC

6    1015 18th Street, NW

7    Suite 204

8    Washington, D.C. 20036

9    202-331-1331

10   jhe@becounsel.com

11

12   On behalf of the Respondent:

13   TERRENCE P. COOK, ESQUIRE

14   Command Counsel

15   United States Naval Academy

16   121 Blake Road

17   Annapolis, Maryland 21402-1300

2

Appx603

18    410-293-1547

19    tcook@usna.edu

20

21


                                3


1        P R O C E E D I N G S

2        S T I P U L A T I O N

3        It is stipulated and agreed by and

4   between counsel for the respective parties that

5   the reading and signing of this deposition is

6   hereby waived.

7

8   Whereupon --

9        BRUCE EDWARD FLEMING,

10   called for examination, having been first duly

11   sworn to tell the truth, the whole truth, and

12   nothing but the truth, testified as follows:

13        EXAMINATION BY MR. COOK:

14   Q.   Professor Fleming, my name is Terry

Appx604

15    A.  I don't think anyone can give a long

16  list of things that you're not allowed to do.  So

17  I cannot answer your question.

18    Q.  Can you give me one more example?

19    A.  Slapping a student.

20    Q.  So touching a student would be wrong?

21    A.  No.  You've just changed the word

11

1  slapping to touching.

2        MR. EHRENBERG:  Correct.  I'm going to

3  object to the form, leading, and not accurately

4  reflecting --

5    A.  We had social touching --

6        MR. EHRENBERG:  Let me finish.  Okay?

7    A.  Thank you.

8        MR. EHRENBERG:  And not accurately

9  depicting the response.  You can continue.

10    A.  We handshake and pat on shoulders and

11  pat on backs all the time.  It's called social

2      Q.   Professor Fleming, do you remember a

3   counseling session with the English Department

4   Chair and the Associate Chair in September 2015?

5      A.   Yes.

6      Q.   Do you remember what the subject of that

7   counseling session was?

8      A.   Yes.

9      Q.   What was it?  Do you remember?

10      A.   Yes, I remember.  It was that a student

11   in an all-male class who was not complaining had

12   talked about the fact that I, in order to make a

13   point which I'll be happy to explain about a poem

14   had sent three professional model pictures.  One

15   was of Mark Wahlberg who at the time went under

16   the name Marky Mark that was in Times Square.

17   Another one was of Rafael Nadal which was a full

18   page in the New York Times.  And the third was a

19   professional model shot of me that had been for

20   decades on the website of my then modeling Agency

21   which is called Central Casting USA.  I'll be

Appx642

37

1    happy to explain what the context was.  And the

2    so-called counseling session was it was fine to

3    send, in their view it was fine to send a picture

4    of Rafael Nadal, it was fine to send a picture of

5    Mark Wahlberg but it was not fine to send a

6    picture of Bruce Fleming.

7        Q.  Do you remember what guidance going

8    forward you agreed to as a result of that

9    counseling session?

10    A.  I'm sure that I said I would not send a

11    full of -- a torso model shot to my students,

12    although I went on record as saying I didn't see

13    what the issue was.

14        Q.  Okay.  So we agree that you were

15    counseled and you agreed not to send anymore

16    pictures; is that correct?

17        MR. EHRENBERG:  Objection to the form.

18    You can answer.

19    A.  I did not agree to send no more

Pleading Number : 2019017762        Submission date : 2019-05-15 12:03:55        Confirmation Number: 1038676809

Appx643

15   unwanted touching of a student?

16       A.   Of course.

17       Q.   Tell me, Professor, how would you know

18   if the touching is unwanted?

19       A.   They could shy away, they could give me

20   no body signals that they -- I don't offer hugs.

21   They come at me like this (indicating) and I hug


54


1   back.  I wait for them to make the first move.  So

2   unwanted means they don't make the first move.

3       Q.   Professor Fleming, are you familiar with

4   a practice where one person lays on the floor

5   while another one walks on their back?

6       A.   Absolutely.  I recommend it for

7   everybody.

8       Q.   Is that a practice that you have

9   performed in classrooms?

10       A.   I'm confused by your calling it a

11   practice.  I certainly showed them how to do it.

Appx662

12  They were talking to me about doing a Pharaoh

13  thing and I said there's something better.

14      Q.  Tell me more about that, Professor

15  Fleming.

16      A.  Pharoah thing is where one guy grabs

17  another guy from the back and pulls him up like

18  this off the floor and it cracks his back.  One of

19  them must have mentioned it and I said I can't

20  remember, I don't remember every word that comes

21  out of my mouth.  But I certainly do have my wife

55

1  walk on my back.

2      Q.  Did you ever participate in back-walking

3  in class?

4      A.  I don't have any real recollection but

5  it certainly seems plausible.

6      Q.  Before you begin classes for a semester,

7  Professor Fleming, do you receive a class roster?

8      A.  Yes.

9    Q.   So you know the names of your students

10   before the semester begins?

11       A.   No, I wouldn't say I know them.  I print

12   it out and stick it in my pink book and use it to

13   come to class.  But no, I don't know the names.  I

14   have access to the names but that's all.

15       Q.   So you've got a list of names who's

16   going to be in your class before the semester

17   convenes?

18       A.   That's correct.

19       Q.   How do you identify the Midshipmen in

20   your class by name?

21       A.   I don't understand the question.


                              56


1        Q.   Well, if there is a Midshipman by the

2    name of Smith and you were looking around the room

3    how would you identify Mr. Smith?

4        A.   Well, if it's a Mr. I read his name tag

5    and say Mr. Smith.  I do learn their names in the

Appx664

6  first period or two.  I used to make it a party

7  trick to learn them right then and there.  It

8  would take me about 10 minutes.  But in recent

9  years I haven't done that.

10    Q.  So Midshipmen wear uniforms that have

11  their names on them; is that correct?

12    A.  I think we all know that's correct.

13    Q.  When you call a Midshipman in class how

14  do you refer to them?  What is the title that you

15  use before their last name?

16    A.  Mr. or Miss.

17    Q.  Referring to them in that manner in this

18  way is respectful; is that correct?

19    A.  Yes.

20    Q.  Would you agree that referring to you as

21  Professor Fleming is also a recognition of your

57

1  position and a sign of respect?

2    A.  Well, I think it sounds hokey but yes.

Appx665

3   Usually they just say Sir.

4       Q.   In someone mispronounced your name

5   initially would you correct them?

6       A.   I always go on about how it's spelled,

7   one M in Fleming.

8       Q.   But if they mispronounced it what would

9   you do?

10      A.   I don't think it's ever happened.

11      Q.   If it did what would you do?

12      A.   I think I would say it's actually

13  Fleming.

14      Q.   Say that again, please.

15      A.   I would say it's actually Fleming.

16      Q.   Would it also be fair to say that you

17  would not expect your name to be mispronounced by

18  that same student again?

19      A.   I can't say what I expect with

20  Midshipmen.  They have attention spans that are

21  very short.  If I had to correct them a second

58

Appx666

1   time, I would, and I would prefer to do it in the

2   nicest way possible because I have to deal with

3   them all semester.

4      Q.  Well, the way that you just mentioned

5   your correction would you use that same demeanor?

6      A.  I'm sorry, I thought that the typing

7   meant that body language was not recorded.

8      Q.  I wanted to ask you about that.

9      A.  Can you characterize that?

10     Q.  Yes.  I'm asking you.  You seemed to say

11  it quite loud and forcefully.

12     A.  Yes, because I thought you didn't hear

13  me.

14     Q.  Is that the way you talk to a

15  Midshipman?

16     A.  No.

17     Q.  How many times would you allow a

18  Midshipman to mispronounce your name?

19     A.  I don't think any Midshipman has ever

20  mispronounced my name.  So I don't know.

21     Q.  Okay.  Would you agree that correctly

Pleading Number : 2019017762        Submission date : 2019-05-15 12:03:55        Confirmation Number: 1038676809

Appx667

59

1 pronouncing an individual's name is a sign of

2 respect?

3    A.   Attempting to correctly pronounce it,

4 sure; but some of the names are more difficult

5 than others.

6    Q.   Did you ever mispronounce a Midshipman's

7 last name by the name of Jin?

8    A.   By the name of what?

9    Q.   Jin, J-I-N.

10    A.   Pretty hard to mispronounce.  I

11 certainly have no recollection of that.

12    Q.   So you never referred to that Midshipman

13 as Kim, Lin or Sin?

14    A.   Not to my recollection.  Why would I do

15 that?  That's mean.

16    Q.   So if you say it didn't happen and

17 Midshipman Jin says it did he'd be lying; is that

18 correct?

Appx668

19    A.    I'm not going to answer that.  You've

20    asked me did I recollect doing it and I said I do

21    not, do not recollect, and I'm not that kind of

60

1    person.

2        Q.    You deny it happened?

3        A.    Of course I deny it happened.

4        Q.    Is it true that lying is an honor

5    offense?

6        A.    I guess so, yeah.

7        Q.    And lying could result in a Midshipman's

8    dismissal from the Academy, correct?

9        A.    I'm not sure now whether that's true but

10    it used to be true.

11        Q.    Have you ever encountered in the past

12    that you can recall your mispronunciation of an

13    Asian-American student's name?

14        A.    No.

15        Q.    Do you recall showing pictures of your

Appx669

# Gentlemen:

email: "fleming@usna.edu Bruce Fleming"        Tuesday, September 26, 2017 at 11:48:26 AM Eastern Daylight Time
To: email: "m211440@usna.edu Matthew Desantis" , email: "m217092@usna.edu Ethan Wheeler"

You two are my right-wing extremists who sit next to each others, so I'll write to both. I'd have the same e-mail to left-wing extremists only there aren't many at USNA!

Now gentlemen. I know you've both grown up listening to Dad spout unopposed at dinner, but this is the big time. One of you hates taxes, the other hates gun regulation. Both are standard right-wing positions, so fine. But to make a paper for Bill, you have to be aware of objections.

on guns, actually there is little gun regulation in many states, so it's unclear what you're opposing! And there are standard objections: more guns - Columbine and the other school massacres. You simply wave these aside. And no citations for the assertions that countries w gun restrictions have more violence. Not the case for Britain, for example--and guns don't help against terrorist bombs. It all seems based on a hatred of federal government--that pays all our salaries and supports this email!

On taxes, it's totally unclear whether your objection is to ALL taxes (as it seems sometimes) or progressive tax rates--i.e. that rich people pay a larger %--you had trouble w my first objection, that 10% of the top people don't make 10% of the $ so OF COURSE they pay more. Is it all taxes? Progressive taxation? Do you seriously ask that those who get welfare PAY BAYUUUUUTCK some of what the gvt just gave them? Is this really an anti-welfare paper? Why shouldn't rich people pay a larger %? Tell Bill why. And what justification do you have for thinking that the current system strangles investment? Need to get shit in gear here.

Sigh. You're both acting like midsheeple: huge flex and no justify.  Sigh. Won't work for Bill.

Welcome to reality. You're not home w Dad any more in your bubble. Believe me, I'd say the same to Bernie, so this is not a left-right thing. It's a justify that thing.

YUUUUUT
R
Prof



EXHIBIT
FLEMING
1
5-3-19

79

Appx680



Appx689

1/21/2018                                    USNA Mail – For next semester





5/3/2018                                   USNA Mail - Fwd: You asked about me now vs 20 years ago



Keith Lindler <lindler@usna.edu>

## Fwd: You asked about me now vs 20 years ago
1 message

Lunsford Schock <m185790@usna.edu>                          Mon, Apr 23, 2018 at 6:48 PM
To: Keith Lindler <lindler@usna.edu>

---------- Forwarded message ----------
From: Bruce Fleming <fleming@usna.edu>
Date: Mon, Sep 25, 2017 at 8:28 PM
Subject: You asked about me now vs 20 years ago
To: m185790@usna.edu

Here is both twenty years ago w a comparable Greek statue and now with
its comparable plus two days ago. I'm thicker for sure but not as
lean.

--
Very Respectfully,
L. D. Schock
MIDN USN

_____

9 attachments



image9.jpeg
237K



image1.jpeg
100K

image2.jpeg
64K



*Enclosure 124*

EXHIBIT
Fleming
6
5-3-19
PENGAD 800-631-6989

90

Appx691

5/3/2016

USNA Mail - Fwd: You asked about me now vs 20 years ago





image10.jpeg
62K



image11.jpeg
107K

noname.txt
1K

noname.txt
1K

noname.txt
1K

noname.txt
1K

Appx692







Pleading Number : 2019017762          Submission date : 2019-05-15 12:03:55          Confirmation Number: 1038676809

Appx695

**Date:** November 30, 2017 at 5:01:16 PM EST
**To:** Bruce Fleming <fleming@usna.edu>
**Subject: Next Semester**

Professor,

I wanted to let you know that I got my schedule for next semester today and I did not get put in your class. They gave me Professor Moore. I did not get a single professor I requested unfortunately. Thanks for everything this semester though and I'll try to keep in touch over the next couple of years.

Very respectfully,

M. R. DeSantis

1

FLEMING/MSPB-1

Appx714



1

FLEMING/MSPB-2

Appx716



Sent from my iPhone

1

FLEMING/MSPB-3

Appx717

Begin forwarded message:

**From:** Matthew Desantis <m211440@usna.edu>
**Date:** December 16, 2017 at 2:20:29 PM EST
**To:** Bruce Fleming <fleming@usna.edu>
**Subject: Re: Speedo Run**



On Dec 16, 2017, at 14:08, Bruce Fleming <fleming@usna.edu> wrote:

1

FLEMING/MSPB-4

Appx718

**Alina Vinci**

| | |
|---|---|
| **From:** | Bruce Fleming <flemingannapolis@comcast.net> |
| **Sent:** | Wednesday, October 24, 2018 2:28 PM |
| **To:** | Jason Ehrenberg |
| **Subject:** | Re: More flexing at student request |



FLEMING/MSPB-5

Appx720



FLEMING/MSPB-6

Appx721



FLEMING/MSPB-7

Appx722



Sent from my iPhone

FLEMING/MSPB-8

Appx723



Sent from my iPhone

1

FLEMING/MSPB-9

Appx724

Soc (2015) 52:114–120
DOI 10.1007/s12115-015-9870-x

COMMENTARY

# The Vocabulary of Transgender Theory

Bruce Fleming

Published online: 3 March 2015
© Springer Science+Business Media New York 2015

**Abstract** The article considers the nascent vocabulary of transgender theory. What are the implications of separating "sex" from "gender" and such locutions as someone "being a woman in the body of a man"? It suggests that this vocabulary is problematic and based on a false view that I alone can control the vocabulary others use to refer to me.

**Keywords** Transgender theory · Sex-change operation · Sexual orientation

With the Supreme Court's decision of October 2014 not to overrule the states that allow gay marriage, the crusade for the legalization of gay marriage in the US may begin to think of claiming victory and going home: if this is not the end of this particular battle, it may be the beginning of the end. What will replace gay marriage as a hot topic? Transgender rights seems poised to move to the center of things.

All changes of attitude and laws find their basis in changes in conceptions, which typically come first as a single person offers a vocabulary that mirrors that change. But it takes a collective to change laws and attitudes. Defining "gay" as an alternative to straight, one of a number of options for what we now call "sexual orientation," was one such re-conception, based on the invented notion of "sexual orientation" that split the oriented person from the orientation as if the latter were the pointer of a compass. The compass is unvarying but its direction changes based on factors outside itself. Any alteration of the way things are has to be expressed in words.

B. Fleming (✉)
Department of English 12B, US Naval Academy,
Annapolis, MD 21402, USA
e-mail: fleming@usna.edu

© Springer

Gay marriage has required what its opponents correctly identify as a re-definition of marriage as being something other than a relationship between a man and a woman. This was so taken for granted by earlier generations that it was rarely even articulated, so it seems reactionary in some circles to note it now. Similarly, civil rights required speaking of "skin color" rather than the more absolutist "race," or at least understanding "race" as trivial rather than determinative. The move by women to greater participation in the workplace has seemed to some to require gender-neutralizing of names of many professions (interestingly, typically in the direction of male rather than female, as Meryl Streep is sometimes called an "actor" and Robert de Niro never an "actress"). As another alteration, we tend nowadays to speak of "enslaved persons" rather than slaves, to make the fact of slavery less than defining of the essence of the being—it's something they underwent, not something they were.

It would be more honest if the proponents of all these alterations admitted the alteration they are proposing, and argued for the alteration in its own terms. Instead what typically happens is that they insist their articulation was the correct one all along: marriage always included the option of being something other than the union of a man and a woman, even if we didn't exercise it. Race is a false absolute, and there were never any such things as slaves, only enslaved persons. Even in the classical world, slaves could be freed. But why prefer "enslaved persons" to "slaves that could be freed"? The former suggests that the state of servitude was illegitimate. What of people who wouldn't agree?

Transgender awareness and the push for acceptance of transgendered individuals has also required linguistic alteration. Concepts that previously were definitive of people were demoted to lesser status, and words invented or borrowed to fill the role of what Locke, borrowing from Aristotle, would have called primary qualities, qualities intrinsic to the entity rather than accidental. The most fundamental linguistic

Pleading Number : 2019017833     Submission date : 2019-05-15 17:59:26     Confirmation Number: 1236669019     page 30 of 155

Appx726

Soc (2015) 52:114–120

alteration in the push for transgender acceptance and rights is in fact the use of "gender," which used to be synonymous with "sex" used in the sense of male or female (rather than the act, or what one "has" in English), to mean a non-essential quality of the individual. In the linguistic world as it was before this push, one "was" of one sex or the other, and this was a fundamental fact of who one was. The most fundamental thing now insisted about "gender" is that it is certainly not determinate of who one is.

What we haven't figured out is what "gender" actually is, any more than we have a consensus about what it means to say someone is "gay" or "straight." Explanations for these last two terms range from the conservative insistence that being gay is a choice of a "lifestyle"—a series of actions we can choose to take or not to take (where being straight presumably isn't a matter of choice but being gay is)—to the tantalizing possibility that it's as fundamental as something in our chromosomes. Nature or nurture? We don't know.

It's also interesting that the two groups, gay rights advocates on one hand and transgender rights advocates on the other (though these groups are sometimes lumped together in so-called LGBT awareness or advocacy), are on opposite sides of the philosophical spectrum in their relationships to microscopic physical facts: gay rights advocates would typically be delighted to hear that being gay was as fundamental as chromosomes, as the brouhaha over claims for a "gay gene" have shown, whereas transgender advocates work hard to minimize the conceptual importance of chromosomes that define an individual as either male or female. It's not a given that biology is destiny. We can say it is so if we wish to express a particular point of view, but biology can always be overridden by other factors: we can acknowledge the biology but trivialize it, as the shift from "race" to "skin color" trivializes a once fundamental distinction.

If gender isn't something that's a given, what is it? Journalists and advocates have taken to referring to gender as something that is "assigned" to an individual at birth: by whom or what? This we never say, probably because we don't know. We've over-extended ourselves linguistically and are apparently hoping that no one will notice. What we used to call a "sex-change operation" is now "gender re-assignment surgery." Yet if it's assigned, it might seem that that's that. You don't change the seat your teacher assigns you, you sit in it. If it's God or Mother Nature that did the assigning, it's not clear you have the right to protest.

The intention behind the idea of gender "assigned at birth" seems to be to separate it logically from another more fundamental entity underneath, which so far as I know is never specified: if gender is "assigned," if we exist before the gender assignment, then it is logically secondary, and the entity that was assigned a gender , like a child assigned a seat can , in theory, get another gender, as another seat.

All epochs in intellectual history are articulated by switches from fundamental to not-fundamental, or the reverse. Such a switch was attempted decades ago in the humanities—broadly, across many disciplines including literary theory, sociology, and anthropology, when we collectively decided that almost everything we do and are is "constructed," apparently to say that any status quo could be "deconstructed": the result is the term we associate with almost half a century of academic literary treatment in the U.S., Derrida's deconstructionism. We "deconstructed" the "text"—whereby we were no longer dealing with what had hitherto been defined by being a poem or a play, something by Shakespeare or Virginia Woolf, but, erasing these distinctions, merely structures of printed words. We had removed one set of definers as primary and substituted something else, rather the way a scientific view of people is uninterested in their sense of humor, only (say) the contents of their blood: Derrida insisted that there was only text, and nothing outside. Eliminating distinctions between works based on individual connections to a world outside, as Derrida did, is rather the way all soft drinks, in the American South, are "Coke"—what kinda Coke you want, honey? 7-Up? Root Beer?

"Deconstructing" a text meant focusing not on what it did do but on what it didn't do, on its fissures and lacks, and seemed to outsiders insufficiently reverential of what the author had in fact accomplished: it "problematized" everything that was and considered this in terms of other works, not in terms of a relationship with an outside world. Thus each work is most fundamentally all the other works it isn't, not what it is. Absence trumps presence. It's certainly a way of leveling the playing field among printed works, but it's based on a decision to make one quality hitherto seen as secondary the primary one: that's what intellectual movements do. And it's what transgender theoreticians are attempting as well.

Most intellectual historians date the genesis of this way of thinking (which can be summed up by saying that what is, is only provisional, a sort of Potemkin village or a set waiting to be struck) to the insistence by Ferdinand de Saussure that all language was merely an arrangement of signs with no intrinsic connection to the world, so that their meaning was created solely by re-ordering the arrangement. "I hate you" doesn't somehow link to hatred, rather it is only an opposite of "I love you," equally meaningless if not contrasted to its opposite. Red isn't so much red as merely not-blue (or for that matter not anything else)—it was an easy step from here to see morality, social institutions, clothes, feelings, rules of any sort and anything else we can name as being merely alternatives to other things like them. Usually this was expressed by saying that they were "constructed"—arbitrary and amenable to being blown to smithereens by the withering force of an intellectual's scholarly analysis.

Thus countless papers read at the Modern Language Association's annual conference for the last decades of the 20th

🍏 Springer

FLEMING/MSPB-11

Appx727

century, and now beyond, are about "The Construction of X"—and so, the deconstruction of X in this brilliant scholar's paper. But assigning too many things to the same category, eliminating what previously were distinctions, encourages people to come up with ways to re-introduce the distinctions by other means. All buildings are constructed, but that doesn't mean there aren't some that are flimsier than others, or deserve to stand more than others. The three little pigs constructed three houses in total, only one of which was ultimately useful against the wolf. Yet the rage to find everything "constructed" was seen as leveling all three houses—indeed anything that could be tarred with its brush. Those who argued for the sub-stantiality and immutability of anything were held simply "not to get it": the world was built on shifting sands.

Of course this was a stance more congenial to those who wanted to change the status quo than to those who wanted to defend it, so it was an easy step from Derrida-influenced "deconstruction" to Foucault-influenced analysis of "texts" as being power plays by those with the upper hand on the powerless: the very fact that we are listening to the voice we are listening to means that it is the voice of the victor—some-thing our analysis has to make clear to the world. Power didn't come out of the barrel of a gun, as Mao insisted: according to American professors, it came from "texts." Yet this was shown to be false when the weaker entities began "writing back" (variations on the joke of "The Empire Writes Back" were endemic at the Modern Language Association for a de-cade or so) without their countries being any richer or power-ful. Having a say didn't mean the colonials were more pow-erful, only that they were writing, a rather circular victory. It wasn't the texts that established the hegemony; all they did was express something the guns had established. It turned out that the world outside the text existed after all. And it turns out that the world outside transgender theory exists as well.

All changes of vocabulary reflect unseen changes of atti-tude that the vocabulary reflects and crystallizes, rendering solid for others: the change of attitude (or whatever we call it) precedes the finding or invention or use of terms to crys-tallize that change. This is the basis of what we call intellectual history. If you assumed that the monarchy was instituted by God, you don't even speak of "governments" because this is too generic and implies viable alternatives, and you certainly don't speak of governments being "instituted" among men. (Saying they were "instituted" doesn't mean you can show how or when this happened: Rousseau tried unsuccessfully to situate this act in history, and so begat John Rawls, who gave up the historical claim and proposed a thought experiment instead). We have to have the Eureka moment of seeing what is as contingent. Then we start to look for vocabulary to ex-press this. If we see our unquestioned belief in a system of heaven and hell as merely "a" religion, or even as a "religion" rather than, say, merely the truth, the ground is ripe for us to question its absolute truth. Someone who speaks in terms of

"skin color" has already denied any importance to divisions of people by the fundamental concept of "race."

Words don't themselves change the world, at least not ini-tially; they presuppose an alteration of what I'm calling atti-tude (or perception, or what-belongs-with-what) that underlies them. Thus we can always question usage of words, especially new words: they reflect this otherwise unseen attitude, they don't prove anything. We use "gender" rather than "sex" to speak of maleness or femaleness (or come up with other words for these last two) to indicate that the horse is already out of the barn with respect to the old conception of sex being what we are: we now designate whatever these qualities are as less than absolute. But using such a term doesn't mean it's more fundamentally related to reality than the terms it replaces: after all, we got where we are by denying reality outside the con-ceptions. Words are rhetorical: they are used for specific pur-poses. But they are based on an invisible bedrock state of themselves. Because we can invent them doesn't mean they will predominate. Writing a paper for the MLA doesn't mean others will use your vocabulary, any more than opening a new store means you'll get rich. Time, marketing and luck play a role. Will your vocabulary take over? That's a real world fact, not one merely about signs.

We are still in the planning stages of the vocabulary of transsexuality/transgenderedness. If I were trying to come up with linguistic turns of phrase that capture the sense of the less-than-fundamental nature to being male or female, it would not most evidently, for that matter, be by saying that gender is "assigned." Gender is "perceived" would work far better than gender is "assigned"—and be more in line with the Aristotelean/Lockean distinction of qualities intrinsic to the entity and qualities that are the result of perception by others. There is however a reason why advocates would want to avoid falling into this Aristotelean rut (to which I return below): they want to insist that the person really *is* the new gender, not merely that s/he/other designation *is perceived as* such. Gen-der theory denies that people are one sex or another in order to make change from one "gender" to the other possible—so that after the change, people apparently can in fact be the new gender. Gender is mutable until it mutates. But all this means is that those who change genders are now in the position of those who didn't have to or want to change—meaning what? That their gender was in fact solid all along? That it was in fact their sex?

The theoretical over-reach of transgender theory is in a situation common to all outsiders who want to claim that the status quo is illegitimate—until they become the status quo. The guerillas in the hills that want to take over the presidential palace have to use terms that suggest that they are different from what they want to replace—whereas in fact what they usually merely want is to replace others' power with their own. Gender is assigned and hence arbitrary—only if I change the assignment, apparently that isn't arbitrary, it's bringing the

🍪 Springer

FLEMING/MSPB-12

Appx728

Soc (2015) 52:114–120

misaligned into alignment. That's the way things were made to be. What of those who think their gender is already the way things were made to be?

If the guerillas want to be the government, they aren't wise to suggest that all governments are illegitimate. Just this one. And then say why. Transgender advocates can allow people to have cosmetic surgery without insisting that "all gender is constructed." Yet this is too soft-core for most transgender advocates, whose philosophy is contained in the very notion that "gender" is of the nature of something that can alter its place or be gone beyond or moved through ("trans-"), if gender isn't something given, it's something that the individual decides and announces.

Transgender theory would be a lot less interesting, but more coherent, if instead of trying to change fundamental terms to make the world more welcoming for a tiny minority, it stuck to saying things like "I'm a man but I'm unhappy with being that, so I am going to use whatever means are at my disposal, ranging from easy fixes like shaving closer and wearing garments that seem female to others, to increasingly miraculous ones like surgery that removes my penis and gives me artificial breasts, to appear female." This makes statements personal, not general: they're less jaw-dropping than locutions like "being assigned a gender at birth" or "being a woman in a man's body," but they are philosophically more coherent.

Of course, we may have some sympathy for advocates of any new idea (here that the world should call us a man when before it called us a woman, or the reverse). Advocates almost always tend to take extreme positions: you aim higher than you actually hope to hit. Besides, this is an intellectual move with a venerable tradition. The twentieth and now twenty-first centuries learned to do this from the nineteenth: Freud, with his sweeping statements about the structures of the psyche in everyone that were based on considering outlyers, neurotics and psychotics, showed us how to do this. All of us had an id clamoring to get out, not just troubled people: the rest of us merely hid this better, so we were all accidents waiting to happen. So did Marx, with his reduction of all history to class conflict: if something didn't look like class conflict, we had only to keep looking below the surface to find this, as it was by definition there.

As recently as the first decade of the twenty-first century, the word used where we now use "transgender" was "transsexual," and the assumption, congruent with the more fundamental sense of "sex" when compared to "gender," was that the person was at some point going to undertake steps to assume at least some qualities of the sex s/he was transitioning to: we spoke of pre- and post-op transsexuals, though these were distinguished from "transvestites," cross-dressers, who might or might not consider themselves to be of the sex their bodies apparently were under the clothing: (French) vêtements or (Italian) vestiti (English's closest cognate being "vestments," or the American word for waistcoat, a "vest"

though vestments tend to be formal usually liturgical in nature). Now, "transgender" is widely used to refer to people who bear few visible marks to others of being the "gender" (formerly: sex) they insist they are. Gender is so subjective it doesn't even necessitate a consideration of others' subjective reactions.

Linguistic usage now, therefore, seems to be the tail wagging the dog, with the insistence that others refer to him/her as she/he preceding any attempt to bring the outward shell of the physical being into congruence with what most people have learned to refer to with the pronoun the individual doing the insisting wants to hear. Nowadays so many people are children of Foucault, who insisted that words really were power (rather than the more defensible and moderate position that words could be used to express power already gained, and in some cases to cow people into surrendering it), that we seem to think that if people say the Emperor's new clothes are beautiful, they are: if we can get someone to address us in the pronoun we want to hear, we have won (this is in a world of civil wars, as I write Ebola, global warming, and religious fanaticism—what kind of a victory is a pronoun?).

Transgender advocates make much of the fact that people clearly do acquire signalers for gender: we learn to be "masculine" or "feminine" based on what we want to project. But the conclusion that is typically drawn is not justified. The usual conclusion of advocates to the undeniable fact that I can decide how "masculine" to be is that gender has no basis other than the act of construction. It's that Saussurian thing again: words are arbitrary. But Saussure was wrong in his conclusion: the particular sounds are arbitrary, but "what time is it?" gets us, in Anglophone countries, the time rather than a stretch in jail or a Kewpie doll. We can't say why this is, but it is. People like a smile and a friendly "Howyadoin?" better than a sneer or a slap. Conventional? Constructed? Possibly, but the reactions to these are quite different. That fact is real. Similarly, the fact that I construct and project the signs of maleness doesn't mean this is based on nothing. How, for starters, do I know what to project? Which gender to construct? It is perfectly possible that an individual acquires the signals for what s/he knows him-/herself to be. That we as individuals have the option of sending signals or not sending them is logically independent of what we are.

I would say of myself for example that I know myself to be male, so I consciously give off signals that will show this—not "maleness" but maleness. Of course transgender advocates want to say that the gender they really are, as opposed to the one they say they are, is the true one—so signals of this gender would presumably be more real and be written without the scare quotes. I'm luckier than they are, as are the vast majority of people: we are what we are without scare quotes. What good does it do to insist that our sex is in fact a constructed series of signs? It's not logical nonsense to say no, I am (in my case) male, and of course I want to seem this. I certainly feel

&#x1F411; Springer

FLEMING/MSPB-13

Appx729

sorry for others who do not feel themselves to be the sex they in fact are. But why insist that there is no sex at all, only gender? How about: people who are in sync with what they are have a sex, those who don't have a gender? Logically it's not self-contradictory.

Now we have individuals who in the old days we would have said were, say, women, or men dressed as women (even though they are "biologically" the opposite of what they say they are—a woman with a penis or a man with a vagina), demanding that the world refer to them and treat them as something other than they apparently they are. The problem here is that what the rest of us perceive is not what the individual wants us to say we perceive. We see purple, but we have to say we see green. Transgender awareness turns out to be a form of linguistic control, a form (as noted) of the Emperor's New Clothes. If we don't want to seem unhip or stupid, we have to say that the Emperor's clothes are beautiful whereas in fact what we perceive is that he's naked. Transgender advocates are less concerned, apparently, with individuals whose outsides match what they want to be referred to and treated as: a post-op male-to-female transsexual clearly uses the ladies' room. The current situation results from advocates trying to assert that I alone have the power to determine how others refer to me and treat me despite what the conventional signs of these things might be. I say I'm female, even though I appear male, and demand the right to use the ladies' room. I'm right, they're wrong.

All of us make judgments many times a minute about what things are based on the signals we get. We can of course be wrong, as Descartes noted, but if these were not the signals we accept as usually making us conclude what we do, we'd change our reactions. If nearly everything we think is a cat is a cat, we have no reason to doubt our saying that what just ran by is a cat. But if we get a skunk or a fox that we initially took to be a cat, we may learn to be more hesitant in saying what ran by. However usually we don't, so saying it's a cat when it looks like a cat is usually justified. If most tables we know support a plate, then we're justified in putting the plate down on a table we have no evidence to be rickety. This one table may be so cleverly rigged or so feeble that even a plate causes it to collapse, sure. But we're not crazy for thinking that tables support plates. The air doesn't typically support a plate; that's why we put it on the table.

People with facial hair and deep voices are what we call(ed) male—that's what it means to say they are. We're not unhip or cruel for saying someone who seems male or female is in fact male or female. After all, we don't hesitate to make the distinction between a table and a chair—we know the difference. To be sure, we can learn about ambiguous combinations. A spork is half spoon half fork, a culotte is half pants half skirt. But this state of affairs then becomes the basis for how we use language. Language, *pace* Foucault, doesn't control us: we control it. I as an individual might not, but collectively we

do. We have the categories precisely because things usually are that way. The world can change, but the case has to be made that it has done so. The transgender advocates are insisting that merely because the case can be made, it is declared made and it's our fault for not agreeing.

Cartesian doubt, wondering if the whole world is the way we think it is (is this a person or a mechanical doll? was Descartes's question) doesn't usually make sense: how probable is it that the person we see from the window is in fact an automaton? Of course we could be wrong, but if it were frequently an automaton we wouldn't say automatically that it's a person—we'd know to investigate. Now that we know that there are people who look male but say they aren't, we're likely to ask them what they are, if we wish to be agreeable. But they have to be something rather than the exception that proves the rule, as they currently are.

One swallow doth not a summer make—nor does it change linguistic usage. Saussure was wrong to make his fundamental distinction between *langue*, what we all do, and *parole*, what I do: there's a lot in the middle. A lot of usages aren't just mine, meaningless divergences from *langue*: instead they're plausible minority usages which, if generally adopted, morph into distinctions in general use. There's a sliding scale, not a dichotomy. Where we've gone wrong is to think that just because it's possible to formulate a language usage that is anything other than *parole*, it has no alternative but to move directly to being *langue*. Because my group uses language in a certain way, others must as well. That is precisely what remains to be seen. Not all linguistic usages bring in the box office. Only those that triumph. Who knows what will?

Why is the end point of transgender theory that others address us using the pronouns that we want to hear? Let's say others call us "he" when we believe ourselves to be a "she"? So what? Frequently what we say to someone doesn't jibe with what others know to be true. We tell the little old lady next door she looks fabulous when actually she doesn't. If the point here is to be nice, and to refer to people the way they want to be referred to (or told they look nice), that is a separable issue from accurate gender assignment. Because someone tells us he is Julius Caesar and Jesus Christ, this doesn't mean we have to agree he is, though we may appear to for fear of our personal safety and tell him we are sure he is what he says he is. Yet advocates want others not only to say the opposite of what we believe to be true, or to insist on a third category (say "trannie") rather than simply "male" or "female," but to believe it as well. This is the intrinsic thought control of transgender theory. Do I really have 100 % of the deciding vote in what others will say about me? According to transgender advocates, apparently so.

Let's say that despite my total lack of qualities that get people to say a person is male (i.e. no penis, no facial hair, no deep voice, and so on) and total possession of qualities that get people to say a person is female (breasts, higher voice,

🌱 Springer

FLEMING/MSPB-14

Appx730

Soc (2015) 52:114–120

smooth skin and so on), I am actually male. Well, fine. What is the "I"? Gilbert Ryle excoriated Descartes for his "schoolboy howler" of presupposing an "I" while appearing to question it; so in this spirit we can ask, what is "I" that is neither intrinsically male nor female? Again: what exactly is "assigned" gender? When? At birth? Not before? Apparently there is a right assignment as well as a wrong one—few transgender advocates would say nay to me when I, with all the signs of maleness, say that I actually am male. They just want to make it possible for someone who looks like me to insist he isn't male: the "assignment" was somehow wrong, due to a slip-up or carelessness (few treatises consider why this mistake may have been made). What predates the assignment of gender, either temporally or logically?

Is it a soul? I've never seen anybody claim this. Instead the claim is of two bodies: the body of a woman in the body of a man, say. Is this only possible with people? Would transgender advocates allow that what we'd all call a table might really be a chair? Can a table, as we say with transgender people, self-identify as a chair? Of course not. We'd require consciousness to have this be a plausible claim, whatever consciousness is: a table can't self-identify as a chair. So inanimate objects are out. What about non-human animals? How about this: can a cat really be a hamster? A cat can't insist it, but perhaps its actions can show it believes it is. (Wittgensteinians who deny mental processes separate from public signals and actions might like this.) Let's say, the "cat" mopes until I day we give it a large hamster wheel? How about if I claim I'm really a table? Can a person self-identify as a hamster? Why not?

But fine. Let's stick with people saying they are different sorts of people than they seem to be. Is gender the only thing that works this way? What about other qualities? How about height? I'm 6'2". Can I really be a dwarf in the body of a tall man? A sub-normal man with the brain of someone more intelligent? Can I really have an IQ of half what I do have? Can I be a black man in the body of a white one (or the reverse)? Or just someone who wants different color skin than I have?

We do allow some alterations as process, though others are beyond us—height for example, and skin color past a certain point. But plastic surgery, sure. And a lot of weed can make anybody stupider. What makes us smarter? Baby Einstein? That's more difficult. But let's apply the same demands that transgender advocates apply. I am 6' 2" but insist I am short. Am I short just because I say so? Transgender advocates would have to say I am. Let's say I take some measures to get people to say I'm short, rather than just insisting they do so: I walk on my knees and announce that I am a small person. Does that make it so? Are others allowed perhaps not to tell me I'm crazy, which probably isn't nice, but to refuse to give me, say, a handicapped tag for my car? What if I insist I'm a

genius despite all evidence that I'm low normal? Do I get a McArthur grant because I want one?

What if I insist I'm an attractive man when in fact I'm ugly, and moreover this degree of odd insistence (here's the Heisenberg Principle at work) ipso facto means I'm not attractive but sad and desperate? Are others allowed to find me sad even though I think I'm fabulous? If we can give somebody silicone breasts and get rid of facial hair, there's no logical necessity for the result to be a woman rather than something else, terms to be invented and inserted here.

Let's say that science solves all these problems: we can make a body that on the outside really passes inspection, not just on the street, but in the locker room and with sex partners. And we can now change the chromosomes! Is anything at all left? Apparently not. This was a mis-assigned girl who is now a boy. No. History is left. How about his/her memories? These may be as a childhood mistreated as a girl when in fact he was a boy. But what about the memories of those who saw him/her? And this isn't introducing "the ghost in the machine," as Ryle called it: consciousness that is separate from physicality. We can just as well appeal to the hospital records of the operations. Can I completely re-create the world around my insistence? A world without history and memory is the world of Orwell's *1984* where old newspapers are corrected to fit new versions of things. How is this different from changing birth certificates, as now we do?

I don't think I can get others to say that my cat is a hamster, the table a chair, or the tea in my cup coffee despite having been made from tea leaves. People say X because of certain conventional qualities they perceive. Anyone is welcome to try to produce those qualities, and so earn the label of X. Now we demand it without the work to produce the qualities. I say it, so it's so.

Many bodybuilders started as 98 lb weaklings, but took steps to become huge. But the insistence of transgender advocates of today—as opposed to those of a decade or so ago who talked about a "sex-change operation"–is that we don't even have to take the steps—which, if enough are taken, virtually eliminate the problem. We agree that people can change: if you want to win the Mr. Olympia, change your body. If you want people to refer to you as a woman, takes steps so they do. What works for street identification may not work in the locker room or in the bedroom, but this true of us all: it's a rare person over forty who looks as good without clothes as with them.

People are welcome to work at seeming what they want to seem. They are not welcome to try and reverse the whole system of signifiers that allows us to tell our glass from a cup, or (to limit ourselves to people) someone in an enemy uniform from someone in our own unit. Can the buddy kill us? Sure, as allied Afghans can kill US servicemen who have trained them. But if it happens as more than an exception, or elsewhere than in

🖄 Springer

FLEMING/MSPB-15

Appx731

Afghanistan, we change our rubrics. Rubrics change because of the world. And it turns out the world outside still exists.

Transgender theory thinks the world exists too: how else would someone know s/he had got the right gender at long last? What of the vast majority of people who not only got assigned the right gender initially (whatever that means) but so identify with it they insist they are in fact that gender, perhaps adding that when the gender is the right one, it's called our "sex"? That's not logically contradictory.

And how about calling the process of making signals that impel people to use pronouns we want them to use (the way a 98 lb weakling, through steroids and weights and a lot of other things, turns into Mr. Olympia) something like "extreme cosmetic alteration procedures" rather than "gender reassignment surgery"—or for that matter, a "sex-change operation"? In fact we neither reassign nor change. We manipulate the world. The world. Not what we say it is, but what it is. Want friends? Be friendly. Want to be referred to as a woman? Take whatever steps necessary to encourage people to do that. Just don't order them around or tell them what they have to say. Few people like that.

**Bruce Fleming** is in his 28th year teaching English to midshipmen at the US Naval Academy. He is the author of over a dozen books and many articles on subjects ranging from literary theory and Modernism to political theory and the military, as well as fiction and dance criticism. His works are listed at www.brucefleming.net.

∅ Springer

FLEMING/MSPB-16

Appx732



**AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS**

1133 19th Street, NW, Suite 200, Washington, DC 20036
PHONE: 202.737.5900 • FAX: 202.737.5526 • www.aaup.org

<u>VIA ELECTRONIC AND U.S. MAIL</u>

February 7, 2018

Vice Admiral Walter E. Carter Jr.
Superintendent
United States Naval Academy
121 Blake Road
Annapolis, Maryland 21402

Dear Superintendent Carter:

Dr. Bruce Fleming, professor in the Department of English with tenure at the United States Naval Academy, has sought the advice and assistance of the American Association of University Professors as a result of a January 31, 2018, memorandum from Vice Academic Dean Daniel O'Sullivan informing him that he was being "temporarily assigned" to "non-teaching duties" and thus removed from the classroom. We understand that Professor Fleming was not afforded an opportunity to respond to the action, the basis for which was a complaint from a midshipman, the nature of which was not specified. Professor Fleming has alleged that the adverse action resulted in significant part from his continued criticism of the decline of USNA academic standards.

The interest of the Association in the case of Professor Fleming stems from our longstanding commitment to academic freedom, tenure, and due process, the basic tenets of which are set forth in the attached 1940 *Statement of Principles on Academic Freedom and Tenure*. That document, a joint formulation of the AAUP and the Association of American Colleges and Universities, has received the endorsement of more than 240 scholarly and educational associations. We note that excerpts from the "academic freedom" section of that document are incorporated into the USNA *Faculty Handbook*. Derivative procedural standards relating to the imposition of sanctions against faculty members are set forth in Regulations 5 and 7 of the AAUP's *Recommended Institutional Regulations on Academic Freedom and Tenure* (also attached). We have noted the relevant provisions of the USNA Academic Dean and Provost Instruction 1531.63C.

Action to separate a faculty member from ongoing academic responsibilities prior to demonstration of stated cause in an appropriate proceeding is considered to be a suspension, which is justified, under Regulations 5c(1) and 7a, "only if immediate harm to the faculty member or others is threatened by the faculty member's continuance. Unless legal considerations forbid, any such suspension should be with pay." According to Interpretive Comment Number 9 on the 1940 *Statement of Principles*, "a suspension which is not followed by either reinstatement or the opportunity for a hearing is a summary dismissal in violation of academic due process." (We understand that Instruction 1531.63C does not appear to address

<span style="color:blue">FLEMING/MSPB-32</span>

Appx734

Superintendent Walter E. Carter
February 7, 2018
Page 2

these points.) No threat of immediate harm has been suggested in Professor Fleming's case. It seems clear that he has thus not been afforded the safeguards of academic due process called for under these generally accepted standards.

The information in our possession regarding this action comes primarily from Professor Fleming, and we recognize that you may have other information that might enhance our understanding of what has occurred. We would accordingly welcome your response. If the facts as we have recounted them are essentially accurate, we urge Professor Fleming's reinstatement to his normal faculty duties. As to any further action in his case, we urge that it be consistent with the procedural standards we have set forth.

Sincerely,

Anita Levy

Anita Levy, Ph.D.
Associate Secretary

Attachments

cc:  Dr. Andrew T. Phillips, Academic Dean and Provost
     Dr. Daniel O'Sullivan, Vice Academic Dean and Provost
     Dr. Jason Shaffer, Chair, Department of English
     Professor Bruce Fleming
     Mr. Jason Ehrenberg, Esq.

FLEMING/MSPB-33

Appx735

# UNITED STATES NAVAL ACADEMY
## Annapolis, Maryland

### HE 111: Rhetoric and Intro. To Literature.    Fall 2016



#### "IT'S ALL ABOUT BILL"

VVVVVVVVVVVVVVVVVVVVVVVVVVVVVVVVVVVVVV
**Existential "YUT!"**

## Prof. Bruce Fleming

Sampson Hall 210.  x6219 or fleming@usna.edu

Let's get this one out of the way at the beginning: correct addresses for me are either my rank at USNA, which is "Professor," or my professional title, which is "Doctor," in writing but not in speech abbreviated "Dr."  If you want to call me by first name, you may: it's "Prof." "Mr." or "Ms" is not for professors at USNA unless the prof specifically asks for it (though it is at Ivy-level colleges where everyone has a Ph.D.) any more than it is for officers.

Quick bio: I graduated from Haverford College, have an M.A. from the University of Chicago and a Ph.D. from Vanderbilt. I'm from the Eastern Shore of Maryland. I've written over twenty books, including the writing book we use in this class. My latest book is called *Bridging the Military-Civilian Divide*. I have three kids. My book about the Naval Academy is *Annapolis Autumn: Life, Death, and Literature at the US Naval Academy*. My Web site is www.brucefleming.net. Other articles by and about me can be found on the Web.

Office Hours: any mutually convenient time. I'm here to help you, and it's not a big step to come by, but you have to take the initiative to do it.

THE 11TH COMMANDMENT: REMEMBER THY WRITING CENTER.

This semester, the first of the standard two-semester sequence in English is meant to teach you a number of things: to pay attention to what you see, to be able to formulate a response, and to express it in clear, mistake-free language.  Its material is short stories and plays; next semester it's poetry and novels.

1

FLEMING/MSPB-122

Appx741

Preparation of the material for class is essential to the effectiveness of the course. While it is unrealistic to think you will read longer texts more than once, that one time must be CAREFULLY, so that the details stick with you. The shorter texts I expect you to read at least twice. The first time is the general "do I get it?" go-through; the second time you concentrate on details. If you don't know the details, you don't know the work. Preparing for English class is no different than preparing for any other aspect of your life here at USNA: don't show me, the material, or yourself the disrespect of being sloppy or doing things in a haphazard way. Speaking of respect, I always trade up for a better kind of respect than the kind you're taught: ask me what this means.

Writing requirements for the course include five three-page papers on the readings for class, plus a two-page play review of the Masqueraders' production (we won't read it beforehand; you pick which performance in November to go to). Initial ("topic") paragraphs for the papers are due a full week before the paper itself, and will be graded. If your first paragraph is awful and gets an F, of COURSE you are expected to change your thoughts about the final paper so that it's better. (This is a response to the question, "Sir, if my first paragraph is [expletive deleted] can I change it?") **Papers are due when they are due,** which is to say at the beginning of class on the day noted on the syllabus: not three days later, not one day later, not ten minutes after the end of class because you forgot it in the Hall. *If it looks as if you are going to be in such a position, you must talk with me about it before the due date of the paper, not wait until after (e-mail okay).* If, because of an act of God, you are unable to turn in your paper on time, lateness penalties will be assessed at one letter grade per calendar day. IF YOU DON'T HAND IN ALL THE PAPERS, YOU CANNOT PASS THE COURSE. This requirement to get the papers in on time applies even to days when you may have excused absences. In other words, it is your responsibility to get your paper in on time whether or not you are going to be present. In addition, **you are responsible for all material presented every day, including the days you are absent. Please do not think you have covered this responsibility by asking the person next to you in twenty seconds before class, "Did we do anything last time?" We ALWAYS do something.**

The written work will provide 60% of your grade; text preparation as measured by class participation and whatever quizzes we have will provide 30%, and 10% is reserved for my estimation of intangibles such as "effort." I hope you will not want to sit like a lump in class, but if you do, you can be sure that (1) I will notice it and (2) your grade will reflect it. Don't start to get whiney about "I'm just a quiet type of person and will I be penalized for that?" I am constantly asking questions; the degree of your preparation (or its lack) reflected by your answers will be the basis of this grade. In addition, I will usually pick "experts for the day," two people to be responsible for introducing the material and guiding the discussion. *I* do the picking; i.e. everybody has to be prepared to be an "expert for the day."

Ask me about re-writes.

Every Friday is GF, Grammar Friday. ON FRIDAYS **BRING** *"Boat Book"* **TO CLASS**. You

2

FLEMING/MSPB-123

Appx742

read the chapter of **BB** that's on the syllabus; I take ca. 10 minutes underlining the important concepts, and then we move on to the literature assignment for that day. The idea is that I've explained it adequately in the text. You bring questions; I assume you've got it unless you ask. YOU MUST BE PRO-ACTIVE. We start with Chap 34 and every week do the next one.

This course is intense, and it goes quickly. We're doing writing, we're doing grammar, and we're doing literature. And it's not over until it's over.

As future officers in the U.S. Navy or Marine Corps, you must be able to write clear, grammatical English free of errors of spelling and punctuation. In order to encourage this, the following rules will be in effect:

l. At the third spelling mistake the grade of the paper in which it appears drops to F.

2. **A comma splice occurs when a comma is used to join two otherwise unrelated independent clauses.** (If in doubt about this, see Bill.) The paper's grade drops one letter for each whole or partial unit of two comma splices in excess of two. Warnings are given for the first two. Three or four CS s and your grade drops from, say, C to D. Five CS s and it drops from C to F.

3. At the third "cardinal sin" in a paper the grade drops to F. A cardinal sin is defined below; it includes the most common sound transpositions: their/there, its/it's, to/too, as well as a number of other items.

This approach to grading may seem hard-line, but believe me, it is better for you to go carefully now than get zapped as Ensigns who can't spell and write. Formal correctness, however, is a means to an end, not the end itself: it gets you (so to speak) in the door and encourages your reader to pay attention. Once you have the reader's attention, however, you still have to have something to say. I want you to think for yourselves and say interesting things in an elegant fashion. Still, form counts for a lot in this course.

All writing except that done in the classroom must be done on the computer, i.e. typed. Hand-written papers are not accepted. Paper format is as follows:

l. Leave adequate margins. This means at least one inch all around, usually 1 1/2 inches on the left side.

2. You may number either at the top right corner or in the center of the bottom. Do not number the first page, but number subsequent pages starting with "2."

3. **No title page, please. At the top right corner of the first page** put your name and alpha code, the course and section, my name (Prof. Fleming--with one "m"), and the date the paper is due--in that order. Single-space this. **DON'T SKIP OVER THIS ONE: I HAVE HAD COUNTLESS PLEBES TURN IN PAPERS THAT WERE SINGLE-SPACED, OR HAD A TITLE SHEET, OR MISSPELLED MY NAME.**

4. Center your title two double spaces below this information, and double space the body of the paper. Do not put quotation marks around the title. Titles of long works referred to in the text (i.e. books, plays, long poems, movies) are <u>underlined</u>. Titles of short works (poems, one-act

3

FLEMING/MSPB-124

Appx743

plays) are put in quotation marks (" "). **READ THIS ONE EXTRA CAREFULLY TOO.**
5. Do not hand in papers that the printer has mangled--i.e. printed over the margins, reduced in type, or whatever. Allow yourself enough time to compensate for the possibility that technology is not going to co-operate. **Staple, please. Let me say that again. Staple, please.**
6. Three spelling mistakes and you're out--i.e. F. Use the spell-checker and the dictionary.

A cardinal sin is any of the mistakes in the list that follows. More than one mistake in either of these last two categories means that the best you can do is a C.

**Cardinal sins:**
-- "its" is not the same as "it's"
-- "to" is not the same as "too"
-- "their" is not the same as "there"
-- "no" is not the same as "know"
    The verb "to lay" is distinct from the verb "to lie." Confusions between them results from the fact that the simple past of the verb "to lie" is the same as the present of the verb "to lay":
To lie: I lie down at noon, I **lay** on the bed for an hour; I have lain on the bed for three hours.
To lay: I **lay** the book down; I have laid it down. (Not: I am going to lay down.)
    "Great" is a quality of mind or morals used with only a few people. For example, we say that Einstein was a great physicist and thinker. In the interest of varying the language and not sounding like a moron, DO NOT use as follows: we had a great time; he is a great guy; I am doing great, Are you doing great? USNA is a great school, Have a great day, etc ad nauseam.
    "Real" is the antonym of unreal, or imaginary. If you mean "very," say so. E.g.: "I'm real sorry" should be "I'm very sorry." Exceptions granted to those who can show at least one parent native of Tennessee or Kentucky.
    "Like" is followed by a noun: A cat is like a chicken in that neither is a dog. He is like me. In the world outside this is widely confused with "as if." E.g.: He is acting like he's crazy. Correct: He is acting as if he were crazy. **THIS IS MORE A VERBAL PROBLEM THAN A WRITTEN ONE. I WILL BE CALLING YOUR ATTENTION TO YOUR OVER-USE OF 'LIKE.'**
    The verb "to go" indicates physical movement from one place to another. Its [note: *not* "it's"] use as the invariable synonym of a host of verbs expressing speech (to say, to question, to exclaim, etc.) is to be discouraged--as in: I go, "Hi," and she goes "hi," and I go, "what's up?" and she goes, "get lost." I won't even comment on "all," as in: "I'm all x," and "she's all y." **THIS TOO IS A VERBAL PROBLEM. START THINKING ABOUT IT NOW. IF YOU'RE NOT A MORON, THERE'S NO REASON TO SOUND LIKE ONE. SOUNDING LIKE A MORON DOES NOT INSPIRE CONFIDENCE IN THOSE YOU ARE ATTEMPTING TO LEAD.**

Quick quiz: How many "m"s does my last name have? SIR ONE SIR.
Who's it all about? SIR ALL ABOUT BILL SIR.
(That's the last time you need to give me the sandwich.)

FLEMING/MSPB-125

Appx744

Actually that's not true. Ask me what the new third sandwich question is.

Texts:
**Literature: A Pocket Anthology**, ed, R. S Gwynn
**The Short Prose Reader**, 13th edition, Muller/Wiener
**"Boat Book"**—Longman Grammar w/ boat on front
Handouts: works by Matt Gallagher and Kayla Williams, as well as Bruce Fleming

I can't believe I have to say this, but experience is a bitter teacher: The text next to a date is the text we're going to discuss on that date. I.e. if it says Monday and it's Monday YOU COME TO CLASS HAVING SOMETHING TO SAY ABOUT THE TEXT THAT IS NEXT TO THE WORD "MONDAY" ON YOUR SYLLABUS.

Dates to be graven on your hearts:
Paper I: First par due Aug 29; paper itself due Sept 6 (Tuesday pretending to be Monday). Plebe summer paper; see below for precise topic.
Paper II: First par due Sept 19 "How I Would Change the World"; paper itself due Sept. 26
Paper III: First paragraph due Oct 7. Paper itself due Oct 17, on short stories.
Paper IV: First paragraph Nov 7. Paper itself due Nov 14, on Ibsen.
Paper V: First paragraph due Nov 21. Paper itself due Dec 2, on Shakespeare.
PLAY REVIEW IS DUE TWO MONDAYS (I.E. A WEEK AND CHANGE) AFTER YOU SEE IT, SO THAT'LL BE IN NOVEMBER TOO. PLAN AHEAD.

Repeat: ask me about re-writes. This in turn is related to the question: What do I do when I get back an "F" on my paper?

All essays (the first three weeks) are in **The Short Prose Reader unless they are by me, in which case they are in the handouts**. I AM INTERESTED IN YOUR CONCENTRATING ON THE STRUCTURE OF THESE ESSAYS, NOT THE CONTENT. IDENTIFY, UNDERLINE, AND NUMBER THE MAJOR IDEAS. WHAT IDEA LEADS TO WHAT? DRAW ARROWS ON THE TEXT. IN ALL CASES YOU MUST COME TO CLASS WITH YOUR CANDIDATE FOR A TOPIC SENTENCE OR SENTENCES. THIS WILL MEAN READING AND CONCENTRATING ON THE TEXT, I.E. READING IT MORE THAN ONCE. IT'S ONLY CA 3 PP; YOU NEED TO SPEND TIME FIGURING IT OUT, NOT JUST LET YOUR EYES PASS OVER IT ONCE.

ESSAYS

22 Aug: Introduction to course.

Explanation of first paper. The first paragraph for this is due on Monday 29 Aug and the paper on Tuesday (Mon sched) 6 Sept. Topic: "The Aspect of My Plebe Summer I Expected Least." It's 900-1000 words, which equals three pages with normal margins (usually 1", i.e. not ridiculously wide) in 12-point font, not including heading material (i.e. four printed-out pages, of which the

FLEMING/MSPB-126

fourth page will only have a few lines on it). Do not merely give me a series of disjointed observations; on the other hand do not limit yourself to describing something that happened. I do NOT want one of the 5-paragraph essays you may have learned to do in high school. These are better than nothing, but at the college level we have to get more sophisticated. DO NOT begin by saying "In this paper I will be making three points"; do not begin "body" paragraphs by saying "My next point is X"; do not tack on a useless paragraph (the fifth under the rules of the 5-p-e) repeating what I already know, "In this paper I have shown that (your three points)." EVERY paragraph gives new information. DO give the information the 5-paragraph essay gives, but do it more subtly. Why? This is college, not high school.

The topic is designed to give you a push towards a structure—what I call a "V." You will hear a lot about the V. The first paragraph is NOT wheel-spinning (ask me); it MUST tell Bill where you're going to take him (ask me). In short, you have to know where the paper is going. Best plan of attack is to write a rough draft of the paper itself so you know what your point is, then pull this up to the top into a V for a first paragraph.

I've purposely scheduled a number of essays dealing with gender in the military as this is Topic A these days. Some of them are by me.

Aug 24: Barbara Ehrenreich, "What I've Learned from Men".
Aug 26: Prof, "Man in the Arena" (handout) **BB 34**

Aug 29: Stephen King, "Why We Crave Horror Movies." First paragraph of Paper I due.
Aug 31: Michael Ingrassia, "The Body of the Beholder"
Sept 2: Prof, Do We Still Need Men? http://www.huffingtonpost.com/bruce-fleming/do-we-still-need-men_b_7129322.html : **BB 35**

Sept 5: Labor Day. No Class.
Sept 6: Replacement class for Sept 5, Tuesday outside the Wall but for us, Monday. Paper I due.
Katha Pollitt, "Why Boys Don't Play With Dolls"
Sept 7: Molly Ivins, "Get a Knife, etc."
Sept 8: James Fallows, "The Tragedy of the American Military"
http://www.theatlantic.com/magazine/archive/2015/01/the-tragedy-of-the-american-military/383516/ **BB 36**

Sept 12: Karen Armstrong, "Fundamentalism is Here to Stay"
Sept 14: Kayla Williams, from "Love My Rifle More Than You" (I sent this in PDF)
Sept 16: Prof, "How to Stop Sexual Assault at Military Service Academies"
http://www.huffingtonpost.com/bruce-fleming/military-service-academies-sex_b_2724757.html?
**BB 37**

## STORIES
All these are in **Literature**.

6

FLEMING/MSPB-127

Appx746

Sept 19: John Updike, "A and P" First paragraph of Paper II. Topic: "How I Would Change the World." This CANNOT be mere fantasy; the change has to be plausible. I.e. don't be silly: don't say you'd plant a lollipop tree behind every house.

Sept 21: Joyce Carol Oates, "Where Are You Going" etc.

Sept 23: Matt Gallagher, excerpt from *Kaboom* sent in PDF **BB 38**
**NB this is not a story. The reason I am putting it here is to get you to think about why it isn't.**

Sept 26: B **BB 39** Paper II due.

Sept 28: Raymond Carver "A Small, Good Thing"

Sept 30: Bobbie Ann Mason, "Shiloh"

Oct 3: Sophocles, *Oedipus Rex*, up to Scene II p. 972

Oct 5: OR up to Sc IV 987

Oct 7: OR end. **BB 40.** First paragraph of Paper III due. Paper itself due Oct 17. Topic: Pick any two of the short stories we read so far that have something in common (topic, treatment, world-view) and present them in such a way that this commonality is at the top of your V, without thereby denying what makes each unique.

Oct 10: Columbus Day: go discover something.

Oct 12: Alice Walker, "Everyday Use"

Oct 14: Ernest Hemingway, "Hills Like White Elephants." **B 41**.

Oct 17: James Joyce, "Eveline" Paper III due.

Oct 19: Nathaniel Hawthorne, "Young Goodman Brown"

Oct 21: Play review day. Assignment: Everybody go to a major newspaper (online or print) such as NYT, LAT, Wall St Journal, Washington Post, and bring in a play review. A play review is the reaction of someone who's gone to see a new production/play, NOT a publicity piece before the fact about the actors, director, or production. Talking theater, please—not musicals.

A play review is like any other piece of writing you'll do for me: you're starting with subjective reactions/impressions and arranging them in an analytical V. In brief, you have to analyze your experience. Writing things down on a checklist helps. The elements that go into a theater experience are:

The play (it makes more sense to talk about this in the review if it's new)

The actors

The director (what does s/he do? We'll talk about it)

The sets/costumes

Lighting/music etc.

Anything else?

In the review you bring in, you have to be able to tell me which of these elements the review starts with and how much they're considered: remember the V—what you start with gets the most emphasis. In addition, a review typically gives a "thumbs up" or a "thumbs down" in the first sentence. As in: "The first-rate production of the scintillating comedy X" or "The leaden

7

FLEMING/MSPB-128

Appx747

performance of a mediocre play by Y." Be able to say whether your play review is basically thumbs-up or thumbs-down. **BB 42**.

Oct 24: Ibsen, *A Doll House*, Act I.
Oct 26: Ibsen, Act II.
Oct 28: Ibsen, Act III. **BB 43**.

Oct 31: Shakespeare, *Othello*, Act I. Boo!
Nov 2: Act II.
Nov 4: Act III. **BB 44**. First paragraph of Paper IV due Nov 7. Paper itself due Nov 14. On "A Doll House" Topic: Many readers think this is a polemical play arguing that women are oppressed by the institution of marriage and by their husbands, or at least were so in the late nineteenth century. Is this in your opinion a valid reading? Why or why not?

Nov 7: Act IV. First paragraph of Paper IV due.
Nov 9: Act V.
Nov 11: Armistice Day WWI/ Veterans' Day. Remember and appreciate.

Nov 14: Tennessee Williams, *The Glass Menagerie*, Scenes 1-3. Paper IV due.
Nov 16: *GM*, Scenes 4-6.
Nov 18: GM scene 7 and wrap-up. **BB 45** NOTE NEXT CHAPTER IS MONDAY

Nov 21: D.H. Lawrence, "The Rocking Horse Winner"
First paragraph of paper V due, on *Othello*. What lessons can military leaders-to-be learn from this play? **BB 46** NOTE THIS IS A MONDAY
Nov 23: Just come to class.

THANKSGIVING!!! TIME TO LET PEOPLE FAWN ON YOU IN AIRPORTS (STOCK ANSWER: "THANK YOU FOR YOUR SUPPORT") AND ADMIRE YOU IN YOUR UNIFORMS AT HOME!!! HOWEVER, DON'T EAT TOO MUCH STUFFING AND GRAVY.

Nov 28: Sandra Cisneros, "Barbie-Q"
Nov 30: Maupassant, "Mother Savage"
Dec 2: Flannery O'Connor, "A Good Man Is Hard to Find" **Paper V due. BB 47.**

Dec 5:TBA/comp (ask)
Dec 7:

LEARNING OUTCOMES FOR WRITING COMPETENCY, CRITICAL READING COMPENTENCY, AND CULTURAL LITERACY IN HE111

HE111 develops writing competency by ensuring that students can
1) compose a persuasive thesis about a complex topic
2) support an argument using evidence derived from analytical thinking about a topic

8

FLEMING/MSPB-129

Appx748

3) structure a paper in logically and rhetorically effective ways
4) employ an effective writing style that expresses ideas with clarity and concision
5) use the grammatical and mechanical conventions of American English

HE111 develops critical reading competency by ensuring that students can
1) distinguish the characteristics of and employ reading strategies particular to different literary and non-literary genres (specifically, the essay, short story, and drama)
2) analyze short fiction by showing how parts of and patterns in the text contribute to the meaning of the whole
3) analyze dramatic literature by explaining how textual and performance choices create meaning

HE111 develops cultural literacy by ensuring that students can
1) recognize the way literature interprets the human experience and cultural values
2) use literature to understand and interpret meaningful life experiences

USNA STATEMENT ON PLAGIARISM

### STANDARD

**Academic plagiarism** is the use of the words, information, insights, or ideas of another without crediting that person through proper citation. **Unintentional plagiarism**, or sloppy scholarship, is **academically unacceptable; intentional plagiarism is dishonorable.** You can avoid plagiarism by fully and openly crediting all sources used.

### GUIDELINES

1. **Give credit where credit is due.** Inevitably, you will use other people's discoveries and concepts. Build on them creatively. But do not compromise your honor by failing to acknowledge clearly where your work ends and that of someone else begins.

2. **Provide proper citation** for everything taken from others. Such material includes interpretations, ideas, wording, insights, factual discoveries, charts, tables, and appendices that are not your own. Citations must guide the reader clearly and explicitly to the sources used, whether published, unpublished, or electronic. Cite a source each time you borrow from it. A single citation, concluding or followed by extended borrowing, is inadequate and misleading. Indicate all use of another's words, even if they constitute only part of a sentence, with quotation marks and specific citation. Citations may be footnotes, endnotes, or parenthetical references.

3. **Recognize the work of others even if you are not borrowing their words.** Theories, interpretations, assessments, and judgments are all intellectual contributions made by others and must be attributed to them.

4. **Paraphrase properly.** Paraphrasing is a vehicle for conveying or explaining a source's ideas and requires a citation to the original source. A paraphrase captures the source's meaning and tone in your own words and sentence structure. In a paraphrase, the words are yours, but the ideas are not. It should not be used to create the impression of originality.

5. **Cite sources in all work submitted for credit.** Your instructor may also require you to identify the contributions of others in drafts you submit only for review. Ask your instructor for his or her citation requirements and any discipline-specific attribution practices.

6. **Be cautious when using web-based sources,** including Internet sites and electronic journals. There is a common misperception that information found on the Internet does not need to be cited. Web-based information, even if anonymous, must be appropriately cited. Do not cut and paste or otherwise take material from websites without proper citation.

7. **Provide a citation when in doubt.** Always err on the side of caution.

9

FLEMING/MSPB-130

Appx749

**Alina Vinci**

| | |
|---|---|
| **From:** | Bruce Fleming <flemingannapolis@comcast.net> |
| **Sent:** | Wednesday, October 24, 2018 2:40 PM |
| **To:** | Jason Ehrenberg |



Sent from my iPhone

i

FLEMING/MSPB-131

Appx751

**Alina Vinci**

| | |
|---|---|
| **From:** | Bruce Fleming <flemingannapolis@comcast.net> |
| **Sent:** | Wednesday, October 24, 2018 2:37 PM |
| **To:** | Jason Ehrenberg |
| **Subject:** | Flex 👊 |



Sent from my iPhone

FLEMING/MSPB-132

Appx752

**Alina Vinci**

| | |
|---|---|
| **From:** | Bruce Fleming <flemingannapolis@comcast.net> |
| **Sent:** | Wednesday, October 24, 2018 2:36 PM |
| **To:** | Jason Ehrenberg |
| **Subject:** | Cowboy day |



1

FLEMING/MSPB-133

Appx753



Sent from my iPhone

2

FLEMING/MSPB-134

Appx754



2

FLEMING/MSPB-139

Appx755



3

FLEMING/MSPB-140

Appx756



Marines to be who have just had their heads shaved

Appx757



FLEMING/MSPB-148

Appx758

# EXHIBIT I

Appx759



8

FLEMING/MSPB-151

Appx760



FLEMING/MSPB-154

Appx761



3

Appx762



FLEMING/MSPB•156

Appx763



s

FLEMING/MSPB-157

Appx764



Sent from my iPhone

6

FLEMING/MSPB-158

Appx765



1133 19th Street, NW, Suite 200, Washington, DC 20036
PHONE: 202.737.5900 • FAX: 202.737.5526 • www.aaup.org

**AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS**

<u>VIA ELECTRONIC AND U.S. MAIL</u>

September 11, 2018

Vice Admiral Walter E. Carter Jr.
Superintendent
United States Naval Academy
121 Blake Road
Annapolis, Maryland 21402

Dear Superintendent Carter:

We corresponded with you last winter, as you are aware, concerning the case of Professor Bruce Fleming and his efforts to contest the Naval Academy administration's action to remove him from the classroom.

We have heard further from Professor Fleming, this time as a result of an August 15, 2018, "Notice of Decision on Proposed Removal" memorandum from Academic Dean and Provost Andrew T. Phillips notifying him that he was being dismissed for cause from his tenured position in the Department of English effective immediately. The stated basis for his dismissal, we understand, was "conduct unbecoming a Federal employee," specifically, that he had "engaged in unprofessional conduct in the classroom and outside the classroom." We understand further that Professor Fleming had previously received a June 26, 2018, "Notice of Proposed Removal" that took issue with his classroom discussions of sexual and transgender issues, to which he responded by July 3 letter charging that

> The Academy's administration appears to have decided that an investigation into alleged student complaints against Professor Fleming was necessary only weeks after Professor Fleming published an article in *The Federalist* that was critical of the United States service academies (including the Academy).

The professor's response further stated that the Academy's recent actions "are part of an ongoing pattern of targeted harassment" against him, and raised allegations of violations of academic freedom with regard to his academic freedom in the classroom in discussing his subject, and in his choice of teaching methods.

FLEMING/MSPB-162

Appx768

Superintendent Walter E. Carter
September 11, 2018
Page 2

The interest of the Association in Professor Fleming's case, as you doubtless know, stems from its longstanding commitment to academic freedom, tenure, and due process as set forth in the 1940 *Statement of Principles on Academic Freedom and Tenure*, the complementary 1958 *Statement on Procedural Standards in Faculty Dismissal Proceedings*, and the Association's *Recommended Institutional Regulations on Academic Freedom and Tenure (RIR)* (copies are attached for your convenience). The 1940 *Statement* is a joint formulation of this Association and the Association of American Colleges and Universities and has received the endorsement of more than 240 professional organizations and learned societies. We have noted the relevant provisions of the USNA Academic Dean and Provost Instruction 1531.63C. We have further noted that excerpts from the "academic freedom" section of the 1940 *Statement* are incorporated in the USNA *Faculty Handbook*.

With regard to the dismissal process, the academic community recognizes that the dismissal for cause of a tenured faculty member should occur only after the affordance of requisite safeguards of academic due process. According to Regulation 5 of the *Recommended Institutional Regulations*, "Adequate cause for a dismissal will be related, directly and substantially, to the fitness of faculty members in their professional capacities as teachers or researchers." The following specific procedures are among those set forth in Regulation 5: an adjudicative hearing of record on the charges, conducted by an elected body of faculty peers; the right to confront and cross-examine witnesses; and the administration's bearing the burden of demonstrating adequate cause for dismissal through clear and convincing evidence in the record considered as a whole. Those standards further provide that, if the hearing committee finds that adequate cause for dismissal has not been established by the evidence in the record, and if the president rejects its findings and recommendations, "the president will state the reasons for doing so, in writing, to the hearing committee and to the faculty member, and provide an opportunity for response before transmitting the case to the governing board." We understand that Professor Fleming was not afforded an opportunity for a faculty hearing.

With respect to the processes that led to the dismissal, we commend to your attention the enclosed *Due Process in Sexual-Harassment Complaints* and *Sexual Harassment: Suggested Policy and Procedures for Handling Complaints*. Suffice it to say that the procedures followed in Professor Fleming's case fall far short of the AAUP-supported principles and procedural standards set forth in these documents, which require that charges be reviewed by a duly constituted faculty body and that sanctions be imposed

FLEMING/MSPB-163

Appx769

Superintendent Walter E. Carter
September 11, 2018
Page 3

only after a faculty hearing of the sort specified in Regulation 5 of the *Recommended Institutional Regulations*.

We urge you to rescind the action taken against Professor Fleming and reinstate him to his academic responsibilities, with any subsequent action in his case to be consistent with the enclosed principles and standards.

We look forward to your response.

Sincerely,

Anita Levy, Ph.D.
Associate Secretary

Attachments

cc:  Dr. Andrew T. Phillips, Academic Dean and Provost
     Dr. Daniel O'Sullivan, Vice Academic Dean and Provost
     Dr. Jason Shaffer, Chair, Department of English
     Professor Bruce Fleming
     Mr. Jason Ehrenberg, Esq.

FLEMING/MSPB-164

Appx770

# EXHIBIT K

Appx771



Keith Lindler <lindler@usna.edu>

## Fwd: Moto photo
1 message

**Nicole Thatcher** <m186426@usna.edu>                          Mon, Apr 23, 2018 at 3:24 PM
To: Keith Lindler <lindler@usna.edu>

Good afternoon, sir,

This was the email I was thinking of. It doesn't include anything upsetting, just a little unusual. If I had to guess, I'd say it was tangentially related to the underlying "stay huge" theme I mentioned that we discussed in class in relation to several poems we studied.

Very Respectfully,

Nicole Thatcher
MIDN    USN

---------- Forwarded message ----------
From: **Bruce Fleming** <fleming@usna.edu>
Date: Thu, Oct 12, 2017 at 3:29 PM
Subject: Moto photo
To: he302.5001.fall@usna.edu


Sent from my iPhone



**image1.jpeg**
80K

Appx772



Keith Lindler <lindler@usna.edu>

## Fwd: You asked about me now vs 20 years ago
1 message

Lunsford Schock <m185790@usna.edu>                         Mon, Apr 23, 2018 at 6:48 PM
To: Keith Lindler <lindler@usna.edu>

---------- Forwarded message ----------
From: **Bruce Fleming** <fleming@usna.edu>
Date: Mon, Sep 25, 2017 at 8:28 PM
Subject: You asked about me now vs 20 years ago
To: m185790@usna.edu

Here is both twenty years ago w a comparable Greek statue and now with
its comparable plus two days ago. I'm thicker for sure but not as
lean.

--
Very Respectfully,
L. D. Schock
MIDN USN

**9 attachments**



**image9.jpeg**
237K



**image1.jpeg**
100K

**image2.jpeg**
64K

Appx773





**image10.jpeg**
62K



**image11.jpeg**
107K

📄 **noname.txt**
1K

📄 **noname.txt**
1K

📄 **noname.txt**
1K

📄 **noname.txt**
1K

Appx774

# EXHIBIT L

Appx775

AGENCY DOCUMENT 0049

**Subject:** Meeting Cancellation Request
**From:** Matt Desantis <m211440@usna.edu>
**To:** Dan Osullivan <osulliva@usna.edu>
**Date Sent:** Wednesday, January 17, 2018 10:07:33 PM GMT-05:00
**Date Received:** Wednesday, January 17, 2018 10:07:54 PM GMT-05:00

Good evening Dr. O'Sullivan,

This is MIDN 4/C Matthew DeSantis. I respectfully request to cancel the meeting previously scheduled for 01/18/2018 at lunchtime to discuss a complaint against a faculty member. I do not wish, at this time, to file such complaint. Thank you for your willingness and openness to discuss this matter. I appreciate your attention to this matter and apologize for the late notice.

--
Very respectfully,

M.R. DeSantis
MIDN    USN

Appx776

# EXHIBIT M

Appx777

AGENCY DOCUMENT 0067

**From:** Schofield, John Cdr Schofield jschofie@usna.edu
**Subject:** Fwd: Let's get rid of Annapolis: Our military academies screw taxpayers and the students — and serve only the powerful brass - Salon.com
**Date:** March 7, 2016 at 2:25 PM
**To:** Ted Carter wcarter@usna.edu
**Cc:** Steve Liszewski liszewsk@usna.edu, Andrew Phillips aphillips@usna.edu, Jennifer Waters jwaters@usna.edu, Boyd Waite waite@usna.edu, Peter Nardi nardi@usna.edu, Michael Brady brady@usna.edu, Erickson, Jenny Erickson erickson@usna.edu, George Lang glang@usna.edu, Steve Vahsen vahsen@usna.edu



FYI in the link, Admiral. Fleming at it again. Almost comical how he regurgitates the same argument.

This won't go anywhere...particularly this week.

V/r John


http://www.salon.com/2016/03/07/lets_get_rid_of_annapolis_our_military_academies_screw_taxpayers_and_the_students_and_serve_only_the_powerful_brass/


Sent from my iPhone

Appx778

# EXHIBIT N

Appx779



Andrew Phillips <aphillip@usna.edu>

## Re: USNA Value
1 message

**Pat Williams** <pwilliam@usna.edu>                                          Thu, Mar 17, 2016 at 12:06 PM
To: Steven Vahsen <svahsen@usna.edu>
Cc: John T CDR USN USNA Annapolis Schofield <jschofie@usna.edu>, George Lang <glang@usna.edu>, Bruce Latta
<latta@usna.edu>, Michael Doherty <mdoherty@naps.edu>, Russell Smith <rusmith@usna.edu>, Andrew Phillips
<aphillips@usna.edu>, Lou Giannotti <giannott@usna.edu>, Steve Liszewski <liszewsk@usna.edu>, COL Athens
<athens@usna.edu>, Ted Carter <wcarter@usna.edu>, Chet Gladchuk <gladchuk@usna.edu>, Joe Rubino
<rubino@usna.edu>

Hi Steve,

Thank you for sharing. I have long since (circa 2009) stopped reading the Fleming articles. Moreover, also a non- Naval
Academy grad, as well as a senior Navy CAPT, former YN1, and honorary Chief, I can attest to the inherent value in the
Service Academies. They are, or should be our most valued leadership laboratory, and as such, one of our most prized
national assets.

Having served on numerous Navy staffs to include Recruiting Command and as a Detailer, there is no more important
duty/responsibility than educating and developing our future ethical leaders of character & consequence who will be
charged with the privilege of leading Sailors and Marines. It doesn't get much more impactful.

R/

On Mar 17, 2016 9:25 AM, "Steve Vahsen" <vahsen@usna.edu> wrote:
   SLT - an article worthy of your consideration...written by a non-USNA grad.  V/r, Steve

31.  Cut Annapolis At Our Peril: A Testimonial To The Value Of The U.S. Naval Academy And U.S. Service Academies
(U.S. NAVAL INSTITUTE BLOG 17 MAR 16) ... Capt. Tate Westbrook

This is a response to Bruce Fleming's article published on salon.com on 7 March. His article was titled in the hyberbolic
terms and vernacular one does not normally expect from college professors: "Let's get rid of Annapolis: Our military
academies screw taxpayers and the students – and serve only the powerful brass."
I am writing from aboard the Sixth Fleet flagship, USS Mount Whitney (LCC-20), steaming in the Adriatic Sea. Despite
submitting this rebuttal to the editors of salon.com soon after Fleming's article was published, they have refused to print
my response. Many thanks to the U.S. Naval Institute Editors for including in here.
In response, I offer your readers an alternative to Mr. Fleming's rant: the perspective of that of a U.S. Navy Captain, at
the point of 23 years of active duty service. I am a Surface Warfare Officer, which means that during my numerous
tours of duty at-sea I drive warships and lead the teams of great Americans who serve in these vessels. Leading the
crew of every Navy ship is the small cadre of commissioned officers charged with developing, training, and managing
the current and future operations of ship and crew. Approximately one third of these officers began their careers one
hot summer in Annapolis as new Naval Academy Midshipmen. As any number of the leadership classics written by
democratic statesmen or capitalist magnates explain: peak-performing teams require bold, qualified leaders. In the
military, we call them officers, and the U.S. Naval Academy produces some of the best.
As part of Samuel Huntington's 1950's classic The Soldier and the State, he presented his readers with the seminal
treatise on military officers. He wrote that though there are many vocations and jobs that are beneficial to society, he
defined four as the only true professions: law, medicine, clergy, and military officership. Huntington identified three key
principles required to meet his definition which serve to bind these professions to their respective duties: expertise,
responsibility, and 'corporateness'. His essay, a subset of the larger tome, is a quick read and I encourage your readers
to examine it in detail. But here I will quickly attempt to paraphrase Huntington's key tenets:
Expertise: The inherent professional education and experience that separates professionals from laymen, which can
only be instilled initially by institutions of research, history, and education. This expertise is perpetuated between the
academic and practical sides of a profession through professional writing, journals, conferences, and the circulation of
personnel between practice and teaching.
Responsibility: Governed by a canon of ethics, empowered by law with authority – but also regulated by the State, with
an auditable process for promotion and certification by qualified peers. And in the case of military officers: sworn by
oath to serve the fundamental foundation of our nation's laws. He noted that responsibilities of commissioned military
officers, unlike any of their civilian professional counterparts, includes the "management of violence." This responsibility

Appx780

10/10/2018                              USNA Mail - Re: USNA Value

does not include the authority to start the next war, but rather depends on the intellectual skill borne of near-continuous study throughout a career, to ensure that, if possible, the officer's actions may avoid the next conflict.

Corporateness: Empowered by custom, history, and collective discipline of the group, professionals engender the trust that society places on them through the self-regulation of their members. An officer's commission is the legal right to practice his or her profession, just as the license to practice applies to a physician. Through a combination of professional associations and an efficient bureaucracy, the integrity of the commission is maintained, and levels of competence are rewarded over time through the promotion of the best and fully qualified.

Mr. Fleming's narrative misses the point that institutions like Annapolis, our nation's other esteemed Service academies, and the Reserve Officer Training Corps (ROTC) units across the country's university system, are the crucible of the cultural indoctrination and education in which the principles above are imbued.

I will attempt to provide the "proof" that his article demands:

I consider myself uniquely qualified to respond to his article, since I am independent of any of the forces of nepotism which he alleges. I have no children nor relatives enrolled at any service academy, past or present. I was not educated at the U.S. Naval Academy (USNA), but was a 4-year Navy scholarship student at a respected private institution, Tulane University. I entered that program following three years of high school as a scholarship student at a small private school in Tennessee, where I washed dishes every day after lunch to fund my tuition and academic aspirations – there was no "brass" supporting my college plans. When I applied to the Navy for educational opportunities, I received the offer of both an ROTC scholarship and was also accepted to Annapolis. Absent the nepotism Mr. Fleming suggests, I was offered these options based on my own academic merit, not due to any connections with USNA alumni, siblings, or school administrators. My ultimate decision to attend Tulane ensures that today I write not from a position as a USNA alumnus, but as an independent observer unaffected by Fleming's allegations of the hush-culture of a "henhouse guarded by foxes" (his terms).

I am also qualified to respond to the numerous fiscal errors in his article, since I periodically have served tours of duty ashore as a Navy budget officer when I have rotated ashore between sea duty assignments. A level-3 certified defense comptroller, I am intimately familiar with the financial analysis required to run the United States Navy, which if it were a for-profit business would rank #9 on the Fortune 100 based on annual budget and overall manpower. I have done cost-benefit analysis of nearly every aspect of naval service, including the fully-burdened cost of education and training of officers and enlisted personnel. The only "smoke and mirrors" (his term) on this topic are the specious sound bites he presented as fact to his readers regarding return-on-investment for the education of the seed corn of our professional officer corps.

As with all statistical analysis, charlatans can use samples of data to suit their needs. For example, "9 out of 10 doctors surveyed prefer this product..." can be misleading if an advertiser gets to pick which group of ten doctors out of a much larger survey group to meet their needs. Similarly, Mr. Fleming's misleading figure of "fewer than one in five" officers in the Navy graduated from Annapolis is a selective manipulation of the facts to fabricate a dramatic sound bite. In fact, the Annapolis-trained portion of the total number of ALL officers serving in the Navy, including reservists, officers of the restricted line (the support branches), staff corps, doctors, lawyers, dentists, professional engineers, and the prior-enlisted technical leaders of the Limited Duty Officer/Warrant Officer "Mustang" corps represents close to that smaller slice of the overall pie chart.

However, the express charter of the Service Academies is to primarily train officers for service in the Unrestricted Line (URL). Unrestricted Line Officers are those trained to aspire for command of ships, submarines, aviation squadrons, special warfare commands, and other units of combat arms. The U.S. Naval Academy provides approximately 1/3 of the graduates for each of these communities. A very small number of Annapolis officers graduate annually with commissions into the staff corps communities, primarily due to being unqualified for the URL billets for medical reasons.

Within my own community of Surface Warfare:

- 29% of my peers who serve in ships were Annapolis graduates,
- 35% from ROTC,
- 26% from Officer Candidate School (OCS),
- 6% from enlisted-to-commission programs,
- 4% from all other sources.

Annual officer accessions vary slightly by graduating year, community choice, and the needs of the Navy, but the approximate 1/3 USNA and 1/3 ROTC share of commissioned officer average remain consistent year after year within the URL.

The seventy-seven Navy ROTC units, comprised of students from 156 universities across the country produce the largest volume of annual accessions as noted above. Depending on the commissioning university, the cost of the tuition alone exceeds the tuition equivalent at Annapolis, including all of the essential costs that Mr. Fleming believes are frivolous, to include room, board, and medical coverage. An "apples to apples" cost comparison is avoided in Mr. Fleming's article, in which he provided a fully-burdened cost per student ... not the same as tuition cost. His estimate, like a recent Government Accountability Office (GAO) report, utilizes the Naval Academy's annual budget appropriated by Congress to operate and maintain the U.S. Naval Academy, and divides that figure by the total student body to derive a cost-per-student of nearly $400,000 from recruitment through graduation, or almost $100,000 per-student/per-year.

This figure seems outrageous, but when compared to a fully-burdened cost of state universities and private universities, which are funded from a combination of state taxes (state schools only), multimillion dollar endowments, and income

Appx781

10/10/2018                                    USNA Mail - Re: USNA Value

from research and sports contracts, the total cost to educate of nearly $100,000 per-student/per-year is right in line with upper-tier institutions.

For example, at my own alma mater, the cost of annual tuition, room, board, and medical insurance is priced at $66,700 per year in the 2016-2017 academic year catalog. Tulane University's audited financial statement reflects annual non-tuition "operating income" from endowments, gifts, grants, research, and other contracts at over $520 million per year. With minor exceptions (specifically, insurance and interest on debt) Tulane and other universities spend their annual expenditures on the same sort of expenses that the Naval Academy executes in their annual outlays mentioned in Fleming's article, daily operations of the university, maintaining facilities including prestigious on-campus historic homes for their most senior educators, grounds keeping, staff salaries, etc. When the $520 million operating income is divided by Tulane's total full-time student enrollment of 13,449 students this year (undergrad and graduate), the per-student costs borne by the university is $38,664.

Adding the university-paid share to the student-paid cost of tuition and fees, the fully-burdened cost of a Tulane education costs over $105,000 per-student/per-year, exceeding total annual costs per student at the SNA.

I did not include the data from Tulane above to "toot the horn" of my own institution, nor to show the inflation-adjusted value of my own degree. I chose Tulane because it is a fair comparison to the Naval Academy's undergraduate programs by metrics of student selectivity, demographic diversity, average SAT scores, academic attrition rate, and even overall varsity sports performance. Additionally, like Tulane, much of the Naval Academy's extracurricular activities for students and much of the sports activities are provided by active alumni associations funded solely through the donations of their members. Even the sports performance of both schools is on par and is merely average to above-average in most categories based on respective conference records (with a few shining exceptions in some years). My apologies to both Green Wave and Naval Academy sports fans out there, but this similarity is a testament to both institutions whose primary focus is on academics and the insistence that the student remain priority in all of their "student-athletes."

Based on these facts, taxpayers who fund the U.S. Naval Academy's annual budget are getting their money's worth: Annapolis graduates receive a comparable upper-tier private university education, and at a comparable cost.

The ultimate question of value and return-on-investment is that at the Naval Academy, the product is so much more than merely a bachelor's degree; Annapolis builds leaders. The "proof" of leadership that Fleming demands, for which fortunately there is no classroom test, can only be borne by the time-tested observations of naval history, by by the current observations of my peers, and by the Sailors we lead.

The real measure of leadership, and the inestimable value of what the Annapolis graduate receives during four years, is as much a product of the naval activities performed outside of the classroom environment as it is in the academic rigors. As Samuel Huntington's tenet of "expertise" requires, the institution's training and cultural indoctrination is primarily led by naval officers, most on active duty and several who are retired, who return to Annapolis to teach Midshipmen from their fleet and world experience. Numerous alumni with storied success in the Navy and Marine Corps as well as in civilian careers return to the campus to lecture and to share their varied expertise. The practical application of the tenets of service and of the Navy core values is further exercised by Midshipmen engaged in world travel during summer military training in the Fleet with Navy and the Marine Corps units.

Mr. Fleming's observation that many officers leave the service after five years is almost accurate, but his assessment that this attrition invalidates the entire training model is not. Many officers commissioned in Annapolis, as well as many of those commissioned from ROTC universities, do depart the service in predictable numbers after their initial service obligation. For Naval Academy graduates, the initial obligation ends between five and seven years, depending on community (Navy and Marine Corps aviation trainees, for example do not begin to satisfy their service obligation until after they receive their "wings," a training process that takes approximately two years). The annual attrition numbers vary annually and are influenced by changes in global economic factors, ship and squadron deployment schedules, as well as the impact of naval service during a time of war that has had a measurable toll on those Navy and Marine Officers who witness it.

No system of recruitment in any major corporation, military branch, or government agency can accurately predict long-term attrition and retention rates, nor can it guarantee long-term retention. Therefore, like the Navy, other businesses and agencies recruit large numbers of initial trainees with the understanding that some will not make it all the way to the IBM boardroom, to the corner office, or to command of a ship, submarine, or squadron. None of those institutions, however, would consider their initial training programs wasteful or worthy of cancellation because some number of their initial applicants didn't last beyond five years, or because the same number didn't make it all the way to CEO.

The time Midshipmen spend in Annapolis is the crucible, but after four years, their commission and newly-earned rank of Navy Ensign or Marine Second Lieutenant is merely their "license to learn." Our enlisted Sailors and Marines swear an oath to God that they will obey the orders of the officers appointed over them, and these officers do not take that obligation lightly. When they get to the Fleet, they embrace this obligation to learn and the responsibilities of active duty with vigor. I have witnessed many superb demonstrations of excellence, self-sacrifice, and devotion to their shipmates by junior officers from all commissioning sources alike. I imagine teaching college students of the age and demographic that America's towns may send to Mr. Fleming's English classes may be occasionally frustrating based on the bitter list of what he says "Midshipmen learn" in his latest article to criticize both his employer and his students.

Unfortunately, Mr. Fleming has only seen them perform in the classroom. However, my peers and I have seen them as junior officers in the Fleet demonstrating "what Midshipmen learn" and performing amazing acts of leadership and selflessness using what the entire institution gave them, not merely the time spent in class. Below are just a few of the anecdotes I have observed that featured resilient and resourceful Naval Academy graduates ... all examples of what they REALLY learn:

Appx782

10/10/2018                                    USNA Mail - Re: USNA Value

- □    A newly-qualified small boat officer I sent out at night in 7-foot seas intuitively changed procedures on-the-fly without asking, resulting in a much faster rescue of one of my crew who had fallen overboard.
- □    On liberty in St. John, USVI, an Ensign intervened in a deadly attack in a bar, saving the life of one of our Chiefs who was in trouble.
- □    An Ensign who returned to work just days after a miscarriage to make direct contributions to execute a complex mission she had originally planned, upon which hundreds of Sailors depended.
- □    A Lieutenant (j.g.) who arrived first on the scene of a major fire onboard the ship, evacuated two injured Sailors from the space without any protective equipment, then returned with only an oxygen bottle and mask and fought the fire for five minutes until he was relieved because an ammunition magazine was on the other side of the bulkhead.
- □    A Lieutenant (j.g.) who designed and built a shower and bathroom facility out of spare parts to ensure dignity and sanitation for nearly ninety refugees we found at sea. Then she spent every hour off-watch supporting and comforting the passengers, using a foreign language she had learned during an exchange year abroad at a foreign service academy.

There are countless other stories like these. I have accumulated these in over 23 years in uniform on active duty in five warships, and continue to see more examples of excellence within the four destroyers in our squadron and our squadron and task force staffs. With every summer graduation cycle, every ship I have served in over these years has received a batch of fresh and enthusiastic men and women ably trained to serve after four years studying in Annapolis. Each cruiser or destroyer-sized ship typically receives around four to seven new officers every year, distributed generally from the source ratio noted earlier, resulting in a couple of USNA graduates.

Upon arrival onboard our ships, I have observed that Naval Academy graduates are consistently better-prepared in the fundamentals of our profession: All Annapolis graduates earn a Bachelor of Science (BS) degree, regardless of their major. Even the liberal arts majors (yes, there are even a few poets, thank God) arrive with the foundation courses required to earn a BS degree. This mandatory USNA curriculum is designed to ensure that all graduates arrive in their ship, submarine, or flight school with a robust knowledge of the engineering, science, math, and physics fundamentals needed to understand our Navy's ships, submarines, and military aircraft: some of the most complicated machines our country can build.

In the wardrooms of my own ships, the Naval Academy Ensigns were able to demonstrate a level of knowledge upon arrival in navigation, weather, ship handling, small arms, firefighting, and watch-standing that exceeded that of most of the NROTC and OCS graduates. The Annapolis graduates also arrived onboard with a seasoned comfort and familiarity with more than naval custom; they already knew how to "get along" and to work through challenges. The unique training environment of the USNA, starting with the arduous "plebe summer," bonds these officers together with a common vision of service, tolerance, mutual support, self-reliance, team dynamics, and the ability to overcome adversity.

As Mr. Fleming's bi-annual call to "get rid of Annapolis" and other Service Academies has hit the blogosphere, I caution taxpayers to rest assured. Navy leaders are not squandering your resources, and continue to select, train, educate, and promote the "best and brightest" to lead the Navy of the future. I am proud to have served alongside Naval Academy graduates everywhere I have been assigned. Thanks to the cooler heads who manage the future of the Navy in Annapolis, throughout the Fleet, in the Pentagon, and in Congress, I am confident that this institution will remain open, and will continue to develop the future of our Fleet long after I have "swallowed the anchor" and pursued a life ashore. Captain ate Westbrook serves as the Deputy Commodore of Task Force 65 and Destroyer Squadron 60. Though no longer writing poetry, he holds a degree in Rhetoric from Tulane University, and an MBA.

Appx783

# EXHIBIT O

Appx784

AGENCY DOCUMENT 0072

From: Andrew Phillips aphillips@usna.edu
Subject: Fwd: USNA Value
Date: March 17, 2016 at 3:24 PM
To: Boyd Waite waite@usna.edu, Jennifer Waters jwaters@usna.edu, Katherine Cermak cermak@usna.edu, Paul Corcoran corcoran@usna.edu, Pete Nardi nardi@usna.edu



## *Andrew T. Phillips*

Academic Dean and Provost
589 McNair Road
United States Naval Academy
Annapolis, MD 21402-5000

Phone:  (410) 293-1583
FAX:    (410) 293-3735

---------- Forwarded message ----------
From: Steve Vahsen <vahsen@usna.edu>
Date: Thu, Mar 17, 2016 at 4:24 PM
Subject: USNA Value
To: Steve Liszewski <liszewsk@usna.edu>, Andrew Phillips <aphillips@usna.edu>, Chet Gladchuk <gladchuk@usna.edu>, George Lang <glang@usna.edu>, COL Athens <athens@usna.edu>, Lou Giannotti <giannott@usna.edu>, Bruce Latta <latta@usna.edu>, Joe Rubino <rubino@usna.edu>, Pat Williams <pwilliam@usna.edu>, Russell Smith <rusmith@usna.edu>, Michael Doherty <mdoherty@naps.edu>
Cc: Ted Carter <wcarter@usna.edu>, John Schofield <jschofie@usna.edu>

SLT - an article worthy of your consideration...written by a non-USNA grad.  V/r, Steve

31.  Cut Annapolis At Our Peril: A Testimonial To The Value Of The U.S. Naval Academy And U.S. Service Academies
(U.S. NAVAL INSTITUTE BLOG 17 MAR 16) ... Capt. Tate Westbrook

This is a response to Bruce Fleming's article published on salon.com on 7 March. His article was titled in the hyberbolic terms and vernacular one does not normally expect from college professors: "Let's get rid of Annapolis: Our military academies screw taxpayers and the students – and serve only the powerful brass."
I am writing from aboard the Sixth Fleet flagship, USS Mount Whitney (LCC-20), steaming in the Adriatic Sea. Despite submitting this rebuttal to the editors of salon.com soon after Fleming's article was published, they have refused to print my response. Many thanks to the U.S. Naval Institute Editors for including it in here.
In response, I offer your readers an alternative to Mr. Fleming's rant: the perspective of that of a U.S. Navy Captain, at the point of 23 years of active duty service. I am a Surface Warfare Officer, which means that during my numerous tours of duty at-sea I drive warships and lead the teams of great Americans who serve in these vessels. Leading the crew of every Navy ship is the small cadre of commissioned officers charged with developing, training, and managing the current and future operations of ship and crew.
Approximately one third of these officers began their careers one hot summer in Annapolis as new Naval Academy Midshipmen. As any number of the leadership classics written by democratic statesmen or capitalist magnates explain: peak-performing teams require bold, qualified leaders. In the military, we call them officers, and the U.S. Naval Academy produces some of the best.
As part of Samuel Huntington's 1950's classic The Soldier and the State, he presented his readers with the seminal treatise on military officers. He wrote that though there are many vocations and jobs that are beneficial to society, he defined four as the only true professions: law, medicine, clergy, and military officership. Huntington identified three key principles required to meet his definition which serve to bind these professions to their respective duties: expertise, responsibility, and 'corporateness'. His essay, a subset of the larger tome, is a quick read and I encourage your readers to examine it in detail. But here I will quickly attempt to paraphrase Huntington's key tenets:
Expertise: The inherent professional education and experience that separates professionals from laymen, which can only be instilled initially by institutions of research, history, and education. This expertise is perpetuated between the academic and practical sides of a profession through professional writing, journals, conferences, and the circulation of personnel between practice and teaching.
Responsibility: Governed by a canon of ethics, empowered by law with authority – but also regulated by the State, with an auditable process for promotion and certification by qualified peers. And in the case of military officers: sworn by oath to serve the fundamental foundation of our nation's laws. He noted that responsibilities of commissioned military officers, unlike any of their civilian professional counterparts, includes the "management of violence." This responsibility does not include the authority to start the next war, but rather depends on the intellectual skill borne of near-continuous study throughout a career, to ensure that, if possible, the officer's actions may avoid the next conflict.
Corporateness: Empowered by custom, history, and collective discipline of the group, professionals engender the trust that society places on them through the self-regulation of their members. An officer's commission is the legal right to practice his or her profession, just as the license to practice applies to a physician. Through a combination of professional associations and an efficient bureaucracy, the integrity of the commission is maintained, and levels of competence are rewarded over time through the promotion of the best and fully qualified.
Mr. Fleming's narrative misses the point that institutions like Annapolis, our nation's other esteemed Service academies, and the Reserve Officer Training Corps (ROTC) units across the country's university system, are the crucible of the cultural indoctrination and

Appx785

AGENCY DOCUMENT 0073

Reserve Officer Training Corps (ROTC) units across the country's university system, are the crucible of the cultural indoctrination and education in which the principles above are imbued.

I will attempt to provide the "proof" that his article demands:

I consider myself uniquely qualified to respond to his article, since I am independent of any of the forces of nepotism which he alleges. I have no children nor relatives enrolled at any service academy, past or present. I was not educated at the U.S. Naval Academy (USNA), but was a 4-year Navy scholarship student at a respected private institution, Tulane University. I entered that program following three years of high school as a scholarship student at a small private school in Tennessee, where I washed dishes every day after lunch to fund my tuition and academic aspirations – there was no "brass" supporting my college plans. When I applied to the Navy for educational opportunities, I received the offer of both an ROTC scholarship and was also accepted to Annapolis. Absent the nepotism Mr. Fleming suggests, I was offered these options based on my own academic merit, not due to any connections with USNA alumni, siblings, or school administrators. My ultimate decision to attend Tulane ensures that today I write not from a position as a USNA alumnus, but as an independent observer unaffected by Fleming's allegations of the hush-culture of a "henhouse guarded by foxes" (his terms).

I am also qualified to respond to the numerous fiscal errors in his article, since I periodically have served tours of duty ashore as a Navy budget officer when I have rotated ashore between sea duty assignments. A level-3 certified defense comptroller, I am intimately familiar with the financial analysis required to run the United States Navy, which if it were a for-profit business would rank #9 on the Fortune 100 based on annual budget and overall manpower. I have done cost-benefit analysis of nearly every aspect of naval service, including the fully-burdened cost of education and training of officers and enlisted personnel. The only "smoke and mirrors" (his term) on this topic are the specious sound bites he presented as fact to his readers regarding return-on-investment for the education of the seed corn of our professional officer corps.

As with all statistical analysis, charlatans can use samples of data to suit their needs. For example, "9 out of 10 doctors surveyed prefer this product..." can be misleading if an advertiser gets to pick which group of ten doctors out of a much larger survey group to meet their needs. Similarly, Mr. Fleming's misleading figure of "fewer than one in five" officers in the Navy graduated from Annapolis is a selective manipulation of the facts to fabricate a dramatic sound bite. In fact, the Annapolis-trained portion of the total number of ALL officers serving in the Navy, including reservists, officers of the restricted line (the support branches), staff corps, doctors, lawyers, dentists, professional engineers, and the prior-enlisted technical leaders of the Limited Duty Officer/Warrant Officer "Mustang" corps represents close to that smaller slice of the overall pie chart.

However, the express charter of the Service Academies is to primarily train officers for service in the Unrestricted Line (URL). Unrestricted Line Officers are those trained to aspire for command of ships, submarines, aviation squadrons, special warfare commands, and other units of combat arms. The U.S. Naval Academy provides approximately 1/3 of the graduates for each of these communities. A very small number of Annapolis officers graduate annually with commissions into the staff corps communities, primarily due to being unqualified for the URL billets for medical reasons.

Within my own community of Surface Warfare:

- 29% of my peers who serve in ships were Annapolis graduates,
- 35% from ROTC,
- 26% from Officer Candidate School (OCS),
- 6% from enlisted-to-commission programs,
- 4% from all other sources.

Annual officer accessions vary slightly by graduating year, community choice, and the needs of the Navy, but the approximate 1/3 USNA and 1/3 ROTC share of commissioned officer average remain consistent year after year within the URL.

The seventy-seven Navy ROTC units, comprised of students from 156 universities across the country produce the largest volume of annual accessions as noted above. Depending on the commissioning university, the cost of the tuition alone exceeds the tuition equivalent at Annapolis, including all of the essential costs that Mr. Fleming believes are frivolous, to include room, board, and medical coverage. An "apples to apples" cost comparison is avoided in Mr. Fleming's article, in which he provided a fully-burdened cost per student … not the same as tuition cost. His estimate, like a recent Government Accountability Office (GAO) report, utilizes the Naval Academy's annual budget appropriated by Congress to operate and maintain the U.S. Naval Academy, and divides that figure by the total student body to derive a cost-per-student of nearly $400,000 from recruitment through graduation, or almost $100,000 per-student/per-year.

This figure seems outrageous, but when compared to a fully-burdened cost of state universities and private universities, which are funded from a combination of state taxes (state schools only), multimillion dollar endowments, and income from research and sports contracts, the total cost to educate of nearly $100,000 per-student/per-year is right in line with upper-tier institutions.

For example, at my own alma mater, the cost of annual tuition, room, board, and medical insurance is priced at $66,700 per year in the 2016-2017 academic year catalog. Tulane University's audited financial statement reflects annual non-tuition "operating income" from endowments, gifts, grants, research, and other contracts at over $520 million per year. With minor exceptions (specifically, insurance and interest on debt) Tulane and other universities spend their annual expenditures on the same sort of expenses that the Naval Academy executes in their annual outlays mentioned in Fleming's article, daily operations of the university, maintaining facilities including prestigious on-campus historic homes for their most senior educators, grounds keeping, staff salaries, etc. When the $520 million operating income is divided by Tulane's total full-time student enrollment of 13,449 students this year (undergrad and graduate), the per-student costs borne by the university is $38,664.

Adding the university-paid share to the student-paid cost of tuition and fees, the fully-burdened cost of a Tulane education costs over $105,000 per-student/per-year, exceeding total annual costs per student at the SNA.

I did not include the data from Tulane above to "toot the horn" of my own institution, nor to show the inflation-adjusted value of my own degree. I chose Tulane because it is a fair comparison to the Naval Academy's undergraduate programs by metrics of student selectivity, demographic diversity, average SAT scores, academic attrition rate, and even overall varsity sports performance. Additionally, like Tulane, much of the Naval Academy's extracurricular activities for students and much of the sports activities are provided by active alumni associations funded solely through the donations of their members. Even the sports performance of both schools is on par and is merely average to above-average in most categories based on respective recorded records (with a few shining exceptions in some years). My apologies to both Green Wave and Naval Academy sports fans out there, but this similarity is a testament to both institutions whose primary focus is on academics and the insistence that the student remain priority in all of their "student-athletes."

Based on these facts, taxpayers who fund the U.S. Naval Academy's annual budget are getting their money's worth: Annapolis graduates receive a comparable upper-tier private university education, and at a comparable cost

Appx786

AGENCY DOCUMENT 0074

The ultimate question of value and return-on-investment is that at the Naval Academy, the product is so much more than merely a bachelor's degree; Annapolis builds leaders. The "proof" of leadership that Fleming demands, for which fortunately there is no classroom test, can only be borne by the time-tested observations of naval history, by by the current observations of my peers, and by the Sailors we lead.

The real measure of leadership, and the inestimable value of what the Annapolis graduate receives during four years, is as much a product of the naval activities performed outside of the classroom environment as it is in the academic rigors. As Samuel Huntington's tenet of "expertise" requires, the institution's training and cultural indoctrination is primarily led by naval officers, most on active duty and several who are retired, who return to Annapolis to teach Midshipmen from their fleet and world experience. Numerous alumni with storied success in the Navy and Marine Corps as well as in civilian careers return to the campus to lecture and to share their varied expertise. The practical application of the tenets of service and of the Navy core values is further developed by Midshipmen engaged in world travel during summer military training in the Fleet with Navy and the Marine Corps units.

Mr. Fleming's observation that many officers leave the service after five years is almost accurate, but his assessment that this attrition invalidates the entire training model is not. Many officers commissioned in Annapolis, as well as many of those commissioned from ROTC universities, do depart the service in predictable numbers after their initial service obligation. For Naval Academy graduates, the initial obligation ends between five and seven years, depending on community (Navy and Marine Corps aviation trainees, for example do not begin to satisfy their service obligation until after they receive their "wings," a training process that takes approximately two years). The annual attrition numbers vary annually and are influenced by changes in global economic factors, ship and squadron deployment schedules, as well as the impact of naval service during a time of war that has had a measurable toll on those Navy and Marine Officers who witness it.

No system of recruitment in any major corporation, military branch, or government agency can accurately predict long-term attrition and retention rates, nor can it guarantee long-term retention. Therefore, like the Navy, other businesses and agencies recruit large numbers of initial trainees with the understanding that some will not make it all the way to the IBM boardroom, to the corner office, or to command of a ship, submarine, or squadron. None of those institutions, however, would consider their initial training programs wasteful or worthy of cancellation because some number of their initial applicants didn't last beyond five years, or because the same number didn't make it all the way to CEO.

The time Midshipmen spend in Annapolis is the crucible, but after four years, their commission and newly-earned rank of Navy Ensign or Marine Second Lieutenant is merely their "license to learn." Our enlisted Sailors and Marines swear an oath to God that they will obey the orders of the officers appointed over them, and these officers do not take that obligation lightly. When they get to the Fleet, they embrace this obligation to learn and the responsibilities of active duty with vigor. I have witnessed many superb demonstrations of excellence, self-sacrifice, and devotion to their shipmates by junior officers from all commissioning sources alike. I imagine teaching college students of the age and demographic that America's towns may send to Mr. Fleming's English classes may be occasionally frustrating based on the bitter list of what he says "Midshipmen learn" in his latest article to criticize both his employer and his students.

Unfortunately, Mr. Fleming has only seen them perform in the classroom. However, my peers and I have seen them as junior officers in the Fleet demonstrating "what Midshipmen learn" and performing amazing acts of leadership and selflessness using what the entire institution gave them, not merely the time spent in class. Below are just a few of the anecdotes I have observed that featured resilient and resourceful Naval Academy graduates ... all examples of what they REALLY learn:

☐   A newly-qualified small boat officer I sent out at night in 7-foot seas intuitively changed procedures on-the-fly without asking, resulting in a much faster rescue of one of my crew who had fallen overboard.

☐   On liberty in St. John, USVI, an Ensign intervened in a deadly attack in a bar, saving the life of one of our Chiefs who was in trouble.

☐   An Ensign who returned to work just days after a miscarriage to make direct contributions to execute a mission she had originally planned, upon which hundreds of Sailors depended.

☐   A Lieutenant (j.g.) who arrived first on the scene of a major fire onboard the ship, evacuated two injured Sailors from the space without any protective equipment, then returned with only an oxygen bottle and mask and fought the fire for five minutes until he was relieved because an ammunition magazine was on the other side of the bulkhead.

☐   A Lieutenant (j.g.) who designed and built a shower and bathroom facility out of spare parts to ensure dignity and sanitation for nearly ninety refugees we found at sea. Then she spent every hour off-watch supporting and comforting the passengers, using a foreign language she had learned during an exchange year abroad at a foreign service academy.

There are countless other stories like these. I have accumulated these in over 23 years in uniform on active duty in five warships, and continue to see more examples of excellence within the four destroyers in our squadron and on our squadron and task force staffs. With every summer graduation cycle, every ship I have served in over these years has received a batch of fresh and enthusiastic men and women each trained to serve after four years studying in Annapolis. Each cruiser or destroyer-sized ship typically receives around four to seven new officers every year, distributed generally from the source ratio noted earlier, resulting in a couple of USNA graduates.

Upon arrival onboard our ships, I have observed that Naval Academy graduates are consistently better-prepared in the fundamentals of our profession: All Annapolis graduates earn a Bachelor of Science (BS) degree, regardless of their major. Even the liberal arts majors (yes, Mr. Fleming, there are even a few poets, thank God) arrive with the foundation courses required to earn a BS degree. This mandatory USNA curriculum is designed to ensure that all graduates arrive in their ship, submarine, or flight school with a robust knowledge of the engineering, science, math, and physics fundamentals needed to understand our Navy's ships, submarines, and military aircraft: some of the most complicated machines our country can build.

In the wardrooms of my own ships, the Naval Academy Ensigns were able to demonstrate a level of knowledge upon arrival in navigation, weather, ship handling, small arms, firefighting, and watch-standing that exceeded that of most of the NROTC and OCS graduates. The Annapolis graduates also arrived onboard with a seasoned comfort and familiarity with more than naval custom; they already knew how to "get along" and to work through challenges. The unique training environment of the USNA, starting with the arduous "plebe summer," bonds these officers together with a common vision of service, tolerance, mutual support, self-reliance, team dynamics, and the ability to overcome adversity.

As Mr. Fleming's bi-annual call to "get rid of Annapolis" and other Service Academies has hit the blogosphere, I caution taxpayers to rest assured. Navy leaders are not squandering your resources, and continue to select, train, educate, and promote the "best and brightest" to lead the Navy of the future. I am proud to have served alongside Naval Academy graduates everywhere I have been assigned. Thanks to the cooler heads who manage the future of the Navy in Annapolis, throughout the Fleet, in the Pentagon, and in

AGENCY DOCUMENT 0075

Congress, I am confident that this institution will remain open, and will continue to develop the future of our Fleet long after I have "swallowed the anchor" and pursued a life ashore.

Captain ate Westbrook serves as the Deputy Commodore of Task Force 65 and Destroyer Squadron 60. Though no longer writing poetry, he holds a degree in Rhetoric from Tulane University, and an MBA.

Appx788

# EXHIBIT P

Appx789

**From:** Ted Carter wcarter@usna.edu
**Subject:** Re: Donald Trump should be my plebe
**Date:** February 24, 2017 at 3:25 PM
**To:** Steven Vahsen vahsen@usna.edu
**Cc:** Terry Cook tcook@usna.edu, Andrew Phillips aphillips@usna.edu, David Mckinney mckinney@usna.edu, George Lang glang@usna.edu

Entertaining....at least....but still inappropriate.
SS

On Feb 24, 2017 2:38 PM, "Steve Vahsen" <vahsen@usna.edu> wrote:
  Prof. Fleming on President Trump....

  http://www.baltimoresun.com/news/opinion/oped/bs-ed-trump-plebe-20170226-story.html

  V/r,
  Steve

Appx790

AGENCY DOCUMENT 0098

From:  Steve Vahsen vahsen@usna.edu
Subject: Donald Trump should be my plebe
Date:  February 24, 2017 at 2:38 PM
To:  Ted Carter wcarter@usna.edu, George Lang glang@usna.edu, Andrew Phillips aphillips@usna.edu, David McKinney
      mckinney@usna.edu, Tcook tcook@usna.edu



Prof. Fleming on President Trump....

http://www.baltimoresun.com/news/opinion/oped/bs-ed-trump-plebe-20170226-story.html

V/r,
Steve

Appx791

AGENCY DOCUMENT 0099

**From:** Ted Carter wcarter@usna.edu
**Subject:** Re: article from Inside Higher Ed yesterday
**Date:** April 12, 2017 at 9:35 AM
**To:** Andrew Phillips aphillips@usna.edu
**Cc:** George Lang glang@usna.edu, CAPT Steven Vahsen vahsen@usna.edu

Got it...no words.
SS

On Wed, Apr 12, 2017 at 9:23 AM, Andrew Phillips <aphillips@usna.edu> wrote:
Thought you might like some light reading ...

https://www.insidehighered.com/advice/2017/04/11/when-teaching-how-you-look-important-essay

*Andrew T. Phillips*
Academic Dean and Provost
589 McNair Road
United States Naval Academy
Annapolis, MD 21402-5000

Phone:  (410) 293-1583
FAX:      (410) 293-3735

Appx792

AGENCY DOCUMENT 0100

**From:** Andrew Phillips aphillips@usna.edu 📎
**Subject:** Re: article from Inside Higher Ed yesterday
**Date:** April 12, 2017 at 9:29 AM
**To:** George Lang glang@usna.edu, CAPT Steven Vahsen vahsen@usna.edu, Ted Carter wcarter@usna.edu



Trying again ...

https://www.insidehighered.com/advice/2017/04/11/when-teaching-how-you-look-important-essay

PDF is also attached.

*Andrew T. Phillips*

Academic Dean and Provost
589 McNair Road
United States Naval Academy
Annapolis, MD 21402-5000

Phone: (410) 293-1583
FAX:    (410) 293-3735

On Wed, Apr 12, 2017 at 9:23 AM, Andrew Phillips <aphillips@usna.edu> wrote:
Thought you might like some light reading ...

https://www.insidehighered.com/advice/2017/04/11/when-teaching-how-you-look-important-essay

*Andrew T. Phillips*

Academic Dean and Provost
589 McNair Road
United States Naval Academy
Annapolis, MD 21402-5000

Phone: (410) 293-1583
FAX:    (410) 293-3735

When teaching,
how yo...ay).pdf

Appx793

AGENCY DOCUMENT 0101

**From:** Ted Carter wcarter@usna.edu
**Subject:** Re: article from Inside Higher Ed yesterday
**Date:** April 12, 2017 at 9:26 AM
**To:** Andrew Phillips aphillips@usna.edu



Andy,

Link is either inop or blocked unfortunately.
SS

On Wed, Apr 12, 2017 at 9:23 AM, Andrew Phillips <aphillips@usna.edu> wrote:
Thought you might like some light reading ...

https://www.insidehighered.com/advice/2017/04/11/when-teaching-how-you-look-important-essay

*Andrew T. Phillips*
**Academic Dean and Provost**
589 McNair Road
United States Naval Academy
Annapolis, MD 21402-5000

Phone: (410) 293-1583
FAX:    (410) 293-3735

Appx794

AGENCY DOCUMENT 0102



**From:** Andrew Phillips aphillips@usna.edu
**Subject:** article from Inside Higher Ed yesterday
**Date:** April 12, 2017 at 9:23 AM
**To:** George Lang glang@usna.edu, CAPT Steven Vahsen vahsen@usna.edu, Ted Carter wcarter@usna.edu

Thought you might like some light reading ...

https://www.insidehighered.com/advice/2017/04/11/when-teaching-how-you-look-important-essay

*Andrew T. Phillips*

**Academic Dean and Provost**
**589 McNair Road**
**United States Naval Academy**
**Annapolis, MD 21402-5000**

**Phone:** (410) 293-1583
**FAX:** (410) 293-3735

Appx795

AGENCY DOCUMENT 0103

4/12/2017                   When teaching, how you look is important (essay)



(https://www.insidehighered.com)



# When teaching, how you look is important (essay)

**Submitted by Bruce Fleming on April 11, 2017 - 3:00am**

Nowadays, when writing something relating to sex, professors can fear for their professional lives, as Laura Kipnis of Northwestern University learned last year when she wrote an <u>article about sexual assault and harassment</u> [1]. So a title linking "erotics" to teaching or being a professor -- even if we dilute it by explaining that we are talking about some sort of Platonic version that really means something closer to animal magnetism -- is liable to bring out the extremists.

But the fact remains that teaching -- whether standing in front of a lecture hall with hundreds of students or at a seminar table with a handful, or conveyed by a computer's video camera into countless other computers worldwide -- is a form of performance art. It's where the appearance and actions of the person talking and moving are of great importance in determining whether the audience takes the information on board. For every moment we are standing up front, we are the performer, and those watching us judge us as physical beings. And that means, in the broadest sense, erotically.

Erotics doesn't necessarily mean flirting or active sex. Think of the way we respond to movie actors, unaware of our gaze and caught in an image projected as light beams or pixels on a screen, knowingly packaging themselves, or allowing themselves to be packaged, as attractive human beings -- or at least interesting ones. We aren't going to have sex with them, and they aren't, except in some undefinable public way, coming on to us. At most they are showing the camera, and by extension us, what they've got.

But at the same time, we are intensely aware of their bodies, words, mannerisms, pores of their skin -- even the way they swallow. (Meryl Streep ought to copyright her gulp.) How does Brad Pitt move his torso? Cary Grant his shoulders? What made Katharine Hepburn so compulsively watchable? Glenda Jackson? This is a form of erotics -- same or different or whatever gender in nature.

A professor teaching a class is somewhat more immediate to the audience than the movie actor's image. The nature of classroom erotics is closer to the rapport between audience members and actors in very small live theater, closer still to the avant-garde variety with audience interaction. But because we are people responding to people, bodies reacting to bodies, and not just minds to minds, or words to words, the physicality of the presenter plays a role. And that means, in the broadest sense, erotics. And it's the erotics of the presentation that underpin and can either convey or ruin the intellectual content of the words uttered, what we might call the script, no matter how improvised in performance. Reading a play is different than seeing it performed.

These are some issues of erotics: Is the person creating a positive impression or feeling in the viewer/listener? Does s/he/ze make the audience want to be there? Are they attractive? Whiny? Reassuring? Inspiring? Are we, the audience, distracted by the person's clothing? Or by mannerisms, such as flicking fingers or the way this person touches their face? Or by verbal tics like

Appx796

4/12/2017                                    When teaching, how you look is important (essay)

"OK" and "if that makes sense" (or like the eternal "like")? What of tones of voice seem unnecessarily sarcastic? Too cutesy? We can be influenced by all of these, sometimes simultaneously.

If we are allowed to list the things that disgust us, distract us or make us wish we were elsewhere, we should equally be allowed to list the things that have the opposite effect. And those may have nothing to do with the content of the words issuing from this person's mouth — the transcript that we could read after the fact and the independent content of which (brilliant? banal?) we may at the same time be aware of. Is the person good-looking? Do they have a developed physique? Is the person standing erect or do they slump or slouch? Well dressed in a way that is flattering without being distracting? And how about the clothing: Does it show the proper class and situation signifiers — not beach wear in a classroom, not lumberjack or greasy spoon waitress attire?

Delivery style: Is the person frenetic? Splenetic? Too nasal? Too gravelly? Mellifluous? Body language matters, too. Does the person rock back and forth or stand nicely upright? Do they seem nailed to the floor or are they clutching the podium?

All these are elements of the erotics of professing. Even the words themselves are not separable but part of such erotics, not like soul disassociated from body. Is the person using words too big for the situation? Too babyish? Are the sentences too complex? Not complex enough? Is the organization coherent? That's a factor of the words not only, say, in the paper that may be published afterward but also of the performance right here, right now.

Everything matters in determining the erotic response of audience members (students) to the professorial presenter. One element alone in excess, or in insufficient quantity, can ruin a performance or make it. To make things more complex, elements are never alone, and only the entire situation can determine what effect it has. Perhaps the audience member is so entranced or repelled by one single aspect (let's say the attractiveness of the presenter's face or their body language) that everything else is either golden or ruined. Perhaps the response is more compartmentalized and nuanced: let's say X or Y liked the message but disapproved of the droning delivery. All these things matter.

Professors like to be in charge. Perhaps as a result, they typically don't like talking about, or perhaps even thinking about, the fact that, of course, students are judging them by their physicality and presence — what I'm calling the erotics of the professorial situation. In America, documentable observations about the physicality of applicants in the hiring process, or even later, can lead to lawsuits. The department chair can't call you in and tell you, as Donald Trump told New Jersey Governor Chris Christie, to lay off the Oreos.

Yet, of course, this kind of physical and erotic response to, say, job candidates for precisely these posts, leads to real-world decisions all the time, even if it's not articulated. Such a response can be either positive or negative: say the job candidate wore inappropriate clothing or picked their nose. Won't get the job. Or just seemed friendly and attractive. Might well get the job. Or was female and black as well as attractive. Just what the department needs! (Negative reactions based on these qualities are, of course, illegal.)

The job list of the Modern Language Association even has to remind job candidates to "maintain eye contact" and dress appropriately in an interview. And at conferences, many presenters (often with years of classroom experience) still read their papers in a monotone while clutching a podium, threatening to put everyone to sleep.

## A Bait and Switch?

My 30 years working for the military as an English professor at the U.S. Naval Academy in Annapolis, Md., have made me conscious of what the military is explicit about and what the civilian

Appx797

4/12/2017                                        When teaching, how you look is important (essay)

world dances around, when they address it at all. Namely, that what you look like in clothing, your demeanor and your physicality determine to a large degree the effect you have on the people you're talking to. The military calls it "command presence."

The military is perfectly clear that its members have to follow strict physical guidelines, including short hair, specific ways uniforms are to be worn (no shirttails out, shoes shined, no wrinkles), specific body weight guidelines and even specifics for jewelry and tattoos. It encourages male body sculpting in the form of a pervasive weight-room culture that I happen to share and be part of. It is clear that looking good (usually the word use here is "sharp") is a large part of the battle.

For men, that means being muscular, even in specialties that don't particularly require muscles. Check out the way all services insist on formfitting shirts held down with elastics attached to the socks to keep shirts flat against washboard abs, or the Marine Corps dress uniforms that hug the body, lengthen the leg visually with the "blood stripe" and widen the shoulders with decorations. This is men dressing up for men, remember.

Recently, I asked my students, midshipmen at the Naval Academy, what percentage of effectiveness is represented by impressive physicality. The answer: 40 percent. Men respect large men who take care of themselves physically, I was told. They didn't have to tell me, however. I've been watching it for three decades.

The military, therefore, is very clear about its erotics, although of course it would never, ever use that word. When it was largely all male, its homoeroticism was rampant, but for that reason never articulated. Now that women are being allowed into all combat specialties, talking about the fact that a mostly male audience is judging the physicality of a woman is the new biggest taboo.

The recent push to integrate women into all aspects of the military has produced a strange conspiracy of silence with respect to the fact that, just as men are judging men as males, so they are also judging women as females. It's a fact that a roomful of, say, male marines will be judging the male officer in front of them on a dozen criteria ranging from the size of his arms and chest to his voice timbre and body language. Yet they are not allowed to admit they are aware of a female officer as a woman, or even as a human being with biceps that just aren't very impressive. You're not supposed to be aware of the size of her breasts. A man being sized up apparently gains authority, while woman being sized up apparently loses authority.

It's true that academics isn't as relentlessly physical as the military. But if the importance of erotics isn't 40 percent for professors, it isn't zero, either. Students remember professors decades later based on their charisma, their personality and their appearance -- not exclusively, but to a much larger degree than we professors may want to admit. We have to start talking about that fact.

To be an effective professor, you don't have to be tall and movie-star gorgeous. (In fact, in the case of women, it's a negative -- as it is for "pretty" men rather than more rugged ones.) Small, intense, wiry people can succeed, too. You can't be too intense, however: that just seems manic.

And you have to be relaxed. Nobody likes being around somebody who doesn't put the audience at ease. But not too relaxed: that induces narcolepsy. You know it when you hit it; as actors know they have their audience in the palm of their hands -- or not.

The profession of academics almost seems like a bait and switch: it attracts introverts and then puts them in front of a group of highly critical, often young people who watch their every move. For the ideal professor, we should demand the combination of a cerebral specialist who doesn't need others with a showman or -woman able to appeal to 20-year-olds, as many students still are (or, more dauntingly, 40-year-olds who have been through several jobs and a marriage or two). It's a counterintuitive combination, and one rarely attained.

Appx798

AGENCY DOCUMENT 0106

4/12/2017    When teaching, how you look is important (essay)

How can we achieve it more often? Some say we should acknowledge reality and simply make two tracks: one for glorified high school teachers with the gift of gab who teach the courses — the other for colorless researchers who never emerge from their caves. But few are willing to go this far.

All that said, talking about the problem is a good place to start. As is acknowledging that we're offering ourselves, everything about ourselves, to the gaze of relentless watchers and listeners. And then liking it.

**Section:**
Teaching and Learning [2]
**Author Bio:**

*Bruce Fleming has taught English at the U.S. Naval Academy since 1987. He has written over a dozen books and numerous articles, listed on his website, www.brucefleming.net [3].*

Source URL: https://www.insidehighered.com/advice/2017/04/11/when-teaching-how-you-look-important-essay?
width=775&height=500&iframe=true

Links:
[1] http://www.huffingtonpost.com/2015/05/31/laura-kipnis-essay-northwestern-title-ix_n_7470046.html
[2] https://www.insidehighered.com/news/focus/teaching-and-learning
[3] https://brucefleming.net

undefined
undefined

Appx799

# EXHIBIT Q

Appx800

AGENCY DOCUMENT 0109

**From:** David Mckinney mckinney@usna.edu
**Subject:** Fleming article
**Date:** July 31, 2017 at 8:40 AM
**To:** Ted Carter wcarter@usna.edu
**Cc:** Steve Vahsen vahsen@usna.edu, George Lang glang@usna.edu, Alberto Ramos aramos@usna.edu, Robert Chadwick chadwick@usna.edu, Andrew Phillips aphillips@usna.edu

Admiral,

This was in clips this morning but wanted to ensure you saw the latest article by Prof. Fleming.

V/r,
David

Appx801

AGENCY DOCUMENT 0110

**From:** Steve Vahsen vahsen@usna.edu
**Subject:** Latest Prof Fleming Article
**Date:** October 16, 2017 at 9:21 AM
**To:** Ted Carter wcarter@usna.edu
**Cc:** George Lang glang@usna.edu, Andrew Phillips aphillip@usna.edu, Tcook tcook@usna.edu, Alberto Ramos aramos@usna.edu,
Valerie Overstreet overstre@usna.edu, Lawrence Hill lhill@usna.edu, Robert Chadwick chadwick@usna.edu

Admiral,

Recent article by Prof. Fleming:

http://thefederalist.com/2017/10/16/not-just-west-point-u-s-military-academies-become-disneyland-politicians/

V/r,
Steve

Appx802

AGENCY DOCUMENT 0111

**From:** George Lang glang@usna.edu
**Subject:** Fwd: Professor Fleming Article
**Date:** October 19, 2017 at 2:29 PM
**To:** Andrew Phillips aphillips@usna.edu



---------- Forwarded message ----------
**From:** "Raymond Marsh" <marsh@usna.edu>
**Date:** Oct 18, 2017 12:50
**Subject:** Professor Fleming Article
**To:** "George Lang" <glang@usna.edu>, "Steve" <vahsen@usna.edu>
**Cc:**

https://www.the-american-interest.com/2017/10/01/fixing-title-ix/

COS,

I love the article and talk about the problems of this national discourse on a daily basis. However, he loses credibility when he complains about the stereotyping of all men by, himself, stereotyping all prevention programs and the people involved in those efforts. He specifically cites "our" programs here at the Naval Academy by using training themes we have not used here in many years. I would know he is trying to make a point, but using outdated material is intellectually lazy and flat-out dishonest. I would expect that he would have the professional courtesy to meet the SAPRO Program Manager and realize that HE is as far from a feminist on a liberal agenda as you can get. Heck, maybe it would be appropriate if he actually attended a training session before citing it in an academic article.

To date, all of my invitations for his input to solving the problem have fallen silent.

Very Respectfully,

Bart

--
CAPT Bart Marsh
USNA SAPRO
410-293-1502
24-Hour USNA VA Response Line  (443) 336-2637
www.SafeHelpline.org
(877) 995-5247 / Text: 55-247

Appx803

AGENCY DOCUMENT 0112

From: Ted Carter wcarter@usna.edu
Subject: Prof. Fleming Article
Date: October 19, 2017 at 4:33 PM
To: Andrew Phillips aphillip@usna.edu



Here's the other recent article...

https://www.the-american-interest.com/2017/10/01/fixing-title-ix/

Appx804

AGENCY DOCUMENT 0273

**From:** Andrew Phillips aphillips@usna.edu
**Subject:** Fwd: Capitol Gazette article and interview on Dr Fleming removal.
**Date:** August 24, 2018 at 6:50 AM
**To:** Dan O'Sullivan osulliva@usna.edu, Jennifer Waters jwaters@usna.edu, Katherine Cermak cermak@usna.edu, Pete Nardi nardi@usna.edu, Ross Pospisil pospisil@usna.edu, David Roberts roberts@usna.edu, Jeffrey Smitherman smitherm@usna.edu, Joe Reason reason@usna.edu, Chris Eberle eberle@usna.edu, Mark Elert elert@usna.edu, Priscilla Zotti zotti@usna.edu, Rich O'Brien riobrien@usna.edu

Just keeping up with the reading ....

*Andrew T. Phillips*

Academic Dean and Provost
589 McNair Road
United States Naval Academy
Annapolis, MD 21402-5000

Phone:  (410) 293-1583
FAX:    (410) 293-3735

---------- Forwarded message ----------
**From:** Jeffrey Smitherman <smitherm@usna.edu>
**Date:** Thu, Aug 23, 2018 at 11:29 PM
**Subject:** Capitol Gazette article and interview on Dr Fleming removal.
**To:** Andrew Phillips <aphillips@usna.edu>, Priscilla Zotti <zotti@usna.edu>

http://www.capitalgazette.com/news/naval_academy/ac-cn-bruce-fleming-fired-follow-0824-story.html

Col Jeff Smitherman, USMC
Senior Marine
Director of Humanities and Social Sciences
United States Naval Academy
smitherm@usna.edu

Appx808

AGENCY DOCUMENT 0280



**aaup**
AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS

1133 19th Street, NW, Suite 200, Washington, DC 20036
PHONE: 202.737.5900 • FAX: 202.737.5526 • www.aaup.org

<u>VIA ELECTRONIC AND U.S. MAIL</u>

September 11, 2018

Vice Admiral Walter E. Carter Jr.
Superintendent
United States Naval Academy
121 Blake Road
Annapolis, Maryland 21402

Dear Superintendent Carter:

We corresponded with you last winter, as you are aware, concerning the case of Professor Bruce Fleming and his efforts to contest the Naval Academy administration's action to remove him from the classroom.

We have heard further from Professor Fleming, this time as a result of an August 15, 2018, "Notice of Decision on Proposed Removal" memorandum from Academic Dean and Provost Andrew T. Phillips notifying him that he was being dismissed for cause from his tenured position in the Department of English effective immediately. The stated basis for his dismissal, we understand, was "conduct unbecoming a Federal employee," specifically, that he had "engaged in unprofessional conduct in the classroom and outside the classroom." We understand further that Professor Fleming had previously received a June 26, 2018, "Notice of Proposed Removal" that took issue with his classroom discussions of sexual and transgender issues, to which he responded by July 3 letter charging that

> The Academy's administration appears to have decided that an investigation into alleged student complaints against Professor Fleming was necessary only weeks after Professor Fleming published an article in *The Federalist* that was critical of the United States service academies (including the Academy).

The professor's response further stated that the Academy's recent actions "are part of an ongoing pattern of targeted harassment" against him, and raised allegations of violations of academic freedom with regard to his academic freedom in the classroom in discussing his subject, and in his choice of teaching methods.

Appx810

AGENCY DOCUMENT 0281

Superintendent Walter E. Carter
September 11, 2018
Page 2

The interest of the Association in Professor Fleming's case, as you doubtless know, stems from its longstanding commitment to academic freedom, tenure, and due process as set forth in the 1940 *Statement of Principles on Academic Freedom and Tenure,* the complementary 1958 *Statement on Procedural Standards in Faculty Dismissal Proceedings,* and the Association's *Recommended Institutional Regulations on Academic Freedom and Tenure (RIR)* (copies are attached for your convenience). The 1940 *Statement* is a joint formulation of this Association and the Association of American Colleges and Universities and has received the endorsement of more than 240 professional organizations and learned societies. We have noted the relevant provisions of the USNA Academic Dean and Provost Instruction 1531.63C. We have further noted that excerpts from the "academic freedom" section of the 1940 *Statement* are incorporated in the USNA *Faculty Handbook.*

With regard to the dismissal process, the academic community recognizes that the dismissal for cause of a tenured faculty member should occur only after the affordance of requisite safeguards of academic due process. According to Regulation 5 of the *Recommended Institutional Regulations,* "Adequate cause for a dismissal will be related, directly and substantially, to the fitness of faculty members in their professional capacities as teachers or researchers." The following specific procedures are among those set forth in Regulation 5: an adjudicative hearing of record on the charges, conducted by an elected body of faculty peers; the right to confront and cross-examine witnesses; and the administration's bearing the burden of demonstrating adequate cause for dismissal through clear and convincing evidence in the record considered as a whole. Those standards further provide that, if the hearing committee finds that adequate cause for dismissal has not been established by the evidence in the record, and if the president rejects its findings and recommendations, "the president will state the reasons for doing so, in writing, to the hearing committee and to the faculty member, and provide an opportunity for response before transmitting the case to the governing board." We understand that Professor Fleming was not afforded an opportunity for a faculty hearing.

With respect to the processes that led to the dismissal, we commend to your attention the enclosed *Due Process in Sexual-Harassment Complaints* and *Sexual Harassment: Suggested Policy and Procedures for Handling Complaints.* Suffice it to say that the procedures followed in Professor Fleming's case fall far short of the AAUP-supported principles and procedural standards set forth in these documents, which require that charges be reviewed by a duly constituted faculty body and that sanctions be imposed

Appx811

AGENCY DOCUMENT 0282

Superintendent Walter E. Carter
September 11, 2018
Page 3

only after a faculty hearing of the sort specified in Regulation 5 of the *Recommended Institutional Regulations*.

We urge you to rescind the action taken against Professor Fleming and reinstate him to his academic responsibilities, with any subsequent action in his case to be consistent with the enclosed principles and standards.

We look forward to your response.

Sincerely,

Anita Levy, Ph.D.
Associate Secretary

Attachments

cc:  Dr. Andrew T. Phillips, Academic Dean and Provost
     Dr. Daniel O'Sullivan, Vice Academic Dean and Provost
     Dr. Jason Shaffer, Chair, Department of English
     Professor Bruce Fleming
     Mr. Jason Ehrenberg, Esq.

Appx812

AGENCY DOCUMENT 0283



**DEPARTMENT OF THE NAVY**
UNITED STATES NAVAL ACADEMY
121 BLAKE ROAD
ANNAPOLIS MARYLAND 21402-1300

September 26, 2018

Dr. Anita Levy, PhD.
Associate Secretary
American Association of University Professors
1133 19th Street, Northwest, Suite 200
Washington, DC 20036

Dear Dr. Levy:

This correspondence responds to your letter of September 11, 2018 regarding the removal of Dr. Bruce Fleming from his position as a tenured faculty member in the English Department at the U.S. Naval Academy. Since Dr. Fleming's removal is a personnel action that is protected under the Privacy Act of 1974, I am prohibited from discussing matters raised in the inquiry without a signed waiver from Dr. Fleming. However, I can address concerns you raised regarding the process used to investigate and resolve allegations of faculty misconduct, including the process followed with respect to Dr. Fleming's case.

The Naval Academy is a Department of the Navy institution of higher learning governed by federal law and regulations promulgated by the Department of Defense and the Department of the Navy. Within this framework, guidelines to manage civilian personnel, which include all members of our faculty, have been issued and remain in effect. Using these guidelines, the Academic Dean and Provost signed a 2016 Academic Dean and Provost instruction that outlined the process for handling allegations of faculty misconduct – ACDEANINST 1531.63C. While you mention the instruction, I am enclosing a complete copy should you wish to review it.

ACDEANINST 1531.63C was the result of many years of meetings with senior members of my faculty and staff. The intent was to balance and protect the interests of midshipmen (students), faculty members, and the institution, and it is my opinion that the intent was achieved with publication of the enclosed document. Allow me to highlight a few of the items in the instruction that may be of particular interest to you, and to describe how they were applied in Dr. Fleming's case.

Allegations of faculty misconduct must be made in writing and signed by the midshipman (complainant) in order to be accepted for review by the Vice Academic Dean. If accepted, the Vice Academic Dean tasks the appropriate Division Director (the equivalent of a College "dean" at other institutions) to assemble and oversee an Inquiry Panel. Panel selectees are senior members of the faculty and are identified by the Faculty Senate Executive Committee, and are then selected in consultation with the Faculty Senate President. In short, the Inquiry Panel is a Faculty Senate committee that is composed of senior faculty who are charged with conducting the investigation and reporting its findings.

The inquiry process is led by the Inquiry Panel and includes an opportunity for the accused faculty member to meet with the Panel and rebut respective allegations. Dr. Fleming declined to meet with the Panel, and instead emailed his rebuttal to the Panel. The Inquiry Panel includes any input provided by the faculty member (in this case, the email that Dr. Fleming sent) in its final report

Appx814

delivered to the Division Director. The Division Director then offers the accused an opportunity to review and comment on the Inquiry Panel's final report. Dr. Fleming's Counsel did so in writing. The Division Director in turn reviews the material, including any response from the accused, and composes a proposed remedy. If that remedy is removal, the entire package is then forwarded to the Academic Dean and Provost for a decision. The faculty member is again notified that a rebuttal/comments may be provided to the Academic Dean and Provost for consideration. Dr. Fleming's Counsel again provided a rebuttal in writing. If the Academic Dean and Provost supports removal, the faculty member may appeal that decision to the Naval Academy Superintendent. Dr. Fleming did not take advantage of this opportunity and, alternatively, appealed the removal action directly to the Merit Systems Protection Board (MSPB).

The MSPB is an independent, quasi-judicial, agency in the executive branch that has responsibility for hearing and adjudicating appeals by federal employees of adverse personnel actions, such as removals, suspensions, and demotions. I am aware that Dr. Fleming's MSPB appeal is underway and an independent administrative judge has been assigned. A hearing date has not yet been scheduled. In the hearing, the burden of proof to substantiate the alleged charges rests with the Naval Academy and the hearing must include opportunities for both parties to present their cases through documentary evidence and the testimony and cross-examination of witnesses. The administrative judge will subsequently render a decision.

While the above process is different from that practiced by the AAUP, it does provide for a full and fair inquiry into allegations of faculty misconduct. This process includes a fact finding inquiry conducted by senior faculty and an opportunity to address allegations by the accused before an Inquiry Panel, prior to an adverse personnel action decision. If disciplinary action includes a lengthy suspension or removal, the accused can appeal the action to the designated independent arbiter of federal personnel disputes, the MSPB. The ability to go outside the organization that is imposing discipline, and challenge the evidence and witnesses before a neutral administrative judge, ensures the rights of both parties are protected. This is federal law.

Before closing, I want to emphasize that adverse civilian personnel actions are rare at the Naval Academy. Removal of faculty members are even more unusual and only occur when the facts and circumstances of the case justify the action.

I trust the above will be helpful to you in understanding the underlying federal and regulatory guidance on addressing civilian federal employee misconduct, and the appellate rights to challenge any disciplinary action taken.

Sincerely,

W. E. CARTER, JR.
Vice Admiral, U.S. Navy
Superintendent

Attachment: As described

2

Appx815



**DEPARTMENT OF THE NAVY**
OFFICE OF THE ACADEMIC DEAN AND PROVOST
UNITED STATES NAVAL ACADEMY
589 MCNAIR ROAD
ANNAPOLIS MARYLAND 21402-1323

AGENCY DOCUMENT 0583

ACDEANINST 5400.2
ADP
2 April 2015

<u>ACDEAN INSTRUCTION 5400.2</u>

From:  Academic Dean and Provost

Subj:  UNITED STATES NAVAL ACADEMY FACULTY HANDBOOK

Ref:  (a) SECNAVINST 1531.2C
    (b) DoD Directive 1322.22 of 24 Aug 1994
    (c) USNAINST 5450.3F
    (d) USNAINST 5420.33B
    (e) 10 U.S.C §6952
    (f) American Association of University Professors 1940 Statement of
        Principles on Academic Freedom and Tenure with 1970
        Interpretive Comments
    (g) SECNAVINST 3900.39D
    (h) 32 CFR 219
    (i) ACDEANINST 5370.4D
    (j) 5 CFR 2635
    (k) 32 CFR 721.18
    (l) DoD 5500.07-R, The Joint Ethics Regulation (JER), November 2011
    (m) American Association of University Professors Statement on
        Professional Ethics, 2009
    (n) ACDEANINST 5370.3
    (o) USNAINST 5354.1A
    (p) ACDEANINST 4001.2
    (q) 31 CFR 1353
    (r) ACDEANNOTE 12451
    (s) ACDEANNOTE 12452
    (t) ACDEANINST 12550.1
    (u) ACDEANINST 5314.1
    (v) ACDEANINST 12335.1A
    (w) USNAINST 124300.4B
    (x) ACDEANINST 5370.3C
    (y) ACDEANINST 3920.3A
    (z) ACDEANINST 12300.1
   (aa) ACDEANISNT 1520.2C
   (bb) ACDEANINST 5450.1B
   (cc) OPNAVINST 1520.4B
   (dd) Classification Act of 1923
   (ee) 10 U.S.C. §6965
   (ff) USNAINST 12831.1A
   (gg) USNAINST 5060.5F
   (hh) DON CHRM, DON Civilian Human Resource Manual
   (ii) ACDEANINST 12630.3B
   (jj) ACDEANINST 1531.80A
   (kk) ACDEANINST 1531.51C
   (ll) ACDEANINST 1531.34B
   (mm) USNAINST 1531.51A
   (nn) ACDEANINST 1531.68A
   (oo) USNAINST 1560.3G
   (pp) USNAINST 1520.2AA
   (qq) USNAINST 1531.39
   (rr) USNAINST 1552.3E
   (ss) USNAINST 12610.4F

Appx845

ACDEANINST 5400.2

    (tt) COMDTMIDNINST 1610.2G
    (uu) USNAINST 1610.3H
    (vv) COMDTMIDNINST 1531.5R
    (ww) ACDEANINST 3920.1N
    (xx) USNA/ACCINST 5530.2A
    (yy) USNA/ACCINST 5218.3E

Encl: (1) United States Naval Academy Faculty Handbook

1. <u>Purpose</u>. To authorize the United States Naval Academy (USNA) Faculty Handbook as one source of governing guidance for the dissemination of policy and information for faculty at the United States Naval Academy.

2. <u>Background</u>. This handbook will familiarize faculty with the Naval Academy and discuss the role of a faculty member. The Naval Academy's history, mission, and administrative procedures affecting faculty are discussed, and include specifics regarding appointment, promotion, salary, and tenure.

3. <u>Applicability</u>. This instruction applies to all faculty, permanent and temporary, military and civilian, at USNA.

4. <u>Discussion</u>. Naval Academy faculty members are expected to support the mission of the Naval Academy in all its moral, mental, and physical dimensions. The USNA's academic program is organized to provide all midshipmen with an education of the highest quality. The foundation of that education is a core curriculum that prepares each graduate for service as a junior officer in the naval operating forces. Beyond that, midshipmen choose an academic major reflecting their interests and abilities, as well as the needs of the naval service. Together, the academic core and the majors program help provide our nation with well-rounded, well-educated officers able to lead the nation's Navy and Marine Corps in the 21st century. Achieving that goal demands exceptional faculty and exceptional students.

5. <u>Policy</u>. All policy is set forth and shall be adhered to in accordance with enclosure (1).

6. <u>Action</u>. The Academic Dean and Provost (ADP) is responsible for maintaining policy, guidance, and all other matters concerning faculty at USNA.

                             A. T. PHILLIPS

Distribution:
All Non-Mids (electronically)

Appx846

# EXHIBIT AA

AGENCY DOCUMENT 0600

ACDEANINST 5400.2

## CHAPTER 2 — WORKING AT THE NAVAL ACADEMY: IMPORTANT RULES

**200. Regulations and Instructions.** The foundation for the Superintendent's authority to employ civilians as members of the faculty is Title 10, U.S. Code, Article 6952, reference (e). Hired not simply as classroom instructors, but to support the Naval Academy's comprehensive mission to develop officers for the Navy and Marine Corps, each faculty member has a commitment to the professional training of midshipmen and the enforcement of regulations. Military discipline, appearance, and courtesies, in particular, are essential elements of every aspect of life at the Academy, including the classroom.

**201. Chain of Command.** The chain of command is a fundamental organizing principle for the U.S. Armed Forces, part of life in the U.S. Navy and Marine Corps, and is observed at the Naval Academy. The chain of command for faculty members leads through the Department Chair, the Division Director, and the Academic Dean and Provost, to the Superintendent. Faculty members may arrange appointments directly with the Academic Dean and the Superintendent, but should be mindful to keep the chain of command informed.

**202. Military Uniform.** Uniforms and grooming standards for military personnel are prescribed by the Superintendent.

**203. Civilian Dress.** Proper civilian attire is expected in the classroom and other professional environments. For men, this is a coat and tie; women members of the faculty should dress comparably. The terms "informal" and "casual" are often used on invitations to social events and ceremonies. Civilian Informal dress means a dress or a pantsuit for women, and coat and tie for men. Casual dress connotes sports or easy attire; for men this usually means slacks and an open-collared shirt; for women, slacks or skirt with a blouse.

**204. Attendance at Academic Functions.** Members of the faculty are expected to attend faculty meetings and to take part in academic processions, particularly at graduation and commissioning ceremonies.

**205. Appointment, Pay, Promotion, and Tenure.** Authority to appoint, re-appoint, promote, and tenure the civilian faculty in a system that closely parallels similar models at the nation's finest academic institutions originated in 1936 when the Secretary of the Navy approved a promotion and tenure system in order to "secure and retain for the civilian staff, teachers distinguished for scholarship and ability" (See "Policy Regarding Pay, Promotion, and Tenure of Office of Civilian Members of the Faculty — at the United States Naval Academy and Postgraduate School", 27 April 1936). Additional specific information regarding these topics can be found in Chapter III entitled "Your Career as a Faculty Member: Appointment, Re-Appointment, Pay, Tenure, and Promotion."

**206. Academic Freedom and Responsibilities.** The Naval Academy subscribes to the American Association of University Professors 1940 Statement of Principles on Academic Freedom and Tenure with 1970 Interpretive Comments, reference (f).

Appx848

# EXHIBIT BB

Appx849

ACDEANINST 5400.2

insurance, since the insurance remains in effect during the full twelve months. Government service is continuous for retirement. Thus, faculty members are credited for a full year of government service for each regular ten month session.

   e.  Summer Intersessional Pay.  Those civilian members of the faculty required or selected by the Academic Dean to perform academic duties beyond the ten-month academic year will be paid additional compensation for the term required.  The summer intersessional period is two months long, from mid-June to mid-August.

   f.  Approval.  Salaries for all administrative faculty members reporting to the Academic Dean will be approved by the Academic Dean. Salary recommendations for all faculty members reporting to the Commandant will be endorsed by the Commandant and approved by the Academic Dean.

316.  Termination.

   a.  Reduction In Force.  A lack of federal funds, change in mission, workload, or organization, or other reasons, may require a reduction in the number of faculty.  In this unlikely event, at least 60 days' notice of termination of service will be given to individuals affected, in accordance with Federal regulations.  Any termination as a result of a Reduction In Force (RIF) will be implemented in accordance with Civil Service regulations.

   b.  Separation for Cause.  Any member of the faculty may be separated for reasons of misconduct, incompetence, or gross negligence irrespective of tenure or length of appointment; see reference (ee), "Failure to report violation: dismissal," for additional information.  Such separation will be effected in accordance with the applicable Civil Service, Department of Defense, and Navy regulations.

   c.  Resignation.  A civilian member of the faculty is expected to give at least six months' notice of intention to resign or retire, in order that an appropriate replacement may be found.

317.  Effective Date of Personnel Actions.  Initial appointments to the faculty normally will become effective on 1 August.  Recommendations for reappointments and promotions normally will become effective on 12 August. Separations and terminations of contract, except for cause or unless specifically outlined otherwise in the appointment letter, normally will become effective on 11 August.  Pay step increases will normally become effective 1 October to coincide with start of the fiscal year.

318.  Retirement.

   a.  Coverage.  Civilian members of the faculty are covered by the Civil Service Retirement System (CSRS) or the Federal Employees Retirement System (FERS).  Qualifying retired faculty members are eligible for certain benefits outlined in reference (ff), Status of Retired Civilian Professors.

   b.  Honorary Titles.  Upon retirement an honorary title, consisting of the academic rank followed by the word Emerita or Emeritus, may be

Pleading Number : 2019017833        Submission date : 2019-05-15 17:59:26        Confirmation Number: 1236669019        page 154 of 155

Appx850

Page 1

BEFORE THE

U.S. MERIT SYSTEMS PROTECTION BOARD

In the Matter of:                    :

                                     :

BRUCE FLEMING,                       :

            Appellant,               :  Docket No.:

                                     :   PH-0752-18-0457-I-1

    v.                               :

DEPARTMENT OF THE NAVY,              :

            Agency.                  :

                        Wednesday,

                        May 22, 2019

                        Merit Systems Protection Board

                        Northeastern Regional Office

                        1601 Market Street, Suite 1700

                        Philadelphia, Pennsylvania

        The above-entitled matter came on for hearing,

pursuant to notice, at 9:00 a.m.


        BEFORE:  MARK K. SYSKA,

                 Administrative Judge

Page 2

1  APPEARANCES:

2          On behalf of the Appellant:

3          JASON H. EHRENBERG, ESQ.

4          Bailey & Ehrenberg PLLC

5          1015 18th Street, NW, Suite 204

6          Washington, D.C. 20036

7          202-331-1331

8          jhe@becounsel.com

9          On behalf of the Agency:

10         TERRENCE P. COOK, ESQ.

11         Department of the Navy

12         U.S. Naval Academy, Superintendent's Office

13         121 Blake Road

14         Annapolis, MD 21402

15         410-293-1547

16         tcook@usna.edu

17

18

19

20

21

22

23

24

25

Page 3

1                        I N D E X

2

3    WITNESS          DIRECT   CROSS   REDIRECT   RECROSS

4

5    Robert Chadwick    7       17       34         39

6    Keith Lindler     41       62       89         --

7    Matthew DeSantis  93      107      142        144

8    Andrew Buckley    148      --       --         --

9    Richard Jin       153     155       --         --

10   Justine Ransdell  158      --       --         --

11   Brandon Gore      162      --       --         --

12   Andrew Phillips   165     182      204         --

13   Anne Marie Drew   213     230       --         --

14                       E X H I B I T S

15

16   EXHIBITS              IDENTIFIED        RECEIVED

17

18   (None)

19

20

21

22

23

24

25

```
 1                P R O C E E D I N G S

 2                                         (9:01 a.m.)

 3         JUDGE SYSKA:  On the record.

 4         It's May 22nd 2019, approximately 9:00 a.m.

 5   We're here in the case of Bruce Fleming versus Department

 6   of the Navy, MSPB docket number PH-0752-18-0457-I-1.  I'm

 7   Administrative Judge Mark Syska presiding.  The case

 8   pertains to the Appellant's removal, from his position at

 9   the U.S. Naval Academy, and the Appellant's accompanying

10   affirmative defenses.  If Appellant and his counsel will

11   state their names, and spell them for the record, please?

12

13         MR. FLEMING:  Bruce Edward Fleming, B-R-U-C-E,

14   Edward, E-W -- E-D-W-A-R-D, Fleming, F-L-E-M-I-N-G.

15         JUDGE SYSKA:  Thank you.

16         MR. EHRENBERG:  Jason H. Ehrenberg, sir, of

17   Bailey & Ehrenberg, Washington, D.C.  J-A-S-O-N, E-H-R-E-

18   N-B-E-R-G.

19         JUDGE SYSKA:  Thank you.  If the Agency will do

20   the same?

21         MR. COOK:  Good morning, Your Honor.

22         JUDGE SYSKA:  Good morning.

23         MR. COOK:  Terrence P. Cook.  I'm the counsel

24   for the United States Naval Academy.  T-E-R-R-E-N-C-E, P

25   as is papa, Cook, C-O-O-K.
```

```
 1        JUDGE SYSKA:  Okay.  Thank you.  I issued a
 2   prehearing conference summary in this case, to which I
 3   received one objection from the Appellant.  We kind of
 4   have an offset situation here.  I'm going to deny the
 5   objection, but I'm going to note I omitted something from
 6   my prehearing conference summary.
 7        I omitted the Appellant's claim, that he was
 8   being discriminated against, because of exercising his
 9   First Amendment rights.  I included the legal standard,
10   and during, in the prehearing conference, under the
11   Board's case Savage, but I didn't include it in the list
12   of issues.  So essentially, my correction offsets your
13   anticipated correction.  So I think we're in the same
14   place.  Any objection or concerns --
15        MR. COOK:  No, Your Honor.
16        JUDGE SYSKA:  -- by the Agency?  Okay.  The
17   Agency has the burden of proof, as to the removal, and
18   will go first.  At the end of the hearing, both sides will
19   have 10 minutes apiece for oral closing arguments, absent
20   further order from me.  And at the end of closing
21   arguments, the record will be closed, also absent further
22   order.  Want to call your first witness?
23        MR. COOK:  Your Honor, first witness will be
24   Captain Robert Chadwick, Commandant of Midshipmen.  Do you
25   want me to go get him, Your Honor?
```

Page 6

1          JUDGE SYSKA:  That'd be fine.

2          MR. COOK:  Okay.

3          JUDGE SYSKA:  Let's go off the record.

4              (Whereupon, a brief recess was taken)

5          JUDGE SYSKA:  On the record.

6          Sir, if you'd stand and raise your right hand?

7          Whereupon,

8                      ROBERT CHADWICK,

9  having been called as a witness by and on behalf of the

10 Agency and, having been first duly sworn, was examined and

11 testified on his oath, as follows:

12         JUDGE SYSKA:  Please be seated.  And state and

13 spell your full name.

14         THE WITNESS:  My name is Robert Chadwick, C-H-A-

15 D-W-I-C-K.

16         JUDGE SYSKA:  And you're a member off the U.S.

17 Navy.  What's your rank, sir?

18         THE WITNESS:  Captain.

19         JUDGE SYSKA:  And your current posting is where?

20         THE WITNESS:  Commandant of Midshipmen, at the

21 United States Navy Academy.

22         JUDGE SYSKA:  And how long have you held that

23 position?

24         THE WITNESS:  Two years.

25         JUDGE SYSKA:  And where were you before that?

1          THE WITNESS:  I was stationed in San Diego,

2     California.

3          JUDGE SYSKA:  Okay.  Your witness, counsel.

4          MR. COOK:  Your Honor, as an administrative

5     matter, do you want me to ask questions standing or may I

6     be seated?

7          JUDGE SYSKA:  Oh, seated is fine.

8          MR. COOK:  Okay.

9          JUDGE SYSKA:  One final matter I forgot.

10    Captain, if, during the course of questioning, from either

11    Agency counsel or Appellant's counsel, you hear the word

12    objection, stop talking.  That means one of the attorneys

13    has an issue with the question, and I have to resolve it

14    one way or the other.  And then you'll be instructed to

15    answer or not answer.  Okay?

16         THE WITNESS:  I understand, Your Honor.  Thanks.

17         MR. COOK:  Thank you, Your Honor.

18                    DIRECT EXAMINATION

19    BY MR. COOK:

20      Q.  Captain Chadwick, can you please tell the Board

21    what your education is?

22      A.  Graduated from the United States Naval Academy

23    in 1991.  And since then, two postgraduate degree.  One

24    master's degree from the Naval Postgraduate School in

25    national security affairs, and a master's degree from the

1  National War College in national security strategy.

2      Q.  You're the Commandant of Midshipmen at the Naval

3  Academy.  Is there a civilian college/university

4  equivalent?

5      A.  The closest equivalent at a civilian college,

6  would be the dean of students, although it's not a perfect

7  analogy.

8      Q.  How many midshipmen as your responsible for, as

9  the Commandant, approximately?

10     A.  Approximately 4,300.

11     Q.  Now, midshipmen do not report directly to you.

12 Can you briefly describe the organizational structure of

13 the Commandant?

14     A.  Sure.  The -- I have six Battalion Officers that

15 report to me.  Battalion Officers are senior Commanders or

16 Captains.  And then under them are five companies.  And

17 each company has a Company Officer, who's a junior

18 officer, and a Senior Enlisted Leader.  That's kind of the

19 chain of command, leading down to the midshipmen.

20     Q.  Okay.  Now, while you are a senior member of the

21 leadership at the Naval Academy, do yo report to someone

22 else?

23     A.  I report to the Superintendent of the Naval

24 Academy.

25     Q.  Who is the Superintendent of the Naval Academy?

Page 9

1     A.   Vice Admiral Walter E. Carter.

2     Q.   Are you familiar with the Naval Academy's

3  mission?

4     A.   I am.

5     Q.   What is it?

6     A.   It states that the mission is to develop

7  midshipmen morally, mentally and physically.  To imbue

8  them with the highest ideals of duty, honor and loyalty.

9  And it goes on to talk about, giving them the tools for

10 further development, to assume the highest positions of

11 citizenship, command and government.

12    Q.   Okay.  To what extent does dignity and respect

13 play a role, in the training of midshipmen, as midshipmen

14 in service in the fleet?

15         JUDGE SYSKA:  Excuse me.  Mr. Cook, could you

16 keep your voice up a little bit?

17         MR. COOK:  Yes, sir.  Okay.  To what extent does

18 dignity and respect play, in the training of midshipmen in

19 service in the fleet?

20         THE WITNESS:  Certainly dignity and respect is

21 something that -- on -- when midshipmen arrive, Plebe

22 Summer, which is their initial indoctrination into the

23 Naval Academy, there are discussions about dignity and

24 respect.  How that's one of the key principals of a

25 military professional; treating everyone with dignity and

Page 10

1  respect.  And certainly that is the expectation for them,

2  throughout their time in the Academy.  And it's made clear

3  to them, that that's the expectation, as they move on to

4  become leaders in the Navy and Marine Corps, that again,

5  dignity and respect is one of those fundamental principles

6  in the military profession.

7  BY MR. COOK:

8     Q.  At the Naval Academy is that a two-way street,

9  between the leadership at the Naval Academy and the

10  midshipmen?

11     A.  Absolutely.

12     Q.  Why is it important that midshipmen learn the

13  proper superior and subordinate relationships?

14     A.  The importance of the senior and subordinate

15  relationships, it's often put in the context of what

16  they're going to be doing in the fleet, when they're

17  leading sailors and marines.  And knowing that there are

18  certain expectations of the leader, you know, and it's all

19  based on building that trust, that has to be there, based

20  on what we're going to -- as military leaders, what you

21  may be asking your subordinates to do.  You know, the two-

22  way street, and the way that again, a senior treats a

23  subordinate, helps to build that trust, that's so critical

24  to, you know, the ultimate mission.

25     Q.  Are role models a factor at the Naval Academy,

Page 11

1   and if so how?

2          MR. EHRENBERG:  Objection.  It's very vague.

3   Role models?

4          JUDGE SYSKA:  Yeah.  I'll sustain that.  A

5   little more specific, counsel.

6   BY MR. COOK:

7      Q.  What roles do the faculty and staff play at the

8   Naval Academy, in teaching midshipmen by example?

9      A.  Obviously, you talked about the mission of the

10  Naval Academy; developing midshipmen morally, mentally and

11  physically.  Every member of the Academy, military or

12  civilian, it is the expectation that they are examples of

13  the principles that we're trying to teach.  And again, all

14  based on the Navy's core values of honor, courage and

15  commitment.  But both military and civilian are expected

16  to be examples of those ideals.

17     Q.  Okay.  What guidance are midshipmen provided, on

18  the touching of other midshipmen?

19     A.  Again, there's the -- any kind of touching,

20  certainly it has to be, you know, consented between both

21  parties.  Don't get me wrong.  There are times when

22  midshipmen are instructed in different combatives, where

23  every midshipmen for instance has to box.  And that's one

24  supervised, sanctioned, and those kind of things happen.

25  But, you know, unwanted touching, unwelcome touching is

1    certainly not permitted.

2        Q.  Are you familiar with the Naval Academy's Honor

3    Concept?

4        A.  I am.

5        Q.  What is it?

6        A.  The Honor Concept is again, that all midshipmen

7    are introduced to the Honor Concept almost on day one of

8    arriving at the Academy.  The fundamentals of the Honor

9    Concept are that midshipmen do not lie, cheat or steal.

10   But it is rooted in the concept, that their integrity is

11   the key component of their character.  And obviously it's

12   their character that's going to define, and will certainly

13   contribute to their success as military leaders.

14       Q.  What happens if a midshipman falls short of the

15   Honor Concept?

16       A.  If a midshipman is accused of an honor offense,

17   there's an investigation.  If found in violation of the

18   Honor Concept, there is a variety of options.  One would

19   be a remediation process, where a midshipman, if we -- if

20   the -- if leadership feels that the midshipman can learn a

21   valuable lesson, the remediation can happen, where a

22   midshipman spends up to six months, with regular meetings

23   with a senior office, to again dive deeper into the Honor

24   Concept and the importance of it.  Certainly, as

25   midshipmen get more senior, and the expectations rise for

Page 13

 1  their performance, an honor offense can lead to separation

 2  from the Naval Academy.

 3      Q.  If a junior or a senior at the Naval Academy are

 4  separated, is there -- what financial penalty is there?

 5      A.  If -- after the beginning of their junior year,

 6  if a midshipman leaves the Naval Academy, for anything

 7  other than a medical condition, you know, in this example

 8  for an honor offense, they're -- they will have to pay the

 9  government for their time.  And it's iterated based on how

10  long they're there.  For instance, a junior would pay less

11  than a senior.  The other option, but that has to be

12  approved up through the Assistant Secretary of the Navy,

13  would be to pay back their education, through enlisted

14  service in the Navy.

15      Q.  Captain Chadwick, how do your duties and

16  responsibility differ from those of the Academic Dean and

17  Provost?

18          MR. EHRENBERG:  Objection, leading.

19          JUDGE SYSKA:  Overruled.  There's no other way

20  to ask it.

21          THE WITNESS:  Again, the -- my role, as the

22  Commandant of Midshipmen, my primary duties involve the

23  professional development, and kind of day to day

24  activities of the Brigade of Midshipmen.     The Academic

25  Dean, the faculty report to the Academic Dean, in terms of

1  their day to day activities, in instructing the

2  midshipmen.  Certainly, the Academic Dean and I work

3  together.

4       You know, we say that the three pillars, the

5  moral, mental and physical development of midshipmen, we

6  share in all of those three pillars.  And so certainly

7  there is overlap and, you know, we work together on that,

8  but obviously faculty report to the Academic Dean.  And I

9  mentioned the chain of command that reports to me.

10  BY MR. COOK:

11       Q.  Do you know the Appellant in this MSPB appeal?

12       A.  I do not know him personally.

13       Q.  Okay.  Are you aware of why we're here this

14  morning?

15       A.  Yes, I am.

16       Q.  Okay.  And what is that?

17       A.  Midshipmen have come forward, with instances of

18  inappropriate conduct in the classroom.

19       Q.  What if any role did you play, in the removal

20  action?

21       A.  I had no role in it.

22       Q.  If you had no role in it, why would the

23  Commandant of Midshipmen be concerned about the behavior

24  of a faculty member in class towards midshipmen?

25       A.  Well, I've already mentioned the role of every

Page 15

1   member of the Naval Academy staff, both military and

2   civilian, play a role in the development of our

3   midshipmen.  Certainly I have, as the Commandant of

4   Midshipmen, an obligation for the safety, and the --

5   again, the proper development of the midshipmen.  And the

6   faculty play a huge role in that.  And so certainly I

7   would have concerns, if something was not supporting that

8   in the classroom.

9       Q.  Are you familiar with the details of the charges

10  against the Appellant in this case?

11      A.  I am.

12      Q.  Did you have an opportunity to read the

13  investigation?

14      A.  I did.

15      Q.  Are there any changes that you would make, or

16  you would consider making, as the Commandant of

17  Midshipmen, in the training of midshipmen, after learning

18  of the Appellant's behavior?

19      A.  I don't think changes.  I think, just providing,

20  you know, further validation, that certainly I want

21  midshipmen to feel empowered to, you know, come forward,

22  if they feel that any member of the staff, military or

23  civilian, is acting in an inappropriate manner.

24      Q.  With almost 30 years of active duty service in

25  the Navy, three tours of command, prior to arriving at the

Page 16

1   Naval Academy, tell me Captain Chadwick, what would you

2   do, if a junior officer labeled an enlisted sailor or

3   marine, a right-wing extremist?

4       A.  Certainly, any kind of labeling like that goes

5   back to the -- you know, going against the expectation, of

6   treating subordinates with dignity and respect.  That's

7   not to say that you don't hold them to a high standard,

8   but dignity and respect has to rule the day.  And

9   certainly any kind of political labeling like that has no

10  -- certainly no place in the military.  And, you know,

11  there would be action taken, as a result of that.

12      Q.  Okay.  What about if one of your junior officers

13  had sent shirtless pictures of themselves to the junior

14  sailors or marines?

15      A.  I can say definitively, if something like that

16  happened, that that crosses the bounds of appropriate

17  behavior between a senior and a subordinate.  Could

18  certainly cross the lines of fraternization.  And in

19  situations like that, I think I can say confidently -- for

20  instance, if it was a division officer, when I had command

21  a ship, I would be removing that officer of their --

22  relieving them of their duties.

23      Q.  Captain Chadwick, having read the investigation,

24  have you formed an opinion on the Appellant's performance,

25  as a role model and mentor to midshipmen?

Page 17

1    A.  Certainly, reading the investigation and the

2  allegations in there, I do not feel that it is the example

3  of appropriate role model.  Again, I can't speak to the

4  Appellant's instruction in English, which is his

5  speciality, but I can certainly speak to my expectation,

6  of what's appropriate in the classroom, and certainly that

7  those were not appropriate.

8         MR. COOK:  No further questions, Your Honor.

9         JUDGE SYSKA:  Cross?

10        MR. EHRENBERG:  Yes, sir.  Thank you.  Sir, may

11  I approach the witness?

12        JUDGE SYSKA:  Certainly.

13                    CROSS-EXAMINATION

14  BY MR. EHRENBERG:

15    Q.  Good morning, Captain.

16    A.  Good morning.

17    Q.  My name is Jason Ehrenberg, and I represent the

18  Appellant Bruce Fleming in this matter.  And I've just

19  handed you some documents.

20        MR. EHRENBERG:  And I will represent to the

21  Court, that those are Appellant's exhibits from tab 29 of

22  the Board's file.

23        JUDGE SYSKA:  Okay.  Tab 29.  Appellant's

24  prehearing submissions.

25        MR. EHRENBERG:  And sir, I will refer you to a

Page 20

1  sorry.  I believe you said you've been serving at the

2  Naval Academy for two years?

3      A.  Two years.

4      Q.  In those two years, have you ever had occasion

5  to discuss my client, Bruce Fleming, with Vice Admiral

6  Carter?

7      A.  Yes.

8      Q.  And can you tell me generally -- I don't care

9  what was specifically said, but what was the nature of the

10  discussion?

11      A.  Generally, it was about that there was an

12  ongoing investigation, during my time as Commandant.

13      Q.  Okay.  And the superintendent shared your view,

14  that Professor Fleming's behavior was inappropriate,

15  correct?  Classroom behavior?

16      A.  We discussed again, if the allegations were

17  proven true, that yes, inappropriate.

18      Q.  Okay.  And inappropriate, based on your

19  experiences in the military, and your experience of what

20  behavior is proper or not proper in the military, is that

21  correct?

22      A.  I would say not just in the military.  Certainly

23  also not proper, in terms of the mission of the Naval

24  Academy.  Again, if you're saying that's part of the

25  military, then yes.  But there's obviously a unique

Page 21

1  situation at the Academy, in terms of the instruction, and

2  everything else that goes with that.  But yes, it is not,

3  you know, conducive to good order and discipline in the

4  military.

5      Q.  Okay.  And I believe you mentioned Professor

6  Phillips or Vice Provost Phillips.  And I believe you

7  stated he is kind of your civilian equivalent at the

8  Academy.  You'd be the dean of students, and he would be

9  more --

10      A.  Academic dean.

11      Q.  -- the academic dean.  Do you ever have occasion

12  to interact with him?

13      A.  I do.  Again, not scheduled meetings, but, you

14  know, certain events, where for instance during the

15  academic board process, at the end of each semester, we

16  work closely together.  And then, like with the

17  Superintendent, if there's specific issues that come up,

18  and at any given time, he and I could talk.

19      Q.  Okay.  Are you aware that Professor Fleming has

20  made a lot of public commentary about the Academy?

21      A.  Yes, I am.

22      Q.  Okay.  And you're aware that some of that

23  commentary was not very flattering --

24      A.  Yes, I am.

25      Q.  -- for the Academy?  I'm sorry?

Page 26

1  okay, rush it, and they -- their goal is to remove a --

2  what's called a dixie-cup, which is the type of cover that

3  they're issued when they're a plebe.  And it has to be

4  replaced by what's called a combination cover, which is

5  the kind of traditional cover of a naval officer.  And

6  they have to figure out how to do it.

7         And it's, you know, again a team.  It requires

8  great teamwork, climbing on top of each other, to scale

9  the 21 foot.  And it -- throughout history, it can take

10  anywhere from an hour, to I think the longest is over

11  three hours, to do it.  But once it's complete, then the

12  tradition says that they are plebes no more, and they are

13  no longer plebes, and are now upper class, in the Brigade

14  of Midshipmen.  So -- and it happens ever commissioning

15  week.  It happened this past Monday, with the opening of

16  this year's commissioning week.

17         MR. EHRENBERG:  Thank you.  Sir, I have a

18  demonstrative exhibit, that I'd like to show the witness,

19  if I may?  And it --

20         JUDGE SYSKA:  Is it in the record?

21         MR. EHRENBERG:  It is not in the record.

22         JUDGE SYSKA:  Okay.

23         MR. EHRENBERG:  It is -- I don't want to enter

24  in the record.  Just --

25         JUDGE SYSKA:  Okay.

1  compare this situation, to a situation in the classroom.

2  The classroom is a very different environment.  The

3  expectation is different in a classroom, in terms of

4  what's acceptable.  And certainly, you know, again, the

5  decorum and level of decorum is very different in the

6  classroom, than it is for the Herndon event.

7      Q.  But you've never been in Professor Fleming's

8  classroom, correct?

9      A.  I have not.

10     Q.  You've never observed him teach?

11     A.  I have not.

12     Q.  You've never observed his interactions with his

13  students?

14     A.  I have not.

15     Q.  And so you don't really know the context, of the

16  interactions with Professor Fleming and the students

17  generally, correct?

18     A.  Certainly.

19     Q.  Right.

20     A.  No.  And I've not been in the classroom.  I've

21  certainly seen pictures and videos, but never been in his

22  classroom.  Again, I've never met Professor Fleming

23  personally.

24     Q.  Okay.  And when you say you've seen pictures, do

25  you mean pictures that were connected to this matter?

1    A.   Yes.

2    Q.   From the emails?

3    A.   In the investigation.  Right.  And the emails.

4    Q.   Okay.  And in your view -- did you form a

5   belief, after viewing those pictures, one way or the

6   other, as to whether Professor Fleming was violating some

7   rule or a policy?

8    A.   Yes.  I felt, you know, any kind of, you know,

9   prolonged -- you know, for instance, I would feel a senior

10  subordinate massaging or anything like that, would not be

11  appropriate.  You know, a handshake or those kind of

12  things, a -- the normal kind of congratulatory gestures, I

13  think are appropriate.  But, you know, certainly prolonged

14  or certainly -- because I think the more prolonged can

15  certainly put an awkward situation for the subordinate, in

16  terms of, you know, certainly what their expectations are.

17   Q.   And when you say prolonged, can you give me an

18  estimate of how long that would be?

19   A.   Sure.  I would say more than, you know, four or

20  five seconds of -- much past that, I think could cause

21  some awkwardness and maybe discomfort, from a subordinate.

22   Q.   Sure.  I just have a few more questions.  Mr.

23  Cook asked you about the Honor Concept?

24   A.   Yes.

25   Q.   And you noted that essentially from day one, the

1  mids are taught don't lie, don't cheat, don't steal,

2  correct?

3      A.  Correct.

4      Q.  Do you -- I guess what is the emphasis?  Why is

5  there an emphasis on don't lie?  Isn't that something

6  people should know anyway?  It's not -- let me rephrase

7  it.  I'm sorry.  Not lying is not unique to the military,

8  correct?

9      A.  Absolutely not.

10      Q.  Okay.  And would you agree that most midshipmen

11  were probably instilled, during their time before the

12  Academy, with the notion that lying is wrong?

13          MR. COOK:  Objection, Your Honor.
                                    That's pure
14  speculation on the part of the witness, in what the

15  midshipmen were thinking about --

16          JUDGE SYSKA:  Well, he's asking --

17          MR. COOK:  -- or their feelings before.

18          JUDGE SYSKA:  He's asking probably.  And given

19  their academic background, I would say there might -- the

20  witness may have an answer.  Does the witness have an

21  answer?

22          THE WITNESS:  Obviously, I can't speak to how

23  every midshipman was raised, and the values they came into

24  the Academy with, but what we focus on is establishing,

25  regardless of what their values and upbringing were, that

1   they understand what the expectation is.  And you asked

2   why?  You know, why is lying important?  You're right,

3   it's not -- I agree with you; it's not unique to the

4   military, but it's fundamental to the military.  And back

5   to the integrity piece, and the building of the trust

6   between senior and subordinates.

7        MR. EHRENBERG:  Sure.  I think that's all I

8   have, sir.

9        JUDGE SYSKA:  Okay.  Redirect?

10       MR. COOK:  Yes, Your Honor.

11                  REDIRECT EXAMINATION

12  BY MR. COOK:

13       Q.  Captain Chadwick, are you familiar with the

14  specific pictures, that Professor Fleming sent to his

15  students?

16       A.  I am.

17       Q.  Can you tell me what they were?

18       A.  They were pictures of him without his shirt on,

19  and in kind of a flexing, you know, kind of pose.

20       Q.  Okay.  Were there any other pictures?

21       A.  All similar in style to that, in terms of his

22  not being fully clothed.

23       MR. COOK:  Okay.  Doing -- Your Honor, since the

24  Appellant has introduced pictures, the Agency would like

25  to show the witness pictures, that were included in the

Page 35

1  exhibit in the deposition.

2       JUDGE SYSKA:  Okay.

3  BY MR. COOK:

4      Q.  Take a look at those pictures, Captain Chadwick.

5  Do you remember ever seeing those before?

6      A.  Yes, I do.

7      MR. COOK:  Your Honor, may I retrieve that from

8  him?

9  BY MR. COOK:

10      Q.  Okay.  Where did you see them?

11      A.  In the investigation package.

12      Q.  Okay.  What are these pictures of?

13      A.  They are pictures of Professor Fleming, again in

14  -- without a shirt on --

15      Q.  Okay.

16      A.  -- and flexing.

17      Q.  Uh-huh.  Were there any swimming pictures

18  available in there?

19      A.  I did not see any.

20      Q.  Okay.  Are there any pictures of him in a

21  Speedo?

22      A.  It appears either underwear or a Speedo.

23      Q.  Now, you testified that the pictures that the

24  Appellant showed the midshipmen -- the midshipman with

25  arms around another and climbing Herndon, would you

1  classify those as good pictures?

2     A.  Yes.

3     Q.  Okay.  What kind of pictures would you describe

4  for the ones that Professor Fleming sent to his students?

5     A.  Again, because you put it in the context of

6  sending it to his students, I feel they are inappropriate

7  pictures for a faculty member, military or civilian, to be

8  sending to students.

9     Q.  You talked a little bit about touching, and

10  there are certain levels of touching that may be

11  acceptable in the class.  What I'd like you to do, if you

12  could, talk about good touching in class that may be

13  appropriate.  Not length.  Good touching, and what would

14  be bad touching.

15        MR. EHRENBERG:  I'm going to object.  Well,

16  actually I withdraw the objection.  I went down there.

17        JUDGE SYSKA:  Okay.

18        THE WITNESS:  Okay.  You know, certainly I

19  mentioned congratulatory gestures, for instance shaking of

20  the hand, commending a midshipman for whatever is worthy

21  of commendation.  Possibly, you know, a tap on the

22  shoulder saying nice job or something along those lines.

23  You know, I think that's the general -- again, the

24  touching of the midshipmen in the classroom, I think would

25  mostly be for the purpose of commending them in some way,

1   or showing appreciation.  Again, I think what I just

2   described, in terms of a handshake or hey, just a kind of

3   a tap on the shoulder saying nice job, I think is about

4   the extent of what I feel.  You know, going beyond that, I

5   think would be bordering on unnecessary and inappropriate.

6           MR. COOK:  No further questions, Your Honor.

7           JUDGE SYSKA:  Any recross?

8           MR. EHRENBERG:  No, sir.

9           JUDGE SYSKA:  Okay.  I have just a couple

10  questions for your, Captain.

11          THE WITNESS:  Yes, sir.

12          JUDGE SYSKA:  Okay.  You mentioned that if two

13  officers are speaking, a senior officer/junior officer,

14  and one calls the other a right-wing extremist, it would

15  be inappropriate.

16          THE WITNESS:  Yes, sir.

17          JUDGE SYSKA:  Okay.  I terms of context, what if

18  the two of them were joking around, and one of them says

19  oh, like -- this is an incredibly dated example, but say

20  from WWII and one says battleships are the way to go.  The

21  other prefers aircraft carriers.  And the aircraft carrier

22  aficionado says clearly you live in the dark ages.  You're

23  an expert in this.  Would joking around like that still be

24  problematic?

25          THE WITNESS:  No, sir.  And I think again, to

1  your point, it's the context, and it's the relationship

2  between the two that's important.  In terms of you said

3  contemporaries joking around with each other, again I

4  think that's different.  When you bring in a

5  senior/subordinate relationship, where those kind of

6  conversations are not expected, I think it takes on a

7  different -- to your point, the context is very different.

8      JUDGE SYSKA:  Okay.  And you mentioned again,

9  obviously the physical side of the Academy; boxing.  In

10 terms of what -- again, you also referred to you're

11 essentially training these men and women to possibly go to

12 war, on behalf of the United States.  They box, they hit

13 each other in the head and all that other stuff.  In terms

14 of getting -- having received both a snarky remark and a

15 good left hook, the second one, I -- had more of an effect

16 on me, than the first one.  So in terms of why would

17 future warriors necessarily have to be protected, from

18 snarky or insulting remarks in the classroom?

19      THE WITNESS:  Well, I think it goes to again,

20 the expectation of a military professional.  And the

21 dignity and respect.  You know, there's a difference

22 between, you know, you can be training someone with

23 dignity and respect, hold them to a high standard.  You

24 know, push them hard to perform.  But do that in a way

25 that is still within the bounds of dignity and respect.

Page 39

1          And certainly when, for the midshipmen, who we

2     are developing, you know, it's a developmental process.

3     It's important that they understand that you can be a

4     demanding leader, but underpinning it all has to be

5     dignity and respect.  And as the midshipmen are -- you

6     know, that's why we need the staff in the military to be

7     those -- that example of dignity and respect, you know, as

8     they're going through this developmental process, because,

9     you know, again, it's -- I think it's the whole concept

10    of, you know, when I talked about leadership, it's about

11    humility.  And you can be a humble and a bold leader, all

12    at the same time, but it has to be the concept I am here

13    for them kind of thing.  So it's -- but again, dignity and

14    respect underpins it all.

15          JUDGE SYSKA:  So essentially you wouldn't want

16    an officer ridiculing their underlings unnecessarily?

17          THE WITNESS:  Absolutely not.

18          JUDGE SYSKA:  Okay.  Any questions based on my

19    questions?

20          MR. EHRENBERG:  Yeah.  Just one.

21                    RECROSS-EXAMINATION

22    BY MR. EHRENBERG:

23     Q.  You read the email that -- or excuse me.  Are

24    you aware that one of the issues in this matter is whether

25    or not -- let me rephrase.  We're talking about military

Page 40

1   concepts, correct, when we're talking about the respect

2   and the relationship, between superior officers and

3   subordinates, is that correct?

4       A.  We're talking about the development of military

5   leaders, yes.

6           MR. EHRENBERG:  Right.  And I'll leave it there.

7   We're done, Your Honor.

8           JUDGE SYSKA:  Okay.  Anything --

9           MR. COOK:  Nothing --

10          JUDGE SYSKA:  -- from the Agency?

11          MR. COOK:  -- Your Honor.  Nothing.

12          JUDGE SYSKA:  Captain, thank you very much for

13  your testimony today.  Because --

14          THE WITNESS:  Thank you, Your Honor.

15          JUDGE SYSKA:  -- the hearing is ongoing, don't

16  discuss your testimony with anyone.  And you're excused.

17          THE WITNESS:  Thank you, sir.

18          JUDGE SYSKA:  Thank you very much.  And we'll go

19  off the record for the next witness.

20              (Whereupon, a brief recess was taken)

21          JUDGE SYSKA:  On the record.

22          Sir, if you'll raise your right hand, please?

23          Whereupon,

24                      KEITH LINDLER,

25  having been called as a witness by and on behalf of the

Page 41

1  Agency and, having been first duly sworn, was examined and

2  testified on his oath, as follows:

3          JUDGE SYSKA:  Please be seated.  And state and

4  spell your full name.

5          THE WITNESS:  Keith Lindler, L-I-N-D-L-E-R.

6          JUDGE SYSKA:  And by whom are you currently

7  employed now?

8          THE WITNESS:  The U.S. Naval Academy.

9          JUDGE SYSKA:  And what's your position there?

10          THE WITNESS:  I'm a professor.

11          JUDGE SYSKA:  Do you have any management or

12  administrative roles, in addition to teaching?

13          THE WITNESS:  I do.  I am the Chair of our

14  department committee, that oversees the junior faculty,

15  mentors the junior faculty, on their way to promotion and

16  tenure.  In the past, I was the Department Chair.

17          JUDGE SYSKA:  Okay.  And how long have you been

18  at the Academy?

19          THE WITNESS:  35 years.

20          JUDGE SYSKA:  Your witness, counsel.

21          MR. COOK:  Thank you, Your Honor.

22                   DIRECT EXAMINATION

23  BY MR. COOK:

24     Q.  Professor Lindler, are you familiar with the

25  Naval Academy mission?

Page 42

1          A.   Yes, I am.

2          Q.   What is that mission?

3          A.   Basically, it is to prepare midshipmen mentally,

4    physically and morally, to be good officers in the naval

5    service.

6          Q.   What do you see as your role, in supporting the

7    mission of the Naval Academy?

8          A.   We are there to obviously help them

9    academically, but more than that, we're taught to be good

10   roles models for the midshipmen, to set a good example, so

11   that they will be good officers.  So we are part of the

12   moral development also.  For example, we're encouraged,

13   before class even starts, if we see something that's not

14   quite right, we are to intervene if someone is, you know,

15   picking on another person unwisely or using unwise

16   language.  Even those class hasn't started, we are asked

17   to step in, as a role model.

18         Q.   Okay.  How does dignity and respect figure into

19   your role model, and your mentorship at the Naval Academy?

20         A.   I think it's a great deal.  I think that, you

21   know, I set a good example.  In my class, I've heard

22   profanity maybe once in my 35 years.  And at that time the

23   midshipman was kind of embarrassed that they let it slip

24   out, because I don't use profanity.  So they don't feel

25   comfortable using profanity themselves.

Page 43

1    Q.  Can you talk a little bit about the asymmetrical

2  relationship, between the facility and midshipmen?

3    A.  Well, again, I'm there as their role model.

4  They see me there as their leader.  They're -- you know,

5  feel subordinate to me.

6         They stand at attention, when I come into class,

7  which took me aback my first time there.  I was not

8  prepared for that.  They didn't tell me that would happen.

9  But they see me as their role model, their leader.  They,

10  you know, respect me.  I mean I respect them too, but they

11  see me as their leader.

12    Q.  Okay.  Let's talk a little bit more, about your

13  role as a mentor to the junior faculty.  How long have you

14  been --

15    A.  Okay.  Go ahead.

16    Q.  How long have you been doing it?

17    A.  I have been doing that probably for about 20

18  years.  I've been the Chair of that committee for about 10

19  years.  And basically, each year we meet with all junior

20  faculty, both assistant and associate professors in our

21  department, that are seeking a promotion either to -- from

22  assistant to associate, or from associate to full.

23         And each year, starting from their very first

24  year, they develop their candidate worksheet, that they

25  will ultimately use in their promotion and tenure package.

1   And we review that worksheet.  We meet with them once a

2   year, to go over their worksheet with them, and let them

3   know whether or not they're on the right track to

4   promotion.

5       Q.  Okay.  What would you advise these junior

6   faculty, about the touching of students?

7       A.  I think it goes without saying, that that would

8   be -- outside of a handshake, that would not be

9   encouraged.

10      Q.  Do you ever talk about it with the junior

11  faculty?

12      A.  I can't recall it really coming up.

13      Q.  What about your view, with the junior faculty,

14  on sharing pictures of a faculty member with students?

15      A.  I would say there's no policy against it, but

16  common sense dictates that you be careful what you send.

17  Especially, it's a government system, be careful with what

18  you send.

19      Q.  Okay.  Common sense is -- could you explain a

20  little bit more?  Common sense, what would be good

21  pictures and what would be bad?  Maybe talk about the

22  extremes?

23      A.  You know, if you came across a photograph, that

24  reinforced your lecture, and it was, you know, what you

25  were studying.  You know, you were studying structures or

1  whatever, and you came across a building that really

2  brought home, what you were trying to say in class, I

3  would consider that would be a good picture.

4      Q.  Okay.  What about personal pictures of the

5  individual?

6      A.  I would discourage it.

7      Q.  Okay.  And why would you discourage it?

8      A.  Because it could be misinterpreted.

9      Q.  Misinterpreted in what way?

10     A.  If you sent an unsolicited photo of yourself,

11  maybe a midshipman might think that you were trying to

12  come onto them.

13     Q.  We're here this morning to talk about your role,

14  as an investigation of midshipmen complaints, against the

15  Appellant.  You're one of many faculty at the Naval

16  Academy.  And how did you come to be a member of this

17  panel?

18     A.  I believe the faculty center President was

19  looking for a panel.  Was instructed to form a panel.  And

20  I believe she asked me, through my Department Chair, if

21  I'd be willing to serve on the committee.

22        And it's not something I look forward to, but

23  part of our job, as a faculty member, is service to the

24  Academy.  So at the time, my service role was not that

25  great, that I couldn't take something else on.  So I did

Page 46

1  say yes.

2      Q.  How many other panel members were there?

3      A.  There were two other panel members.  And then a

4  representative from the -- non-voting member from the

5  JAG's office was there.

6      Q.  You -- could you speak up who the fourth member

7  was?

8      A.  Paige Ormiston, from your office.

9      Q.  Is she military or civilian?

10     A.  She's military.

11     Q.  Okay.  Does she have a speciality?

12     A.  I assume that it's law, but I do not know that

13  for a fact.

14     Q.  Okay.

15     A.  She was there to guide us, to make sure that,

16  you know, we stayed on track.  And if we had any legal

17  issues, we were to bring them to her.

18     Q.  When the panel was formed, did you get any

19  specific guidance from anyone, on a outcome, on how to do

20  it?

21     A.  We had a kick off meeting with the division

22  director, from the division that Professor Fleming was a

23  member of.  And he basically gave us our charge, as to

24  what we were to do.  He introduced everybody to each

25  other, and said, you know, exactly what we were to do, as

Page 47

1   far as this investigation was concerned.  And then that

2   was it.  And he appointed me as Chair of the committee.

3       Q.  You mentioned that he told you -- he gave you

4   your charge?

5       A.  Right.

6       Q.  Can you explain that a little bit more; charge?

7   What was in the charge?

8       A.  Basically, he gave us a notebook that contained

9   letters of complaint from several midshipmen, and told us

10  we were basically to investigate those complaints, but not

11  to form an opinion.  Just investigate what we thought of

12  the complaints.  The truthfulness of the complaints.  The

13  seriousness of the complaints.  And to give a memo of

14  report at the end.

15      Q.  How did you develop your questions?

16          JUDGE SYSKA:  Allow me to get a clarification.

17  You said, if I'm understanding, investigate the charges,

18  but don't form an opinion?

19          THE WITNESS:  He did not -- they did not want us

20  to state whether or not we think Professor Fleming should

21  be separated.  They --

22          JUDGE SYSKA:  Okay.  So no disciplinary

23  recommendation?

24          THE WITNESS:  Right.

25          JUDGE SYSKA:  Okay.  Thank you.

Page 48

1        MR. COOK:  Okay.  The question I'm going to have

2   for you, Professor Lindler, is how did you develop the

3   questions for your investigation?

4        THE WITNESS:  We read all the complaints, and

5   basically jotted down questions, that we thought would

6   keep the midshipmen that we were questioning to those

7   complaints.  We didn't want to just bring them in here,

8   and, you know, let them ramble for an hour, and not really

9   address those complaints.  So we wrote down questions,

10  that we thought addressed those complaints, so that we

11  could keep the interviews to a reasonable length.

12  BY MR. COOK:

13     Q.  How did you identify who you were going to

14  interview?

15     A.  At first, we decided to interview anyone in his

16  classes by volunteer.  We put -- we sent an email to his

17  sections only, stating that there complaints against him,

18  and if they would like to testify, either in favor of him

19  or against him?  Either way, if they would volunteer and

20  come through, we would listen to them.  So we set up

21  available time slots, and the midshipmen signed up for

22  those time slots, and we interviewed those.

23        After we interviewed all of those that came

24  forth voluntarily, we realized that perhaps the process

25  was not fair, especially in his behalf, because the

1  students are more likely to come forward with a complaint

2  than praise.  So we thought, in fairness, we should

3  interview every single one of the students.  And we did

4  interview every student in his fall classes, not his

5  spring classes.  He'd only met with the spring classes for

6  about a month.

7      Q.  And how did you record the results of the

8  interview with the students?

9      A.  Captain McGrath, who was on the committee, and

10 one of the other senior professors who was on the

11 committee, hand wrote their answers, as best he could,

12 while we were -- while I was asking the questions and they

13 were answering.  And at the end of the questioning, he met

14 with them outside the committee room, and gave them a

15 chance to read their responses, and initial that what he

16 had written was accurate.

17     Q.  How did you incorporate the results of the

18 interview into your report?

19     A.  Well, as an appendices, every single one of

20 those interviews were added.  So each of those do appear

21 in the report itself.

22     Q.  Did you have any opportunity --

23         JUDGE SYSKA:  Can you keep your voice up a

24 little, professor.

25         THE WITNESS:  Excuse me?

Page 50

```
 1          JUDGE SYSKA:  Can you keep your voice up a
 2   little, professor?
 3          THE WITNESS:  Sure.
 4          JUDGE SYSKA:  Thank you.
 5          MR. COOK:  Did you have an opportunity to
 6   interview the Appellant in this case?
 7          THE WITNESS:  I offered him an opportunity twice
 8   via email.
 9   BY MR. COOK:
10      Q.  Okay.  Let's talk about the first time.  What
11   happened?
12      A.  The first time I simply stated that there were
13   charges against him, and I had interviewed his students,
14   and wanted to give him a chance to speak on his behalf,
15   but he declined.  And if I recall, he said something to
16   the effect that it's not fair that you're asking me to
17   come in, when I don't even know what the charges are.
18      Q.  How did he respond to you?
19      A.  Via email.
20      Q.  Okay.  Now, this email that he responded, what
21   was in that email, in response to your first request for
22   an interview?  What did he tell you?
23      A.  I'm not sure if I --
24      Q.  Okay.  Did he respond to your first request for
25   an interview?
```

Page 51

1        A.  I believe he did, or perhaps that was the one he

2   sent an email to all faculty.  My memory is not quite

3   clear on that right now.

4        Q.  Okay.  If -- is there anything that would

5   refresh your recollection?

6        A.  If I could see that email.

7             MR. COOK:  Your Honor, this is tab 8, the Board

8   tab 8.  And the numbering is difficult to see, but it

9   looks like it's 130 of 162.  And it's an email from

10  Professor Fleming to faculty list.  May I approach the

11  witness with this --

12             JUDGE SYSKA:  Certainly.

13             MR. COOK:  -- Your Honor?

14  BY MR. COOK:

15       Q.  Please take a moment, Professor Lindler, and

16  take a look at that, and see if that refreshes your

17  recollection of the response.

18       A.  Okay.  Yeah.  Now I do remember.

19       Q.  Okay.

20       A.  He --

21       Q.  If you'd just hold on for a second?

22             MR. COOK:  Your Honor, with your permission --

23             JUDGE SYSKA:  Sure.

24             MR. COOK:  -- retrieve it?  Now, let me ask the

25  question again, Professor Lindler.  There was a response

Page 52

1   to your request to the Appellant for an interview.  What

2   was that response?

3        THE WITNESS:  He essentially sent an email to

4   all faculty at the U.S. Naval Academy.  What you had just

5   shown me was quite a long-winded response.  And it  seemed

6   to be more about his previous case, and thinking that I

7   was trying to dig up stuff from the previous case, which I

8   barely knew anything about, and certainly wasn't digging

9   up anything from the previous case.  And that email was

10  actually recalled.  The Naval Academy sent out a notice to

11  recall that email, because he had put in private

12  information of an existing midshipman, that should have

13  been sent out to everyone.

14  BY MR. COOK:

15     Q.  Let me slow this down a little bit, Professor.

16  That email identified a specific midshipman?

17     A.  Correct.

18     Q.  What was that midshipman's name?  Do you recall?

19     A.  I do not.  I do remember that it was an Asian

20  midshipman.  And because he thought that the current

21  complaint, by an Asian midshipman, was related, and I

22  didn't even know about the prior email, or the prior

23  complaint from an Asian midshipman at all --

24     Q.  And --

25     A.  -- until he brought it up.

Appx926

Page 53

1    Q.  You mentioned that that email was recalled.  Why

2 was it recalled?

3    A.  He had information about that midshipman, I

4 believe the SAT scores and grades of that midshipman in

5 the email, and that's private information.

6    Q.  Who received that email at the Naval Academy?

7    A.  All faculty.

8    Q.  So after that first email was sent out by the

9 Appellant, what did you do after that?

10   A.  It -- we, as faculty, received an email fairly

11 soon after that, asking us to delete that email.  And I

12 was quite torn, because normally when I get a request like

13 that, I delete the email.  But then I realized I'm in

14 charge of a committee, that's supposed to be investigating

15 this type of stuff.  So I figured it was my duty, as part

16 of the committee, to actually read the email, find out why

17 it was being recalled.

18   Q.  Okay.  Now, after that first email, and the --

19 and then it was recalled, did you have an opportunity to

20 reengage with the Appellant --

21   A.  I did.

22   Q.  -- at any time?  Okay.  What happened?

23   A.  I sent him a second request.  And this time I

24 listed out the complaints against him.  So we did, as a

25 committee, agree that it really wasn't fair, to bring him

Page 54

1  in, without letting him know what the charges were.  So we

2  sent out a second request to see him.  We offered that he

3  could feel free to bring his counsel with him, but that it

4  was voluntary on his part, whether he wanted to talk to

5  the committee.

6       Q.  Okay.  What was his response to your second

7  interview request?

8       A.  He chose not to come in person, but he sent, via

9  email, a reply to each of the allegations against him.

10      Q.  Who did he send this email to?

11      A.  I believe that was just to me, and I think he

12  CC'ed his counsel.

13      Q.  What did you do with this email, when you got

14  it?

15      A.  I presented it to the committee, and --

16      Q.  Uh-huh.

17      A.  -- we decided that since he would not come in,

18  we would just treat that as his answers to the complaints

19  against him.

20      A.  Okay.  Let's talk a little bit more about the

21  process now.  There was an allegation by two midshipmen,

22  that the Appellant referred to them as right-wing

23  extremists, after reading their works on a military -- on

24  a writing assignment.  What was Professor Fleming's

25  response to that allegation?

1    A.  He denied that he referred to anyone as right-

2  wing extremists.

3    Q.  What did your investigation find?

4    A.  The midshipmen complaining actually provided the

5  email, where it was clear in the email, that he did refer

6  to them as white ring -- right-wing extremists.

7    Q.  You've been at the Naval Academy for almost --

8  for some 35 years.  Have you ever heard of another faculty

9  member labeling a midshipman like that?

10    A.  No.

11    Q.  Let's talk about the pictures, that the

12  Appellant sent to midshipmen.  What was Professor

13  Fleming's response to that allegation?

14    A.  He seemed again to think that I was dwelling on

15  his past case, with the Academy.  And he indicated that he

16  had -- that the photograph that I was referring to, was

17  more than two years old, and that it was already

18  litigated, and that he'd already agreed with his

19  Department Chair not to do it again, and that it didn't

20  happen after those two years or two years ago.  More

21  recently than two years.

22    Q.  Okay.  What did your investigation find?

23    A.  We found numerous photos, shirtless photos, that

24  were -- midshipmen submitted to me, that showed shirtless

25  photos, that Professor Fleming had sent to him as recently

Page 56

1  as a year ago.

2      Q.  Do you recall what those pictures were

3  specifically of?

4      A.  One of them was him flexing his arm.  He was

5  shirtless and he was flexing his arm.  It was kind of like

6  just a little bit more than half of his body upwards.  And

7  the other one was him in a Speedo bathing suit, that went

8  all the way down to perhaps his thighs.

9      Q.  Were there any other shirtless pictures in

10  there?

11      A.  There was one photo sent, that was basically

12  just like zoomed in on this portion of his body.

13      Q.  The court reporter can't record that.  Can you

14  point to --

15      A.  Oh, it was --

16      Q.  Describe it --

17      A.  It was just basically a photo, that showed his

18  shoulder and bicep.

19      Q.  What about the allegation that he touched

20  students on their neck, shoulders and back in class, and

21  without their consent?  What was his response?

22      A.  His response went along the lines that all I've

23  ever done was hug a mid, and that I can read body

24  language.  And, you know, I can tell when it's a mutual

25  hug.  And that I've never hugged plebes.

1    Q.  Do you recall his opening response, in that

2  email, to this allegation?

3    A.  I do not.

4        MR. COOK:  Your Honor, if I may approach the --

5

6        JUDGE SYSKA:  Certainly.

7        MR. COOK:  -- witness again with the email?

8  It's Board tab 8, and it begins on page 123.  It's an

9  email from Professor Fleming to Professor Lindler.  It

10  starts on page 123.

11  BY MR. COOK:

12    Q.  Now, you've already looked at this again, but if

13  you would just look at the section that talks about the

14  touching of students?  I think the question of touching

15  the students is right at the bottom of one page, and then

16  it circles up to the next.

17        MR. COOK:  If I may, I could probably point out,

18  Your Honor?

19        THE WITNESS:  Okay.  Sure.

20        MR. COOK:  Okay.  It's on -- the number at the

21  bottom, that I can see, is 218 (sic).  And it says "you

22  touch your students on the neck, shoulders and back in

23  classes, without consent."  So it's 228.  So if you focus

24  on 228 and 229, to refresh your memory?

25        THE WITNESS:  Okay.

Page 58

1    BY MR. COOK:

2       Q.  And then when you're finished, let me know, and

3    I'll retrieve that from you.

4             (Whereupon, a brief recess was taken)

5             JUDGE SYSKA:  On the record.

6             Okay.  We're back on.

7             MR. COOK:  Professor Lindler, having looked at

8    this correspondence, that Professor Fleming sent to you,

9    do you recall what his initial reaction was, to the

10   allegation?

11            THE WITNESS:  He said that was total bullshit.

12   That he does not do that, as far as touching necks, and

13   back and shoulders.  That he can read body language.  And

14   he knew when a midshipman wanted a hug.  And that he would

15   hung them, only when it was consensual.  And that he would

16   never hug a plebe.

17   BY MR. COOK:

18      Q.  What did your investigation find?

19      A.  We found one midshipman -- actually, a classmate

20   of his brought it to our attention, that there was a

21   midshipman that he -- and rub his back, without the

22   midshipman's consent.  And so I did send an email to the

23   midshipman, that was brought up in the investigation.  And

24   he did reply to my email, that there was a time when

25   Professor Fleming sat next to him, while class was being

Page 59

1  going on, and rubbed his back for a period that he thought

2  was about up to 15 seconds.  And that he believed it

3  happened no more than twice.

4      Q.  You recall that midshipman's name?

5      A.  Buckley comes to mind, but I don't know if

6  that's him for sure.

7      Q.  That's fine.  -- the response that there were no

8  plebe hugs?

9      A.  Numerous plebes said that he would hug them.

10     Q.  Let's turn to the next allegation, where he

11  displayed photographs of his son's date, and made -- her,

12  her clothing and her mother in class.  What was Professor

13  Fleming's response to that allegation?

14     A.  He did not deny that.  He did say that occurred.

15  That he has absolute right to bring his kids social life

16  into the classroom.  And he referred to the date -- a 15

17  year old date as scantily dressed, and said something to

18  the effect that the mother wasn't much.

19     Q.  What did -- let me move on to the next one then.

20  The mispronunciation of an Asian student's name multiple

21  times, and spoke derogatorily back to the midshipman, when

22  the midshipman tried to correct him.  What was Professor

23  Fleming's response?

24     A.  The complaint said that he mispronounced a name,

25  which we all do.  I think the midshipman's complaint was

1  more along the lines of how he handled it. He did it on

2  multiple times, and it was always similar names to his

3  own, even though they wear name tags, so it's easy to

4  correct yourself.  But the midshipman said that he told

5  him one time just to "fuck off".

6      Q.  Could you say that again?  I didn't hear you.

7      A.  The midshipman said that Professor Fleming's

8  response one time was to "fuck off".  And Professor

9  Fleming's response to that allegation was "I never said

10  fuck you".  So that's kind of playing with words, because

11  that --

12      Q.  What was the panel's finding, on this allegation

13  by the Asian-American midshipman?

14      A.  We asked each and every student in his class

15  about the incident, and to be honest with you, none of

16  them recalled it.

17      Q.  Uh-huh.

18      A.  But we also interviewed the midshipman in

19  question, and he seemed very truthful about it, and very

20  somewhat upset he was being singled out that way.  And now

21  to try to put this in perspective, I think that what

22  happens is Professor Fleming's class has so much foul

23  language in it, it was directed to you and you didn't

24  remember it.  So I really think it happened, but we did

25  not find any other witness to back it up.

Page 61

1      Q.  Do you recall what the midshipman's name was?

2      A.  I believe it was Jin.

3      Q.  Okay.  Do you recall the mispronunciations that

4   Professor Fleming allegedly --

5      A.  I think they were like --

6      Q.  -- did?

7      A.  -- Lin, Kim, Sung.  All other Asian names, that

8   could almost be close to his.

9      Q.  Now, you've got the midshipmen interviews,

10  you've got Professor Fleming's response.  What did the

11  committee do then, or the panel?

12     A.  We basically wrote it to the effect that we did

13  believe the midshipmen, but there was no collaborating

14  evidence.

15     Q.  Okay.  Once you had all the -- your report?

16     A.  We actually did -- between the three of us, we

17  did read up various complaints, and we reviewed our notes

18  and wrote up the report.  State what the complaint was,

19  state was Professor Fleming's response was, and state

20  various midshipmen's responses, that address that

21  complaint.  And then we wrote down what we felt as a

22  committee.  All of those together.

23     Q.  Okay.  Who, other than you committee,

24  participated in the writing of that report?

25     A.  No one.

Page 62

1      Q.  Who did you deliver that report to?

2      A.  Colonel Aytes, who was the Division Director.

3      Q.  Professor Lindler, with almost 40 years of

4  service at the Naval Academy, and as a member of the

5  faculty, have you formed an opinion on this investigation

6  in the behavior of a colleague?

7      A.  I have.

8      Q.  What is that opinion?

9      A.  Okay.  I was very torn -- interviews of his

10 students, Professor Fleming clearly is a good professor,

11 as far as his teaching ability.  He -- by more than half,

12 he was well-liked.  So he is clearly a good college

13 teacher, but his behavior is so far out of the norms, that

14 I don't think that -- I was kind of glad, that we were not

15 asked to form an opinion, but, you know, one does come to

16 us.  And I don't think that he belongs, with his behavior.

17          MR. COOK:  No further questions from the Agency,

18 Your Honor.

19          JUDGE SYSKA:  Cross?

20          MR. EHRENBERG:  Yes, sir.

21                    CROSS-EXAMINATION

22 BY MR. EHRENBERG:

23     Q.  Good morning, Professor.

24     A.  Good morning.

25     Q.  My name is Jason Ehrenberg, and I represent

Page 63

1  Professor Fleming in this matter.  I'm just going to ask

2  you a few questions about your report, and then some

3  follow up, for some of the things that Mr. Cook asked you.

4  You never -- Professor Fleming's classroom, when he's

5  teaching, correct?

6      A.  That's correct.

7      Q.  And you never reviewed his annual reviews?

8      A.  I reviewed his student opinion forms, but not

9  anything that his Chair would have written.

10     Q.  Okay.  Now, in your report, you note that you

11 looked -- that could readily be collected, is that right?

12     A.  I'm not sure.  For example, I did not look at

13 the case from two years prior.  I guess I could have

14 looked at that, but I thought that would be unfair to him

15 to bring it up.  But I mean we interviewed each and every

16 mid.  And we did review each and every student opinion

17 form from that semester.

18     Q.  But you never looked at any opinion forms or

19 evaluations from the English Department, correct?

20     A.  I do not believe we did, no.

21     Q.  Okay.  So you did not have occasion to know

22 then, that some of these issues are addressed in Professor

23 Fleming's evaluations?

24     A.  Well, outside of Professor Fleming's own words

25 to -- but like I say, he did bring up in the email --

Page 64

1  actually, in the email to the faculty, about the case two

2  years ago.

3      Q.  I'm not asking about the case two years ago.

4  I'm asking if -- why you did not look at English

5  Department evaluations, of Professor Fleming's

6  performance?

7      A.  I don't think I would find -- the students'

8  complaint was not to the Department Chair.  So all the

9  students' complaint and those reports.  I would -- all I

10 would find would be the Department Chair's opinion.

11     Q.  Exactly.  And the department's view of Professor

12 Fleming, as a classroom teacher, correct?

13     A.  I think he's a great classroom teacher.  So I'm

14 not sure if the Department Chair affirming that to me

15 would make any difference in my report.

16     Q.  One of the questions you -- that was listed on

17 the form for the midshipmen questions you asked, was

18 whether Professor Fleming deviated from coursework or the

19 syllabus?

20     A.  Correct.

21     Q.  Okay.  And you found, from some of the

22 interviews, that Professor Fleming did sometimes, in some

23 students' minds, deviate a little, correct?

24     A.  Correct.

25     Q.  But would you agree that it's found, that most

Page 65

1    of the midshipmen found that these deviations sometimes

2    helped, to prepare them to be future officers?

3        A.  On occasion he was giving them good advice.

4    That's truthful.  Sure.

5        Q.  Okay.  Now, you mentioned complaints that you

6    received.  Were they complaints or how did -- Mr. Cook was

7    asking you about how you came to be involved in the

8    investigation.  What do you know, if anything, about how

9    the investigation became -- came to be?

10       A.  My understanding is Midshipman DeSantis sent a

11   letter probably to the Dean, or Vice Academic Dean, and

12   making a rather lengthy complaint, is the best way I would

13   describe it.

14       Q.  And that was in January of 2018, correct?

15       A.  Correct.

16       Q.  Okay.  And so that would be the semester

17   following Midshipman DeSantis' time in Professor Fleming's

18   class?

19       A.  That's correct.

20       Q.  Okay.  And so your understanding is that

21   Midshipman DeSantis lodged a complaint, a written

22   complaint, and that --

23       A.  I believe approximately five other students

24   followed that, with small complaints of their own.  And we

25   always guessed it was perhaps at Midshipman DeSantis'

Page 66

1    encouragement, that he said hey, I'm putting my neck on

2    the line and making a complaint.  You've mentioned prior

3    problems yourself.  And I believe he encouraged them to

4    lodge a complaint also.

5        Q.  Okay.  And then you -- packet?  Or not a packet.

6    You received these written complaints, is that right?

7        A.  It was basically a binder, that had the written

8    complaints in them.  Also had the pertinent Naval Academy

9    instructions, as far as behavior of faculty.

10       Q.  Okay.  Can you tell me what those instructions

11   were?

12       A.  The instructions to us as the committee?

13       Q.  No, no.  You said the instruction, as to faculty

14   behavior.

15       A.  The pertinent university -- what is considered

16   appropriate behavior for a faculty member.

17       Q.  Right.  And I'm asking what those are?

18       A.  I cannot -- I could not list them out, without

19   reading them, no.

20       Q.  Okay.  Do you know generally what they are?

21       A.  Most of them are common sense.  That's why I

22   can't recall them.  Just they make -- they're just common

23   sense.

24       Q.  Okay.  And are there specific directives in the

25   policy, as to what behavior is appropriate and what

Page 67

1  behavior is inappropriate?

2      A.  I don't know if it gets into detail like that,

3  no.

4      Q.  Okay.

5      A.  I don't believe it does.  Again, common sense

6  dictates.  It can't list everything, that you should do in

7  class.

8      Q.  Right.  Do they list anything that you shouldn't

9  do in a class?

10     A.  I can't recall.

11     Q.  Okay.  Would it be fair to say that you did not

12  have a lot of cause, to consider the relevant policy,

13  prior to serving on this committee?

14     A.  I know we read it at the time, and before we

15  invited our first -- I don't recall it's relevance.  You

16  know, again, if I recall it was mostly common sense type

17  things, of what you should and should not do.  But, you

18  know, it did not weigh heavily on the committee.

19     Q.  Okay.

20     A.  We were basically charged with finding out

21  whether these complaints were valid.

22     Q.  And you say these complaints, meaning these

23  letters that you have received with Santis (sic) -- with

24  Midshipman DeSantis, which was somewhat lengthy?

25     A.  Correct.

Page 68

1    Q.  And then shorter letters from you said --

2    A.  I believe about five others

3    Q.  Five others, that you said he probably --

4    A.  Encouraged.

5    Q.  -- encouraged?

6    A.  Let them know that he had sent the letter

7  himself.  That was my guess.  I don't know if I knew that

8  for a fact.

9    Q.  Okay.  Now -- profanity, and how you never have

10  cause to use profanity in your classroom.  I don't believe

11  I heard what department you're in?

12    A.  Mechanical Engineering.

13    Q.  Mechanical Engineering.  Other than frustration,

14  there's probably not a lot of cause for profanity in your

15  field?

16    A.  I would --  I guess that's fair to say.

17    Q.  And the -- you say you're in the Mechanical

18  Engineering Department.  What specifically do you teach?

19    A.  I teach energy-related courses.  I teach

20  Statics, Dynamics, Thermodynamics, Heat Transfer.  I have

21  an elective in Solar Energy.

22    Q.  And so your classes, are those -- generally, the

23  engineering classes, are those required of all midshipmen?

24    A.  The courses that I currently teach are for --

25  generally for engineering majors only.  In the past, I

Page 69

1    have taught what was formerly EN300, is now EM300, which

2    is Thermodynamics for the non-engineers.

3        Q.  Okay.  But you've never taught English, correct?

4        A.  English course.  I've taught English majors

5    before.

6        Q.  Okay.  And you said earlier, you've never been

7    in Professor Fleming's classroom, correct?

8        A.  That's correct.

9        Q.  Have you ever read any of his books?

10       A.  I have not.

11       Q.  Okay.  Is profanity prohibited at the Academy?

12       A.  Not that I know of.

13       Q.  And to be clear, midshipmen, when they come in,

14   as -- generally the same age as freshmen in non-military

15   colleges?

16       A.  There are exceptions.  There are quite a few,

17   that will be prior enlisted.  The go to the fleet first,

18   as an enlisted sailor, and decide that hey, I wouldn't

19   mind being an officer.  So they -- there are some 22 year

20   old.  And I think the cut off is around 24, when they can

21   come as a plebe.

22       Q.  Okay.  But generally the range is about 17 or 18

23   to 22?

24       A.  Uh-huh.

25       Q.  Okay.  Do you think -- you mentioned -- I

1  believe you mentioned that your belief or feeling, that

2  professors at the Academy should be role models?

3       A.  Correct.

4       Q.  And that -- can you tell me a little of what you

5  mean by that?  What you mean by we should be roles models?

6       A.  We should stay as a professor-student

7  relationship.  We shouldn't try to pretend we're one of

8  the gang, and, you know, send, for example, emails that

9  would be somewhat inappropriate for a superior to send to

10  a subordinate.

11      Q.  Okay.  Are you familiar with the Uniform Code of

12  Military Justice generally?

13      A.  Not really.

14      Q.  Okay.  Do you know what it is?

15      A.  I've heard of it.

16      Q.  Okay.  Does the Uniform Code of Military Justice

17      apply to you, as a professor at the Academy?

18      A.  I do not know.

19      Q.  You do not.  Okay.

20          MR. EHRENBERG:  Sir, if I may approach?

21          JUDGE SYSKA:  Certainly.

22          MR. EHRENBERG:  Sir, I'm handing you -- haven't

23  yet --

24          THE WITNESS:  Okay.

25          MR. EHRENBERG:  -- but I'm -- for the record, I'm

1  handing a copy of tab 7 to the witness.

2  BY MR. EHRENBERG:

3      Q.  Sir, if you could turn to page 97.  It's going

4  to be hard to find, but on the bottom right, 97 of 155.

5  I'm sorry that's --

6      A.  I see pages out of 191.

7          JUDGE SYSKA:  Yeah.  I have 191 in that tab

8  also.

9  BY MR. EHRENBERG:

10     Q.  I might have given you the wrong one.

11     A.  Yeah.  One -- 97 of 191 is the start of the

12  report.

13     Q.  Yes.  That's what I'm referring you to.

14     A.  Okay.  All right.

15     Q.  Can you remind me, when did you and the rest of

16  the committee members get your charge to your

17  investigation?

18     A.  I'm going to guess that it was February of 2018.

19     Q.  Okay.  And when did your -- when did the

20  committee's investigation end?

21     A.  The report was actually -- I guess we probably

22  had interviewed just about everyone by April 30th, but the

23  report was written in early May and submitted on May 18th.

24     Q.  Okay.  Do you know, during that time period,

25  whether Professor Fleming was permitted to teach?

1    A.  He was not.

2    Q.  He was suspended, right?

3    A.  That's correct.

4    Q.  And he was suspended for the entire semester,

5    correct?

6    A.  Correct.

7    Q.  And then he was suspended through the summer,

8    correct?

9    A.  That's my understanding.

10    Q.  And then he was fired at the beginning of the

11    next school year, correct?

12    A.  I believe that's correct.

13    Q.  Are you aware that Professor Fleming had just

14    had a heart attack, when he was fired?

15    A.  I did not.

16    Q.  You did not.  Okay.  Well, looking at your

17    report, if you could turn to page 97?  Did you get any

18    guidance from anybody, in terms of figuring out what

19    information to collect?

20    A.  No, no.  Not really.

21    Q.  Okay.  And you mentioned that there was someone

22    by the name of Paige Ormiston --

23    A.  Correct.

24    Q.  -- on the committee?  And I'm correct that she's

25    a Lieutenant Commander?

1       A.   That's my understanding.

2       Q.   In the Navy JAG, is that correct?

3       A.   Correct.

4       Q.   Okay.  And she was the legal advisor to the

5    panel?

6       A.   That's correct.

7       Q.   Okay.  And did she in fact provide legal advice

8    to the panel?

9       A.   Somewhat.  I know after we formed our questions,

10   she said let me take these questions back to the JAG

11   office and polish them, to make sure that they're not too

12   leading, or misleading type questions.

13      Q.   Okay.

14      A.   She said that we should err on the side of

15   collecting too much information, rather than not enough

16   information.  That type of advice.

17      Q.   Okay.  And did she provide you with any -- or

18   did anyone have occasion to ask Lieutenant Commander

19   Ormiston about the policy, that had to be interpreted?

20   The policy you mentioned, about whether Professor

21   Fleming's behavior would be categorized one way or the

22   other?

23      A.   We -- again, as our charge, we were just asked

24   to determine whether or not the complaints were

25   legitimate.   We -- asked to say, you know, this is

Page 74

1  clearly outside the bounds of, you know, your charge as a

2  professor at the Academy.  We were just -- we were asked

3  to determine the legitimacy of the complaints.

4      Q.  Okay.

5      A.  And not to necessarily form an opinion about

6  well, that's a fireable offense, which I was glad,

7  because, you know, I have tenure and I respect the tenure

8  system.  And I don't want it to be easy to fire a

9  professor.

10     Q.  Are you familiar with the -- called the AAUP?

11     A.  I am.

12     Q.  The American Association of University

13 Professors, is that correct?

14     A.  Correct.

15     Q.  And can you tell me your understanding of what

16 the AAUP is?

17     A.  My understanding it's a national nationwide

18 organization that is -- predominate goal is to perfect --

19 to protect university professors.

20     Q.  And you sometimes get emails from the AAUP, is

21 that correct?

22     A.  I do.

23     Q.  And is that -- is there any particular reason

24 you get them?  Or do you get emails that are sent to, you

25 know, an email blast, let's say?

Page 75

1     A.  I get in an email blast.

2     Q.  Okay.  Nothing particular to you?

3     A.  That's correct.

4     Q.  Okay.  All right.  In your report, on page 97

5  you note that the student opinion forms indicated that

6  most students enjoyed Professor Fleming's energetic

7  teaching style.  And rated his overall effectiveness of

8  his instruction as excellent or good.  Is that correct?

9     A.  That is correct.

10    Q.  And in fact, student opinions in HE302 course

11 were universally positive, correct?

12    A.  HE302?

13    Q.  Yeah.  HE302.

14    A.  That -- he did not finish that course, is my

15 understanding.  So I would not have seen opinion forms for

16 that course.

17    Q.  Okay.  It says a full sentence.  Student opinion

18 --

19    A.  Are we still on the page 97?

20    Q.  Yes.  "Student opinions in the HE302 course were

21 universally positive --

22    A.  Okay.

23    Q.  -- with many comments on Dr. Fleming's positive

24 attitude, meaningful discussions and focus on improving

25 student writing."  Do you see that?

Page 76

1    A.   Right.  We must have looked at his prior year

2  then.

3    Q.   Okay.  Where --

4    A.   Because --

5    Q.   -- in the report would it reflect that?

6    A.   I'm not sure it would, but if my recollection is

7  correct, he taught HE111 in the fall, and had started to

8  teach HE302 in January.  And had only taught in January.

9  And so they would not have had time to do.  So we must

10  have collected the previous year's student opinion form

11  also.

12    Q.   Okay.  And if you look at the -- go back to 97

13  and the last sentence starting "many of these compliments

14  were repeated by students in the HE111 section".  Do you

15  see that?

16    A.   Correct.

17    Q.   But you did find some disturbing statements --

18  the classroom conduct, correct?

19    A.   Correct.

20    Q.   And you noted that specific criticism of Dr.

21  Fleming by these students, included the amount of time

22  spent on topics, other than assigned readings?

23    A.   Correct.

24    Q.   Okay.  Can you tell me is HE111 a plebe class?

25    A.   That's correct.

Page 77

1    Q.   Okay.  So it's a freshman writing class?

2    A.   Right.

3    Q.   Okay.  And the fall semester of -- would have

4  been their first semester?  The plebe's first semester at

5  the Academy?

6    A.   Correct.

7    Q.   So these are students who are inexperienced in

8  the college classroom, correct?

9    A.   Inexperienced?  Correct.

10   Q.   Yes.  And if you look at that sentence talking

11 about the specific criticisms, it -- you see it says

12 "after the assigned readings", it discusses unprofessional

13 or unclear communication?  Can you tell me what

14 unprofessional -- what you mean by unprofessional?

15   A.   Well, one complaint was that he went into

16 transgender surgery in minute detail.

17   Q.   And what's wrong --

18   A.   And it didn't --

19   Q.   What's wrong with that?

20   A.   it didn't relate to the class.

21   Q.   Okay.

22   A.   It would be --

23   Q.   Are you aware that Professor Fleming had

24 published on transgender surgery, and transgender issues

25 and the use of -- in that arena?

Page 78

1    A.  Well, to put it in a different perspective, I've

2   published on say thermoelectric generators, and I would

3   think it inappropriate for me to bring that into my

4   Statics class.  And that's a more appropriate subject and

5   it would not make students feel uncomfortable.

6    Q.  So your --

7    A.  It just doesn't belong in the class.

8    Q.  Your belief is that students should be

9   uncomfortable, when someone is talking about transgender

10  surgery --

11   A.  No.  I --

12   Q.  -- in the classroom?

13   A.  I did not say that.  I said that it is

14  uncomfortable.  They did state that to me.  I didn't say

15  it should.  I just said it does.

16   Q.  Okay.  And why does it matter that it makes some

17  of them uncomfortable?

18   A.  It has nothing to do with the class material at

19  hand.

20   Q.  Do you know that for certain?

21   A.  That's what they're telling me.  I believe them.

22   Q.  Okay.  So you believe the 17 or 18 year olds,

23  who are telling you that these discussions, that some find

24  very meaningful, have nothing to do with the class?   A.

25   (No audible answer)

Page 79

1      Q.  And you've never been in Professor Fleming's

2  class?

3      A.  That's correct.

4      Q.  And you've never read any of --

5          MR. COOK:  Objection, Your Honor.  Asked and

6  answered.

7          JUDGE SYSKA:  Sustained.

8  BY MR. EHRENBERG:

9      Q.  Would you -- I'll move on.  If you could turn to

10  page 111?

11          JUDGE SYSKA:  Same tab?

12          MR. EHRENBERG:  Yes.

13          JUDGE SYSKA:  Tab 7, page 111.

14          MR. EHRENBERG:  It's page 15 of the report.

15          THE WITNESS:  Okay.

16  BY MR. EHRENBERG:

17      Q.  And actually if you could look at page 14?  I

18  want to talk about the additional findings.

19      A.  Okay.

20      Q.  So if you could look at additional finding one,

21  "Dr. Fleming uses profanity in the classroom, discussions

22  and email."  Do you see that?

23      A.  I do.

24      Q.  So you then say that Midshipman DeSantis and

25  Jin, Professor Fleming used profanity in classroom

Page 80

1   discussions.  And Midshipman DeSantis provided an email,

2   which Dr. Fleming wrote the word "shit".  Do you see that?

3       A.  I do.

4       Q.  Is there something wrong with using the word

5   shit, or do we need context?

6       A.  I believe Professor Fitzgerald wrote this

7   section.  And I agree with him, it's unprofessional.

8       Q.  Okay.  And who is Professor Fitzgerald?

9       A.  He was one of the senior -- one of the three

10  senior faculty members on the committee.

11      Q.  And what department is he in?

12      A.  Chemistry.

13      Q.  Chemistry.  Okay.  Probably not a lot of cause

14  to --

15          MR. COOK:  Objection, Your Honor.

16          MR. EHRENBERG:  -- swear in a chemistry

17  classroom --

18          JUDGE SYSKA:  Okay.

19          MR. EHRENBERG:  -- as well?

20          THE WITNESS:  No.  I think the reason he put it

21  --

22          JUDGE SYSKA:  Objection is sustained.  You don't

23  have to answer it.

24          THE WITNESS:  Okay.

25  BY MR. EHRENBERG:

Page 81

1    Q.  If you look down to the last two sentence -- or

2    paragraphs on page 14, you noted that during interviews --

3    or excuse me.  You actually didn't write this part of the

4    report?

5    A.  We all reviewed it.  We all polished each

6    others' sections.

7    Q.  Okay.  So I don't want to ask you about

8    something that you're not familiar with.

9    A.  Oh, no.  We're -- we all -- let's put it this

10   way.  We wrote each section independent, and then we got

11   together the entire report.

12   Q.  Okay.

13   A.  And so there's nothing in the report, that

14   wasn't in there by consensus.

15   Q.  And do you remember which part of the report

16   Captain McGrath authored?

17   A.  Don't even remember which ones I authored, to be

18   100% sure.  Okay?  Because by the end of it we got

19   together and wordsmithed it so much that it all blended

20   together.

21   Q.  Okay.  Now, you report -- if you were to report

22   to anyone, in a chain of command, you report to -- or your

23   supervisor, I guess, would that be --

24   A.  Department Chair.

25   Q.  Department Chair.  And then above the Department

1   Chair would be?

2       A.   Division Director.

3       Q.   And who is the Division Director of the English

4   Department?

5       A.   At the time it was Colonel Aytes.

6       Q.   Okay.  And do you know if the other members of

7   the committee spent any time in Professor Fleming's

8   classroom?

9       A.   I do not believe any of us have.

10      Q.   Okay.

11      A.   That would be very rare at the Academy, for us

12  to visit someone in a different department.  The kind of -

13  - we visit each others' class, as part of our mentoring,

14  each and every semester.

15      Q.   Okay.  So --

16      A.   The Promotion and Tenure Committee would visit

17  his class, when he was being considered for promotion.

18  And that would probably be the last time that someone

19  outside has visited his class.

20      Q.   Okay.  If you could look at page 15?  Your

21  additional finding two.  "Dr. Fleming spends signature

22  class time on off topic discussions."  Do you see that?

23      A.   I do.

24           JUDGE SYSKA:  Which is Board tab 10, at page

25  111.

1  BY MR. EHRENBERG:

2      Q.  Can you tell me why there's -- this additional

3  finding was put in the report?

4      A.  Just that there's really no policy against that,

5  but it just shows to me that he's not spending class time

6  improving their knowledge.  That he's more passing time

7  with them.  It could be one reason why he's so well-liked,

8  because midshipmen do love to get professors off topic,

9  because they feel that they'll be responsible for less

10 material, if they cover less material.

11     Q.  And that's all midshipmen?

12     A.  No.  Definitively not.  Some midshipmen learn --

13 whatever class they're in, they want 100% to that class.

14     Q.  Sure.  So the panel believed that Dr. Fleming

15 spent -- based on what the students reported, spent would

16 you say too much time off topic, talking about things that

17 would not result in any educational benefits?

18     A.  Not always.  Some times he was giving them good,

19 sound advice.

20     Q.  Okay.

21     A.  You know, telling them to wear protection,

22 that's good, sound advice.

23     Q.  Right.  And you're aware that Professor Fleming

24 sometimes refers to some of these discussions as life

25 lessons?

Page 84

1      A.  That's my understanding.

2      Q.  Okay.  And are you aware that the English

3   Department at least, in their reviews of Professor

4   Fleming, more recent reviews time frame, basically lauded

5   Professor Fleming for the life lessons and --

6           MR. COOK:  Objection, Your Honor.  The counsel

7   is testifying.

8           JUDGE SYSKA:  Yeah.  Unless you have a place,

9   that you can call the witness' attention to.

10          MR. EHRENBERG:  No, Your Honor.  The witness

11  said they did not --

12          JUDGE SYSKA:  Okay.

13          MR. EHRENBERG:  He did not review the

14  evaluation.  So --

15          JUDGE SYSKA:  Okay.

16  BY MR. EHRENBERG:

17     Q.  Some of Professor Fleming's students indicated

18  that they appreciated the life lessons, correct?

19     A.  That's correct.

20     Q.  Okay.  If you could turn to -- in the same tab,

21  tab 7, if you could turn to page 149, please?

22     A.  Okay.  Is that P-3?

23     Q.  Yes, sir.

24     A.  Okay.

25     Q.  Can you just take a moment to look at that?

Page 85

1      A.   Okay.

2      Q.   Would you agree, that many midshipmen who you

3   interviewed --

4           MR. COOK:  Objection, Your Honor.  Many

5   midshipmen.

6           JUDGE SYSKA:  Well, I think it's also asked and

7   answered, that most of the midshipmen --

8           MR. COOK:  Right.

9           JUDGE SYSKA:  -- had given good reviews.

10          MR. EHRENBERG:  This actually is slightly

11   different.  It goes to the review of the quality of the

12   instruction for the writing.

13          JUDGE SYSKA:  Well, giving the instructor high -

14   - good remarks -- excuse me, good grades for his teaching,

15   would imply that it's the actual subject involved.  At

16   least that's how I took it.

17          MR. EHRENBERG:  That's not what these reports

18   show.  That's not what these interviews show.  And that's

19   why I trying to go through.  I'm trying to point out that,

20   you know, the report summarizes some of this, but it kind

21   of cherry picks and ignores the vast majority of the

22   information that was collected, where the same students --

23   not the same students.  Midshipmen were asked about the

24   same issues, and indicated very clearly that those issues

25   had no impact on them.

1          JUDGE SYSKA:  Well, the point I've gotten, I

2     mean even in this example you're on, on 149, it's -- it

3     appears to be a different course, HE300, as opposed to the

4     plebe course.

5          MR. COOK:  Right.

6          JUDGE SYSKA:  So --

7          MR. EHRENBERG: Well, the -- I mean the plebe

8     course was mentioned.  Not the plebe course.  I'm sorry.

9     It was mention in the report; this class.

10          JUDGE SYSKA:  Right.  Yeah.  I got that.  And

11     they indicated the reviews were almost completely

12     positive, in the 300 level class.

13          MR. EHRENBERG:  Sure.  The witness testified

14     somewhat to the contrary.  I was just trying to clarify

15     that.

16          JUDGE SYSKA:  Okay.

17          THE WITNESS:  I did not testify to the contrary,

18     by the way.

19          JUDGE SYSKA:  Sir --

20          THE WITNESS:  Okay.

21          JUDGE SYSKA:  -- unless there's a question

22     pending --

23          THE WITNESS:  All right.  If he's attacking me -

24     -

25                    CONTINUED CROSS-EXAMINATION

Page 87

1  BY MR. EHRENBERG:

2      Q.  I might have heard you wrong.  I'll just ask you

3  to look at one more.  If you could turn to page 152?

4      A.  Okay.

5      Q.  And it looks like this individual may have had

6  Professor Fleming for two classes, HE111 and then 3001, is

7  that correct?

8      A.  No.  That would be HE111 and then 3001 would be

9  his third period section.

10     Q.  Oh, okay.  And so this would have been a first

11 year student?

12     A.  Correct.

13     Q.  Okay.  And if you look at the student's comment,

14 high energy --

15         MR. COOK:  Objection, Your Honor.  We've got the

16 information out here that Professor Fleming is an

17 excellent academic teacher, when he's teaching English.

18         JUDGE SYSKA:  Well, we --

19         MR. EHRENBERG:  That's --

20         MR. COOK:  All we're doing is going over the

21 same --

22         MR. EHRENBERG:  No.

23         MR. COOK:  -- for a different student.

24         JUDGE SYSKA:  We -- these documents, which I've

25 read them all.  So --

Page 88

1          MR. EHRENBERG:  This is going towards the first

2     witness' entire testimony.  It's the same issue about --

3     I'm about to get into, about training officers and the

4     mission of the Academy.

5          JUDGE SYSKA:  Well, all right.  I'll give you a

6     leeway on one or two questions, but obviously I've read

7     all this.  And I think the witness -- well, go ahead.

8          MR. EHRENBERG:  Do you agree, this student is

9     stating that high energy every day, and then explains and

10    correlates each reading assignment to leadership, and our

11    future as naval officers?  Do you see that?

12         THE WITNESS:  I do.

13    BY MR. EHRENBERG:

14    Q.  Okay.  And the student goes on to say that they

15    were concerned, with the higher energy and Professor

16    Fleming's strong opinions, but actually began to enjoy his

17    style in the class, and --

18         JUDGE SYSKA:  You're reading it again.  We don't

19    need to read it.

20         MR. EHRENBERG:  Okay.  Your Honor, if I may just

21    have a moment?

22         JUDGE SYSKA:  Certainly.

23         MR. EHRENBERG:  Thank you.  Yeah.  That's all.

24    Sorry.

25         JUDGE SYSKA:  Okay.  Any redirect?

1          MR. COOK:  Just one area, Your Honor, if I may?

2                    REDIRECT EXAMINATION

3     BY MR. COOK:

4          Q.  Professor Lindler, you were asked a question

5     about Professor Fleming's suspension.  What do you know

6     about the facts of his suspension?

7          A.  My understanding was that he was removed from

8     the classroom, either very late January or very early

9     February, fall semester.  And that it took some time after

10    that, before he was actually terminated, his employment

11    was terminated.

12         Q.  Do you know whether or not he was paid, while he

13    was taken out of the classroom?

14         A.  I do not know.

15         Q.  -- told you that he was paid?

16         A.  I would not be surprised.

17         MR. COOK:  No further questions, Your Honor.

18         JUDGE SYSKA:  Okay.  I just have a couple,

19    Professor.  I think at least in two points in your

20    testimony, you said he's either a great classroom teacher,

21    yet you concluded he -- based on your view of the events,

22    he doesn't belong in the classroom.  How do those fit

23    together?

24         THE WITNESS:  That's why I said I was torn.

25    Because I agree, you know, he's got great reviews from his

1  students.  Especially the ones who like the life lessons,

2  he's got great reviews.

3       So as far as a teaching ability is concerned, he

4  certainly -- member of anybody's faculty.  In fact, the

5  Naval Academy takes pride, in that you cannot get

6  promoted, without being a good teacher, where some schools

7  you can get promoted, as long as your research is top

8  notch.  The Naval Academy, you have to be a top notch

9  teacher to get -- but his teaching ability is -- no one

10 found anything wrong with that.

11      It's his unprofessionalism.  His touching mids,

12 when it's not -- you know, a mid would be uncomfortable.

13 If a professor comes up, and starts rubbing them on the

14 back, first of all he's making them uncomfortable to his

15 classmates.  Like why is he singling me out?

16      And then they would -- because of the nature of

17 the relationship, you know, you're not going to say hey,

18 stop that, because that's the person that's going to give

19 you a grade at the end of the semester.  So that's very

20 unprofessional.

21      The one time a mid asked him about registration,

22 and he replies with a semi-clad photo of himself, I would,

23 if I were in that mid's position, wonder whether or not

24 the professor was coming on to me.  So it's totally

25 unprofessional.  So I believe he's a good classroom

1    instructor, but I just don't think he's professional.

2          JUDGE SYSKA:  Okay.  And I think you also noted

3    that Professor Fleming has been teaching a number of

4    years.  Did you get any sense, during the course of your

5    interview, as to why now things were taking this turn with

6    the midshipmen?

7          THE WITNESS:  I'm going to guess because

8    Midshipman DeSantis took time to write such a large, long

9    letter of complaint.  But, you know, why he didn't get

10   similar complaints earlier, I don't know if he did or he

11   did not.

12         JUDGE SYSKA:  So one midshipman making a

13   particularly serious complaint, sort of was the domino

14   that knocked the other dominoes over?

15         THE WITNESS:  That's the best way I see it.

16         JUDGE SYSKA:  Okay.  Any questions based on my

17   questions?

18         MR. COOK:  Nothing from the Agency, Your Honor.

19         MR. EHRENBERG:  No, sir.

20         JUDGE SYSKA:  Okay.  Professor, thank you very

21   much.  Because the hearing is ongoing, don't discuss you

22   testimony with anyone.  And you're excused.

23         THE WITNESS:  Thank you.

24         JUDGE SYSKA:  Thanks again.  And we'll go off

25   the record for the next witness.

Page 92

1              (Whereupon, a brief recess was taken)

2          JUDGE SYSKA:  On the record.

3          Good morning.  Will you raise your right hand,

4    please?

5          Whereupon,

6                    MATTHEW DESANTIS,

7    having been called as a witness by and on behalf of the

8    Agency and, having been first duly sworn, was examined and

9    testified on his oath, as follows:

10         JUDGE SYSKA:  Please be seated.  And state and

11   spell your full name.

12         THE WITNESS:  My full name is Matthew Robert

13   DeSantis, M-A-T-T-H-E-W, R-O-B-E-R-T, D-E-S-A-N-T-I-S.

14         JUDGE SYSKA:  And you're a midshipman?

15         THE WITNESS:  Yes, sir.

16         JUDGE SYSKA:  What year are you?

17         THE WITNESS:  I'm class of 2021, which is the

18   youngster class.  There's a third class of midshipmen.

19         JUDGE SYSKA:  So sophomore in civilian terms?

20         THE WITNESS:  Yes, sir.

21         JUDGE SYSKA:  Okay.  How many classes have you

22   had with Professor Fleming?

23         THE WITNESS:  I've had one class, sir.

24         JUDGE SYSKA:  And that was HE111?

25         THE WITNESS:  Yes, sir.

1          JUDGE SYSKA:  And that was the fall of 2017?

2          THE WITNESS:  Yes, sir.

3          JUDGE SYSKA:  Okay.  Your witness, counsel.

4          MR. COOK:  Thank you, Your Honor.

5                    DIRECT EXAMINATION

6     BY MR. COOK:

7          Q.  Midshipman DeSantis, why did you choose to apply

8     to the Naval Academy?

9          A.  I chose to apply to the Naval Academy, because

10    it seemed like the best institution for leadership

11    development.  And when I looked at other officer

12    development programs, you didn't have four years to

13    development as a midshipman, and kind of experience and

14    learn, experiment and learn from people above you, and

15    learn form people below you.  So at lot of those factors

16    led me to believe, it's the best opportunity for

17    development and growth.

18         Q.  Do you have any military background in your

19    family?

20         A.  -- background in my family.

21         Q.  Okay.  Are you familiar with the Honor Concept

22    of the Naval Academy?

23         A.  I am.

24         Q.  What is it?

25         A.  The Honor Concept consists of three parts.  And

1  it's a midshipmen based system.  And so at the heart of it

2  midshipmen do not lie, cheat or steal, or tolerate those

3  who do.

4      Q.  Your class with Professor Fleming HE111, what

5  class -- what is the class size?

6      A.  About probably five females and 15 males.

7      Q.  Okay.  What grade did you get in that class?

8      A.  I received a C.

9      Q.  Okay.  At the end of the semester, January 2018,

10 you provided a written statement to the Vice Academic

11 Dean, that alleged misconduct by the Appellant.  What

12 prompted you to file that complaint?

13     A.  Well, a conversation with then fourth class

14 Espinoza (ph), where he was bursting into tears and

15 crying, about how he was going to leave the Academy, and

16 he's having depressing thoughts, about how Professor

17 Fleming has talked to him and --

18         MR. EHRENBERG:  Objection.

19         THE WITNESS:  -- made him --

20         MR. EHRENBERG:  I'm sorry, that's hearsay, but -

21 -

22         JUDGE SYSKA:  Which is admissible in Board

23 proceedings.  So I will overrule.

24         THE WITNESS:  And how Professor Fleming is

25 described, in his role at the Naval Academy.  And then

Page 95

1    just us in general.

2    BY MR. COOK:

3        Q.   Okay.  I'm a little confused.  Who is Midshipman

4    Espinoza?

5        A.   He was another student in HE111.

6        Q.   And what happened to Midshipman Espinoza?

7        A.   He, a couple of months later, dropped on request

8    out of the Naval Academy.

9        Q.   Okay.  At any time in the process of filing this

10   complaint, did you have second thoughts about doing so?

11       A.   I did.

12       Q.   Okay.  What were those second thoughts and why?

13       A.   So initially, after scheduling the meeting, I

14   canceled the meeting, because upon further reflection with

15   my parents and just people around me, I didn't want to be

16   the -- because knowing what happened in the past, to the

17   two female midshipmen, who filed complaints against

18   Professor Fleming, it was really clear that this was going

19   to be a long, drawn-out battle.  And I didn't really want

20   to be the person on the horse fighting.

21            And I knew that I would be attacked.  Like

22   legally attacked, on the Academy side.  I was a first

23   semester plebe, trying to get my footing at the Academy.

24            I didn't really understand what the Academy was

25   about, or how to be a midshipman at this point.  And I

1  didn't want to even call into any question my grades, or

2  academics or even conduct, because I know Professor

3  Fleming used the conduct system as a weapon, against the

4  people that tried to go against him in the past.  And it

5  just didn't seem like the right decision for me, as I'm

6  trying to develop as a midshipman, to have to bring up

7  this misconduct to the service.  Didn't seem like it was

8  my responsibility at that time.

9      Q.  Okay.  You talked about two specific concerns,

10  that you raised.  One is about two female midshipmen.

11  What do you know about that?

12      A.  I know that they alleged misconduct before, and

13  brought it to the administration.  And they were attacked.

14  Pretty much all the midshipmen know about that situation.

15      Q.  What does that term mean?

16      A.  They were -- they used -- Professor Fleming used

17  the conduct system, as a weapon, essentially trying to

18  mute them, and also to legally, like they were being

19  intimidated as well.

20      Q.  Okay.  What is the midshipmen conduct system?

21      A.  Oh, the midshipmen conduct system is similar to

22  a legal judiciary system, in the civilian world, where

23  midshipmen are punished for acts, that are deemed in mid

24  regulations, called mid regs for short.  And that's signed

25  by the Commandant of Midshipmen.  That is how midshipmen

1   conduct needs to be analyzed, in the Naval Academy.

2       Q.  Okay.  Well, then why did you go -- with all

3   these concerns, why did you still go forward?

4       A.  At the end of the day, it became clear to me

5   that there's a lot of people that didn't want to fight for

6   themselves.  And when it came down to it, I didn't -- it

7   didn't feel right, to let them suffer in silence, when all

8   this stuff was happening.  And all the compilation of

9   things was taking place, and it didn't seem right to let

10  it go unnoticed.  Especially when other people are

11  suffering, and my friends were crying and bursting into

12  tears about --

13      Q.  Okay.

14      A.  -- that class.

15      Q.  If the behavior of Professor Fleming was bad

16  during this semester, why didn't stop then and report it?

17      A.  Earlier, with my position as a first semester

18  plebe at the Academy, the academics is extremely important

19  for your treatment, as a plebe.  And you can't -- you're

20  not told to speak up.  You're told to follow orders, from

21  like the day you show up, to the day you go to the start

22  of the class.

23          And that's all we'd really known as the Plebe

24  Summer, like militaristic environment.  And the

25  intimidation, through the two female midshipmen, that I've

Page 98

1  heard about in the past.  As well as just not wanting to

2  screw up my academics in any way, was a majority of the

3  reason.

4      Q.  What if any impact did your grade have on this

5  decision?

6      A.  None.  My grade didn't have any weight.

7      Q.  I want to talk to you a little bit about the

8  statement that you provided.  The nicknames midsheeple

9  (ph) and goldfish used in your HE111 class.

10     A.  I'm --

11     Q.  Okay.  What do they mean, and how are they used

12  in the class?

13     A.  Midsheeple is a term utilized by Professor

14  Fleming, to state that midshipmen are group think

15  mentality, and can't deviate from that group think

16  mentality.  And then goldfish is then utilized to say that

17  midshipmen have about a 10 second memory span, which is

18  the memory span of a goldfish.  And that we don't remember

19  things, and can't think logically.

20     Q.  Do you recall about a class writing assignment,

21  that was to discuss how you would change the world?

22     A.  I do.

23     Q.  Okay.  What do you recall about that writing

24  assignment?

25     A.  I remember it was I think the third writing

1  assignment of the semester.  And I wrote about tax reform,

2  kind of as a standard thing.  It wasn't a political move

3  on my end.  It wasn't me trying to put my political spin

4  on things.  I was trying to take tax reform, and look at

5  it from a holistic view --

6      Q.  What was Professor Fleming's response, to your

7  writing assignment?

8      A.  Professor Fleming sent me and Midshipman Third

9  Class Wheeler (ph) an email, entitled right-wing

10 extremists, and kind of went on with this big rant, about

11 how we fell into that type, and fell into the dad

12 stereotype of him shouting at the dinner table, and didn't

13 defend our position.

14     Q.  What did he refer to you and Midshipman Wheeler

15 as?

16     A.  Quote/unquote right --

17     Q.  How'd that make you feel?

18     A.  I was really confused, because that wasn't

19 really where I was going for, and I'm definitely not a

20 right-wing extremist, by any stretch of the imagination.

21 And I had a tutor company read over my paper, to see if

22 like maybe I was just like didn't do it right, or didn't

23 do a good job on the assignment.  And they said it was

24 really good, and really well laid out.  And I definitely

25 did not deserve the grade I got on that assignment.  So I

Page 100

 1  was just confused and --

 2      Q.  Would you agree that a midshipman's evaluation

 3  of your paper, is probably not the same as a professor at

 4  the Naval Academy?

 5      A.  To a certain extent yes, but at the same time

 6  they were both were writing like extensive theses on the

 7  topic.  So I trusted their English knowledge.

 8      Q.  Do you recall a class discussion about Professor

 9  Fleming's son's homecoming dance date?

10      A.  I do.

11      Q.  What do you recall?

12      A.  I remember Professor Fleming talked about it for

13  maybe 20 minutes.  And he pulled up a picture of his son's

14  homecoming date's dress, and zoomed in on an area and her

15  legs, and was trying to suggest that because of the dress

16  length, that she was looking for more, and trying to get

17  something sexually out of his son.

18      Q.  How did you come to the conclusion, that he was

19  suggesting that?

20      A.  I believe he used the words looking for more.

21  And he also talked about the mother's dress length, and

22  how it was exactly like the mother, and the mother was

23  looking for more.

24      Q.  Could you say that again, please?  I'm sorry, I

25  didn't hear you.

Page 101

1    A.  Professor Fleming said that the mother was

2  looking for more.  And he utilized the daughter was

3  exactly like the mother.

4    Q.  How did this make you feel, based on in your

5  personal life?

6    A.  It made me feel very angry and upset,

7  considering my sister was about the same age, and just

8  starting to go to dances as well.  And it just made me

9  think what people were thinking about my sister

10  potentially.  And how maybe some of the adults and dads

11  were thinking that about my sister, just even though she

12  was just trying to have a dress, like just a regular

13  dress.  Like really messed up on multiple levels.  So

14  really messed up.

15    Q.  Did you have an opportunity to talk to your

16  parents about this?

17    A.  I did.

18    Q.  What was the result of that conversation?

19    A.  I talked to my parents, after I received the

20  picture from Professor Fleming --

21    Q.  Uh-huh.

22    A.  -- emailed to me.  My mom was in tears, and

23  didn't really know what to expect.  And she was just

24  confused, about how a professor at the Naval Academy is

25  doing this, and what that means.  And just very confused

1  and sad.

2          And my mom cried a lot, when I said it to her.

3  My dad, who's a lawyer, was very confused and was like

4  this not right.  This is not right.

5      Q.  Were there any other discussions in that class,

6  where Professor Fleming's son was used as a discussion

7  topic?

8      A.  One more time, where -- well, he also visited

9  the class for one day of the semester.  But besides that,

10  we talked about his son's marijuana usage.

11      Q.  Uh-huh.  What did he tell you about that?

12      A.  He went into -- he explained how his son -- he

13  caught his son using marijuana.

14      Q.  Uh-huh.

15      A.  And went onto to kind of the positive effects of

16  marijuana, and how marijuana is kind of becoming this new

17  part of the culture in America.

18      Q.  What's the Naval Academy policy on drug use for

19  midshipmen?

20      A.  It's a zero tolerance policy.  Any drug kit

21  would be immediate separation without a hearing, without

22  any reparations.

23      Q.  Are you familiar with the term life lessons?

24      A.  I am.

25      Q.  Are they a part of a regular class discussion,

Page 103

1    in Professor Fleming's class?

2        A.  They are.

3        Q.  Okay.  To the best of your recollection, what

4    are the most memorable discussions of life lessons to you?

5        A.  I think the most memorable life lesson, was when

6    went into detail about how transgender surgery works.

7        Q.  Okay.  How it works.  Explain.  Please explain

8    that a little bit.

9        A.  How a male appendage is cut off, and how a

10   vaginoplasty is like -- is -- in order to create the shape

11   of a female vagina for transgender people.

12       Q.  What relationship did that conversation have,

13   with the topic of the day?

14       A.  It had no connection.

15       Q.  Was it in the syllabus?

16       A.  It was not on the syllabus.

17       Q.  Did you ever receive a picture from Professor

18   Fleming?

19       A.  I did.

20       Q.  Tell me about the picture.

21       A.  I received a shirtless picture from him, on

22   response to about how to register for next semester.  And

23   as a first semester plebe, I didn't know how the

24   registration works or even what registration was.  So I

25   was trying to receive information about that.  And I think

Page 104

1  he took it, as me wanting to be in his section the next

2  semester.  Than he sent a picture just to me of him

3  shirtless, flexing his left arm.

4      Q.  Are you familiar with the term extra

5  instruction?

6      A.  I am.

7      Q.  What is that?

8      A.  Extra instruction is utilized at the Naval

9  Academy by professors, to inhibit learning outside the

10 classroom.  So if you have to catch up, so you miss a

11 class, and you go to extra instruction with the teacher.

12 Or if you're falling behind, you got to extra instruction,

13 to try to gain more knowledge, as the regular scheduled

14 class at the Naval Academy.

15     Q.  How many people are in these extra instruction

16 sessions?

17     A.  It's usually just you and the professor, unless

18 there's like a review session, that are held towards final

19 exams.  It depends on the course and section.

20     Q.  -- advantage of this opportunity, in Professor

21 Fleming's class?

22     A.  I did.

23     Q.  How many times?

24     A.  Once.

25     Q.  Okay.  What was your recollection of that one

1  incident, that one time?

2      A.  I believe he talked about the -- we talked about

3  a paper.  I believe it was the tax reform paper. We talked

4  about the paper for five minutes, and then we talked about

5  like Naval Academy stuff, and life in general for another

6  10 to 15 maybe.

7      Q.  Did he explain to you why he thought, or why he

8  commented on the problems that you may be having in

9  writing?

10     A.  During that meeting, he pulled up my academic

11 record, and looked at my SAT scores.  And then I believe

12 he said oh, this explains a lot about me, and my academic

13 standing in his class at the time.

14     Q.  What did that mean to you then, when he said

15 that?

16     A.  I took it to mean I didn't have the mental

17 capacity, in his eyes, to succeed in his class.

18     Q.  The physical aspect is part of the Academy.  How

19 does Professor Fleming incorporate the physical mission

20 into his class?

21     A.  You're correct.  That's one of the three pillars

22 in the Naval Academy.  I think -- then again, sorry --

23     Q.  Okay.

24     A.  -- I don't understand what --

25     Q.  How does --

1    A.  -- you're saying.

2    Q.  -- Professor Fleming incorporate physical

3  fitness into his class?  The physical aspect of the

4  Academy.

5    A.  He refers to himself as jacked a lot, or refer

6  to himself as jacked a lot.  And believes that his

7  physical stature was what we should all strive to, strive

8  to be like.  And he did utilize a lot of physical touch in

9  the classroom environment.

10    Q.  Midshipman DeSantis, you've now completed two

11  years at the Naval Academy.  Have you ever -- the

12  classroom behavior displayed by Professor Fleming, in any

13  of the other classes at the Naval Academy?

14    A.  Never.  Professor -- the faculty of the Naval

15  Academy mostly are awesome.

16    Q.  Okay.  If there's one thing, one of the most

17  important things that you've learned in Professor

18  Fleming's class, what is that?

19    A.  I think at the end of the day, I learned that I

20  don't -- at all, in any aspect.  And his failure to take

21  ownership, and his failure to take responsibility for his

22  actions, and the problems that he caused, and the mental

23  anguish that he caused, to so many people, is gut-

24  wrenching.  And the failure to take ownership is a big

25  deal in the military.

Page 107

1           Taking ownership and taking responsibility is

2     very important.  And his failure to do that is terrible.

3     It's terrible.

4           And I don't want to be anything like him.  His

5     lack of dignity and respect towards people.  The way he

6     treats individuals, he treats people at the Naval Academy

7     is terrible.  And as a leader, I never want to be anything

8     like him.  Anything like him.

9           MR. COOK:  No further questions, Your Honor.

10          JUDGE SYSKA:  Cross?

11          MR. EHRENBERG:  Sure.

12                    CROSS-EXAMINATION

13    BY MR. EHRENBERG:

14       Q.  Would you like a moment, or are you good?

15       A.  I'm okay.

16       Q.  All right.  Good morning.  My name is --

17       A.  Good morning.

18       Q.  Or almost afternoon.  My name is Jason

19    Ehrenberg, and I represent Professor Fleming in this

20    proceeding.  Can you tell me who you spoke with about --

21    well, have you spoken with anyone about your testimony,

22    that you would be giving today?

23       A.  Just the legal counsel for the Academy.

24       Q.  Okay.  And have you spoken with any other

25    midshipmen, about your coming here today?

1    A.  Just the midshipmen -- the seven midshipmen in

2  the same -- we rode up in the same van, about coming.  We

3  didn't discuss anything specific about it.  Just --

4    Q.  Okay.  Where did you grow up?

5    A.  I grew up in the shores of New Jersey, but then

6  I moved down to Florida, when I was entering sixth grade.

7  And then I went from sixth grade to senior year of high

8  school, I was in Naples, Florida.

9    Q.  Okay.  And are you from a religious family?

10    A.  I am.

11    Q.  And are you yourself somewhat religious?

12    A.  Somewhat, yes.

13    Q.  Okay.  I'm sorry.  Somewhat is a -- kind of a

14  vague term.  You were talking about -- Mr. Cook asked you

15  some questions, about why you decided to choose the Naval

16  Academy.

17    A.  Uh-huh.

18    Q.  And I believe you said there was something

19  different about the leadership training was it?

20    A.  Sure.

21    Q.  Can you just repeat that?  I'm not entirely sure

22  I understood.

23    A.  So leadership training in that as a plebe you

24  have people above you, who you could -- kind of leadership

25  and learn lessons from.  And then as you keep progressing

Page 109

1  through years at the Naval Academy, you become a

2  youngster, a second class, a firstie, you then have people

3  underneath you.  You can experiment, test, and then

4  ultimately understand the best leadership strategy moving

5  forward, to because the best junior officer or officer

6  later in life.

7      Q.  Okay.  And is that not the case at the other

8  service academies?

9      A.  Not to the extent that I saw at the Naval

10 Academy, just from my visits there.  I thought that

11 there's a lot more hands on, especially midshipmen.  And

12 also the relationships between midshipmen are a lot

13 stronger than they of the cadets.  And it's a lot more it

14 is what you make of it, than it is the structured

15 environment of the -- of West Point or the Air Force

16 Academy.

17     Q.  Okay.  And so you started at the Academy, would

18 it have been in August of 2017?

19     A.  I started in June 28th 2017, which was Induction

20 Day, to start Plebe Summer.  And I started the academic

21 year August 17th 2017.

22     Q.  And what do you do, over the Plebe Summer,

23 before you start your academic career at the Academy?

24     A.  Plebe Summer is the six months (sic) of initial

25 training, before you enter the Academy.  So you learn how

Page 110

1  to like wear a uniform.  How to do drill, how to march,

2  and how to just become a midshipman, so you can join the

3  Brigade, and start your academic year.

4      Q.  And I'm sure there are discussions -- or is

5  there training over that summer?  Are you provided with

6  training about the conduct system?

7      A.  Not over the summer, no.

8      Q.  No?

9      A.  Didn't talk about conduct system.

10     Q.  Okay.  All right.  I want to ask you a little

11 bit about the letter that you wrote.

12         MR. EHRENBERG:  Your Honor, may I approach?

13         JUDGE SYSKA:  Certainly.

14         MR. EHRENBERG:  Let the record reflect that I am

15 handing Board tab 29 again to the witness.  And if you

16 could please turn, within that document, to page 115?

17 It'll be on the bottom right; 115 out of 191.

18         THE WITNESS:  Okay.  I'm with you.

19 BY MR. EHRENBERG:

20     Q.  If you could just take a moment to look at that,

21 and see if you recognize the document?

22     A.  115 out of 155 is what I have, not 191.

23         JUDGE SYSKA:  Yeah.  Did you want tab 7?  This

24 appears to be --

25         MR. EHRENBERG:  Oh, did I --

Page 111

1          JUDGE SYSKA:  -- something other than the --

2          THE WITNESS:  This is a letter from

3    Superintendent Walter E. "Ted" Carter.

4    BY MR. EHRENBERG:

5      Q.  No, that's -- yes.

6      A.  For the interests of association --

7      Q.  That would be wrong.  Yeah.  This is from the

8    Agency file submission part 1, which is Board tab 7.  They

9    might have copied it wrong.  That may be.  If I could take

10   that back from you?

11         MR. EHRENBERG:  Handing the correct exhibit to

12   the witness.  Page 115, please.

13         THE WITNESS:  I'm with you.

14   BY MR. EHRENBERG:

15     Q.  Are we ready?

16     A.  Yes.

17     Q.  Okay.  It looks like from 115 to 128, am I

18   correct in that that is the memo that you drafted and sent

19   to Daniel O'Sullivan?

20     A.  That's correct.

21     Q.  Okay.  And it is dated 19 January 2018?

22     A.  That's correct.

23     Q.  And was the fall semester over at this point, or

24   was it still ongoing?

25     A.  It was over.

1    Q.  It was over.  Okay.  If you can look down on

2  page 115, where you're discussing that first midshipmen as

3  midshippeople (sic) and goldfish?

4    A.  Uh-huh.

5    Q.  And you say this prejudice is based upon

6  Professor Fleming's view, that midshipmen make a blind

7  commitment to the Institution, right?

8    A.  (No audible answer)

9    Q.  Is that something that he said in class, or is

10  that something --

11         JUDGE SYSKA:  Was that a yes?

12         THE WITNESS:  Yes, it was.

13         JUDGE SYSKA:  Okay.

14         THE WITNESS:  Yeah.

15         MR. EHRENBERG:  Sorry.  Is that something that

16  he stated in class, or is that just your perception, based

17  on being in his classroom?

18         THE WITNESS:  I don't really remember, but I

19  believe that's something he stated.

20  BY MR. EHRENBERG:

21    Q.  He stated that he's prejudiced?

22    A.  He did not say he's prejudiced, no.

23    Q.  Okay.  If you can look at page 20?

24    A.  120?

25    Q.  Sorry, 116 out of 191.  I'm sorry.  And if you

1  look at the first full -- where you're talking about

2  Professor Fleming utilizing the classroom, to conduct

3  attacks against midshipmen?  Other than the email that

4  you're talking about, that you mentioned that Professor

5  Fleming sent you, with the right-wing extremist language,

6  what attacks against midshipmen are you aware of?

7      A.  What do you mean by attacks against midshipmen?

8      Q.  Well, you said Professor Fleming utilizing an

9  email server, to conduct many attacks against midshipmen.

10     A.  Well, he does -- that right-wing extremist thing

11 was throughout the entire class.  So whenever there was

12 two of us needed to be together, it was me and Ethan (ph),

13 for the remainder of the semester.  I don't know how that

14 helps.

15         JUDGE SYSKA:  Yeah.  I think what counsel was

16 asking you, other than this email --

17         THE WITNESS:  Uh-huh.

18         JUDGE SYSKA:  -- about the right-wing extremist

19 on the tax -- your tax policy paper, what other attacks

20 has the professor, to your knowledge, made --

21         THE WITNESS:  Uh-huh.

22         JUDGE SYSKA:  -- against other midshipmen?

23         THE WITNESS:  Well, to my knowledge, I was

24 starting with the midsheeple and the goldfish remarks.

25 That was just kind of how this came about.  And the third

Page 114

1   -- now third class, like I don't know specifically.  This

2   is like two years ago, from being -- but I know at the

3   time there was attacks.  I don't know specifically.

4   BY MR. EHRENBERG:

5       Q.  Okay.  So the right-wing extremist statement,

6   was in an email that Professor Fleming sent you, talking

7   about a paper you had written, correct?

8       A.  That's correct.

9       Q.  Okay.  If you can look at page 117?  That's the

10  next page over.  The first line, "he then followed".  Do

11  you see that?  "He then followed, attacking the position".

12  And that's page 117 out of 191.

13      A.  I do not see that.

14      Q.  It's the first sentence, full sentence on the

15  page.

16      A.  Oh, it's blocked by the flip.  Yeah.  I'm with

17  you now.

18      Q.  And it says "he then followed, attacking the

19  position we presented in our essays, not in a logical

20  framework, but from a purely political perspective."  Do

21  you see that?

22      A.  I do.

23      Q.  Is that something that you came to that

24  conclusion on your own, that from that email that -- well,

25  let me ask you this.  You say that you thought your paper

Page 115

1  was extremely well laid out, is that right?

2      A.  That's what I said, yes.

3      Q.  Okay.  And you were at the beginning of your

4  time at the Academy, correct?

5      A.  That's correct.

6      Q.  You had -- had you written a college paper

7  before?

8      A.  I'd written college papers my entire senior

9  year.  That's what my English --

10     Q.  Okay.  And was this your first, I guess, essay

11 at the Naval Academy?  The first one you had been tasked

12 with putting together?

13     A.  I believe it was my fifth or sixth.  English and

14 Naval History, at the time, was my other course of --

15     Q.  Okay.

16         JUDGE SYSKA:  Your first for Professor Fleming?

17         THE WITNESS:  This is probably third for --

18         JUDGE SYSKA:  Okay.

19         THE WITNESS:  -- Professor Fleming.

20         MR. EHRENBERG:  And did Professor Fleming

21 provide you with any comment, about the first two papers

22 that you had done in his class?

23         THE WITNESS:  He did.  He marks the papers.

24 BY MR. EHRENBERG:

25     Q.  Okay.  And did you disagree with his mark ups on

1  the paper, or whatever criticism he provided?

2    A.  I don't remember specifically each paper.  I've

3  probably written 50 papers for the Academy at this point.

4    Q.  Okay.  You then state your belief in that daft,

5  that you felt that Professor Fleming responded in an

6  aggressive manner, because it was a political position

7  that was being address, is that right?

8    A.  I believe so, yes.

9    Q.  How do you know that?

10   A.  That's the way I understood the email, and then

11  the follow on right-wing extremist.

12   Q.  Okay.  And you deemed this -- you say the way

13  Professor Fleming responded was unprofessional?

14   A.  Yes.

15   Q.  What is that?  What do you mean by that?

16   A.  Unprofessional in the fact that if another paper

17  was that bad, we didn't receive an email, but since it was

18  a political thing, and we received an email, that's how I

19  came to that interpretation.

20   Q.  Okay.  Your use of the word unprofessional, did

21  anybody suggest to you, that that would should be included

22  in this document?

23   A.  This document was 100% me.  It wasn't any

24  externally.

25   Q.  Okay.

1    A.  But I guess I did talk to my -- Ethan Wheeler

2  about the same situation.  He felt the -- he felt similar,

3  about the situation.  But no, it was 100% me putting

4  unprofessional in there.

5    Q.  Okay.  And you said that Midshipman Wheeler felt

6  the same way about things as you?

7    A.  At the time, yes.

8    Q.  And this was in January of 2018?

9    A.  No.  That was during the academic year.

10    Q.  Oh, okay.  So you --

11    A.  During the fall.

12    Q.  -- said he felt like you during the --

13    A.  At the time of the paper.  So I guess October-

14  November.  Maybe November.

15    Q.  Okay.  So he was also upset or unhappy with the

16  email, is that right?

17    A.  Yes, he was.

18    Q.  Okay.  If you can look at the -- just the

19  bottom.  And I'm to stop asking you about this document

20  soon.  The last sentence "in the classroom", do you see

21  that?

22    A.  I do.

23    Q.  And you say it seemed sexually explicit,

24  unprofessional again, vulgar, X-rated and crude.  I just

25  want to ask, you know, what was -- what did Professor

Page 118

1  Fleming do in the classroom, that you viewed to be

2  obscene?

3      A.  I guess that was the culmination, of all of the

4  sexual activities that were explained in class, was the

5  condoms, the transgender thing, to the -- all the sexual

6  topics of the classroom, that weren't related to the

7  course material, is where I came up with obscene.

8      Q.  And how old were you, when you started at the

9  Academy?

10     A.  18.  18.

11     Q.  What was sexually explicit that -- is that the

12  same just generally?  I'm just trying to understand the

13  use of the words.

14     A.  Sure.  The same generally sexual topics.

15     Q.  Okay.  What was X-rated?

16     A.  The numerous sexual topics.  And then saying

17  that midshipmen should have sex in the hall, and going

18  into that scenario as well.  And just how sex should be

19  this open thing.  And it just --

20     Q.  And the Academy has a policy that there cannot

21  be any sexual interaction in --

22     A.  That's correct.  Males and females have to have

23  the door open at a 90 degree angle, whenever males and

24  females are in the same room.

25     Q.  And maybe just for the Administrative Judge's

1  benefit, what is Bancroft Hall?

2      A.  Bancroft Hall is the dormitory of the Naval

3  Academy.  That's where every midshipmen lives, including

4  male and females all intermixed in the same company.

5  Males live together, females live together.  And there's

6  two, three, four, five and six man.  So you have a

7  roommate.  It's mandatory you have a roommate.

8      Q.  And so you -- you're saying that Professor

9  Fleming said in class, that the midshipmen should have sex

10  in --

11      A.  Correct.

12      Q.  Okay.  Did he say they should, or they should be

13  allowed to or --

14      A.  Should be allowed to.

15      Q.  Okay.  Because the Academy had -- again, I've

16  already said that.  Professor Fleming also makes or made,

17  when you were in his class, some -- what you would deem to

18  be disparing -- disparaging remarks about the Academy?

19      A.  Yes.

20      Q.  Can you tell me about any of those?

21      A.  Not specifically, I guess, but just a general

22  sense of the Academy is useless, in the needs of the

23  nation, especially when it comes to the funding, which is

24  his personal opinion.

25      Q.  Okay.  And it's clearly his personal opinion,

1  right?

2      A.  That's correct.

3      Q.  It's -- all right.  If you could turn to 121, in

4  the same exhibit, tab?  And you see the first full

5  paragraph there?

6      A.  Yep.

7      Q.  Events described above culminated on November 7,

8  2017, when Professor Fleming sent me an unsolicited semi-

9  nude picture.  Do you see that?

10     A.  I do see that.

11     Q.  And what was that a picture of?

12     A.  His torso, nipple and arm.

13     Q.  Okay.

14     A.  It was -- I believe it was attached to this

15  document --

16     Q.  Okay.  And he was flexing in that picture,

17  right?

18     A.  That's correct.

19     Q.  And can you tell me, did you cover, when you

20  were in Professor Fleming's class, a writing concept

21  called flex?

22     A.  We did.

23     Q.  And can you tell the Administrative Judge what

24  your understanding of what that is?

25     A.  Flex is the -- getting to the heart of the

1  paper.  I didn't really have a good grasp on it.

2      Q.  Okay.  But it is -- and Professor Fleming often,

3  in his emails, would include a -- at the end, under his

4  signature, he'd have a picture of an arm flexing, like a

5  drawing, not a photo?

6      A.  (No audible answer)

7      Q.  Okay.  Do you remember flexing in his classroom?

8      A.  I'm sure it did.

9      Q.  Do you remember taking pictures in his

10  classroom, or having pictures taken in the classroom?

11      JUDGE SYSKA:  Okay.  We need to keep our voices

12  up.  You -- in terms of flexing in the classroom, did you

13  answer that you had done it, or the professor had done it?

14      THE WITNESS:  I can't really remember.  I'm sure

15  it did happen though.  I'm sure someone did flex, because

16  that's again the -- how to write a paper.

17      JUDGE SYSKA:  Okay.

18      MR. EHRENBERG:  Okay.  And do you ever go to the

19  gym at the Academy?

20      THE WITNESS:  I do.

21  BY MR. EHRENBERG:

22      Q.  Is there a -- like a separate building at the

23  Academy, that is the gym, where people go to work out?

24      A.  There's about seven gyms at the Academy.  Seven

25  or eight gyms.  MacD, there's a place in Lejeune.  There's

Page 122

1  another place in Wesley Brown, which is the Track and

2  Field House.  There's Hospital Point.  There's a gym

3  facility, which is on the north end of the Academy.

4      Q.  And are there any swimming pools --

5          JUDGE SYSKA:  Can you keep your --

6          MR. EHRENBERG:  -- in any of the --

7          JUDGE SYSKA:  -- voice up again?  You're --

8          THE WITNESS:  Sorry.

9          JUDGE SYSKA:  -- fading out.

10         THE WITNESS:  Yeah.

11         JUDGE SYSKA:  I don't know if you're getting

12 tired or --

13         THE WITNESS:  Yeah.

14         MR. EHRENBERG:  Are there any swimming pools in

15 any of those gyms?

16         THE WITNESS:  There's one in MacD.  It's called

17 the Dungeon.  Then there's another one in -- also in MacD.

18 It's the water polo pool.  And then there's a pool in

19 Lejeune, that's used by the swim team to practice.

20 BY MR. EHRENBERG:

21     Q.  Okay.  And have you ever seen Professor Fleming

22 at any of those gyms?

23     A.  I have not.

24     Q.  Okay.  Now, just back to page 121.  And lower

25 down in that paragraph, you talked about how you were

Page 123

1    concerned, and you considered approaching the -- was that

2    the SAPR program, the sexual assault harassment prevention

3    program?

4        A.   That's correct.

5        Q.   You -- what did you feel -- when you received

6    this semi-nude picture of Professor Fleming, your -- you

7    thought about approaching the sexual harassment program.

8    Why is that?

9        A.   Because I didn't really know what the picture

10   meant at the time.  So you're trying to -- or not trying -

11   - I see what you're saying about the flex thing, but that

12   wasn't associated with what I interpreted the picture to

13   mean, in my perspective.

14       Q.   Okay.  So you felt that he was sending that to

15   you, because he was attracted to you?

16       A.   I didn't know.  It didn't feel right the

17   professor was sending me that type of picture.

18       Q.   Okay.

19       A.   It's one thing to have a picture of an arm, for

20   like a course discussion, but it's a different thing to

21   send an actual picture of yourself, to someone over email.

22   Especially, I didn't want that to be on my email, because

23   they check our -- through the ITSD department, which is

24   the cybersecurity department at the Naval Academy.  I

25   didn't want that -- them to see, after going through my

Page 124

1 emails, that I have a picture of my professor shirtless on

2 there, without at least letting someone know.

3     Q.  And you were concerned, that if the picture was

4 there, they would have thought you were homosexual?

5     A.  It's not about what they thought about it.  I

6 think it's just not appropriate for a government email

7 server.  And I guess all we've been taught on things on

8 government servers, you've got to be really cautious about

9 government servers, because it's all tracked, and all

10 checked for cybersecurity, in today's age of cyber

11 threats.

12     Q.  Okay.  If you could turn to page 123?

13     A.  Yep.

14     Q.  And kind of towards the middle, there's a

15 sentence that begins "one time" and then "while getting EI

16 on a paper".  Do you see that?

17     A.  I do.

18     Q.  And you said that Professor Fleming was so close

19 to you, that you considered finding an object to fight

20 him, if he attempted to sexually assault you.  Do you see

21 that?

22     A.  I do see that.

23     Q.  So when you were in that EI session, you felt

24 like you were going to be sexually assaulted?

25     A.  I felt uncomfortable, because it was just really

1  And then if you can't do that, you'll try to, what they

2  say is suspend the duty.

3          So say you were the Con of a ship, and the

4  Officer of the Watch told you to turn right, and and that

5  would have crashed the ship, you would then make the

6  Officer of the Watch the Conning Officer, who's in charge

7  -- he carries out the order and not you.  And then the

8  fourth step is ultimately just disobey -- publicly disobey

9  the order, within the command structure.  So you can't

10  just disobey the order by yourself.  You need to publicly

11  say I'm not following this order, because -- lay out why

12  you are disobeying that order.

13      Q.  Okay.  And Professor Fleming talked about

14  leadership in his class, didn't he?

15      A.  Maybe a little bit.  Not -- it wasn't a major

16  thing.

17      Q.  Okay.  You were talking earlier about a picture,

18  that Professor Fleming showed in class, of his son and a

19  prom date, is that right?

20      A.  I was.  Correct.

21      Q.  And you said that the picture was zooming in on

22  the crotch area?

23      A.  Well, he was doing that.  It was like an iPhone

24  screen.  So he was zooming in, on the picture.

25      Q.  Okay.  So he was focusing the picture, on the

Page 140

1  area where you could see the length of the skirt?

2      A.  Yes.

3      Q.  Okay.  And just one last question.  Going back

4  to the questioning of the mindset.  So when you receive an

5  order from a superior officer -- do you ever receive

6  orders from superior officers, in your position as a

7  midshipman at the Academy?

8      A.  I do.

9      Q.  Okay.  And you don't just blindly follow those,

10 right?  Those orders.

11     A.  No.

12     Q.  Okay.  You question the mindset of --

13     A.  Correct.

14     Q.  -- the person giving you the order, right?

15     A.  Uh-huh.

16     Q.  And you -- what you said.  You go through that

17 four step process, correct?

18     A.  Uh-huh.

19     Q.  Okay.

20     A.  That's at least what I've learned from the

21 officers at the Academy.  Officers at the Academy.  So

22 Commander Chapman, who's my ethics professor.  And

23 Lieutenant DeBuck, would be the -- he's my Company

24 Officer.  Would be the most significant military-like

25 order specifics, where I've learned that.  So --

Appx1014

1  first of the year.

2         MR. COOK:  No further questions, Your Honor.

3         MR. EHRENBERG:  Nothing, sir.

4         JUDGE SYSKA:  I just have a couple for you,

5  midshipman.  Was the high school you attended in Florida,

6  a religious high school?

7         THE WITNESS:  It was.

8         JUDGE SYSKA:  It was?

9         THE WITNESS:  It was.

10        JUDGE SYSKA:  Okay.  And you indicated that you

11 were taking, I believe advanced placement English, college

12 level English?

13        THE WITNESS:  Yes, sir.

14        JUDGE SYSKA:  Okay.  What kind of grade did you

15 get in AP English?

16        THE WITNESS:  I got an A in AP English.  And I

17 believe I got a four on the AP exam, to the best of my

18 recollection.  And my teacher was a former professor in

19 college as well.

20        JUDGE SYSKA:  Okay.  So was the C you received

21 from Professor Fleming your first C in English?

22        THE WITNESS:  It was my first C in English.

23        JUDGE SYSKA:  Okay -- your first semester at the

24 Academy?

25        THE WITNESS:  I had a 3.0, which is I guess like

Page 148

1  English.

2           JUDGE SYSKA:  That would be HE111?

3           THE WITNESS:  Yes.

4           JUDGE SYSKA:  The fall of 2017?

5           THE WITNESS:  I believe so, yes.

6           JUDGE SYSKA:  Okay.  Your witness, counsel.

7           MR. COOK:  Thank you, Your Honor.

8                     DIRECT EXAMINATION

9  BY MR. COOK:

10     Q.  Midshipman Buckley, let me direct your attention

11  to the fall of 2017, and your class Rhetoric and

12  Introduction to Literature.  Who was the instructor in

13  that class?

14     A.  Professor Fleming.

15     Q.  What grade did you get in that class?

16     A.  I got a C.

17     Q.  Do you recall the instructor touching you?

18     A.  Yes, I do.

19     Q.  Okay.  Please explain to the Administrative

20  Judge what happened.

21     A.  So I would sit next to him in a circle-type, so

22  everyone could look at each other, and have a

23  conversation.  And he would pick the spot next to me.  And

24  he just -- would just reach over, and touch my back and

25  like pat it, rub it.

Page 149

1      Q.  Okay.  Midshipman Buckley, let's go a little bit
2  more about this touching.  How many times did it happen?
3      A.  No more than twice.
4      Q.  Okay.  How long did it last?
5      A.  15 seconds.
6      Q.  Okay.  Now, you mentioned that it was a patting?
7  Are you sure?  Is that consistent with your email, that
8  you sent to Professor Lindler?
9      A.  It was -- yeah, I mean a rubbing.  A rub.  I
10  would say a rub.
11      Q.  Okay.  Let me be clear.  I want you to be clear.
12  What happened in that classroom?  How did he touch you?
13      A.  He reached over, and would do this, and like do
14  this.  Like rub.  More of a rub, I'd say.
15      Q.  Hold old were you, when this happened?
16      A.  19.
17      Q.  Did you ever talk to your classmates about it?
18      A.  I did.
19      Q.  What did you say?
20      A.  I expressed a little bit of discomfort --
21      Q.  Why?
22      A.  Because I was uncomfortable.
23      Q.  Has that ever happened to you in any other --
24      A.  No, sir.
25      Q.  Did it ever happen to you, when you were in high

Page 152

```
1          A F T E R N O O N   S E S S I O N
2                                    (Time:  1:14 p.m.)
3          JUDGE SYSKA:  On the record.
4          Just raise your right hand, please.
5          Whereupon,
6                     RICHARD JIN,
7   having been called as a witness by and on behalf of the
8   Agency and, having been first duly sworn, was examined and
9   testified on his oath, as follows:
10         JUDGE SYSKA:  Please be seated.  And state and
11  spell your full name.
12         THE WITNESS:  My full name is Richard Jin, R-I-
13  C-H-A-R-D, J-I-N.
14         JUDGE SYSKA:  And you're a midshipman at the
15  Naval Academy?
16         THE WITNESS:  Yes, sir.
17         JUDGE SYSKA:  What year?
18         THE WITNESS:  I'm a third class midshipman.
19         JUDGE SYSKA:  Class of '21?
20         THE WITNESS:  Yes, sir.
21         JUDGE SYSKA:  And have you taken any courses
22  with Professor Fleming?
23         THE WITNESS:  I have, sir.
24         JUDGE SYSKA:  What course?
25         THE WITNESS:  Introduction to Rhetoric and
```

Page 153

1   Literature (sic).

2           JUDGE SYSKA:  That's the plebe English?

3           THE WITNESS:  Yes, sir.

4           JUDGE SYSKA:  The HE111?

5           THE WITNESS:   Yes, sir.

6           JUDGE SYSKA:  And that would be the fall of

7   2017?

8           THE WITNESS:  Correct, sir.

9           JUDGE SYSKA:  Okay.  Your witness, counsel.

10          MR. COOK:  Thank you, Your Honor.

11                      DIRECT EXAMINATION

12  BY MR. COOK:

13      Q.  Midshipman Jin, are you familiar with the Naval

14  Academy Honor Concept?

15      A.  Yes, sir.

16      Q.  What is it?

17      A.  It's a long paragraph, basically three

18  statements, where midshipmen will not lie, cheat or steal.

19      Q.  Have you been trained in the Honor Concept?

20      A.  Yes, sir.

21      Q.  How have you been taught at the Naval Academy,

22  to refer to your instructors?

23      A.  We're to refer to our instructors as professor

24  last name, or doctor last name, however they prefer.

25      Q.  Okay.  How are midshipmen generally referred to

Page 154

1  by their instructor?

2      A.  Midshipmen are generally referred to as

3  midshipman last name, or just the last name.

4      Q.  How would a professor know what you last name

5  is?

6      A.  Our names are stitched on our uniforms.

7      Q.  How were you -- by Professor Fleming, in HE111?

8      A.  I was referred to as just Jin.  Just my last

9  name.  Although on occasional cases, there were different

10  pronunciations of my name.

11     Q.  What were those mispronunciations?

12     A.  They were names that were close to what my last

13  name sounds like.  Other variations of Asian names, such

14  as Kim, Jong or Lim, of the sorts.

15     Q.  You ever try to correct Professor Fleming?

16     A.  Yes, sir.

17     Q.  How many times?

18     A.  I've attempted to correct Professor Fleming at

19  least three or four times.

20     Q.  And what was his response, to those attempts to

21  correct him?

22     A.  Most of the time Professor Fleming just kind of

23  walked away.  However, there was one incidence where he

24  told me to "fuck off".

25     Q.  Okay.  Are there any other instructors at the

1  Naval Academy, that experienced trouble pronouncing your

2  name?

3      A.  No, sir.

4      Q.  How did the professor -- how did Professor

5  Fleming's mispronunciation of your name impact you

6  personally?

7      A.  So as a child of two immigrant parents, who came

8  to the United States with literally nothing, and created a

9  living for my family and my brother, our last name in --

10  at least in an Asian-American household is very important

11  to us.  The last name holds significant honor, background

12  and essentially our culture, as a family.  So my last name

13  means very much to me.  My last name Jin, in Chinese, is

14  translated to gold, which is something that I've always

15  shown pride in.  And to have my last name be

16  mispronounciated (sic) on purpose, was basically a slap in

17  the face.

18          MR. COOK:  No further questions, Your Honor.

19          JUDGE SYSKA:  Okay.  Cross?

20          MR. EHRENBERG:  Yes.

21                    CROSS-EXAMINATION

22  BY MR. EHRENBERG:

23      Q.  Good morning.  My name --

24      A.  Good morning, sir.

25      Q.  Or afternoon.  My name is Jason Ehrenberg, and I

Page 158

1          THE WITNESS:  I do.  I took it the fall of my

2    plebe year.  That's our freshman year.

3          JUDGE SYSKA:  So fall 2017?

4          THE WITNESS:  Yes, sir.

5          JUDGE SYSKA:  And can you keep your voice up a

6    little bit, once the attorney's start questioning you?

7    And counsel, it's all yours.

8          MR. COOK:  Thank you, Your Honor.

9          THE WITNESS:  Yes, yes.

10                    DIRECT EXAMINATION

11   BY MR. COOK:

12       Q.  Midshipman Ransdell, do you recall a class,

13   where pictures of children and their dates were shown?

14       A.  I do.

15       Q.  Okay.  Who were those pictures of?

16       A.  The picture, it was his son's date to a dance.

17       Q.  Anybody else in the picture?

18       A.  I'm not sure if his son was in it, or her mom

19   was in it, but I definitely remember seeing the date.

20       Q.  Okay.  Do you know the approximate age of the

21   girl in the picture?

22       A.  High school age.

23       Q.  How were their pictures shown to you?

24       A.  They were on his phone.

25       Q.  What did Professor Fleming say, about the people

Page 159

1  in the pictures?

2     A.  That the daughter and the mom were dressed, what

3  he deemed inappropriately.  Their heels were high.  Their

4  skits were short.  He said that it was inappropriate for a

5  girl of her age, and I guess for the mom's age too.

6     Q.  Did he use any specific terms, to describe what

7  he thought they were dressed like?

8     A.  From what I recall, he either called them -- he

9  either called their dress shitty or slutty.  It was one or

10 the other.

11        JUDGE SYSKA:  -- actually both of you.

12        THE WITNESS:  Yes.

13        MR. COOK:  Yes, sir.

14        THE WITNESS:  Sorry.

15 BY MR. COOK:

16    Q.  Midshipman Ransdell, you've been two years at

17 the Naval Academy, do you have an opinion on this type of

18 commentary, by a Naval Academy professor in the classroom?

19    A.  I think it was inappropriate.

20    Q.  And why --

21    A.  Unorthodox.

22    Q.  Why was it inappropriate?

23    A.  I'd say for any class at the Academy, talking

24 about -- maybe really talking about someone in that

25 manner, especially to students, especially when the girl

Appx1033

Page 160

1   was underage, just seemed inappropriate.

2          MR. COOK:  I have no further questions, Your

3   Honor.

4          JUDGE SYSKA:  Cross?

5          MR. EHRENBERG:  No, sir.

6          JUDGE SYSKA:  We're flying through here.

7   Midshipman Ransdell --

8          THE WITNESS:  Sir?

9          JUDGE SYSKA:  -- were you personally offended by

10  it?

11         THE WITNESS:  I believe that everyone should

12  have their own opinions.  So I understand that was his

13  opinion.  And I guess an older male -- I mean you hear

14  people's opinions all the time about   things like that.

15  I think maybe some of the girls felt uncomfortable by it.

16  Personally, I mean I'm going to -- care what people think,

17  but yeah.  Yes, sir.

18         JUDGE SYSKA:  So yes, you were offended or no

19  you weren't?

20         THE WITNESS:  I was not offended.

21         JUDGE SYSKA:  Okay.  Any question based on my

22  question?

23         MR. EHRENBERG:  No, sir.

24         MR. COOK:  No, sir.

25         JUDGE SYSKA:  Midshipman Ransdell, thank you

1          JUDGE SYSKA:  And have you ever taken a class

2    with Professor Fleming?

3          THE WITNESS:  Yes, sir.

4          JUDGE SYSKA:  What class?

5          THE WITNESS:  English 1.  I forget the number

6    for it.

7          JUDGE SYSKA:  Would HE111 sound familiar?

8          THE WITNESS:  Yes, sir.  That's right.

9          JUDGE SYSKA:  Do you remember when you took it?

10         THE WITNESS:  First semester of plebe year.

11         JUDGE SYSKA:  So fall 2017?

12         THE WITNESS:  Yes, sir.

13         JUDGE SYSKA:  Okay.  Your witness, counsel.

14         MR. COOK:  Thank you, Your Honor.

15                     DIRECT EXAMINATION

16   BY MR. COOK:

17      Q.  Midshipman Gore, are you familiar with the term

18   life lessons?

19      A.  Yes, sir.

20      Q.  How are they used in Professor Fleming --

21      A.  Every now and then in the class, we'd talk about

22   life lessons, whether it was romantic relationship advice,

23   whether it was maybe -- it could be down to like how to

24   dress.  Things that you should buy, as an adult.  Things

25   like that.  Or just like general life advice.  Even if it

Page 163

1   was sexual things, like I think at some point anal sex was

2   talked about.  Oral sex, things like that.

3       Q.  Who -- taught or discussed in these life

4   lessons?

5       A.  Primarily it was just Professor Fleming.

6       Q.  To the best of your recollection, what

7   relationship did those topics of life lessons have, to the

8   subject matter for the day or the syllabus?

9       A.  Some of them maybe stemmed off of some of the

10  material, but most of them didn't.

11      Q.  How did these discussions help you better

12  understand the material, or to become a better naval

13  officer?

14      A.  I mean some of the advice was maybe

15  constructive, but I would have to say oral sex, anal sex,

16  things like that, were definitely not something that I

17  would have used, to become a naval officer.  Not very

18  constructive for me.

19      Q.  Based on your training as a midshipman, would

20  this be the kind of topic and behavior, that you would

21  discuss with your sailors and marines in the fleet?

22      A.  Not at all.

23      Q.  What would happen if you did?

24      A.  There -- some kind of action against you.  Maybe

25  sexual harassment.  Something like that.

Page 164

1      Q.  Were you offended by Professor Fleming's

2  comments?

3      A.  I didn't really feel too uncomfortable about it,

4  but I know that other people in the class definitely did.

5  And you could kind of feel it in the room too.

6          MR. COOK:  I have no further questions, Your

7  Honor.

8          JUDGE SYSKA:  Cross?

9          MR. EHRENBERG:  No, sir.

10         JUDGE SYSKA:  Okay.  Midshipman Gore, thank you

11 very much for your testimony today.  Because the hearing

12 is ongoing, do not discuss your testimony with anyone.

13 And you're excused.  Thank you --

14         THE WITNESS:  Thank you, sir.

15         JUDGE SYSKA:  -- very much.  Off the record for

16 the next witness.

17             (Whereupon, a brief recess was taken)

18         JUDGE SYSKA:  On the record.

19         Would you raise your right hand, please, sir?

20

21         Whereupon,

22                 ANDREW PHILLIPS,

23 having been called as a witness by and on behalf of the

24 Agency and, having been first duly sworn, was examined and

25 testified on his oath, as follows:

Appx1038

1          JUDGE SYSKA:  Please be seated.  And state and

2     spell your full name.

3          THE WITNESS:  Andrew Todd Phillips.  P-H-I-L-L-

4     I-P-S.

5          JUDGE SYSKA:  And by whom are you currently

6     employed?

7          THE WITNESS:  United States Naval Academy.

8          JUDGE SYSKA:  And what --

9          THE WITNESS:  Academic Dean and Provost.

10         JUDGE SYSKA:  And how long have you held that

11    position?

12         THE WITNESS:  10 years.

13         JUDGE SYSKA:  Your witness, counsel.

14         MR. COOK:  Thank you, Your Honor.

15                    DIRECT EXAMINATION

16    BY MR. COOK:

17    Q.  Dean Phillips, prior to your arrival at the

18    Naval Academy, were you employed -- where were you

19    employed, and what position did you hold?

20    A.  In 1988 I began as a civilian professor at the

21    Naval Academy.  I held that position for 10 years.  In

22    1998 I left to go to the University of Wisconsin Eau

23    Claire -- there.  And then Dean of the Graduate Studies

24    and the Vice Provost, before returning to the Naval

25    Academy in 2009, as Academic Dean and Provost.

Page 166

1    Q.  And as the Academic Dean and Provost, what are

2  your duties and responsibilities?

3    A.  I'm responsible -- faculty personnel matters,

4  all curricular matters, all academic extracurricular

5  matters, including co-curricular things, involving the

6  education of midshipmen at the Naval Academy.

7    Q.  To what extent are you still involved in the

8  teaching role?

9    A.  I teach every semester.  It's not part of my

10  assigned duties, but I teach one course each semester.

11  Have done that for several years now.

12    Q.  And why do you keep teaching, as the Dean?

13    A.  It's important to me to demonstrate, by virtue

14  of my own actions, my own leadership, that I am still in

15  touch with what the faculty do on a day to day basis, and

16  in touch with what the midshipmen are learning.  In my

17  particular case, I teach a course in cyber operations

18  every semester.

19    Q.  Your professional career has been in academia.

20  Have you had -- and since you've had an opportunity, to

21  serve in both a civilian college and university, and at

22  the Naval Academy, can you briefly -- differences between

23  the two?

24    A.  So the Naval Academy is considerably different

25  than a civilian college university, because it is

Page 167

1  specifically a service academy.  All of the students are

2  an active duty, unlike a civilian college.  All of the

3  students at the Naval Academy are destined to serve their

4  country, as active duty officers in the Navy or Marine

5  Corps, to lead sailors and marines.  None of that would be

6  something that would be normal at a civilian college or

7  university.

8       We do that in four years.  Not longer, not

9  shorter.  Again, at a civilian college, you can take

10  longer or you can graduate earlier.  But for us, it's a

11  developmental model, that requires four years to complete.

12       All of our students are 18 to about 24 years

13  old.  Most of them come directly from high school.  None

14  of them work, while they're at the Naval Academy, other

15  than collecting the pay that they get, by virtue of being

16  on active duty.

17  Q.  Why did you return to the Naval Academy?

18  A.  Returned in 2009 for the same reason I started

19  at the Academy in 1988.  I wanted to be part of an

20  organization, that has sort of a higher cause, a higher

21  calling, graduating students to serve their country.  I

22  wanted to be able to be part of that important

23  developmental model.  That's not something that the

24  University of Wisconsin, or any other college -- civilian

25  college can really do.  And so when I had the chace to

1    come back, I jumped at it, to be able to lead an

2    organization like that with that calling.

3        Q.  Dean Phillips, what's the makeup of the Naval

4    Academy faculty?

5        A.  Just over 50% civilian faculty.  A little bit

6    under that active duty naval officers.  The majority of

7    the naval officers are in the Navy, but a smaller number

8    are in the Marine Corps.  So it's just a little bit more

9    civilian than it is military, on the faculty side at

10   least.

11       Q.  Directing your attention to the beginning of the

12   2018-2019 academic year.  The fall of 2018.  Do you and

13   the Superintendent routinely meet with the facility,

14   before the beginning of an academic year?

15       A.  The Superintendent routinely has an all hands

16   faculty convocation once a year, typically in August or

17   September.  It doesn't happen ever year, but it did happen

18   in the fall of 2018.  I have a separate one, with just the

19   faculty usually each year.  I don't -- year, because I

20   think the Superintendent did his instead.

21       Q.  During that fall of 2018, meaning August time

22   frame, were there any discussions on Professor Fleming's

23   removal?

24       A.  The Superintendent did talk about that publicly

25   with the faculty members.  His intent in doing so, was to

Page 169

1  try to assuage any concerns, about the impact it would

2  have on academic freedom, on tenure, on student opinion

3  forms and the like.  It was specifically about Dr.

4  Fleming, but rather to assuage any faculty concerns, about

5  the broader impacts of what removal might mean.

6      Q.  I don't know if I heard you, but did the

7  Superintendent discuss at any time, specifics of the case?

8      A.  He mentioned that the specifics of the case --

9  he mentioned that the case involved specifically

10  inappropriate photos emailed to students, and

11  inappropriate touching.  He didn't go beyond that.

12      Q.  Was there any discussion made, on who was the

13  one who made the decision to remove Professor Fleming?

14      A.  I don't believe he specifically addressed that.

15  He may have used the word we, in referring to the Naval

16  Academy, but I don't believe he specifically said that

17  that was my decision or not.

18      Q.  Dean Phillips, what I want to do now, is I want

19  to turn to the specific misconduct, and the elements of

20  your decision, to remove Professor Fleming.  How do you

21  know Professor Fleming?

22      A.  Professor Fleming started at the Naval Academy a

23  few years before I did.  So I've known him since I started

24  at the Naval Academy in 1988.

25      Q.  In the supervisory chain, where are you?

Page 170

1      A.  I'm the senior -- Academy.  So all of the
2  academic faculty, in one -- or another report up through a
3  chain of command to me.
4      Q.  -- in addressing the complaint, that was filed
5  by Midshipman DeSantis and others?
6      A.  I had no involvement, up until the point that
7  the Proposing Official, Colonel Aytes, provided to me his
8  Proposed Notice of Removal, and a report from the
9  investigating panel.
10     Q.  To what degree were you aware of the complaint
11 and its processing?
12     A.  I was aware that there were complaints filed.  I
13 was aware of the timeline of the process.  I was not aware
14 of the content of the complaints, or of the report, except
15 to the extent that Dr. Fleming emailed all faculty his
16 responses to that report.  So I saw it in that context.
17     Q.  To what extent were you involved, in the
18 proposed action issued by the Division Director Colonel
19 Aytes?
20     A.  I had no involvement in that.
21     Q.  What guidance, if any, did you receive from the
22 Superintendent, or anyone else at the Naval Academy, about
23 this case?
24     A.  I had no guidance from anyone.
25     Q.  After you received the report, what did you do?

1    A.  I received the report in early July of 2018.

2  Spent several weeks reading through, and considering all

3  of the evidence; the investigating panel's report, all of

4  the enclosures, the complaints from the students, and the

5  Proposing Official's recommendations.  And made my

6  decision at the end of July.

7    Q.  -- anything that the Appellant provided, that

8  you considered?

9    A.  Yes.  The Appellant provided his responses to

10  the panel in writing in an email.  And again to the

11  Proposing Official in writing.  So I considered all of the

12  responses, that the Appellant provided.

13    Q.  Now the time that you were considering the

14  information, what period of this is it, in the Academy's

15  academic calendar?

16    A.  So it's in the summer.  There are no -- well,

17  the midshipmen are largely not at the Naval Academy in the

18  summer.  There are some around, for a small summer school

19  session.  The faculty don't report back until the second

20  week of August.  So we were also in the period of time

21  between faculty departures in June and arrive -- so it was

22  in the slowest period of the academic year; classes not

23  being in session, most faculty not being present.

24    Q.  Are you familiar with the Douglas Factors?

25    A.  I am.

Page 172

1    Q.  How did they work?  How did you -- your

2  decision?

3    A.  Well, the Douglas Factors guided the decision.

4  So I considered each of the Douglas Factors in sequence,

5  just as the Proposing Official had done himself, and

6  weighed the evidence, against what the Douglas Factors

7  required.

8    Q.  Okay.  At any time during this process, either

9  before you received, or after you received the report,

10  prior to your decision, were you aware that Professor

11  Fleming had filed an Office of Special Counsel complaint?

12    A.  I was not aware of that.

13    Q.  Are you familiar with the Office of Special

14  Counsel?

15    A.  I am familiar with the Office of Special

16  Counsel.

17    Q.  And how are you familiar with that?

18    A.  In 2009, I denied Professor Fleming a pay raise

19  and issued him a letter of caution, for comments he had

20  written publicly, about minority students at the Naval

21  Academy.  The Office of Special Counsel intervened on his

22  behalf, and determined that I was in the wrong, in issuing

23  that denial.  We corrected that action, and I've accepted

24  that decision.  That was in '10.

25    Q.  What role if anything did that prior action

1  have, in your decision making process?

2      A.  It had no role in it.

3      Q.  Who's your supervisor at the Naval Academy?  Who

4  do you --

5      A.  The Superintendent, Vice Admiral Walter Carter.

6      Q.  Okay.  What discussions did you have with him,

7  about this case and/or the outcome?

8      A.  The only discussions with -- on the timing of

9  the process itself.  Where we were, in the stage of the

10 process.  At what point would a decision be rendered?  But

11 we never discussed any of the contents of the process.

12 Neither of us were aware of those contents, except of the

13 -- being sent.

14     Q.  Are you familiar with the charge Conduct

15 Unbecoming a Federal Employee?

16     A.  I am.

17     Q.  Okay.  Can you define, for the Administrative

18 Judge, the term Conduct Unbecoming?

19     A.  Conduct of a sufficient nature that it would be,

20 in this instance, unprofessional, disrespectful, in the

21 context of the academic environment.  Kinds of behaviors

22 that we cannot condone at the Naval Academy, given the

23 kind of outcome we're seeking to desire.

24     Q.  How does dignity and respect --

25     A.  That --

1    Q.  -- play a part in the faculty-student

2  relationship at the Naval Academy?

3    A.  Yeah.  That's specifically the conduct I'm

4  referring to.  That when you're trying to gradate -- in

5  the Navy and Marine Corps, in an organization that has a

6  chain of command, superiors and subordinates, it's crucial

7  that our graduates, our midshipmen,  learn what dignity

8  and respect looks like, because we are going to expect

9  them to treat their subordinates, the citizens of this

10  country, the citizens of other countries, with dignity and

11  respect at all times.  It's a professional organization.

12       Because they are only 18 to 24 years old when we

13  get them, and they come from all of the Congressional

14  Districts, they do not arrive at the Naval Academy, with a

15  shared sense of what dignity and respect look like, or

16  what right and wrong look like.  Because they come from

17  such different backgrounds, it's our responsibility as

18  faculty members to be role models for them, mentors for

19  them.  And demonstrate by our behavior, what appropriate

20  respect is for each other, and for students, and what a

21  dignified, professional behavior on the part of mentors

22  and role models looks like.  And that is unique.

23       That is not the sort of thing, that you

24  necessarily would see at a civilian college or university.

25  You could reasonably hear someone at a different college

Page 175

1   or university say the words do as I say, but not

2   necessarily as I do.  Those would not be words you would

3   hear at the Naval Academy.

4        You would hear do as I say, and as I do, because

5   I'm expected to be a role model and a mentor, for the

6   midshipmen that we're developing.  So dignity and respect

7   is a thread, that runs through everything we do.  It goes

8   right to the heart of developing leaders and what we're

9   about.

10       Q.  Is there any specific conduct, other than what

11  you -- that you've already mentioned in the decision,

12  about dignity and respect, that is especially troubling to

13  you in this case?

14       A.  This case hinges on really three significant

15  factors in my mind.  One, the inappropriate emails with

16  the photographs.  A repeated behavior.  The unwanted,

17  inappropriate touching of midshipmen.

18       And then the outright rejection, that there was

19  anything wrong with that.  The refusal to admit any

20  responsibility for doing so, and the claim that Dr.

21  Fleming is in the right, in having done it, and would do

22  it again.  That -- and respectful approach to educating

23  midshipmen.  Those are sorts of things that the Naval

24  Academy cannot condone.  Those are the sorts of things,

25  that would get officers relieved of command, were they to

Page 176

1   repeat that in the fleet.

2       Q.   What about the importance of trusting your

3   faculty with the students?

4       A.   We talk very specifically about faculty members

5   being role models for midshipmen, and mentors to them.

6   And the presence of midshipmen, to do that very thing.

7   They are often alone with midshipmen in their classroom,

8   or in their office.

9            So I've lost confidence in Professor Fleming, to

10  adhere to those principles, because he's demonstrated

11  repeatedly in this case that he's going to do it his own

12  way.  So I  don't have confidence that he will be

13  respectful toward the midshipmen, and be a good role model

14  for them, as they are preparing to graduate, and lead

15  sailors and marines.  To have someone always with him,

16  sort of looking over his shoulder, to make sure he does

17  that, that's impossible for me to accomplish.

18      Q.   Why is it -- and why would it be impossible for

19  -- monitor that behavior in the classroom?

20      A.   It would require someone full time, to be with

21  him every time he teaches a class.  To be with him every

22  time he's in his office with midshipmen.  To be with him

23  every time he's around midshipmen.

24           He emails midshipmen -- to monitor that sort of

25  thing.  I don't have the resources necessary to do that;

Page 177

1  to monitor that sort of behavior.  And he's made it quite

2  clear, he intends to continue that behavior.  He does not

3  see anything wrong with what he's done.

4      Q.  When you say he doesn't see anything wrong with

5  what he has done, what specific conduct are you referring

6  to?

7      A.  So he sees nothing inappropriate, in the

8  touching of midshipmen in class.  He sees nothing

9  inappropriate, in the disrespectful comments he's made to

10  midshipmen, in person and in email.  He rejects that he

11  sent the second round of inappropriate photos of himself.

12  He claims that he never did so, in spite of the evidence

13  that he did.  And it's correct, that he had a corrective

14  active, an oral counseling by his Department Chair, a

15  couple of years earlier.  So he denies that it ever

16  happened again, even though we have the evidence that it

17  was so.

18      Q.  During the course of -- Professor Fleming sent

19  out a separate email, defending his actions, rather than

20  talking to the panel.  Do you recall that email?

21      A.  I do.

22      Q.  What is troubling about this email, and what was

23  the result?

24      A.  It's troubling on several grounds.  First, that

25  he sent it to the entire faculty.  The panel invited him

Page 178

1  to come, and have a conversation with them privately, and

2  he chose not to do that, but instead to respond in a

3  email, writing -- copying all of the faculty, giving only

4  his side of the story, instead of allowing -- we're not

5  able to give our side of the story.  And repeatedly, in

6  that same email, he rejects out of hand, either that

7  incidents occurred, or that there's anything wrong with

8  them.  He's very strident in his response, that there's

9  nothing wrong with what he was doing, and that the Academy

10 is in the wrong, in suggesting otherwise.

11     Q.  In one of those emails he mentioned a former

12 student.  Are you familiar with that?

13     A.  I am familiar with that as well.

14     Q.  And what was troubling about that commentary in

15 the email?

16     A.  All right.  So that former student had filed a

17 complaint, a written complaint, against Dr. Fleming a year

18 or so earlier, about comments Dr. Fleming had made to the

19 student, that were disrespectful.  He had been orally

20 counseled by that, by his Department Chair -- and case.

21 He violated the Privacy Act, in emailing private

22 information, PII protected information, about that

23 midshipman; SAT scores, grades, the midshipman's name and

24 so forth.  In an attempt to defend himself in this case,

25 but yet again, managed to be disrespectful toward that

Page 179

1  midshipman.  That action and that incident ended up with a

2  Letter of Reprimand issued by someone else, for violation

3  of the PII.

4      Q.  Do you recall what the ethnicity was --

5      A.  That midshipman was Asian.

6      Q.  What is your opinion, of Professor Fleming's

7  ability, to perform at a satisfactory level, in the

8  workspace, classroom, academic side of the house?

9      A.  I do not have any confidence, that he will

10  perform satisfactorily.  His comments, in response to

11  these allegations, make it clear -- is to continue to

12  behave, as he has always behaved.  That's the sort of

13  behavior at the Naval Academy I can't permit.  So I don't

14  have confidence that he's perform satisfactorily.

15      Q.  What do you think about Professor Fleming's

16  rehabilitative potential?

17      A.  So over the past four or five years, he's had

18  two oral counseling sessions by his Department Chair.  One

19  of those was the oral counseling of the Asian midshipman

20  you just mentioned.  Counseling for the first round of

21  inappropriate photos, where he vowed he wouldn't do it

22  again.  And yet, he did it again.  So he's demonstrated

23  that he will do -- will violate the same actions again.

24      But maybe more importantly, in his written

25  response to the investigating panel, he declared he wasn't

Appx1053

Page 180

1    in the wrong.  He took no responsibility for any of his

2    actions.  Doesn't see anything inappropriate that he did.

3    And suggests, in that written response, that he intends to

4    continue his behavior.  His own words tell me what I need

5    to know, which is he does not intend to be rehabilitated.

6        Q.  Are you familiar that Professor Fleming writes

7    articles about the Naval Academy?

8        A.  I am.

9        Q.  Are you familiar on any recent articles that

10   were written, around the time that the allegations of this

11   complaint were made?

12       A.  I'm aware that he wrote an article in The

13   Federalist, but I have not read that article.

14       Q.  -- are familiar that the article exists?

15       A.  I am familiar that the article exists.

16       Q.  And how are you familiar?  How are you -- how do

17   you know, that he wrote an article?

18       A.  It was brought to my attention by, I think, the

19   Public Affairs Officer, when the article came out, in a

20   short email suggesting that Dr. Fleming had written an

21   article.  But as I said, I didn't read it.  So I aware of

22   its existence.

23       Q.  Why don't you read his articles?

24       A.  The articles are sort of repetition of his usual

25   mantra, that the Naval Academy is a failed institution

Appx1054

Page 181

1  that should be closed.  And so it doesn't -- it's not a

2  valuable use of my time, to continue to read that.  It's

3  not important to me anymore.

4      Q.  If he had suggestions, on the changes that

5  should be made at the Naval Academy, how would he make

6  those recommendations?

7      A.  Like any other faculty member.  Suggest them up

8  through the chain of command, through his Department

9  Chair, to his Division, to me and to the Superintendent.

10 There's any number of avenues, but that would be the

11 normal expectation, to bring his ideas and his thoughts

12 through his chain of command.

13     Q.  Dean Phillips, why shouldn't Professor Fleming

14 be a member of the faculty?

15     A.  Because his behavior runs counter, to the thread

16 of dignity and respect, to what we're looking for in a

17 faculty member, to be a role model and a mentor to

18 midshipmen.  He has his own agenda, that flies in the face

19 of what the Naval Academy's agenda is, of developing

20 leaders to serve the country, in charge of sailors and

21 marines, and leaders of character.  So he's interested

22 only in his own view of that, not in supporting the Naval

23 Academy perspective.

24     Q.  In your opinion, Dean Phillips, what message

25 would you be sending, to the midshipmen and the other

Page 182

1  faculty, by returning Professor Fleming to the classroom?

2      A.  Were I to return him to the classroom, I would

3  be telling the midshipmen and the faculty that that sort

4  of behavior is in some sense condoned.  You can do it.

5  You can say you'll continue to do it.  And while you might

6  be reprimanded, you will be returned to the classroom, to

7  repeat that behavior.  Not a message I can send.  That's

8  not message that I think people would accept.  It would

9  confuse everyone, as to what exactly I'm doing.

10         MR. COOK:  I have no further questions, Your

11  Honor.

12         JUDGE SYSKA:  Cross?

13         MR. EHRENBERG:  Sir, may we have a brief

14  restroom break?

15         JUDGE SYSKA:  Sure.  Let's go off the record

16  until 2:05.

17            (Whereupon, a brief recess was taken)

18         JUDGE SYSKA:  On the record.

19          Okay.  And we're back on the record for cross.

20         MR. EHRENBERG:  Yes, sir.

21                      CROSS-EXAMINATION

22  BY MR. EHRENBERG:

23      Q.  Good afternoon, Vice Provost Phillips.  We've

24  met before, correct?

25      A.  We have.

1      Q.  And in fact, we were in each other's proximity a

2  few weeks ago, right?

3      A.  (No audible answer)

4      Q.  Would you agree that you stated that you came

5  back to the Academy -- 2009, is that right?

6  ]  A.  That's right.

7      Q.  And I believe you mentioned, that there had been

8  an OSC involvement or investigation?

9      A.  That's right.

10      Q.  An O -- the actions you took, were violative of

11  Professor Fleming's rights, correct?

12      A.  That's right.

13      Q.  What was it that -- I want to talk a little bit

14  just about that decision.  And how did you have occasion,

15  to have any input in -- as to what Professor Fleming

16  makes, in a given year?

17      A.  I was responsible for confirming pay raises.

18      Q.  Okay.  And can you tell me how they are handled

19  at the Academy?  What the process is, for one to get a pay

20  raise, whether -- they're merit raises, correct?

21      A.  They are.

22      Q.  And then there are other types of raises?

23      A.  Cost -- federal cost of living raises.

24      Q.  Okay.  So primarily though -- let me stop there

25  for a second.  How long had you been back at the -- when

1    Q.  And can you tell me, when did that Academic

2  Instruction come into being?

3    A.  I would need the Instruction to highlight the

4  date.

5    Q.  Okay.  I'd like to ask you a little bit, about

6  your knowledge of Professor Fleming's work at the Academy.

7  Are you familiar -- what his speciality is, in -- within

8  the English Department?

9    A.  I'm not.

10    Q.  Have you ever read any of the books that he's

11  written?

12    A.  I have; Annapolis Autumn.

13    Q.  And can you tell me what that book was about?

14    A.  I'm afraid I can't recall.  It's been 10 years

15  since I read it.

16    Q.  Are you aware that Professor Fleming has written

17  on issues, such as the use of sexuality and language?  The

18  connection or the vocabulary affiliated with issues?

19    A.  I wasn't aware of that.

20    Q.  Okay.  So you obviously did not then take into

21  account, the nature of the work that he does, or the

22  nature of the readings that he assigns, in terms of the

23  appropriateness or inappropriateness of some of the

24  discussion?

25    A.  Did I take that into account in this decision?

1    Q.  No.  I'm saying am I correct that you did not

2    take that into account, because you --

3    A.  I wasn't aware of it.

4    Q.  Okay.

5    A.  I did not take into account.

6    Q.  Okay.  Sir, if you could turn in page 127?  And

7    let me know when you're ready for me to ask a question.

8    A.  I'm ready.

9    Q.  Okay.  Would you agree this is an email from

10   Superintendent Carter to you?

11   A.  I agree.

12   Q.  Dated -- 19, 2017, correct?

13   A.  Uh-huh.  I agree.

14   Q.  And Vice Admiral Carter is sending you an

15   article here?

16   A.  Uh-huh.  I agree.

17   Q.  And it's one of Professor Fleming's articles?

18   A.  Okay.

19   Q.  Did you review that?

20   A.  I have no recollection.  I'm sure I did, if he

21   sent it to me, but I don't recall this article.

22   Q.  Okay.  What about the other article, that

23   Professor Fleming published, in the -- in October '17?

24   Did you review any other articles that he might have

25   written?

Page 195

1    A.  I -- what other article?

2    Q.  The article that appeared in The Federalist.

3    A.  I did not read that article.

4    Q.  Okay.  But you knew about it, correct?

5    A.  I knew about it.

6    Q.  In between -- I want to talk about the time

7  period in between 2011 and 2017.  So before the fall

8  semester 2017, going back until after the stuff with OSC

9  was over.

10    A.  Uh-huh.

11    Q.  Did you have, in that time period, any other

12  occasion to investigate Professor Fleming, or evaluate the

13  appropriateness of his behavior in the classroom?

14    A.  In that time period, I was not personally

15  involved in any of those -- in any such actions.  I'm

16  aware there were investigations, but I was not involved in

17  any of them.

18    Q.  Okay -- any of those investigations resulted in

19  any finding of wrongdoing?

20    A.  I do.

21    Q.  And can you tell me what you recall?

22    A.  The original inappropriate emailing of photos,

23  resulted in formal counseling at the Department Chair

24  level.  The complaints by the Asian student, about

25  disrespectful treatment, resulted in formal counseling by

1 the Department Chair.  The PII breach, resulted in written

2 Letter of Reprimand by someone.  I don't recall who did

3 that.

4      Q.  And I'm sorry that was after --

5      A.  Oh, I'm sorry.

6      Q.  -- the fall.

7      A.  That was afterwards.  Yeah.  You're correct.

8

9      Q.  So just --

10      A.  Up to 2017.

11      Q.  So I just want to -- one was photos?  Sending

12 photos?

13      A.  Right.

14      Q.  And that --

15      A.  And one --

16      Q.  And that resulted in?

17      A.  Counseling by the Department Chair.

18      Q.  Okay.  And do you know what the Department Chair

19 -- did the Department -- instruct Professor Fleming not to

20 do that again?

21      A.  Yes, he did.

22      Q.  He told him not to do that?

23      A.  It was in writing.

24      Q.  It was in writing.  Okay.

25      A.  There was one other.  A Letter of Reprimand

1  issued by the then Division Director of Humanities and

2  Social Sciences, for retaliation against two midshipmen,

3  that was in that same period of time.  Those are the three

4  actions taken in that window of time, from 2011 to 2017.

5      Q.  Okay.  And other than informal counseling, and

6  receiving a Letter of Reprimand, do you know whether

7  Professor Fleming faced any other, in that time period?

8      A.  Not to my knowledge he didn't.

9      Q.  Okay.  Oh, I'm going to -- I want to come back

10  to the instruction that you mentioned, with the English

11  Department.  You said he received counseling from the

12  English Department?

13      A.  From the Department Chair and Associate Chair.

14  That's right.

15      Q.  Okay.  And can you tell me what you -- about

16  that?

17      A.  The Department Chair, Mark McWilliams, and

18  Associate Chair, Deb Fermo, wrote in a counseling letter,

19  that they delivered to Dr. Fleming, that his sending --

20  photos to midshipmen, was inappropriate and

21  unprofessional.  They had consulted with several former

22  Department Chairs, who also agreed it was inappropriate

23  and unprofessional.  As were his comments about those

24  photos, in the email -- Dr. Fleming.  And in that written

25  counseling memo, they said that Dr. Fleming understood,

Page 198

1    how those photos could be considered inappropriate, and he

2    vowed not to repeat that behavior again.

3         Q.   Okay.  And I'm going to hand you --

4              MR. EHRENBERG:  If I may approach, Your Honor?

5              JUDGE SYSKA:  Certainly.

6              MR. EHRENBERG:  What's been marked as tab 8.

7         This is Board tab 8.  And if you could turn to page

8    158 out of 162.

9              THE WITNESS:  Uh-huh.

10   BY MR. EHRENBERG:

11        Q.   It looks like this is a memorandum from the

12   English Department Chair, to the Division Director of

13   Humanities and Social Sciences, is that right?

14        A.   Uh-huh.  It is.

15        Q.   And who was that at the time?

16        A.   '15.  I don't recall who the Division Director

17   was at that time.

18        Q.   Okay.  And if you look down, it looks like the

19   Chair Mark McWilliams --

20        A.   Uh-huh.

21        Q.   -- is memorializing that on the 13th of '15, he

22   and Commander Debbie Fermo met with Professor Fleming, to

23   deliver a letter acknowledging counseling and required

24   training, correct?

25        A.   That's correct.

1      Q.  And is that the letter that you're talking

2   about?

3      A.  This is not the letter I'm talking --

4      Q.  No, no.

5      A.  -- about.

6      Q.  I'm sorry.  The letter referenced in this memo.

7      A.  I would have to see the letter, but I believe it

8   is.

9      Q.  Okay.

10     A.  The letter I'm referring to is on the next page,

11  159.

12     Q.  Okay.  And since you mentioned it, let's take a

13  look at that.  Take a look at page 159.  Can you tell me

14  why -- I'm trying to understand the circumstances, when

15  counseling by a department would be appropriate, versus

16  some other kind of investigation.  And why was Professor

17  Fleming -- why was the Department Chair involved, I guess,

18  at this level?

19     A.  That was -- by the Division Director, to

20  determine whether to delegate that to the Department

21  Chair.  So we would have to ask the Division Director that

22  question.

23     Q.  Okay.  Let me know if you see anywhere in that

24  letter, where Professor Fleming is being instructed, not

25  to send the pictures again, not to send pictures in the

Page 200

1   future.

2      A.   I believe there's an implicit such instruction,

3   when they wrote in point five, "you recognized that your

4   behavior could be seen as inappropriate, and agreed to" --

5   "impropriety in the future."

6      Q.   And what specifically did he agree to was agreed

7   to?  Not to -- what did Professor Fleming agree not to do

8   in the future?

9      A.   I believe sending the photographs to his

10  students, since that's what this is about.

11     Q.   So he agreed not to send any photographs to

12  students or -- I'm wondering -- well, so you are inferring

13  that, from this document that, it was made clear to

14  Professor Fleming, that his action in sending the -- is --

15  was prohibited by Academy policy?

16     A.   Point one makes it clear what this document is

17  about, when they wrote -- when the Chair wrote, "after

18  reviewing seven of these emails, forwarded to the Chair by

19  one of your" -- "we consulted with several former English

20  Department Chairs.  Some of the material in these emails,

21  particularly several photographs of yourself, and your

22  comments on those photographs, seemed clearly

23  inappropriate."  So I believe Dr. Fleming would have

24  understood, that that is what he should not continue to do

25  in the future.

Page 203

1    The first being the Lockhart case.

2            MR. EHRENBERG:  Okay.  If I may have just one

3    moment to --

4            JUDGE SYSKA:  Certainly.

5            MR. EHRENBERG:  -- locate a document?  Okay.

6    BY MR. EHRENBERG:

7        Q.  When you were handling your -- the Notice of

8    Proposed Removal --

9        A.  Uh-huh.

10       Q.  -- did you consult with anybody?

11       A.  The HR Director and his colleagues provided me

12   the template for the Douglas --

13       Q.  Okay.

14       A.  Beyond that, no, I didn't consult with anyone.

15       Q.  And so in terms of owning the decision, that

16   would be 100% your decision?

17       A.  That's correct.

18           MR. EHRENBERG:  Okay.  Sir, if we could have a

19   two minute break?  I might be able to skip a lot of

20   questions, and move us along.

21           JUDGE SYSKA:  Okay.  We'll go off the record for

22   two minutes.

23               (Whereupon, a brief recess was taken)

24           JUDGE SYSKA:  On the record.

25           And we're back on the record.

Appx1077

1      JUDGE SYSKA:  Okay.  Any questions based on my

2  questions?

3      MR. COOK:  I do, Your Honor.

4      JUDGE SYSKA:  Okay.

5           CONTINUED REDIRECT EXAMINATION

6  BY MR. COOK:

7   Q.  Dean Phillips, is there any percentage of

8  student evaluations, that would register approval or

9  liking, that would negate his behavior in the classroom?

10   A.  No.  We don't -- that's not how we look at it.

11  And in fact, teaching effectiveness is really quite

12  different, than inappropriate behavior in this case.  I

13  mean I grant that Professor Fleming can be, often is, a

14  very effective teacher of writing.  While at the same time

15  is disrespectful, and violates principles we've got,

16  regarding being a positive role model for students.

17  They'd be no percentage.

18   Q.  And during the course of the investigation, did

19  the panel -- how did the panel address the complaints?

20  Specifically the evidence they collected, who provided it

21  and how they came out?  For example, the statement on

22  touching, the statement on right-wing extremists, sending

23  partially clothed pictures.  Was it just the statement,

24  and they determined the credibility, or how did they

25  determine it?

1   A.  So the students themselves filed formal written

2   complaints, detailing that allegations in writing,

3   producing evidence, emails of the photos, emails of the

4   right-wing extremist comments, emails of the -- midsheeple

5   and other sorts of things.  The panel then interviewed all

6   of the students.  Reviewed all of the student opinion

7   forms, that come at the end of a semester.

8       So all that's in writing -- and response, where

9   he admits, in may cases, to the behavior.  And in other

10  cases, for example the emails, rejects that ever happened.

11  But everything was collected, by direct interviews with

12  the students, by emails and their own, I guess, testimony

13  with the panel.

14      MR. COOK:  I have no further questions, Your

15  Honor.

16      JUDGE SYSKA:  Anything?

17      MR. EHRENBERG:  No, sir.

18      JUDGE SYSKA:  Okay.  Dean Phillips, thank you

19  very much for your testimony today.  Because the hearing

20  is ongoing, don't discuss your testimony with anyone.  And

21  you're excused.

22      THE WITNESS:  All right.  Thank you, sir.

23      JUDGE SYSKA:  Thank you very much.

24      MR. COOK:  Your Honor, the Agency has no more

25  witnesses.

1  Bruce, you know, that's about this big.  Well, he's

2  provided one snapshot.

3         But the -- you know, I've read over the years --

4  I was doing the math the other day.  I teach English.  So

5  I'm not good at math.  But I've read about 1,000 of his

6  student evaluations over the years.

7         They're extraordinary.  90% of them say this

8  class is interesting.  He cares about us.  He makes us

9  think.

10        He gets bad evals, but so do a number of other

11 people.  But the majority of his students over the years -

12 - and I've either been on the -- Chair and I've had to

13 write his fit reps.  I've read -- I did the math.  It's

14 almost 1,000 of them, I have read over the years.  They

15 are absolutely glowing.

16        Some people don't like him.  You know, I've told

17 him I don't know that I like him, as a professor

18 necessarily.  But I'm -- you know, fully 90% of students

19 think he's just extraordinary, and are glad that he

20 challenges them, and that he's in such good physical

21 shape.

22        Some of them say -- the Academy, or if he's got

23 such problems with them, but that's not the majority.  And

24 so that was part of my concern.  Of course, when any of us

25 get caught, in this kind of a trap, we're looked at in

Page 226

1    this small of a frame, and he's way more than just that

2    little piece in this frame.

3            MR. EHRENBERG:  If I just have one moment?

4            JUDGE SYSKA:  Certainly.

5    BY MR. EHRENBERG:

6        Q.  Would it be fair to say, that you don't believe

7    that Professor Fleming should have been removed from his

8    employment?

9        A.  Oh, if you hadn't asked me that question, I

10   would have found to say to -- a way to say it.

11   Absolutely, he should have not been removed.  The Academy

12   went from I think the most severe, whatever he ever had,

13   was a Letter of Reprimand.  That to firing.

14           Again, because they just assumed he can't be

15   rehabilitated, because he doesn't want to be

16   rehabilitated, and doesn't think he needs to be

17   rehabilitated.  I mean that was the language.  But they

18   went from a Letter of Reprimand to firing him.

19           And they invoked this use of the Douglas

20   Factors.  I don't know if we've talked about those Douglas

21   Factors yet.  But no one, not one Chair, not -- knew what

22   these Douglas Factors -- and I've had to write Letters of

23   Reprimand myself, when I was Chair.

24           I asked other Chairs.  We've never even heard of

25   these Douglas Factors, that popped up in the letter, in

Page 228

1    Q.  Professor Fleming?

2    A.  Uh-huh.

3    Q.  So you're aware that he is said to have sent a

4  picture of himself?

5    A.  I saw the picture.  Yeah.  Uh-huh.

6    Q.  And as a professor at the Academy --

7    A.  Uh-huh.

8    Q.  -- do you feel that that action was prohibited?

9    A.  I think it was ill-advised.  It wasn't

10  prohibited.  I don't think it was the smartest thing he

11  ever did, but no, not prohibited.  I mean good grief.

12         One of the things I had to get to used to

13  working at the Academy, is I'm always seeing people

14  walking around in work out stuff, which I don't like, but

15  it's part of the culture.  I'm serious about that.  When I

16  first got to the Academy, and realized I was going to see,

17  sorry, sweaty men in their, you know, running clothes

18  walking up and down the hallway, I thought oh, geez.  But

19  it's part of the culture.

20         As I said, I don't think it was the best idea he

21  ever did, but no, it's not prohibited.  It's a workout

22  photo.  We see people working out all the time.

23    Q.  Do you know whether or not Professor Fleming

24  works out?

25    A.  Of course he works out.

Page 229

1      Q.  That was a precursor, to the next question.

2      A.  Okay.

3      Q.  Do you know whether Professor Fleming works out,

4  in proximity to midshipmen?

5      A.  Oh, sure he does.  A lot of faculty do.  A lot

6  of faculty do.  I don't know how they do it, but, you

7  know, they talk about oh, yeah, we were over there

8  swimming.  Oh, I saw.  They see their students in the

9  locker room.  They see them.

10          This is both -- well, I don't talk to men about

11  this, but my female colleagues talk about screwing with

12  other people.  And right, it -- I don't know my colleagues

13  do it, but I know a number of them do.  They work out with

14  the mids, which seems like a horrible thing to me, but it

15  happens all the time.

16          JUDGE SYSKA:  Why horrible?

17          THE WITNESS:  I don't want to be sweaty, in

18  front of my students.  It just -- I mean I work out in a

19  gym, but I wouldn't want to do it with --

20          JUDGE SYSKA:  So it's not like there's anything

21  innately inappropriate?

22          THE WITNESS:  Oh, no, no.

23          JUDGE SYSKA:  Okay.

24          THE WITNESS:  I'm sorry.

25          JUDGE SYSKA:  All right.

Page 230

 1          THE WITNESS:  Oh, heavens no.  No, no, no.

 2          JUDGE SYSKA:  Okay.

 3          THE WITNESS:  No.  It's just -- it's me being

 4   self-conscious.  I don't want to be around students in my

 5   workout gear.

 6          MR. EHRENBERG:  That's all I have, sir.

 7          JUDGE SYSKA:  Okay.  Cross?

 8          MR. COOK:  Thank you, Your Honor.

 9                   CROSS-EXAMINATION

10   BY MR. COOK:

11      Q.  Professor Drew, would you agree that the faculty

12   are role models and mentors to midshipmen?

13      A.  Yes.

14      Q.  And part of being a role model, is to support

15   the Naval Academy mission to develop midshipmen morally,

16   mentally and physically?  Is that true?

17      A.  Absolutely.  Absolutely.

18      Q.  Dignity and respect?

19      A.  Yes.

20      Q.  To tell the truth?

21      A.  Sure.  Of course.

22      Q.  You mentioned that you know the charges against

23   Professor Fleming?

24      A.  Uh-huh.

25      Q.  Okay --

Page 237

1      Q.  Do you know of any other faculty member, that

2  send partially clothed pictures of themselves to students?

3      A.  I don't know any other faculty member, that

4  sends workout photos.  No, I wouldn't know that.

5      Q.  But you don't know?

6      A.  No, I don't.

7      Q.  Okay.  Do you know of any other faculty members,

8  that label their students, based on their writings, as

9  right-wing extremists?

10      A.  I know that -- I don't know that anybody says

11  right-wing extremists, but I do know, and especially in

12  the English Department, we sometimes make up names for

13  midshipmen, meant to be unkind or dismissive.

14      Q.  Okay.  If a label is given to a midshipman,

15  based on their writing, do you think that's appropriate?

16      A.  A label --

17      Q.  Calling them something --

18      A.  No.  I don't think so.  Yeah.  No.  I don't

19  think that's appropriate.

20      Q.  You don't think it's appropriate?

21      A.  Unh-uh.

22      Q.  Okay.

23          JUDGE SYSKA:  You said -- okay.  You indicated

24  other English teachers will make up names for students

25  too.  What are you referring to?

1  prior classes?

2      THE WITNESS:  It's a very interesting question.

3      JUDGE SYSKA:  Thank you.

4      THE WITNESS:  There is a -- I was going to say

5  intuitive, but then I thought maybe -- yeah.  But it's a

6  good question.  The student body is shifting.

7      They are -- now, I'm speaking in huge

8  generalities, but I've been there for, you know, 30 years.

9  They are more -- they're shifting.  They're more -- I've

10  had students, for example, in class isn't comfortable.

11  And I say oh, good, good.  Tell me why you're

12  uncomfortable.  And then I realize, oh, wait a minute.

13  I'm supposed to feel bad that they're uncomfortable.

14      So they are more willing to say, if something

15  makes them uncomfortable or -- yeah.  So there is a

16  difference.  I don't know that I can quantify it, but

17  absolutely there is a difference.  More sensitive maybe?

18  Maybe that's -- I don't know --

19      JUDGE SYSKA:  Okay.  That's all I've got.  Any

20  questions based on my questions?

21      MR. EHRENBERG:  No, sir.

22      MR. COOK:  No, sir.

23      JUDGE SYSKA:  Professor Drew, thank you very

24  much for your testimony today.  Because the hearing is

25  ongoing, don't discuss your testimony with anyone.  And

# UNITED STATES OF AMERICA
# MERIT SYSTEMS PROTECTION BOARD

| | | |
|---|---|---|
| BRUCE FLEMING, | ) | |
| | ) | DOCKET NUMBER |
| Appellant | ) | PH-0752-18-0457-I-1 |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF THE NAVY, | ) | |
| | ) | DATE:  September 27, 2019 |
| Agency. | ) | |

## AGENCY'S PETITION FOR REVIEW AND
## <u>CERTIFICATION REGARDING INTERIM RELIEF</u>

Alison Gray                                T.P. Cook
Agency Representative                       Agency Representative
Associate Counsel                          Counsel
Office of Civilian Human Resources          United Stated Naval Academy
U.S. Department of the Navy                 U.S. Department of the Navy
614 Sicard St., SE, Suite 100              121 Blake Road
Washington, DC 20374                       Annapolis, MD 21402-1300
202.685.6411 (phone)                       410.293.1547 (phone)
202.685.6616 (fax)                         410.293.0005 (fax)
Alison.gray@navy.mil                       tcook@usna.edu

Appx1199

Table of Contents

I.      INTRODUCTION ………………………………………………………….   1

II.     PROCEDURAL BACKGROUND  …………………………………………..   3

III.    ARGUMENT: THE AJ ERRED AS A MATTER OF LAW AND FACT IN
        FAILING TO SUSTAIN THE CHARGE AND THE BOARD SHOULD
        GRANT THE PFR AND UPHOLD THE PENALTY OF REMOVAL ………..   4

        A. Standard of Review ………………………………………………..   4

        B. Standard of Proof for a Conduct Unbecoming a Federal Employee
           Charge ………………………………………………………………..   4

        C. The AJ's Introductory "Analysis and Fact Finding" Is Materially
           Flawed ………………………………………………………………..   5
           1.  The AJ Errs in Considering Performance as a Factor in
               Determining Misconduct …………………………………………   5
           2.  The AJ Errs by Focusing on Numbers versus Content and
               Challenging MD's Credibility When His Testimony on
               Material Issues Was Fully Corroborated ………………….....................   6

        D. The AJ Erred as a Matter of Law and Fact in Failing to Sustain the
           Seven Underlying Specifications in Support of the Conduct
           Unbecoming Charge …………………………………………….....................   8
           1.  The AJ Erred in Failing to Sustain Specification 1: Referring
               to Students as "Right-Wing Extremists"  …………………….............   9
           2.  The AJ Erred in Failing to Sustain Specification 2: Classroom
               Comments/Discussion Regarding Anal Sex, Oral Sex and
               Transgender Surgery …………………………………………………   12
           3.  The AJ Erred in Failing to Sustain Specification 3: Emailing
               Partially Clothed Pictures of Yourself to Students after Having
               Been Counseled that Doing so Was Inappropriate and Your
               Agreement Not to Do So in the Future  …………………………..   20
           4.  The AJ Erred in Failing to Sustain Specification 4: Touching
               Students without Their Approval ……………………………………   26
           5.  The AJ Erred in Failing to Sustain Specification 5: Referring to
               Your Own Sexual Experiences …………………………….................   32

Appx1200

6.  The AJ Erred in Failing to Sustain Specification 6: Repeatedly
    Mispronouncing an Asian-American Student's Name Despite
    Being Corrected Several Times by the Student ………………………..     35

7.  The AJ Erred in Failing to Sustain Specification 7: Making
    Demeaning Sexually Related Comments about a Young
    Woman Attending a Dance with your Son and Similar
    Offensive Comments About the Young Woman's Mother ………………..     44

E.  The Board Should Find Nexus and Uphold the Penalty of Removal
    on the Record Evidence     ………………………………………………..     48

IV.  CONCLUSION …………………………………………………………     50

CERTIFICATION REGARDING INTERIM RELIEF AND SUPPORTING
EXHIBITS ………………………………………………………………………     52

Appx1201

Page 1

BEFORE THE

U.S. MERIT SYSTEMS PROTECTION BOARD


In the Matter of:                    :

                                     :

BRUCE FLEMING,                       :

            Appellant,               :   Docket No.:

                                     :     PH-0752-18-0457-I-1

    v.                               :

DEPARTMENT OF THE NAVY,              :

            Agency.                  :

                          Wednesday,

                          May 22, 2019

                          Merit Systems Protection Board

                          Northeastern Regional Office

                          1601 Market Street, Suite 1700

                          Philadelphia, Pennsylvania

        The above-entitled matter came on for hearing,

pursuant to notice, at 9:00 a.m.


        BEFORE:  MARK K. SYSKA,

                 Administrative Judge

Appx1266

```
                                                          Page 2
 1   APPEARANCES:

 2           On behalf of the Appellant:

 3           JASON H. EHRENBERG, ESQ.

 4           Bailey & Ehrenberg PLLC

 5           1015 18th Street, NW, Suite 204

 6           Washington, D.C. 20036

 7           202-331-1331

 8           jhe@becounsel.com

 9           On behalf of the Agency:

10           TERRENCE P. COOK, ESQ.

11           Department of the Navy

12           U.S. Naval Academy, Superintendent's Office

13           121 Blake Road

14           Annapolis, MD 21402

15           410-293-1547

16           tcook@usna.edu

17

18

19

20

21

22

23

24

25
```

Appx1267

```
 1                    I N D E X

 2

 3   WITNESS         DIRECT   CROSS   REDIRECT   RECROSS

 4

 5   Robert Chadwick   7       17        34         39

 6   Keith Lindler    41       62        89         --

 7   Matthew DeSantis 93      107       142        144

 8   Andrew Buckley  148       --        --         --

 9   Richard Jin     153      155        --         --

10   Justine Ransdell 158      --        --         --

11   Brandon Gore    162       --        --         --

12   Andrew Phillips 165      182       204         --

13   Anne Marie Drew 213      230        --         --

14                    E X H I B I T S

15

16   EXHIBITS              IDENTIFIED       RECEIVED

17

18   (None)

19

20

21

22

23

24

25
```

Burke Court Reporting, LLC
973-692-0660

Appx1268

Page 41

1  Agency and, having been first duly sworn, was examined and

2  testified on his oath, as follows:

3         JUDGE SYSKA:  Please be seated.  And state and

4  spell your full name.

5         THE WITNESS:  Keith Lindler, L-I-N-D-L-E-R.

6         JUDGE SYSKA:  And by whom are you currently

7  employed now?

8         THE WITNESS:  The U.S. Naval Academy.

9         JUDGE SYSKA:  And what's your position there?

10        THE WITNESS:  I'm a professor.

11        JUDGE SYSKA:  Do you have any management or

12  administrative roles, in addition to teaching?

13        THE WITNESS:  I do.  I am the Chair of our

14  department committee, that oversees the junior faculty,

15  mentors the junior faculty, on their way to promotion and

16  tenure.  In the past, I was the Department Chair.

17        JUDGE SYSKA:  Okay.  And how long have you been

18  at the Academy?

19        THE WITNESS:  35 years.

20        JUDGE SYSKA:  Your witness, counsel.

21        MR. COOK:  Thank you, Your Honor.

22                    DIRECT EXAMINATION

23  BY MR. COOK:

24     Q.  Professor Lindler, are you familiar with the

25  Naval Academy mission?

Appx1306

Page 42

1      A.   Yes, I am.

2      Q.   What is that mission?

3      A.   Basically, it is to prepare midshipmen mentally,

4   physically and morally, to be good officers in the naval

5   service.

6      Q.   What do you see as your role, in supporting the

7   mission of the Naval Academy?

8      A.   We are there to obviously help them

9   academically, but more than that, we're taught to be good

10  roles models for the midshipmen, to set a good example, so

11  that they will be good officers.  So we are part of the

12  moral development also.  For example, we're encouraged,

13  before class even starts, if we see something that's not

14  quite right, we are to intervene if someone is, you know,

15  picking on another person unwisely or using unwise

16  language.  Even those class hasn't started, we are asked

17  to step in, as a role model.

18     Q.   Okay.  How does dignity and respect figure into

19  your role model, and your mentorship at the Naval Academy?

20     A.   I think it's a great deal.  I think that, you

21  know, I set a good example.  In my class, I've heard

22  profanity maybe once in my 35 years.  And at that time the

23  midshipman was kind of embarrassed that they let it slip

24  out, because I don't use profanity.  So they don't feel

25  comfortable using profanity themselves.

Pleading Number : 2019039531        Submission date : 2019-09-27 15:26:28        Confirmation Number: 1466219108        page 113 of 359

Appx1307

Page 147

1   you.

2           JUDGE SYSKA:  Okay.  Go off the record.

3               (Whereupon, a brief recess was taken)

4           JUDGE SYSKA:  On the record.

5           So we'll be taking like a 20-25 minute break,

6   either after direct or after cross, depending on how quick

7   the witness goes.  Okay.  Sir, will you stand and raise

8   your right hand?  We're on the record.

9           Whereupon,

10                  ANDREW BUCKLEY,

11  having been called as a witness by and on behalf of the

12  Agency and, having been first duly sworn, was examined and

13  testified on his oath, as follows:

14          JUDGE SYSKA:  Please be seated.  And state and

15  spell your full name.

16          THE WITNESS:  Andrew John Buckley, A-N-D-R-E-W,

17  J-O-H-N, B-U-C-K-L-E-Y.

18          JUDGE SYSKA:  And you're a midshipman at the

19  Naval Academy?

20          THE WITNESS:  Yes, sir.

21          JUDGE SYSKA:  And what year are you?

22          THE WITNESS:  I am a third class.  Class of '21.

23          JUDGE SYSKA:  And have you taken -- what courses

24  have you taken with Professor Fleming?

25          THE WITNESS:  Just plebe English, freshman

Pleading Number : 2019039531       Submission date : 2019-09-27 15:26:28       Confirmation Number: 1466219108       page 218 of 359

Appx1412

Page 157

1          Whereupon,

2                        JUSTINE RANSDELL,

3     having been called as a witness by and on behalf of the

4     Agency and, having been first duly sworn, was examined and

5     testified on his oath, as follows:

6          JUDGE SYSKA:  Please be seated.  And state and

7     spell your full name.

8          THE WITNESS:  Justine Alexandra Ransdell, J-U-S-

9     T-I-N-E, A-L-E-X-A-N-D-R-A, R-A-N-S-D-E-L-L.

10         JUDGE SYSKA:  And you're a midshipman at the

11    Naval Academy?  What year?

12         THE WITNESS:  I'm a sophomore.

13         JUDGE SYSKA:  AKA third class, AKA class of '21?

14         THE WITNESS:  Yes, sir.

15         JUDGE SYSKA:  And have you taken any --

16         THE WITNESS:  I have.  Yes, sir.

17         JUDGE SYSKA:  What course?

18         THE WITNESS:  Rhetoric and Intro to Literature

19    my plebe year.

20         JUDGE SYSKA:  Is that one course or two courses?

21         THE WITNESS:  One course.

22         JUDGE SYSKA:  Okay.  And that's the HE111 plebe

23    course?

24         THE WITNESS:  I believe.

25         JUDGE SYSKA:  Do you recall when you took it?

Pleading Number : 2019039531      Submission date : 2019-09-27 15:26:28      Confirmation Number: 1466219108      page 228 of 359

Appx1422

Page 161

1  very much for your testimony today.  Because the hearing

2  is ongoing, do not discuss your testimony with anyone.

3  And you're excused.  Thank you.

4          THE WITNESS:  Thank you.

5          JUDGE SYSKA:  Off the record for the next

6  witness.

7              (Whereupon, a brief recess was taken)

8          JUDGE SYSKA:  On the record.

9          Okay.  We're back on the record.  If you'll go

10  stand over there, and raise your right hand?

11          Whereupon,

12                      BRANDON GORE,

13  having been called as a witness by and on behalf of the

14  Agency and, having been first duly sworn, was examined and

15  testified on his oath, as follows:

16          JUDGE SYSKA:  Please be seated.  And state and

17  spell your full name.

18          THE WITNESS:  Brandon Michael Gore.

19          JUDGE SYSKA:  And the spelling of the last name?

20          THE WITNESS:  Gore, G-O-R-E.

21          JUDGE SYSKA:  Okay.  And you're a midshipman at

22  the Naval Academy?

23          THE WITNESS:  Yes, sir.

24          JUDGE SYSKA:  What year?

25          THE WITNESS:  2021.  So a sophomore.

Page 165

1          JUDGE SYSKA:  Please be seated.  And state and
2     spell your full name.
3          THE WITNESS:  Andrew Todd Phillips.  P-H-I-L-L-
4     I-P-S.
5          JUDGE SYSKA:  And by whom are you currently
6     employed?
7          THE WITNESS:  United States Naval Academy.
8          JUDGE SYSKA:  And what --
9          THE WITNESS:  Academic Dean and Provost.
10         JUDGE SYSKA:  And how long have you held that
11    position?
12         THE WITNESS:  10 years.
13         JUDGE SYSKA:  Your witness, counsel.
14         MR. COOK:  Thank you, Your Honor.
15                    DIRECT EXAMINATION
16    BY MR. COOK:
17    Q.  Dean Phillips, prior to your arrival at the
18    Naval Academy, were you employed -- where were you
19    employed, and what position did you hold?
20    A.  In 1988 I began as a civilian professor at the
21    Naval Academy.  I held that position for 10 years.  In
22    1998 I left to go to the University of Wisconsin Eau
23    Claire -- there.  And then Dean of the Graduate Studies
24    and the Vice Provost, before returning to the Naval
25    Academy in 2009, as Academic Dean and Provost.

Burke Court Reporting, LLC
973-692-0660

Appx1430

1    His performance, he's a prolific scholar.  A well-regarded

2    scholar.

3            His teaching evaluations are mixed.  You can

4    find students who think very, very highly of him.

5    Students who think very, very poorly of him.  And then in

6    the area of service, because we have three areas of

7    evaluation, service, he does not conduct much service.  He

8    does no institutional service.  The service he conducts is

9    at the department level only -- satisfactory.

10           JUDGE SYSKA:  Okay.  When you say his teaching

11   evaluations are mixed, at least based on the record that

12   I've been presented, it doesn't look like it's evenly

13   mixed.  Would you say it's like 20% hate him, 80% love

14   him?  Somewhere 50/50?  Whereabouts?

15           THE WITNESS:  No, I couldn't.  I haven't

16   counted.  So I don't know about that.

17           JUDGE SYSKA:  Well, would it make a difference

18   if, in given any particular year, like only a handful of

19   students were upset?  Would that be significant?

20           THE WITNESS:  I wouldn't -- yeah, I wouldn't --

21   I probably -- if that were the case, I would have said

22   that the evaluations were on the whole very positive.  I

23   recognize that there's always some small number of

24   students, who don't react well to any given professor.

25           JUDGE SYSKA:  Okay.  And I saw in your

Page 212

```
 1          JUDGE SYSKA:  -- use their expertise.
 2          MR. EHRENBERG:  Actually, you know what?  You
 3   make a good point, and the client has been pressuring me,
 4   to get her out of here.  So I will --
 5          JUDGE SYSKA:  She had --
 6          MR. EHRENBERG:  All right.  You're back.
 7          JUDGE SYSKA:  Well --
 8          MR. FLEMING:  I've already done this.
 9          JUDGE SYSKA:  Actually, I think --
10          MR. FLEMING:  Oh, is she -- oh --
11          JUDGE SYSKA:  Oh, yeah.
12          MR. EHRENBERG:  Could we just -- okay.  You
13   convinced me.
14          MR. FLEMING:  Okay.
15          MR. EHRENBERG:  It's not fair to make her sit.
16          MR. FLEMING:  It's not -- and she's got to -- I
17   know.  My wife puts a shower cap on at night, and she has
18   that done to her hair.  That's what you'd have to do.
19          JUDGE SYSKA:  Good afternoon.
20          THE WITNESS:  Hi.
21          JUDGE SYSKA:  Could you --
22          Whereupon,
23                     ANNE MARIE DREW,
24   having been called as a witness by and on behalf of the
25   Appellant and, having been first duly sworn, was examined
```

Pleading Number : 2019039531        Submission date : 2019-09-27 15:26:28        Confirmation Number: 1466219108        page 283 of 359

Appx1477

Page 213

1    and testified on his oath, as follows:        JUDGE

2    SYSKA:  Please be seated.  And state and spell your full

3    name.

4             THE WITNESS:  Anne Marie Drew.  That's A-N-N-E,

5    M-A-R-I -- D-R-E-W.

6             JUDGE SYSKA:  And by whom are you currently

7    employed?

8             THE WITNESS:  The United States Naval Academy.

9             JUDGE SYSKA:  And what's your position there?

10            THE WITNESS:  I'm a English professor.

11            JUDGE SYSKA:  -- have you taught there?

12            THE WITNESS:  30 years.  I'm rounding up. It's

13   29 and a half.

14            JUDGE SYSKA:  I think you're the relative

15   newbie, compared -- of the instructors we've had today.

16   Do you have any committee -- significant committee

17   assignments, or other administrative responsibilities?

18            THE WITNESS:  Yes.  I am Chair of a Senate ad

19   hoc committee, that was titled Complaints Against Faculty

20   Members.  It's year long committee.

21            JUDGE SYSKA:  Uh-huh.  Okay.  Your witness,

22   counsel.

23                      DIRECT EXAMINATION

24   BY MR. EHRENBERG:

25      Q.  Good afternoon, Professor Drew -- mentioned that

Appx1478

1  you've been at the the Academy for about 30 years?

2      A.  Yes.

3      Q.  Do you know how your colleagues regard you,

4  within the institution?

5          MR. COOK:  Objection, Your Honor.

6          JUDGE SYSKA:  Well, there's probably a better

7  way to ask that --

8          MR. EHRENBERG:  Yeah.

9          JUDGE SYSKA:  -- but --

10         MR. EHRENBERG:  You're somewhat of an elder

11  stateswoman, are you not, at the Academy?

12         THE WITNESS:  Yes.  I was tempted to wear my

13  medals today, but I didn't think it would be appropriate.

14  Yes.

15  BY MR. EHRENBERG:

16     Q.  And can you tell me a little bit about some of

17  the -- your experience on committees, and leadership

18  positions at the Academy?

19     A.  Sure.  I --

20     Q.  Can you tell me when you -- what experience you

21  have, if any, other than what you already mentioned?

22     A.  Oh, sure.  First 10 years I was there, I

23  directed Masqueraders.  That's the theater troupe.  And

24  then I was Department Chair of the English Department for

25  four years.  And then there was a little lapse in time,

1  and I was President of Faculty Senate.

2      Q.  Okay.  And have you -- in any of those -- on any

3  of those committees, or in any of those roles, to comment

4  on -- or address Naval Academy policy?

5      A.  Oh, sure.

6      Q.  And can you tell me generally what kind of

7  policies --

8      A.  Well, as Department Chair for example, if

9  anybody would get into trouble, let me just use that for

10  shorthand, we had to pay attention to what -- do they get

11  a Letter of Instruction?  A Letter of Reprimand?

12  Whatever.  Do they get a talking to?  So that was as

13  Department Chair.

14          As Faculty Senate President, there you're not

15  just in charge of the English Department.  And so whenever

16  a faculty member, in any department, got himself or

17  herself into a situation, as Senate President, I was asked

18  to form the committee, that would look into the incident.

19      Q.  Okay.  You mentioned first, that you were on an

20  ad hoc committee.

21      A.  Yes.

22      Q.  Can you tell the Administrative Judge, a little

23  bit about that committee, and what your role is?

24      A.  There were a number of instances at the Naval

25  Academy, where the faculty became concerned, that the

1  policies that we have in place, needed to be reexamined.

2  So to handle complaints against faculty members.

3        JUDGE SYSKA:  Approximately what years are we

4  talking about?

5        THE WITNESS:  This -- the committee I was asked

6  to Chair, has just been this past year.

7        JUDGE SYSKA:  Okay.

8        THE WITNESS:  But it was in -- I was asked to

9  Chair it by the Senate President, in response to a serious

10  of personnel decisions, that had happened in previous

11  years, that made us think that our policy, for looking at

12  complaint numbers, needed to be looked at again.  You want

13  me to talk about what that committee did, or is --

14        JUDGE SYSKA:  Certainly.

15        THE WITNESS:  -- that too much information?

16  Okay.  We spent -- and we had English professors,

17  engineers, psychologists, the whole range of people, on

18  the committee.  And we looked at how complaints against

19  faculty members are handled, across the United States.  We

20  certainly looked at the other military academies.  We also

21  looked at, you know -- and UC Berkeley.  And we looked at

22  how they handled complaints against faculty members, how

23  they squared with AAUP, and how we might improve, how the

24  Academy handles complaints against faculty members.

25        JUDGE SYSKA:  What was the perceived problem,

1    with the series of personnel actions?

2         THE WITNESS:  Well, you said perceived, so that

3    I can answer that question.  The perceived problem was,

4    that the administration wasn't following even its own

5    limited instruction, as inadequate as that instruction is.

6    And having studied it for an entire year now, I'm triply

7    convinced that -- but the concern was, that people were

8    being yanked out of classrooms.

9         And of course, we're all operating with this

10   much information.  We don't know everything, as the

11   Deanery is very quick to tell us.  And -- but we saw

12   instances, where people were -- and then put back in.

13        We all knew, for example, of the case where

14   Professor Fleming early on, when Dean Phillips was new,

15   got denied a pay step by the Dean, but then went to the

16   OSC, and that was reversed.  So we are aware of, what we

17   perceived to be a pattern, where the Academy is not

18   following, even it's own instructions, let alone what AAUP

19   sets forth.  I hasten to add that the Deans disagree with

20   me.

21        JUDGE SYSKA:  I pretty much presumed that.

22        THE WITNESS:  Yeah.

23        JUDGE SYSKA:  In your opinion, to what degree

24   does AAUP -- is the AAUP position controlling?

25        THE WITNESS:  That's an interesting question.

Appx1482

Page 218

1  Here's my view.  And again, the Deans disagree with me.

2  In our handbook, it says that in matters of promotion and

3  tenure, we follow AAUP.  The truth is we do not.

4       And again, I hasten to add, that I've been

5  whacked on the nose twice, in the past six months, for

6  saying that.  Well, whatever.  But my position is, if

7  we're not going to follow -- then we should take it out of

8  the Faculty Handbook.

9       We shouldn't hire junior faculty, and tell them

10  you're governed by AAUP.  Nor should we allow senior

11  faculty assume, that they're protected by AAUP, when --

12  and I'm sure most recently in this current case, Colonel -

13  - I mean Admiral Carter wrote to the AAUP, and said while

14  we do not follow AAUP guidelines, the process we offer our

15  employees is fair.  So my view is you can't have it both

16  ways.  Take it out of the handbook, if you're not going to

17  follow it.

18       JUDGE SYSKA:  Okay.  Go ahead, counsel.  My

19  digression.

20            CONTINUED DIRECT EXAMINATION

21  BY MR. EHRENBERG:

22    Q.  Professor, do you know whether, under the

23  current policy --

24    A.  Uh-huh.

25    Q.  -- do faculty have any involvement, in the

Appx1483

Page 219

1  decision as to whether someone should be -- another

2  faculty member should be terminated?

3      A.  Any --

4      Q.  Do the faculty have a say, in whether or not a

5  professor -- action is taken against a professor, before

6  it is taken?

7      A.  I don't exactly know how to respond to the word

8  say.  You heard Keith Lindler.  And he was -- he Chaired a

9  committee.  So typically a Facility Senate Committee is

10  set up, to -- it depends.  This is -- to collect evidence.

11  And there's a real discussion about, do they just collect

12  evidence, or do they present recommendations?  And -- but

13  everybody knows it's not the faculty's decision.

14      Q.  There -- is there any process, under the current

15  regulation, for a hearing before -- so there is no formal

16  process for a hearing, before a faculty committee?

17      A.  Well, this is Anne Marie Drew's response.

18  Right?  If you asked the Dean that, he would say of course

19  we have a meeting, before we make a decision.  And that

20  meeting consists of the HR Director, the Division

21  Director, the Department Chair, a Dean.  And they will --

22  and they are told what the presumed offense is.  And that

23  constitutes a meeting.

24      But no -- and again, this is second-hand

25  information.  I have never been in on those meetings.

Pleading Number : 2019039531        Submission date : 2019-09-27 15:26:28        Confirmation Number: 1466219108        page 290 of 359

Appx1484

Page 220

1  Department Chairs tell me that it's -- the decision has

2  already been made.

3         That no one actually asks you, Professor

4  Shaffer, for example, who's our current Chair, what do you

5  think?  This is the written accusation against Professor

6  Fleming, for example.  So again, that's second-hand

7  information, but I've heard it more than once, from people

8  whom I respect.  So I don't know if that's hearsay or not.

9     Q.  So there's a committee that investigates, are

10 you aware of that?  Under that policy, there's a faculty

11 committee?

12    A.  Yeah.

13    Q.  And they investigate?

14    A.  Yes.

15    Q.  They're told what to investigate, is that right?

16    A.  Well, when I was Senate President, we presented

17 them with a concern, the complaint.  And it depends.

18 Sometimes it's another faculty member complaining against

19 a faculty member.  More often, it's students.

20        And you simply say to them, this is what

21 happened.  We need you to gather information.  And that's

22 tricky.  I mean there was once instance, you probably know

23 about, with Professor Fleming that, you know, a committee

24 worked for a long time, and then the Academy couldn't use

25 it, because it was so prejudicial.  There hadn't been

Appx1485

Page 221

1  enough guidance, in how that would work, and it just went

2  off the rails.  So --

3      Q.  Okay.  You know Vice Provost Phillips?

4      A.  Yes.

5      Q.  Yes?  Well, excuse me.

6      A.  Uh-huh.

7      Q.  And how long have you know Provost Phillips?

8      A.  Since he came.  I forgot what year he came, but

9  I was Senate President, when he came.  So I got to know

10  him.  I don't want to say very well.  He's a Dean.  We

11  didn't hang out together.  But I met with him every week,

12  every two weeks for Senate issues.

13      Q.  Okay.

14      A.  Uh-huh.

15      Q.  And did you ever have occasion to discuss my

16  client with Provost Phillips?

17      A.  I've had discussion to discuss your client with

18  a whole lot of people, in my time at the Academy.  And

19  yes, I have.  I talked to Dean Phillips about him.

20      Q.  Okay.  And did -- has Dean Phillips ever said

21  anything to you, about his views on Professor Fleming?

22      A.  Yes.  But he didn't say anything to me, that he

23  hasn't said to everybody else.  He doesn't think -- well,

24  that first year that he was there -- actually, what was

25  it, the first month or the first two weeks Phillips was

Appx1486

Page 222

1   there, he took back Bruce's pay step, that the English

2   Department had given him.  And I remember saying to Dean

3   Phillips, boy if you had asked for my advice, which of

4   course he didn't do, before you did that, I would have

5   told you not to do it.  You don't take back a pay step,

6   especially not in your first two weeks on the job.

7        As Bruce had just published an article in the

8   Capital, pointing out some flaws in the Academy, he said

9   Professor Fleming is not a good role model.  Therefore he

10  doesn't deserve this pay step.  Yeah.  Very clear that

11  Dean Phillips take issue, with much of what Bruce says and

12  does.

13       Q.  And that's been since his arrival --

14       A.  Yes.  From -- right, from my perspective, yes.

15       Q.  Okay.  Have you ever talked to anyone else in

16  the Academy's leadership -- well, let me rephrase.  Have

17  you had occasion, in your 29 years at the Academy, to

18  discuss Professor Fleming, with any of the Superintendents

19  of the Academy?

20       A.  Oh, sure.  Sure.  Admiral Rempt, Admiral Fowler,

21  Admiral Miller.  So the three Superintendents before this

22  current one, all of whom I was very fond of.  I had nice

23  working relationships with all of them, especially Fowler

24  and Miller.

25       I guess I can stop saying from my perspective,

Pleading Number : 2019039531        Submission date : 2019-09-27 15:26:28        Confirmation Number: 1466219108        page 293 of 359

Appx1487

Page 223

1  because you know that, because I'm the one talking, right?

2  That they had a blind spot, when it came to Bruce.  When I

3  first met Admiral Rempt, I'm giving the image to everybody

4  I -- as sort of a western kind of a fellow.  And you could

5  almost kind of see him pulling up his suspenders, and

6  saying that Bruce Fleming is going to -- you know, I'm

7  going to put him in his place.

8        And again, he -- as I say, they were all good

9  men, but from a military standpoint, they should just --

10  they think he should shut his mouth, and not talk.  And if

11  it's such a bad place, why doesn't he just leave?  Every

12  single one of them would have been happy -- him to stop

13  talking, or they could have gotten him to leave.

14        And we talked about it.  I mean I talked about

15  it with each of them.  And I said to each of them, have

16  you ever considered the approach of instead of trying to

17  push him away, bring him in, put him on the privy council,

18  like Queen Elizabeth would have done or something?  Use

19  what he's saying -- but that's a civilian mindset.  That's

20  not a military one.  And that's partly why we're in this

21  room.  Right?

22     Q.  You've known Professor Fleming since your

23  arrival at the Academy?

24     A.  Yeah.

25     Q.  And in all fairness, I will represent to the

Pleading Number : 2019039531        Submission date : 2019-09-27 15:26:28        Confirmation Number: 1466219108        page 294 of 359

Page 224

1   Court, that you two are friendly.

2       A.  Yeah.  For the years I was there, he wasn't

3   anything by a colleague, but then oddly enough, when I

4   became Chair, we became friends.  I think it's because he

5   had a baby that year, and, you know, that gave us -- but

6   yes, I'd say we've been friends for 15 years.

7       Q.  Okay.  And are you here today, because you're

8   his friend?

9       A.  Oh, no.  On, no.  I'm not here, because I'm

10  friend.

11      Q.  Other than me putting your name on a list, and

12  Mr. Cook telling you you had to come, why are you here

13  today?

14      A.  Because I think it's important to be here.

15  Because I think it's important, that the faculty have a

16  voice, in how complaints against them are handled.  I --

17  the way Bruce has been handled has been wrong.  And I feel

18  like I'm in a position, to say something about that.  And

19  so that's why --

20      Q.  I'm sorry.  You said you think you're in a

21  position, to say something about that?

22      A.  Right.

23      Q.  Is that because of the experience you have?

24      A.  Right.  And part of what has bothered me about

25  this whole process, is that we've taken a snapshot of

Appx1489

Page 225

1  Bruce, you know, that's about this big.  Well, he's

2  provided one snapshot.

3          But the -- you know, I've read over the years --

4  I was doing the math the other day.  I teach English.  So

5  I'm not good at math.  But I've read about 1,000 of his

6  student evaluations over the years.

7          They're extraordinary.  90% of them say this

8  class is interesting.  He cares about us.  He makes us

9  think.

10         He gets bad evals, but so do a number of other

11 people.  But the majority of his students over the years -

12 - and I've either been on the -- Chair and I've had to

13 write his fit reps.  I've read -- I did the math.  It's

14 almost 1,000 of them, I have read over the years.  They

15 are absolutely glowing.

16         Some people don't like him.  You know, I've told

17 him I don't know that I like him, as a professor

18 necessarily.  But I'm -- you know, fully 90% of students

19 think he's just extraordinary, and are glad that he

20 challenges them, and that he's in such good physical

21 shape.

22         Some of them say -- the Academy, or if he's got

23 such problems with them, but that's not the majority.  And

24 so that was part of my concern.  Of course, when any of us

25 get caught, in this kind of a trap, we're looked at in

Pleading Number : 2019039531        Submission date : 2019-09-27 15:26:28        Confirmation Number: 1466219108        page 296 of 359

Appx1490

1  this small of a frame, and he's way more than just that

2  little piece in this frame.

3          MR. EHRENBERG:  If I just have one moment?

4          JUDGE SYSKA:  Certainly.

5  BY MR. EHRENBERG:

6      Q.  Would it be fair to say, that you don't believe

7  that Professor Fleming should have been removed from his

8  employment?

9      A.  Oh, if you hadn't asked me that question, I

10  would have found to say to -- a way to say it.

11  Absolutely, he should have not been removed.  The Academy

12  went from I think the most severe, whatever he ever had,

13  was a Letter of Reprimand.  That to firing.

14          Again, because they just assumed he can't be

15  rehabilitated, because he doesn't want to be

16  rehabilitated, and doesn't think he needs to be

17  rehabilitated.  I mean that was the language.  But they

18  went from a Letter of Reprimand to firing him.

19          And they invoked this use of the Douglas

20  Factors.  I don't know if we've talked about those Douglas

21  Factors yet.  But no one, not one Chair, not -- knew what

22  these Douglas Factors -- and I've had to write Letters of

23  Reprimand myself, when I was Chair.

24          I asked other Chairs.  We've never even heard of

25  these Douglas Factors, that popped up in the letter, in

Page 227

1  which Professor Fleming was told, you know, that he was

2  being shown the door -- administrator, as a Faculty Senate

3  President, when I was getting committees together, I never

4  had access to these Douglas Factors that said, now you

5  need to look at these things, because when we go to fire

6  someone, this is what you're going to be looking at.

7        In this committee I just served on, Complaints

8  Against Faculty Members, when we asked the Dean, and we

9  interviewed the Dean, now what do you want us look like?

10  The Dean want us to look at.  The Dean never said well,

11  make sure you pay attention to the Douglas Factors.  So I

12  don't know where they came from.

13        And -- so no, he shouldn't have been fired.

14  That is not to say that I agree, with every single thing

15  he does in his classroom, but that's not the point.  The

16  firing did not follow the Academy's own instruction.

17        And as I say, it went -- he went from a Letter

18  of Reprimand to getting fired.  And it wasn't -- and maybe

19  this is going to be hearsay, but of course we're talking

20  about this at the Academy.  Even people who wish Bruce

21  would stop saying what he says, don't think he should have

22  been fired.

23     Q.  Are you aware of the nature of the allegations,

24  that were levied against Bruce?

25     A.  Uh-huh.

Pleading Number : 2019039531        Submission date : 2019-09-27 15:26:28        Confirmation Number: 1466219108        page 298 of 359

Appx1492

1    Q.  Professor Fleming?

2    A.  Uh-huh.

3    Q.  So you're aware that he is said to have sent a

4  picture of himself?

5    A.  I saw the picture.  Yeah.  Uh-huh.

6    Q.  And as a professor at the Academy --

7    A.  Uh-huh.

8    Q.  -- do you feel that that action was prohibited?

9    A.  I think it was ill-advised.  It wasn't

10  prohibited.  I don't think it was the smartest thing he

11  ever did, but no, not prohibited.  I mean good grief.

12        One of the things I had to get to used to

13  working at the Academy, is I'm always seeing people

14  walking around in work out stuff, which I don't like, but

15  it's part of the culture.  I'm serious about that.  When I

16  first got to the Academy, and realized I was going to see,

17  sorry, sweaty men in their, you know, running clothes

18  walking up and down the hallway, I thought oh, geez.  But

19  it's part of the culture.

20        As I said, I don't think it was the best idea he

21  ever did, but no, it's not prohibited.  It's a workout

22  photo.  We see people working out all the time.

23    Q.  Do you know whether or not Professor Fleming

24  works out?

25    A.  Of course he works out.

Page 229

1    Q.  That was a precursor, to the next question.

2    A.  Okay.

3    Q.  Do you know whether Professor Fleming works out,

4  in proximity to midshipmen?

5    A.  Oh, sure he does.  A lot of faculty do.  A lot

6  of faculty do.  I don't know how they do it, but, you

7  know, they talk about oh, yeah, we were over there

8  swimming.  Oh, I saw.  They see their students in the

9  locker room.  They see them.

10        This is both -- well, I don't talk to men about

11  this, but my female colleagues talk about screwing with

12  other people.  And right, it -- I don't know my colleagues

13  do it, but I know a number of them do.  They work out with

14  the mids, which seems like a horrible thing to me, but it

15  happens all the time.

16        JUDGE SYSKA:  Why horrible?

17        THE WITNESS:  I don't want to be sweaty, in

18  front of my students.  It just -- I mean I work out in a

19  gym, but I wouldn't want to do it with --

20        JUDGE SYSKA:  So it's not like there's anything

21  innately inappropriate?

22        THE WITNESS:  Oh, no, no.

23        JUDGE SYSKA:  Okay.

24        THE WITNESS:  I'm sorry.

25        JUDGE SYSKA:  All right.

Appx1494

1          THE WITNESS:  Oh, heavens no.  No, no, no.

2          JUDGE SYSKA:  Okay.

3          THE WITNESS:  No.  It's just -- it's me being

4     self-conscious.  I don't want to be around students in my

5     workout gear.

6          MR. EHRENBERG:  That's all I have, sir.

7          JUDGE SYSKA:  Okay.  Cross?

8          MR. COOK:  Thank you, Your Honor.

9                    CROSS-EXAMINATION

10    BY MR. COOK:

11         Q.  Professor Drew, would you agree that the faculty

12    are role models and mentors to midshipmen?

13         A.  Yes.

14         Q.  And part of being a role model, is to support

15    the Naval Academy mission to develop midshipmen morally,

16    mentally and physically?  Is that true?

17         A.  Absolutely.  Absolutely.

18         Q.  Dignity and respect?

19         A.  Yes.

20         Q.  To tell the truth?

21         A.  Sure.  Of course.

22         Q.  You mentioned that you know the charges against

23    Professor Fleming?

24         A.  Uh-huh.

25         Q.  Okay --